**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>ECTOR COUNTY ENERGY CENTER LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 22-_____ (__) |

**DECLARATION OF JOHN BAUMGARTNER, CHIEF**
**RESTRUCTURING OFFICER, IN SUPPORT OF CHAPTER 11**
**PETITION, FIRST DAY MOTIONS, AND RELATED RELIEF**

I, John Baumgartner, hereby declare under penalty of perjury:

1.       I am a Managing Director of Grant Thornton LLP ("Grant Thornton").  I am based in Houston, Texas. Grant Thornton is the United States member firm of Grant Thornton International Ltd, one of the world's leading organizations of independent audit, tax and advisory firms. Grant Thornton was engaged to provide financial advisory services and initially retained by Ector County Energy Center LLC ("ECEC" or the "Debtor") on or about September 8, 2021. During January 2022, the engagement was modified to provide the Debtor with a Chief Restructuring Officer ("CRO"), as well as additional personnel to assist the CRO on an as needed basis. I have been designated as the Debtor's CRO.

2.       I have more than 17 years of experience with financial and operational restructurings, viability analyses, solvency analyses, valuation of assets and enterprises, asset divestitures, and due diligence. My background includes advising trustees, debtors, senior lenders, mezzanine lenders, and unsecured creditors of companies in a wide range of industries that

---

[1]  The last four digits of the Debtor's federal tax identification are 6852.  The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.  More information about the Debtor and this case is available on the website maintained by Donlin, Recano & Company, Inc., the Debtor's proposed claims and noticing agent, at www.donlinrecano.com/ecec, or can be requested by e-mail at ececinfo@donlinrecano.com.

include power and utilities, real estate, healthcare, retail gas marketing, retail power marketing, midstream energy companies, web hosting/e-commerce, transportation, and retail services. Before I became a consultant, I spent two years with Reliant Resources in the wholesale power acquisition, development and management group.   Within Grant Thornton, I have been the primary person overseeing the tasks associated with the Debtor's restructuring efforts.

3.      Based on my work as CRO and oversight of the work performed by Grant Thornton for the Debtor, I am generally familiar with the Debtor's day-to-day operations, business model, assets, liabilities, revenue and expenses, and other aspects of the Debtor's business.

4.      The Debtor, an operating company, is seeking a variety of relief pursuant to the provisions of the Bankruptcy Code in its concurrently filed "first day" applications and motions (collectively, the "First Day Motions") in order to ensure the continued operation of the Debtor's business during the pendency of this case and ultimately, maximize going-concern value.

5.      As duly authorized representative of the Debtor, I submit this declaration (the "Declaration") in support of the voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") filed on April 11, 2022 (the "Petition Date") commencing the above-captioned chapter 11 case (the "Chapter 11 Case"), and the relief requested in the various First-Day Motions described herein.

6.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtor's operations and finances; (b) information learned from my review of relevant documents, such as the Debtor's books and records as maintained in the ordinary course of business; (c) information supplied to me by Debtor's management team, advisors, contractors or employees of Grant Thornton working directly under my supervision; or (d) my opinion based on my experience, knowledge, and information concerning the Debtor's

operations, financial affairs, and restructuring initiatives.  References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters.

7.    If called upon to testify, I would testify competently to the facts set forth in this Declaration.

## PART I

## OVERVIEW OF DEBTOR'S BUSINESS AND OPERATIONS

**(a)    Debtor's Business, and Events Leading to Filing, Generally.**

8.    The Debtor is in the business of owning and operating a 330 MW natural gas-fired electricity-generating facility ("Power Plant") located on 32.5 acres of Debtor-owned land in Ector County, Texas, just outside of Odessa, that is part of the Permian Basin. The Debtor dispatches energy generated by its two natural gas fueled simple-cycle combustion turbines and related balance of plant equipment, all designed to enable the Power Plant to generate energy and respond quickly at times when demand is "peaking" and the market requires additional power supply.

9.    ECEC is licensed as a "power generating company" by the Public Utilities Commission of Texas or "PUCT," and is a participant in the competitive wholesale electricity market operated by the Electric Reliability Council of Texas ("ERCOT") as a "Qualified Scheduling Entity" ("QSE"), as described more fully below.  The Power Plant was placed in service on or about September 28, 2015 and has maintained ordinary course peaker[2] operations

---

[2] Peaker plants are power plants designed to balance the fluctuating power requirement in the electricity network and operate during periods of high level demand for electricity or shortfalls of electricity supply, such as during periods of extreme heat when air conditioning causes electricity usage to reach its highest levels.

since then, with one notable exception, during the extraordinary and prolonged cold weather event that occurred in February 2021 referred to as "Winter Storm Uri."

10.     The impact of Winter Storm Uri was felt throughout the Texas energy market. Other energy producing companies impacted by the storm opted to address challenges arising from the storm by engaging in asset disposition transactions. Those transactions revealed a seemingly strong M&A market for ERCOT power generation assets, indicating that investors have an interest in acquiring generation assets.  For example, Agilon Energy Holdings completed a robust bankruptcy court supervised sale process for its peaker plant during 2022 for a price of $439/kW.  In 2021, Temple Generation I, LLC sold its combined cycle gas turbine plant for $560/kW.

11.     ECEC had twice before tested the M&A market, undertaking sale exploration processes in 2016 and again in 2018.  Those processes, however, generated an insufficient level of interest to warrant engaging in a transaction. The most recent efforts in 2018 generated expressions of interest in amounts that were less than half the per-kilowatt price realized in recent power plant deals.  The apparent increase in market interest caused ECEC to conclude that again testing the market was warranted.

12.     ECEC was among the ERCOT industry participants negatively impacted by the storm.  As a result of Winter Storm Uri, ECEC was unable to procure natural gas needed to power its turbines for a period of several days when production systems that fed into the gas pipelines froze, effectively preventing the Debtor from dispatching power at a time of extreme demand.

13.     At the time of the storm, ECEC was party to a heat rate call option ("HRCO") which provided for the HRCO counterparty, Direct Energy Business Marketing, LLC ("Direct Energy"), to pay a monthly premium to ECEC for the right to call on ECEC to produce energy and various

quantities of ancillary services.  The unprecedented conditions of Winter Storm Uri resulted in ECEC being unable to deliver power or ancillary services, ultimately leading to the purported termination of the HRCO by Direct Energy in May, 2021, when Direct Energy disputed ECEC's assertion of a force majeure event. That purported termination was followed by Direct Energy commencing litigation in the New York Supreme Court asserting a claim for damages in excess of $400 million, of which $393 million was alleged to be owed for the month of February, 2021.

14.     Additional litigation arising from the impact of Winter Storm Uri was brought against ECEC and other utilities and market participants.  ECEC has been named as a defendant in approximately 113 personal injury and/or property damage tort claims currently pending in the Texas state court system.

15.     Following the purported termination of the HRCO, ECEC shifted from generating revenue under a pre-agreed pricing model to primarily operating as a merchant peaker plant selling power and ancillary services in the Day Ahead[3] and real-time markets. That shift resulted in uneven cash flow attendant upon changing from primarily a HRCO-driven revenue model with a contractually established stream of minimum monthly payments to selling energy in the ERCOT market based on competitive bid processes. The monthly expense burden resulting from the litigation relating to the purported HRCO termination and the over 100 personal injury and/or property damage cases has further caused uneven and difficult to predict cashflow.

