## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ECTOR COUNTY ENERGY CENTER LLC,[1] | Case No. 22-_____ (__) |
| Debtor. | |

### MOTION OF DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS
### (I) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL,
### (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
### LENDERS, (III) MODIFYING AUTOMATIC STAY, (IV) SCHEDULING
### A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Ector County Energy Center LLC, the debtor and debtor-in-possession in the above captioned chapter 11 case ("ECEC" or the "Debtor"), through this *Motion of Debtor For Entry of Orders (I) Authorizing The Debtor To Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Motion"), hereby moves, pursuant to sections 105, 361, 362, and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Interim Order") substantially in the form attached hereto as **Exhibit A** and, following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final Order"), to be submitted in a form substantially similar to the Interim Order, providing the following relief:

---

[1] The last four digits of the Debtor's federal tax identification are 6852. The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761. More information about the Debtor and this case is available on the website maintained by Donlin, Recano & Company, Inc., the Debtor's proposed claims and noticing agent, at www.donlinrecano.com/ecec, or can be requested by e-mail at ececinfo@donlinrecano.com.

(a) authorizing the Debtor to use Cash Collateral (as defined below) in which the Prepetition Secured Lenders (defined below), through Credit Suisse AG, Cayman Islands, as administrative agent and as collateral agent (the "Agent"), holds an interest on their collective behalf;

(b) providing adequate protection to the Prepetition Secured Lenders for any decrease in the value (such decrease, a "Diminution") of their interest in the Prepetition Collateral (defined below) resulting from the (i) use, sale or lease of the Debtor's property (in accordance with the Interim Order) or (ii) the imposition of the automatic stay;

(c) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor, the Agent, and the Prepetition Secured Lenders to implement the terms of the Interim Order and the Final Order;

(d) waiving any applicable stays under the Bankruptcy Rules and providing for the immediate effectiveness of the Interim Order and, upon its allowance after the Final Hearing, the Final Order;

(e) scheduling the Final Hearing within approximately twenty one days of entry of the Interim Order to consider approval of this Motion on a final basis; and

(f) granting related relief.

In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of John Baumgartner*, the Debtor's Chief Restructuring Officer, (the "First Day Declaration"), filed concurrently herewith. ***The Debtor believes that, as of the Petition Date, no party other than the Prepetition Secured Lenders asserts a secured interest in the Cash Collateral. The Debtor has negotiated the terms of the Interim Order, and has been informed that the Prepetition Secured Lenders will support entry of the Interim Order and the Final Order on a consensual basis***. In further support of the relief requested in this Motion, the Debtor states as follows:

## INTRODUCTION

1.      The February 2021 winter storm in Texas, referred to as Winter Storm Uri, set in motion a series of events that had a broad impact on the energy production industry in the Electric

#95606257v7

83030366.1

Reliability Council of Texas ("ERCOT") market.  Those adverse events have generated a number of Chapter 11 cases by ERCOT-industry participants, including Brazos Electric Power Cooperative, Entrust Energy, Inc., Griddy Energy, LLC, Just Energy Group, Inc., Liberty Power Holdings, LLC, and others.

2.      Other energy producing companies impacted by the storm opted to address challenges arising from the storm by engaging in asset disposition transactions. Those transactions revealed a seemingly strong M&A market for ERCOT power generation assets, indicating that investors have an interest in acquiring generation assets. For example, Agilon Energy Holdings completed a robust bankruptcy court supervised sale process for its peaker plant during 2022 for a price of $439/kW.  In 2021, Temple Generation I, LLC sold its combined cycle gas turbine plant for $560/kW.

3.      ECEC had twice before tested the M&A market, undertaking sale exploration processes in 2016 and again in 2018.  Those processes, however, generated an insufficient level of interest to warrant engaging in a transaction. The most recent efforts in 2018 generated expressions of interest in amounts that were less than half the per-kilowatt price realized in recent power plant deals.  The apparent increase in market interest caused ECEC to conclude that again testing the market was warranted.

4.      ECEC was among the ERCOT industry participants negatively impacted by Winter Storm Uri.  ECEC is licensed as a "power generating company" by the Public Utilities Commission of Texas or "PUCT," and is a participant in the competitive wholesale electricity market operated by ERCOT as a "Qualified Scheduling Entity" ("QSE"), as described more fully below. The Debtor maintained ordinary course peaker operations since entry into the ERCOT market in 2015

3

with one notable exception, during the extraordinary and prolonged cold weather event that occurred in February 2021 referred to as "Winter Storm Uri."

5.      At the time of the storm, ECEC was party to a heat rate call option ("HRCO") which provided for the HRCO counterparty, Direct Energy Business Marketing, LLC ("Direct Energy"), to pay a monthly premium to ECEC for the right to call on ECEC to produce energy and various quantities of ancillary services. For several days during Winter Storm Uri, ECEC was unable to procure natural gas needed to power its turbines when production systems that fed into the gas pipelines froze, effectively preventing the Debtor from dispatching power at a time of extreme demand. Those unprecedented factors resulted in ECEC being unable to deliver power or ancillary services when called for by Direct Energy, ultimately leading to the purported termination of the HRCO in May, 2021, when Direct Energy disputed ECEC's assertion of a force majeure event. That termination led to Direct Energy commencing litigation in the New York Supreme Court asserting a claim for damages in excess of $400 million, of which $393 million was alleged to be owed for the month of February, 2021. Additional litigation arising from the impact of Winter Storm Uri was brought against ECEC and other utilities and market participants.  ECEC has been named as a defendant in approximately 113 personal injury and/or property damage tort claims currently pending in the Texas state court system.

6.      Given the apparent current market interest in ERCOT energy production assets, and the continuing expense and distraction arising from Winter Storm Uri and its fallout, ECEC determined that a concerted sale effort represented the best option to maximize and realize the Debtor's going-concern value for the benefit of the Debtor and its creditors. The Debtor also concluded that, as a practical matter, maximizing value also turned on affording a purchaser the comfort that it would receive title to the Power Plant free and clear of liens, claims, and interests

4

which is attainable only through a sale under section 363 of the Bankruptcy Code. With a stalking-horse bid having been accepted following a period of substantial marketing efforts led by the Debtor's professionals, this case has been filed to achieve those results. To that end, the Debtor has concurrently filed a motion seeking approval of bid procedures relating to post-petition solicitation of overbids to a $91,250,000 stalking horse bid and approval of a sale to the highest and best bidder identified in that solicitation process.

7.      In order to get to a closing of that transaction, ECEC requires the use of cash and cash equivalents subject to liens held by the Agent for the benefit of the Prepetition Secured Lenders under the Credit Agreement (defined below).  Those lenders have agreed to ECEC's use of cash collateral in accordance with the budget attached hereto as Exhibit "B" (the "Budget") on the conditions, including the grant of adequate protection rights, described below and set forth in the *Interim Order Authorizing The Debtor To (I) Use Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Lenders, (III) Modifying Automatic Stay, (IV) Scheduling A Final Hearing, And (V) Granting Related Relief*.  Through this Motion, the Debtor seeks this Court's approval of the Debtor's use of cash collateral in the agreed amounts set forth in the Budget and in accordance with the agreed terms, first on an interim basis to avoid irreparable harm pending Final Hearing and, after final hearing, on a final basis.

## JURISDICTION

8.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtor confirms its consent, pursuant to Local Rule 9013-1(f), to the entry of a final order by the Court, to the extent it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the U.S. Constitution.

#95606257v7

83030366.1

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested in this Motion are sections 105(a), 361, 362, and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001(a)-1.

## GENERAL BACKGROUND

### A.      The Debtor, Generally

11.     On April 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with this Court, commencing this chapter 11 case (the "Chapter 11 Case").

12.     The Debtor continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Case and no committee has yet been appointed.

13.     The Debtor is in the business of owning and operating a 330 MW natural gas-fired electricity-generating facility ("Power Plant") located on 32.5 acres of Debtor-owned land in Ector County, Texas, just outside of Odessa, that is part of the Permian Basin. The Debtor dispatches energy generated by its two natural gas fueled simple-cycle combustion turbines and related balance of plant equipment, all designed to enable the Power Plant to generate energy and respond quickly at times when demand is "peaking" and the market requires additional power supply.

14.     The Power Plant features two General Electric 7FA simple-cycle combustion turbines that have been designed to enable the Debtor to provide "Non-Spinning Reserve Services" when the ERCOT power grid requires additional power supply to meet short-term demands. The Debtor's revenue is generated primarily from sale of its energy output to various participants in

the ERCOT West region of Texas in the Day-Ahead Market and Real-Time Markets, [2] along with from offering Ancillary Services based on competitive bid processes.

15.    Energy generated at the Power Plant is delivered through the Debtor's interconnection with Oncor Electric Delivery Company's 138 kV Holt Switching Station, which connects three existing 138 kV Oncor transmission lines.  The natural gas that fuels the turbines is purchased on the spot-market from a select group of suppliers, and delivered through the ONEOK WesTex Transmission Pipeline.

16.    The Debtor has no employees, but instead relies on certain non-debtor affiliates for the day-to-day operation of the Power Plant.  Invenergy Services, LLC ("Invenergy Services") is serving as ECEC's "energy manager" pursuant to an Energy Management Agreement dated November 2, 2017, to generally provide energy management, fuel management, and power management services to ECEC as participant in the ERCOT market; Invenergy Services has also been designated as ECEC's "QSE Agent." Separately, Invenergy Services Thermal US LLC is responsible for administration of all project agreements, and general operation, maintenance and administration of the Power Plant, pursuant to a Facility Management Agreement dated November 25, 2014.

17.    Additional information regarding the Debtor and its business operations is set forth in the First Day Declaration, and described below.

B.    **Historical and Projected Financial Performance**

18.    Following the purported termination of the HRCO, ECEC shifted from generating revenue under a pre-agreed pricing model to primarily operating as a merchant peaker plant selling power and ancillary services in the Day Ahead and real-time markets. That shift resulted in uneven

---

[2] As defined in the ERCOT protocols, available at https://www.ercot.com/mktrules/nprotocols/current.

#95606257v7

83030366.1

cash flow attendant upon changing from primarily a HRCO-driven revenue model with a contractually established stream of minimum monthly payments to selling energy in the ERCOT market based on competitive bid processes. The litigation relating to the purported HRCO termination and the over 100 personal injury and/or property damage cases contributed to the uneven and difficult to project cash flow, imposing an unpredictable monthly expense burden on ECEC.

19.     ECEC's unaudited financial statements for the twelve months ending December 31, 2021 indicate normalized operating revenues of $22,974,152 and normalized operating expenses of $24,308,322 inclusive of $3,308,912 of depreciation expense, for EBITDA of $1,974,742. The normalized results were calculated by excluding the extraordinary impact of the asserted HRCO loss claim required to be reported in accordance with GAAP, but including the professional fees and other costs incurred in connection with the Debtor's prospective sale and restructuring. The Debtor reported total cash balances as of December 31, 2021 of $15.9 million, inclusive of the $7 million posted by the Debtor to collateralize the Direct Energy LC. Excluding those funds, the Debtor's ending cash position as of December 31, 2021 was approximately $8.9 million.

20.     The Debtor's audited financial statements for the twelve months ending December 31, 2020 reported operating revenues of $71.0 million, and EBITDA of $54.3 million. The Debtor's cash position as of year-end 2020 was $11.7 million.

21.     ECEC's unaudited financial statements for the two months ending February 28, 2022 reported operating revenues of $0.7 million, and EBITDA loss of $(1.9 million). The Debtor's cash position as of February 28, 2022 was approximately $14.1 million, inclusive of the $7 million cash posted to collateralize the Direct Energy LC.

#95606257v7

83030366.1

22.     On a cash basis, as of March 31, 2022, the Debtor collected gross receipts of approximately $2.1 million during the low shoulder months of January through March. Projected cash flow for April through July 31, 2022 shows cash revenue of approximately $6.6 million. While that might suggest an approximately $13.2 million pace, peaker operations in the ERCOT market have historically been seasonal, with the highest level of demand, and the attendant revenues, during the yet-to-come heat of the summer.  The Debtor does project a diminution of available cash from a high of $5,629,211 on April 10, 2022 to $723,436 million as of July 31, 2022. The projected positive cash balance, however, is in no small part a function of anticipated draws of the DIP Facility.

### C.     The Debtor's Secured Debt

23.     Pursuant to (a) that certain Amended and Restated Credit and Guaranty Agreement, dated as of August 22, 2019 (as amended,[3] supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Credit Agreement"),[4] by and among Invenergy Thermal Operating I LLC ("ITOI"), as borrower, the Debtor and certain of its non-debtor affiliates, as Subsidiary Guarantors,  each of the banks and other financial institutions party thereto as Lenders, the financial institutions from time to time parties thereto as issuing banks in respect of Revolving Letters of Credit (the "Revolving LC Issuers", collectively with the Lenders, the "Prepetition

---

[3] Specifically, as amended by that certain Amendment No. 1 to the Amended and Restated Credit and Guaranty Agreement, dated as of March 3, 2020, by that certain Amendment No. 2 to the Amended and Restated Credit and Guaranty Agreement, dated as of February 24, 2021, by that certain Amendment No. 3 to the Amended and Restated Credit and Guaranty Agreement, dated as of April 28, 2021 and by that certain Amendment No. 4 to the Amended and Restated Credit and Guaranty Agreement, dated as of April 4, 2022, through which the Prepetition Secured Lenders agreed, among other terms, to waive any defaults arising under the Credit Agreement arising from the commencement of this Chapter 11 Case and the transactions contemplated in the Plan Support Agreement.

[4] The Borrower, the Subsidiary Guarantors, certain of the Lenders party thereto,the Administrative Agent and the Collateral Agent entered into that certain Credit and Guaranty Agreement, dated as of August 28, 2018, as amended by that certain letter agreement dated December 7, 2018 (as in effect immediately prior to the Amendment Effective Date, "Original Credit Agreement").  The Original Credit Agreement was amended and restated pursuant to an Omnibus Amendment Agreement dated August 22, 2019.

#95606257v7

83030366.1

Secured Lenders"), the Agent (together with the Prepetition Secured Lenders, the "Prepetition Secured Parties"), and (b) the other "Loan Documents" (as defined in the Credit Agreement and, together with the Credit Agreement, the "Prepetition Loan Documents"), pursuant to which the Prepetition Secured Lenders agreed to provide term loans (those lenders, the "Term Lenders") and revolving loans (those lenders, the "Revolving Lenders") to, and for the account of, ITOI.

24.     In particular, in addition to amending the terms of a $350 million term loan ("Original Term Loan") that had previously funded under the Original Credit Agreement as restated through the Credit Agreement, certain of the Prepetition Secured Lenders agreed to fund an Incremental Term Loan in the amount of $75,000,000 ("Incremental Term Loan"), and a Revolving Loan in the amount of up to $70,000,000 ("Revolving Loan"), inclusive of amounts available to fund Revolving Letters of Credit, on behalf of ITOI or its operating subsidiaries (the Original Term Loan, the Incremental Term Loan, and the Revolving Loan collectively referred to as the "Prepetition Secured Loans").  In addition to the issuance of letters of credit to provide credit support for ITOI and its subsidiaries, the proceeds of the Revolving Loan were made generally available to fund the working capital requirements of ECEC, as well as the operations of Credit Agreement co-guarantors Invenergy Nelson LLC and Grays Harbor Energy LLC (collectively with ECEC, the "ITOI Projects"), for project maintenance and capital expenditures, and other general corporate purposes.

25.     Among the letters of credit funded through proceeds of the Revolving Loan is a $7.0 million standby letter of credit posted by the Debtor in connection with the HRCO in favor of Direct Energy ("HRCO LC").  The HRCO LC has been cash-collateralized and is secured by a $7.2 million deposit held on account with ECEC ("HRCO LC Deposit").  In addition, a $225,000 letter of credit in favor of OneOK (the "OneOK LC") has been cash collateralized by a $230,625

cash collateral deposit held by ECEC (the "OneOK LC Deposit" and collectively with the HRCO LC Deposit the "LC Deposits").

26.     Pursuant to Article XI of the Credit Agreement, ECEC has provided an unconditional joint and several guaranty (the "Guaranty") of "due and punctual payment in full of all Secured Obligations[5] (other than, for the avoidance of doubt, Excluded Swap Obligations) when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration," defined in the Credit Agreement as the "Guaranteed Obligations." As a guarantor of ITOI's obligations, ECEC is also an "Obligor" under the Prepetition Loan Documents.

27.     In Section 11.03 of the Credit Agreement, ECEC also agreed that it will "upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to beneficiaries as aforesaid."

