**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ECTOR COUNTY ENERGY CENTER LLC,[1] | Case No. 22-_____ (__) |
| Debtor. | |

**MOTION OF THE DEBTOR FOR ORDERS (I)(A) AUTHORIZING DEBTOR'S ENTRY INTO ASSET PURCHASE AGREEMENT, (B) AUTHORIZING AND APPROVING THE BIDDING PROCEDURES, (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) AUTHORIZING AND APPROVING A BREAK-UP FEE AND REDUCED BREAK-UP FEE, (E) APPROVING THE NOTICE PROCEDURES, AND (F) SETTING A DATE FOR THE SALE HEARING; AND (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Ector County Energy Center LLC, the above-captioned debtor and debtor in possession (the "Debtor" or "ECEC") hereby submits this motion (the "Motion"), pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of (i) an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit B, (a) approving the Debtor's entry into that certain Asset Purchase Agreement originally dated as of March 3, 2022, and as amended on March 31, 2022, by and among the Debtor and Ector County

---

[1]  The last four digits of the Debtor's federal tax identification are 6852.  The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.  More information about the Debtor and this case is available on the website maintained by Donlin, Recano & Company, Inc., the Debtor's proposed claims and noticing agent, at www.donlinrecano.com/ecec, or can be requested by e-mail at ececinfo@donlinrecano.com.

Generation LLC, an acquisition entity affiliated with Rockland Capital, LLC (together with its assignees or designees, "Proposed Purchaser") (attached hereto as Exhibit C, the "Asset Purchase Agreement" or "APA"), (b) authorizing and approving the bidding procedures (as appended to the Bidding Procedures Order as Exhibit 1, the "Bidding Procedures"), (c) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases, (d) authorizing and approving the terms and conditions of the Break-Up Fee and Reduced Break-Up Fee (each as defined below), including granting super-priority administrative expense status to the Break-Up Fee and Reduced Break-Up Fee, as applicable, and a right of surcharge against all secured interests, (e) approving the form and manner of the Sale Notice and Cure Notice (both as defined below, and as appended to the Bidding Procedures Order as Exhibits 2 and 3, respectively) (together, the "Notice Procedures"), and (f) setting the time, date and place of a hearing (the "Sale Hearing") to consider the sale and the assumption and assignment of the Assumed and Assigned Contracts (as defined below); and (ii) an order (the "Sale Order"), substantially in the form attached hereto as Exhibit D, authorizing and approving (a) the sale of the Debtor's right, title and interest in the assets (the "Acquired Assets"), free and clear of all liens, claims, encumbrances, and interests (each as described below), pursuant to section 363 of the Bankruptcy Code, (b) the assumption and assignment of certain executory contracts and real property leases pursuant to section 365 of the Bankruptcy Code, and (c) granting such other and further relief as the Court deems just and proper.

In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of John Baumgartner in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), and the *Declaration of Alexander Svoyskiy in Support of Sale and Proposed Bidding Procedures* (the "Svoyskiy Declaration"), each filed contemporaneously

herewith and incorporated by reference herein, and in further support of the relief requested in this Motion, states as follows:

1.  The February 2021 winter storm in Texas, referred to as Winter Storm Uri, set in motion a series of events that had a broad impact on the energy production industry in the Electric Reliability Council of Texas ("ERCOT") market.  Those adverse events have generated a number of chapter 11 cases by ERCOT-industry participants, including Brazos Electric Power Cooperative, Entrust Energy, Inc., Griddy Energy, LLC, Just Energy Group, Inc., Liberty Power Holdings, LLC, and others.

2.  ECEC was among the companies affected by Winter Storm Uri.  Off-site frozen gas production facilities curtailed gas deliveries into the pipelines that were operational and precluded the Debtor from procuring the fuel needed to power its turbines, rendering ECEC unable to generate power or schedule ancillary services. After Direct Energy disputed the "force majeure" event noticed by ECEC and ultimately terminated the HRCO, ECEC lost a primary source of predictable cash flow, and the Debtor's business model shifted to operating primarily as a merchant peaker plant selling power and ancillary services in the Day Ahead[2] and real-time markets. Meanwhile, the Debtor also found itself subjected to the monthly expense burden resulting from the litigation relating to the purported HRCO termination and the over 100 personal injury and/or property damage cases naming the Debtor as defendant, causing uneven and difficult to predict cashflow.

3.  The impact of Winter Storm Uri was felt throughout the Texas energy market. Other energy producing companies impacted by the storm opted to address challenges arising from the storm by engaging in asset disposition transactions. Those transactions revealed a seemingly

---

[2] As defined in the ERCOT Protocols.

strong M&A market for ERCOT power generation assets, indicating that investors have an interest in acquiring generation assets. For example, Agilon Energy Holdings completed a robust bankruptcy court supervised sale process for its peaker plant during 2022 for a price of $439/kW. In 2021, Temple Generation I, LLC sold its combined cycle gas turbine plant for $560/kW.

4.      ECEC had twice before tested the M&A market, undertaking sale exploration processes in 2016 and again in 2018.  Those processes, however, generated an insufficient level of interest to warrant engaging in a transaction. The most recent efforts in 2018 generated expressions of interest in amounts that were less than half the per kilowatt price realized in recent power plant deals. The apparent increase in market interest caused ECEC to conclude that again testing the market was warranted.

5.      As described below, the Debtor has commenced this chapter 11 case so that all parties-in-interest can benefit from the current transactional market despite the financial challenges it faces.  To that end, through the Motion the Debtor is seeking approval of bid procedures relating to post-petition solicitation of overbids to a $91,250,000 stalking horse bid, and approval of a sale to the highest and best bidder identified in that solicitation process, as discussed in greater detail herein.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtor confirms its consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.      Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1.

## GENERAL BACKGROUND

### A.      The Debtor, Generally

9.      On April 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, with this court, commencing this chapter 11 case (the "Chapter 11 Case").

10.      The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been requested in the Chapter 11 Case and a committee has not been appointed.

11.      The Debtor owns and operates a 330 MW natural gas-fired power generating facility located on 32.5 acres of Debtor-owned land in Ector County, Texas ("Power Plant"). Construction of the Debtor's Power Plant began in 2014 and commercial operations within the ERCOT wholesale power market commenced on approximately September 28, 2015.

12.       The Power Plant features two General Electric 7FA simple-cycle combustion turbines that have been designed and retrofitted to enable the Debtor to provide "Non-Spinning Reserve Services" when the ERCOT power grid requires additional power supply to meet short-term demand, as well as to stay idle for extended periods. The Debtor's revenue is generated primarily from sale of its energy output to various participants in the ERCOT West region of Texas in the Day-Ahead Market and Real-Time Markets, along with offering Ancillary Services based on competitive bid processes.

13.     Connected to the 138 kV Holt Switching Station, of the Oncor Electric transmission lines and distribution system, ECEC sells capacity and energy within the "ERCOT West" region.

14.     The Debtor has no employees, but instead relies on certain non-debtor affiliates for the day-to-day operation of the Power Plant.  Invenergy Services, LLC ("Invenergy Services") is serving as ECEC's "energy manager" pursuant to an Energy Management Agreement dated November 2, 2017, to generally provide energy management, fuel management, and power management services to ECEC as participant in the ERCOT market; Invenergy Services has also been designated as ECEC's "QSE Agent." Separately, Invenergy Services Thermal US LLC ("Invenergy Thermal") is responsible for administration of all project agreements, and general operation, maintenance and administration of the Power Plant, pursuant to a Facility Management Agreement dated November 25, 2014.

15.     The obligations to be restructured in this Chapter 11 Case include secured debt encumbering title to the Debtor's assets, as more particularly described in the pending *Motion of Debtor for Entry of Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* ("Cash Collateral Motion") and the First-Day Declaration.

16.     In addition, although there are no other valid liens of record,[3] there are substantial disputed litigation claims against the Debtor.  More specifically, Direct Energy has disputed the force majeure event, purportedly terminated the HRCO, and sued ECEC in New York Supreme Court seeking to recover approximately $403 million, including approximately $393.4 million that

---

[3] Real estate title records also indicate that BMT Acousition (sic), LLC recorded a Mechanic's & Materialman's Lien Affidavit on title to the Debtor's real estate dated August 7, 2015.  Upon information and belief, no amount remains due.

Direct Energy calculates as allegedly owing to it under the HRCO for February 2021. Additionally, as referenced above, the Debtor has also named as a defendant in approximately 113 cases initiated by various Texas residents asserting personal injury and/or property damage claims against power generators and other companies in connection with Winter Storm Uri.

B.    **Background Regarding the Sale Process**

17.    The primary goal of this Chapter 11 Case is to take advantage of a currently strong market for ERCOT power generating facilities for the benefit of all parties-in-interest by consummating a sale of the Debtor's assets that will maximize recoveries for the Debtor's estate. The Debtor envisions that this Chapter 11 Case will ultimately result in a sale of substantially all of its assets and distribution of the proceeds of that sale through a liquidating plan.

18.    Due in part to the increase in market interest in ERCOT energy production assets, the uneven cash flow caused by Direct Energy's purported termination of the HRCO, and over 100 financial and human resource-draining litigation actions brought against the Debtor, the Debtor, in its business judgment, determined that a third effort to sell the Debtor or its assets was in the best interests of all interested parties and that the only practical means of affording any purchaser sufficient comfort that it would receive title free and clear of liens, claims, and interests was through a sale under section 363 of the Bankruptcy Code.

19.    As described in the Svoyskiy Declaration, the Debtor engaged in a robust pre-petition marketing process, led by its investment banker, Perella Weinberg Partners LP/Tudor Pickering Holt & Co ("PWP"). PWP, together with the Debtor's representatives, identified strategic parties who are in the energy industry or who they believed would be interested in investing in the energy space.

