**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ECTOR COUNTY ENERGY CENTER LLC,[1] | Case No. 22-10320 (JTD) |
| Debtor. | |

**DIRECT ENERGY BUSINESS MARKETING, LLC'S OMNIBUS OBJECTION TO DEBTOR'S (I) MOTION TO USE CASH COLLATERAL AND GRANT ADEQUATE PROTECTION, (II) BID PROCEDURES MOTION, AND (III) SHARED SERVICES MOTION**

---

[1] The last four digits of the Debtor's federal tax identification are 6852. The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................................................2

FACTUAL BACKGROUND ...................................................................................................6

    A.    The Debtor Is A Subsidiary Guarantor Under Invenergy's Credit
        Agreement ...................................................................................................................6

    B.    Invenergy Attempts To Hinder And Delay And Defraud After The Debtor
        Is Sued By Direct Energy ...........................................................................................8

ARGUMENT .........................................................................................................................11

II.    THE CASH COLLATERAL ORDER MUST BE MODIFIED SIGNIFICANTLY ........11

    A.    The Proposed Adequate Protection Is Altogether Unnecessary .............................11

    B.    The Proposed Challenge Period And Budget Are Wholly Inadequate ...................14

    C.    The Proposed Final Cash Collateral Order Contains Numerous Other
        Objectionable Provisions That Should Be Stricken ................................................17

        1.    The Estate's Right To Marshal Assets Must Be Preserved .......................17

        2.    The Adequate Protection Liens Should Not Extend To The
            Proceeds Of Avoidance Actions .................................................................19

        3.    Rights To Surcharge Collateral Must Be Preserved ..................................20

        4.    The Debtor Cannot Waive Section 552(b)..................................................21

        5.    Invenergy Secured Lenders' Draconian Remedies Upon Any One
            Of Numerous Termination Events Should Be Stricken Or Modified........22

III.    THE BID PROCEDURES ORDER MUST CLEARLY PRESERVE PARTIES'
      RIGHTS TO OBJECT TO THE PROPOSED SALE......................................................23

    A.    The Proposed Schedule Must Be Modified In Order To Protect Unsecured
        Creditors' Rights ......................................................................................................23

    B.    The Bid Procedures Order Is Vague And Includes Improper Findings .................24

IV.    THE SHARED SERVICES MOTION BELIES THE FACT THAT THIS CASE
      IS NOT BEING RUN FOR THE BENEFIT OF THE DEBTOR OR ITS ESTATE........26

RESERVATION OF RIGHTS ...............................................................................................28

CONCLUSION......................................................................................................................28

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re 47 Hops LLC*,
   2020 WL 2485808 (Bankr. E.D. Wash. May 13, 2020) ........................................................... 27

*Berman v. Green (In re Jack Green's Fashions for Men Big & Tall Inc.)*,
   597 F.2d 130 (8th Cir. 1979) ...................................................................................... 18

*Bertram v. WFI Stadium, Inc.*,
   41 A.3d 1239 (D.C. Cir. 2012) ............................................................................. 4, 16

*In re Bidermann Indus. U.S.A. Inc.*,
   203 B.R. 547 (Bankr. S.D.N.Y. 1997) ......................................................................... 5

*In re Burlington Motor Carriers, Inc.*,
   1999 WL 1427683 (D. Del. Dec. 30, 1999) ................................................................ 27

*In re Columbia Gas Sys., Inc.*,
   1992 WL 79323 (Bankr. D. Del. Feb. 18, 1992) ....................................................... 14

*In re Cont'l Airlines, Inc.*,
   146 B.R. 536 (Bankr. D. Del. 1992) ......................................................................... 12

*In re Davis Heritage GP Holdings, LLC*,
   443 B.R. 448 (Bankr. N.D. Fla. 2011) ...................................................................... 16

*Duck v. Wells Fargo Bank (In re Spectra Prism Industries, Inc.)*,
   28 BR. 397 (9th Cir. BAP 1983) .............................................................................. 18

*In re Efcor, Inc.*,
   74 B.R. 837 (Bankr. M.D. Pa. 1987) ........................................................................ 12

*In re Energy Future Holdings Corp.*,
   Case No. 14-10979(CSS) (Bankr. D. Del. Nov. 3, 2015) ...................................... 6, 19

*In re Excel Maritime Carriers, Ltd.*,
   Case No. 13-23060-RDD, (Docket No. 133) (Bankr. S.D.N.Y. Aug. 6, 2013) ...... 19

*In re Family Christian, LLC*,
   533 B.R. 600 (Bankr. W.D. Mich. 2015) ............................................................ 25, 26

*First Servs. Grp., Inc. v. O'Connell (In re Ceron)*,
   412 B.R. 41 (Bankr. E.D.N.Y. 2009) ................................................................. 20, 21

*Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co. Inc)*,
   53 B.R. 772 (Bankr. S.D.N.Y. 1985)................................................................ 18

*Gatz Properties, LLC v. Auriga Cap. Corp.*,
   59 A.3d 1206 (Del. 2012) ...................................................................... 5, 15

*In re General DataComm Industries, Inc.*,
   407 F.3d 616 (3d Cir. 2005) .................................................................. 19

*In re Glob. Serv. Grp., LLC*,
   316 B.R. 451 (Bankr. S.D.N.Y. 2004)............................................... 17, 18

*In re Grant Broadcasting of Philadelphia, Inc.*,
   75 B.R. 819, 842 (E.D. Pa. 1987) ....................................................... 13

*In re Haydel Properties, LP*,
   2017 WL 1155690 (Bankr. S.D. Miss. Mar. 27, 2017........................... 11

*In re HSAD 3949 Lindell, Ltd.*,
   2010 WL 5209266 (Bankr. N.D. Tex. Sept. 2, 2010).......................... 19, 20

*In re High Strength Steel*,
   269 B.R. 560 (Bankr. D. Del 2001) ...................................................... 18

*In re ICL Holding Co., Inc.*,
   802 F.3d 547 (3d Cir. 2015) .................................................................. 19

*In re ID Liquidation One, LLC*,
   503 B.R. 392 (Bankr. D. Del. 2013)...................................................... 27

*In re Klaas Talsma Frisia Hartley, LLC*,
   2010 WL 5209363 (Bankr. N.D. Tex. Jun. 10, 2010) .......................... 19

*In re Latam Airlines Grp. S.A.*,
   620 B.R. 722 (Bankr. S.D.N.Y. 2020).................................................. 15

*In re Mehta*,
   310 F.3d 308 (3d Cir. 2002) ................................................................. 19

*In re Memorial Production Partners, LP*,
   Case No: 17-30262 (Docket No. 333) (Bankr. S.D. Tex. Apr. 4, 2017) ............ 26, 27

*Merrigan v. Small Bus. Admin. (In re Clary House, Inc.)*,
   11 B.R. 462 (Bankr. W.D. Mo. 1981) ................................................... 18

*In re Metaldyne Corp.*,
   2009 WL 2883045 (Bankr. S.D.N.Y. June 23, 2009).......................... 22

*Meyer v. U.S.*,
   375 U.S. 233 (1963) ........................................................................................................ 17

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003) ............................................................................................ 19

*Pepper v. Litton*,
   308 U.S. 295 (1939) .......................................................................................................... 5

*In re Prichard*,
   170 B.R. 41 (Bankr. N.D.N.Y. 1994) .............................................................................. 18

*In re Roach Automotive, L.P.*,
   540 B.R. 146 (Bankr. W.D. Pa. 2007) ............................................................................. 12

*Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*,
   554 F.3d 382 (3d Cir. 2009) ......................................................................................... 5, 6

*In re Shepler*,
   2014 WL 3700806 (Bankr. N.D. Ohio Jul. 24, 2014) ............................................... 17, 18

*Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n (In re TerreStar Networks, Inc.)*,
   457 B.R. 254 (Bankr. S.D.N.Y. 2011) .......................................................................... 21, 22