16.     Given the apparent current market interest in ERCOT energy production assets, and the continuing expense and distraction arising from Winter Storm Uri and its fallout, ECEC determined that a concerted sale effort represented the best option to maximize and realize the

---

[3] As defined in the ERCOT Protocols.

Debtor's going-concern value for the benefit of the Debtor and its creditors. The Debtor also concluded that, as a practical matter, maximizing value also turned on affording a purchaser the comfort that it would receive title to the Power Plant free and clear of liens, claims, and interests which is attainable only through a sale under section 363 of the Bankruptcy Code. With a stalking-horse bid having been accepted following a period of substantial marketing efforts led by the Debtor's professionals, this case has been filed to achieve those results.

**(b)    Formation of the Debtor and Organizational Structure.**

17.    Formed in 2014 as a Delaware limited liability company and a wholly-owned subsidiary of non-debtor Ector County Energy Center Holding LLC, ECEC is one entity within a portfolio of energy generation and storage companies held, indirectly, by Invenergy Clean Power LLC. Within that structure, ECEC is among the group of gas-fired electric power plants owned through intermediate holding companies by Invenergy AMPCI Thermal Power LLC, a joint venture in which Invenergy Clean Power LLC and AMPCI North America Thermal Power Acquisition LLC each hold a fifty percent (50%) interest.

**(c)    The Power Plant and Market.**

18.    ERCOT functions as an independent system operator or "ISO," overseen by the PUCT and Texas legislature, bearing responsibility for management of the Texas Interconnection power grid.  Upon information and belief, as an ISO, ERCOT schedules power for more than 26 million electric customers over a network that contains approximately 52,000 miles of transmission lines and connects to more than 850 generation units, like ECEC.[4]

19.    Broadly, power generating companies sell electricity using ERCOT as an intermediary. Generated wholesale power is sold to retail electric providers or "REPs." Those

---

[4] It is my understanding that the natural gas market is overseen by the Texas Railroad Commission.

REPs work with Transmission and Distribution Service Providers or "TDSPs" to ensure that electricity reaches end-user customers.  I understand that ERCOT ensures that electrical supply equals demand in the market by regulating the power generated by various power plants, closely tracking and reporting projected capacity, demand, and reserves. Unlike other commodities, since electricity cannot be stored in significant quantities, it must be produced as and only when needed; electricity supply and demand within the State of Texas is constantly balanced by ERCOT.

20.    In addition to the contractual market in which generators, marketers and retail providers can enter into longer term contracts, the Texas energy market operates as a spot market in which electric generators sell electricity for purchase by load serving entities such as REPs. In the simplest sense, in Texas, power generators place offers with ERCOT to provide electricity and ancillary services to REPs for a particular time period, typically a day or hour ahead, indicating the minimum price at which they would agree to deliver.  Wholesale electricity is measured in megawatts ("MW"), and when delivered over a period of time, transactions are based on megawatt-hours ("MWh").

21.    ERCOT operates pursuant to certain rules known as "protocols" that establish a comprehensive set of rules that govern the ERCOT market and how market participants, including ERCOT, interact ("Protocols").

22.    During the Winter Storm Uri, in February 2021, the wholesale price of electricity was subject to ERCOT's "scarcity pricing" protocols, a mechanism that allowed market prices to increase under certain circumstances. This led to ERCOT setting prices at $9,000 per MWh during the emergency.  In contrast, the average price during 2020 for the ERCOT day ahead market was $22/MWh.

23.     In order to participate in the ERCOT market as a "Resource Entity," ECEC entered into a Standard Form Market Participant Agreement with ERCOT ("ERCOT SFA") dated April 1, 2015 which requires ECEC to abide by all ERCOT Protocols pertaining to its role in the market, such as the ERCOT Nodal Protocols. Through an amendment of the ERCOT SFA dated April 20, 2020, ECEC has qualified and is currently registered under the Protocols as a Qualified Scheduling Entity or "QSE," a Congestion Revenue Right Account Holder, and a Resource Entity. ECEC has posted cash security with ERCOT of approximately $540,000.

24.     Connected to the 138kV Holt Switching Station of the Oncor Electric transmission and distribution system, ECEC sells capacity and energy within the "ERCOT West" region.

25.     ECEC purchases the natural gas that fuels its turbines in the spot market from a select group of suppliers. One such supplier from which ECEC purchases gas is Sequent Energy Management, LP ("Sequent"). Once purchased, natural gas is transported under a *Gas Service Agreement* and related Customer Order with ONEOK WesTex Transmission LLC and delivered to the Power Plant via the ONEOK WesTex Transmission Pipeline, part of which was originally constructed for ECEC pursuant to a *Facility Construction, Ownership, and Operating Agreement* with ONEOK WesTex Transmission, L.L.C. If necessary, natural gas purchased by ECEC can be temporarily stored by ONEOK Texas Gas Storage pursuant to a *Storage Service Agreement and Service Order* which allows ONEOK Storage to enter into storage service with ECEC through the use of Service Orders for injection, storage, and withdrawal of gas. Sequent is holding a prepetition cash deposit of $1 million.

26.    Pursuant to a Contractual Service Agreement, General Electric International, Inc. ("GEI") is responsible for inspection, maintenance, and repair of the turbines and related equipment through the earlier of the "Performance End Date" or September 12, 2034.[5]

27.    The Debtor has no employees, but instead relies on certain non-debtor affiliates for the day-to-day operation of the Power Plant. First, ECEC has contracted with Invenergy Services LLC ("Invenergy Services"), an affiliate, pursuant to an *Energy Management Agreement* dated November 2, 2017 ("EMA"), to act as ECEC's "energy manager," to generally provide energy management, fuel management, and power management services to ECEC as participant in the ERCOT market.

28.    As part of this arrangement, as discussed in Part III below, Invenergy Services has agreed to schedule and offer power and ancillary services to ECEC.  The arrangement covers participation in the Day-Ahead Market, Ancillary Services Market, and Real-Time Market,[6] with Invenergy Services acting as "QSE Agent" on behalf of ECEC.  Staffing to provide these functions is made available by Invenergy Services.

29.    The administration of all project agreements and general operation, maintenance and oversight of the Power Plant, including oversight and inspection of all maintenance work undertaken by GEI, is conducted by Invenergy Services Thermal US LLC ("Invenergy Thermal")[7] on ECEC's behalf pursuant to a *Facilities Management Agreement* dated November 25, 2014 (the "FMA").  Pursuant to the FMA, as of the Petition Date, ECEC is obligated to pay a

---

[5] The Contractual Services Agreement defines the Performance End Date as "for each Covered Unit, the date that is the later of either (a) the first to occur of 48,000 Factored Fired Hours of operation or 1800 Factored Starts for that Covered Unit or (b) completion of the second (2nd) Gas Turbine Hot Gas Path Inspection on the second Covered Unit to have its second Gas Turbine Hot Gas Path Inspection during the Term hereof."

[6] All as defined in the ERCOT Protocols.

[7] As assignee of Invenergy Services LLC.

management fee to Invenergy Thermal in the amount of approximately $24,520 per month, as well as a monthly administrative expense fee which reimburses Invenergy Thermal for human resources, IT and accounting services provided to ECEC. Ector is also required to reimburse Invenergy Thermal for all labor and other overhead charges and expenses incurred on behalf of ECEC as a form of "Shared Services Agreement," as more fully discussed in Part III below, in arrears.

30. All labor is provided directly to ECEC either by employees of Invenergy Thermal under the FMA, or by employees of Invenergy Services under the EMA.