28.     ITOI, ECEC and the other Subsidiary Guarantors' obligations to the Prepetition Secured Lenders under the Credit Agreement are secured through a separately executed Pledge and Security Agreement dated August 28, 2018 ("Security Agreement," and included in the Prepetition Loan Documents, defined above), by (a) a first-priority security interest in and lien upon (the "Prepetition Liens") each entity's real and personal property assets and the proceeds thereof, and (b) ITOI Holding's pledge to the Agent of a security interest its capital stock in ITOI

---

[5] As defined in the Credit Agreement.

#95606257v7

83030366.1

(the collateral described in clause (a) hereto with regard to the Debtor only, the "Prepetition Collateral"). The Agent, on behalf of the Prepetition Secured Lenders, perfected the Prepetition Secured Lenders' security interests in the ECEC-owned personalty constituting Prepetition Collateral through the filing of UCC-1 financing statements with the Office of the Secretary of State for Delaware and a Transmission Utility Financing Statement with the Office of the Texas Secretary of State.

29.    Separately, the Prepetition Secured Lenders' security interests in ECEC's cash and cash equivalents generated from operation of the Power Plant, were perfected under a Depositary Agreement, dated as of August 28, 2018 (as amended, the "Depositary Agreement"), among ITOI, the Subsidiary Guarantors, the Administrative Agent, the Collateral Agent and The Bank of New York Mellon, as the depositary bank (the "Depositary Bank"). The Depositary Agreement provides the Collateral Agent, on behalf of the Prepetition Secured Lenders, a first priority lien and control over ECEC"s right, title and interest in, funds on deposit with the Depositary Bank in various "Collateral Accounts," maintained by the Debtor in connection with its business in the ordinary course. The Collateral Accounts maintained with the Depository Bank include an Ector Revenue Account (as defined in the Depositary Agreement), which receives all income and receipts generated through operation of the Power Plant, and an Ector Operating Account (as defined in the Depositary Agreement), from which ECEC's operating and maintenance expenses are paid on a monthly basis (collectively, the "Account Collateral" and included in the definition of "Prepetition Collateral").

30.    ECEC's obligations to the Prepetition Secured Lenders are also secured by a mortgage granted against ECEC's owned real estate assets and improvements and easement rights pertaining to the Power Plant property in Ector County, Texas, through a *Deed of Trust, Security*

*Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing*, as amended on August 22, 2019, recorded by the Collateral Agent with the Public Records Office of Ector County, Texas.

31.      As of the Petition Date, the principal balance of approximately $337,319,920.82 was outstanding under the Term Loans ("Term Loan Balance"), and Revolving Letters of Credit totaling of approximately $64,553,598.00 were issued and outstanding (the "Revolving Loan Balance"), exclusive of fees, interest, and other costs to which the Prepetition Secured Lenders are entitled pursuant to the Prepetition Loan Documents. (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Loan Documents, included in the definition of "Loan Obligations" set forth herein).[6]

### D.      The PSA and the Chapter 11 Case

32.      Faced with a strong M&A market, uncertain cash flow due to Direct Energy's purported termination of the HRCO, extraordinary litigation costs and related distraction and projected cash flow challenges, the Debtor hired an investment banker, a financial advisory firm, and restructuring counsel to evaluate its business and consider various potential strategic and financial alternatives with a view to maximizing value for ECEC's stakeholders. In addition, a Special Committee of the Invenergy AMPCI Board of Managers, inclusive currently of an independent director, with delegated authority over all board-level decisions regarding ECEC, was appointed. That Special Committee, in turn, appointed John Baumgartner of Grant Thornton LLP as ECEC's chief restructuring officer (the "CRO").

33.      After full consideration of market factors, extraordinary litigation related financial costs and personnel distraction, uneven cash flow and the additional demands on that cash flow

---

[6] Copies of the Prepetition Loan Documents will be separately filed.

#9560627v7

83030366.1

associated with assessment by ERCOT of Winter Storm Uri related uplift charges, ECEC, with authority from the Special Committee and in consultation with the Debtor's advisors and management team, elected to pursue a sale of ECEC or its assets. Recognizing that the pending litigation brought by Direct Energy and the named plaintiffs in the Texas MDL would likely lead any prospective purchaser to require the comfort only attainable through an order pursuant to section 363 of the Bankruptcy Code as a condition to closing, ECEC with Special Committee authority opted to pursue that sale through this Chapter 11 Case.

34.     The Special Committee and the CRO also recognized that concessions from and consent of the Prepetition Secured Lenders was necessary in order to achieve the primary goal of ensuring that all creditor constituencies share in the benefits of a sale made at what appears to be the height of the historical market.

35.     The Credit Agreement as originally executed as of August 28, 2018 expressly contemplated a potential Ector Disposition, and Section 3.20(b)(vii) of that agreement, as well as the amendment to that agreement executed on August 22, 2019, required that an "Ector Target Sale Amount" of $75,000,000 be applied as a mandatory prepayment of the Loans. In conjunction with execution of the PSA, and to facilitate the transactions contemplated in the PSA, including the sale of substantially all of the Debtor' assets, that Credit Agreement provision was amended to require that the Debtor make a mandatory prepayment in that same $75 million amount upon the earlier of a change of control of ECEC and July 31, 2022.

36.     The existence of a default, however, removes ECEC's right to sell its assets and deliver to the Term Lenders only $75 million with any balance of the proceeds being available for other uses. Rather, upon the occurrence of an event of default, the Term Lenders have the right to accelerate the entire outstanding balance of the loan, currently in excess of $340 million, and

enforce the joint and several liability provisions of the Credit Agreement, including through asserting a right to all sale proceeds received in the sale under section 363 of the Bankruptcy Code proposed by the Debtor and more fully described below.

37.    Credit Agreement defined Events of Default include, but are not limited to, a cross default arising upon a failure to pay over $10 million in  principal due under a "Hedge Agreement," such as the HRCO under which Direct Energy asserts an over $400 million claim, entry of an adverse judgment of in excess of $5 million, again, such as the judgment for over $400 million that is sought by Direct Energy in already pending litigation and the amounts sought in each of the over 100 Winter Storm Uri related litigations, as well the filing of a bankruptcy proceeding, such as this very Chapter 11 Case.

38.    Recognizing the risk posed to the ability of all creditor-constituencies sharing in the sale proceeds realized during the current strong M&A market should the Prepetition Secured Lenders, premised upon declaration of default, assert a $340 million undersecured claim in this Chapter 11 Case, ECEC entered negotiations with the Prepetition Secured Lenders geared towards maintaining the availability of the Credit Agreement-provided $75 million pay down due upon an Ector Disposition.

39.    Over the course of several months of negotiations, the Debtor and the Prepetition Secured Lenders reached agreement as to the provisions of a Plan Support Agreement ("PSA") pursuant to which ECEC would undertake a sale process geared towards locating and closing a transaction regarding the sale of substantially all of ECEC's assets and the Prepetition Secured

Lenders would support an agreed allocation and distribution of those proceeds in accordance with the terms of a liquidating plan.

40.     The PSA provides for a sale process under which a stalking horse would be located prepetition and that bid would be subjected to a court approved post-petition bid solicitation and resolution process.  The Prepetition Secured Lenders agreed to support the process provided that certain timing benchmarks and other conditions were met.  The support by the lenders includes the Revolving Lenders limiting their recovery to the proceeds of the LC Deposits and the Term Lenders partially subordinating and limiting their recovery to the Credit Agreement provided minimum mandatory payment due upon an Ector Disposition despite the occurrence of material events of default.

41.     The PSA further provides for the funding of this Chapter 11 Case through use of cash collateral subject to the Prepetition Secured Lenders' liens and for partial subordination of the Term Lenders' liens and payment rights to debtor-in-possession financing provided by the Debtor's affiliate (the "DIP Financing") under negotiated terms.

42.     Perhaps most importantly, under the PSA, the Prepetition Secured Lenders have agreed that, despite an arguable $340 million claim secured by substantially all of ECEC's assets, the sale proceeds would be distributed as follows:

> (i)     The first $55 million to the Agent for the ratable benefit of the Term Lenders ("First Priority Base Distribution");

> (ii)    The next proceeds toward payment in full of all professional fees of the Debtor and, subject to a $25,000 limitation on fees and expenses related to investigating the Prepetition Secured Lenders' claims and liens and a prohibition on use in connection with a challenge to the Prepetition Secured Lenders' claims and liens, of any official

#95606257v7

83030366.1

committee appointed in the Chapter 11 Case,[7] U.S. Trustee fees and other administrative and priority claims;

(iii)     Up to the next $5 million to satisfy the Effective Date balance due under the DIP Financing;

(iv)     A $5 million allocation for distribution under the plan to general unsecured creditors;

(v)     An amount not exceeding $5 million to satisfy post-Effective Date costs and expenses of administration, including, but not limited to, U.S. Trustee fees, fees and costs associated with pursuing contested matters and adversary proceedings, if any, the fees and expenses associated with any appeals and other fees and costs associated with completing the Chapter 11 Case through entry of a final decree, with any unused balance to be distributed under the plan in accordance with the Plan Waterfall (defined below); and

(vi)     The next funds paid to the Agent for the ratable benefit of the Term Lenders until the Term Lenders have received total payments equal to $75 million plus payment of the legal fees and expenses of the Prepetition Secured Lenders' primary and local counsel (the "Remaining Term Lender Claims");

(vii)     The balance for distribution under the plan to general unsecured creditors.

(Collectively, (i) through (vii) the "Plan Waterfall" and items (ii) through (v) the "Estate Allocation"). A more detailed summary of the provisions of the PSA is set forth in the First Day Declaration.

43.     Specific to this Motion, the Prepetition Secured Lenders agreed through the PSA to use by the Debtor of its cash and cash equivalents subject to the Prepetition Secured Lenders' lien as of the Petition Date ("Cash Collateral"), but not inclusive of the LC Deposits, in accordance with the terms described herein and in the form of Interim Order attached hereto, with use of the Cash Collateral to be in accordance with the Budget.

---

[7] Use of cash collateral for investigation of the Prepetition Secured Lenders' claims and liens is limited to $25,000 and precluded for use in connection with challenges, including adversary proceedings, against the Prepetition Secured Lenders.

44. In exchange, the Debtor has agreed to provide the Prepetition Secured Lenders with various forms of adequate protection to protect against a diminution in the Prepetition Secured Lenders' interest in the Cash Collateral, including termination of the Prepetition Secured Lenders' consent to use of Cash Collateral upon the occurrence of certain events, all as more fully set forth in the Summary or Material Terms of Interim Order below.

45. Finally, as detailed in the Interim Order, the Debtor has agreed that the automatic stay is modified to allow the Revolving Lenders, in the event that there is a draw on either of the cash collateralized letters of credit posted by the Revolving Lenders, including a draw on the HRCO LC by Direct Energy or the OneOK LC, during the pendency of the Case, to sweep the funds posted as cash collateral to the extent necessary to reimburse the Revolving Lenders for the amount of the letter of credit draw.

**E.     The Asset Purchase Agreement**

46. Sale efforts that took place contemporaneously with the PSA negotiations were also successful. As more fully set forth in the Debtor's *Motion for Orders (I)(A)Authorizing Debtor's Entry into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving a Break-Up Fee and Reduced Break-Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving (A) The Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sale Motion"), after extensive arm's length negotiations between the Debtor and Ector County Generation LLC, an acquisition entity affiliated with Rockland Capital, LLC (together with its assignees or designees, the "Proposed Purchaser"),

#95606257v7

83030366.1

ECEC and the Proposed Purchaser executed an Asset Purchase Agreement (the "Asset Purchase Agreement") providing for the sale of substantially all of the Debtor's assets.

47.    The Asset Purchase Agreement calls for the Debtor to transfer, subject to the solicitation of higher and better bids and subject to this Court's approval, substantially all of its assets constituting and related to its 330 MW natural gas-fired generating facility located on 32.5 acres of Debtor-owned land in Ector County, Texas, including the real estate, improvements on that real estate and the equipment, receivables, gas-on-hand, intellectual property, intangible assets, permits to the extent transferrable, causes of action (including specifically Avoidance Actions under Chapter 5 of the Bankruptcy Code), and certain identified contracts and contract rights.

48.    Pursuant to the terms of the Asset Purchase Agreement, the Proposed Purchaser has agreed to purchase the Debtor's assets for a purchase price of (i) $91,250,000 (the "Stalking Horse Bid Amount"), subject to various potential adjustments set forth in the Asset Purchase Agreement.[8] Those adjustments include a working capital true up based on a $550,000 target working capital amount where the closing date working capital upon which the adjustment will be based includes those cash deposits that the Debtor has posted and will be left with the deposit holders post-closing for the benefit of the Potential Purchaser, an amount that is expected to be approximately $4 million.  The purchase price will also be increased by "Incentive Consideration" of $2.7 million if a transaction is closed on or before July 31, 2022 with a $110,000 per day reduction in that

---

[8] Capitalized terms used but not defined in this Motion have the definitions ascribed to them in the Asset Purchase Agreement. To the extent that there are inconsistencies between the summary description of the Asset Purchase Agreement contained herein and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement control.

#95606257v7

83030366.1

Incentive Consideration for each day after July 31, 2022 that the Potential Purchaser does not realize or accrue post-closing revenue.

<u>**SUMMARY OF MATERIAL TERMS OF INTERIM ORDER**</u>

49.    In accordance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), the following chart contains a summary of material terms of the proposed Interim Order.[9]

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| **Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Subject to terms and conditions of the Interim Order and in accordance with the Budget, for "Permitted Payments" further defined as the following:<br><br>• Operating and administrative expenses<br><br>• Quarterly and other fees to the Office of the United States Trustee and to the Bankruptcy Court<br><br>• Ordinary course and other payments authorized or directed by the Bankruptcy Court<br><br>• Debtor's legal, financial and investment banking professional fees, including counsel, Perella Weinberg Partners (whose success fee will be paid upon closing of the Asset Sale), and any other advisors<br><br>• Fees and expenses of the Prepetition Secured Lenders' legal and financial professionals as and to the extent set forth below<br><br>• Fees and expenses of the Chief Restructuring Officer<br><br>• Fees and expenses of any Committee (not including any success fee) | ¶¶ 1-3. |
| **Entities with Interests in Cash Collateral** | Credit Suisse AG, Cayman Branch, as collateral agent for the Prepetition Secured Lenders. | ¶ F. |

---

[9] To the extent anything in this Motion is inconsistent with the underlying documents, the terms of the applicable documents shall control.