20.    On December 1, 2021, PWP initiated a marketing and sale process by contacting 103 potentially interested strategic and financial parties. PWP received 470 diligence questions from thirty-five prospective bidders with executed non-disclosure agreements.  Those parties executing NDAs were afforded access to an extensive virtual diligence room and provided with substantial additional diligence.  Four binding bids were received by a February 4, 2022 call for bids deadline, and nine additional parties indicated an interest in participating in a post-petition overbid process.

21.    Ultimately, as a result of the prepetition marketing process, the Debtor negotiated the terms of a sale to the Proposed Purchaser pursuant to section 363 of the Bankruptcy Code, subject to solicitation of higher and better bids and Court approval, and executed the Asset Purchase Agreement on March 3, 2022, with a subsequent amendment thereto on March 31, 2022. Additional information regarding the prepetition marketing process is set forth in the Svoyskiy Declaration.

## THE ASSET PURCHASE AGREEMENT

22.    After extensive arm's length, good faith negotiations between the Debtor and the Proposed Purchaser, each represented by their respective advisors, the Debtor determined that the Asset Purchase Agreement represents the best opportunity for the Debtor to maximize the value of its assets and serves as a basis for conducting a post-petition overbid solicitation process to seek higher or otherwise better offers.

23.    The Asset Purchase Agreement executed with the Proposed Purchaser, a "stalking-horse bid," provides for the Debtor to transfer, subject to the solicitation of higher and better bids and subject to this Court's approval, substantially all of its assets constituting and related to its Power Plant to the Proposed Purchaser. The Asset Purchase Agreement provides for the Proposed Purchaser to acquire substantially all assets constituting or relating to that facility, including the

real estate, improvements on that real estate and the equipment, receivables, gas-on-hand, intellectual property, intangible assets, permits to the extent transferrable, causes of action (including specifically all Avoidance Actions under Chapter 5 of the Bankruptcy Code),[4] and certain identified contracts and contract rights.

24.     The Debtor has negotiated and entered into the Asset Purchase Agreement with the Proposed Purchaser, pursuant to which Proposed Purchaser will acquire the Acquired Assets on the terms and conditions specified therein. A Word version of the Asset Purchase Agreement has been placed in the data room set up by the Debtor for prospective bidders.

25.     The sale transaction pursuant to the Asset Purchase Agreement is subject to competitive bidding as set forth herein, the Bidding Procedures, and the Bidding Procedures Order. Pursuant to the terms of the Asset Purchase Agreement, the Proposed Purchaser has agreed to purchase the Acquired Assets for a purchase price of (i) $91,250,000 (the "Stalking Horse Bid Amount"), subject to various potential adjustments set forth in the Asset Purchase Agreement.[5] Those adjustments include a working capital true up based on a $550,000 target working capital amount where the closing date working capital upon which the adjustment will be based includes those cash deposits that the Debtor has posted and will be left with the deposit holders post-closing for the benefit of the Proposed Purchaser, an amount that is expected to be approximately $4 million.  The purchase price will also be increased by "Incentive Consideration" of $2.7 million if a transaction is closed on or before July 31, 2022 with a $110,000 per day reduction in that

---

[4] In accordance with Section 11.6 of the Asset Purchase Agreement, the Proposed Purchaser shall not pursue, participate in the pursuit of, sell, transfer, or enter into any agreement with a third party to facilitate the pursuit of, any Avoidance Action acquired under the Asset Purchase Agreement.

[5] Capitalized terms used but not defined in this Motion have the definitions ascribed to them in the Asset Purchase Agreement. To the extent that there are inconsistencies between the summary description of the Asset Purchase Agreement contained herein and the terms and conditions of the Asset Purchase Agreement, the terms and conditions of the Asset Purchase Agreement control.

Incentive Consideration for each day after July 31, 2022 that the Proposed Purchaser does not realize or accrue post-closing revenue.

26.     Under the Asset Purchase Agreement, the Proposed Purchaser funded an earnest deposit in the amount of $9,125,000 (the "Earnest Deposit") with an escrow agent on April 8, 2022. Should the Proposed Purchaser be determined to be the Successful Bidder (as defined below), at Closing, (i) the Earnest Deposit will be credited against the purchase price ultimately resulting after completion of the overbid solicitation process, and (ii) Proposed Purchaser will pay to the Debtor by wire transfer of immediately available funds an amount equal to the balance.

27.     The Proposed Purchaser, as a condition to Proposed Purchaser's willingness to proceed, has negotiated to receive a fee of 3% of the Stalking Horse Bid Amount plus an expense reimbursement capped at an additional 0.5% of the Stalking Horse Bid Amount (collectively the "Break-Up Fee") payable, as an allowed super-priority administrative expense claim, only in the event that the Proposed Purchaser is outbid at or prior to the Auction in according with the Bid Procedures, payable only from the proceeds received by the Debtor at closing in a transaction with the Successful Bidder.  Alternatively, and also a condition of Proposed Purchaser's willingness to proceed, the Proposed Purchaser has negotiated to receive and relied on a one percent (1%) break-up fee (the "Reduced Break-Up Fee") generally payable as an allowed super-priority administrative expense claim in the event that the Debtor abandons its efforts to pursue and consummate the sale of substantially all of its assets or fails to oppose efforts to derail pursuit of such a sale. As provided in Section 11.3(d) of the Asset Purchase Agreement, approval of each of the Break-Up Fee and the Reduced Break-Up Fee is an integral part of the transactions contemplated by the Asset Purchase Agreement and, in the absence of the Debtor's obligation to

pay the Break-Up Fee or the Reduced Break-Up Fee, as applicable, the Proposed Purchaser would not have entered into the Asset Purchase Agreement.

28.    The Debtor seeks approval, with the consent of the Prepetition Secured Lenders, to treat the Break-Up Fee and the Reduced Break-Up Fee, as applicable, as super-priority administrative expense claims with a right of surcharge against secured interests. The Debtor seeks this Court's determination, with the Prepetition Secured Lenders' consent, that the Break-Up Fee amount and Reduced Break-Up Fee amount, as applicable, each constitute a reasonable approximation of the fees, costs and expenses incurred and to be incurred by the Proposed Purchaser in connection with its investigation, negotiation, and consummation of the transaction envisioned in the Asset Purchase Agreement, will compensate Proposed Purchaser for its time and effort in examining the Debtor's business, conducting due diligence, and the loss of opportunity that such time and effort has caused should another bidder be the Successful Bidder, and that it would fairly compensate the Proposed Purchaser for the benefit it has provided to the estate.

29.    As stated above, the Break-Up Fee is to be payable on no later than the fifth Business Day following, and only in the event that there occurs, a closing of a transaction that is the subject of a Competing Bid (as defined below). The Reduced Break-Up Fee is to be payable on no later than the third Business Day following, and only in the event that there occurs, a termination of the Asset Purchase Agreement as a result of a willful or intentional breach of covenant on the part of the Debtor. In addition, in the event that the Break-Up Fee or the Reduced Break-Up Fee, as applicable, is earned by the Proposed Purchaser, at the same time that the Break-Up Fee the Reduced Break-Up Fee, as applicable, is delivered, or in the event of the termination of the Asset Purchase Agreement for any reason other than a default under the Asset Purchase

Agreement by the Proposed Purchaser, the Debtor shall refund the Earnest Deposit to the Proposed Purchaser.

30.     The Proposed Purchaser's entitlement to the Reduced Break-Up Fee equal to 1% of the Stalking Horse Bid Amount is largely in the control of the Debtor - it is only earned by the Proposed Purchaser in the event that the Debtor abandons the sale process, fails to oppose a party-in-interest's efforts to derail the sale process or willfully and intentionally breaches one of a fairly limited number of Asset Purchase Agreement provided covenants. More importantly, in the unlikely event that the Debtor were to trigger the Proposed Purchaser's right to the Reduced Break-Up Fee, the payment of the Reduced Break-Up Fee would not negatively impact the Debtor or the estate.  Payment of the Reduced Break-Up Fee will not be funded by the Debtor, but rather will be satisfied in full with funds placed in escrow by an affiliate of the Debtor prior to the Petition Date.

31.     The Debtor, in the exercise of its business judgment, believes that the Break-Up Fee and the Reduced Break-Up Fee are necessary inducements for the Proposed Purchaser and thus are necessary to establish a "floor" for the sale of the Acquired Assets and ultimately encourage competitive bidding and promote the realization of the highest or otherwise best value for the Acquired Assets. Further, and as described above and in Section 11.3(d) of the Asset Purchase Agreement, approval of the Break-Up Fee and the Reduced Break-Up Fee is an integral part of the transactions contemplated by the Asset Purchase Agreement and, in the absence of the Debtor's obligation to pay the Break-Up Fee or the Reduced Break-Up Fee, as applicable, the Proposed Purchaser would not have entered into the Asset Purchase Agreement.

32.     The Debtor's management has determined that a Sale of the Power Plant as a going-concern is the best option available for the Debtor to preserve and realize the highest value for the Debtor's operating assets for the benefit of its creditors. Accordingly, the Debtor submits that

approval of this Motion, thereby permitting entry into the Asset Purchase Agreement with the Proposed Purchaser on the terms set forth therein, including, but not limited to, the provisions for the Break-Up Fee and the Reduced Break-Up Fee, as well as permitting the further solicitation of bids in accordance with the Bidding Procedures, should be approved in order to obtain the highest or otherwise best offer for the Debtor's assets, as is appropriate and in the bests interests of its estate.

## **RELIEF REQUESTED**[6]

33.     First, by this Motion, the Debtor seeks entry of the Bidding Procedures Order: (i) authorizing the Debtor to enter into the Asset Purchase Agreement and take other such steps as are necessary to consummate the transactions contemplated thereunder, subject to approval at the Sale Hearing, (ii) authorizing and approving the Bidding Procedures, (iii) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases, (iv) authorizing and approving the amount and payment of the Break-Up Fee and the Reduced Break-Up Fee, (v) approving the Notice Procedures, and (vi) setting the time, date, and place of the Auction and the Sale Hearing.