*In re Swedeland Dev. Grp., Inc.*,
   16 F.3d 552 (3d Cir. 1994) ............................................................................................. 14

*In re Triplett*,
   87 B.R. 25 (Bankr. W.D. Tex. 1988) ................................................................................ 11

*In re Univ. Med. Ctr.*,
   973 F.2d 1065 (3d Cir. 1992) ........................................................................................... 27

*In re Xinde Int'l, Inc.*,
   13 B.R. 212 (Bankr. D. Mass. 1981) ................................................................................ 13

*In re Zerodec Mega Corp.*,
   39 B.R. 932 (Bankr. E.D. Pa. 1984) ................................................................................. 5

## Statutory Authorities

11 U.S.C. § 105 ................................................................................................................ 11, 22

11 U.S.C. § 362 ................................................................................................................ 12, 22

11 U.S.C. § 363 ....................................................................................................... 2, 10, 13, 20

11 U.S.C. § 364 ............................................................................................................. 21

11 U.S.C. § 503(c) ....................................................................................................... 25, 26

11 U.S.C. § 506 ....................................................................................................... 3, 12, 20, 22

11 U.S.C. § 544 ............................................................................................................. 14, 17

11 U.S.C. § 552(b) ............................................................................................. 3, 12, 20, 21, 22

Direct Energy Business Marketing, LLC ("Direct Energy") hereby files this omnibus objection (the "Objection") to (i) *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Invenergy Secured Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 6) (the "Cash Collateral Motion"), (ii) *Motion of the Debtor for Orders (I)(A) Authorizing Debtor's Entry into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving A Break-Up Fee and Reduced Break-Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of All Liens, Claims, and Encumbrances and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (Docket No. 7) (the "Bid Procedures Motion"), and (iii) *Motion of Debtor for Entry of Order (I) Authorizing the Debtor to Continue to Perform Under Shared Services Agreements, (II) Authorizing Payment of Post-Petition Obligations Accruing Under Shared Services Agreements, and (III) Granting Related Relief* (Docket No. 34) (the "Shared Services Motion" and with the Cash Collateral Motion and the Bid Procedures Motion, the "Motions"), and respectfully states as follows:

1

# PRELIMINARY STATEMENT[2]

1.      This case was commenced in furtherance of Invenergy's scheme to sacrifice the Debtor in order to recover value on account of Invenergy's equity interests in the Debtor, which are of course junior to unsecured claims, including Direct Energy's significant, lawful breach of contract claim against the Debtor.   If Invenergy succeeds in pushing its plan through this Court, Invenergy will reap a windfall by reducing its own debt obligations, while selling the Debtor to new owners and stranding the Debtor's unsecured creditors with pennies.   Governed by a "special committee" that is 80% dominated by representatives of Invenergy, the Debtor agreed with Invenergy's secured lenders (the "Invenergy Secured Lenders") to a series of transactions (the "PSA Transactions") for the sole benefit of insiders and the Invenergy Secured Lenders, to the detriment of Direct Energy and the Debtor's other unsecured creditors.   Pursuant to the PSA Transactions, the Debtor, through its conflicted special committee, unhindered by the sole "independent" member, agreed to: (1) voluntarily incur a (voidable) non-contingent liability to Invenergy's lenders in replacement of a contractual obligation on the part of *Invenergy* to pay its secured lenders $75 million upon a sale of the Debtor's assets; (2) file for bankruptcy without any legitimate need for the imposition of bankruptcy's automatic stay and just as the Debtor was "anticipat[ing] strong revenue opportunities . . . enter[ing] the summer peak months"[3]; and (3) sell all of its assets—not reorganize—for the benefit of its newly-crystalized secured lenders (*i.e.*, the Invenergy Secured Lenders) and Invenergy, which stands to receive a reduction of its own liabilities.   As if all of that was not enough of a gift to Invenergy at Direct Energy's expense, the Debtor also seeks to insulate Invenergy from any collateral damage whatsoever by

---

[2]    Capitalized terms not otherwise defined in the Preliminary Statement have the meanings given to them herein or in the Motions.

[3]    *Declaration of John Baumgartner, Chief Restructuring Officer, in Support of the Chapter 11 Petition, First Day Motions, and Related Relief* (Docket No. 2) ("Baumgartner Decl.") ¶ 44.

granting releases to it and its affiliates, confirming the fact that this case is not in furtherance of any of bankruptcy's primary policies (*i.e.*, reorganizing a business or maximizing recoveries to creditors).

2.      The PSA and certain of the PSA Transactions—including a proposed section 363 sale of the Debtor's assets (the "Proposed Sale") and the releases of Invenergy and its affiliates, officers, and directors (among others)—purportedly are not the subject of the Debtor's requested "Second Day Relief."    But at a minimum they serve as an important backdrop to the following *final* relief sought by the Debtors (among other things), which the Court should not approve:

- *Waiver of the right to marshal assets away from the Invenergy Secured Lenders for the benefit of the estate* notwithstanding that these lenders are Invenergy's lenders not the Debtor's and are sufficiently covered with the value of Invenergy and other non-Debtor collateral *(Cash Collateral Order ¶ 12);*[4]

- *Unnecessary adequate protection to the Invenergy Secured Lenders for the Debtor's use of Cash Collateral, including the pledge of Avoidance Action proceeds,* including with respect to Avoidance Actions against the very same Invenergy Secured Lenders and notwithstanding the existence of an obvious voidable obligations incurred mere weeks before the Petition Date *(Cash Collateral Order ¶ 8(a));*

- *Waiver of the right to surcharge the Invenergy Secured Lenders' Debtor collateral (the "Collateral") pursuant to section 506(c) of the Bankruptcy Code for the costs and expenses of preserving and disposing of such Collateral,* notwithstanding the Debtor's intent to do nothing more than dispose of such Collateral through the Proposed Sale and notwithstanding that no amounts are to be afforded to the costs of any challenge given that no creditors' committee has been formed *(Cash Collateral Order ¶¶ 8(a), 10);*

- *"Waiver" of this Court's statutory authority under section 552(b) of the Bankruptcy Code to deny a lien on post-petition proceeds and profits of Collateral based upon the "equities of the case,"* notwithstanding that under Invenergy's scheme, if allowed to proceed, valuable contribution claims will arise post-petition that, under all circumstances, must not be grabbed by the Invenergy Secured Lenders *(Cash Collateral Order ¶ 11);*[5]

---

[4]    The proposed final Cash Collateral Order has not yet been filed.    Paragraph citations to the "Cash Collateral Order" refer to the Interim Order, entered on April 14, 2022 (Docket No. 71).

[5]    Under no circumstances could subrogation claims against Invenergy be contested to be offspring or proceeds of collateral.

- *Granting to the Invenergy Secured Lenders enforcement rights and remedies under the Prepetition Loan Documents, upon, among other things, (i) the termination of the PSA (that has not been presented for consideration by this Court), (ii) the commencement of litigation (other than to enforce the terms of the PSA or final Cash Collateral Order) against the Invenergy Secured Lenders by any party in interest, or (iii) the charging of Collateral pursuant to sections 506(c) or 552(b) of the Bankruptcy Code (Cash Collateral Order ¶¶ 6,7);*

- *A Challenge Period that is unreasonably brief given the circumstances of the case, and contemplates a miniscule budget ($25,000), which in any event would only be made available to a (non-existent) Committee (Cash Collateral Order ¶¶ 8(f), 16);*

- *A Bid Procedures Order that will include findings that, if entered, would prejudice any party in interest's objection to the Proposed Sale (Bid Procedures Order ¶¶ J, F);*

- *A sale schedule that will prejudice any party in interest's ability to assert Avoidance Actions (particularly claims against Invenergy and the Invenergy Secured Lenders)[6]—regardless of any extension of the Challenge Deadline—by assigning away those claims to the Proposed Purchaser (who has agreed not to pursue said Avoidance Actions) upon the entry of the Sale Order, the hearing for which is proposed to be held on June 27, 2022 (Bid Procedures Order ¶ 4); and*

- *Court authorization for the Debtor to pay its Invenergy affiliates to continue to perform under Shared Services Agreements, and to effectively fund its non-Debtor affiliate's "KERP" payments to the affiliate's employees (Shared Services Order ¶¶ 2, 5).*

3.    The PSA may not be before the Court, but it speaks volumes about the Debtor's true intentions—*i.e.*, to accomplish in bankruptcy what would be an impermissible fraudulent transfer outside of bankruptcy.[7]   The absence of any creditors committee, in conjunction with the undeniably-conflicted nature of the Debtor's corporate governance structure, means that

---

[6]  It is difficult to understand why a buyer, particularly the proposed stalking horse, would agree to "buy and bury" claims against Invenergy and its lenders absent Invenergy, through its control of the Debtor's special committee, requiring such a provision.