**(d)    Winter Storm Uri and Market Disruption.**

31. As of February 2021, a significant portion of ECEC's revenue was generated under the HRCO, embodied in an ISDA 2002 Master Agreement and associated Transaction Confirmation with Direct Energy dated October 18, 2017. Through the HRCO, Direct Energy committed to pay ECEC a monthly charge for an option to call production of power or ancillary services, based on then-current market conditions. The Debtor issued a letter of credit in Direct Energy's favor in the amount of $7 million in connection with execution of the HRCO (the "Direct Energy LC").

32. Unlike at any point over the first three years of the HRCO, the conditions that Winter Storm Uri brought to the State of Texas and the impact on the energy industry from February 12-23, 2021, including spikes in electricity demand and scarcity pricing imposed by ERCOT, gave rise to a chain of events that have posed challenges for ECEC.

33. Press and industry reports indicate that Texas Governor Greg Abbott declared a state disaster for all Texas counties on February 12, 2021 and that colder-than-forecasted weather caused electricity demand to be approximately 20% higher than ERCOT's day-ahead electricity

load forecast. The increased electricity demand caused real-time electricity prices to settle well above day-ahead electricity prices for several days.  By overnight of February 14, 2021 into February 15, 2021, energy demand in the ERCOT market exceeded available supply.

34.     It is my understanding and recollection that on February 15, 2021, ERCOT and the PUCT took emergency measures in an attempt to preserve the reliability of the grid. ERCOT issued an Energy Emergency Alert 3 ("EEA3") and ordered curtailment over 10,000 MW of firm load, resulting in rolling blackouts across the state of Texas. In an effort to trigger an increase in production to balance a grid experiencing outages and loss of key-voltage, the PUCT issued an order instructing ERCOT to set electricity prices at $9,000 per MWh, using an adjustment to ERCOT's "Real-Time Reliability Deployment Price Adder."  ERCOT remained in EEA3 with the real-time settlement price set at $9,000/MWh until after 9:00 a.m. on February 19, 2021 (the "Adjusted Market Price").

35.     It is also my understanding that, during that period, Direct Energy called on ECEC to perform under the HRCO. Because frozen gas production facilities severely curtailed gas deliveries into the pipelines that were able to operate during the storm, ECEC was unable to procure the natural gas necessary to generate power or schedule ancillary services. I understand that ECEC issued a notice to Direct Energy on February 13, 2021 of a "force majeure" event that lasted through February 23, 2021. Direct Energy has disputed the force majeure event, purportedly terminated the HRCO, and sued ECEC in New York Supreme Court seeking to recover approximately $403 million, including approximately $393,409,000 that Direct Energy calculates as allegedly owing to it under the HRCO for February 2021. Upon information and belief, this litigation is in the early stages.

36.     In addition, ECEC has been named as a defendant in approximately 113 cases initiated by various Texas residents asserting personal injury and/or property damage claims against power generators and other companies in connection with Winter Storm Uri.  These cases are proceeding in the *In re Winter Storm Uri* Multi-District Litigation ("Texas MDL") in Texas.

37.     Because ECEC was operating in February, 2021 as a QSE under its ERCOT SFA Agreement and ERCOT Protocols incorporated therein by reference, ECEC was assessed a charge in an unquantified amount to be allocated by ERCOT over as many as thirty years.  That charge is purportedly for ECEC's alleged share of the so-called Default Uplift Charges,[8] calculated by ERCOT using a load-ratio based assessment spread across QSEs and other market participants.

**(e)     Historical and Projected Financial Performance.**

38.     Since the purported termination of the HRCO, the Debtor has generated revenue primarily from sale of its energy output as a merchant peaker plant into the ERCOT Day-Ahead Market and Real Time Market along with from offering Ancillary Services based on competitive bid processes. In the latter market, generators like ECEC essentially make themselves available for sudden deployment in an electric grid emergency to maintain grid stability and security.  Prices for Ancillary Services typically mirror the rise and fall of prices in the Real-Time energy market.

39.     It is my understanding that the Day-Ahead Market is a voluntary, financially-binding forward energy market through which market participants commit to buy electricity, and electricity producers commit to sell the ordered electricity to satisfy the buyer's commitment, one day before the operating day. The pricing is nodal, based on hourly pricing, and is invoiced two business days after the operating day with payments due two days thereafter.

---

[8] As defined in the ERCOT Protocols § 9.19(1)(e).

40.     That operational shift from operating with the HRCO in place to sale of peak power and ancillary services has led to an uneven and difficult to project revenue stream.  Because the Debtor's operating expenses are largely driven by the costs of dispatching power, operating expenses are also subject to substantial volatility.

41.     ECEC's unaudited financial statements for the twelve months ending December 31, 2021 indicate normalized operating revenues of $22,974,152 and normalized operating expenses of $24,308,322 inclusive of $3,308,912 of depreciation expense, for EBITDA of $1,974,742. The normalized results were calculated by excluding the extraordinary impact of the asserted HRCO loss claim required to be reported in accordance with GAAP, but including the professional fees and other costs incurred in connection with the Debtor's prospective sale and restructuring. The Debtor reported total cash balances as of December 31, 2021 of $15.9 million, inclusive of the $7 million posted by the Debtor to collateralize the Direct Energy LC. Excluding those funds, the Debtor's ending cash position as of December 31, 2021 was approximately $8.9 million.

42.     The Debtor's audited financial statements for the twelve months ending December 31, 2020 reported operating revenues of $71.0 million, and EBITDA of $54.3 million. The Debtor's cash position as of year-end 2020 was $11.7 million.

43.     ECEC's unaudited financial statements for the two months ending February 28, 2022 reported operating revenues of $0.7 million, and EBITDA loss of $(1.9 million).  The Debtor's cash position as of February 28, 2022 was approximately $14.1 million, inclusive of the $7 million cash posted to collateralize the Direct Energy LC.

44.     On as cash basis, as of March 31, 2022, the Debtor collected gross receipts of approximately $2.1 million during the low shoulder months of January through March. This period historically represented one of the low points of the Debtor's revenue seasonality.

Projected cash flow for April through July 31, 2022 shows cash revenue of approximately $6.6 million. Company management anticipates strong revenue opportunities as the merchant peaker facility enters the summer peak months in ERCOT. Operating cash flow is projected for April to July to be approximately $0.1 million. While ECEC continues to maintain disciplined cost controls during this Chapter 11 Case, the Debtor's April 1, 2022 cash balance was $5.42 million. This balance excludes the $7.4 million held in a collateral account to secure the Prepetition Secured Lenders' potential exposure under the Direct Energy LC and the OneOK LC per the PSA (as defined below). The Debtor projects decreasing available cash due to non-recurring expenses during the Chapter 11 Case, resulting in ending cash balance of approximately $0.723 million as of July 31, 2022. This ending cash position includes anticipated draws of $5.0 million under a proposed debtor-in-possession financing facility more fully described below.

  **(f)**  **Secured Debt Obligations.**

  45.  As is described in the contemporaneously filed *Motion For Entry of Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* ("Cash Collateral Motion"),[9] the Debtor is a party to the Credit Agreement by and among ITOI, as borrower, the Debtor and certain of its non-debtor affiliates, each of the Prepetition Secured Lenders, and the Agent.