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| Bankruptcy Rule 4001(b)(l)(B)(i) | | |
| **Term and Termination**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Prepetition Secured Lenders' consent to the Debtor's use of cash collateral terminates upon the occurrence of any of the following:<br><br>• Breach of any provision or representation contained in the Interim Order;<br><br>• Appointment of a chapter 11 trustee;<br><br>• Conversion of the Chapter 11 Case to chapter 7;<br><br>• Dismissal of the Chapter 11 Case;<br><br>• Appointment of an examiner;<br><br>• Excessive Budget variance (described below)<br><br>• Litigation or adversary proceeding against the Prepetition Secured Lenders by the Debtor;<br><br>• Incurring debt that is senior to or *pari passu* with the Prepetition Secured Loans as to either or both payment or lien priority, other than with respect to the DIP Financing;<br><br>• Breach of any representation or provision contained in the PSA including, but not limited to, the failure to meet any of the Benchmarks;<br><br>• Occurrence of an Event of Default under the DIP Financing. | ¶ ¶ **5-6.** |
| **Budget, Reporting and Variance**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)-(iii) and Bankruptcy Rule 4001 (c)(1)(B) | • Budget submitted monthly five days before month end to the Agent.<br><br>• Budget compliance subject to a fifteen percent (15%) aggregate negative operating disbursement variance, tested on a rolling four-week basis commencing with the fourth week following the Petition Date; *provided* that fees and expenses of the Prepetition Secured Lenders and any official committee of unsecured creditors is excluded for purposes of variance testing. Surplus amounts from one Budget Period may be rolled forward to future periods for purposes of testing variance limits. | ¶ **3.** |

#95606257v7

83030366.1

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| | • Budget to actual variance analysis will be delivered by the Friday following the last day of each reporting period.<br><br>• The Debtor will continue to provide the monthly operating report in the form agreed by the Debtor and the Agent no later than one day prior to the end of each month, following the end of the applicable reporting period.<br><br>• The Debtor will deliver to the Agent copies of the Monthly Operating Report substantially simultaneously with filing of the Monthly Operating Report in the Chapter 11 Case. | |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iv) and 4001(c)(1)(B)(ii) | • A lien on the Debtor's post-petition assets and superpriority claims to the same extent and with the same priority as was held by the Term Lenders and the Revolving Lenders, as applicable, in the Debtor's prepetition assets as of the commencement of the Chapter 11 Case, provided that the DIP Claims shall be senior in right of payment and lien priority to the Adequate Protection Claims in respect of the third priority Remaining Term Lender Claims, but junior in right of payment and lien priority to the Adequate Protection Claims in respect of the First Priority Base Distribution and Revolving Lender Claims.<br><br>• The Debtor shall pay the reasonable fees and expenses of the Agent and the Ad Hoc Group, including fees and expenses of counsel (but limited to Davis Polk & Wardwell LLP and Richards Layton & Finger, P.A.) in connection with the Chapter 11 Case.  For the avoidance of doubt, such payments shall not be characterized as principal or applied to reduce the principal amount of the obligations under the Credit Agreement.<br><br>• The Debtor shall satisfy the Milestones as defined in the PSA and set forth below.<br><br>• A limitation on Cash Collateral that can be used by any Committee to investigate the claims of | ¶ 8. |

#95606257v7

83030366.1

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| | the Prepetition Secured Lenders and claims against the Prepetition Secured Lenders of $25,000 and no use of Cash Collateral to commence adversary proceedings or other litigation against the Prepetition Secured Lenders (the "Committee Investigation Budget"). <ul><li>Upon the occurrence of a Termination Event, all of the DIP Lender's rights under the DIP Facility Documents (as defined in the DIP Order) and the DIP Order shall be automatically assigned to the Agent for the benefit of the Term Lenders without requiring any further actions by the DIP Lender, the Agent, the Prepetition Secured Lenders, or this Court.</li></ul> | |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Prepetition Secured Lenders have agreed to several allocations of the proceeds of their collateral that fall within the scope of the term carve-out.<br><br>In the event of a default under the DIP Financing, which triggers a termination of the Prepetition Secured Lenders' consent to the Debtor's use of Cash Collateral, the Prepetition Secured Lenders have agreed to, and the Interim Order provides for, a carve-out in an amount equal to the sum of (i) all fees required to be paid to the Court and United States Trustee, plus interest at the statutory rate (the "UST Fees"), (ii) all reasonable fees incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim or final compensation order, procedural order, or any other order of the Bankruptcy Court, all unpaid fees, costs, and expenses (the "Carve-Out Professional Fees") incurred or accrued by persons or firms retained by the Debtor pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any official committee that may be appointed (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") appointed in the Chapter 11 Case pursuant to section 1103 of the Bankruptcy Code at any time before or on the first business day | ¶ 17. |

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| | following delivery by the Agent (acting at the direction of the Requisite Consenting Lenders) to the Debtor of the occurrence of a default, plus (iv) Allowed Professional Fees of Professional Persons incurred after the first business day following delivery of that notice in an aggregate amount, to the extent allowed at any time, whether by interim or final compensation order, procedural order, or any other order of the Bankruptcy Court, not to exceed $1 million, plus any in a success fee earned by the Debtor's investment banker; provided that except for the success fee earned by the Debtor's investment banker, no success, completion or similar fees shall be payable from the Carve-Out (the amount set forth in clause (iv), the "Post Carve-Out Trigger Notice Cap"). | |
| | In addition, the Prepetition Secured Lenders have agreed that, even if the Prepetition Secured Lenders' consent to use of cash collateral use is not terminated, from the proceeds of a sale of substantially all of the Debtor's assets, after the Prepetition Secured Lenders receive $55 million from the proceeds, the UST Fees, all fees and expenses of all Professional Persons and all allowed priority claims may be paid, up to $5 million may be paid to satisfy the holder of the DIP Financing debt, $5 million may be allocated and distributed to holders of general unsecured claims, and up to an additional $5 million may be allocated to and used for post-plan effective date administration of this Chapter 11 case. | |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The Interim Order modifies the automatic stay as necessary to effectuate all of the terms and provisions thereof, including to: (a) permit the Debtor to grant the Adequate Protection Liens; (b) permit the Debtor to perform such acts as may be needed to assure the perfection and priority of the liens granted in the Interim Order; (c) permit the Debtor to incur all liabilities and obligations under the terms of the Interim Order; and (d) authorize the Debtor to pay, and the Prepetition Secured Lenders to retain and apply, any payments made in accordance with the terms of the Interim Order. | ¶ 20. |

#95606257v7

83030366.1

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| | In addition, the Interim Order modifies the automatic stay to authorize Credit Suisse AG, New York Branch, in its capacity as a Revolving LC Issuer, in the event of a draw of one or more letters of credit issued by Credit Suisse AG, New York Branch to secure obligations of the Debtor, to draw from cash collateral held as security for such letters of credit that are held in a segregated account holding only funds securing the issued letters of credit. | |
| **Sale Milestones/** <br><br> **Benchmarks** <br><br> Bankruptcy Rule 4001(b)(1)(B)(iii) | • Petition Date: the Debtor shall file the DIP Motion and Cash Collateral Stipulation <br><br> • 3 Business Days following the first hearing in the Chapter 11 Case (the "First Day Hearing"): Court shall have entered the Interim DIP Order and Interim Cash Collateral Order <br><br> • Petition Date + 10 days: the Debtor shall file the Bidding Procedures Motion <br><br> • Petition Date + 30 days: Bankruptcy Court shall enter the Final DIP Order and Final Cash Collateral Order <br><br> • Petition Date + 35 days: Bankruptcy Court shall approve the Bidding Procedures and enter the Bidding Procedures Order <br><br> • Petition Date + 60 days: the Debtor shall file the Plan and Disclosure Statement <br><br> • Petition Date + 70 days at 11:59 p.m. (Eastern Time): Deadline for submitting Qualified Bids <br><br> • Petition Date + 75 days: the Auction shall be held <br><br> • Petition Date + 80 days: Bankruptcy Court shall approve and enter the Sale Order <br><br> • Petition Date + 90 days: Company shall file an Amended Disclosure Statement if necessary | Plan Support Agreement (attached to First Day Declaration) |

| Bankruptcy Rule | Summary of the Material Terms of Interim Order | Location in Interim Order |
|---|---|---|
| | • Petition Date + 120 days: Bankruptcy Court shall approve the Disclosure Statement<br><br>• Petition Date + 155 days: Sale Transaction shall close*<br><br>• Petition Date + 160 days: the Confirmation Hearing shall commence*<br><br>• Petition Date + 175 days: Bankruptcy Court shall approve and enter the Confirmation Order*<br><br>• Petition Date + 190 days: Plan Effective Date shall occur* | |
| * Subject to a 60 day extension in the event of a default by the Winning Bidder (defined below) and pursuit of a closing with a back-up bidder. | | |

## LOCAL RULE DISCLOSURES

50.    In addition to the disclosures above, pursuant to Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or to obtain financing must highlight the existence and location of certain terms and provisions pertaining to the proposed use of cash collateral ("Rule 4001 Provisions"). Set forth below are the disclosures required in accordance with the Local Rules (with additional justification for particular Rule 4001 Provisions also discussed in Section I(C) herein):

| Local Rule | Summary of the Terms and Justification | Location in Document |
|---|---|---|
| **Amount of Cash Collateral to Use**<br><br>**Local Rule 4001-2(a)(i)(A)** | $1,152,033, on an Interim basis through the week of 5/1/22.  For final amount, see Budget. | **Exhibit B hereto** |

| Local Rule | Summary of the Terms and Justification | Location in Document |
|---|---|---|
| **Local Rule 4001-2(a)(i)(E)  - Budget** | See above Table. | **¶¶ 1-3 of Interim Order.** |
| **Local Rule 4001-2(a)(i)(F)  - Carve-Out** | See above Table for description of Carve-Out. | **¶ 17.** |
| **Local Rule 4001-2(a)(i)(G)  - Post-Petition Liens on Unencumbered Assets** | None. | |
| **Local Rule 4001-2(a)(i)(K)  - Payment of Prepetition Secured Lenders' fees** | The Debtor shall pay, or reimburse, all such reasonable and documented costs and expenses incurred by Davis Polk & Wardwell LLP, and by Richards, Layton & Finger, P.A., counsel for the Agent and the Ad Hoc Group of Lenders, during the post-petition period, with notice to and review by the U.S. Trustee and any official committee. | **¶ 8(b).** |
| **Local Rule 4001-2(a)(i)(L)** <br><br> **Investigation of claims of Prepetition Secured Lenders** | The Interim Order contains a limitation on Cash Collateral that can be used by any Official Committee of Unsecured Creditors to investigate the claims of the Prepetition Secured Lenders and claims against the Prepetition Secured Lenders of $25,000 and does not authorize use of Cash Collateral to commence adversary proceedings or other litigation against the Prepetition Secured Lenders. | **¶ 8.** |
| **Local Rule 4001-2(a)(i)(M)** <br><br> **Termination Provisions** | See Table above. | **¶¶ 5-6.** |
| **Local Rule 4001-2(a)(i)(P)** <br><br> **Priming Liens** | None granted to the Prepetition Secured Lenders. The DIP Lender will receive a lien that partially primes the Prepetition Secured Lenders in connection with the DIP Financing. | DIP Credit Agreement |
| **Local Rule 4001-2(a)(i)(Q)** <br><br> **Stipulations/Admissions** | The Prepetition Secured Lenders required that, subject to the Challenge Period (as defined in the Interim Order), the Interim Order contains certain stipulations by the Debtor to, among other things, the | **¶ K of Interim Order.** |

#95606257v7

83030366.1

| Local Rule | Summary of the Terms and Justification | Location in Document |
|---|---|---|
| | amount, validity, priority, and enforceability of, as applicable, the Credit Agreement, the Guaranty, the Loan Obligations, and the Prepetition Liens. Subject to the Challenge Period (as defined in the Interim Order), the Interim Order also includes a release of the Prepetition Secured Lenders, in their capacities as such, and each of their respective former, current and future officers, employees, directors, agents, representatives, owners, members, partners, financial and other advisors and consultants, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors and successors in interest; *provided that* any and all rights of a Creditors' Committee or any party in interest to contest the extent, validity, priority or perfection of any and all liens of the Agent for the benefit of the Prepetition Secured Lenders (other than Adequate Protection Liens), to contest the amount of the Prepetition Secured Lenders' asserted claims, to seek the avoidance, recharacterization or subordination of the Agent's or the Prepetition Secured Lenders' liens, claims or interests, to seek the avoidance of any transfer to the Agent or the Prepetition Secured Lenders or to otherwise contest the claims, rights and liens of the Agent for the benefit of the Prepetition Secured Lenders by any party in this Chapter 11 Case are preserved for the Challenge Period (as defined in the Interim Order). The Challenge Period is discussed below. | |

#95606257v7

83030366.1

| Local Rule | Summary of the Terms and Justification | Location in Document |
|---|---|---|
| **Waiver of Right to Surcharge Collateral under 506(c)**<br>**Local Rule 4001-2(a)(i)(V)** | As is customary for agreed cash collateral orders, the Prepetition Secured Lenders required that the Debtor waive its right under section 506(c) of the Bankruptcy Code as a condition to the consensual use of Cash Collateral. Nonetheless, in exchange, the Prepetition Secured Lenders have agreed to fund the Carve-Out, which will be available for chapter 11 and chapter 7 estate administration in the event that the Debtor defaults under the DIP Facility and the Prepetition Secured Lenders' consent to cash collateral use terminates, as well as allocations to and surcharges from the Collateral for chapter 11 professional fees and other priority claims, agreement to partial priming of the Prepetition Secured Lenders' existing liens by the DIP Facility, a $5 million amount to be distributed to general unsecured creditors under a plan and additional amounts to pay allowed professional fees and post-plan effective date costs of completing the Chapter 11 Case, which the Debtor submits constitutes valuable consideration supporting the provisions of the Interim Order, and the to-be submitted Final Order. This 506(c) waiver, though, is not effective immediately, but rather, upon entry of a Final Order. | ¶ 10. |

## BASIS FOR RELIEF

### I.    THE DEBTOR'S PROPOSED USE OF CASH COLLATERAL IS NECESSARY AND APPROPRIATE UNDER BANKRUPTCY CODE SECTIONS 361, 362 AND 363(c).

51.    By this Motion, the Debtor requests entry of an Interim Order and Final Order authorizing the use of Cash Collateral and granting adequate protection in connection with the use of such Cash Collateral on the terms described herein and in the Interim Order, on an emergency basis, and the scheduling of a final hearing and entry of a final order approving use of Cash Collateral.

#95606257v7

83030366.1

**A.    The Debtor Requires Use of Cash Collateral to Operate.**

52.    The Prepetition Secured Lenders hold a properly perfected security interest in, and are in control of through the Depositary Agreement, Cash Collateral consisting of the Debtor's cash and cash equivalents, generated in the ordinary course of its business through operation of the Power Plant, as well as in the Debtor's accounts receivable and the proceeds thereof.

53.    As described in the First Day Declaration, the Debtor requires immediate access to that Cash Collateral in order to meet its ordinary course post-petition operating expense obligations, address working capital needs, and fund the ongoing reorganization efforts, as obligations arise over the course of this Chapter 11 Case.

54.    Although the Debtor has sought approval of limited DIP Financing, that facility was sized as a supplement to use of Cash Collateral.  The DIP Financing, if approved, is to be used primarily to meet anticipated demands for credit support by key suppliers of the natural gas required to fuel the Debtor's power generating turbines.  That DIP Financing, however, provides insufficient liquidity to meet all of the Debtor's post-petition operating expenses and costs of administration, requiring the Debtor's access to Cash Collateral to meet those needs.

55.    The Debtor believes that the approval of this Motion is in the best interest of the Debtor, its creditors and its estate because it will enable the Debtor to (i) continue the orderly operation of its business and avoid an immediate shuttering of the Power Plant; (ii) meet its obligations for necessary ordinary course expenditures, and other operating expenses pending closing of a sale; (iii) make payments authorized under other orders entered by this Court, thereby avoiding immediate and irreparable harm to the Debtor's estate; and, most importantly, (vi) enable it to pursue the sale process that is the underpinning of this Chapter 11 Case.

#95606257v7

83030366.1

**B.**        **The Debtor Should Be Authorized to Use Cash Collateral.**

56.    The Debtor's use of property of its estate, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[10] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Section 363(e) further provides that "on request of an entity that has an interest in property . . . to be used, sold or leased, by the trustee, the court . . . shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."

57.    In turn, section 361 of the Bankruptcy Code provides that when adequate protection is required under section 362, 363, or 364, such adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; . . . (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such

---

[10] "Cash Collateral" is defined by Section 363(a) of the Bankruptcy Code to mean:

> Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

#95606257v7

83030366.1

entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

58.     In this instance, the Debtor has satisfied all of the requirements for consensual and nonconsensual use of Cash Collateral, with appropriate forms of adequate protection.

     i.     <u>The Prepetition Secured Lenders Have Consented To The Use of Cash Collateral</u>.

59.     Section 363(c)(2) permits a debtor to use, sell or lease cash collateral if the entity with an interest in the cash collateral consents. *See* 11 U.S.C. § 363(c)(1)-(2).  Here, the Prepetition Secured Lenders, the only parties-in-interest with a secured interest in the Cash Collateral, have consented to the relief requested in the Motion on the terms and with the conditions set forth in the Interim Order.  Accordingly, the Debtor submits that authority for the Debtor to use the Cash Collateral on the terms set forth in the Interim Order is appropriate under section 363(c)(2) of the Bankruptcy Code.

     ii.     <u>The Proposed Adequate Protection Is Appropriate</u>.

60.     Section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, leaving courts to decide what constitutes sufficient adequate protection on a case-by-case basis. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994)("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re Columbia Gas Sys.*, Inc., 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case").

61.     The concept of adequate protection is generally designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use.

*See, e.g., See In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value); *see also In re Monroe Park*, 17 B.R. 934, 937 (D. Del. 1982) (adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in collateral during the case); *In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."). Courts have recognized that using cash collateral to preserve the value of the secured creditors' collateral is a form of adequate protection in itself. *See, e.g., In re Salem Plaza Assocs.,* 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (so finding); *495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that whether the value of a debtor's property will increase as a result of the use of collateral is part of considering whether a party is adequately protected).

62.     The Budget indicates an expectation that the Debtor's cash position will diminish over the initial stages of the Chapter 11 Case. As is the case with all peaker plants in ERCOT, the late winter and early spring are typically not high demand periods, so dispatch-related revenues are limited. During the summer, however, demand increases with a commensurate increase in dispatch and revenues.

63.     As negotiated with the Prepetition Secured Lenders, adequate protection against that projected Cash Collateral diminution is provided in part by a grant to the Prepetition Secured Lenders of a lien on the Debtor's post-petition assets and the proceeds thereof to the same extent and with the same priority as was held in the Prepetition Collateral as of the Petition Date, with the exception of the DIP Financing Proceeds, and subject to the various carveouts, allocations and surcharges.