34.     Second, the Debtor requests entry of the Sale Order, pursuant to sections 105, 363, and 365, authorizing and approving (i) the sale of the Acquired Assets, free and clear of all liens, claims, encumbrances, and interests, to the Successful Bidder (the "Sale"), and (ii) the assumption and assignment of certain contracts and leases.

---

[6] In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the contemplated Asset Purchase Agreement with the Proposed Purchaser have been summarized and are attached hereto as Exhibit A.

## I.   PROPOSED BID AND SALE PROCEDURES

### A.  Assets to be Sold

35.    The Debtor will offer for sale all, or substantially all, of the Debtor's assets.  As stated above, those assets consist generally of the Debtor's 330 MW natural gas-fired generating facility located on 32.5 acres of Debtor-owned land in Ector County, Texas and substantially all equipment, receivables, gas-on-hand, intellectual property, intangible assets, permits to the extent transferrable, causes of action (including specifically Avoidance Actions under Chapter 5 of the Bankruptcy Code) and certain identified contract and contract rights.

### B.  The Sale Schedule

36.    This Motion and the Bidding Procedures propose the following schedule for the major key dates and deadlines to establish an efficient, expedited, and open process for the solicitation, receipt, and evaluation of Bids and the consummation of a Sale. These requested dates and deadlines are subject to the Court's availability and approval, and may also be modified by the Debtor to the extent permitted under the Bidding Procedures and the Bidding Procedures Order.

| Event | Date | Deadline |
|---|---|---|
| Bidding Procedures Objection Deadline | 3 days before Bidding Procedures Hearing | Deadline by which any objections to the Bidding Procedures must be filed with the Court and served so as to be actually received by the Objection Notice Parties (as defined in the Bidding Procedures Order). |
| Bidding Procedures Hearing | May 2, 2022 (Petition Date + twenty-one (21) days) | Date for the hearing to consider the approval of the Bidding Procedures. |
| Sale Notice | Within three (3) business days following entry of the Bidding Procedures Order | Date by which the Debtor will file and serve the Sale Notice (as defined below). |

| Event | Date | Deadline |
|-------|------|----------|
| Cure Notice | Within twenty (20) business days prior to the Sale Hearing | Date by which the Debtor will serve the Cure Notice (as defined below) upon each counterparty to an Assumed and Assigned Contract (as defined below) and file a global exhibit listing Cure Amounts (as defined below). |
| Deadline to Object to Assumption and Assignment of Executory Contracts/Cure Notice | June 17, 2022 | Deadline by which objections to the proposed assumption and assignment of the applicable Assumed and Assigned Contract, the proposed Cure Amounts, if any, or adequate assurance of future performance by the Proposed Purchaser must be filed with the Court and served so as to be actually received by the Objection Notice Parties. |
| Sale Objection Deadline | 30 days after filing and service of the Sale Notice | Deadline by which objections to the Sale must be filed with the Court and served so as to be actually received by the Objection Notice Parties. |
| Bid Deadline | June 17, 2022 (five (5) days prior to the Auction) | Deadline by which the Debtor must *actually receive* binding Qualified Bids from Qualified Bidders (as defined below). |
| Auction (if necessary) | June 22, 2022 (five (5) days prior to Sale Hearing) | Date that an Auction for the Acquired Assets will be conducted, in person or via virtual meeting, whichever is appropriate at that time. |
| Sale Hearing | June 27, 2022 (Petition Date + 75 days) | Date for a hearing at which the Court will consider approving the Sale of the Acquired Assets to the Successful Bidder or Back-Up Bidder, pursuant to the Sale Order. |

37.     As set forth above and in the Svoyskiy Declaration, given the extensive prepetition marketing process and the financial condition of the Debtor, the Debtor believes the above timeline is reasonable and will lead to a Sale that maximizes the value of the Acquired Assets.

38.     The timing of the process leading up to entry of the Sale Order is also driven in part by the terms of the APA and the financial modeling that underlies the Proposed Purchaser's offered purchase price.  The Debtor generates the bulk of its dispatch related revenue during the summer months.  The Proposed Purchaser's pricing, including the $2.7 million "Incentive Consideration" that will be paid if a closing occurs and revenue generating operations are commenced by the Purchaser on or before July 31, 2022 is premised on the assumption that the Proposed Purchaser will not only own the Acquired Assets, but will be in operation, in time to realize the bulk of that summer dispatch related revenue.

39.     Although the seventy-five day schedule as proposed envisions entry of the Sale Order within a period that would enable a closing prior to summer peak dispatch period, the APA provides as a condition to closing or operation that those Governmental Approvals and Filing(s) listed on Disclosure Schedule 5.2(d) of the APA be received, satisfied or issued, as applicable. Although the Proposed Purchaser has agreed to commence certain of the processes necessary to fulfill those conditions prior to this Court's entry of the Sale Order, certain notifications and applications cannot be undertaken prior to Closing, and the Proposed Purchaser is unwilling to undertake the time and expense attendant upon others until post-Closing or at least until being determined to be the Successful Bidder.  Completion of that permitting and notification process, therefore, will likely extend into the summer peak demand period, suggesting that increasing the chances of both receiving the Incentive Consideration and generating the positive working capital likely to lead to an upward adjustment in the Purchase Price supports adherence to the APA provided limitation that entry of the Sale Order occur no later than the 75th day following the filing of this motion.

## C.  The Bidding Procedures

40.     In order to ensure that the Debtor receives the maximum value for the Acquired Assets, the Asset Purchase Agreement will serve as the "stalking-horse" bid for the Acquired Assets.

41.     The Bidding Procedures, which are attached to the proposed Bidding Procedures Order as Exhibit 1, are designed to obtain the highest or otherwise best offer for the Acquired Assets, while effectuating an efficient sale of the Acquired Assets. The key provisions of the Bidding Procedures to be employed with respect to the proposed Sale of the Acquired Assets and assumption of Assumed Liabilities are as follows:[7]

a. Bid Deadline. A Qualified Bidder that desires to make a Bid (as defined below) will deliver written copies of its Bid **by electronic mail** to the Debtor as follows: (i) Ector County Energy Center LLC, Attn: John Baumgartner, CRO, john.baumgartner@us.gt.com, with copy to: ann.huynh@us.gt.com; (ii) Debtor's counsel: (a) Holland & Knight LLP, John J. Monaghan, Esq. and David W. Wirt, Esq., bos-bankruptcy@hklaw.com, david.wirt@hklaw.com; and (b) Polsinelli PC, Christopher A. Ward, Esq. and Michael V. DiPietro, Esq., cward@polsinelli.com, mdipietro@polsinelli.com; and (iii) Debtor's investment banker: Perella Weinberg Partners L.P., Attn: Alexander Svoyskiy, Jonathan Sherman, and Sam Tanzer, asvoyskiy@pwpartners.com, jsherman@tphco.com, and stanzer@pwpartners.com; so as to be received not later than **June 17, 2022, at 4:00 p.m. (ET)** (as may be extended as set out below, the "Bid Deadline"). As soon as practicable after receipt of a Bid, but in no event more than 24 hours after receipt of a Bid, Debtor's counsel shall provide copies of the Bid and all related documents to (i) any statutory committee appointed in this Chapter 11 Case (the "Official Committee"); (ii) the Agent; and (iii) counsel to the Proposed Purchaser.

b. Provisions Governing Qualifications of Bidders. Unless otherwise ordered by the Court, for cause shown, or as otherwise determined by the Debtor, in order to participate in the Bidding Process, prior to the Bid Deadline (as defined below), each person other than the Proposed Purchaser who wishes to participate in the Bidding Process (a "Potential Bidder") must deliver to the Debtor at the addresses provided above:

---

[7] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern. Capitalized terms used but not defined in this section only have the meanings ascribed to them in the Bidding Procedures.

    (i)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder) in form and substance satisfactory to the Debtor. In the event that the Potential Bidder has already entered into an acceptable confidentiality agreement with the Debtor, it must provide a statement waiving any of its rights under such confidentiality agreement that are in conflict with the Bidding Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Sale it may enter into;

    (ii)    sufficient information, as determined by the Debtor, which may include current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtor and its advisors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale; and

    (iii)    a statement demonstrating to the Debtor's satisfaction, a bona fide interest in purchasing the Acquired Assets from the Debtor.

A Potential Bidder that has complied with the requirements described above, and that the Debtor determines in its reasonable business judgment, after consultation with its counsel and advisors and any Official Committee appointed in this Chapter 11 Case, is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale, will be deemed a "Qualified Bidder." For the avoidance of doubt, the Proposed Purchaser will be deemed a Qualified Bidder, and the stalking horse bid from the Proposed Purchaser shall be deemed a Qualified Bid for purposes of the Bidding Procedures, which status cannot be abrogated by subsequent amendment or modification to these Bidding Procedures.

c.   Provisions Governing Qualified Bids. An offer, solicitation, or proposal (each, a "Bid") that is submitted in writing by a Qualified Bidder and satisfies each of the following requirements, as determined by the Debtor, in its reasonable business judgment and in consultation with its counsel and advisors, and any Official Committee appointed in this Chapter 11 Case, shall constitute a "Qualified Bid":

    (i)    *Acquired Assets*. Each Bid must state that the applicable Qualified Bidder offers to purchase all or a portion of the Acquired Assets, upon the terms and conditions substantially as set forth in the Asset Purchase Agreement, including, without limitation, with respect to certainty and timing of closing, or upon alternative terms and conditions that the Debtor reasonably determines are no less favorable than the terms and conditions of the Asset Purchase Agreement.

(ii)    *Purchase Price; Minimum Bid*. Each Bid must clearly set forth the purchase price to be paid (the "Purchase Price"). The Purchase Price shall include (a) cash in an amount not less than five percent (5%) greater than the Stalking Horse Bid Amount; and (b) otherwise be on terms no less favorable than the Asset Purchase Agreement.

(iii)    *Binding and Irrevocable*. Each Bid must include a letter stating that the Qualified Bidder's Bid is irrevocable until the Court approves the selection of the Successful Bidder (as defined below) and the Back-Up Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) thirty (30) days after the Outside Closing Date (as defined in the Asset Purchase Agreement).