[7]  *See Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1245–46 (D.C. Cir. 2012) ("We are satisfied that these allegations sufficed to state a claim under the UFTA that the debtor Distributive incurred an obligation—an agreement to surrender specified collateral in exchange for a release of the majority shareholder's personal guarantee of Distributive's debt—with the intent to hinder, delay, or defraud the Stadium as creditor.   We find support for this conclusion in the many cases in which courts have considered claims that a debtor company, acting through its majority owner/CEO, undertook a transaction that resulted in release of the owner/CEO's personal guarantee of the company's debt, and have allowed the claims to proceed under the UFCA or the UFTA or have voided the transactions under the Bankruptcy Code.").

protecting the rights of this estate will fall to Direct Energy (or a subsequently appointed trustee). Under all circumstances, if this case is to proceed under the Bankruptcy Code, it must proceed with the balance contemplated by Congress, with all of the rights and protections provided therein—not with the Debtor having succeeded at tying both of the estate's hands behind its back.

4.      Importantly, the Court's review of the Motions and transactions implicated therein should not be governed by the business judgment rule.  Rather, "the longstanding general rules that (1) insider transactions are subject to greater scrutiny than "arms length" transactions and that (2) the usual burden of proof which is placed on the objecting party is reversed and must be borne by the insiders[,]" apply.  *In re Zerodec Mega Corp.*, 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)); *see also Gatz Properties, LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1214 n. 27 (Del. 2012) ("[T]he entire fairness standard is exacting, and requires the board of directors to establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price.") (internal quotation marks omitted).  The Debtor's shareholder negotiated, and effectively directed the Debtor to enter into, the PSA Transactions—including those which will be effectuated, at least in large part, through the relief requested in the Motions.  As such, these transactions are inherently suspect because "they are rife with the possibility of abuse."  *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (internal quotation marks omitted). Therefore, the business judgment rule should not apply, and the Motions should be subject to rigorous scrutiny.  *See Pepper*, 308 U.S. at 306 (noting that a controlling shareholder's dealings with corporation "are subjected to rigorous scrutiny" and the insider must prove not only its good faith, but "also to show its inherent fairness[.]"); *Schubert v. Lucent Techs. Inc. (In re Winstar*

*Commc'ns, Inc.*), 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between

a debtor and an insider is to be rigorously scrutinized by the courts").

5.      For all of the reasons discussed above and below, the Motions fail under any

standard and should be denied.[8]

## FACTUAL BACKGROUND

### A.      The Debtor Is A Subsidiary Guarantor Under Invenergy's Credit Agreement

6.      The Debtor is the owner and operator of a 330 MW natural gas-fired electricity-

generating facility ("Power Plant") located in Ector County, Texas.    Its direct parent, Invenergy

Thermal Operating I LLC ("Invenergy"), has a portfolio of seven natural gas-fired power plants,

including the Debtor, located across the U.S. and Canada.    Invenergy is ultimately controlled

and managed by Invenergy LLC, a large private equity firm that develops, owns, and operates

power generation facilities around the globe, comprising a portfolio of approximately 190

projects.

7.      Invenergy is the borrower and primary obligor under a secured Credit and

Guaranty Agreement, dated August 28, 2018 with Credit Suisse AG, New York Branch ("Credit

Suisse"), in its capacity as agent for the Invenergy Secured Lenders (as amended, the "Credit

Agreement").[9]    The Debtor, along with Invenergy's other subsidiaries (the "Subsidiary

---

[8]      Even if entire fairness does not apply—and it should in view of the fact that the proposed Cash
Collateral Order was negotiated between the Debtor's conflicted special committee, Invenergy, and
Invenergy's secured lenders—"[t]he business judgment test here differs from the general corporate law
business judgment rule which protects corporate directors . . . when they have exercised due care and are
not self-interested in the transaction.    Here, in addition to state law requirements, the Bankruptcy Court
reviews the debtors' business judgment to determine independently whether the judgment is a reasonable
one."    *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. Nov. 3, 2015)
(Docket No. 6878) (transcript at 17).

[9]      A redline of the Credit Agreement, as amended on April 4, 2022 ("Amendment No. 4"), is attached
as Exhibit 1 to this Objection.    Credit Suisse is also collateral agent under the Pledge and Security
Agreement, dated August 28, 2018 (the "Security Agreement") § 2.1.

Guarantors"), is a guarantor of Invenergy's debt under the Credit Agreement (the "Prepetition Secured Loans").

8.      Section 11.01 of the Credit Agreement contemplates the guaranty of due and punctual payment in full of all Secured Obligations, but only "*when the same shall become due*, whether at stated maturity, by required prepayment, declaration, acceleration, or otherwise." Credit Agmt. § 11.01 (emphasis added).   Section 11.03 provides that only "upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due," the Subsidiary Guarantors shall pay the Guaranteed Obligations at the demand of the Administrative Agent.   *Id.* § 11.03.

9.      The Credit Agreement contemplated certain circumstances in which Invenergy would be obligated to make mandatory prepayments to the Invenergy Secured Lenders. Relevant here, the Credit Agreement provided that upon a sale, transfer, or other disposition of the property and assets of the Debtor (an "Ector Disposition"), ***Invenergy*** (***not the Debtor***) was required to make a prepayment on the Prepetition Secured Loans equal to $75,000,000 (the "Ector Target Sale Amount").   *See* Amendment No. 4 at 83 (§ 3.08(b)(vii)) (originally providing that upon the "receipt by the Borrower . . . of any Ector Disposition Proceeds . . . the ***Borrower*** shall make a mandatory prepayment of the Prepetition Secured Loans in an amount equal to the Ector Target Sale Amount.") (emphasis added).

10.     The Debtor had no primary obligation to prepay the Prepetition Secured Loan upon an Ector Disposition—that obligation was squarely Invenergy's as the primary borrower. So absent the relief sought from this Court, as well as the agreement among Invenergy, the Invenergy Secured Lenders, and the Debtor's conflicted special committee, the value of any sale of the Debtor's assets would be preserved for the Debtor's unsecured creditors.

11.    The Credit Agreement was amended several times between August of 2018 and March of 2022, but none of those amendments altered Invenergy's obligation to make the $75,000,000 mandatory prepayment upon an Ector Disposition.    That is, until April 4, 2022, on the eve of this Chapter 11 Case.

### B.    Invenergy Attempts To Hinder And Delay And Defraud After The Debtor Is Sued By Direct Energy

12.    Prior to Winter Storm Uri, the Debtor and Direct Energy were party to a financially settled heat rate call option, memorialized in a Transaction Confirmation and ISDA Master Agreement, signed October 18, 2017 (the "<u>Agreement</u>"), pursuant to which Direct Energy made fixed monthly cash payments and the Debtor agreed that, if Direct Energy exercised its option, the Debtor would pay Direct Energy the excess of market power price and generating costs of electricity.[10]    Given that the Agreement was financially settled, it did not contemplate or require an actual exchange of energy, and was not actually tied to whether any power plant could or could not operate.