  46.  In accordance with the Credit Agreement as originally executed, the Prepetition Secured Lenders agreed to provide term and revolving funding to, and to issue and/or participate in Revolving Letters of Credit for the account of, ITOI. As of the Petition Date, the principal

---

[9] Capitalized terms used in this Subjection (f) shall have the meanings ascribed in the Cash Collateral Motion.

balance of approximately $337,319,920.82 was outstanding under the Term Loans ("Term Loan Balance"), and Revolving Letters of Credit totaling approximately $64,553,598.00 were issued and outstanding (the "Revolving Loan Balance"), exclusive of fees, interests, and other costs to which the Prepetition Secured Lenders are entitled pursuant to the Loan Documents.

47.     The Credit Agreement as originally executed as of August 28, 2018 expressly contemplated a potential Ector Disposition, and Section 3.20(b)(vii) of that agreement, as well as the amendment to that agreement executed on August 22, 2019, required that an "Ector Target Sale Amount" of $75,000,000 be applied as a mandatory prepayment of the Loans.  In conjunction with execution of the PSA, and to facilitate the transactions contemplated in the PSA, including the sale of substantially all of the Debtor' assets, that Credit Agreement provision was amended to require that the Debtor make a mandatory prepayment in that same $75 million amount upon the earlier of a change of control of ECEC and July 31, 2022.

48.     ECEC's obligations to the Prepetition Secured Lenders under the Credit Agreement are secured by a first-priority security interest in, and lien granted to the Agent for the ratable benefit of Prepetition Secured Lenders on, ECEC's real and personal property assets and the proceeds thereof. The Collateral Agent, on behalf of the Prepetition Secured Lenders, perfected the Prepetition Secured Lenders' security interests in Prepetition Collateral held by ECEC through the filing of UCC-1 financing statements with the Office of the Secretary of State for Delaware and a Transmission Utility Financing Statement with the Office of the Texas Secretary of State.

49.     Separately, the Prepetition Secured Lenders' security interests in cash and cash equivalents generated by ECEC was perfected under a Depositary Agreement. The Depositary Agreement provides the Collateral Agent, on behalf of the Prepetition Secured Lenders, a first

priority lien and control over ECEC's right, title and interest in, funds on deposit with the Depositary Bank in various "Collateral Accounts," maintained in the ordinary course. The Collateral Accounts maintained with the Depository Bank include an Ector Revenue Account, receiving all income and receipts generated through operation of the Power Plant, and an Ector Operating Account, from which certain of ECEC's operating and maintenance expenses are paid on a monthly basis, as well as a local account used to pay certain vendors providing services to the Power Plant.

50.     ECEC's obligations to the Prepetition Secured Lenders are also secured by a mortgage granted against ECEC's owned real estate assets and improvements and easement rights pertaining to the Power Plant property in Ector County, Texas, through a *Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing*, as amended on August 22, 2019, recorded by the Collateral Agent with the Public Records Office of Ector County, Texas.

**(g)     Other Trade and Miscellaneous Unsecured Debt.**

51.     The Debtor is subject to a disputed, unliquidated, unsecured claim for damages demanded by Direct Energy, as described above, in the approximate amount of $403 million; that obligation is partially backed by the Direct Energy LC.  Other unsecured claims include: (a) the disputed, unliquidated, claims alleged by the plaintiffs in the MDL, certain of which may potentially be covered by the Debtor's prepetition insurance policies; (b) the Default Uplift Charges due to ERCOT; and (c) accrued and unpaid trade and miscellaneous unsecured claims that accrued prior to the Petition Date in the estimated amount of approximately $600,000, exclusive of prepetition deposits funded in favor of certain suppliers.

**PART II**

**EVENTS LEADING TO THE CHAPTER 11 FILING, PREPETITION RESTRUCTURING EFFORTS AND THE PLAN SUPPORT AGREEMENT**

52.     The combination of the currently strong ERCOT M&A market in conjunction with the volatile cash flow as a result of the purported termination of the HRCO and the expense and distraction of approximately 113 litigation matters, including the action brought by Direct Energy seeking in excess of $400 million, led ECEC to conclude that it was appropriate to renew exploration of the M&A options available to maintain, maximize and assure realization of value for the benefit of all ECEC stakeholders. To that end, the Debtor hired an investment banker, a financial advisory firm, and restructuring counsel.

53.     In addition, a Special Committee of the Invenergy AMPCI Board of Managers, inclusive currently of an independent member, with delegated authority over all board-level decisions regarding ECEC, was appointed to oversee all decisions relating to ECEC and the potential means of addressing its challenges.

54.     After full consideration of market factors, extraordinary litigation related financial costs and personnel distraction, and seasonal trends in projected cash flow, ECEC, upon authority from the Special Committee and in consultation with the Debtor's advisors, elected to pursue a sale of ECEC or its assets through a marketing and diligence process spearheaded by Perella Weinberg Partners LP and Tudor, Pickering, Holt & Co. (collectively "PWP") as investment banker.

55.     The Debtor was further cognizant that concessions from and consent of the Prepetition Secured Lenders would become necessary in order to achieve any successful M&A transaction and accomplish the primary goal of ensuring that all creditor constituencies share in the benefits of a sale.

56.     Over the course of several months, the Debtor, through its professionals, engaged in negotiations with the Agent and an ad hoc group of the Prepetition Secured Lenders regarding the provisions of a Plan Support Agreement ("PSA"), a copy of which is attached hereto as Exhibit A.  As ultimately negotiated, the PSA provides the terms pursuant to which the Prepetition Secured Lenders will support ECEC in its undertaking a sale process geared towards closing a sale of substantially all of ECEC's assets by mid-summer 2022, and for the allocation and distribution of the net sale proceeds through a liquidating Chapter 11 plan. The PSA also contains terms for consensual use of the Prepetition Secured Lenders' cash collateral during the pendency of this case, as described in the Cash Collateral Motion. Further, the PSA evidences the Prepetition Secured Lenders' agreement to partially subordinate their liens and payment priority to post-petition financing to be provided by the Debtor's affiliate, ITOI, for which authority is sought in the DIP Financing Motion as defined and described below.  Finally, under the PSA, the Prepetition Secured Lenders agree to support minimum distributions of $5,000,000 to junior unsecured creditors, which amount may be materially higher depending on the outcome of the bid solicitation process to be undertaken in connection with the sale of the Debtor's assets.

     a.     **The Sale of Substantially All Assets**

57.     As contemplated in the PSA, and as described in the contemporaneously filed *Motion of Debtor for Orders (I)(A) Authorizing Debtor's Entry Into Asset Purchase Agreement, (B) Authorizing and Approving The Bidding Procedures, (C) Approving Procedures Related To The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving a Break-Up Fee and Reduced Break-Up Fee, (E) Approving The Notice Procedures, and (F) Setting a Date For The Sale Hearing; and (II) Authorizing and Approving (A) The Sale Of Certain Assets Free and Clear of All Liens, Claims, Encumbrances*

*and Interests, and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* ("Sale Motion"), after extensive arm's length negotiations between the Debtor and Ector County Generation LLC, an acquisition entity affiliated with Rockland Capital, LLC (the "Proposed Purchaser"), ECEC and the Proposed Purchaser executed an Asset Purchase Agreement providing for the sale of substantially all of the Debtor's assets.

58.     Pursuant to the terms of the Asset Purchase Agreement, the Proposed Purchaser has agreed to purchase the Debtor's assets for a purchase price of $91,250,000, subject to various potential adjustments set forth in the Asset Purchase Agreement, inclusive of $2.7 million in "Incentive Consideration" to be received if a closing occurs on or prior to July 31, 2022 and a dollar for dollar purchase price adjustment above a baseline of $550,000 in which those cash deposits identified as "Specified Cash Deposits" under the Asset Purchase Agreement left with the deposit holders post-closing for the benefit of the Proposed Purchaser are included. It is a condition to closing that the Debtor commence this Chapter 11 Case, with consent of the Prepetition Secured Lenders, and obtain a form of sale order that provides the Proposed Purchaser with the ability to acquire ECEC's assets free and clear of all liens, claims and encumbrances, pursuant to section 363(f) of the Bankruptcy Code.