#95606257v7
83030366.1

64.     The primary form of adequate protection of the Prepetition Secured Lenders' projected diminishing cash collateral position, however, comes through pursuit of the sale process. As stated above, and despite the occurrence of material Credit Agreement defined events of default, the Prepetition Secured Lenders have agreed to forego invoking the joint and several liability of the Debtor for the full $340 million outstanding loan balance and instead to limit their recovery to the $75 million amount that the lenders would have been entitled in a prepetition disposition of ECEC or its assets had there not been an ECEC default.  Use of cash collateral to pursue the sale process based on the existing stalking horse bid of $91.25 million, if that sale or the sale to an overbidder is consummated, is projected to yield a $75 million payment to the Prepetition Secured Lenders.

65.     As additional adequate protection, the Debtor has agreed to limit its Cash Collateral use to the purposes and amounts, subject to the Permitted Variance, set forth in the Budget, all as previously negotiated with approved by the Prepetition Secured Lenders. The CRO and the Debtor's financial advisory team worked closely with the Debtor's management team to prepare the Budget, a 13 Week Cash Flow projection of the Debtor's revenue, expenses and liquidity after payment of necessary operating expenses and reorganization costs which also tracks sources and uses of Cash Collateral for the first thirteen weeks of the case, inclusive of the time between case commencement and the likely final hearing (the "Interim Period"). The Budget provides for timely payment of all obligations to be incurred post-petition in the ordinary course as well as payments for certain prepetition obligations owing to certain critical suppliers and contract counterparties in accordance with relief to be granted in connection with the Debtor's First Day Pleadings.[11] The

---

[11] In the event that the motions calling for payment of these prepetition obligations are not allowed, the Budget will be amended accordingly.

#95606257v7

83030366.1

Debtor shall also pay, or reimburse, all such reasonable and documented costs and expenses incurred by those attorneys and advisors representing the interests of (1) the Debtor; (2) any official committee appointed; and (3) the Prepetition Secured Lenders as those amounts are authorized or approved by the Court on a monthly, interim, or final basis. Based on the Budget, and with authority to use Cash Collateral as supplemented by the DIP Financing, the Debtor projects that it will have adequate liquidity to pay all reasonable, necessary, and foreseeable expenses incurred in connection with the operation of the Debtor's business.

66.    The proposed use of the Cash Collateral in accordance with the Budget provides further adequate protection to the Prepetition Secured Lenders by ensuring that the Power Plant operates as a going-concern pending the completion of the sale process. The Court's authorization of the use of Cash Collateral, therefore, will protect the Prepetition Secured Lenders' security interests by preserving the value of their collateral, while simultaneously preserving excess value for the Debtor's unsecured creditors. *See In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use of rents to maintain and operate property "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the secured lender's] mortgage"); *In re Cardinal Indus. Inc.*, 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990) (ruling that secured lenders were adequately protected by debtor's use of rents to maintain and manage encumbered properties). Granting the Adequate Protection Lien also provides adequate protection of the Prepetition Secured Creditors' secured interest, while the limitation of that lien to only the amount of a Diminution, especially when combined with the $5 million purchase price carveout for the benefit of unsecured creditors, also preserves value for the creditor body. *See, e.g., In re Gen. Growth Props., Inc.,* 412 B.R. 122, 124 (Bankr. S.D.N.Y. 2009)*, appeal dismissed as moot*, 423 B.R. 716 (S.D.N.Y. 2010).

#95606257v7
83030366.1

67.     Finally, by precluding the Debtor from access to, and permitting Credit Suisse AG, New York Branch, in its capacity as a Revolving LC Issuer to offset any Debtor reimbursement obligation arising upon a letter of credit draw from, the HRCO LC and/or OneOK LC, as applicable, the Revolving LC Issuer's interest in the LC Deposits will be adequately protected.

68.     Courts in this and other districts have approved similar adequate protection packages in recent chapter 11 cases. *See, e.g., In re Salem Harbor Power Development LP, et al.,* Case No. 22-10239-MFW (Bankr. D. Del. March 25, 2022) [D.I. 54] (Interim Order); *In re Alex and Ani, LLC, et al.*, No. 21-10918 (Bankr. D. Del. June 9, 2021) (CTG) [D.I. 214]*; In re Things Remembered, Inc*., No. 19-10234 (Bankr. D. Del. Mar. 29, 2019) (KG) [D.I. 353]; *In re White Eagle Asset Portfolio, LP*, No. 18-12808 (Bankr. D. Del. Jan. 15, 2019) (KG) [D.I. 81]; *In re Ascent Res. Marcellus Holdings, LLC*, No. 18-10265 (Bankr. D. Del. Mar. 20, 2018) (LSS) [D.I. 107]; *In re ExGen Texas Power, LLC*, No. 17-12377 (BLS) (Bankr. D. Del. Nov. 8, 2017) [D.I. 46] (Interim Order); *In re Central Grocers, Inc.*, No. 17-10993 (LSS) (Bankr. D. Del. June 8, 2017) [D.I. 368].

69.     Under the circumstances before the Court, the Debtor submits that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) under the terms that the Debtor negotiated, provides relief that is in the best interests of the Debtor and its estate.

**C.     The Findings of Validity, Perfection, or Amount of Prepetition Liens and Challenge Period Are Appropriate.**

70.     As previously indicated, Local Rule 4001-2(a)(i) requires a debtor to justify the inclusion of the Rule 4001 provisions in a proposed cash collateral order; the Rule 4001 Provisions are summarized in Paragraph 48 above. The Debtor believes that each Rule 4001 Provision

#95606257v7

83030366.1

included in the Cash Collateral Orders is justified and necessary in the context and circumstances of this case.

71.     In addition to the information set forth above, the Interim Order complies with Local Rule 4001-2(a)(i)(Q) by providing any party in interest with ample opportunity to file an adversary proceeding challenging the validity, extent, perfection, or priority of the Secured Obligations or the liens on the Prepetition Secured Lenders' collateral by no later than what is defined as the "Challenge Deadline."  The "Challenge Deadline" shall mean the earlier of (1) the date of confirmation of a plan of reorganization; or (2) (i) as to the Committee, 60 days from the date of the formation of the Committee (if appointed) and (ii) for any other party in interest, 75 days following the entry of the Interim Order, as such deadline may be extended (x) in writing prior to  the expiration of the Challenge Deadline or (y) by this Court for good cause shown pursuant to an application filed and served by a party in interest prior to the expiration of the Challenge Deadline; and (iii) if, prior to the expiration of the  Challenge Deadline, (x) the Chapter 11 Case converts to chapter 7 and a chapter 7 trustee is appointed, or (y) if a chapter 11 trustee is appointed, then, in each such case, the Challenge Deadline shall be extended, solely with respect to such trustee, until the later of the Challenge Deadline and ten (10) calendar days after such trustee's appointment.

72.     The Debtor believes that this protocol is appropriate under the circumstances, consistent with the Local Rules, and provides any official committee or other party in interest, including a subsequently appointed trustee, with sufficient time for a thorough investigation.

### D.   Interim Relief Is Necessary and Appropriate.

73.     Bankruptcy Rule 4001(b)(2) governs the procedures for obtaining authorization to use cash collateral and provides, in relevant part:

#95606257v7

83030366.1

> The court may commence a final hearing on a motion for
> authorization to use cash collateral no earlier than 14 days after
> service of the motion. If the motion so requests, the court may
> conduct a preliminary hearing before such 14 day period expires,
> but the court may authorize the use of only that amount of cash
> collateral as is necessary to avoid immediate and irreparable harm
> to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(b)(2).

74. Local Bankruptcy Rule 4001-2(b) further provides that interim relief is available to the extent necessary to avoid immediate and irreparable harm pending a final hearing, except that barring extraordinary circumstances, the Court shall not approve interim financing orders that include any of the provisions set forth in Local Rule 4001-2(a)(i)(P)-(X).

75. The Debtor has an immediate need to use the Cash Collateral for the purposes identified in the Budget for the Interim Period. Without the ability to use Cash Collateral, the Debtor would be unable to meet its post-petition obligations or to fund working capital needs, thus causing irreparable harm to the going-concern value of the Debtor's assets that are in the midst of a sale process in an effort to maximize value for the benefit of the Debtor's constituents. The provisions of the Interim Order do not purport to seek approval of any of provisions set forth in Local Rule 4001-2(a)(i)(P)-(X) under an interim order.

76. Courts in this district recognize the importance of a debtor's ability to use cash collateral to prevent immediate and irreparable harm to its estate. *See, e.g., In re Salem Harbor Power Development LP, et al.,* Case No. 22-10239-MFW (Bankr. D. Del. March 25, 2022) [D.I. 54] (Interim Order); *In re Longview Power, LLC*, Case No. 20-10951 (BLS) (Bankr. D. Del. Apr. 15, 2020) [D.I. 60]; *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS) (Bankr. D. Del. Feb. 2, 2020) [D.I. 90]; *In re Lucky's Market Parent Company, LLC*, Case No. 20-10166 (JTD) (Bankr. D. Del. Jan. 28, 2020) [D.I. 50]; *In re REVA Medical, Inc.*, Case No.

20-10072 (JTD) (Bankr. D. Del. Jan. 15, 2020) [D.I. 34]; *In re Things Remembered, Inc.*, Case No. 19-10234 (KG) (Bankr. D. Del. Feb. 7, 2019) [D.I. 70].

77.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rule 4001(b), and Local Rule 4001-2, the Debtor respectfully requests that this Court schedule the Interim Hearing on an emergency basis, and enter the Interim Order at the conclusion of the Interim Hearing, authorizing the Debtor to use Cash Collateral on the terms set forth in the Interim Order pending entry of the Final Order, to avoid irreparable harm to the Debtor's estate.

### E.     The Automatic Stay Should Be Modified On A Limited Basis.

78.     The relief requested herein contemplates a *limited* modification of the automatic stay to permit the Debtor to grant the Adequate Protection Liens to the Prepetition Secured Lenders, and to perform such acts as may be requested to assure the perfection and priority of such liens.

79.     Stay modifications of this kind are ordinary and standard features for the use of cash collateral, and in the Debtor's business judgment, are reasonable and fair under the present circumstances.

### F.     Request for a Final Hearing

80.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court (a) set a date for the Final Hearing that is as soon as practicable but no later than twenty-one (21) days from the Petition Date, and (b) fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### REQUEST FOR IMMEDIATE RELIEF

81.     The Debtor respectfully requests emergency consideration of the Motion under Bankruptcy Rule 6003, which provides that the relief requested in this Motion may be granted if it is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. As described

#95606257v7

83030366.1

herein and in First Day Declaration, any disruption of the Debtor's use of the Cash Collateral would substantially diminish or impair the Debtor's efforts in this Chapter 11 Case to preserve and maximize the value of its estate. For this reason and those set forth above, the Debtor respectfully submits that the requirements of Bankruptcy Rule 6003 are satisfied and the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate.

## BANKRUPTCY RULE 6004 SHOULD BE WAIVED

82.     To the extent applicable to certain of the relief requested in this Motion pursuant to Section 363, and on the grounds outlined in detail above, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

83.     Nothing contained herein is or should be construed as: (i) an admission as to the validity of any claim against any Debtor or the existence of any lien against the Debtor's properties; (ii) a waiver of the Debtor's rights to dispute any claim or lien on any grounds; (iii) a promise to pay any claim; (iv) an implication or admission that any particular claim would constitute an allowed claim; (v) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; or (vi) a limitation on the Debtor's rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with any party subject to the Interim Order and Final Order once entered. Nothing contained in the Interim Order or the Final Order shall be deemed to increase, decrease, reclassify, elevate to an administrative expense status, or otherwise affect any claim to the extent it is not paid.

**NO PREVIOUS REQUEST**

84.      No previous request for the relief sought herein has been made by the Debtor to this or any other court.

**NOTICE**

85.      Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet Sarkessian)(juliet.m.sarkessian@usdoj.gov); (b) the parties appearing on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Agent and the Ad Hoc Group, Davis Polk & Wardwell LLP, Attn: Brian Resnick, Esq. and Joshua Sturm, Esq., 450 Lexington Avenue, New York, NY 10017 (brian.resnick@davispolk.com; joshua.sturm@davispolk.com) and Richards, Layton & Finger P.A., Attn: Mark D. Collins, Esq. (collins@rlf.com); (d) all known parties, to the best of the Debtor's knowledge, information, or belief, asserting a lien against or other interest in the Prepetition Collateral; (e) counsel to be selected by any Committee in the event of an upon its formation by such date; (f) the Internal Revenue Service, and all other state taxing authorities in jurisdictions in which the Debtor does business; (g) all applicable governmental and regulatory agencies governing the Debtor's industry, (including the Environmental Protection Agency and any state environmental regulatory agencies in the states in which the Debtor does business); (h) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (i) any other party entitled to notice pursuant to Local Rule 9013-1(m) (the "Notice Parties").

#95606257v7

83030366.1

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the Interim Order, substantially in the form attached hereto as Exhibit A, (ii) following the Final Hearing, enter the Final Order, and (iii) grant the Debtor such other and further relief as is just and proper.

Dated:  April 11, 2022
        Wilmington, Delaware

Respectfully submitted,

*/s Christopher A. Ward*            
**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Michael V. DiPietro (Del Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone: 302-252-0920
Facsimile: 302-252-0921
cward@polsinelli.com
mdipietro@polsinelli.com

-and-

**HOLLAND & KNIGHT LLP**
John J. Monaghan (*pro hac vice* admission pending)
Lynne B. Xerras (*pro hac vice* admission pending)
Kathleen M. St. John (*pro hac vice* admission pending)
10 St. James Avenue
Boston, MA 02116
Telephone: 617-523-2700
Facsimile: 617-523-6850
bos-bankruptcy@hklaw.com

-and-

David W. Wirt (*pro hac vice* admission pending)
Phillip W. Nelson (*pro hac vice* admission pending)
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Telephone: 312-263-3600
Facsimile: 312-578-6666
david.wirt@hklaw.com
phillip.nelson@hklaw.com

*Proposed Counsel for the Debtor and Debtor in Possession*

#95606257v7

83030366.1

# EXHIBIT A

## Proposed Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| ECTOR COUNTY ENERGY CENTER LLC,[1] | Case No. 22-_____ (__) |
| Debtor. | **Re: Docket No. ___** |

**INTERIM ORDER AUTHORIZING THE DEBTOR TO (I) USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED LENDERS, (III) MODIFYING AUTOMATIC STAY, (IV) SCHEDULING
A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Ector County Energy Center LLC, the debtor and debtor-in-possession ("ECEC" or the "Debtor") in the above captioned chapter 11 case ( "Chapter 11 Case"), having filed a *Motion of Debtor for Entry of Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Motion"), on April 11, 2022 [Docket No. _____], requesting, pursuant to sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002, 4001-2, 9006-1 and 9013-1(m) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), on an emergency basis, entry of an interim order and, following a final hearing (the "Final Hearing"), entry of a final order (the "Final Order"), providing the following relief:

---

[1]  The last four digits of the Debtor's federal tax identification are 6852.  The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.  More information about the Debtor and this case is available on the website maintained by Donlin, Recano & Company, Inc., the Debtor's proposed claims and noticing agent, at www.donlinrecano.com/ecec, or can be requested by e-mail at ececinfo@donlinrecano.com.

(a) authorizing the Debtor to use Cash Collateral (as defined in the Motion) in which Credit Suisse AG, Cayman Islands, as administrative agent and as collateral agent (the "<u>Agent</u>"), holds an interest on the collective behalf of the Prepetition Secured Lenders[2];

(b) providing adequate protection to the Prepetition Secured Lenders for any diminution of their collective secured interest in the Prepetition Collateral resulting from the (i) use, sale or lease of the Debtor's property in accordance with the Interim Order or (ii) the imposition of the automatic stay;

(c) scheduling the Interim Hearing to consider entry of this Interim Order;

(d) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtor, the Agent, and the Prepetition Secured Lenders to implement the terms of the Interim Order and the Final Order;

(e) waiving any applicable stays under the Bankruptcy Rules and providing for the immediate effectiveness of the Interim Order and the Final Order;

(f) scheduling the Final Hearing within approximately 21 days of the Petition Date to consider approval of this Motion on a final basis; and

(g) granting related relief.

The Interim Hearing having been held on April __, 2022, pursuant to Bankruptcy Rules 2002, 4001(b) and (d), 9014, and Local Rule 4001-2, and upon the record made by the Debtor at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      **Commencement of Case**. On April 11, 2022 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>" or the "<u>Court</u>"), thereby commencing the Chapter 11 Case.