(iv)    *Marked Agreement*. Each Bid must include a duly authorized and executed asset purchase agreement, including the Purchase Price for the Acquired Assets expressed in U.S. Dollars, together with all exhibits and schedules thereto and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto (or term sheets that describe the material terms and provisions of such agreements), as well as copies of such materials marked to show those amendments and modifications to the Asset Purchase Agreement (a "Marked Agreement") and the proposed order for approval of the Sale by the Court proposed by the Qualified Bidder. Each Bid may not contain additional termination rights, covenants, financing or due diligence contingencies, shareholder, board of director or other internal approval contingencies, or closing conditions, other than as may be included in the Asset Purchase Agreement (it being agreed and understood that such Bid shall modify the Asset Purchase Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder, such as the Break-Up Fee and the Reduced Break-Up Fee).

(v)    *Demonstrated Financial Capability*. Each Bid must include written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreement.

(vi)    *Identity*. Each Bid must fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise sponsoring or participating in connection with such Bid, and the complete terms of any such participation. Each Bid must fully disclose any relationship or connection that the Potential Bidder submitting such Bid has with the Debtor or with any officer, director, member, or manager of the Debtor.

(vii)   *As-Is, Where-Is*.  Each  Bid  must  include  an  acknowledgement  and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the Acquired Assets prior to making its offer; (b) has relied solely upon its own independent review,  investigation  and/or  inspection  of  any  documents  and/or  the Acquired Assets in making its bid; (c) did not rely upon any written or oral statements,  representations,  promises,  warranties  or  guaranties  whatsoever, whether express or implied (by operation of law or otherwise), regarding the Acquired Assets or the completeness of any information provided in connection  therewith  or  the  Auction,  except  as  expressly  stated  in  the Marked Agreement; and (d) is not entitled to any expense reimbursement or break-up fee in connection with its bid.

(viii)  *Affirmative Statement*. Each Bid shall be accompanied by an affirmative statement that: (i) all Qualified Bidders submitting such Bid have acted in good faith consistent with section 363(m) of the Bankruptcy Code and not in any manner prohibited by section 363(n) of the Bankruptcy Code; (ii) all Qualified Bidders submitting such Bid have and will continue to comply with the Bidding Procedures; and (iii) with the exception of the Proposed Purchaser as the stalking horse bidder, all Qualified Bidders submitting such Bid waive any entitlement to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and waive any substantial contribution (administrative expense) claims under section 503(b) of the Bankruptcy Code related to the bidding for the Debtor's assets or otherwise participating the Auction.

(ix)    *Authorization*. Each Bid must include evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with  respect  to  the  submission,  execution,  delivery  and  closing  of transaction contemplated by the Marked Agreement and the Sale.

(x)     *Good Faith Deposit*. Each Bid must be accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine) in an amount equal to the Earnest Deposit (i.e. 10% of the Stalking Horse Bid Amount), which the Debtor shall hold in trust, to be dealt with as provided for under "Good Faith Deposits" herein.

(xi)    *Executory Contracts*. Each Bid must identify with particularity which executory contracts or unexpired leases the Qualified Bidder wishes to assume, include an acknowledgment and representation that the Qualified Bidder will assume the Debtor's obligations under such executory contracts and unexpired leases arising from and after the closing, and identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing.

(xii)    *Adequate Assurance*. Each Bid must include evidence of the Qualified Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future under the contracts and leases proposed in its Bid to be assumed by the Debtor and assigned to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases.

(xiii)   *Consent to Jurisdiction*. Each Bid must state that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court.

(xiv)    *Additional Information*. Each Bid must contain any other information reasonably requested by the Debtor.

(xv)     *Bid Deadline*. Each Bid must be received by to the Bid Deadline.

The Debtor will determine, in its reasonable business judgment whether to entertain Bids for the Acquired Assets that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids. Notwithstanding the foregoing, Proposed Purchaser will be deemed a Qualified Bidder, and the Asset Purchase Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.

d.    <u>Evaluation of Competing Bids</u>. A Qualified Bid will be valued based upon several factors including, without limitation, items such as the Purchase Price and the net value (including assumed liabilities and the other obligations to be performed or assumed by the Qualified Bidder) provided by such Bid, the claims likely to be created by such Bid in relation to other Bids, the counterparties to the transactions, the proposed revisions to the relevant transaction documents, the effect of the transactions on the value of the ongoing business of the Debtor (including ongoing relationships with partners, customers and suppliers), other factors affecting the speed, certainty and value of the transactions (including any regulatory approvals required to close the transactions), the Acquired Assets included or excluded from the bid, the transition services required post-closing and any related restructuring costs, and the likelihood and timing of consummating such transactions, each as determined by the Debtor, in consultation with its counsel and advisors, and any Official Committee appointed in this Chapter 11 Case.

e.    <u>No Qualified Bids</u>. If the Debtor does not receive any Qualified Bids other than the Asset Purchase Agreement, the Auction (as defined below) shall be cancelled and the Debtor shall report the same to the Court and, subject to requiring and obtaining approvals of the Court and satisfaction of the conditions set forth in the Asset Purchase Agreement, the Debtor shall promptly proceed to seek entry of the appropriate order approving the Sale transactions with Proposed Purchaser pursuant to the terms and conditions set forth in the Asset Purchase Agreement. In addition, if no Qualified Bid other than the Asset Purchase Agreement is received, the Debtor reserves the right to request that the Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

f. <u>Auction Process</u>:  If the Debtor receives at least one Qualified Bid other than the Asset Purchase Agreement, the Debtor will conduct an auction (the "<u>Auction</u>") for the Acquired Assets, which shall be transcribed or recorded on video, to begin on **June 22, 2022 at 10:00 AM EST** or such other date and time, at the Court's convenience, and at a location to be determined, including by virtual meeting, as shall be timely communicated to all entities entitled to attend the Auction, which Auction may be cancelled or adjourned. The Debtor reserves its right to hold the Auction virtually. The Auction shall run in accordance with the following procedures:

(i)     The Debtor and any Qualified Bidder that has timely submitted a Qualified Bid, and each of their respective advisors, shall be entitled to attend the Auction, in person or by virtual meeting, whichever is appropriate at that time. In accordance with Local Rule 6004-1, all creditors are also entitled to attend the Auction.

(ii)    Only Qualified Bidders will be entitled to make any subsequent Bids at the Auction.

(iii)   Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale transactions.

(iv)    At least two (2) days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtor whether it intends to participate in the Auction; <u>provided</u> that in the event a Qualified Bidder elects not to participate in the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the Court's approval of the selection of the Successful Bidder and Back-Up Bidder and (ii) if such Qualified Bidder is selected as the Successful Bidder or the Back-Up Bidder, the earlier of (x) closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (y) thirty (30) days after the Outside Closing Date (as defined in the Asset Purchase Agreement). At least one (1) day prior to the Auction, the Debtor will provide a summary of all Qualified Bids to all Qualified Bidders that have informed the Debtor of their intent to participate in the Auction and will state which Qualified Bid or combination of Qualified Bids the Debtor believes, in its reasonable business judgment, is the highest or otherwise best offer (the "<u>Starting Bid</u>").

(v)     All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction; <u>provided</u> that all Qualified Bidders wishing to participate in the Auction must have at least one individual representative with authority to bind such Qualified Bidder attend the Auction in person.

(vi)    The Debtor, after consultation with its counsel and advisors and any Official Committee appointed in this Chapter 11 Case may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids or requiring Subsequent Bids be the Qualified Bidders' final and best bids) for conducting the Auction, <u>provided</u> that such rules are (i) not inconsistent with these Bidding Procedures, the Local Rules, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

(vii)    Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "<u>Subsequent Bid</u>") and (ii) the Debtor determines, in consultation with its counsel and advisors, and any Official Committee appointed in this Chapter 11 Case, that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid at the Auction shall provide net value to the estate of at least $250,000 over the Starting Bid or the Leading Bid, as the case may be; provided that the Debtor shall retain the right, in consultation with its counsel and advisors, and any Official Committee appointed in this Chapter 11 Case, to modify the increment requirements at any time at or prior to the Auction after informing each participating Qualified Bidder. After the first round of bidding and between each subsequent round of bidding, the Debtor shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "<u>Leading Bid</u>"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

(viii)    The Proposed Purchaser shall be permitted to include as part of any and all of its subsequent bids a credit for the Break-Up Fee.  For the avoidance of doubt, the Proposed Purchaser shall not be deemed to waive its entitlement to the Break-Up Fee or the Reduced Break-Up Fee upon submitting a higher or otherwise better bid than the Asset Purchase Agreement at the Auction.

(ix)    Each Bid made at the Auction shall be irrevocable until the Court approves the selection of the Successful Bidder (as defined below) and the Back-Up Bidder (as defined below), provided that if a Bid is selected as the Successful Bid or the Back-Up Bid, it shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Back-Up Bidder, and (ii) thirty (30) days after the Outside Closing Date (as defined in the Asset Purchase Agreement).

g.  Reservation of Rights. Except as otherwise provided in the Asset Purchase Agreement, the Bidding Procedures or the Bidding Procedures Order, the Debtor, after consultation with its counsel and advisors, and any Official Committee appointed in this Chapter 11 Case: (i) may determine after each round of bidding at the Auction which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (ii) may reject, at any time, any Bid that the Debtor determines is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtor, its estate, and stakeholders as determined by the Debtor; (iii) except as otherwise specifically set forth herein, may modify the Bidding Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Acquired Assets; (iv) may extend the deadlines set forth herein; and (v) may continue or cancel the Auction or Sale Hearing in open court without further notice.

h.  Selection of Successful Bid. Prior to the conclusion of the Auction, the Debtor, in consultation with its counsel and advisors, and any Official Committee appointed in this Chapter 11 Case, will (i) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" section, (ii) identify the highest or otherwise best offer or offers for the Acquired Assets received at the Auction (one or more such Bids, collectively the "Successful Bid" and the bidder(s) making such Bid, collectively, the "Successful Bidder") and (iii) communicate to the Qualified Bidders the identity of the Successful Bidder, the Back-Up Bidder, if any, and the details of the Successful Bid and Back-Up Bid (as defined below), if any. The determination of the Successful Bid and Back-Up Bid by the Debtor, at the conclusion of the Auction, shall be final, subject to approval by the Court. The Debtor's selection of and presentation to the Court of the Successful Bid and, if applicable, the Back-Up Bid will not constitute the Debtor's acceptance of either of such Bids, which acceptance will only occur upon the approval of such Bids by the Court at the Sale Hearing.