13.    In or around February 13-17, Winter Storm Uri struck Texas, during which Invenergy took the Power Plant offline, despite the fact that gas was available to run the plant, albeit at a higher cost than usual.    On February 13, 2021, Invenergy sent a notice of a force majeure event to Direct Energy, asserting that the storm prevented the Power Plant from generating energy and, because of that, the Debtor could not perform under the Agreement. Notably, neither Invenergy nor the Debtor asserted that the storm prevented the Debtor from making the contractually required payments to Direct Energy—which had exercised its option under the Agreement—because it did not.    Financial payments only required that the financial

---

[10]    *See* Amended Complaint, *Direct Energy Business Marketing, LLC v. Ector County Energy Center, LLC, et al.*, Index No. 653977/2021 (Docket No. 70), filed January 27, 2022, ¶ 4.

system was functioning, which it was.    Moreover, neither Invenergy nor the Debtor ever disputed that Direct Energy properly exercised its option rights.

14.    The parties thereafter entered into a standstill agreement, deferring payments and invoicing in order to engage in settlement discussions.    By April 30, 2021, the Debtor owed Direct Energy approximately $400 million.    *Id.* ¶ 7.

15.    In May 2021, the *Debtor and Invenergy* filed suit against *Direct Energy*, alleging that the Agreement was void.    The lawsuit was commenced in Ector County, Texas, despite the Agreement's exclusive forum selection clause designating New York State as the exclusive forum for disputes.    The Texas court promptly dismissed the Debtor's lawsuit.    *Id.* ¶ 8.

16.    Continuing their refusal to pay Direct Energy the amounts clearly owed to it under the Agreement, in June 2021, the Debtor and Invenergy submitted a fraudulent drawdown demand to Credit Suisse, falsely asserting that Direct Energy owed the Debtor more than $840,000 under the same agreement the Debtor had just branded null and void in Texas.    *Id.* ¶ 9.    Thereafter, Direct Energy commenced suit in New York Supreme Court against the Debtor and Invenergy, asserting a claim for damages in an amount in excess of $400 million, none of which the Debtor has paid.

17.    The Debtor's and Invenergy's evasion of their obligations under the Agreement continued.    They refused to provide Direct Energy with discovery in the New York State action, and even directed Credit Suisse to withhold the Credit Agreement in response to the third-party subpoena served by Direct Energy.    Meanwhile, the Debtor and Invenergy had apparently undertaken a "broad marketing outreach"[11] to sell substantially all of the Debtor's assets, and,

---

[11]    *See Declaration of Alexander Svoyskiy in Support of Motion of the Debtor for Orders (I)(A) Authorizing Debtor's Entry into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving A Break-Up Fee and Reduced Break-*

on March 3, 2022, entered into the asset purchase agreement (the "APA") with the Proposed Purchaser.

18.     Then, on April 4, 2022, *even though it was faced with no current or impending default thereunder*, Invenergy entered into Amendment No. 4 to the Credit Agreement.    Among other things, Amendment No. 4 purported to relieve Invenergy of its obligation to make a mandatory prepayment upon an Ector Disposition under section 3.02(b)(vii) *and instead made the Debtor the party responsible for that prepayment*.    *See* Amendment No. 4 at 83 (amending former section 3.02(b)(vii) (now section 3.08(b)(vii)) to provide that "following the receipt of any Ector Disposition Proceeds (a 'Disposition Proceeds Date') by Ector, *Ector* shall make a mandatory prepayment of the Prepetition Secured Loans in an amount equal to the Ector Target Sale Amount") (emphasis added).    The Debtor does not appear to have received any consideration or benefit in exchange for its new obligation.

19.     Second, on April 4, 2022, Invenergy caused the Debtor to enter into the PSA, which provides for the sale of the Debtor's assets (namely, the Power Plant), with the proceeds to be used to make $75 million in prepayments to the Invenergy Secured Lenders and more than $10 million to fund chapter 11 administrative expenses and a wind-down budget, leaving only $5 million available for all general unsecured creditors (the "Proposed Waterfall").    *See* PSA at Ex. B (Term Sheet).    In addition, as discussed herein, the PSA obligates the Debtor to abandon Avoidance Actions (inclusive of claims against the Invenergy Secured Lenders) and to release the party who has controlled and obligated the Debtor to this process—Invenergy.

---

*Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of All Liens, Claims, and Encumbrances and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (Docket No. 8) ¶ 13.*

20.     Completing the Debtor's sacrifice, as it was bound to do under the PSA, on April 11, 2022, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court, commencing this chapter 11 case (the "Chapter 11 Case").

## ARGUMENT

## II.     THE CASH COLLATERAL ORDER MUST BE MODIFIED SIGNIFICANTLY

### A.     The Proposed Adequate Protection Is Altogether Unnecessary

21.     The Bankruptcy Code permits a debtor in possession to use cash collateral if the entities with an interest in the cash collateral consent, or the court authorizes such use conditioned on the provision of adequate protection of the interest.    *See* 11 U.S.C. §§ 363(c)(2)(B), (e).   Notably, however, "restriction of the use of cash collateral should occur only where the facts show that failure to restrict use may 'impair' the creditor and deny the creditor adequate protection."   *In re Haydel Properties, LP*, 2017 WL 1155690, at *5 (Bankr. S.D. Miss. Mar. 27, 2017) (quoting *In re Triplett*, 87 B.R. 25, 27 (Bankr. W.D. Tex. 1988)).

22.     Here, neither the Debtor nor the Prepetition Secured Parties can demonstrate the need for the Court to condition the Debtor's use of Cash Collateral on the Adequate Protection Obligations, which include, among other things:

(a)     liens on the Debtor's post-petition property and assets, including proceeds of Avoidance Actions;

(b)     payment of the Agent's and Ad Hoc Group's fees and expenses, including legal fees and expenses;

(c)     the Debtor's agreement to limit its use of Cash Collateral to the purposes and amounts set forth in the Budget, subject only to Permitted Variances, and to provide regular reporting to the Prepetition Secured Parties;

(d)     significant limitations to the ability of the Committee and other interested parties to bring claims and assert challenges against the Invenergy Secured Lenders;

(e)     imposition of strict Milestones, including that the Debtor shall file a plan and disclosure statement within 60 days of the Petition Date;

(f)     prohibition of any costs or expenses of administration of the Chapter 11 Case or any future proceedings under the Bankruptcy Code from being charged against the Collateral pursuant to sections 506(b), 552(b), or 105(a) of the Bankruptcy Code, or any similar principle of law;

(g)     a purported waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code; and

(h)     prohibition of the invocation of the equitable doctrine of "marshaling" against the Prepetition Secured Parties.

23.     Critically, neither the Debtor nor the Prepetition Secured Parties can assert that the Prepetition Collateral is insufficient to secure the Prepetition Secured Loans.   To the contrary, the prepetition debt is well-covered by Invenergy's assets and its "portfolio of energy generation and storage companies,"[12] virtually all of which have been pledged as collateral for the Prepetition Secured Loans.[13]   *See In re Roach Automotive, L.P.*, 540 B.R. 146, 152 (Bankr. W.D. Pa. 2007) (concluding that valuable assets already pledged by third parties can constitute adequate protection).   Indeed, the debt—which is the primary obligation of Invenergy—is not in default and is not trading at any discount to par.[14]   This ultimate "equity cushion," comprised of assets that are not protected by any automatic stay, alone constitutes adequate protection. *See In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("If the creditor is oversecured many courts hold that the equity cushion alone satisfies the adequate protection requirement of section 362(d)(1)."); *In re Efcor, Inc.*, 74 B.R. 837 (Bankr. M.D. Pa. 1987) ("An equity 'cushion' in and of itself may constitute adequate protection within the meaning of

---

[12]     Baumgartner Decl. ¶ 17.