**b.     Consensual Use of Cash Collateral**

59.     Obtaining the benefits of the Asset Purchase Agreement, however, requires that ECEC remain in operation through the duration of the Chapter 11 Case.  To that end, the PSA also addresses the terms under which the Prepetition Secured Lenders will consent to ECEC's use of cash and cash equivalents constituting the Prepetition Secured Lenders' collateral under the Credit Agreement.  As stated above, ECEC's post-petition operations and expenses are projected to result in a sizable diminution in cash between the Petition Date and a July 31, 2022 closing of

an all asset sale.  That diminution is largely driven by the current low demand season in the ERCOT market which reduces the opportunity to generate and sell power and costs of this Chapter 11 Case, including professional fees.  The downward cash trajectory would likely reverse were ECEC to remain in operation through August and September, as summer month demand for dispatch of energy with the attendant revenues continued.

60.     Under the terms of the PSA, which are reflected in the Cash Collateral Motion, the Prepetition Secured Lenders have agreed to the Debtor's use of cash collateral in accordance with the budget attached thereto as Exhibit B (the "Budget").  I personally participated in and oversaw all aspects of the preparation of the Budget that is attached to the Cash Collateral Motion. The Budget fairly reflects the projected revenues and expenses of ECEC for the period indicated.

61.     The Prepetition Secured Lenders have agreed, and the PSA provides, that ECEC may use cash collateral to pay the categories of expenses reflected in the Budget in the aggregate amounts set forth for each four-week period in the Budget, subject to a fifteen percent (15%) operating expense variance without consideration of fees of the Prepetition Secured Lenders' professionals, any committee's professionals, or draws from cash accounts securing issued letters of credit, and with timing variances accommodated by rolling unused operating expense Budget allocations into later periods.

62.     As adequate protection for the Debtor's use of cash collateral, ECEC has acknowledged, after due investigation, the enforceability of the Prepetition Secured Lenders' claims and the perfection of their liens, in each instance subject to a committee or other party-in-interest investigation period.  ECEC has also agreed to provide: (i) current payment of the fees and expenses incurred by the Prepetition Secured Lenders' professionals; (ii) various forms of periodic reporting; (iii) adherence to a series of Milestones largely relating to accomplishment of

various steps in the sale and plan processes; and (iv) senior liens on post-petition assets to secure superpriority claims that compensate the Prepetition Secured Lenders for any diminution in their prepetition secured position.

        **c.**      **Lender Consent to DIP Financing.**

63.    The Budget also indicates that ECEC has insufficient liquidity to maintain operations through a projected July 31, 2022 closing absent post-petition financing. ECEC's gas suppliers generally require a cash deposit or letter of credit as a condition to supplying ordered fuel. Current market volatility with resulting increased gas prices and an attendant increase in the amount of required cash deposits have resulted in a projected strain on ECEC's liquidity.

64.    ECEC's debt structure posed substantial challenges to locating and structuring post-petition financing. The Credit Agreement renders ECEC jointly and severally liable for, as of the Petition Date, approximately $340 million in senior secured Term Debt owed to lenders not favorably disposed towards subordinating their claims or liens. At the same time, the $5 million projected amount of ECEC's post-petition funding need, coupled with a projected inability to repay a post-petition loan until and unless a section 363 sale closes, made the financing unattractive for most potential lenders.

65.    The Prepetition Secured Lenders were unwilling to directly extend the required post-petition financing in part because their prepetition borrower was not ECEC, but instead was ITOI as backstopped by the credit enhancement provided by the various guarantors, including ECEC. Although the post-petition financing required by ECEC to succeed in pursuing a sale of its assets through a section 363 sale could not be made directly by the Prepetition Secured Lenders, an indirect route was supported by the Lenders, and achieved.

66.    The PSA provides the Prepetition Secured Lenders' consent to ECEC receiving post-petition financing from ITOI--one of its intermediate parent company affiliates, and the borrower of the Prepetition Secured Lenders.   Under the terms of the proposed debtor-in-possession financing (the "DIP Financing"), as described more fully in the pending *Motion of the Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing Secured by Priming Liens, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, (the "DIP Financing Motion," discussed below), ITOI will make available a $5 million multi-draw term loan for working capital needs in accordance with the Budget including, but not limited to, for payment of cash deposits to gas providers or letter of credit providers in connection with natural gas purchases.  The loan matures on the earliest of (i) the plan effective date, (ii) the occurrence of an event of default, or (iii) eight months after the entry of a final order approving the DIP Financing.  No payments will be due until maturity.  The outstanding principal balance will bear interest at SOFR plus three and one-half percent.

67.    Under the PSA, the Prepetition Secured Lenders have agreed to accommodate a partial priming position for the DIP Financing. The PSA envisions, and the proposed DIP Financing provides, that ITOI's lien and payment right will be subordinated to $55 million of the Prepetition Secured Lenders' claim and lien, but senior to the balance of the Prepetition Secured Lenders' claims and liens. The lien granted to ITOI will encumber substantially all assets of ECEC.   Under the Credit Agreement, ITOI's interest in the DIP Financing will constitute collateral for the Prepetition Secured Lenders' claims.   Consistent with the already existing pledge, the PSA provides, and the documents relating to the DIP financing provide, that, upon a default by ECEC in its obligations under the DIP Financing, ITOI will assign its interest in the

22

DIP Financing to the Prepetition Secured Lenders, and those lenders, through the Agent, will become the holder of the DIP Financing.

68.      I have contacted three entities that I know to be in the business of extending post-petition financing to chapter 11 debtors. After inquiry, none of these three entities indicated a willingness to provide post-petition financing to ECEC, much less financing on terms as beneficial to ECEC and its creditors as the terms offered by ITOI.

### d.      Liquidating Chapter 11 Plan Support.

69.      The PSA also provides for the Prepetition Secured Lenders to support both the funding and confirmation of a liquidating chapter 11 plan.  The PSA provides that, not only will the DIP Financing be repaid after the Prepetition Secured Lenders receive $55 million towards what is arguably a nearly $340 million claim, but that the unsecured creditor class will receive a $5 million allocation of funds (the "Unsecured Creditor Allocation") for *pro rata* distribution under a plan and an amount of up to an additional $5 million will be set aside to complete administration of the post-effective date Chapter 11 Case (the "Wind-Down Reserve"), including finalizing the claims resolution process, engaging in any appellate cases that might arise, paying U.S. Trustee fees and, ultimately, seeking entry of a final decree and order closing the case. Following the Prepetition Secured Lenders receiving $55 million and the funding of the approximately additional $15 million for the DIP Financing, the Unsecured Creditor Allocation and Wind-Down Reserve, the Prepetition Secured Lenders have agreed to limit their recovery under the Plan toward their Term Debt to receipt of the next $20 million plus fees and expenses, with any balance of the Debtor's funds being distributed to unsecured creditors until paid in full. The Prepetition Secured Lenders have also agreed to limit their recovery from ECEC towards the

Revolving Loan Balance to the balance of cash collateral for the Direct Energy LC and the ONEOK LC remaining on deposit in a segregated account as of the plan's effective date.