---

[2] Capitalized terms not herein defined shall have the meanings ascribed in the Motion.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

B.      **Debtor in Possession**. Since the Petition Date, the Debtor has been managing and operating its business and properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.      **Jurisdiction and Venue**. This Court has jurisdiction over the Chapter 11 Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. §157(b)(2). The predicates for relief sought herein are section 105, 361, 362 and 363 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Committee**.  As of the date hereof, no official committee of unsecured creditors has been appointed in the Chapter 11 Case (any such committee, the "Creditors' Committee" and, together with any other statutory committee appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code, a "Committee").

E.      **Notice**. The Debtor has represented that notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor in accordance and compliance with Bankruptcy Rules as well as the Local Rules and is sufficient under the circumstances.  Without limiting the forgoing, the Debtor has represented that due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery on April ____ 2022, to certain parties in interest, including: (a) the United States Trustee for the District of Delaware; (b) the parties set forth on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) Davis Polk & Wardwell LLP, Attn: Brian Resnick, Esq. and Joshua Sturm, Esq., 450 Lexington Avenue, New York, NY 10017 (brian.resnick@davispolk.com; joshua.sturm@davispolk.com) and Richards, Layton & Finger,

P.A., Attn: Mark D. Collins, Esq. (collins@rlf.com); (d) all known parties, to the best of the Debtor's knowledge, information, or belief, asserting a lien against the Prepetition Collateral; (e) all relevant taxing jurisdiction; (f) the Electric Reliability Council of Texas and the Public Utilities Commission of Texas; and (g) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules and the Local Rules. No other notice need be provided for entry of this Interim Order (collectively, (a) through (g), the "<u>Notice Parties</u>").

F.    **Prepetition Loan Documents**. The Debtor stipulates that ECEC is a party to that certain (a) Amended and Restated Credit and Guaranty Agreement, dated as of August 22, 2019 (as amended by that certain Amendment No. 1 to the Amended and Restated Credit and Guaranty Agreement, dated as of March 3, 2020, by that certain Amendment No. 2 to the Amended and Restated Credit and Guaranty Agreement, dated as of February 24, 2021, by that certain Amendment No. 3 to the Amended and Restated Credit and Guaranty Agreement, dated as of April 28, 2021 and by that certain Amendment No. 4 to the Amended and Restated Credit and Guaranty Agreement, dated as of April 4, 2022, the "<u>Credit Agreement</u>"), by and among ITOI, as borrower, the Debtor and certain of its non-debtor affiliates, as Subsidiary Guarantors,[4] each of the banks and other financial institutions party thereto as Lenders, the financial institutions from time to time parties thereto as issuing banks in respect of Revolving Letters of Credit (the "<u>Revolving LC Issuers</u>", collectively with the Lenders, the "<u>Prepetition Secured Lenders</u>"), and the Agent (together with the Prepetition Secured Lenders, the "<u>Prepetition Secured Parties</u>"), and (b) the other "Loan Documents" (as defined in the Credit Agreement and, together with the Credit

---

[4] The Subsidiary Guarantors are, in addition to ECEC: *Invenergy Thermal LLC, Invenergy Development Company LLC, Invenergy Nelson Holdings LLC, Ector County Energy Center Holding LLC, Invenergy Grays Harbor Holding LLC, Invenergy Grays Harbor LLC, Invenergy Nelson LLC and Grays Harbor Energy LLC.*

Agreement, the "Prepetition Loan Documents"), pursuant to which the Prepetition Secured Lenders agreed to provide term loans (those lenders, the "Term Lenders") and revolving loans (those lenders, the "Revolving Lenders") to, and to issue and/or participate in Revolving Letters of Credit (as defined in the Credit Agreement) to and for the account of, ITOI.

G.     **Prepetition Secured Guarantees**.  The Debtor stipulates that in accordance with the Credit Agreement, ECEC, and each of the other Subsidiary Guarantors, provided an unconditional joint and several guaranty (the "Guaranty") of "due and punctual payment in full of all Secured Obligations[5]… when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration demand or otherwise …," defined in the Credit Agreement as the "Guaranteed Obligations."

H.     The Debtor stipulates that ECEC secured its obligations to the Prepetition Secured Lenders under the Credit Agreement through a separately executed Pledge and Security Agreement dated August 28, 2018 ("Security Agreement," and included in the Prepetition Loan Documents, defined above), granting the Prepetition Secured Lenders a first-priority security interest in and lien upon its real and personal property assets and the proceeds thereof (the "Prepetition Collateral").

I.     The Debtor stipulates that separately, the Prepetition Secured Lenders' security interests in ITOI, ECEC and the Subsidiary Guarantors' cash and cash equivalents generated from operation of the ITOI Projects, including the Power Plant, were perfected under a Depositary Agreement, dated as of August 28, 2018 (as amended, the "Depositary Agreement"), among ITOI, the Subsidiary Guarantors, the Agent and The Bank of New York Mellon, as the depositary bank (the "Depositary Bank"). The Depositary Agreement provides the Agent, on behalf of the

---

[5] As defined in the Credit Agreement.

Prepetition Secured Lenders, a first priority lien and control over each of the Obligors' (as defined in the Credit Agreement) right, title and interest in funds on deposit with the Depositary Bank in various "Collateral Accounts" (as defined in the Depositary Agreement), maintained by ITOI and each of the Subsidiary Guarantors in connection with their business operations in the ordinary course. The Collateral Accounts maintained with the Depository Bank include the Ector Revenue Account (as defined in the Depositary Agreement), receiving all income and receipts generated through operation of the Power Plant, and the Ector Operating Account (as defined in the Depositary Agreement), from which ECEC's operating and maintenance expenses are paid. Additionally, ECEC maintains the Local Account (as defined in the Depositary Agreement) in Ector County with JP Morgan Chase that is subject to a Deposit Account Control Agreement in favor of the Agent (collectively, the Local Account and the Collateral Accounts, the "<u>Account Collateral</u>" and included in the definition of "<u>Prepetition Collateral</u>").

J.      The Debtor stipulates that ECEC's obligations to the Prepetition Secured Lenders as Subsidiary Guarantor are also secured by a deed of trust granted on ECEC's owned real estate assets and improvements and easement rights pertaining to the Power Plant property in Ector County, Texas, through a *Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing*, as amended on August 22, 2019, recorded by the Agent with the Public Records Office of Ector County, Texas.

K.      **Claim Stipulation**.  The Debtor agrees, acknowledges and stipulates for itself and its estate that, under the Credit Agreement, as of the Petition Date: (i) the Term Lenders hold (x) valid, enforceable, contingent and liquidated guaranty claims against the Debtor for an aggregate amount of no less than $337,319,920.82 (the "<u>Term Lender Guaranty Claims</u>"), (y) a valid, enforceable and liquidated claim under the Credit Agreement against the Debtor for $75,000,000

(the "Ector Prepayment Claim"), and (z) other Obligations (as defined in the Credit Agreement, together with the Term Guaranty Claims and the Ector Prepayment Claim, and any additional interest, fees, costs and expenses, including any legal fees, reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing under or in connection with the Prepetition Loan Documents, collectively, the "Prepetition Term Loan Obligations"); and (ii) the Revolving Lenders hold valid, enforceable, contingent and liquidated guaranty claims against the Debtor under the Credit Agreement in  connection with issued and outstanding letters of credit, for an aggregate amount of no less than $64,553,598.00 (together with any additional interest, fees, costs and expenses, including any legal fees, reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whenever arising, due, or owing under or in connection with the Prepetition Loan Documents, the "Prepetition Revolving Loans Obligations", together with the Prepetition Term Loan Obligations, the "Prepetition Obligations").

L.      **Lien Stipulation**.  The Debtor agrees, acknowledges and stipulates for itself and its estate that the liens and security interests granted by the Debtor to secure its obligations under the Credit Agreement, the Guaranty and any other of the Loan Documents (the "Prepetition Liens") constitute valid, perfected, unavoidable and enforceable first priority liens and secured interests in all respects as to the Prepetition Collateral.

M.      **Plan Support Agreement**.  The Debtor represents and stipulates that the Debtor, the Agent, Term Lenders holding no less than 66.67% of the aggregate outstanding balance as of the Petition Date of the term loans outstanding under the Credit Agreement (the "Consenting Term Lenders") and Revolving Lenders holding 100% of the Revolving Loan Exposure (as

7

defined in the Credit Agreement) as of the Petition Date under the Credit Agreement (the "Consenting Revolving Lenders" and together with the Consenting Term Lenders, collectively, the "Consenting Lenders") have entered a Plan Support Agreement dated as of April 4, 2022 (the "Plan Support Agreement"), setting forth the terms under which the Debtor will seek, and the Consenting Lenders will support, *inter alia*, authority to use Cash Collateral, approval of post-petition financing (the "DIP Financing", the motion seeking interim or final approval by this Court of the DIP Financing, the "DIP Motion", and an interim or final order by this Court authorizing such DIP Financing, the "DIP Financing Order") and confirmation of a liquidating chapter 11 plan.  A copy of the Plan Support Agreement has been filed as Exhibit A to the *Declaration of John Baumgartner, Chief Restructuring Officer, in Support of Chapter 11 Petition, First Day Motions, and Related Relief* [Docket No. 2].

  N. **Stipulations Regarding Cash Collateral**.  The Debtor represents and stipulates that all of the Debtor's cash, cash equivalents, negotiable instruments, investment property, and securities (other than cash deposits funded by the Debtor for the benefit of certain of the Debtor's suppliers and regulatory agencies prior to the Petition Date in the ordinary course of business, or those cash deposits specifically anticipated to be posted during the pendency of this case as set forth in the Budget, including, but not limited to, cash to be segregated for the benefit of the Debtor's utility service providers in accordance with subsequent Court orders, retainers held by the Debtor's professionals, funds held in escrow accounts as of the Petition Date unless and until such funds become property of the Debtor's estate pursuant to the terms of the applicable asset purchase agreement or an order of the Court), and the LC Deposit, defined below, which LC Deposit constitutes the cash collateral of Credit Suisse AG, New York Branch in its capacity as Revolving LC Issuers, exclusively) (the "Excluded Cash Deposits")  constitute Cash Collateral

of the Agent on behalf of itself and the other Prepetition Secured Parties. The Debtor continues to collect cash, rents, income, offspring, products, proceeds and profits generated from the Cash Collateral, all of which constitute Prepetition Collateral subject to the Prepetition Liens. All Cash Collateral and all proceeds of the Prepetition Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, shall be used and/or applied in accordance with the terms and conditions of this Interim Order, and for no other purpose.  As security for the Debtor's obligation to reimburse those Prepetition Secured Lenders that have acted as Revolving LC Issuers (as defined in the Credit Agreement), in the event of a draw on posted letters of credit, the Debtor has deposited funds in a segregated cash collateral account with The Bank of New York, N.A. (the "L/C Deposit"), held in the name of Credit Suisse AG, New York Branch in its capacity as Revolving LC Issuer, to secure the ECEC's contingent liability in the event of a draw on either or both the $7 million letter of credit posted in connection with the HRCO in favor of Direct Energy ("HRCO Letter of Credit") or the $225,000 letter of credit posted in favor of OneOK Texas Gas Storage, LLC (the "OneOK Letter of Credit").

O.    **Prepetition Obligations as Valid and Binding Obligations**.  The Debtor agrees, acknowledges and stipulates for itself and its estate that the Prepetition Obligations constitute the legal, valid and binding obligations under the Credit Agreement, where the Debtor is (i) a primary Obligor (as defined in the Credit Agreement) with respect to the Obligations provided in Section 3.02(b)(vii) of the Credit Agreement and (ii) a joint and several Subsidiary Guarantor with respect to all other Obligations, each in accordance with the terms of the Credit Agreement, the Guaranty and any other of the Loan Documents, which guaranty is valid and enforceable by its terms and in all respects.  No portion of the Prepetition Obligations or any payments made to the Agent or the Prepetition Secured Lenders is subject to any contest, avoidance, recharacterization, offset,

9

"claim" (as defined in the Bankruptcy Code), attack, disallowance, disgorgement, impairment, reduction, attachment, recoupment, counterclaim, cross-claim, defense, objection, recovery, subordination (whether equitable, contractual or otherwise), cause of action, impairment or any other challenge of any kind or nature pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

P.     **No Valid or Enforceable Claims Against Agent or Prepetition Secured Lenders**.  Subject to the challenge provision described in Paragraph 16 herein, as of the date hereof, except with respect to any claims arising under or in connection with the Plan Support Agreement, the Debtor agrees, acknowledges and stipulates for itself and its estate that it holds no valid or enforceable "claims" (as defined in the Bankruptcy Code), counterclaims or causes of action against the Agent, the Prepetition Secured Lenders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees whether arising at law or in equity, including without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any similar provisions of applicable state or federal law.  The Debtor hereby irrevocably waives and releases, for itself and its affiliates (with respect to any non-Debtor affiliate, to the maximum extent provided under applicable law), any and all claims, counterclaims or causes of action against each of the Agent and the Prepetition Secured Lenders, and any right to challenge or contest in any way the perfection, validity, priority or enforceability of the Prepetition Liens, the validity or enforceability of the Prepetition Obligations, the Prepetition Loan Documents, or this Interim Order.

Q.     **Adequate Protection for the Prepetition Secured Parties**.  The Consenting Lenders and the Debtor have represented that they have negotiated in good faith regarding the

10

Debtor's use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtor's estates and continued operation of its business in accordance with the terms hereof. The Debtor, through the Plan Support Agreement, has received the necessary consents from the Prepetition Secured Parties to the Debtor's proposed use of Cash Collateral, until the Termination Date (as defined below), exclusively in accordance with and subject to the terms and conditions set forth herein, including the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, to the extent such section applies. The Prepetition Secured Parties are entitled to the adequate protection as and to the extent set forth herein pursuant to sections 361, 362, and 363 of the Bankruptcy Code. Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including the Cash Collateral) as set forth herein are (i) consistent with and authorized by the Bankruptcy Code, (ii) fair and reasonable, (iii) reflect the Debtor's prudent exercise of business judgment, (iv) necessary to protect the Prepetition Secured Parties from the diminution of their respective interests in the value of the Prepetition Collateral, and (v) constitute reasonably equivalent value and fair consideration for the Prepetition Secured Parties' consent thereto; provided that nothing in this Interim Order shall be construed as a consent by any Prepetition Secured Party to the use of any Prepetition Collateral (including Cash Collateral) except on the terms set forth in this Interim Order.

R.     **Credit Bid**. Pursuant to the PSA, the Agent and each of the Prepetition Secured Lenders by and through the Agent have waived the right to submit a credit bid under section 363(k) of the Bankruptcy Code in connection with a sale of the Debtor's assets under section 363

11

of the Bankruptcy Code, provided that (i) such sale will provide the Minimum Term Lender Distribution and (ii) the Plan Support Agreement remains in full force and effect.

      S.    **Necessity of Relief Requested**. The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and Local Rule 4001-2. The Debtor has demonstrated that without access to the Cash Collateral, the Debtor's ability to manage, administer and preserve the Debtor's estate would be immediately and irreparably harmed, thereby putting at risk consummation of a sale of substantially all of the Debtor's assets and materially impairing the possibility for a successful outcome in the Chapter 11 Case. The relief requested in the Motion is, therefore, necessary, essential, and appropriate for the management and preservation of the Debtor's estate and in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

Based on the foregoing, and upon the record made at the Interim Hearing, and good and sufficient cause appearing therefor,

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

      1.    <u>Motion Granted</u>. The Motion is granted on an interim basis as herein provided, and the use of Cash Collateral is authorized, subject to the terms and conditions set forth in this Interim Order. Any objections to the interim relief requested in the Motion that have not previously been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled. The rights of all parties in interest to object to entry of a Final Order are reserved.

      2.    <u>Authorization to Use Cash Collateral</u>. The Debtor is authorized to use Cash Collateral (which Cash Collateral shall not include the L/C Deposit) subject to the terms hereof up to the amounts and for the purposes set forth in the Budget (as defined below), through and

12

including the Termination Date (as defined below), and not beyond, subject to the Carve-Out (as defined below) and the provisions of this Interim Order.  All of the Debtor's Cash Collateral and any other cash of the Debtor not constituting Cash Collateral shall be maintained in the same accounts in which all such cash and cash equivalents were held as of the Petition Date except to the extent disbursed in accordance with the provisions of this Order.

      3.      <u>Approved Budget and Periodic Reporting</u>.