The Debtor will sell the Acquired Assets to the Successful Bidder pursuant to the terms of the Successful Bid (or, under certain circumstances described herein, the Back-Up Bidder) upon the approval of such Successful Bid (or Back-Up Bidder if applicable) by the Court at the Sale Hearing.

i.  Closing with Back-Up Bidders. If the Debtor receives one or more additional Qualified Bid(s), then, at the Sale Hearing, the Debtor will seek approval of the Successful Bid, and, at the Debtor's election, the next highest or otherwise best Qualified Bid (the "Back-Up Bid" and, such bidder, the "Back-Up Bidder"). Following Court approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the Sale for any reason, then the Back-Up Bid will be deemed to be the Successful Bid and the Debtor will be authorized, but not directed, to effectuate a Sale to the Back-Up Bidder subject to the terms of the Back-Up Bid of such Back-Up Bidder without further order of the Court. The Back-Up Bid shall remain open until the earlier of (i) the thirtieth (30th) day after the Outside Closing Date (as defined in the Asset Purchase Agreement) or (ii) the consummation of the Sale to the Successful Bidder (the "Back-Up Bid Expiration Date"). Any provision in the Back-Up Bid conditioning such bid on a closing prior to the Back-Up Bid Expiration Date shall be void. All the Qualified Bids

other than the Successful Bid and the Back-Up Bid shall be deemed rejected by the Debtor on and as of the date of approval of the Successful Bid and the Back-Up Bid by the Court.

j.  <u>Failure to Close</u>. If the Successful Bidder fails to consummate the transaction in accordance with the terms of the applicable agreement executed by the Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason, the Debtor shall: (i) solely to the extent provided for in the applicable purchase agreement or Asset Purchase Agreement with the Proposed Purchaser, retain the Successful Bidder's Good Faith Deposit; (ii) solely to the extent provided for in the applicable purchase agreement or Asset Purchase Agreement with the Proposed Purchaser, maintain the right to pursue all available remedies, whether legal or equitable; and (iii) be free to consummate the proposed transaction with the Back-Up Bidder at the Back-Up Bid, without the need for an additional hearing or Order of the Court.

k.  <u>Good Faith Deposits</u>. The Good Faith Deposit of any Back-Up Bidder shall be retained by the Debtor until the Back-Up Bid Expiration Date and returned to the Back-Up Bidder within five (5) Business Days thereafter or, if the Back-Up Bid becomes the Successful Bid, shall be applied to the Purchase Price to be paid by the Back-Up Bidder in accordance with the terms of the Back-Up Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Back-Up Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of the Successful Bidder and the Back-Up Bidder. The Good Faith Deposit of the Successful Bidder will be dealt with in accordance with the terms of the Successful Bid. With respect to the Proposed Purchaser, the Asset Purchase Agreement provides that the Earnest Deposit is the sole and exclusive remedy of the Debtor in the event the Asset Purchase Agreement is terminated.

l.  <u>Sale Hearing</u>. The Debtor will seek entry of the Sale Order from the Court at the Sale Hearing to begin on **June 27, 2022** at 10:00 A.M. (EST), (or at another date and time convenient to the Court) to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bidding Procedures.

m.  <u>No Shop or No Solicitation</u>. The Bidding Procedures Order does not limit the Debtor's ability or right to solicit higher or otherwise better bids upon entry of the Bidding Procedures Order.[8]

---

[8] Section 11.2(j) of the APA provides that only (i) between the Execution Date and the date that this Court enters the Bidding Procedures Order and (ii) from and after the Auction is declared closed by the Debtor, the Debtor will not, directly or indirectly, and will not permit any of its Affiliates or Representatives (or Representatives of any of its Affiliates) to (A) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by any Person with respect to an Alternative Transaction, or otherwise facilitate any effort or attempt to make a proposal or offer to the Seller or any of its Affiliates or Representatives (or Representatives of any of its Affiliates) with respect to an Alternative Transaction or (B) engage in, continue or otherwise participate in any discussions or negotiations relating to any Alternative Transactions. The Debtor respectfully submits that this is a material term to the Proposed Purchaser's willingness to act as the stalking horse bidder with respect to the Acquired Assets in this Chapter 11 Case.

### D.    The Sale Notice Procedures

42.    As stated above, the Debtor requests that this Court schedule the Sale Hearing on June 27, 2022. The Debtor proposes that any objections to the Sale (other than an Assumption/Cure Objection (as defined below)), which shall be governed by the procedures set forth below) (a "Sale Objection"), must (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, together with proof of service, on or before the date that is thirty days after service of the Sale Notice (the "Sale Objection Deadline"); and (e) be served, so as to be actually received on or before the Sale Objection Deadline, upon the following parties (collectively, the "Objection Notice Parties"): (a) Debtor's counsel, (i) Holland & Knight LLP, Attn: John J. Monaghan, Esq., 10 Saint James Avenue, 11th Floor, Boston, Massachusetts 02116, bos-bankruptcy@hklaw.com; and (ii) Polsinelli PC, Christopher A. Ward, Esq. and Michael V. DiPietro, Esq., cward@polsinelli.com, mdipietro@polsinelli.com, 222 Delaware Avenue, Suite 1101, Wilmington, Delaware 19801; (b) counsel to the Agent and the Ad Hoc Group, Davis Polk & Wardwell LLP, Attn: Brian Resnick, Esq. and Joshua Sturm, Esq., 450 Lexington Avenue, New York, NY 10017 (brian.resnick@davispolk.com; joshua.sturm@davispolk.com) and (ii) Richards, Layton & Finger, P.A., Attn: Mark D. Collins, Esq. (collins@rlf.com); (c) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Juliet Sarkessian, Esq. (juliet.m.sarkessian@usdoj.gov); (d) counsel to the Proposed Purchaser, (i) Bracewell LLP, CityPlace I, 34th Floor, 185 Asylum Street, Hartford, CT 06103 Attn: Mark E. Dendinger, Esq. (mark.dendinger@bracewell.com) and 711 Louisiana St., Suite 2300, Houston, Texas 77002, Attn: Ryan S. Holcomb, Esq. (ryan.holcomb@bracewell.com); and (ii) Bayard, P.A., 600 N. King Street, Suite 400, P.O. Box 25130, Wilmington, DE 19899, Attn: Erin Fay, Esq.

(efay@bayardlaw.com); and (e) counsel to any Official Committee appointed in this Chapter 11 Case.  If a Sale Objection is not filed and served on or before the Sale Objection Deadline, the Debtor requests that the objecting party be barred from objecting to the Sale and appearing at the Sale Hearing, such that this Court may enter the Sale Order without further notice to any party failing to file a timely Sale Objection.

43.    The Debtor also requests that the Court approve the form of the Notice of Bidding Procedures, Auction Date, and Sale Hearing (the "Sale Notice"), substantially in the form of Exhibit 2 to the Bidding Procedures Order.  The Debtor will serve a copy of the Sale Notice on the following parties: (a) the Objection Notice Parties, (b) any parties requesting notices in this case pursuant to Bankruptcy Rule 2002; (c) the offices of the attorneys general for the states in which the Debtor operates; (d) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Acquired Assets; (e) all parties requesting notice pursuant to Bankruptcy Rule 2002; (f) all non-Debtor parties to any Assumed and Assigned Contracts; (g) all applicable governmental and regulatory agencies; (h) the Office of the Secretary of State in each state in which the Debtor operates or is organized; (i) all relevant taxing jurisdictions; (j) the Debtor's insurers; (k) all known creditors of the Debtor; (l) all known holders of equity interests in the Debtor; (m) all environmental authorities having jurisdiction over any of the Acquired Assets; and (n) to the extent not included above, all parties in interest listed on Debtor's creditor matrix (collectively with the parties specified in this paragraph, the "Sale Notice Parties").[9]

44.    The Debtor proposes to file with the Court and serve the Sale Notice within three (3) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Sale Notice Parties. The Sale Notice provides that any party that has not received a

---

[9] Copies of the Bidding Procedures Order will also be made available to prospective purchasers of Acquired Assets.

copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may obtain such documents on the website maintained by Donlin, Recano & Company, Inc., the Debtor's proposed claims and noticing agent, at www.donlinrecano.com/ecec, or by email request to ececinfo@donlinrecano.com.

45.      The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and Sale, and Sale Hearing to the Debtor's creditors and other parties in interest as well as to those who have expressed an interest or are likely to express an interest in bidding on the Acquired Assets. Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed procedures with respect to the Sale Notice.

**E.      Procedures for Assumption and Assignment of the Executory Contracts and Unexpired Leases.**

46.      To facilitate and effect the contemplated Sale, the Debtor will be required to assume and assign to the Successful Bidder certain executory contracts and unexpired leases (the "Assumed and Assigned Contracts").  No later than twenty (20) days prior to the Sale Hearing, the Debtor shall cause notice to be provided to all counterparties to executory contracts and unexpired leases that may be Assumed and Assigned Contracts, substantially in the form of Exhibit 3 (the "Cure Notice") to the Bidding Procedures Order. The Cure Notice shall provide the counterparties to the possible Assumed and Assigned Contracts notice of the amount that the Debtor believes must be cured upon the assumption and assignment as required under section 365 of the Bankruptcy Code (the "Cure Amount").