[13]     Pursuant to the Security Agreement, Invenergy and the Subsidiary Guarantors pledged as security for the Invenergy Secured Lenders, among other things, all existing or later acquired accounts, deposit accounts, equipment, fixtures, goods, money, securities accounts, and receivables.

[14]     Invenergy's debt under the Credit Agreement was reported by Bloomberg as of the Petition Date to be trading without any meaningful discount—*i.e.*, 98.25.

§ 362(d)(1)); *In re Grant Broadcasting of Philadelphia, Inc.*, 75 B.R. 819, 823 (E.D. Pa. 1987) (existence of an equity cushion "alone" can constitute adequate protection).

24.     Furthermore, the Debtor's projected cash flows show an *increase* in total expected receipts, which increase the Debtor attributes to higher summer demand and the attendant revenues,[15] while operating cash flows are projected to remain flat.[16]    Thus, any Cash Collateral used to continue to fund the Power Plant will be replenished and maintain the Invenergy Secured Lenders' secured position.    *See In re Xinde Int'l, Inc.*, 13 B.R. 212, 215 (Bankr. D. Mass. 1981) ("[T]he court believes that at this time this debtor is operating at a break-even point or at a small profit, and the cash collateral will be replenished so as to maintain the creditor's secured position.").    To the extent the Debtor's use the Invenergy Secured Lenders' Cash Collateral to pay costs and fees associated with the restructuring—which the Debtor acknowledges is itself a form of adequate protection[17]—the Invenergy Secured Lenders should not be entitled to further adequate protection.

25.     The requested adequate protection is particularly egregious here, where the stated purpose of the Chapter 11 Case is to facilitate a section 363 sale of virtually all of the Debtor's assets, the proceeds of which the parties propose to pay to the Invenergy Secured Lenders.    If this plan were to be implemented, the Debtor acknowledges that the sale process itself serves as the "*primary form of adequate protection*."    Cash Collateral Mot. ¶ 64 (emphasis added); *see also id.* ¶ 66 ("The proposed use of the Cash Collateral in accordance with the Budget provides further adequate protection to the [Invenergy Secured Lenders] by ensuring that the Power Plant operates as a going-concern pending the completion of the sale process.").

---

[15]    *See* Baumgartner Decl. ¶ 77.

[16]    *See* Budget–Monthly Cash Flow Forecast, attached as Exhibit B to the Cash Collateral Order.

[17]    *See* Cash Collateral Mot. at 22.

26.     As the Debtor duly notes, the Bankruptcy Code "leav[es] courts to decide what constitutes sufficient adequate protection on a case-by-case basis."   Cash Collateral Mot. ¶ 60 (citing, *e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992)).   Given the purpose of this Chapter 11 Case and the extent of Collateral securing parent Invenergy's primary indebtedness to the Invenergy Secured Lenders, as well as the Debtor's own cash projections, Direct Energy submits that the Debtor's use of Cash Collateral need not be conditioned on the imposition of the Adequate Protection Obligations.

### B.     The Proposed Challenge Period And Budget Are Wholly Inadequate

27.     The Cash Collateral Order provides that all of the varied and broadly drafted stipulations and admissions contained anywhere in the order (the "Stipulations") will be binding on all parties unless the (non-existent) Committee or other party in interest seeks to obtain standing to challenge the Stipulations by no later than 75 days after the entry of the Interim Order (the "Challenge Period").   Among these Stipulations are the Debtor's agreement, acknowledgement, and stipulation that the Invenergy Secured Lenders hold, among other things, (i) a $337.3 million contingent guaranty claim against the Debtor, (ii) "a valid, enforceable and liquidated claim under the Credit Agreement against the Debtor for $75,000,000," and (iii) "valid, perfected, unavoidable and enforceable first priority liens and secured interests in all respects as to the Prepetition Collateral."[18]

28.     An independent investigation into the propriety of these Stipulations, as well as potential estate causes of action, including the right to marshal assets pursuant to section 544 of the Bankruptcy Code (the "Investigation"), is particularly critical in this case, given the Debtor's

---

[18]    Cash Collateral Order ¶¶ K, L.

conflicted corporate governance.   The prepetition and proposed post-petition transactions at issue implicate conflicting interests among the Debtor and its parent and the Invenergy Secured Lenders, the latter two of which are the beneficiaries of such transactions.   For example, the Debtor incurred a crystalized direct obligation to the Invenergy Secured Lenders a mere week before the Petition Date and without consideration, when it entered into Amendment No. 4 to the Credit Agreement, pursuant to which ***Invenergy*'s** obligation to make a $75 million prepayment to the Invenergy Secured Lenders upon a sale of the Debtor's assets became ***the Debtor's*** obligation to make the $75 million prepayment to the Invenergy Secured Lenders.   Specifically, Amendment No. 4 amends the Credit Agreement as follows:

> (vii)    Ector Disposition.  No later than three (3) Business Days following the receipt ~~by the Borrower or any of its Subsidiaries~~ of any Ector Disposition Proceeds~~: (A) the Borrower~~**a "Disposition Proceeds Date") by Ector, Ector** shall make a mandatory prepayment of the Loans in an amount equal to the Ector Target Sale Amount~~, to be~~ **(the "Ector Disposition Payment").  In the event that Ector Disposition Proceeds have not been received by Ector on the earlier of (i) the date on which a change of control of Ector occurs and (ii) July 31, 2022, on such date, Ector shall make a mandatory prepayment of the Loans in the amount of $75,000,000 in lieu of its obligation to make the Ector Disposition Payment.  Any mandatory prepayment of the Loans made by Ector pursuant to this section shall be** applied as set forth in Section 3.03~~; and (B) the Revolving Loan Commitment Amount shall be reduced in accordance with Section 2.02(b); provided that unless an Event of Default has occurred and is continuing, the Borrower may make Restricted Payments of any Excess Sale Proceeds from an Ector Disposition.~~.

Amendment No. 4 at 83.   This amendment, made for the obvious benefit of the Debtor's parent and the Invenergy Secured Lenders, warrants heightened scrutiny, and in all likelihood gives rise to fraudulent transfer claims.   *See In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020) (noting the applicability of a "heightened scrutiny" test in assessing the *bona fides* of a transaction between a debtor and an insider of the debtor); *Gatz Properties*, 59 A.3d at 1214, n. 27 (noting that the heightened standard "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained" as well as the fairness of the

"economic and financial considerations" of the transaction); *Bertram*, 41 A.3d at 1245–46 ("We are satisfied that these allegations sufficed to state a claim under the UFTA that the debtor Distributive incurred an obligation—an agreement to surrender specified collateral in exchange for a release of the majority shareholder's personal guarantee of Distributive's debt—with the intent to hinder, delay, or defraud the Stadium as creditor.   We find support for this conclusion in the many cases in which courts have considered claims that a debtor company, acting through its majority owner/CEO, undertook a transaction that resulted in release of the owner/CEO's personal guarantee of the company's debt, and have allowed the claims to proceed under the UFCA or the UFTA or have voided the transactions under the Bankruptcy Code.").

29.     Moreover, the Challenge Period must be sufficient to allow for the investigation and, if warranted, commencement of litigation on the estate's behalf pursuant to section 544(a) of the Bankruptcy Code to assert claims to marshal the Debtor's assets.   As discussed in section II.C.1, below, these marshaling claims likely will be the primary basis of any meaningful unsecured creditor recovery.[19]   As such, Direct Energy submits that the Challenge Deadline must be extended an additional 60 days (*i.e.*, from June 28 to August 27) to ensure that these claims, as well fraudulent transfer and other estate claims, can be sufficiently investigated and pursued.