70.     After full consideration of market factors and upon consulting with the Debtor's advisors, ECEC, upon authority and direction of the Special Committee, elected to initiate the Chapter 11 Case to pursue a sale of the Power Plant to the Proposed Purchaser or the highest bidder identified in a post-petition process to be conducted with authority of this Court pursuant to section 363 of the Bankruptcy Code, with the net proceeds to be distributed to ECEC's creditors under a to-be-filed liquidating chapter 11 plan.

71.     It is my belief that the commencement of this Chapter 11 Case establishes a clear path to sell the ECEC Power Plant and associated business as a going concern while maximizing the value to be shared among the Debtor's various secured and unsecured creditor constituents.

72.     In order to ensure that the Debtor is able to maintain its operations without disruption pending the closing of a sale and throughout the extended marketing period, however, the Debtor requires a variety of standard relief on the "first-days" of this case, described below.

## **PART III**

### **FIRST-DAY MOTIONS AND RELATED RELIEF**

73.     The Debtor is requesting Court approval of the First Day Motions and entry of the related orders (the "Proposed Orders") in furtherance of its restructuring and preservation of going-concern value, pending sale closing.  Each of the First Day Motions and Proposed Orders has been filed with the Court on the Petition Date.

74.     Prior to submitting this Declaration, I closely reviewed and became familiar with the contents of each First Day Motion (including the exhibits attached thereto), and based on my knowledge of the Debtor's operations and information obtained while serving as CRO, it is my

belief that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element in achieving a successful restructuring of the Debtor; (c) best serves the Debtor's estate; and (d) is, in those instances where the relief seeks immediate access of funds or payment of prepetition amounts, necessary to avoid immediate and irreparable harm to the Debtor's estate.

1.   **Case Funding Motions**.

(a)   **Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "Cash Collateral Motion").**

75.   The Cash Collateral Motion seeks authority to use certain of the cash constituting the collateral of the Prepetition Secured Lenders for the purpose of meeting operating expense obligations, paying the costs associated with these proceedings, and satisfying those payments authorized or directed by this Court, in accordance with the Budget.  That authority is sought initially on an interim basis to the extent necessary to avoid irreparable harm and then, after conduct of a final hearing, on a final basis.  A general overview of the terms of the proposed use of cash collateral and the conditions of the Prepetition Secured Lenders' consent as well as the adequate protection to be provided is set forth in the PSA attached hereto as Exhibit A.

76.   As more fully set forth in Section II(b) above and in the PSA, with limited exceptions for deposits held by third-party providers, all cash and cash equivalents of ECEC are subject to interests held by the Prepetition Secured Lenders.  The Debtor, therefore, has no ability to fund post-petition operations absent access to Cash Collateral.[10]

---

[10] Capitalized terms not otherwise defined in this Part III shall have the meanings ascribed in the respective First-Day Motion referenced.

77.     The Cash Collateral will be used for the purposes and in the aggregate amounts set forth in the Budget, subject to the negotiated fifteen percent (15%) variance in the total operating disbursement budget line for the applicable four week period.  Making the payments contemplated in the Budget is necessary to sustain the Debtor's operations and maintain the Debtor as a going concern.  Continued operations are critical to maximize the value to be received in the sale transaction for which authority is sought through the Sale Motion. ECEC is coming into its seasonal period of highest demand and resulting high point in annual revenue generation. Under paragraph 7.1 of the Asset Purchase Agreement, ECEC is required to, and it is a condition to the Potential Purchaser's obligation to close that it, "conduct the Business in the Ordinary Course of Business" from the Asset Purchase Agreement's execution through the Closing Date.  The failure to maintain ECEC's business in the ordinary course, therefore, will jeopardize the sale transaction around which the success of this Chapter 11 Case is centered.

78.     Of the expenses projected in the Budget for the April 11, 2022 Petition Date through April 30, 2022, approximately is $331,200 is projected for operating expenses, and $820,835 for fuel purchases necessary to maintain operations and provide power dispatch.  The failure to make those budgeted payments will be more likely than not to cause irreparable harm to ECEC and its creditors.

79.     Based on the foregoing and other factors described in the Cash Collateral Motion, I believe the relief requested in the Cash Collateral Motion is in the best interests of the Debtor and its creditors.

 **(b)**  **Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Secured Post-Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief (the "<u>DIP Financing Motion</u>").**

80. Through the DIP Financing Motion, the Debtor requests entry of an order authorizing it to obtain post-petition financing from its affiliate, ITOI, under the terms of a financing agreement affording ECEC a $5 million multi-draw term loan facility under the terms of the DIP Credit Agreement evidencing the parties' respective obligations regarding the DIP Financing.  The DIP Financing will mature on the earlier of the effective date of a liquidating chapter 11 plan, the end of the eighth month following the Petition Date, or the occurrence of an event of default.  The Debtor is not requesting interim relief regarding the DIP Financing Motion, and requests instead that the Court schedule a Final Hearing to consider the relief requested therein.

81. As more fully set forth in Section II(c) above, the Debtor's operationally generated liquidity is projected to be insufficient to sustain operations through an anticipated July 31, 2022 closing of the sale transaction. That anticipated cash shortfall is largely a function of a recent increase in natural gas prices and the anticipated demands of gas suppliers for cash deposits or other costs associated with procuring fuel.

82. The Debtor's affiliate, and the borrower under the Credit Agreement to which the Agent and the Prepetition Secured Lenders are counterparties, ITOI, has agreed to provide the needed financing on favorable terms, including a below market interest rate of SOFR plus 3.5% with no payments due until maturity and a lien position and payment right subordinated to $55 million of the existing senior debt of the Prepetition Secured Lenders.  Those Prepetition Secured Lenders have agreed to accommodate the DIP Financing by agreeing to subordinate their payment

right to all but $55 million of what they assert is the Debtor's joint and several liability for the approximately $340 million in Term Debt due under the Credit Agreement and their senior lien position securing that claim.

83.     As the Budget indicates, without the proposed DIP Financing, ECEC would be unable to sustain operations through a July 31, 2022 closing date of the sale transaction. The DIP Financing has been sized in an amount no greater than is necessary to sustain operations. Without the DIP Financing, the Debtor would be unable to meet its post-petition obligation to pay operating expenses and the costs of the Chapter 11 Case, likely resulting in cessation of operations and loss of the asset sale transaction around which this Chapter 11 Case is centered.

84.     Based on the foregoing, and as described in the DIP Financing Motion, I believe the relief requested in the DIP Financing Motion is in the best interests of the Debtor and its creditors and, accordingly, submit on behalf of the Debtor that it should be approved.

**2.     Operations-Related Motions.**

**(a)     Motion of Debtor for Entry of an Order Providing Adequate Assurance of Utility Payments ("Utilities Motion").**

85.     Pursuant to the Utilities Motion, the Debtor seeks entry of an order prohibiting utility companies (collectively the "Utilities" or individually a "Utility") from altering, refusing, or discontinuing services to the Debtor on account of prepetition invoices; (ii) authorizing and approving the amount and method by which the Debtor may furnish certain Utilities with adequate assurance of payment for post-petition utility services and directing the Utilities to continue providing such services pending entry of the Final Order; and (iii) scheduling a final hearing on this Motion within 30 days of the Petition Date (the "Final Hearing").