      (a)      The Debtor's use of Cash Collateral is authorized, and shall be in accordance with the budget attached hereto as <u>Exhibit A</u> (the "<u>Initial Budget</u>"), and as updated in accordance with the provisions of this Order (each such update, an "<u>Updated Budget</u>" and with the Initial Budget, a "<u>Budget</u>"), in each instance subject to the limitations and variances set forth herein. Cash Collateral use shall be limited to the payment of operating costs and other administrative expenses, fees owed to the United States Trustee, ordinary course and other payments authorized or directed by this Court, such as (i) professional fees and fees incurred by the Agent and the Ad Hoc Group (discussed below), (ii) the Debtor's legal, financial, special committee of the board and investment banking fees, fees and expenses of the Chief Restructuring Officer, and (iii) fees and expenses of any Committee but not including any success fee of a committee professional.  The Initial Budget that has been approved by the Agent and a requisite percentage of Consenting Lenders (the "Requisite Consenting Lenders") for the period starting with the Petition Date (the Initial Budget, and any other budget subsequently approved by the Agent (acting at the direction of the Requisite Consenting Lenders), an "<u>Approved Budget</u>") is attached hereto as Exhibit A.

      (b)      <u>Updated Budgets and Periodic Reporting</u>.  During the period of the Debtor's authority to use Cash Collateral, the Debtor shall furnish to the Agent the following: (i) no later than five (5) days before each month-end, starting in April 2022, a rolling updated 13-week cash

13

flow forecast and budget setting forth all projected cash receipts and expenditures on a line item and cumulative weekly basis for the next 13-week period for review by the Agent and the Ad Hoc Group.  The Requisite Consenting Lenders shall be deemed to have approved such updated budget absent written objection within three days of receipt, provided, however, that approval of any update to an Approved Budget then in effect shall be limited to only the subsequent four week period and that no approval of the Agent or the Requisite Consenting Lenders shall be required with respect to any proposed update to the Approved Budget to the extent the previously approved line items therein remain unchanged for the same period set forth in the Approved Budget then in effect.  Upon and subject to the approval of any such Updated Budget by the Agent (acting at the direction of the Requisite Consenting Lenders), such Updated Budget shall constitute the then-Approved Budget; provided, however, that in the event the Agent (acting at the direction of the Requisite Consenting Lenders) and Debtor are unable to reach agreement regarding an Updated Budget, the Approved Budget most recently in effect shall remain the Approved Budget; (ii) no later than one day prior to the end of each month, commencing with [April] 2022, the Debtor shall deliver to the Agent a monthly operating report in the form and on the date required by the Credit Agreement or such other form as is agreed by the Company and the Agent (acting at the direction of the Requisite Consenting Lenders); and (iii) the Debtor shall deliver to the Agent copies of the Monthly Operating Report substantially simultaneously with filing of the Monthly Operating Report in the Chapter 11 Case.

(c)     Variance Reporting.  Not later than the later of the fifth (5th) day or the Friday following the end of each month, commencing May 2022 (the "Initial Reporting Date"), and not later than the later of the fifth (5th) day or the Friday following the end of each month thereafter (the "Reporting Date" and each month-long period, a "Reporting Period"), the Debtor shall deliver

14

to the Agent a variance report (each, a "Variance Report") setting forth the cumulative operating disbursement variance for the immediately preceding Reporting Period and the cumulative operating disbursement variance from the Petition Date to the date of the then most recently ended Reporting Period, comparing actual cumulative cash receipts and disbursements to the amounts of the cumulative cash receipts and disbursements projected in the Approved Budget.  The Variance Report shall include the percentage and amount by which the actual cumulative receipts and disbursements differed from the cumulative receipts and disbursements set forth in the Approved Budget (x) for such Reporting Period and (y) on a cumulative basis from the Petition Date to the end of the then-most recent Reporting Period.

(d)    Permitted Variances. The Debtor shall not, without the written consent of the Agent (acting at the direction of the Requisite Consenting Lenders) (which may be delivered via email by counsel), make operating disbursements during any Reporting Period in an aggregate amount that would exceed the sum of (i) the aggregate amount of the operating expenses set forth in the Approved Budget for such Reporting Period and (ii) the aggregate positive difference, if any, of the budgeted operating disbursements in the Approved Budget for the Reporting Periods prior thereto (the "Prior Budget Periods") by more than fifteen percent (15.0%) (the "Permitted Variances"), *provided however* that the Agent's Fees (defined below), the fees of any Committee and any disbursement or release of funds from the L/C Deposit or other payments towards the Debtor's reimbursement obligations arising from a draw on any letter of credit issued by the Revolving LC Issuers shall not be included as a budgeted expense in the calculation of Permitted Variances.

4.    L/C Deposit.  To the extent that one or both the HRCO Letter of Credit or the OneOK Letter of Credit is drawn during the pendency of the Chapter 11 Case, Credit Suisse AG,

New York Branch in its capacity as Revolving LC Issuer is authorized, allowed and hereby granted relief from the automatic stay imposed by Section 362 of the Bankruptcy Code in order to obtain and apply the L/C Deposit to the extent necessary to fully satisfy any reimbursement claim resulting therefrom.

5.      Termination.  The Debtor's authorization to use Cash Collateral shall terminate on a date that is five (5) business days (the "Remedies Notice Period") following the Debtor's receipt from the Agent (acting at the direction of the Requisite Consenting Lenders) of a notice (which may be delivered via email by counsel, such notice, the "Termination Event Notice") of the occurrence of one or more of the events set forth in paragraph 6, below (each a "Termination Event", and such date, the "Termination Date"), unless continued use of Cash Collateral is extended or authorized by an order of this Court.

6.      Termination Events. The occurrence of each of the following shall constitute a "Termination Event":

(a)      a material breach by the Debtor of the provisions of the Plan Support Agreement including, but not limited to, a failure to meet one or more of the Milestones set forth therein;

(b)      the termination of the Plan Support Agreement by the Debtor or the Requisite Consenting Lender (as defined in the Plan Support Agreement) in accordance with the terms thereof or the Plan Support Agreement otherwise ceases to be in full force and effect;

(c)      (i) the failure of the Debtor to make any payment or reimbursement to the Agent or the Ad Hoc Group as and when such payment or reimbursement becomes due; or (ii) this Court's entry of an order avoiding, disgorging, or requiring repayment of any portion of any payment or reimbursement made by the Debtor to the Agent or the Ad Hoc Group, in each case, unless such fees are either voluntarily reduced by Agent or the Ad Hoc Group or disallowed by the Court;

(d)      the failure of the Debtor to maintain the Cash Collateral in the same accounts in which all such cash and cash equivalents were held as of the Petition Date except to the extent disbursed in accordance with the provisions of this Order;

(e)      the expenditure by the Debtor of Cash Collateral for purposes not set forth in the Budget or in amounts that exceed the Permitted Variance;

83030398.1

(f)      a Final Order relating to the Debtor's use of Cash Collateral shall not have been entered that is in form and substance acceptable to the Requisite Consenting Lenders on or before thirty days after the Petition Date;

(g)      an order shall have entered relating to the use of Cash Collateral or adequate protection to any party that is not acceptable in all respects to the Agent and Requisite Consenting Lenders;

(h)      an order shall have been entered by this Court (or the Debtor seeks an order) granting any party other than the Agent for the benefit of the Prepetition Secured Lenders, or any party other than the Agent for the benefit of the Prepetition Secured Lenders otherwise obtains, a lien on the Prepetition Collateral or the Adequate Protection Collateral (as defined below), or otherwise having a claim against or recourse to, in each case except as arising under applicable state law, the Debtor, the Prepetition Collateral, or the Adequate Protection Collateral, in each case without the consent of the Requisite Consenting Lenders, that was not held by such party prior to the Petition Date and that is senior to or of equal priority with the liens held by, or granted herein to, the Agent for the benefit of the Prepetition Secured Lenders, with the exception of any relief granted in connection with the DIP Financing;

(i)      (i) the Court grants any application by any party (other than the Prepetition Secured Parties) seeking allowance or payment of any claim on a superpriority administrative claim basis *pari passu* with, or senior to, the Adequate Protection Superpriority Claims other than as expressly permitted by this Interim Order or the DIP Financing Order; or (ii) the filing by the Debtor of a motion seeking any such superpriority administrative claims other than as expressly permitted under this Interim Order or the DIP Financing Order;

(j)      this Interim Order ceases to be in full force and effect for any reason or an order is entered (or the Debtor seeks an order) reversing, amending, supplementing, staying, vacating or otherwise modifying this Interim Order without the prior written consent of the Agent (acting at the direction of the Requisite Consenting Lenders);

(k)      subject to the terms of the order approving a sale of substantially all of the Debtor's assets as described in the Sale Motion (the "Sale Order"), (i) any Adequate Protection Liens or Adequate Protection Superpriority Claims held by or granted to the Prepetition Secured Parties, as applicable, ceases to be valid, perfected and enforceable in all respects, or the Debtor asserts the invalidity, non-perfection or unenforceability of; or (ii) purports to revoke, terminate or rescind, any of the Adequate Protection Liens or the Adequate Protection Superpriority Claims;

(l)      a filing by the Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Prepetition Obligations or asserting any other cause of action against and/or with respect to the Prepetition Obligations, the Prepetition Collateral or any of the Prepetition Secured Parties (in their capacity as such) (or if the Debtor supports or fails to contest any such motion, pleading, application or adversary proceeding commenced by any third party;

83030398.1

(m)     subject to the terms of the Sale Order, any lien purported to be created under the Prepetition Loan Documents shall cease to be a valid and perfected lien, with the priority set forth in this Interim Order; and

(n)     relief from stay shall have been granted in this Chapter 11 Case for the purpose of any creditor exercising post-default secured party rights, including, but not limited to, rights of foreclosure, upon any of the Prepetition Collateral;

(o)     there shall have occurred an Event of Default under the DIP Financing (as described in the motion seeking approval of the DIP Financing);

(p)     the Chapter 11 Case is dismissed or converted to a chapter 7 case, a chapter 11 trustee or an examiner with expanded powers pursuant to section 1106(b) is appointed in the Chapter 11 Case, the Court abstains from hearing the Chapter 11 Case, or the Debtor files a motion or other pleading with the Court seeking any of the foregoing relief;

(q)     the Debtor shall file a motion seeking, or the Court shall enter, an order authorizing the sale of all or any portion of the Debtor's assets, or the Debtor shall sell all or any portion of its assets outside the ordinary course of business, except as contemplated in the Sale Motion, unless such order or sale is consented to by the Requisite Consenting Lenders;

(r)     an order shall have been entered by the Court terminating, shortening, or otherwise modifying (except for extending the period for) the exclusive right of the Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code without the prior written consent of the Requisite Consenting Lenders;

(s)     the entry of an order in the Chapter 11 Case charging any of the Prepetition Collateral or Adequate Protection Collateral of the Prepetition Secured Parties under sections 506(c) or 552(b) of the Bankruptcy Code against any of the Prepetition Secured Parties under which any person takes action against such collateral or that becomes a final non-appealable order (or any order requiring any of the Prepetition Secured Parties to be subject to the equitable doctrine of "marshalling");

(t)     the commencement of litigation against the Prepetition Secured Lenders by the Debtor or any party in interest in the Chapter 11 Case, other than to enforce the terms of the Plan Support Agreement or this Interim Order or the Final Order; or

(u)     The Debtor fails to comply with any other provision of this Interim Order.

7.      <u>Rights and Remedies Upon Termination Events</u>.  On the date that is five (5) business days following the Debtor's receipt of the Termination Event Notice, the Agent (acting at the direction of the Requisite Consenting Lenders) and the Prepetition Secured Lenders may exercise the remedies available to them under this Interim Order and applicable non-bankruptcy

18

law, including, but not limited to, revoking the Debtor's right to use Cash Collateral and collecting and applying any proceeds of the Cash Collateral, Adequate Protection Collateral and Prepetition Collateral in accordance with the terms of this Interim Order and the Prepetition Secured Debt Documents. During the Remedies Notice Period, the Debtor may request that this Court order the continued use of Cash Collateral. During the Remedies Notice Period, the Debtor may continue to use Cash Collateral in the ordinary course of business, consistent with past practices and the most recently delivered Budget, but may not enter into any transactions or arrangements (including, without limitation, the incurrence of indebtedness or liens, investments, restricted payments, asset sales, or transactions with non-Debtor affiliates) that are not in the ordinary course of business. Unless the Court orders otherwise during the Remedies Notice Period, at the end of the Remedies Notice Period, the Debtor shall automatically, without further notice or order of the Court, no longer have the right to use Cash Collateral, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the Remedies Notice Period, without further notice or order of the Court, and the Agent (acting at the direction of the Requisite Consenting Lenders) and the Prepetition Secured Lenders shall be permitted to exercise all rights and remedies set forth in this Interim Order, the Prepetition Loan Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder. The delay or failure to exercise rights and remedies under this Interim Order or the Prepetition Loan Documents shall not constitute a waiver of the Agent's or Prepetition Secured Lenders' rights thereunder or otherwise.

83030398.1

8.     _Adequate Protection_.  As adequate protection of the Prepetition Secured Lenders'
interest in the Prepetition Collateral, the Prepetition Secured Lenders are entitled to receive an
amount equal to the aggregate diminution in value (if any) of their interests in the Prepetition
Collateral (including Cash Collateral) from and after the Petition Date, calculated in accordance
with section 506(a) of the Bankruptcy Code, resulting from, among other things, the use of Cash
Collateral, the use, sale, lease, consumption or disposition of Prepetition Collateral, and the
imposition or enforcement of the automatic stay pursuant to sections 361, 362, 363(e), and 507 of
the Bankruptcy Code (collectively, the "_Diminution in Value_").  In consideration of the foregoing
and of the stipulations and consents set forth herein, the Prepetition Secured Parties are hereby
granted, from and after the Petition Date and as a condition for use of Cash Collateral, adequate
protection as follows (collectively, the "_Adequate Protection Obligations_"):

(a)     _Adequate Protection Liens_. Effective and perfected upon the date of this Interim
Order and without the necessity of the execution by the Debtor (or recordation or other filing) of
security agreements, control agreements, pledge agreements, financing statements, mortgages or
other similar documents, or the possession or control by the Agent of any property, the Agent for
the benefit of the Prepetition Secured Lenders is hereby granted continuing, valid, binding and
enforceable, fully perfected, non-avoidable additional and replacement security interest in and first
priority and senior liens on, and security interests in, all of the Debtor's assets to the same extent,
priority and enforceability held by the Agent for the benefit of the Prepetition Secured Lenders as
of the Petition Date, including first priority liens and security interests in and liens (the "_Adequate
Protection Liens_") on all of the Debtor's presently owned or hereinafter acquired property and
assets, whether such property and assets were acquired by the Debtor before or after the Petition
Date, of any kind or nature, and all post-petition proceeds, products, offspring or profits of the

20

Prepetition Collateral, excluding causes of action arising under any section of chapter 5 of the Bankruptcy Code but including, subject only to and effective upon entry of the Final Order, proceeds thereof (provided that such lien on proceeds shall be released automatically upon closing of a sale pursuant to the Sale Motion (a "Sale") to the extent that such Sale both (i) transfers the underlying claims arising under chapter 5 of the Bankruptcy Code to the Sale purchaser and (ii) includes substantially the same terms as set forth in Section 11.6 of the Asset Purchase Agreement (as amended) (all property identified in this paragraph 5(a) being collectively referred to as the "Adequate Protection Collateral", together with the Cash Collateral and the Prepetition Collateral, the "Collateral"), to secure the Prepetition Obligations to the extent of any Diminution in Value of the Prepetition Secured Lenders' interests in the Prepetition Collateral from and after the Petition Date, subject only to and subordinate to the Carve-Out and to the liens granted in connection with the DIP Financing as and to the extent provided in the Plan Support Agreement, provided, however, in no event shall the proceeds from the DIP Financing constitute the Prepetition Secured Lenders' Prepetition Collateral, and the Adequate Protection Liens shall not extend to or encumber the proceeds of the DIP Financing.  The Adequate Protection Liens shall be enforceable against the Debtor, its estate, and any successor thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Cases"), or upon the dismissal of this Chapter 11 Case or any Successor Case.  Except as otherwise expressly provided herein, under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party except as provided herein, no matter when arising.  The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code and, if approved in

21

the Final Order, the Adequate Protection Liens shall not be subject to section 506(c) of the Bankruptcy Code. The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment, or avoidance, for all purposes in this Chapter 11 Case and any Successor Cases.

(b)    <u>Fees and Expenses</u>. The Agent and the Ad Hoc Group shall receive from the Debtor reimbursement of all reasonable fees and expenses incurred or accrued, whether prior to or after the Petition Date, including and limited to the reasonable fees and disbursements of Davis Polk & Wardwell LLP and Richards, Layton & Finger P.A. as counsel to the Agent and the Ad Hoc Group, and regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. None of the fees and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or comply with U.S. Trustee guidelines. The Debtor shall pay the fees and expenses provided for in this paragraph promptly (but no later than ten (10) days) after invoices for such fees and expenses shall have been submitted to counsel to the Debtor and copies thereof provided to the Office of the U.S. Trustee and counsel to any Committee ("<u>Fee Notice Parties</u>") <u>provided</u> that if prior to the expiration of such ten (10) day period either the Debtor or any of the Fee Notice Parties shall have objected in writing to such fees and expenses, the Debtor shall pay only the undisputed portion (if any) of such fees and expenses and such objection shall be resolved by the Bankruptcy Court upon notice and hearing and the fees approved by the Bankruptcy Court shall be promptly paid in accordance with separate Court order. Invoices for professional fees shall include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals

22

bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation for each attorney; provided, however, that the U.S. Trustee reserves the right to seek copies of invoices containing the detailed time entries of any professional. The Agent and the Ad Hoc Group may redact the invoices transmitted to the Debtor and the other Notice parties, and such transmission of the invoices, even if not redacted, shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.