47.      Except as may otherwise be agreed to by the parties to an Assumed and Assigned Contract (with the consent of the Successful Bidder), within ten (10) business days following

closing of the transfer of the Acquired Assets, payments to cure those defaults under the Assumed and Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code will be made in accordance with the Asset Purchase Agreement executed by the Successful Bidder by (a) payment of the undisputed Cure Amounts, and/or (b) reserving amounts with respect to the disputed Cure Amounts.  In the event of a dispute regarding the Cure Amount, any payments required, following entry of a Final Order resolving such dispute, shall be made as soon as practicable thereafter.

48.     Objections, if any, to the proposed assumption and assignment of the Assumed and Assigned Contracts, including, but not limited to, objections relating to the Cure Amount and/or adequate assurances of future performance (an "Assumption/Cure Objection"), must be filed and served so as to be actually received by the Objection Notice Parties by no later than (i) **June 17, 2022 at 4:00 p.m. (ET)** or (ii) the date otherwise specified in the Cure Notice (the "Assumption/Cure Objection Deadline") provided, however, that counterparties may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed and Assigned Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed and Assigned Contract solely in the event that the Proposed Purchaser is not the Successful Bidder.

49.     Any counterparty to an Assumed and Assigned Contract who receives a Cure Notice and wishes to receive evidence of Qualified Bidders' ability to provide adequate assurance of future performance under section 365 of the Bankruptcy Code may make such a request in writing (an "Adequate Assurance Notice Request") to Holland & Knight LLP, Attn: John J. Monaghan, Esq., 10 Saint James Avenue, 11th Floor, Boston, Massachusetts 02116; Attn: David W. Wirt, Esq., 150 N. Riverside Plaza, Suite 2700, Chicago, Illinois 60606, or by emailing bos-

bankruptcy@hklaw.com and david.wirt@hklaw.com, **by June 10, 2022 at 4:00 p.m. (ET)**. Within 24 hours of the determination that Potential Bids are Qualified Bids, the Debtor shall send, by email, the evidence submitted by Qualified Bidders in their Qualified Bids of their ability to provide adequate assurance of future performance to any counterparty that has submitted a timely Adequate Assurance Notice Request.

50.     If no Assumption/Cure Objections are timely received by the Assumption/Cure Objection Deadline, the Debtor seeks entry of an order determining that the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assumed and Assigned Contract or otherwise asserted by the non-debtor party thereto.

51.     The Debtor seeks authorization and approval to assume and assign the Assumed and Assigned Contracts at Closing. However, if the Cure Amount for any Assumed and Assigned Contract is subject to dispute as of the Closing then such Assumed and Assigned Contract will not be assumed and assigned until after the Court determines the Cure Amount. If the Court determines the Cure Amount for such Assumed and Assigned Contract to be less than or equal to the amount set forth in the Cure Schedule, then the Debtor seeks, by this Motion, authorization and approval to assume and assign such Assumed and Assigned Contract on the date of such determination by the Court, if not stayed.

52.     Except to the extent otherwise provided in the Successful Bid, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed and Assigned Contracts pursuant to section 365(k) of the Bankruptcy Code.

53.     Pursuant to section 365(f) of the Bankruptcy Code, the Debtor seeks authorization and approval to assume and assign the Assumed and Assigned Contracts notwithstanding any

provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

54.     Upon assumption of the Assumed and Assigned Contracts by the Debtor and assignment to the Successful Bidder, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Bidding Procedures Order.

**F.      Sale Free and Clear of All Liens, Claims, Encumbrances, and Interests**

55.     At the Sale Hearing, the Debtor will seek Court approval of the Sale to the Successful Bidder, free and clear of all liens, claims, interests, and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims, interests, and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Acquired Assets prior to the Sale, including the assumption by the Debtor and assignment to the Successful Bidder of the Assumed and Assigned Contracts pursuant to section 365 of the Bankruptcy Code. The Debtor will also seek an order of the Court prohibiting all persons holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against the Successful Bidder under section 363(f) of the Bankruptcy Code. The Debtor will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtor's estate and all interested parties, and satisfies the standards necessary to approve a sale of substantially all of a debtor's assets, as a reasonable exercise of the Debtor's business judgment.

## BASIS FOR RELIEF REQUESTED

**A.    The Bidding Procedures Are Fair, in the Best Interests of the Estate and Its Creditors, and Should be Approved.**

i.    <u>The Bidding Procedures Will Maximize the Value Received for the Acquired Assets.</u>

56.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (noting that bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

57.    Procedures to dispose of assets, similar to the proposed Bidding Procedures, have been regularly approved in other bankruptcy cases. *See, e.g., In re Ravn Air Group, Inc.*, Case No. 20-10755 (BLS) (Bankr. D. Del. June 3, 2020); *In re Emerald Oil, Inc.*, No. 16-10704 (KG) (Bankr. D. Del. July 28, 2016); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Oct. 6, 2015); *In re IMRIS, Inc.*, Case No. 15-11133 (CSS) (Bankr. D. Del. June 16, 2015); *In re Velti Inc.*, Case No. 13-12878(PJW) (Bankr. D. Del. Nov. 20, 2013); *In re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS) (Bankr. D. Del. Jul. 8, 2013); *In re Conex Holdings LLC*, Case No. 11-10501(CSS) (Bankr. D. Del. Sept. 14, 2011); *In re Barnes Bay Dev. Ltd.*, Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); *In re East West Resort Dev. V, L.P., L.L.L.P.*, Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); *In re Dana Corp.*, Case

No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); *In re Delphi Corp.*, Case No. 05¬44481 (Bankr.

S.D.N.Y. June 22, 2006); *In re Oxford Automotive, Inc.*, Case No. 04-74377 (Bankr. E.D. Mich.

Jan. 24, 2005); *see also In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 6, 2006).[10]

58.     The Bidding Procedures proposed herein are designed to maximize the value

received for the Debtor's business by facilitating a competitive bidding process in which all

Potential Bidders are encouraged to participate and submit competing bids, taking into account the

financial exigencies facing the Debtor. The Bidding Procedures will provide for an open,

competitive process in which the value of the Acquired Assets may be tested and maximized at an

auction and through the ensuing Sale Hearing. By providing a competitive and fair bidding

process, the Bidding Procedures were designed to ensure receipt of the greatest possible

consideration for the Acquired Assets for the benefit of the Debtor's creditors. They also allow the

Debtor to undertake an auction in an expeditious and efficient manner, which the Debtor believes

is essential to maximizing the value of the Debtor's estate for its creditors.

59.     The proposed Bidding Procedures will promote active bidding from seriously

interested parties and will dispel any doubt as to the highest or otherwise best offer reasonably

available for the Acquired Assets. In particular, the proposed Bidding Procedures will allow the

Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage

participation by financially capable bidders who demonstrate the ability to close a transaction.  The

Bidding Procedures provide the Debtor with the opportunity to consider all Qualified Bids and to

select, in its reasonable business judgment, and after consultation with its legal and financial

advisors and any Official Committee appointed in this Chapter 11 Case, the highest or otherwise

best offer(s) for the Acquired Assets. The Bidding Procedures also provide the Debtor with the

---

[10] Because the number of orders cited is voluminous, individual orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtor's proposed counsel.

flexibility to modify the Bidding Procedures, if necessary, to maximize value for the Debtor's estate.

60.     The Bidding Procedures envision a sale process that the Debtor believes is necessary to obtain maximum value of its assets and prevent any undue diminution of value. The sale process envisioned by this Motion and the Bidding Procedures is also appropriate in light of the Debtor's extensive prepetition marketing process led by PWP, over three months prior to the Petition Date, while still affording all interested parties sufficient notice in accordance with Bankruptcy Rule 2002.

61.     In sum, the Bidding Procedures will encourage bidding for the Acquired Assets and are consistent with the relevant standards governing auctions and bidding incentives in bankruptcy proceedings. Accordingly, the Debtor submits that the proposed Bidding Procedures are reasonable, appropriate, and within the Debtor's sound business judgment.

ii.     <u>Approval of Bid Protections in the Form of the Break-Up Fee and the Reduced Break-Up Fee is Reasonable and Appropriate Under the Circumstances, and is a Recognized and Necessary Practice.</u>

62.     The Debtor has formulated a bidding process that will induce prospective competing bidders to expend the time, energy and resources necessary to submit a bid, and that the Debtor believes is fair and reasonable and will provide a benefit to the Debtor's estate and creditors. As an inducement to the Proposed Purchaser to participate in the bidding process as a stalking horse purchaser, the Debtor agreed to the Break-Up Fee and the Reduced Break-Up Fee. Absent the Break-Up Fee and Reduced Break-Up Fee, the Proposed Purchaser would seek to terminate the Asset Purchase Agreement, resulting in considerable loss and delay to the Debtor's

estate. The Bidding Procedures and, in particular, the proposed Break-Up Fee and Reduced Break-Up Fee, are reasonable and supported by applicable case law.

63.      The provision for bid protections to a stalking horse bidder is an established practice in the context of sales of a substantial amount of a debtor's assets conducted through a chapter 11 proceeding, because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . [i]n fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be *necessary* to discharge [such] duties to maximize value." *In re Integrated Resources, Inc.*, 147 B.R. at 659-60 (emphasis added). Bid protections like the Break-Up Fee and Reduced Break-Up Fee "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted). *See also Integrated Resources*, 147 B.R. at 660–61 (bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

64.      Courts in this Circuit regularly approve such bidding protections in the context of bankruptcy asset sales where a proposed fee or reimbursement provides a benefit to the estate. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (explaining that bidding incentives in the bankruptcy context are governed by the administrative expense provisions in section 503(b) of the Bankruptcy Code, and therefore must provide a benefit to the estate to warrant approval).

65.      In *O'Brien*, the Third Circuit Court of Appeals opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, if "assurance of a

break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Environmental Energy, Inc*., 181 F.3d at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

66.     The Debtor submits that the proposed bid protection in the forms of the Break-Up Fee and Reduced Break-Up Fee is reasonable and warranted here.