---

[19]     This entire Chapter 11 Case seeks to effectuate a "reverse marshaling," which must be challenged by an estate fiduciary, or a party standing in its place.   *See In re Davis Heritage GP Holdings, LLC*, 443 B.R. 448, 456 (Bankr. N.D. Fla. 2011) ("Here, the true intent and effect of this case and the Debtor's Plan are plain: the Debtor's insiders seek to donate assets subject to Inervest's judgment lien to SunTrust and Wells Fargo in order to shield their own assets and money from those creditors.   This scheme, memorialized in the Debtor's Chapter 11 Plan, amounts to a kind of reverse marshaling.   The Plan takes the only assets available to Inervest (and subject to its levy), property owned not by the Debtor but by the Lower Tier LLCs, and shifts that property to SunTrust and Wells Fargo, creditors with claims secured by other assets owned by the insiders.   This Plan reduces the amount that Inervest may collect and simultaneously reduces the guarantors'/insiders' liability to SunTrust and Wells Fargo.").

30.     The Cash Collateral Order also places undue restrictions on the funding for an Investigation.   It authorizes the expenditure of no more than $25,000, which may be incurred solely by a Committee and used only to investigate (but not litigate) any challenge to the Invenergy Secured Lenders' claims and liens (the "Investigation Cap").   Not only is this amount insufficient to fund the requisite Investigation, but given the absence of Committee, the Investment Cap is effectively zero.   Direct Energy submits that the Investigation Cap should either be removed or increased to a more reasonable amount in light of the amount of work that needs to be done, and, given that no creditors' committee has been formed, should be made available to any unsecured creditor(s) who undertakes such investigation for the benefit of the estate.

**C.     The Proposed Final Cash Collateral Order Contains Numerous Other Objectionable Provisions That Should Be Stricken**

**1.     The Estate's Right To Marshal Assets Must Be Preserved**

31.     Upon entry of the Cash Collateral Order, as proposed, "the Prepetition Secured Parties shall not be subject to the equitable doctrine of 'marshalling' or any other similar doctrine" with respect to the Collateral.[20]   As marshaling claims may be the primary basis for recovery for unsecured creditors in this case, the Debtor should not be permitted to waive any rights to marshaling.

32.     "Marshaling is an equitable principle designed to protect the rights of a junior creditor by compelling a senior creditor to attempt to collect its claim first from another source unavailable to the junior creditor."   *In re Glob. Serv. Grp., LLC*, 316 B.R. 451, 463 (Bankr. S.D.N.Y. 2004) (citing *Meyer v. U.S.*, 375 U.S. 233, 237 (1963)).   Outside of the bankruptcy context, generally only creditors can assert marshaling; the debtor cannot.   *See In re Shepler*,

---

[20]     Cash Collateral Order ¶ 12.

2014 WL 3700806, at *3 (Bankr. N.D. Ohio Jul. 24, 2014) (citing cases).    However upon a bankruptcy filing, courts have permitted trustees and debtors in possession to assert marshaling. *See In re High Strength Steel*, 269 B.R. 560, 573–74 (Bankr. D. Del 2001) ("Accordingly, we conclude that a bankruptcy trustee, as a hypothetical lien creditor as of the petition date, has standing to bring an action for marshaling.") (citing *Duck v. Wells Fargo Bank (In re Spectra Prism Industries, Inc.)*, 28 BR. 397, 399 (9th Cir. BAP 1983); *Fundex Capital Corp. v. Balaber-Strauss (In re Tampa Chain Co. Inc)*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985); *Merrigan v. Small Bus. Admin. (In re Clary House, Inc.)*, 11 B.R. 462, 466–67 (Bankr. W.D. Mo. 1981)); *Glob. Serv.*, 316 B.R. at 463; *In re Prichard*, 170 B.R. 41, 45 (Bankr. N.D.N.Y. 1994).    The rationale is that a bankruptcy trustee or debtor in possession has certain rights of a "hypothetical lien creditor" under section 544(a) of the Bankruptcy Code.    The trustee or debtor in possession can employ its "deemed" lien creditor status under section 544(a) to seek to require actual creditors to marshal their recoveries.    The ability of the estate to marshal assets avoids the inequitable result of allowing a secured party to exhaust the assets of a bankrupt debtor without first looking to other available assets over which it also has a security interest.    *See Berman v. Green (In re Jack Green's Fashions for Men Big & Tall Inc.)*, 597 F.2d 130, 133 (8th Cir. 1979) ("[I]t would be the highest degree of inequitable to allow the bank to exhaust the business assets of the corporate bankrupt without first looking to the [guarantor-shareholders'] real estate mortgaged to it.    To permit such a course would leave the general unsecured creditors of the business with nothing.").    Based upon the value in this case of marshaling, and the absence of any allegation regarding why the proposed waiver is necessary, it is critical that the Debtor's waiver of marshaling be stricken from the Cash Collateral Order.

### 2.    The Adequate Protection Liens Should Not Extend To The Proceeds Of Avoidance Actions

33.    The proposed adequate protection package includes liens on, among other collateral, the proceeds of Avoidance Actions.  Avoidance actions are intended to benefit *unsecured* creditors, and therefore should not be pledged for the benefit of *secured* creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (noting that unsecured creditors are whose interests avoidance actions are designed to protect).

34.    The fact that the Invenergy Secured Lenders limited their liens to the "proceeds" of Avoidance Actions (rather than the actions themselves) should not alter the analysis.    Indeed, the Third Circuit has repeatedly refused to "elevate form over substance" when ruling on issues of bankruptcy law.   *See, e.g.*, *In re General DataComm Industries, Inc.*, 407 F.3d 616, 621 (3d Cir. 2005) ("We are persuaded that this contention elevates form over substance, and is thus unavailing and unacceptable); *see also In re ICL Holding Co., Inc.*, 802 F.3d 547, 556 (3d Cir. 2015); *In re Mehta*, 310 F.3d 308, 313 (3d Cir. 2002).

35.    Therefore, courts generally exclude avoidance actions and their proceeds from lenders' adequate protection packages.   *See, e.g.*, *In re Energy Future Holdings Corp*., Case No. 14-10979-CSS, (Docket No. 855), at 22, 25 (Bankr. D. Del. Jun. 6, 2014) (cash collateral order providing that adequate protection liens and superpriority claims have no recourse to avoidance actions); *In re Excel Maritime Carriers, Ltd.*, Case No. 13-23060-RDD, (Docket No. 133), at 14 & 16 (Bankr. S.D.N.Y. Aug. 6, 2013) (excluding avoidance actions and proceeds from the scope of adequate protection liens); *In re Klaas Talsma Frisia Hartley, LLC*, 2010 WL 5209363, at *4 (Bankr. N.D. Tex. Jun. 10, 2010) (excluding avoidance actions and proceeds thereof from the adequate protection package provided to Wells Fargo, a prepetition secured lender); *In re HSAD*

*3949 Lindell, Ltd.*, 2010 WL 5209266, at *5 (Bankr. N.D. Tex. Sept. 2, 2010) (adequate protection package excluded "any and all avoidance actions under Chapter 5 of the Bankruptcy Code and any proceeds thereof").

36.    This Court should decline to do so, too.    The Invenergy Secured Lenders' adequate protection liens should leave Avoidance Actions and the proceeds thereof to their intended beneficiaries—unsecured creditors.    This principle applies *a fortiori* in this Chapter 11 Case in which many of the most valuable Avoidance Actions would be against the Invenergy Secured Lenders.    Therefore, at the very least, the Invenergy Secured Lenders should not be granted a lien on Avoidance Actions against themselves, or the proceeds thereof.

### 3.    Rights To Surcharge Collateral Must Be Preserved

37.    The Debtor also seeks to waive the estate's rights to surcharge the Collateral for the costs and expenses of administration of the Chapter 11 Case (or any future proceedings under the Bankruptcy Code), including for the "reasonable, necessary costs and expenses of preserving, or disposing of, [a secured creditor's collateral] to the extent of any benefit" to such creditor. 11 U.S.C. § 506(c).