86.     Several Utilities provide the Debtor with traditional utility services, such as telecommunications services, electricity, water, and other similar services that are necessary for

the continued operation of the Debtor's day-to-day business operations.  A nonexclusive list of Utility Providers is attached to the Utility Motion as Exhibit.  The Debtor has made a good-faith effort to identify all Utility Providers and list them on the Utility Providers List.

87.     On average the Debtor spends approximately $16,130 each month for third-party Utility services, calculated as a historical payment average for the 12 months preceding the Petition Date. To provide adequate assurance of payment, the Debtor proposes to deposit an Adequate Assurance Deposit of $16,130 to be held in the Deposit Account, which represents an amount equal to approximately one month of the Debtor's average monthly utility service costs; this account will not be considered to be the cash collateral of the Prepetition Secured Lenders or DIP Lender.  The Adequate Assurance Deposit is included in the Budget.

88.     I believe that the proposed protocol for Utility Providers to request release of a portion of the Adequate Assurance Deposit on account of any post-petition payment default by the Debtor, as well as for Utility Providers to request an additional Adequate Assurance Deposit, is appropriate to protect the Utility Providers from further loss, while preventing termination of service.

89.     Should any Utility refuse or discontinue service, such refusal could jeopardize the Debtor's ability to maintain the value of its business and result in irreparable harm to the Debtor and its estate.  Accordingly, it is essential that the Utility Motion be granted.

**(b)     Motion of Debtor for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Utilizing Its Cash Management System, and (B) Maintain Existing Bank Accounts and Business Forms; (II) Waiving Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief ("Cash Management Motion").**

90.     Through the Cash Management Motion, the Debtor requests the entry of interim and final orders authorizing, but not directing, the Debtor to continue using its existing cash

management practices, bank accounts and business forms ("<u>Cash Management System</u>") and granting related relief.

91.     The Cash Management System is comprised of four bank accounts in the Debtor's name (the "<u>Bank Accounts</u>") held at two separate financial institutions, JP Morgan Chase Bank, N.A. ("<u>JP Morgan</u>") and Bank of New York Mellon ("<u>BNY</u>" and together with JP Morgan, the "<u>Banks</u>"). The cash on deposit with the Banks is FDIC insured, and JP Morgan is an approved chapter 11 financial institution (an "<u>Authorized Depository</u>") under the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "<u>UST Operating Guidelines</u>") published by the Office of the U.S. Trustee.

92.     Other than with regard to the recently-established JPM account that will hold the proceeds of DIP Financing in amounts and on terms as approved by the Court, the funds on deposit with the Banks are subject to the Prepetition Secured Lenders' security interest in the cash and cash equivalents generated by ECEC from operation of the Power Plant, as perfected under the Depositary Agreement, with regard to BNY, and a control agreement, with regard to JP Morgan.

93.     Prior to the Petition Date, the Debtor established the BNY Revenue Account for use by ERCOT in depositing settlement payments it receives on a daily basis. Closing the BNY Revenue Account, used primarily for this purpose, and re-opening a new revenue account, particularly without the consent of the Prepetition Secured Lenders, with a sale in progress could jeopardize the Debtor's liquidity, to the detriment of all constituents.  Just as important is the requirement under the terms of the PSA, discussed above, and as a condition for consensual use of the Prepetition Secured Lenders' Cash Collateral, that the Debtor maintain the Bank Accounts

with BNY and JP Morgan, subject to the Prepetition Secured Lenders' security interest as perfected through the Depositary Agreement.

94.     I believe that if the Debtor was required to close the Bank Accounts in order to comply with the UST Guidelines, there is substantial risk that the Debtor will be placed in breach of the PSA, with far reaching consequences that could jeopardize the sale process.

95.     Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor, its estate and its creditors, and will ensure a seamless transition into chapter 11, such that the Cash Management Motion should be approved.

    **(c)**    **Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Continue to Perform Under Shared Services Agreements; (II) Authorizing the Debtor to Pay Post-Petition Obligations Under Shared Services Agreements; and (III) Granting Related Relief (the "<u>Shared Services Motion</u>").**

96.     As stated above and as described in the Shared Services Motion, the Debtor has no employees, but rather, receives certain necessary management, administrative, corporate, operational and related office support services, as well as energy management and QSE-related support, from two non-Debtor affiliates, Invenergy Thermal and Invenergy Services.

97.     Under the EMA, Invenergy Services serves as ECEC's "Energy Manager," providing a broad array of critical services relating to participation in the ERCOT wholesale power market as a generator.  These services include "General Energy Management Services," such as market registration and monitoring the ERCOT protocols, "Power Management Services," such as providing the personnel and infrastructure to communicate and maintain all telemetry equipment required by ERCOT to be installed at the Power Plant, and offering all available energy and Ancillary Services into the ERCOT market, "Fuel Management Services," such as procuring all natural gas required to generate power, and "Administrative Services"

relating to administrative functions undertaken by Invenergy Services as Energy Manager, for instance, trade confirmations, and invoicing and reconciliation of settlement payments.

98.     Invenergy Services also serves as ECEC's "QSE Agent," and in that capacity, performs some of the most important regulatory, market and compliance tasks for ECEC, including to ensure that ECEC maintains its qualification as a "Level IV" QSE, and provide QSE support services to ECEC relating to all transactions conducted with ERCOT.  For these EMA-related services, the EMA requires that ECEC pay Services a fixed monthly Energy Management Fee of $18,500 that escalates annually at a rate of 2.5%.  As of April, 2022, the monthly EMA Management Fee was approximately $20,420.54 ("EMA Fee").

99.     Separately, through the FMA, a form of "Shared Services Agreement" common in corporate structures like that of the Debtor, Invenergy Thermal provides a variety of services required by the Debtor to enable it to effectively and efficiently manage and operate the Power Plant. Among other tasks, Invenergy Thermal performs the following critical services, without which the Debtor and its estate would suffer a material, value-destroying disruption in operations (collectively, the "O&M Services"):

      a.     providing a skilled workforce to render the services contemplated under the FMA;

      b.     supervising, managing, and operating the day-to-day business, operations, management, and administration of the Debtor;

      c.     supervising, managing, and administering activities necessary for the Debtor to maintain compliance with all applicable federal, state, and local laws;

      d.     maintaining full and accurate operating records and books of account;

      e.     filing, or causing to be filed, all necessary or appropriate records and reports with federal, state, and local authorities, to the extent required by applicable laws;

f.      performing, or arranging for the performance of, all normal maintenance and repair services of the Facility to ensure that the Facility remains in good repair and in safe operating order;

g.      managing and supervising any third-party maintenance service providers, subcontractors, vendors, or other third parties;

h.      ensuring that a sufficient variety and quantity of shop tools, equipment, test instruments, spare parts, and other materials are on hand to support the normal operation of the Facility;

i.      preparing quarterly operating reports to, among other things, apprise the Debtor of quarterly expenditures and all significant events that occurred during the preceding quarter relating to the operations of the Facility, among other things; and

j.      designing and administering operating procedures for all systems and equipment, including emergency procedures.

100.    Invenergy Thermal, as "Manager," also performs various "Administrative Services," that include, with the Project construction complete, appointing individuals to manage the Debtor's day-to-day affairs, providing accounting and administrative support for all operations, including maintenance of accounting and tax records in accordance with the accounting standards set forth in the Credit Agreement, facilitation of payment of all reasonable operating expenses, preparation of financial reports, preparation of an annual budget, and review of property tax assessments and payment (or dispute of) tax bills (collectively, and as more fully described in the FMA, the "Administrative Services").