(c)     <u>Budget Compliance</u>.  The Debtor shall comply with the Approved Budget, subject to Permitted Variances, and all budget variance reporting requirements set forth herein.

(d)     <u>Adequate Protection Superpriority Claims</u>. The Prepetition Secured Parties are each hereby granted an allowed senior administrative expense claim (collectively, the "<u>Adequate Protection Superpriority Claims</u>") against the Debtor with priority over any and all administrative expenses against the Debtor of the kind specified in 503(b) and 507(b) of the Bankruptcy Code, in an amount equal to such Prepetition Secured Parties' claims for the Diminution in Value, payable from all Adequate Protection Collateral, each of which shall be *pari passu* with the other, which shall have priority over any and all administrative expenses or other claims of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, now existing or hereafter arising; <u>provided</u> that the Superpriority Claims shall be (x) subject only to the Carve-Out and (y) subordinate only to the DIP Lender's claim under the DIP Financing as and to the extent provided in the Plan Support Agreement

(e)     <u>DIP Financing upon Termination Event</u>.  If and to the extent the relief sought in the DIP Motion is granted, as additional adequate protection for the Prepetition Secured Parties' security interest in the Prepetition Collateral, upon the occurrence of a Termination Event, all

23

of the DIP Lender's rights under the DIP Facility Documents (as defined in the DIP Financing Motion) and the DIP Order shall be automatically assigned to the Agent for the benefit of the Term Lenders without requiring any further actions by the DIP Lender, the Agent, the Prepetition Secured Lenders, or this Court.

(f)    <u>Limitation on the Use of Cash Collateral</u>.  Notwithstanding anything herein to the contrary, the Debtor shall not assert or prosecute, and no portion of the proceeds of the Collateral, including any Cash Collateral or the Carve-Out, and no disbursements set forth in the Budget, shall be used in connection with (a) preventing, hindering, or delaying any of the Prepetition Secured Parties' enforcement or realization upon any of the Collateral once a Termination Event has occurred and after the Remedies Notice Period has expired, (b) objecting or challenging or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations, the Collateral or the obligations under the DIP Financing, or any other rights or interest of the Agent or the DIP Lender, (c) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any Prepetition Secured Party or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or the DIP Lender, or (d) paying any amount on account of any claims arising prior to the Petition Date or any non-ordinary course administrative claim unless such payments are (i) approved by an order of this Court and (ii) in accordance with the Budget; provided, however, that up to $25,000 of Cash Collateral may be used to pay the allowed fees and expenses incurred solely by any Committee in investigating (but not commencing or prosecuting), the validity, enforceability, perfection, priority, or extent of the liens under the Prepetition Loan Documents (the "<u>Committee Investigation Budget</u>") prior to the Challenge Deadline; provided

24

further, however, that, subject to entry of the Final Order, any fees and expenses incurred by any Committee or any of its legal or financial advisors in connection with any such investigation in excess of the Committee Investigation Budget, and any fees or expenses incurred by any Committee or its legal or financial advisors in connection with commencing or prosecuting any Challenge, shall not constitute allowed administrative expense claims for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

9.    <u>Monitoring of Collateral</u>. The Agent, the Consenting Lenders, and their respective consultants and advisors (including counsel to the Ad Hoc Group), upon reasonable notice, at reasonable times during normal business hours, shall be (i) given reasonable access to the Debtor's books, records, assets, and properties for purposes of monitoring the Debtor's businesses and the value of the Prepetition Collateral, (ii) permitted to reasonably consult with the Debtor's management and advisors on matters concerning the Debtor's business, financial condition, operations and assets, excluding any information for which confidentiality is owed to third parties pursuant to an agreement or similar obligation in existence as of the Petition Date or applicable law, information subject to attorney-client or similar privilege, or where such disclosure would not be permitted by any applicable requirement of law, solely to the extent the Debtor is unable, after commercially reasonable efforts, to obtain a waiver of such confidentiality requirement, and (iii) permitted to conduct, to the extent reasonable and necessary, and at the Debtor's cost and expense, field audits, collateral examinations and inventory appraisals in respect of the Prepetition Collateral, *provided* any expenses or costs incurred by the Debtor in connection with the activities described in this paragraph shall not be included as expenses for purposes of compliance with the Budget or the calculation of Permitted Variances.

25

10.     <u>Limitation on Charging Expenses Against Collateral</u>.  Subject only to the entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Case or any future proceedings under the Bankruptcy Code shall be charged against or recovered from the Prepetition Collateral or the Cash Collateral pursuant to Bankruptcy Code sections 506(b), 552(b) or 105(a) or any similar principle of law.

11.     <u>Section 552(b) Waiver</u>: Upon entry of a Final Order, the Prepetition Secured Lenders and the Agent shall be entitled to all rights and benefits of section 552(b) and the "equities of the case" exception shall not apply to any of the Prepetition Secured Lenders or the Agent with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral or the Cash Collateral.

12.     <u>No Marshalling</u>: Subject to entry of the Final Order, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the Prepetition Collateral or Collateral, as the case may be, and proceeds or payments shall be received and applied in accordance with the Prepetition Loan Documents, notwithstanding any other agreement or provision to the contrary.

13.     <u>Reservation of Rights of the Prepetition Secured Parties</u>.  Notwithstanding any other provision hereof, this Interim Order is without prejudice to, and does not constitute a waiver, expressly or implicitly, of the Agent's or any Prepetition Secured Lender's rights with respect to any person or entity or with respect to any other collateral owned or held by any person or entity. The rights of the Prepetition Secured Lenders and the Agent are expressly reserved and, except as provided expressly herein, entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of: (a) the Prepetition Secured Lenders' rights under any of the Prepetition Loan Documents; (b) the Prepetition Secured Lenders' rights to seek any

26

other or supplemental relief in respect of the Debtor; (c) the Prepetition Secured Lenders' rights to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection at any time, without prejudice to the right of the Debtor or any other party in interest to contest such modification; or (d) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the Prepetition Secured Lenders.

14.    No Control.  None of the Prepetition Secured Lenders or the Agent (solely in such capacity as a Prepetition Secured Lender or Agent, including in connection with the Plan Support Agreement) controls the Debtor or its properties or operations, has authority to determine the manner in which the Debtor's operations are conducted or are control persons or insiders of the Debtor by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Prepetition Loan Documents or this Interim Order (including by permitting the Debtor to use the Prepetition Collateral (including the Cash Collateral) or in taking any other actions permitted by this Interim Order).  In permitting the Debtor to use of Cash Collateral under the terms set forth herein or in taking any other actions related to this Interim Order, the Prepetition Secured Parties shall have no liability to any third party shall not owe any fiduciary duty to any of the Debtor, its creditors, or its estates, and shall not be party to or be deemed to be party.to a joint venture or partnership with the Debtor. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Agent or the Prepetition Secured Lenders of any liability for any claims arising from the prepetition or postpetition activities of the Debtor and its affiliates (as defined in section 101(2) of the Bankruptcy Code).

15.    Release.  Subject to the challenge provisions described in Paragraph 16 herein, with the sole exception of any claims arising under or in connection with the Plan Support Agreement, the Debtor hereby unconditionally, forever and irrevocably releases, discharges, and acquits all

former, current and future (a) Prepetition Secured Parties, in each case acting in such capacity as a Prepetition Secured Party, (b) affiliates of the Prepetition Secured Parties, and (c) officers, employees, directors, agents, representatives, owners, members, partners, principals, financial and other advisors and consultants, legal advisors, shareholders, managers, accountants, attorneys, and predecessors and successors in interest of each of the Prepetition Secured Parties and each of their respective affiliates (collectively, the "Releasees") of and from any and all claims, counterclaims, demands, accounts, contracts, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, and judgments of every type, whether matured, unmatured, known, unknown, foreseen, unforeseen, liquidated, unliquidated, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to this Interim Order, the Final Order, the Prepetition Loan Documents, the negotiation thereof and/or the transactions contemplated thereby, the obligations owing and made hereunder or thereunder, including, without limitation, (w) any lender liability, equitable subordination, or similar claims or defenses, (x) any and all claims and causes of action arising under the Bankruptcy Code, except for any Avoidance Action (as defined in the Asset Purchase Agreement), (y) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of any of the Prepetition Secured Parties, and (z) any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Obligations, in each case that the Debtor had, now has or may have, or that their successors or assigns hereafter can or may have against any of the Releasees for or by reason

28

of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date

of this Interim Order. No exception or defense in contract, law or equity exists as to any obligation

set forth, as the case may be, in this paragraph or in the Prepetition Loan Documents to indemnify

and/or hold harmless any Prepetition Secured Party, and any such defenses are hereby waived. The

releases in this paragraph are in addition to and shall not limit any other releases, covenants not to

sue, or waivers by the Debtor in favor of the Releasees.

16.     Preservation of Challenge Rights.  The stipulations and admissions contained in

this Interim Order, including, without limitation, including, but not limited to, the provisions of

Paragraphs K, L, N, O and P above, shall be binding upon the Debtor, its affiliates, and any of its

successors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected

for the Debtor) in all circumstances and for all purposes, and the Debtor is deemed to have

irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

Notwithstanding anything herein to the contrary, any and all rights of any Committee or any other

party in interest in the Chapter 11 Case to contest the extent, validity, priority or perfection of any

and all liens of the Prepetition Secured Parties (other than Adequate Protection Liens), to contest

the amount of the Prepetition Secured Parties' asserted claims, to seek the avoidance,

recharacterization or subordination of the Agent's or the Prepetition Secured Lenders' claims or

interests, to seek the avoidance of any transfer to the Agent or the Prepetition Secured Lenders or

to otherwise contest the claims, rights and liens the Prepetition Secured Parties (each a

"Challenge") is expressly preserved, provided that (i) any Challenge by a party in interest with

standing must be commenced on or before the Challenge Deadline (as defined below) by

commencing an adversary proceeding or contested matter and (ii) there is a final, non-appealable

order entered in favor of the plaintiff sustaining any such Challenge in any such timely filed

29

adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is timely filed prior to the Challenge Deadline, or any such timely-filed adversary proceeding or contested matter does not result in a final, non-appealable order in favor of the plaintiff sustaining any such Challenge, without further order of this Court: (x) any and all such Challenges shall be deemed to be forever waived, released and barred, (y) the Debtor's agreements, acknowledgements and stipulations set forth herein, including those set forth in Paragraphs K, L, N, O and P above, shall be irrevocably binding upon all parties in interest, including, without limitation, any Committee, all creditors, interest holders, any other person acting on behalf of the Debtor's estate, all other parties in interest in this Chapter 11 Case and any Successor Case, and (z) the Prepetition Obligations and the Prepetition Liens shall not be subject to any other or further claim or challenge by any party in interest, including any Committee, and any defenses, claims, causes of action, counterclaims, setoff, recoupment, reduction, subordination, recharacterization or avoidance, whether arising under the Bankruptcy Code or otherwise, by any party in interest against any Releasee arising out of or relating to the Prepetition Loan Documents, the Prepetition Obligations, or the Prepetition Liens shall be deemed forever waived, released and barred.  For the avoidance of doubt, if any Challenge is timely filed and a final, non-appealable order is entered in favor of the plaintiff sustaining any such Challenge, the stipulations and admissions contained in this Interim Order, including the Debtor's stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity, except to the extent that such stipulations and admissions were expressly challenged in an adversary proceeding or contested matter prior to the Challenge Deadline and sustained by the final, non-appealable order.  For the purposes of this Order, the "Challenge Deadline" shall mean the earlier of (1) the date of confirmation of a plan in this Chapter 11 Case; or (2) (i) as to any Committee, 60 days from the date of the formation of

83030398.1

such Committee (if appointed) and (ii) for any other party in interest, 75 days following the entry

of this Interim Order, as such deadline may be extended in writing prior to the expiration of the

Challenge Deadline (which writing may be in the form of email by counsel) from time to time by

the Agent (acting at the direction of the Requisite Consenting Lenders) in its sole discretion.  Nothing

in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including

any Committee (if appointed) or any non-statutory committees appointed or formed in the Chapter

11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or

its estate, and all rights to object to such standing are expressly reserved.

17.    Carve-Out.  Notwithstanding anything to the contrary contained in this Interim

Order or other order of this Court, the liens and claims of, or granted to, the Agent and the

Prepetition Secured Lenders in this Interim Order shall be subject and subordinate to the payment,

without duplication, of a carve-out (the "Carve-Out") from claims pursuant to section 507(b) of

the Bankruptcy Code, the Adequate Protection Liens and the Prepetition Liens, in an amount equal

to the sum of (i) all fees required to be paid to the Clerk of the Court and United States Trustee,

plus interest at the statutory rate (without regard to the notice set forth in (iii) below, and regardless

of amounts set forth in Budget), (ii) all reasonable fees incurred by a trustee under section 726(b)

of the Bankruptcy Code (without regard to the notice set forth in (iii) below) in an amount not to

exceed $50,000, (iii) to the extent allowed at any time, whether by interim or final compensation

order, procedural order or any other order of the Bankruptcy Court, all unpaid fees, costs, and

expenses (the "Allowed Professional Fees") incurred or accrued by persons or firms retained by

the Debtor pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "Debtor

Professionals") and any Committee in the Chapter 11 Case pursuant to section 328 or 1103 of the

Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the

"Professional Persons") at any time before or on the first business day following a delivery by the Agent (acting at the direction of the Requisite Consenting Lenders) of a Carve-Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, plus (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1 million plus the success fee (if earned) by Perella Weinberg Partners LP/Tudor Pickering Holt & Co in connection with the sale process (the "PWP Success Fee"), provided that except for the PWP Success Fee, no success, completion or similar fees shall be payable from the Carve-Out, incurred after the first business day following delivery by the Agent of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim or final compensation order, procedural order, or any other order of the Bankruptcy Court (the amount set forth in this clause (iv), the "Post Carve-Out Trigger Notice Cap").  Notwithstanding anything to the contrary in this Interim Order, following the delivery of a Carve-Out Trigger Notice, any of the statutory, Allowed Professional Fees or other fees covered by this Carve Out shall be paid (and shall be deemed to have been satisfied) first, from unencumbered cash that is not Cash Collateral (if any) and second, if there is no remaining unencumbered cash that is not Cash Collateral, from Cash Collateral. For the avoidance of doubt, the amount of Allowed Professional Fees due and payable by the Debtor or under 28 U.S.C. § 1930(a) shall not be restricted or capped by the Budget or the Carve-Out. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (i) a Challenge, (ii) any attempts to modify any of the right granted to any of the Prepetition Secured Parties hereunder, or (iii) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of the Court.

18.     Immediately upon the Debtor's receipt of a "Carve-Out Trigger Notice," the Debtor shall deposit first, from unencumbered cash that is not Cash Collateral (if any) and second, if there is no remaining unencumbered cash that is not Cash Collateral, from the Cash Collateral an amount equal to the Carve-Out (the "Carve-Out Amount") into a segregated account not subject to the control of either the DIP Lender or the Agent (the "Carve-Out Account").  For the purpose of this Order, a Carve-Out Trigger Notice is a written notice issued by the Agent (at the direction of Requisite Consenting Lenders) or by the DIP Lender by email (or other electronic means), sent following the Termination Date to the Debtor, Holland & Knight LLP as their lead restructuring counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of a Termination Event under this Order or under the DIP Financing stating that the Post Carve-Out Trigger Notice Cap has been invoked.

19.     Continuing Effect of Order.

(a)     If an order dismissing this Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations shall have been paid and satisfied in full; and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Adequate Protection Liens.

(b)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (A) the validity, priority, or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Agent of the effective date of such reversal, modification,

33

vacatur or stay; or (B) the validity, priority or enforceability of the Prepetition Liens, the Prepetition Obligations, or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of Cash Collateral, any Adequate Protection Obligations incurred by the Debtor, or Adequate Protection Liens granted by the Debtor hereunder, as the case may be, prior to the actual receipt of written notice by the Agent of effective date of such reversal, stay, modification or vacatur, shall be governed in all respects by the original provisions of this Interim Order, and the Agent and Prepetition Secured Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, and this Order with respect to all uses of Cash Collateral, the Adequate Protection Obligations and Adequate Protection Liens.