67.     The Asset Purchase Agreement will serve as a minimum or floor bid for other bidders. The Break-Up Fee and Reduced Break-Up Fee are the product of good faith, arm's length negotiations, after the thorough prepetition marketing process conducted by the Debtor and led by PWP. The Proposed Purchaser has represented that it would not agree to act as a "stalking horse" without both the Break-Up Fee and the Reduced Break-Up Fee.

68.     As to the Break-Up Fee, the Proposed Purchaser sought protection against expending the substantial time and expense that would be incurred in connection with entering into definitive documentation and then being outbid at the Auction.

69.     As to the Reduced Break-Up Fee, the Proposed Purchaser sought protection against the perceived risk that the Debtor, after putting the Proposed Purchaser to the task of conducting diligence and documenting the transaction, would opt at some point in the time span of executing the Asset Purchase Agreement, negotiating and finalizing an agreement with the Prepetition Secured Lenders and obtaining entry of the Bid Procedures Order, to pursue a restructuring option other than a sale.

70.     Without the Break-Up Fee and the Reduced Break-Up Fee, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Acquired Assets and would certainly lose the downside protection that will be afforded by the existence of the Proposed Purchaser. As provided in Section 11.3(d) of the Asset Purchase Agreement, the Break-Up Fee and Reduced Break-Up Fee are an integral part of the transactions contemplated by the Asset Purchase Agreement and, in the absence of the Debtor's obligation to pay the Reduced Break-Up Fee or Break-Up Fee, as applicable, the Proposed Purchaser would not have entered into the Asset Purchase Agreement. The bid of the Proposed Purchaser represented by the Asset Purchase Agreement establishes a market-based floor for all Potential Bidders to consider that the Acquired Assets are worth at least the Stalking Horse Bid Amount. Therefore, without the benefit of the bid of the Proposed Purchaser, the bids received at auction for the Acquired Assets could be substantially lower than the bid offered by the Proposed Purchaser.

71.     The Debtor believes the Break-Up Fee, which represents 3% of the Stalking Horse Bid Amount and an expense reimbursement capped at 0.5% of the Stalking Horse Bid Amount, is fair and reasonable in amount in light of the transaction size and nature of the Acquired Assets, as well as the efforts that have been expended by the Proposed Purchaser in connection with the Sale and entry into the Asset Purchase Agreement, which will serve as the baseline for other bids for the Acquired Assets. The amount of the Break-Up Fee is well within market for similar bankruptcy court-approved transactions. *See, e.g., In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("The total amount of the proposed break-up fee and expense reimbursement is less than 3% of the total purchase price. This falls within the range of what courts in this jurisdiction have found to be acceptable break-up fees."). *See also In re BHCosmetics Holdings, LLC*, No. 22-10050-CS (Bankr. D. Del. Jan. 28, 2022) (approving breakup fee equal to 4% of the cash

consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 3.5% of the cash consideration of the stalking horse bid); *In re Gorham Paper and Tissue, LLC*, No. 20-12814-KBO (Bankr. D. Del. Nov. 19, 2020) (approving break-up fee in an amount equal to approximately 3.4% of cash purchase price and expense reimbursement up to an amount equal to approximately 1.1% of cash purchase price); *In re Proteus Digital Health, Inc., No. 20-11580* (JKS) (Bankr. D. Del. July 14, 2020) (approving break-up fee equal to 3% of the purchase price, and expense reimbursement of an amount up to 4% of the purchase price); *In re Valeritas Holdings, Inc.*, 20-10290 (LSS) (Bankr. D. Del. Mar. 6, 2020) (approving 3% break-up fee and $1 million expense reimbursement totaling 7.3% of stalking horse bid); *In re Celadon Grp., Inc.*, No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (authorizing a break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price); *In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del., Feb. 11, 2015) (court approved break-up fee, which together with expense reimbursement, was 4.3% of the purchase price under stalking horse agreement); *In re AgFeed USA, LLC*, No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (authorizing breakup fee of 3% and expense reimbursement of 1%); *In re Point Blank Solutions, Inc.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000); *In re Filene's Basement, Inc.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Global Motorsport Group, Inc.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (court approved a break-up fee of approximately 4%, or $500,000 in connection with sale).

72.    Similarly, the Reduced Break-Up Fee, which is to be received by the Proposed Purchaser only in the alternative circumstance in which the Debtor either affirmatively opts to abandon the now-documented sale or passively obtains the same result through failing to oppose the efforts of others to derail the sale, is consistent with the market for similar bankruptcy court approved sales.  Even if the Reduced Break-Up Fee equal to 1% of the Stalking Horse Bid Amount were potentially payable to the Proposed Purchaser in addition to the Break-Up Fee, the resulting 4.5% of the sale price fee would be in line with bid protections approved in this jurisdiction.  *See, e.g., In re BHCosmetics Holdings, LLC*, No. 22-10050-CS (Bankr. D. Del. Jan. 28, 2022) (approving breakup fee and expense reimbursement collectively equal to an amount up to 7.5% of the cash consideration of the stalking horse bid); *In re Gorham Paper and Tissue, LLC*, No. 20-12814-KBO (Bankr. D. Del. Nov. 19, 2020) (approving break-up fee and expense reimbursement collectively equal to an amount of 4.5% of the cash purchase price); *In re Proteus Digital Health, Inc., No. 20-11580* (JKS) (Bankr. D. Del. July 14, 2020) (approving break-up fee and expense reimbursement collectively equal to an amount up to 7% of the purchase price); *In re Valeritas Holdings, Inc*., 20-10290 (LSS) (Bankr. D. Del. Mar. 6, 2020) (approving 3% break-up fee and expense reimbursement collectively equal to an amount of up to 7.3% of stalking horse bid); *In re Celadon Grp., Inc*., No. 19-12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) (authorizing a break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price); *In re Hipcricket, Inc*., Case No. 15-10104 (LSS) (Bankr. D. Del. Feb. 11, 2015) (court approved break-up fee, which together with expense reimbursement, was 4.3% of the purchase price under stalking horse agreement); *In re AgFeed USA, LLC*, No. 13-11761 (BLS) (Bankr. D. Del. Aug. 1, 2013) (authorizing breakup fee of 3% and expense reimbursement of 1%).  The Reduced Break-Up Fee, however, is not available as an add on to the Break-Up Fee.

73.     The Reduced Break-Up Fee, as well as being in line with prior approved bid protections, also cannot impact parties-in-interest in this case. The Proposed Purchaser's recourse in the event that that the Reduced Break-Up Fee is earned is limited to recovery from an escrow account funded prepetition by the Debtor's upper tier non-debtor parent, Invenergy AMPCI Thermal Power LLC ("AMPCI"). No funds or other assets of the Debtor contributed to or were used to fund that escrow account.  Under the escrow agreement the funds, if earned by the Proposed Purchaser, are to be released by the escrow agent to the Proposed Purchaser, and if not earned are to be refunded to AMPCI.

74.     Therefore, the Debtor's proposed bid protection in the form of payment of the Break-Up Fee in the amount of  between 3% and 3.5% of the Stalking Horse Bid Amount, or alternatively in the form of the Reduced Break-Up Fee of 1% of the Stalking Horse Bid Amount, under the conditions set forth in this Motion is (a) an actual and necessary cost of preserving the Debtor's estate, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtor's estate and creditors and all parties in interest herein, (c) reasonable and appropriate, and (d) necessary to ensure that the Proposed Purchaser will continue to pursue the Asset Purchase Agreement and the proposed purchase of the Acquired Assets, and therefore constitute administrative expenses with priority pursuant to Bankruptcy Code section 503(b). Similarly, the Reduced Break-Up Fee payable to the Proposed Purchaser under the terms of the Asset Purchase Agreement as set forth in, and in accordance with, Section 11.3(b) of the Asset Purchase Agreement was a material inducement to the Proposed Purchaser to submit a bid that will serve as a minimum or floor bid on which the Debtor, its creditors, other bidders, and other parties in interest can rely, is reasonable and appropriate under the circumstances and cannot negatively impact parties-in-interest in this case because funded by a non-debtor parent of the

Debtor.

**B.      The Assumption and Assignment of the Assumed and Assigned Contracts and the Procedures for Assumption and Assignment Should Be Authorized.**

75.      Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

76.      Upon finding that a trustee or debtor in possession has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989). Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, No. 00-4459 JJF, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

77.      Section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor, providing:

(b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -

(A)      cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;

(B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if--

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

78.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

79.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

80.    To the extent any defaults exist under any Assumed and Assigned Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment. If necessary, the Debtor will submit evidence

prior to or at the Sale Hearing to show the financial credibility of the Successful Bidder and willingness and ability to perform under the Assumed and Assigned Contracts. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

81.     In addition, the Debtor submits that it is an exercise of its sound business judgment to assume and assign the Assumed and Assigned Contracts to the Successful Bidder in connection with the consummation of the transactions contemplated in the Successful Bidder's asset purchase agreement, and the assumption, assignment, and sale of the Assumed and Assigned Contracts to the Successful Bidder are in the best interests of the Debtor, its estate, its creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Successful Bidder are an integral part of the Acquired Assets being purchased by the Successful Bidder, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtor's estate. The Court should therefore authorize the Debtor to assume and assign the Assumed and Assigned Contracts as set forth herein.

82.     The Debtor submits that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with section 365 of the Bankruptcy Code. To the extent that any defaults exist under any Assumed and Assigned Contracts, any such defaults will be cured pursuant to the Successful Bidder's asset purchase agreement. Accordingly, the Debtor submits that the cure procedures for effectuating the

assumption and assignment of the Assumed and Assigned Contracts as set forth herein are appropriate and should be approved.