38.    The stated purpose of this Chapter 11 Case is to "pursue a sale of the Power Plant to the Proposed Purchaser or the highest bidder identified in a post-petition process to be conducted with the authority of this Court pursuant to section 363 of the Bankruptcy Code,"[21] the proceeds of which will be paid to the Invenergy Secured Lenders, in satisfaction of the Invenergy's primary obligation.    The Invenergy Secured Lenders should pay for the benefits they are receiving during the pendency of this Chapter 11 Case.    *See, e.g.*, *First Servs. Grp., Inc. v. O'Connell (In re Ceron)*, 412 B.R. 41, 48 (Bankr. E.D.N.Y. 2009) ("[T]he underlying

---

[21]    Baumgartner Decl. ¶ 70.

purpose of 11 U.S.C. § 506(c) is that the secured creditor should pay for the benefit it received.")

(citation omitted).    Waiving the Debtor's surcharge rights at all under these circumstances

creates a serious risk that the costs of preserving the Collateral will be borne by the Debtor's

unsecured creditors.    The Court should reject this prospective waiver of an important statutory

right at the outset of this case, thereby preventing the Invenergy Secured Lenders from receiving

a windfall at the estate's expense.

### 4.        The Debtor Cannot Waive Section 552(b)

39.      The Debtor is also seeking to waive the so-called "equities of the case" exception

contained in Bankruptcy Code section 552(b).    Specifically, section 552(b) permits "*the court*"

to deny a lien on post-petition "proceeds, products, offspring, or profits" of prepetition collateral

based on the "equities of the case."    11 U.S.C. § 552(b) (emphasis added).    This provision

should be stricken from any final order because the Debtor does not have the authority to agree

to such a waiver.

40.      The "equities of the case" exception contained in section 552(b) is a statutory

grant of power *to the Court*, not to the Debtor.    Unlike section 363 or section 364 (or even

section 506(c)), there is no phrase "the trustee may" (or may not) in section 552(b).    Rather, the

statute provides the law, for the Court's *retrospective* application, governing the allocation of

post-petition value to secured and unsecured creditors depending on what transpires.    Just as the

Debtor cannot waive the requirements for confirmation under section 1129 or the absolute

priorities set forth in section 726, it cannot waive the "equities of the case."

41.      Moreover, it would be inherently impossible for the Court to make such a

determination at this very early stage of the case.    *See, e.g.*, *Sprint Nextel Corp. v. U.S. Bank

Nat'l Ass'n* (*In re TerreStar Networks, Inc.*), 457 B.R. 254, 272–73 (Bankr. S.D.N.Y. 2011)

(denying request for 552(b) waiver as premature because factual record was not fully

developed); *In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (declining to waive prospectively the equities of the case exception in connection with approval of debtor's use of cash collateral).   Because the Court will be unable to determine the "equities of the case" until what has transpired in the Chapter 11 Case is known, a waiver of the doctrine at this time would be inappropriate and prejudicial to the Debtor's other stakeholders.   The rights of all parties to demonstrate that the equities of the case exception applies should be preserved, and the proposed waiver should be stricken from the Cash Collateral Order.

### 5.    Invenergy Secured Lenders' Draconian Remedies Upon Any One Of Numerous Termination Events Should Be Stricken Or Modified

42.    The Cash Collateral Order includes more than twenty "Termination Events" upon which, after short notice, the Invenergy Secured Lenders would have the right to exercise all rights and remedies under the Prepetition Loan Documents or otherwise available under the law "without any further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code."[22]   Among these "Termination Events" is the termination of the PSA (which has not been presented to this Court for consideration, much less approval), commencement of litigation against the Invenergy Secured Lenders by any party in interest (other than to enforce the terms of the PSA or the Final Order), as well as the charging of any Prepetition or Adequate Protection Collateral under sections 506(c) or 552(b) of the Bankruptcy Code.   For the reasons discussed herein, it is possible, if not probable, that a party in interest (including a potential chapter 11 trustee) may commence litigation against the Prepetition Secured Parties relating to Amendment No. 4 to the Credit Agreement and/or marshaling under section 544(b) of the Bankruptcy Code, among other potential claims.   And it is possible, if not likely, that the Collateral will be subject to surcharge

---

[22]    Cash Collateral Order ¶ 7.

(provided the Court strikes the Debtor's waiver of surcharge rights from the Cash Collateral Order).   If any one of these Termination Events occurs, the Prepetition Secured Parties would be free to pursue all available remedies without Court approval.   Direct Energy submits that the relevant provisions should be stricken from the Cash Collateral Order.

## III.    THE BID PROCEDURES ORDER MUST CLEARLY PRESERVE PARTIES' RIGHTS TO OBJECT TO THE PROPOSED SALE

43.    While the Bid Procedures Motion does not purport to seek the approval of the Proposed Sale, the Bid Procedures Order must be clarified to ensure that the rights of parties in interest to object to the sale on all bases are fully preserved.   Direct Energy reserves all rights to object to the APA and Proposed Sale, including to the Distribution Waterfall, at the appropriate time.

### A.    The Proposed Schedule Must Be Modified In Order To Protect Unsecured Creditors' Rights

44.    The Debtor, Invenergy, and the Prepetition Secured Parties endeavor to put this case on a fast track in order to ensure a quick consummation of the Proposed Sale in order to shield the PSA Transactions from scrutiny—which they could not withstand.

45.    As part of this attempt, the parties ask for the Court to set the Sale Objection Deadline approximately 30 days from the entry of the Bid Procedures Order, and the Sale Hearing on June 27, 2022.   These dates should be postponed in order to permit parties in interest a full and fair opportunity to investigate the interconnected PSA Transactions, including the Proposed Sale.   Indeed, under the APA, the Proposed Purchaser will acquire the Avoidance Actions and "agrees that it will not pursue, participate in the pursuit of, sell, transfer, or enter into any agreement with a third party to facilitate the pursuit of, any Avoidance Action acquired under [the APA]."   APA § 11.6.   As a result, any Investigation will be rendered a nullity upon the approval of the APA.   Therefore, the Sale Objection Deadline and Sale Hearing should be

rescheduled in accordance with any extension of the Challenge Deadline and to permit parties sufficient time to assess any Proposed Sale.

46.     Moreover, the APA prohibits the Debtor from contacting any potential purchasers, soliciting any bids, or even engaging in any discussions relating to any alternative transaction until the Bid Procedures Order is entered.   As a result, the June 17, 2022 Bid Deadline does not provide sufficient time to test whether the Stalking Horse Bid is the highest or best offer—or to prove that, as the Debtor asserts, the current ERCOT M&A market is so strong that the Debtor was compelled to pursue a sale of the Power Plant at this time.

### B.    The Bid Procedures Order Is Vague And Includes Improper Findings

47.     While the Proposed Sale and related Sale Order are not currently up for approval, the Bid Procedures Order obfuscates what, if any, provisions of the APA would be approved upon entry of the Bid Procedures Order as currently drafted, and includes certain findings that could be prejudicial to any Sale Objection, and to other challenges to the PSA Transactions.

48.     The Bid Procedures Motion and Order are vague as to whether the order purports to approve any portion of the APA.   For example, the order states that "the Debtors' obligations under this Bid Procedures Order, the provisions of this Bid Procedures Order, ***and the portions of the [APA] pertaining to the Bidding Procedures***" shall survive conversion of this Chapter 11 Case to a case under chapter 7, or confirmation of a chapter 11 plan in the Chapter 11 Case.[23] However, it is unclear which portions of APA "pertain to the Bidding Procedures."   The Debtor must clarify what exactly it is asking the Court to order.

---

[23]     Bid Procedures Order ¶ 27 (emphasis added).   Moreover, the title of the Bid Procedures Motion states that that it is motion for, among other things, an order "Authorizing Debtor's Entry into the Asset Purchase Agreement."