101.    Under the FMA, ECEC is required to pay Invenergy Thermal a monthly "Administrative Expense" that reimburses Invenergy Thermal for expenses incurred on behalf of ECEC.  Those reimbursed expenses include Invenergy Thermal's "home office expenses related to Invenergy Thermal's provision of services including its all-in labor expense (at actual cost), travel, telephone, facsimile and postage and all third party home office administrative expenses incurred by Invenergy Thermal related to its provision of services under the FMA including legal,

33

consulting, audit, tax preparation, construction management, engineering, insurance, technical, marketing, materials, equipment, supervision and subcontractor costs . . . ." FMA at § 6.1. All Administrative Expenses are charged at cost without premium or markup. These amounts appear on invoices prepared by Invenergy Thermal as: "Labor Costs," consisting of direct labor costs associated with those Invenergy Services employees providing services under the FMA, and "RTO Payroll and Other Expenses" consisting of an allocation of departmental labor and expenses incurred in carrying out Invenergy Thermal's obligations under the FMA.

102.    ECEC must also reimburse Invenergy Thermal for all operating expenses paid by Invenergy Services to third parties on the Debtor's behalf for "O&M Services." Operating expenses include, in any given month, the actual out of pocket amounts paid by Invenergy Thermal to third parties in connection with operation and maintenance of the Power Plant.

103.    I understand that Invenergy Thermal determines the amount to allocate to ECEC as its Operating Expenses each month for labor costs by reviewing its employees' weekly coded time submissions and totaling the time devoted to ECEC tasks, and comparing that amount to Invenergy Thermal's total employee related costs across all projects, including ECEC, based on the calculated percentage.

104.    In addition, Invenergy Thermal presently charges a "Management Fee" of $62,500 quarterly which is adjusted annually in accordance with the Consumer Price Index. CPI adjustments are made each November, and, as of November 2021, the quarterly management fee was approximately $74,000, paid in $24,520 monthly installments.

105.    Because the Debtor has no employees, it could not operate absent receiving the Shared Services from the Managers. Based on my experience and investigation, the charges paid by ECEC to the Managers under the Shared Services Agreements are at or below market terms,

and consistent with industry practices, including the nature, purpose and amount of the retention bonuses and severance benefits proposed by Invenergy Thermal to pay to those Invenergy Thermal employees who operate the Power Plant and whose services will be essential to consummating a sale.

106.    The Debtor's continued performance under the Shared Services Agreements is critical in order to enable the Debtor to conduct its business and operate the Power Plant, particularly given that the Debtor does not otherwise have the personnel or resources necessary to conduct its business or operations or to procure one or more substitute contractors to replace either Invenergy Services or Invenergy Thermal.

107.    Given the Debtor's goal of closing a sale of the Power Plant by mid-summer, it is preferable to continue to perform and receive performance under the Shared Service Agreements on an interim basis, rather than prematurely assume those contracts, and potentially saddle the Debtor and the estate with an administrative rejection damages claim should the ultimate purchaser not seek to acquire these contracts by assignment.

108.    As a result, I believe that the relief requested in the Shared Services Motion is both necessary, and appropriate.  The Debtor is not seeking interim relief regarding the Shared Services Motion, and requests a final hearing.

**3.    Retention and Compensation Motions.**

**(a)    Application of Debtor for Appointment of Donlin Recano & Company, Inc. as Claims, Noticing and Solicitation Agent Nunc Pro Tunc to the Petition Date (the "Claims and Noticing Agent Motion").**

109.    The Debtor requests entry of an order (the "Retention Order") appointing Donlin Recano & Company, Inc. ("Donlin Recano") as claims, noticing and solicitation agent in the Debtor's Chapter 11 Case pursuant to 28 U.S.C. § 156.

110.     As Claims and Noticing Agent, Donlin Recano will, among other tasks, (i) serve as the noticing agent to mail notices to the estate's creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtor's bankruptcy case.

111.     ECEC undertook a prepetition bid solicitation from six companies in the business of acting as a claims and noticing agent.  As a result of that process, the Debtor concluded that Donlin Recano's rates are competitive and reasonable given the quality of services and expertise. The terms of Donlin Recano's retention are set forth in the Engagement Agreement (the "Engagement Agreement") included in the Claims and Noticing Agent Motion.

112.     In view of the number of anticipated claimants, the Debtor submits that the appointment of a claims and noticing agent is in the best interests of both the Debtor's estate and its creditors. Further, by appointing Donlin Recano as the Claims and Noticing Agent in the Chapter 11 Case, the distribution of notices and the processing of claims will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of processing what may be an overwhelming number of claims. Prior to the Petition Date, the Debtor provided Donlin Recano a retainer in the amount of $20,000.

113.     Except as disclosed in the Claims and Noticing Agent Motion, Donlin Recano has represented that it neither holds nor represents any interest materially adverse to the Debtor's estate in connection with any matter on which it would be employed.

**(b)**      **Motion of Debtor to Approve Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members (the "Interim Compensation Motion").**

114.    The Debtor requests entry of an order establishing an orderly, regular process for the allowance of payment of compensation and reimbursement of expenses for attorneys and other professionals who are retained pursuant to section 327 and 1003 of the Bankruptcy Code and are required to file applications for allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code. In addition, the Debtor requests entry of an order approving procedures for reimbursement of reasonable out-of-pocket expenses incurred by members of any official committee appointed in the Chapter 11 Case (a "Committee") by the Office of the United States Trustee for the District of Delaware. Implementation of compensation procedures will provide an efficient structure for disbursing compensation.

115.    The Debtor seeks authorization to retain and employ various professionals (the "Debtor's Professionals"), including but not limited to: (1) Holland & Knight LLP; (2) Polsinelli P.C.; (3) Grant Thornton LLP; (4) Perella Weinberg Partners LP; (5) Crowell & Moring LLP and (6) Locke Lord LLP. (To the extent necessary, the Debtor may seek to retain additional professionals during this Chapter 11 Case. Additionally, the Committee will also seek to retain counsel and other professionals to represent it in connection with this case, and will also request payment on an interim basis) (together with the Debtor's Professionals, the "Professionals").

116.    The Debtor proposes procedures to govern the payment and reimbursement of expenses of the Professionals and Committee members in this Chapter 11 Case (the "Compensation Procedures") as set forth in the Interim Compensation Motion.

117.    The Debtor further requests that the Court limit service of interim and final fee applications to a limited number of parties in accordance with customary practice and approval

of the Office of the U.S. Trustee. I believe that the Interim Compensation Procedures requested will enable the Debtor to best manage its cash-flow and enable it to manage the Budget and reporting required by the Prepetition Secured Lenders in connection with use of cash collateral.

118.    As set forth above, I am familiar with the content and substance of the above identified First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor the opportunity to maximize the value of its estate.

119.    Accordingly, for the reasons set forth herein and in each of the respective First Day Motion, the relief requested in each of the First Day Motions is necessary and appropriate.

<u>EMERGENCY DETERMINATION</u>

120.    The Debtor is requesting entry of Proposed Orders approving each of the First Day Motions, other than the Shared Services Motion and the DIP Financing Motion, as soon as possible following the Petition Date in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Local Rules of the United States Bankruptcy Court for the District of Delaware.

121.    If the Court does not grant the relief requested by the Debtor in the First Day Motions on an emergency basis, it is my belief that the Debtor will suffer immediate and irreparable harm.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 11, 2022

By: */s/ John Baumgartner*_____
    John Baumgartner
    Chief Restructuring Officer
    Ector County Energy Center LLC