20.     <u>Modification of Automatic Stay</u>. The automatic stay under Bankruptcy Code section 362(a) is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtor to grant the Adequate Protection Liens and the 507(b) Claims; (b) permit the Debtor to perform such acts as the Agent or Prepetition Secured Lenders each may request in their reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and obligations to the Agent and Prepetition Secured Lenders under the terms of this Interim Order; (d) authorize the Debtor to pay, and the Agent and Prepetition Secured Lenders to retain and apply, any payments made in accordance with the terms of this Interim Order; (e) permit the delivery by the Agent of a Termination Event Notice or to request, and withhold consent to, the form of reporting required herein; and (f) permit the Agent to obtain and apply the L/C Deposit to the Debtor's reimbursement obligations in the event that either of both the HRCO Letter of Credit or the OneOK Letter of Credit are drawn.

34

21.     <u>Proofs of Claim</u>. Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Case or any Successor Case to the contrary, the Agent and the Prepetition Secured Lenders shall not be required to file proofs of claim in the Chapter 11 Case or any Successor Case for any claim allowed herein. The statements of claim in respect of the Prepetition Obligations set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status.  However, and notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Case or any Successor Case to the contrary, the Agent, on behalf of itself and the Prepetition Secured Parties, and each other Prepetition Secured Party (as applicable) is hereby authorized and entitled, in each of their sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim (including, for the avoidance of doubt, a single master proof of claim on behalf of the relevant Prepetition Secured Parties) in the Chapter 11 Case or any Successor Case for any and all of their respective claims arising under the applicable Prepetition Loan Documents and hereunder.  The provisions set forth in this paragraph and any such proof of claim filed in accordance herewith are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in this Chapter 11 Case.

22.     <u>No Waivers</u>. Notwithstanding any provision in this Interim Order to the contrary, any delay or failure by the Prepetition Secured Parties to exercise their rights and remedies under this Interim Order, the Prepetition Loan Documents, applicable law, as applicable, shall not constitute a waiver of any of the Prepetition Secured Parties' rights hereunder, thereunder or

otherwise, and no such waiver shall be deemed to have occurred unless such waiver is made pursuant to a written instrument executed in accordance with the term of the applicable document.

23.     <u>No Third Party Rights</u>. Except as expressly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

24.     <u>Binding Effect of Interim Order</u>.  Immediately upon entry by the Bankruptcy Court (notwithstanding any applicable law or rule to the contrary), (i) the Adequate Protection Obligations shall constitute valid, binding and non-avoidable obligations of the Debtor, enforceable against the Debtor and its estate and any successor thereto, including any trustee appointed or elected in the Chapter 11 Case or in any Successor Case, in accordance with the terms of this Interim Order and (ii) the terms and provisions of this Interim Order, including all findings herein, shall become valid and binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the Agent, the Prepetition Secured Lenders, any Committee, the Debtor, all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this Chapter 11 Case or any Successor Case, and shall inure to the benefit of the Prepetition Secured Parties and the Debtor and their respective successors and assigns, whether in the Chapter 11 Case, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 case; <u>provided</u> that none of the Prepetition Secured Parties shall have any obligation to permit the use of the Prepetition Collateral by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estate of the Debtor. In the event of any inconsistency between the provisions of this Interim Order and any other order other than any Final Order relating to the Debtor's use of cash collateral (including any "First Day" order), the provisions of this Interim Order shall govern and control

unless such other order expressly provides that it controls over this Interim Order. Any payments to be made under any order (including any "First Day" order) shall be made in accordance with this Interim Order, including, without limitation, the line item expenditures set forth in the Approved Budget. The rights and benefits in favor of the Agent and the Prepetition Secured Lenders hereunder shall survive the termination of the Debtor's right to use Cash Collateral in accordance with the terms hereof. Any payments to be made by the Debtor under any other order (including any "First Day" order) entered by this Court shall be made in accordance with this Interim Order, including, without limitation, the line item expenditures set forth in the Budget.

25.      Effect of this Interim Order. This Interim Order shall take effect and be enforceable as of the Petition Date immediately upon issuance.

1.      Objections. Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before 4:00 p.m. (prevailing eastern time) on _____, 2022, with a copy served upon: (i) counsel to the Debtor, Holland & Knight LLP, Attn:  John J. Monaghan, Esq., 10 St. James Avenue, Boston, MA, 02116 (bos-bankruptc@hklaw.com) and Polsinelli P.C., Attn: Christopher Ward, Esq., 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801 (cward@polsinelli.com); (ii)  Davis Polk & Wardwell LLP, Attn: Brian Resnick, Esq. and Joshua Sturm, Esq., 450 Lexington Avenue, New York, NY 10017 (brian.resnick@davispolk.com; joshua.sturm@davispolk.com) and Richards, Layton & Finger, P.A., Attn: Mark D. Collins, Esq. (collins@rlf.com); (iii) counsel to be selected by any Committee upon its formation, and (iv) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet Sarkessian)(juliet.m.sarkessian@usdoj.gov).

26.    <u>Final Hearing</u>.  The Bankruptcy Court shall hold the Final Hearing to consider the relief requested in the Motion, including any objection filed in accordance with this Interim Order, on _____, 2022 at _____ (prevailing Eastern Time).

27.    <u>Retention of Jurisdiction</u>.  This Court hereby retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

**EXHIBIT B**

**Budget**

#95606257v7

83030366.1

**EXHIBIT A: BUDGET - Weekly Cash Flow Forecast**
Ector County Energy Center, LLC
Assumes Petition Date: April 11, 2022; Transaction Close Date: July 31, 2022.
Weekly Cash Flow Forecast

| Weekly Cash Flow Summary | P1 | P2 | Post-Petition W1 | W2 | W3 | W4 | W5 | W6 | W7 | W8 | W9 | W10 | W11 | W12 | W13 | Pre-Petition | Post-Petition |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ actuals | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total | Total |
| Week Ending | 4/3/22 | 4/10/22 | 4/17/22 | 4/24/22 | 5/1/22 | 5/8/22 | 5/15/22 | 5/22/22 | 5/29/22 | 6/5/22 | 6/12/22 | 6/19/22 | 6/26/22 | 7/3/22 | 7/10/22 | 2-Weeks | 13-Week |
| Total Receipts | 260,625 | 260,625 | 260,625 | 260,625 | 260,625 | 121,405 | 121,405 | 121,405 | 121,405 | 283,193 | 283,193 | 283,193 | 283,193 | 283,193 | 850,425 | 521,250 | 3,533,883 |
| Commodity Fuel (Gas) Expense | - | - | - | - | (820,835) | - | - | - | (1,135,692) | - | - | - | - | (255,765) | - | - | (2,212,292) |
| **Receipts, Net of Fuel** | **260,625** | **260,625** | **260,625** | **260,625** | **(560,210)** | **121,405** | **121,405** | **121,405** | **(1,014,287)** | **283,193** | **283,193** | **283,193** | **283,193** | **27,428** | **850,425** | **521,250** | **1,321,591** |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | |
| Asset Management | - | (729,612) | - | - | - | - | - | - | (215,946) | - | - | - | - | (331,388) | - | (729,612) | (547,334) |
| Utilities | (3,127) | (3,127) | (3,127) | (3,127) | (3,127) | (3,908) | (3,908) | (3,908) | (3,908) | (3,127) | (3,127) | (3,127) | (3,127) | (3,127) | (3,908) | (6,253) | (44,555) |
| Plant Maintenance | - | - | - | - | (13,733) | - | - | - | (120,489) | - | - | - | - | (13,733) | - | - | (147,956) |
| Plant Operating Expense | (47,200) | (47,200) | (47,200) | (47,200) | (179,406) | (16,124) | (16,124) | (16,124) | (108,331) | (5,000) | (5,000) | (5,000) | (5,000) | (57,206) | (7,231) | (94,399) | (514,945) |
| Other Operating Expense | (1,422) | (1,422) | (1,422) | (1,422) | (1,422) | (1,777) | (1,777) | (1,777) | (630,762) | (1,422) | (1,422) | (1,422) | (1,422) | (12,995) | (1,777) | (2,844) | (660,821) |
| Professional Fees | (162) | (162) | (162) | (162) | (29,683) | (202) | (202) | (202) | (4,845) | (162) | (162) | (162) | (162) | (4,805) | (2,827) | (323) | (43,737) |
| **Total Operating Disbursements**[1] | **(51,910)** | **(781,522)** | **(51,910)** | **(51,910)** | **(227,371)** | **(22,012)** | **(22,012)** | **(22,012)** | **(1,084,282)** | **(9,710)** | **(9,710)** | **(9,710)** | **(9,710)** | **(423,255)** | **(15,744)** | **(833,432)** | **(1,959,348)** |
| *Total Op Disbursements (Incl. Fuel Costs)* | *(51,910)* | *(781,522)* | *(51,910)* | *(51,910)* | *(1,048,206)* | *(22,012)* | *(22,012)* | *(22,012)* | *(2,219,974)* | *(9,710)* | *(9,710)* | *(9,710)* | *(9,710)* | *(679,020)* | *(15,744)* | *(833,432)* | *(4,171,640)* |
| **Operating Cash Flow** | **208,715** | **(520,897)** | **208,715** | **208,715** | **(787,581)** | **99,392** | **99,392** | **99,392** | **(2,098,570)** | **273,483** | **273,483** | **273,483** | **273,483** | **(395,827)** | **834,681** | **(312,182)** | **(637,757)** |
| **Non-Recurring Operating Costs** | | | | | | | | | | | | | | | | | |
| Collateral Cash (Posting) / Receipt | - | - | (1,449,547) | - | - | - | - | - | - | - | - | - | (1,500,000) | - | - | - | (2,949,547) |
| Adequate Assurances - Utility | - | - | (16,130) | - | - | - | - | - | - | - | - | - | - | - | - | - | (16,130) |
| **Non-Recurring Operating Costs** | **-** | **-** | **(1,465,677)** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **(1,500,000)** | **-** | **-** | **-** | **(2,965,677)** |
| **Total Operating Cash Flow** | **208,715** | **(520,897)** | **(1,256,962)** | **208,715** | **(787,581)** | **99,392** | **99,392** | **99,392** | **(2,098,570)** | **273,483** | **273,483** | **273,483** | **(1,226,517)** | **(395,827)** | **834,681** | **(312,182)** | **(3,603,435)** |
| Restructuring Fees and Expenses | - | (974,643) | - | - | (557,548) | - | - | - | (1,085,048) | - | - | - | - | (1,671,429) | - | (974,643) | (3,314,024) |
| DIP Draw / (Repayment) | - | - | - | - | - | - | - | 2,500,000 | - | - | - | 2,500,000 | - | - | - | - | 5,000,000 |
| **Net Cash Flow** | **208,715** | **(1,495,540)** | **(1,256,962)** | **208,715** | **(1,345,129)** | **99,392** | **99,392** | **2,599,392** | **(3,183,617)** | **273,483** | **273,483** | **2,773,483** | **(1,226,517)** | **(2,067,256)** | **834,681** | **(1,286,825)** | **(1,917,459)** |
| **Beginning Cash Balance (Consolidated)** | **5,420,496** | **5,629,211** | **4,133,672** | **2,876,709** | **3,085,425** | **1,740,296** | **1,839,688** | **1,939,080** | **4,538,473** | **1,354,855** | **1,628,338** | **1,901,822** | **4,675,305** | **3,448,788** | **1,381,532** | **5,420,496** | **4,133,672** |
| Operating Cash Flow | 208,715 | (520,897) | 208,715 | 208,715 | (787,581) | 99,392 | 99,392 | 99,392 | (2,098,570) | 273,483 | 273,483 | 273,483 | 273,483 | (395,827) | 834,681 | (312,182) | (637,757) |
| Non-Recurring Operating Costs | - | - | (1,465,677) | - | - | - | - | - | - | - | - | - | (1,500,000) | - | - | - | (2,965,677) |
| Restructuring Cash Flow | - | (974,643) | - | - | (557,548) | - | - | - | (1,085,048) | - | - | - | - | (1,671,429) | - | (974,643) | (3,314,024) |
| DIP Draw / (Repayment) | - | - | - | - | - | - | - | 2,500,000 | - | - | - | 2,500,000 | - | - | - | - | 5,000,000 |
| **Available Cash Balance** | **5,629,211** | **4,133,672** | **2,876,709** | **3,085,425** | **1,740,296** | **1,839,688** | **1,939,080** | **4,538,473** | **1,354,855** | **1,628,338** | **1,901,822** | **4,675,305** | **3,448,788** | **1,381,532** | **2,216,213** | **4,133,672** | **2,216,213** |

[1]Total Operating Disbursements subject to Permitted Variance reporting per Cash Collateral Motion.

*Strictly Confidential*
*Draft - Subject to Change*

**EXHIBIT A: BUDGET - Monthly Cash Flow Forecast**
**Ector County Energy Center, LLC**
**Assumes Petition Date: April 11, 2022; Transaction Close Date: July 31, 2022.**
**Monthly Cash Flow Forecast**

| $ actual | 4/11 filing Forecast | Post-Petition Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|
| Month Ending | 4/30/2022 | 5/31/2022 | 6/30/2022 | 7/31/2022 | 4/1/22 - 7/31/22 |
| Total Receipts | 1,303,125 | 485,618 | 1,415,965 | 3,401,698 | 6,606,407 |
| Commodity Fuel (Gas) Expense | (820,835) | (1,135,692) | (255,765) | (1,150,200) | (3,362,492) |
| **Receipts, Net of Fuel** | **482,290** | **(650,074)** | **1,160,200** | **2,251,499** | **3,243,915** |
| | | | | | |
| **Operating Disbursements** | | | | | |
| Asset Management | (729,612) | (215,946) | (331,388) | (398,388) | (1,675,335) |
| Utilities | (15,633) | (15,633) | (15,633) | (15,633) | (62,533) |
| Plant Maintenance | (13,733) | (120,489) | (13,733) | (13,733) | (161,689) |
| Plant Operating Expense | (368,205) | (156,705) | (77,205) | (81,130) | (683,243) |
| Other Operating Expense | (7,110) | (636,094) | (18,683) | (33,130) | (695,018) |
| Professional Fees | (30,329) | (5,452) | (5,452) | (15,952) | (57,184) |
| **Total Operating Disbursements**[1] | **(1,164,622)** | **(1,150,319)** | **(462,094)** | **(557,967)** | **(3,335,003)** |
| | | | | | |
| ***Total Op Disbursements (Incl. Fuel Costs)*** | ***(1,985,457)*** | ***(2,286,011)*** | ***(717,859)*** | ***(1,708,166)*** | ***(6,697,494)*** |
| | | | | | |
| **Operating Cash Flow** | **(682,332)** | **(1,800,393)** | **698,105** | **1,693,532** | **(91,088)** |
| | | | | | |
| **Non-Recurring Operating Costs** | | | | | |
| Collateral Cash (Posting) / Receipt | (1,449,547) | - | (1,500,000) | - | (2,949,547) |
| Adequate Assurances - Utility | (16,130) | - | - | - | (16,130) |
| **Non-Recurring Operating Costs** | **(1,465,677)** | **-** | **(1,500,000)** | **-** | **(2,965,677)** |
| | | | | | |
| **Total Operating Cash Flow** | **(2,148,010)** | **(1,800,393)** | **(801,895)** | **1,693,532** | **(3,056,765)** |
| | | | | | |
| Restructuring Fees and Expenses | (1,532,191) | (1,085,048) | (1,671,429) | (2,351,629) | (6,640,296) |
| DIP Draw / (Repayment) | - | 2,500,000 | 2,500,000 | - | 5,000,000 |
| **Net Cash Flow** | **(3,680,201)** | **(385,440)** | **26,677** | **(658,097)** | **(4,697,061)** |
| | | | | | |
| **Beginning Cash Balance (Consolidated)** | **5,420,496** | **1,740,296** | **1,354,855** | **1,381,532** | **5,420,496** |
| Operating Cash Flow | (682,332) | (1,800,393) | 698,105 | 1,693,532 | (91,088) |
| Non-Recurring Operating Costs | (1,465,677) | - | (1,500,000) | - | (2,965,677) |
| Restructuring Cash Flow | (1,532,191) | (1,085,048) | (1,671,429) | (2,351,629) | (6,640,296) |
| DIP Draw / (Repayment) | - | 2,500,000 | 2,500,000 | - | 5,000,000 |
| **Available Cash Balance** | **1,740,296** | **1,354,855** | **1,381,532** | **723,436** | **723,436** |

[1]Total Operating Disbursements subject to Permitted Variance reporting per Cash Collateral Motion.

*Strictly Confidential*
*Draft - Subject to Change*