**C.    Sale of the Assets Is a Product of the Debtor's Reasonable Business Judgment and Appropriate under Bankruptcy Code Section 363(b).**

83.    The Debtor seeks to have the Sale approved at the Sale Hearing pursuant to section 363 of the Bankruptcy Code, which provides: "the Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, the Sale should be approved pursuant to this Court's broad equitable authority under the Bankruptcy Code, which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

84.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1). The Debtor has determined that the Sale of the Acquired Assets by auction in which a stalking horse bid is subjected to a post-petition overbid solicitation process will enable it to obtain the highest or otherwise best offer for its assets (thereby maximizing the value of the estate) and is in the best interests of the Debtor's creditors. In particular, the Sale will be the result of comprehensive arm's-length negotiations, subject to higher or otherwise better offers, and will provide a greater recovery for the Debtor's creditors than would be provided by any other existing alternative.

85.    Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor in possession. *See In*

*re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for the proposed transaction); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (Bankr. D. Del. 1999) (finding debtor's sound business purpose justified the sale of its assets outside of the ordinary course of business); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. at 153)); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Stroud Ford, Inc.,* 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

86.     If a debtor's actions satisfy the business judgment rule, the transaction in question should be approved under section 363(b)(1).  When applying the "business judgment" standard,

courts show great deference to a debtor's business decisions. *See In re Trans World Airlines*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale."); *In re First Wellington Canyon Assocs.*, No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

87.     The primary aim of any sale of estate property under section 363 of the Bankruptcy Code is to obtain the maximum return possible for the benefit of the estate and its creditors. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting *In re Atlanta Packaging Prods.*, Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988))). As long as the sale appears to enhance a debtor's estate, court approval of a decision to sell should only be withheld if the judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

88.     The Debtor submits that the sound business reason test is satisfied here because: (1) the Sale by public auction will enable the Debtor to obtain the highest and best offer for the Acquired Assets (including by imposition of a "floor" bid for the Acquired Assets as represented by the Stalking Horse Bid Amount); (2) the Bidding Procedures provide for accurate and reasonable notice; (3) the Sale will provide a greater recovery for the Debtor's creditors than would be provided by any other alternative; and (4) the Sale will be the result of comprehensive good-faith arm's length negotiations, subject to higher or otherwise better offers.

**D.    Sale of the Acquired Assets Should Be Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Bankruptcy Code Section 363(f).**

89.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Debtor's right, interest, and title in the Acquired Assets to the Successful Bidder free and clear of all liens, claims, encumbrances, and interests, except as set forth in the proposed asset purchase agreement, with such liens, claims, encumbrances, and interests, to attach to the proceeds of the Sale of the Acquired Assets, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto.

90.     Section 363(f) of the Bankruptcy Code provides, in pertinent part:

The trustee may sell property under subsection (b) or (c) of this Section free and clear of any interest in such property of an entity other than the estate, only if –

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) is written in the disjunctive, satisfaction of any one of the five requirements will suffice to justify the sale of the Acquired Assets "free and clear" of liens, claims, encumbrances, and other interests. *See, e.g., In re Dura Automotive Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *6 (Aug. 15, 2007); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

91.     With respect to any creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code §§ 363(f)(1)-(5) has been satisfied. The one perfected lien of record held by the Agent for the benefit of Prepetition Secured Lenders has consented to the sale free and clear of the Agent's liens, with those liens to attach to the proceeds of the Sale.  Other potential holders of liens, claims, encumbrances, or interests who did not object or who withdraw their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code section 363(f)(2). Those holders of liens, claims, encumbrances, or interests who do object fall within one or more of the other subsections of Bankruptcy Code section 363(f).

92.     A sale free and clear of liens, claims, encumbrances, or interests is necessary to maximize the value of the Acquired Assets. A sale of the Acquired Assets other than one free and clear of all liens, claims, encumbrances, or interests would yield substantially less value for the Debtor's estate, with less certainty than the transaction contemplated in the Asset Purchase Agreement. Therefore, the transaction contemplated by the Asset Purchase Agreement is in the best interests of the Debtor, its estate and creditors, and all other parties in interest. A sale free and clear of liens, claims, encumbrances, or interests is particularly appropriate under the circumstances because any lien, claim, encumbrance, or interest in, to or against the Debtor's right,

interest and title in the Acquired Assets that exists immediately prior to the closing of any Sale

will attach to the Sale proceeds allocated to the Debtor with the same validity, priority, force and

effect as it had at such time, subject to the rights and defenses of the Debtor or any party in interest.

The Debtor submits that holders of liens, claims, encumbrances, or interests, if any, will be

adequately protected by the availability of the proceeds of the Sale to satisfy their liens, claims,

encumbrances, or interests.

E.     **The Successful Bidder Should Be Granted the Protection of Bankruptcy Code Section 363(m).**

93.     The Debtor also maintains that the Successful Bidder is entitled to the protections

afforded by Bankruptcy Code section 363(m).

94.     Specifically, Bankruptcy Code section 363(m) provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

95.     While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re*

*Abbotts Dairies of Pennsylvania, Inc.* has held that:

> the requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d 143, 147 (3d Cir. 1986) (citations omitted). *See also Marin v. Coated Sales, Inc., (In re*

*Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990)

(holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt

to take grossly unfair advantage of other bidders"); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610

(S.D.N.Y. 1988); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts

of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).

96.      Execution of the Asset Purchase Agreement was wholly a function of a broad prepetition marketing undertaking led by PWP.  The Proposed Purchaser has no relationship with the Debtor other than as a party interested in acquisition of its assets.  That interest was spurred by a solicitation from a nationally recognized investment banking firm that simultaneously solicited interest from over 100 additional parties.

97.      Prior to the Petition Date, the Debtor spent a considerable amount of time and resources negotiating the Asset Purchase Agreement at arm's length, with give and take on both sides. Further, to the extent the Successful Bidder is not the Proposed Purchaser, any Successful Bidder will be an entity making an arm's-length, good faith bid following the competitive process contemplated by the Bidding Procedures, and the Debtor will have spent substantial time and effort negotiating the Successful Bid. Under the circumstances, this Court should find that the Successful Bidder is a good faith purchaser entitled to all of the protections of Bankruptcy Code section 363(m).

**F.      The Asset Purchase Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n).**

98.      As set forth above, the Debtor engaged with the Proposed Purchaser at arm's length and in good faith regarding the sale of the Acquired Assets. The Debtor does not believe that any sale pursuant to the Bidding Procedures will be the result of collusion or other bad faith between bidders or that the purchase price under the proposed asset purchase agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

99.      The Sale has been negotiated, proposed, and entered into without collusion, in good

faith, and from arm's-length bargaining positions. Neither the Debtor nor any Successful Bidder have engaged in any conduct that would cause or permit the proposed asset purchase agreement to be avoided under Bankruptcy Code section 363(n).

**G.      Notice of the Proposed Sale is Reasonable and Appropriate under the Circumstances**.

100.    The Debtor submits that the Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction (if necessary), the Sale Objection Deadline, the Sale Hearing and the Sale. Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Debtor's assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.

101.    The Debtor submits that the Notice Procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtor's creditors and other interested parties. The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction will provide interested purchasers sufficient time to participate in the Auction.

**H.      Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d).**

102.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay

pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

103.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally Collier on Bankruptcy* P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

104.    In light of the Debtor's financial constraints, the need for the Proposed Purchaser to provide notice to or acquire permits from various governmental and other regulatory authorities prior to engaging in the degree of operations necessary to entitle the Debtor to receive $2.7 million in Incentive Consideration and because of the potentially diminishing value of the Acquired Assets, the Debtor must close this sale promptly to afford sufficient time for the Successful Bidder to provide those notices and obtain those permits necessary to commence operations and generate revenue prior to July 31, 2022. Thus, waiver of any applicable stays is appropriate in this circumstance.

## NOTICE

105.    Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware; (b) the parties appearing on the List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Agent and the Ad Hoc Group, Davis Polk & Wardwell LLP, Attn: Brian Resnick, Esq. and Joshua Sturm, Esq., 450 Lexington Avenue, New York, NY 10017 (brian.resnick@davispolk.com; joshua.sturm@davispolk.com); (d) counsel to the Proposed Purchaser, (i) Bracewell LLP, CityPlace I, 34th Floor, 185 Asylum

Street, Hartford, CT 06103 Attn: Mark E. Dendinger, Esq. (mark.dendinger@bracewell.com) and 711 Louisiana St., Suite 2300, Houston, Texas 77002, Attn: Ryan S. Holcomb, Esq. (ryan.holcomb@bracewell.com); and (ii) Bayard, P.A., 600 N. King Street, Suite 400, P.O. Box 25130, Wilmington, DE 19899, Attn: Erin Fay, Esq. (efay@bayardlaw.com); (e) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Acquired Assets; (f) all non-Debtor parties to any Assumed and Assigned Contracts; (g) the Debtor's insurers; (h) counsel to be selected by any Committee in the event of an upon its formation by such date; (i) the Internal Revenue Service, and all other state taxing authorities in jurisdictions in which the Debtor does business; (j) all applicable governmental and regulatory agencies governing the Debtor's industry, (including the Environmental Protection Agency and any state environmental regulatory agencies in the states in which the Debtor does business); (k) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (l) any other party entitled to notice pursuant to Local Rule 9013-1(m) (the "Notice Parties").

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein.

Dated:  April 11, 2022
        Wilmington, Delaware

Respectfully submitted,

*/s Christopher A. Ward* _____
**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Michael V. DiPietro (Del Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone: 302-252-0920
Facsimile: 302-252-0921
cward@polsinelli.com
mdipietro@polsinelli.com
-and-

**HOLLAND & KNIGHT LLP**
John J. Monaghan (*pro hac vice* admission pending)
Lynne B. Xerras (*pro hac vice* admission pending)
Kathleen M. St. John (*pro hac vice* admission pending)
10 St. James Avenue
Boston, MA 02116
Telephone: 617-523-2700
Facsimile: 617-523-6850
bos-bankruptcy@hklaw.com

-and-

David W. Wirt (*pro hac vice* admission pending)
Phillip W. Nelson (*pro hac vice* admission pending)
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Telephone: 312-263-3600
Facsimile: 312-578-6666
david.wirt@hklaw.com
phillip.nelson@hklaw.com

*Proposed Counsel for the Debtor and*
*Debtor in Possession*