49.    In addition, the Bid Procedures Order includes findings that are inappropriate. Specifically, the Bid Procedures Order includes a finding that "the Debtor has demonstrated sound business justifications for offering the sale of the Acquired Assets pursuant to the Bidding Procedures, under the circumstances, timing, and procedures set forth [in the Bid Procedures Order], in the Bid Procedures Motion, and in the APA."[24]    Similarly, the Bid Procedures Order includes a finding that the Debtor's entry into the APA is in the best interests of the Debtor and was the result of the sound exercise of its business judgment.[25]    At the very least, these findings are premature.    There is no record to support a finding that the Debtor and its insiders have acted in accordance with their fiduciary duties in seeking to sell the Power Plant at this time.    In fact, the Debtor itself casts doubt on this fact by virtue of its admission that when the Debtor last marketed its assets in 2018, it received "expressions of interest in amounts that were less than half the per kilowatt price realized in recent power plant deals."    Bid Procedures Mot. ¶ 4.    Yet in the current, supposedly "strong ERCOT M&A market," the Debtor's Stalking Horse Bid implies a sale price of approximately half the per kilowatt price realized in the recent power plant deals cited by the Debtor.[26]    Given the intended use of the proceeds of the Proposed Sale to pay down its parent's obligation to the Invenergy Secured Lenders, the decision—whether made by the Debtor's conflicted special committee or Invenergy itself—to sell the Debtor's assets warrants Investigation.    *See In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015) ("Where a proposed sale would benefit an insider of a debtor, the court is required to give heightened scrutiny to the fairness of the value provided by the sale and the good faith of

---

[24]    *Id.* ¶ J.

[25]    *Id.* ¶ F.    Moreover, as noted, the business judgment standard is inapplicable to the PSA Transactions, including the Proposed Sale.

[26]    According to the Debtor, Agilon Energy Holdings and Temple Generation I, LLC sold their plants for $439/kW and $560/kW per hour, respectively. *See* Bid Procedures Mot. ¶¶ 3-4.    Meanwhile, the Stalking Horse Bid is $91,250,000—or $276/kW per hour.

the parties in executing the transaction."). The Bid Procedures Order therefore should not include any findings regarding the propriety of the Debtor's decision to sell its assets, the sale process itself, or its entry into the APA.

## IV.    THE SHARED SERVICES MOTION BELIES THE FACT THAT THIS CASE IS NOT BEING RUN FOR THE BENEFIT OF THE DEBTOR OR ITS ESTATE

50.    In yet another shocking display of its willingness to take positions detrimental to itself and its estate for the benefit of its parent and affiliates, the Debtor filed the Shared Services Motion, in which it has requested authorization from this Court to pay to Invenergy Services Thermal US LLC ("Thermal") and Invenergy Services LLC ("Services" and together with Thermal, the "Managers")—both non-debtor affiliates of the Debtor and Invenergy—the wages and salaries of the Managers' employees, as well as Management Fees.[27]  The proposed payments also include bonus and severance payments to *Thermal* employees under a KERP that "*Thermal* determined to extend . . . to those Thermal employees who operate the Power Plant." *Id.* ¶ 17 (emphasis added).   At a minimum, such payments should be subject to section 503(c) of the Bankruptcy Code, which conditions any transfer made or obligation incurred for the benefit of an insider to induce such person to remain with the debtor's business upon findings by the court, based upon evidence in the record, that, among other requirements, "such transfer or obligation is essential to the retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation[.]"   11 U.S.C. § 503(c)(1).   The Debtor, however, does not even attempt to satisfy the standards of section 503(c) of the Bankruptcy Code.   For this reason alone, this Motion should be denied.   *See In re Memorial Production Partners, LP*, Case No: 17-30262 (Docket No. 333) (Bankr. S.D. Tex.

---

[27]    Shared Servs. Mot. ¶¶ 14, 22.

Apr. 4, 2017) (transcript at 334:2-3 "I'm never going to approve an intentional intent to get around 503(c), which is what the witness said.").

51.    The Debtor justifies its motion by arguing that "[w]ithout the Shared Services Agreements, the Debtor would—at least until the Debtor could find a new party to perform such services—be unable to operate the Power Plant or perform even the most basic business and bankruptcy functions required during the Chapter 11 Case."[28]    This assertion is patently false.

52.    "During the interim period between the petition date and the deadline to assume or reject contracts . . . [an executory] contract is generally enforceable by, but not against, the trustee or debtor in possession."    *In re 47 Hops LLC*, 2020 WL 2485808, at *3 (Bankr. E.D. Wash. May 13, 2020) (collecting cases); *see also In re Univ. Med. Ctr.*, 973 F.2d 1065, 1075 (3d Cir. 1992) ("During this [interim] period, the terms of an executory contract are temporarily unenforceable against the debtor."); *In re Burlington Motor Carriers, Inc.*, 1999 WL 1427683, at *12 (D. Del. Dec. 30, 1999) ("[D]uring the time between filing the petition and the rejection, a contract remains in effect and the creditors are bound to it."). Accordingly, there was no practical reason for the Debtor to file the Shared Services Motion seeking authorization to pay the Managers amounts owed under the Shared Services Agreements, as the Managers must continue preforming until such time as the agreements are assumed or rejected.[29]    Nevertheless, the Debtor, through its Invenergy-controlled special committee filed (or was compelled to file)

---

[28]    *Id.* ¶ 2.

[29]    It the apparent intent of the parties to leave the Shared Services Agreements intact through the sale, so that the purchaser may decide whether to acquire the Agreements. *See* Baumgartner Decl. ¶ 107 ("Given the Debtor's goal of closing a sale of the Power Plant by mid-summer, it is preferable to continue to perform and receive performance under the Shared Service Agreements on an interim basis, rather than prematurely assume those contracts, and potentially saddle the Debtor and the estate with an administrative rejection damages claim should the ultimate purchaser not seek to acquire these contracts by assignment."). This rationale, of course, ignores the fact that any claim by the insiders would be subject to "intense scrutiny." *In re ID Liquidation One, LLC*, 503 B.R. 392, 400 (Bankr. D. Del. 2013) ("Case law teaches that insiders of a debtor may be entitled to claims in bankruptcy but the claims should be subject to intense scrutiny by the Court.") (internal quotation marks omitted).

the Shared Services Motion, allowing insiders to avoid the effort, expense, and risk of filing a motion to compel assumption or rejection or to lift the automatic stay to permit contract termination, and of filing an administrative expense claim for any post-petition work under the Agreement.   Instead, Invenergy spurns this option in favor of causing the Debtor to file the Shared Services Motion in an effort to have these claims—which would otherwise be subject to close scrutiny—paid "in the ordinary course."   The Shared Services Motion is nothing more than another improper attempt by insiders to obtain preferential treatment in this case at the Debtor's expense, and it should be denied.

## **RESERVATION OF RIGHTS**

53.    Direct Energy expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to present evidence at the hearing, to supplement and amend this Objection, to raise further and other objections to the Motions and the form of the Final Orders.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Direct Energy respectfully requests that the Court (i) enter the Cash Collateral Order subject to the requested modifications, (ii) enter the Bid Procedures Motion subject to the requested modifications, (iii) deny the Shared Services Motion, and (iv) grant any further relief the Court deems just and proper.

Dated: May 2, 2022
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 571-6600
Facsimile:    (302) 571-1253
**CM/ECF Noticing**: bankfilings@ycst.com
Email:        mnestor@ycst.com
               mlunn@ycst.com

– and –

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone, Esq.
Christopher D. Kercher, Esq.
Kate Scherling, Esq.
Zachary Russell, Esq.
Jacqueline M. Stykes, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:   (212) 849-7000
Facsimile:    (212) 849-7100
Email:        benjaminfinestone@quinnemanuel.com
              christopherkercher@quinnemanuel.com
              katescherling@quinnemanuel.com
              zacharyrussell@quinnemanuel.com
              jacquelinestykes@quinnemanuel.com

    – and –

K. John Shaffer, Esq.
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:   (213) 443-3000
Facsimile:    (213)443-3100
Email:        johnshaffer@quinnemanuel.com

*Counsel to Direct Energy Business Marketing, LLC*

29