**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ECTOR COUNTY ENERGY CENTER LLC,[1] | Case No. 22-10320 (JTD) |
| Debtor. | **Re: Docket Nos. 6, 34, and 118** |

**REPLY OF DEBTOR TO DIRECT ENERGY MARKETING, LLC'S OMNIBUS
OBJECTION TO DEBTOR'S (I) MOTION TO USE CASH COLLATERAL
AND GRANT ADEQUATE PROTECTION, (II) BID PROCEDURES MOTION,
AND (III) SHARED SERVICES MOTION**

Ector County Energy Center LLC, the debtor and debtor-in-possession in the above captioned

chapter 11 case (the "Debtor"), hereby submits this reply (the "Reply") to *Direct Energy Marketing,*

*LLC's Omnibus Objection to Debtor's (I) Motion To Use Cash Collateral And Grant Adequate*

*Protection, (II) Bid Procedures Motion, and (III) Shared Services Motion* (the "Objection") [Docket

No. 118].[2]  In the Objection, Direct Energy Business Marketing, LLC ("Direct Energy") continues to

weave the narrative that it first raised during the April 13, 2022 First Day Hearing that this case

represents nothing other than a "scheme" by the Debtor's equity to "sacrifice" the Debtor for the

benefit of its single member LLC credit agreement co-obligors.  That grandstanding spin is premised

---

[1]  The last four digits of the Debtor's federal tax identification are 6852.  The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.  More information about the Debtor and this case is available on the website maintained by Donlin, Recano & Company, Inc., the Debtor's claims and noticing agent, at www.donlinrecano.com/ecec, or can be requested by e-mail at ececinfo@donlinrecano.com.

[2]  The Objection has been mooted as to the *Motion of Debtor for Orders (I)(A) Authorizing Debtor's Entry into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving a Break-Up Fee and Reduced Break-Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving the Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* [Docket No. 7] through a negotiated resolution and this Court's entry of the *Order (A) Authorizing Debtor's Entry into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving a Break-Up Fee and Reduced Break-Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing* (the "Bid Procedures Order") [Docket No. 136].

on the extraordinary and unsupportable position that a company that is conducting a sale of substantially all of its assets at what appears to be a high point in the market while in its second consecutive year of cash losses and projecting a near-term liquidity crisis has commenced this chapter 11 case for the sole purpose redirecting value to its equity holders.  Direct Energy makes this accusation despite the Debtor having negotiated and entered a Plan Support Agreement filed on the Petition Date providing for (i) approximately $20 million in carveouts from the Prepetition Secured Lenders'[3] collateral for the benefit of the Debtor's estate, (ii) a $75 million cap on the Prepetition Secured Lenders' recovery from the proceeds of their collateral, which represents a return to those lenders of only 60% of the $125 million cash benefit that the Debtor received under the facility and of less than 22% of the $340 million Term Loan balance that the Debtor is primarily liable for, (iii) a minimum cash distribution to unsecured creditors of $5 million and (iv) unsecured creditors to receive 100% of the upside after the Prepetition Secured Lenders receive their fractional recoveries following a sale of property that is undeniably the Prepetition Secured Lenders' collateral.  Direct Energy also takes issue with the relief requested by the Debtor in the form of orders proposed in connection with each of the (i) *Motion of Debtor for Entry of Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Cash Collateral Motion") [Docket No. 6], and (ii) *Motion of Debtor for Entry of Order (I) Authorizing the Debtor to Continue to Perform under Shared Services Agreements, (II) Authorizing Payment of Post-Petition Obligations Accruing under Shared Services Agreements, and (III) Granting Related Relief* (the "Shared Services Motion") [Docket No. 34].

---

[3] Defined terms not otherwise defined here will have the meanings set forth in the Cash Collateral Motion (defined below).

In support of this Reply, the Debtor relies upon and incorporates by reference the (i) *Declaration of John Baumgartner, Chief Restructuring Officer, In Support of Chapter 11 Petition, First Day Motions, and Related Relief* (the "<u>First Day Declaration</u>") [Docket No. 2], filed on April 11, 2022, and (ii) *Supplemental Declaration of John Baumgartner, Chief Restructuring Officer, in Support of Debtor's Reply to Direct Energy Marketing, LLC's Omnibus Objection to Debtor's (I) Motion to Use Cash Collateral and Grant Adequate Protection, (II) Bid Procedures Motion, and (III) Shared Services Motion* (the "<u>Supplemental Declaration</u>") filed contemporaneously herewith. In further support of the relief requested herein an in the above referenced Motion, the Debtor states as follows:

## **<u>Introduction</u>**

1.      Direct Energy's Objection used three customary motions to continue a now-steady stream of soapbox supposition dressed up with select snippets from a limited subset of documents to the exclusion of actual examination of the documentary evidence.

2.      Through the Cash Collateral Motion, a debtor with a now years-long pattern of diminution in liquidity from a high of $11.7 million as of year-end 2020 to a projected $723,000 as of the end of July of this year provided that its liquidity is supplemented through a $5 million DIP financing facility that Direct Energy has also signaled an intention of contesting, seeks to grant adequate protection rights that are reasonable, customary and have been granted regularly in cases in this District.  The Prepetition Secured Lenders receiving those adequate protection rights are projected to suffer a seven figure post-petition diminution in the balance of their cash collateral, have agreed to subordinate all but $55 million of their $340 million term debt to DIP financing necessary to reach the closing of a $91 million sale, and have agreed to provide approximately $20 million in carveouts from the sale proceeds (inclusive of payments of the DIP financing) for the benefit of the Debtor's estate.

3.      Through the Shared Services Motion, the Debtor seeks to obtain clear authority to perform its obligations under and receive the benefits provided under two contracts with affiliates for the operation and management of the Debtor without imposing on the estate the burden attendant upon executory contract assumption.

4.      In response, Direct Energy primarily offers frustrated venting, likely originating with regret over its own historical business decisions.  When the HRCO (as defined below) upon which Direct Energy bases its claim was executed, Direct Energy agreed to limit the security for its claim to a single $7 million letter of credit issued under the existing Credit Agreement (defined below) that it has not drawn.  Contrary to the assertions set forth in the Objection, the relevant documents demonstrate that (i) the Debtor's Power Plant, which upon sale will generate the funds available for distribution in this case, was constructed using over $117 million of debt funding under a construction loan facility; (ii) that loan facility was refinanced by the Prepetition Secured Lenders under the Original Credit Agreement (defined below); (iii) the Credit Agreement expressly provides that the Debtor's obligations thereunder are primary, not secondary;[4] (iv) the Debtor under the Credit Agreement has, and has always had, an obligation to ensure that  $75 million of any  proceeds of a sale of its assets are delivered to the Prepetition Secured Lenders; (v) the Debtor itself has twice been subject to occurrences falling within the Credit Agreement's definition of events of default and, if Direct Energy's lawsuit resulted in the sought judgment, there would be a third occurrence falling within that definition; (vi) a Credit Agreement event of default would afford the Prepetition Secured Lenders a right to exercise remedies and demand the first $340 million in proceeds generated by sale of their collateral; and (vii) those lenders have agreed to subordinate all but $55 million of their senior

---

[4] As discussed in paragraphs 20 and 21 below, the Credit Agreement provides that the Debtor's obligation "is a primary obligation … and not merely a contract of surety" that is "irrevocable, absolute, independent and unconditional."

secured claim to approximately $20 million in carveouts and to leave 100% of all sale proceeds behind for unsecured creditors once the Prepetition Secured Lenders receive $75 million.

## **Background**

5. On April 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with this Court, commencing this chapter 11 case (the "Chapter 11 Case").

6. The Debtor continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been requested in the Chapter 11 Case and no committee has yet been appointed.

7. The Debtor owns and operates a 330 MW capacity natural gas-fired power plant ("Power Plant") on 32.5 acres of land in Ector County, Texas.  Placed in service in September 2015, the Power Plant features two General Electric 7FA simple-cycle combustion turbines that provide peaking energy and respond quickly at times when power demand requires additional supply from peaking plants.  The Power Plant connects to the ERCOT 138kV Holt Switching Station of the Oncor Electric transmission system, selling energy and ancillary services within the "ERCOT West" region. Its natural gas is delivered via the ONEOK WesTex Transmission Pipeline ("OneOK").

8. Prior to May 28, 2021, substantially all of the Power Plant's power generation capacity was committed to Direct Energy, a wholly owned subsidiary of NRG Energy, Inc., under the terms of a "Heat Rate Call Option for Energy and Ancillary Services," as set forth in a Transaction Confirmation and ISDA 2002 Master Agreement, dated October 18, 2017 (the "HRCO").  Generally stated, the HRCO provided that, in exchange for a flat monthly payment, Direct Energy had the option to call for certain quantities of energy and ancillary services at pre-established pricing.

9. In May 2021, Direct Energy purported to terminate the HRCO, asserting that the Debtor's inability to obtain gas to fuel its turbines during 2021's Winter Storm Uri resulting in an

inability to deliver power was cause for termination, giving rise to claims totaling approximately $403 million.

10.     Direct Energy commenced litigation in New York Supreme Court against the Debtor and two affiliates of the Debtor, seeking to recover its asserted damages claim, including approximately $393,409,000 that Direct Energy calculates as owing to it under the HRCO for February 2021.[5] The Direct Energy litigation is in the early stages, and has been stayed as to the Debtor as a result of the commencement of the Chapter 11 Case and has been removed to the United States District Court for the Southern District of New York.

11.     The Debtor has also been named as a defendant in 113 personal injury and/or property damage cases in the Texas Storm Uri multi-district litigation in Texas by consumers asserting claims against Texas-based power companies as a result of the forced power black-outs initiated by ERCOT throughout Winter Storm Uri.  These claims are presently stayed as to the Debtor as well.

**A.     <u>Chapter 11 Case Overview</u>**

12.     Parties-in-interest in this case have a current and, given two prior unsuccessful sale efforts, perhaps singular, opportunity to capitalize on a strong M&A market for ERCOT power plant assets.

13.     The Debtor's current financial condition provides no path for accomplishing that result other than through section 363 of the Bankruptcy Code's sale provisions.  Direct Energy's May 2021 HRCO termination deprived the Debtor of the steady source of the vast bulk of its revenues. The Debtor's existing senior secured debt imposes a loan to value ratio (absent the concessions obtained in the executed plan support agreement) in excess of 300% and Direct Energy's asserted claim alone is more than four times what the market has currently suggested is the Debtor's value, which not only

---

[5] Direct Energy's claim is disputed, contingent and unliquidated, premised on a contractual provision that is unenforceable because the product of fraud in the execution.  Were that agreement provision enforceable, however, the force majeure clause contained in the agreement would preclude Direct Energy's sought recovery.

renders the Debtor over-leveraged but also unfinanceable. The Debtor entered this case with less than $5.4 million[6] in total cash and projects running out of that cash in July absent obtaining $5 million in post-petition financing.

14.     Sale of the Debtor's assets and confirmation of the chapter 11 plan in accordance with the provisions of the executed plan support agreement dated as of April 4, 2022 (the "Plan Support Agreement" or the "PSA")[7] will result in between a 16% and 22% pay down of the approximately $340 million in term debt for which each Obligor under the Prepetition Secured Loans (defined below), including the Debtor, is jointly and severally liable on a primary, not secondary, basis.

15.     The Prepetition Secured Lenders' anticipated distributions of $55 million to $75 million will yield for those lenders between 47% and 65% of the amount of actual cash benefit received by the Debtor from the facility. As stated above, the Original Credit Agreement provided by the Prepetition Secured Lenders refinanced a $117 million construction loan that funded construction of the Debtor's Power Plant. Throughout the history of the Debtor and the Prepetition Secured Lenders under the Credit Agreement, the Debtor has benefitted from the issuance of letters of credit, with two such letters of credit outstanding as of the Petition Date. Direct Energy itself was also a beneficiary of the Debtor's access to the Prepetition Secured Loans, having a $7 million letter of credit posted as security for the Debtor's obligations under the HRCO. An additional letter of credit of approximately $225,000 was also posted under the Prepetition Secured Loans to secure the Debtor's obligations to OneOK.

16.     Sale of the Debtor's assets and confirmation of the chapter 11 plan as outlined in the Plan Support Agreement will also ensure distribution to the Debtor's unsecured creditors. In contrast

---

[6] The cash balance as of March 31, 2022 was $5.4 million. It was approximately $3.6 million as of the Petition Date.

[7] Despite Direct Energy's repeated references to the PSA "not being before the court," *see, e.g., Objection*, ¶ 3, the Plan Support Agreement was attached to the First Day Declaration as Exhibit A.

to a scenario where the Prepetition Secured Lenders were to exercise their remedies outside of a chapter 11 case based on their first lien on all of the Debtor's assets, which would likely result in no recovery for unsecured creditors, if a plan consistent with the PSA is confirmed unsecured creditors will receive a guaranteed $5 million distribution and 100% of the upside of any deal closed in the sale process that generates a $75 million payment to the Prepetition Secured Lenders.

17.    Sale of the Debtor's assets and confirmation of the chapter 11 plan as outlined in the Plan Support Agreement also does not provide "equity" with the windfall alleged in the Objection. The equity will retain no interest in the Debtor and the pay down of the Prepetition Secured Loans will be no more than 60% (and potentially far less) of the amount drawn by or for the benefit of the Debtor,[8] leaving the "equity" responsible for the remaining 40%.

**B.    The Prepetition Loan Documents**

18.    The Debtor, Invenergy Thermal Operating I LLC ("ITOI"), and eight additional affiliated entities are party to the Amended and Restated Credit and Guaranty Agreement, dated as of August 22, 2019 (the "Credit Agreement"). *See Supplemental Declaration at Ex. C.* The Credit Agreement amended an earlier agreement executed as of as of August 28, 2018 (the "Original Credit Agreement"). *See Supplemental Declaration at Ex. B.* That Original Credit Agreement represented a refinancing of a construction facility documented under an agreement titled Construction Bridge Loan Agreement dated as of October 10, 2014 among Invenergy Thermal LLC, the lenders party thereto, Morgan Stanley Senior Funding, Inc., as Administrative Agent and The Bank of New York Mellon as Collateral Agent (the "Construction Facility"). *See Supplemental Declaration at Ex. A.*

19.    The recitals contained in the Construction Facility include that "Ector County Energy Center LLC … is developing the generating facility commonly known as 'Ector County Energy

---

[8] The $125 million number is a rounding of the sum of $117,883,780.33 drawn under the refinanced construction loan, the $7 million letter of credit issued under the revolving facility to Direct Energy and a $225,000 letter of credit issued under the revolving facility to OneOK.

Center,' a proposed 330 MW (approximately) natural gas-fired generating facility to be located in Ector County, Texas …."  The recitals go on to state, "Borrower has requested that the Lenders extend credit hereunder in the form of Loans in an aggregate principal amount of up to $117,883,780.33, the proceeds of which shall be used: (a) by Ector to fund the development, construction, installation, and testing of the Ector Project and (b) pay the expenses incurred in connection with the foregoing."  The obligations of Invenergy Thermal LLC were guaranteed by nine subsidiary guarantors, including the Debtor and ITOI. *See Supplemental Declaration at Ex. A.* As contemplated by the Construction Facility, approximately $117 million of borrowed funds were drawn and used to construct the Debtor's Power Plant.

20.    Under the Original Credit Agreement that refinanced the Construction Facility, ITOI replaced Invenergy Thermal LLC as borrower and each of nine affiliated entities, including the Debtor is a guarantor. *See Supplemental Declaration at Ex. B.* The Credit Agreement then refinanced the obligations under the Original Credit Agreement, and provides for both a term facility (the "Term Loan") that had a Petition Date balance of $337,319,920.82, and a revolving facility (the "Revolving Loan" and collectively with the Term Loan, the "Prepetition Secured Loans") that had a Petition Date balance of outstanding letters of credit totaling $64,553,598.00.

21.    Article XI of the Credit Agreement imposes on the Debtor, and each of the other guarantors, an unconditional joint and several guaranty (the "Guaranty") of "due and punctual payment in full of all Secured Obligations … when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise" defined in the Credit Agreement as the "Guaranteed Obligations."  That guaranty obligation is "a primary obligation," Credit Agreement Section 11.04(a), that is "irrevocable, absolute, independent and unconditional …."  Credit Agreement Section 11.04. The "Secured Obligations" that the Debtor, as one of ten "Obligors" is responsible for, are defined in the Credit Agreement through a cross-reference

9

to a Collateral Agency and Intercreditor Agreement executed as of August 28, 2018, which defines the term as "all obligations owed under the Credit Agreement …." *See Supplemental Declaration at Ex. C.*

22.      In Section 11.03 of the Credit Agreement, the Debtor also agreed that it will "upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to beneficiaries as aforesaid." Section 11.04 provides that "[t]his Guaranty is a primary obligation of each Subsidiary Guarantor and not merely a contract of surety." *See Supplemental Declaration at Ex. C.*

23.      ITOI, the Debtor, and the other Subsidiary Guarantors' obligations to the Prepetition Secured Lenders under the Credit Agreement are secured through a separately executed Pledge and Security Agreement dated August 28, 2018 by a first-priority security interest in and lien upon (the "<u>Prepetition Liens</u>") each entity's real and personal property assets and the proceeds thereof (the "<u>Prepetition Collateral</u>"). The security interests granted in the Debtor's property to secure its guaranty obligations were perfected as to the personalty through the filing of UCC-1 financing statements with the Office of the Secretary of State for Delaware and a Transmission Utility Financing Statement with the Office of the Texas Secretary of State, as to the real estate through the filing of a *Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing*, as amended on August 22, 2019, recorded by the Collateral Agent with the Public Records Office of Ector County, Texas, and as to cash and cash equivalents through the execution of a Depositary

Agreement with the institution holding the applicable account. *See, First-Day Declaration (as incorporating certain provisions of the Cash Collateral Motion).*

24.    Since its 2018 inception, the Credit Agreement has always expressly envisioned and accommodated the very transaction that is contemplated in the Bid Procedures/Sale Motion and further provided for a conditional waiver of the Prepetition Secured Lenders' otherwise-existing right to receive all of the proceeds of a sale of the Debtor or its assets.

25.    Section 9.06 of the Credit Agreement establishes a generally-applicable prohibition on asset sales by or of any Obligor. That section goes on, however, to allow for an "Ector Disposition," defined as a sale of the Debtor or substantially all of its assets, provided that the sale price is at least the $75 million "Ector Target Sale Amount" in cash or cash equivalents and that the net proceeds of the sale "except for Excess Sale Proceeds" are delivered to the Prepetition Secured Lenders as a "mandatory prepayment of the Loans." The mandatory prepayment has always been defined in Section 3.02(b)(vii) of the Credit Agreement to be equal to the $75 million "Ector Target Sale Amount," with any amount over that $75 million available to be used for "Restricted Payments," defined to include "any prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement or similar payment with respect to any Indebtedness" other than the Loans "unless an Event of Default has occurred and is continuing." *See Supplemental Declaration at Ex. C.*

26.    Contrary to the contention of Direct Energy, however, the obligation to cause the Ector Disposition proceeds to be applied to the mandatory prepayment does not lie exclusively with ITOI as Borrower. To be sure, the original Section 3.02(b)(vii) imposed on the Borrower the obligation to make a mandatory loan prepayment within three business days of "receipt by Borrower or any of its Subsidiaries of any Ector Disposition Proceeds." *See Supplemental Declaration at Ex. B.* Section 9.06(f)(i), however, has always stated that any "Obligor or Subsidiary" may receive "Ector Disposition Proceeds," and Section 9.06(f)(2) has always required that "the Ector Disposition

Proceeds … received by such Obligor ... are applied to the mandatory prepayment of the Loans …."[9]

*See Supplemental Declaration at Exs. B and C.*

27.     In the event of the occurrence of a default, the Prepetition Secured Lenders have also always had the right to preclude any use of "Excess Proceeds" for any purpose other than satisfaction of the obligations under the Credit Agreement, with Section 10.03 of the Credit Agreement affording the lenders the right to "declare the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents to be due and payable." *See Supplemental Declaration at Exs. B and C.*

**C.     The Defaults, the PSA, and the Credit Agreement Amendment**

28.     Were it not for the Debtor having negotiated and executed the PSA and a series of amendments to the Credit Agreement, the Prepetition Secured Lenders would be in a position to demand all proceeds of the sale of their collateral, leaving other creditors without a source of distribution.

29.     The Debtor has twice been subject to occurrences that fall within the Credit Agreement's definition of events of default.  Defaults arising from those events and occurrences have been conditionally waived by the Prepetition Secured Lenders. Were Direct Energy to succeed in its litigation, a third event falling within the event of default definition will take place.  No commitments have been received from the Prepetition Secured Lenders should that occur.

---

[9] Even had the Original Credit Agreement and every iteration thereafter not contained the language requiring recipients of Ector Disposition Proceeds to cause those proceeds to be paid to the Prepetition Secured Lenders, those Lenders had the ability to compel that result.  There is no basis to dispute that the Prepetition Secured Lenders have a claim against the Debtor and that the claim is secured by a properly perfected first priority lien on all of the Debtor's assets.  Outside of a chapter 11 case, the Debtor could not close a sale of its assets absent the Prepetition Secured Lenders delivering a release and discharge of all of their liens--a delivery they undoubtedly would not make absent payment of a contractually dictated or negotiated amount.  Inside of a chapter 11 case, the Prepetition Secured Lenders could, absent consent, put the Debtor to the task of demonstrating that the provisions of section 363(f)(4) were satisfied through presenting proof that there is "an objective basis--either in law or fact--to cast doubt on the validity …" of the Prepetition Secured Lenders' "interest in such property." *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015).  Even Direct Energy does not appear to contest that the Prepetition Secured Lenders have a valid interest in the Debtor's assets as a result of their perfected liens.  Rather, Direct Energy's opposition appears to center on the amount of the secured claim.

30.     Direct Energy's termination of the HRCO and the Debtor's failure to satisfy Direct Energy's demand for over $393 million due to for the Debtor's alleged non-performance under the HRCO during February 2021 would, were it not for an agreement reached by the Debtor, the Prepetition Secured Lenders, ITOI, and the Debtor's co-guarantors, afford the Prepetition Secured Lenders the right to exercise remedies under the Credit Agreement.

31.     Section 10.01(e) of the Credit Agreement provides that any Obligor's "failure to make when due any … amount payable in respect of, any Indebtedness with an individual or aggregate principal amount is excess of $10,000,000 … or … [any] default or breach in the performance of or compliance with any other term of any Indebtedness … and as a consequence of such default such Indebtedness has become due" is an event of default under the Credit Agreement. Indebtedness is defined to include "all net liabilities … under all Hedge Agreements," which is in turn defined as "all agreements or arrangements designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices." *See Supplemental Declaration at Ex. C.*

32.     Recognizing the impact of the asserted HRCO default by the Debtor and the resulting $393 million claim, the parties to the Credit Agreement negotiated and, on April 28, 2021, executed Amendment No. 3 to the Credit Agreement. *See Supplemental Declaration at Ex. D.* To the benefit of all of the Debtor's creditor constituencies that amendment provided for a limited and conditional waiver of defaults "solely as a direct result of an Ector Default or a termination of the Ector HRCO [or] solely as a result of the inclusion of a … 'going concern' [qualification] with respect to Ector … in the Borrower's annual audited financial statements … solely on account of the February 2021 Liability." *See, Id.*

33.     That waiver was limited. It did not waive any default arising from the commencement of a bankruptcy case (a default under Section 10.01(i) of the Credit Agreement), the entry of an

adverse judgment of more than $5 million  (a default under Section 10.01(f) of the Credit Agreement) or the attachment of assets or imposition of liens (a breach of a negative covenant set forth in Section 9.02 of the Credit Agreement if in an amount in excess of $1 million and, therefore, a default under Section 10.01(d) of the Credit Agreement). *See Supplemental Declaration at Ex. D.*

34.      The waiver was also forfeitable.  In the event that the Debtor spends more than $3 million and amounts on deposit in the Ector Revenue Account to "pay any amount in respect the February 2021 Liability," it will have breached the waiver provisions.  The waiver also constrained the Debtor's use of liquidity, prohibiting the Debtor from using "Ector Loan Proceeds" to or for the benefit of Direct Energy until such time as Direct Energy has released its claims against the Debtor relating to the "February 2021 Liability."   *See Supplemental Declaration at Ex. D.*

35.      The Debtor again afforded the Prepetition Secured Lenders a basis to seek to exercise remedies under the Credit Agreement when it filed this Chapter 11 Case.  Section 10.01(i)(iv) of the Credit Agreement provides that it is an event of default for any Obligor to "permit of suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case of proceeding under any bankruptcy of insolvency law …." *See Supplemental Declaration at Ex. C.*

36.      In anticipation of that default and the impact it would have on parties-in-interest, the Debtor negotiated, and it and the Prepetition Secured Lenders executed, the Plan Support Agreement under which the Prepetition Secured Lenders agreed to forego their contractual right under the Credit Agreement to insist on receipt of all proceeds of the sale of their collateral until they receive the full $340 million balance of their term loan claim and instead to limit their recovery to $75 million.  The parties also executed *Amendment No. 4 to the Amended and Restated Credit and Guaranty Agreement and Consent and Waiver to the Amended and Restated Credit and Guaranty Agreement and the Depositary Agreement* ("Amendment 4"). Amendment 4 provided for advance waivers of the defaults that would arise under the Credit Agreement upon the filing of a chapter 11 case, anticipated that

Direct Energy might draw upon the still-outstanding letter of credit, and further anticipated the section 363 sale that is the focal point of this Chapter 11 Case, including making clear that the consent to the sale did not alter the already existing obligations under Section 9.06 of the Credit Agreement that the Obligor that receives the Ector Disposition Proceeds must deliver those proceeds to the Prepetition Secured Lenders. It also included adjustments to section 3.02(b)(vii) to reflect the terms of the contemplated transactions. *See First-Day Declaration, Exhibit A (and Exhibit C thereto).*

37.    The cause for the Prepetition Secured Lenders' exercise of remedies that has not been waived admittedly has not yet occurred, but that Direct Energy has stated is near certain were it not for the automatic stay and, in any event, is too consequential for the Debtor to chance.  Section 10.01(f) provides that the entry of one or more final and non-appealable judgment or judgments for payment of money in excess of $5,000,000 (exclusive of judgment amounts covered by insurance) … rendered against any Obligor" is an event of default.  The approximately $400 million judgment sought by Direct Energy is itself $395 million above that threshold.  That same judgment sought by Direct Energy is also approximately $395 million above the cash balance held by the Debtor upon the commencement of this Chapter 11 Case.  Depending on the sufficiency of the Debtor's insurance coverage, the pending Texas personal injury and property damage litigations could present as many as 113 additional potential Credit Agreement Default-causing judgments that will also tax the limited cash assets of the Debtor.

**D.    <u>Historical and Projected Financial Performance</u>**

38.    The Debtor's audited financial statements for the twelve months ending December 31, 2020 reported operating revenues of $71.0 million, and EBITDA of $54.3 million.  Those numbers include approximately $40 million in "hedge revenue mark to market," which, even if excluded, would yield revenues of approximately $31 million and EBITDA of approximately $14 million.  The Debtor's cash position as of year-end 2020 was $11.7 million.  *See First-Day Declaration at Par.  42.*

39.     The Debtor's unaudited financial statements for the twelve months ending December 31, 2021 indicate normalized operating revenues of $22,974,152 and normalized operating expenses of $24,308,322 inclusive of $3,308,912 of depreciation expense, for EBITDA of $1,974,742. Excluding $7 million of restricted cash collateralizing an outstanding letter of credit posted for the benefit of Direct Energy, the Debtor's ending cash position as of December 31, 2021 was approximately $8.9 million. *See First-Day Declaration at Par. 41.*

40.     The Debtor's unaudited financial statements for the two months ending February 28, 2022 reported operating revenues of $0.7 million, and EBITDA loss of $(1.9 million).  The Debtor's cash position as of February 28, 2022 was approximately $7.1 million, again excluding the $7 million cash posted to collateralize the Direct Energy LC. *See First-Day Declaration at Par. 43.*

41.     On a cash basis, as of March 31, 2022, the Debtor collected gross receipts of approximately $2.1 million during the low shoulder months of January through March. Projected cash flow for April through July 31, 2022 shows cash revenue of approximately $6.6 million. Operating cash flow is projected for April to July to be approximately $0.1 million.  *See First-Day Declaration at Par. 44.*

42.     The Debtor's April 1, 2022 cash balance was $5.42 million. *See First-Day Declaration at Par.  44.* This balance excludes $7.4 million held in a collateral account to secure the Prepetition Secured Lenders' potential exposure under letters of credit posted for the benefit of Direct Energy and OneOK.  Its Petition Date cash balance had already decreased to $3.6 million.  *See, Schedule A/B, D.E. 46.*

43.     The Debtor projects decreasing available cash due to non-recurring expenses during the Chapter 11 Case, resulting in ending cash balance of approximately $0.723 million as of July 31, 2022. This ending cash position includes anticipated draws of $5.0 million under a proposed debtor-

in-possession financing facility for which approval has been sought. *See, Budget (as filed with Cash Collateral Motion).*

## ARGUMENT

I.    **THE CASH COLLATERAL MOTION SHOULD BE GRANTED AND THE PROPOSED FINAL ORDER ENTERED AS PROFFERED.**

44.    Direct Energy, through its Objection, appears to posit the extraordinary view that a chapter 11 debtor in its second consecutive year of cash losses resulting in consistently diminishing cash balances that projects reducing a $3.6 million Petition Date cash balance to $723,000 even after receiving $5 million in DIP Financing in order to get to a point where it can deliver no more than 22% of the Prepetition Secured Lenders' $340 million term debt and 60% of the cash actually received by the Debtor under the facility refinanced under the Original Credit Agreement need not provide adequate protection to those lenders.   It seems to premise that position on the view that "the prepetition debt is well-covered by [non-debtor co-obligor] Invenergy's assets and its 'portfolio of energy generation and storage companies ...." *Objection*, ¶ 23.  In apparent recognition of the lack of both evidentiary and legal support for its conclusory statements, Direct Energy goes on to find fault with a series of adequate protection provisions that each have broad precedential support.  Both Direct Energy's "swing for the fences" argument and its term-specific objections are without merit.

A.    **A Consensual Deal on the Use of Cash Collateral Should Be Approved if it Reflects the Sound Exercise of the Debtor's Business Judgment.**

45.    Section 363(c)(2) is clear that "the trustee may not use, sell, or lease cash collateral [] unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Where a debtor opts to obtain the consent of its prepetition secured creditors for the use of cash collateral, a court should uphold the overall agreement if it reflects the exercise of the debtor's sound business judgment.  *See, e.g., Aurelius Capital Master, Ltd. v. Tousa Inc.*, Nos.

08–61317–CIV, 08–61335–CIV, 2009 WL 6453077, at *16 (S.D. Fla. Feb. 6, 2009) ("[T]here is significant case law to support the use of the business judgment standard in approving a consensual Cash Collateral Order.") (collecting cases).  There is no basis upon which fundamental provisions of an integrated agreement on the consensual use of cash collateral can be altered without undermining the basis upon which prepetition secured creditor consent was obtained.  *See id*. at *9 ("Even though Appellants now limit their request to relief to the excision of specific, discrete, provisions of the Cash Collateral Order, permitting such relief would unravel the Cash Collateral Order, which was reached by consensus based on the inclusion of all of its components.").

46.    Direct Energy does not call into question the Debtor's business judgment in agreeing to the proposed order granting the relief requested in the Cash Collateral Motion on a final basis (the "Proposed Final Order") [Docket No. 120].  Rather, it attempts to invoke a heightened scrutiny that is only applicable to insider transactions. *Objection*, ¶ 4. However, Direct Energy does not even allege that the Prepetition Secured Lenders are insiders, or that the Proposed Final Order was negotiated with the alleged insider, the Debtor's parent Invenergy. As a factual matter, the Proposed Final Order was negotiated between the Debtor and Prepetition Secured Lenders at arm's-length. The relief that Direct Energy advocates for is striking critical protections for the Prepetition Secured Lenders from the Proposed Final Order while continuing to hold the Prepetition Secured Lenders to their commitment to consent to the use of their Cash Collateral.  Direct Energy does not offer and will not find a legal basis for the requested relief.  Each of the contested provisions is customary, fair, and reasonable in the context of the negotiated deal.

**B.     The Adequate Protection Provisions of the Proposed Cash Collateral Order are Appropriate.**

47.    Direct Energy appears to purport to have information that the Debtor does not in asserting that the Prepetition Secured Lenders are not entitled to the adequate protection for which approval is sought.  It indicates without equivocation that the sum of the $340 million Term Loan and

the $64 million Revolving Loan "is well-covered by Invenergy's assets and its 'portfolio of energy generation and storage companies.'"

48.    Direct Energy's reference to the value of all assets of all Obligors under the Credit Agreement as evidenced by the trading price of the Prepetition Secured Lenders' debt is flawed on at least two levels. First, when undertaking an adequate protection analysis as it relates to protecting a secured party against diminution arising from a debtor's use of cash collateral, the availability and value of non-debtor property is wholly irrelevant.  Second, when asserting the existence of an equity cushion as the basis for affording a secured party adequate protection, the standard to be applied is the going concern value of the collateral provided by the debtor, not the trading price of debt owed by multiple obligors.

49.    The Supreme Court has explained that valuation in the adequate protection context is the same as valuation for purposes of establishing the amount of a secured claim under section 506(a) of the Bankruptcy Code.  *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 372 (1988).  Section 506(a), in turn, calls for a valuation of "the extent of the value of such creditor's interest **in the estate's interest** in such property," (emphasis added) which "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property …."  11 U.S.C. § 506(a)(1).

50.    Adherence to the Supreme Court's directive to apply a section 506(a) analysis to determine a secured lender's adequate protection rights precludes the reference to the collateral posted by the Debtor's co-obligors for each of their joint and several liability obligations.  The statutory text of section 506(a) underlying the valuation analysis that the *Timbers* decision directs be applied to adequate protection analyses is clear that the relevant valuation relates to the creditor's interest **in the**

**estate's interest in property**.  11 U.S.C. § 506(a) (emphasis added).  There is no ambiguity that might suggest also looking to property in which the estate does not hold an interest.

51.     Decisional law does not support an alternative construct. The limited circumstances in which non-debtor collateral might appropriately work its way into a valuation analysis is when the statutory text refers to the value of a moving creditor's property, not in situations where the Debtor's or the estate's property is the subject of the valuation.  For example, section 362(d)(1) requires that a court to determine a "lack of adequate protection of an interest in property of … [a] party in interest" seeking relief from stay.  As to adequate protection in connection with use of cash collateral, however, the statutory analysis turns on maintaining the value of an interest in property of the debtor.  *See* 11 U.S.C. § 363(e) (an entity that has an interest in property proposed to be used by the debtor is entitled to "adequate protection of such interest"); *see also* 11 U.S.C.  § 506(a) (secured claim determined by valuing "such creditors' interest in the estate's interest in such property").

52.     In the former situation, where the value of the creditor's property is at issue, reference to non-debtor pledged collateral may be appropriate.  In the latter, where the estate's interest in property, or where the property that the debtor seeks to use, are the focus, no reference to non-debtor property is appropriate. *See, e.g., The Prudential Ins. Co. of N. Am. v. SW Boston Hotel Venture LLC (In re SW Boston Hotel Venture LLC)*, 748 F.3d 393, 410 (1st Cir. 2018) (value of non-debtor property may not be considered in determining lack of equity in connection with determining whether under section 362(d)(2) there is equity in property of the debtor, but may be considered in determining whether there is adequate protection of an interest in property of the moving party in interest under section 362(d)(1)).

53.     When determining the value of the creditors' interest in the estate's interest in property, the standard to be applied is not the trading price of the debt, but the going concern value of the collateral posted by the debtor. *See, e.g., Official Committee of Unsecured Creditors v. U.M.B.*

*Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013).  *See also*

Douglas B. Baird, *The Rights of Secured Creditors After ResCap*, 2015 U. ILL. LAW REV. 849, 854

("The better view of current law is that a 'going concern valuation' [is] necessary for adequate

protection purposes ….").  The United States Court of Appeals for the Third Circuit has squarely held

that, where a debtor intends to retain property, determining "the fair market value of the property" is

the proper valuation methodology.  *In re Heritage Highgate, Inc.*, 679 F.3d 132, 143 (3d Cir. 2012).

The standard is similar when a sale occurs, where "going concern valuation" of the debtor's interest

in assets is valued.  *Polk Lending 33, LLC v. THL Corporate Finance, Inc., (In re Aerogroup*

*International, Inc.)*, 601 B.R. 571, 593 (Bankr. D. Del. 2019).

54.     Because the trading price of debt can be influenced by any number of factors largely

divorced from the statutorily required valuation of a secured party's collateral, it does not represent a

proxy for the required going concern valuation when determining the adequate protection rights of

the Prepetition Secured Lenders.  Although if it were a proxy, Direct Energy's internally conflicting

statements that the Prepetition Secured Lenders debt "is not trading at any discount to par," *Objection*,

¶ 23, that is immediately footnoted to a statement that the debt was reported by Bloomberg "to be

trading without any **meaningful** discount--i.e. 98.25." *Id.* n. 15 (emphasis added) might suggest a

market perception of less than full collateral coverage.

55.     The available documentary evidence makes clear that the Debtor is jointly and

severally liable for $340 million in term debt and $64 million in revolving debt and that, after a robust

prepetition marketing effort conducted by a highly regarded investment banking firm, the value of

the creditors' interest in the estate's interest in its property is approximately $91.25 million, or $250

million less than the Term Loan for which the Debtor is jointly and severally liable.  Applying the

Supreme Court required analysis, there is no basis for the Debtor to rely on an equity cushion as adequate protection for the projected cash collateral diminution.

56.     Finally, there is simply no rational basis to undertake the cost and the risk of existential litigation with the Prepetition Secured Lenders that Direct Energy suggests, especially when, at the end of a long and expensive valuation contest, the Bankruptcy Code and the bulk of available decisional law simply do not allow for consideration of non-debtor assets in connection with analyzing adequate protection of rights in debtor-owned property.  No, the better, more fiduciarily prudent course is to recognize that the adequate protection provisions for which approval is sought are squarely in line with the provisions contained in a long line of cases in this District.

**C.     The Challenge Period is in Compliance with the Local Rules Mandate and There is No Committee or Other Estate Functionary Entitled to Receive the Investigation Budget.**

57.     Rule 4001-2(Q) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") envisions an investigation period of seventy-five (75) days from the entry of the initial interim order.  The form of order complies with that Local Rule directive.

58.     Direct Energy filed a preliminary objection before the first-day hearing and has gotten a solid start on the investigation, having served on the Debtor a request for production of documents and three notices of deposition.  It has also served deposition subpoenas on the agent bank and on one or more of the Debtor's affiliates.  With such a fast start, it seems unlikely that it will need an extension of the challenge period, but that issue can be dealt with should it arise.

59.     There is also no need currently to discuss the amount of the investigation budget. Section 330 of the Bankruptcy Code limits the parties entitled to receive compensation from the Debtor to a trustee, consumer privacy ombudsman, examiner, patient care ombudsman or a professional person employed under section 327 or 1103. There has been no retention of any professional other than the Debtor's professionals regarding whom retention authority is sought through motions currently pending before this Court.  It is also at best premature to discuss whether

any of the actions taken by Direct Energy may be viewed as serving any interests other than its own

if its current reference to an investigation budget is a precursor to a potential substantial contribution

claim. *See Lebron v. Mecham Fin. Inc.*, 27 F.3d 937 (3d Cir. 1994). As such, Direct Energy's

objections in this respect should be overruled.

**D.      The Liens Granted to the Prepetition Secured Lenders on Avoidance Action Proceeds are Limited, Neutral to the Estate, and Consistent with Customary Practice in this District.**

60.      Contrary to Direct Energy's Objection and strained reading of the Bankruptcy Code,

granting Adequate Protection Liens on the proceeds of Avoidance Actions is permissible under the

Bankruptcy Code, appropriate under the circumstances, and regularly approved by courts in this

District in similar cases.

61.      Direct Energy argues that the Adequate Protection Liens, which extend to the proceeds

of any Avoidance Action, are inappropriate because "avoidance actions are intended to benefit

*unsecured* creditors . . . ." *Objection*, ¶ 33. However, the Bankruptcy Code suggests otherwise. *See,*

*e.g.*, 11 U.S.C. § 550(a) (permitting recoveries on avoidance actions "for the benefit of the estate,"

not exclusively for the benefit of unsecured creditors); *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d

290, 293 (7th Cir. 2003) ("Lest this way of resolving the issue be taken to assume that § 550(a)

requires that some benefit flow to unsecured creditors, we add that the statute does not say this.

Section 550(a) speaks of benefit to *the estate*--which in bankruptcy parlance denotes the set of all

potentially interested parties-- rather than to any particular class of creditors.") (emphasis in original);

*see also In re Calpine Corp.*, 377 B.R. 808, 813 (Bankr. S.D.N.Y. 2007) (citing *Mellon Bank* with

approval).

62.      The proceeds of avoidance actions are the property of a debtor's estate pursuant to

Bankruptcy Code section 541(a)(3), and as such, like all other estate property, may be pledged to

secure the claims of secured creditors, including adequate protection claims. *See* 11 U.S.C.

§ 541(a)(3). The Debtor has entered this case with projections indicating that it will decrease its Petition Date cash balance of $3.6 million to $723,000 as of July 31, 2022 if its cash is supplemented with the proceeds of a $5 million DIP facility that will partially prime the Prepetition Secured Lenders' interest in the Debtor's cash collateral. Sections 363(c)(2) and 363(e) of the Bankruptcy Code are clear that secured claimants with an interest in cash collateral are entitled to adequate protection against that very form of projected diminution. Section 361 is equally clear that the grant of a replacement lien is an appropriate means of providing that required adequate protection. *See* 11 U.S.C. §§ 361, 362, 363.

63.     The Prepetition Secured Lenders already have a lien on all of the Debtor's assets. The robust prepetition marketing process outlined above has revealed that those assets are worth approximately $250 million less than the $340 million Term Loan claim that the Prepetition Secured Lenders, were it not for the Plan Support Agreement's terms, would have an entitlement to assert here. The Debtor is projecting that it will diminish the Prepetition Secured Lenders' interests in cash collateral and it has no other asset on which to grant the section 361(2) replacement lien that is not already encumbered to secured the Prepetition Secured Lenders' claims.

64.     The Adequate Protection Lien on the Avoidance Action proceeds is, in accordance with section 361(2), only being granted to the extent of diminution. It is not a rollup of the full prepetition $340 million claim of the Prepetition Secured Lenders. That same diminution in value is the subject of a super-priority administrative claim granted to the Prepetition Secured Lenders under the Cash Collateral Order in terms that do no more than memorialize those lenders' statutory entitlement under section 507(b). The Adequate Protection Lien on the Avoidance Action proceeds, therefore, is neutral to the estate as it represents an interest in the same money and in the same amount as the Prepetition Secured Lenders would receive in payment toward their super-priority administrative expense claim.

65.     Finally, Direct Energy's assertion that "courts generally exclude avoidance actions and their proceeds from lenders' adequate protection packages," *Objection*, ¶ 33, is plainly incorrect, as courts in this District in fact frequently approve the inclusion of liens on proceeds of avoidance actions as part of an adequate protection package. *See, e.g., In re TECT Aerospace Group Holdings, Inc.*, No. 21-10670 (KBO) (Bankr. D. Del. May 13, 2021) [Docket No. 174]; *In re Marsh Supermarkets Holding, LLC*, No. 17-11066 (BLS) (Bankr. D. Del. July 19, 2017) [Docket No. 429]; *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 1, 2015) [Docket No. 307]; *In re Noble Logistics, Inc.*, No. 14-10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [Docket No. 117]; *In re Coda Holdings, Inc.*, No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [Docket No. 187]; *In re EWGS Intermediary, LLC*, No. 13-12876 (MFW) (Bankr. D. Del. Apr. 29, 2014) [Docket No. 371]; *In re Caribe Media, Inc.*, No. 11-11387 (KG) (Bankr. D. Del. May 24, 2011) [Docket No. 78].

66.     In light of the reasonable and customary nature of the Adequate Protection Liens, the Court should enter the Final Cash Collateral Order.

**E.      Direct Energy's Objections to Specific Provisions of the Cash Collateral Motion are Without Merit.**

      (i)     <u>Direct Energy's Objection to the Proposed Marshaling Waiver Has No Sound Basis in Law.</u>

67.     The doctrine of marshaling only applies in contexts where a single debtor controls multiple collateral funds, and a senior secured creditor can access both a common fund and a separate fund available to only the senior secured creditor, thereby permitting the senior secured creditor to deplete the common fund at other creditors' expense.  Here, the Debtor does not control multiple collateral funds--all of its assets are subject to first priority liens held by the Prepetition Secured Lenders.

68.     "The doctrine of marshaling applies where there is a common debtor of senior and junior creditors and the senior creditor alone has the right to resort to both a common fund and a

separate fund." *In re Tampa Chain Co., Inc.*, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985).  *See also In re Advanced Mktg. Servs., Inc.*, 360 B.R. 421, 427 (Bankr. D. Del. 2007) ("Marshaling of assets applies when a senior secured creditor can collect on its debt against more than one property or fund held by the debtor but a junior secured creditor can only proceed against one of those sources.").

69.    Although Direct Energy does not address the contours of the alleged marshaling claims in the Objection, to the extent Direct Energy envisions that two (or more) funds owned separately by the Debtor and any of its affiliates may be treated as "a common fund and a separate fund," the marshaling claim is without merit.   The requirement of multiple funds belonging to the same debtor "is not met where the two funds sought to be marshaled are held separately, such as by the corporation and its shareholder." *In re Am.'s Hobby Ctr.*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998).  This is so even if the shareholder guaranteed the debt. *In re Tampa Chain Co., Inc.*, 53 B.R. 772, 778 (Bankr. S.D.N.Y. 1985).  Accordingly, any marshaling argument concerning funds held separately by the Debtor and its affiliates fails.

70.    In any event, marshaling waivers are common features of DIP financing facilities and in cash collateral orders. *See, e.g.*, *In re MPM Silicones, LLC*, No. 14-22503 (RDD), H'rg Tr. at *92–93 (Bankr. S.D.N.Y. 2014) (approving a no-marshaling provision in a cash collateral order and holding that, "[g]enerally speaking, this is the debtor's right to negotiate or ***secured*** creditors' rights to insist on.") (emphasis added).  And courts in this district regularly approve marshaling waivers on a final basis in the DIP financing and cash collateral contexts. *See, e.g.*, *In re TECT Aerospace Group Holdings, Inc.*, No. 21-10670 (KBO) (Bankr. D. Del. May 13, 2021) [Docket No. 174]; *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. April 30, 2015) [Docket No. 307]; *In re Gridway Energy Holdings*, No. 14-10833 (CSS) (Bankr. D. Del. May 14, 2014) [Docket No. 197]; *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Oct. 11, 2013) [Docket No. 377]; *In re Monitor Co. Group LP*, No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012) [Docket No. 186].

71.    Accordingly, in light of the reasonable and customary nature of the no-marshalling provision, the Court should enter the Final Cash Collateral Order.

(ii)    The 506(c) Waiver is Reasonable and Customary and Should Be Approved.

72.    The Prepetition Secured Lenders have agreed to subordinate a portion of their liens and claims to approximately $20 million in carve-outs. Specifically, under the Plan Support Agreement envisioned chapter 11 plan, the Prepetition Secured Lenders retain only a $55 million senior distribution right, after which the allowed claims of all estate professionals, the fees and expenses required to be paid to the United States Trustee and to the Court, a $5 million DIP Loan, an up to $5 million wind-down expense allocation, and an additional $5 million minimum payment to unsecured creditors are paid before the Prepetition Secured Lenders receive the next $20 million. After that payment to the Prepetition Secured Lenders, all of the balance of any sale proceeds is to be retained by the estate for distribution. Twenty million dollars from a $91 million sale plus 100% of the upside from a competitive auction represents more than a substantial carve-out (the "Carve-Out"). The Carve-Out ensures that the Chapter 11 Case is sufficiently funded, and that unsecured creditors will receive no less than a $5 million distribution.  It also prevents the Prepetition Secured Lenders from obtaining a financial windfall at the expense of the Debtor's estate and holders of general unsecured claims.

73.    Debtors alone have the authority to waive their rights under section 506(c) of the Bankruptcy Code. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000); 11 U.S.C. § 506(c) ("the ***trustee*** may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property, to the extent of any benefit to the holder of such claim.") (emphasis added).  The Supreme Court in *Hartford Underwriters* expressly held "[t]he question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision [section 506(c)].  We have little difficulty

27

answering yes." *Hartford Underwriters*, 530 U.S. at 6; *see also In re Smart World Techs., LLC*, 423 F.3d 166, 181-82 (2d Cir. 2005) ("Section 506(c) . . . allows only the 'trustee,' or debtor-in-possession, to take advantage of this exception . . . .  We read *Hartford Underwriters* to stand for the proposition that § 1109(b) does not entitle parties in interest, such as . . . creditors, to usurp the debtor-in-possession's role as legal representative of the estate.").  *Hartford Underwriters* and its progeny support the Debtor's view that the 506(c) waiver is an appropriate exercise of the Debtor's business judgment, especially given the substantial benefits the Debtor will receive under the Final Cash Collateral Order, together with the protections guaranteed by the Carve-Out to the Debtor's general unsecured creditors and other stakeholders.

74.     A waiver of rights under section 506(c) is particularly appropriate where, as here, a secured lender has agreed to subordinate its liens and claims to a "carve-out."  Courts in this District routinely approve section 506(c) waivers, particularly when coupled with a professional fee carve-out.  *See, e.g.*, *In re Marsh Supermarkets Holding, LLC*, No. 17-11066 (BLS) (Bankr. D. Del. July 19, 2017) [Docket No. 429]; *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 1, 2015) [Docket No. 307]; *In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del. July 22, 2014) [Docket No. 162]; *In re Tuscany Int'l Holdings (U.S.A.) Ltd.*, No. 14-10193 (KG) (Bankr. D. Del. Mar. 21, 2014) [Docket No. 219]; *In re EWGS Intermediary, LLC*, No. 13-12876 (MFW) (Bankr. D. Del. Apr. 29, 2014) [Docket Nos. 89, 371]; *In re Pallet Co. LLC*, No. 13-11459 (KG) (Bankr. D. Del. July 1, 2013) [Docket No. 225]; *In re Conexant Sys., Inc.*, No. 13-10367 (MFW) (Bankr. D. Del. Apr. 19, 2013) [Docket No. 203]; *In re Vertis Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 27, 2012) [Docket No. 203]; *In re Dallas Stars L.P.*, No. 11-12935 (PJW) (Bankr. D. Del. Oct. 17, 2011) [Docket No. 121]; *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Oct. 5, 2011) [Docket No. 310]; *In re The Penn Traffic Co.*, No. 09-14078 (PJW) (Bankr. D. Del. Jan. 25, 2010) [Docket No. 460].

75.     Direct Energy's argument that "[t]he [Prepetition] Secured Lenders should pay for the benefits they are receiving" misses the mark for two reasons.  *Objection*, ¶ 38.  First, there is no statutory requirement, doctrine, or other applicable authority requiring a lender to pay for a 506(c) waiver.  The propriety of a 506(c) waiver turns on whether the Debtor, in its business judgment, determines that such a waiver will yield benefits for the Debtor, its estate, and its stakeholders. Second, to the extent the Prepetition Secured Lenders' "payment" is relevant, the Debtor submits that the eight-figure Carve-Out is sufficient "pay[ment] for the benefits they are receiving." *Id.*

76.     Accordingly, in light of the reasonable and customary nature of the 506(c) waiver, and in light of the substantial Carve-Out agreed to by the Prepetition Secured Lenders, the Court should enter the Final Cash Collateral Order.

(iii)     The 552(b) Waiver is Reasonable and Customary and Should Be Approved.

77.     Direct Energy first challenged the provisions of the proposed form of cash collateral order by insisting that the 552(b) waiver is inappropriate because "section 552(b) permits '*the court*' to deny a lien on post-petition 'proceeds, products, offspring, or profits' of prepetition collateral based on the 'equities of the case.'" *Objection*, ¶ 39 (quoting 11 U.S.C. § 552(b)) (emphasis in original). That the Debtor is before the Court now requesting that ***the Court*** approve the 552(b) waiver eviscerates Direct Energy's argument.  To the extent the Debtor has "agreed" to the 552(b) waiver, the Debtor has done so pending this Court's approval, as evidenced by the Cash Collateral Motion, the Interim Cash Collateral Orders, and this Reply.

78.     Second, Direct Energy argues that "it would be inherently impossible for the Court to make . . . a [552(b) waiver] determination at this very early stage of the case." *Objection*, ¶ 41 (citing two out-of-district opinions without analysis).  But there is nothing unusual about granting a 552(b) waiver at this stage of a case. *See, e.g.*, *In re TECT Aerospace Group Holdings, Inc.*, No. 21-10670 (KBO) (Bankr. D. Del. May 13, 2021) [Docket No. 174] (granting a 552(b) waiver thirty-eight (38)

days after the petition date); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. Apr. 30, 2015) [Docket No. 307] (granting a 552(b) waiver forty-five (45) days after the petition date); *In re Noble Logistics, Inc.*, No. 14-10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [Docket No. 117] (granting a 552(b) waiver thirty-three (33) days after the petition date); *In re Coda Holdings, Inc.,* No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [Docket No. 187] (granting a 552(b) waiver twenty-eight (28) days after the petition date); *In re Evergreen Solar, Inc.*, No. 11-12590 (MFW) (Bankr. D. Del. Sept 8, 2011) [Docket No. 171] (granting a 552(b) waiver twenty-five (25) days after the petition date).  Granting the 552(b) waiver at this juncture falls squarely within the timeframe similar waivers were granted in the foregoing cases, among others.

79.    Bankruptcy Code section 552 provides that "prepetition security interests extend to post-petition 'proceeds, product, offspring, or profits' of prepetition collateral, 'to the extent provided by such security agreement and by applicable non-bankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.'"  *In re Tower Air, Inc.,* 397 F.3d 191, 205 (3d Cir. 2005) (citing 11 U.S.C. § 552(b)(1)).  The purpose of the "equities of the case" exception is "to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the [Debtor]'s use of other assets of the estate."  *In re Bennett Funding Grp., Inc.*, 255 B.R. 616, 634 (N.D.N.Y. 2000); *see also In re Tower Air, Inc.*, 397 F.3d 191, 205 (3d Cir. 2005) ("[T]he normal application of the equity exception is in chapter 11 cases, to prevent an oversecured lender from receiving a windfall by taking assets that would otherwise go to rehabilitating the debtor.") (quotations omitted); *In re J. Catton Farms, Inc.*, 779 F.2d 1242, 1246 (7th Cir. 1985) ("The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral.") (citations omitted).

80.     Here, the Prepetition Secured Lenders hold $340 million in term debt, of which over $117 million originates from debt funding advanced directly for the benefit of the Debtor, secured by properly perfected first priority liens on property that a fulsome marketing process conducted by a highly regarded investment banking firm provided substantial market based evidence have a value of $91 million. There is little basis to assert any argument that the Prepetition Secured Lenders are oversecured.

81.     Finally, in cases where secured parties have agreed to subordinate their claims to a carve-out, as the Prepetition Secured Lenders have done here, courts in this District routinely have approved waivers of the "equities of the case" exception as part of consensual adequate protection packages. *See, e.g.*, *In re EWGS Intermediary, LLC*, No. 13- 12876 (MFW) (Bankr. D. Del. Apr. 29, 2014) [Docket Nos. 89, 371]; *In re Noble Logistics, Inc.*, No. 14- 10442 (CSS) (Bankr. D. Del. Apr. 2, 2014) [Docket No. 117]; *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. July 19, 2013) [Docket No. 253]; *In re Coda Holdings, Inc.*, No. 13-11153 (CSS) (Bankr. D. Del. May 29, 2013) [Docket No. 187]; *In re SP Newsprint Holdings LLC*, No. 11-13649 (CSS) (Bankr. D. Del. Jan. 25, 2012) [Docket No. 388]; *In re Evergreen Solar, Inc.*, No. 11-12590 (MFW) (Bankr. D. Del. Sept 8, 2011) [Docket No. 171]; *In re Urban Brands, Inc.*, No. 10-13005 (KJC) (Bankr. D. Del. Oct. 13, 2010) [Docket No. 188]; *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. Nov. 12, 2009) [Docket No. 1311].

82.     Accordingly, the 552(b) waiver is a reasonable component of the relief the Debtor seeks in the Cash Collateral Motion.  Moreover, the Debtor submits that the waiver is a necessary component of obtaining the Prepetition Secured Lenders' agreement to subordinate their claims to the Carve-Out, and Direct Energy's objection to such waiver should therefore be overruled.

(iv)    The "Draconian Consequences" of a Termination Event Do Not Occur Unless the Debtor is Unsuccessful in Convincing the Court That They Should Not.

83.    The proposed Final Cash Collateral Order and the Plan Support Agreement[10] do indeed provide that, if the Debtor defaults under, or is unable to deliver, certain critical components of the negotiated resolution that led to the Debtor's ability to sell its assets in the current favorable market and do something with the proceeds other than deliver them all to the Prepetition Secured Lenders, the Prepetition Secured Lenders may opt not to proceed with their end of the negotiated resolution. That standard concept that almost uniformly appears as an element of adequate protection should come as no surprise. If the elements of adequate protection that the Prepetition Secured Lenders have agreed upon as a condition to their consent to use of cash collateral are not provided, the underlying consent falls away.

84.    The ability to exercise remedies--characterized by Direct Energy as "draconian consequences"--does not automatically and immediately arise. Rather, they arise "[o]n the date that is five (5) business days following the Debtor's receipt of [a] Termination Event Notice." During that five business day period "the Debtor may request that [the] Court order the continued use of Cash Collateral." Further, "the Debtor may continue to use Cash Collateral in the ordinary course of business, consistent with past practices and the most recently delivered budget …."

85.    The highly negotiated five business day period for the Debtor, presumably with the assistance of Direct Energy, to obtain continued access to cash collateral in order to complete the underway sale process affords all parties in interest protection against the precipitous exercise of remedies that Direct Energy has indicated concern about.

---

[10] Contrary to Direct Energy's assertion, the Plan Support Agreement is indeed "before the court" and has been since the Petition Date when it was attached as an exhibit to the First Day Declaration.

86.     Accordingly, each of Direct Energy's objections to the Cash Collateral Motion is without merit, and the Debtor respectfully submits that the Final Cash Collateral Order should be entered as requested in the Cash Collateral Motion.

## II.    THE PROVISIONS OF THE SHARED SERVICES AGREEMENT ARE APPROPRIATE AND NECESSARY UNDER THE CIRCUMSTANCES AND SHOULD BE APPROVED.

87.     Direct Energy takes the Debtor to task both for filing the Shared Services Motion which it views as unnecessary given the obligation of non-debtor counterparties to abide by the terms of executory contracts during the pre-assumption "limbo" period, *see N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("*Bildisco*"), and for disclosing and seeking authority in that motion to abide by the contractual terms that would require the Debtor to reimburse those counterparties for less than $85,000 in employee retention and severance payments that the affiliate-counterparty has committed to make to its employees post-petition, but that Direct Energy posits are noncompliant with section 503(c)'s limitations.

88.     As set forth in the Shared Services Motion, the Debtor's Power Plant is staffed by employees of its affiliate Invenergy Services Thermal US LLC ("Thermal").  Under the terms of its agreement with Thermal, the Debtor is responsible for reimbursing Thermal for the payroll and other compensation expenses incurred by Thermal in connection with operations at the Debtor's Power Plant. Among the obligations that the Debtor expects that Thermal will bill it for and for which it will likely assert an administrative claim are post-petition payments that Thermal will make to its employees that operate the Debtor's Power Plant in the form of retention benefits.

89.     Direct Energy's assertion that the counterparty's obligation to perform under a pre-assumption executory contract is only half of the analysis. The other half is a determination of the Debtor's responsibilities if the contract counterparty does in fact perform.

90.     "As a corollary to its holding that an executory contract is unenforceable against the estate prior to assumption, the United States Supreme Court opined in *Bildisco* that even if the debtor-in-possession postpones the assumption/rejection decision but continues to receive the benefits under the executory contract, 'the debtor-in-possession is obligated to pay for the reasonable value of those services, … which, depending on the circumstances of a particular contract, may be what is specified in the contract ….'" *In re National Steel Corp.*, 316 B.R. 287, 305 (Bankr. N.D. Ill. 2004) (quoting *Bildisco*, 465 U.S. at 531).

91.     The Debtor's primary motivations for filing the Shared Services Motion are both to provide transparency as to the post-petition contractual obligations asserted by the Debtor's affiliate, and to avoid later criticism should the Debtor's view of the propriety of the payment differ from that of other parties-in-interest or of the Court.  The Debtor's view is that its adherence to the financial performance obligations of the Shared Services Agreement is both warranted and appropriate.

92.     The proposed payments under the Shared Services Agreements are actual, necessary, and beneficial to the Debtor.  *See* 11 U.S.C. §503(b)(1). Although Thermal itself may have an obligation of post-petition/pre-assumption performance, *its employees do not*.  Thermal's ability to retain valued and experienced employees to operate the Debtor's Power Plant is critical to the Debtor's continued operations.

93.     Equally as important, were Thermal put to the task of procuring substitute, and potentially more expensive, labor in order to meet its contractual obligations, those additional costs would pass straight through to the Debtor under the terms of the agreement.

A.     **The KERP Does Not Provide for Payments to "Insiders" and Thus Is Not Governed by Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code.**

94.     As to the section 503(c) analysis requested by Direct Energy, the KERP is not subject to the restrictions in section 503(c)(1) of the Bankruptcy Code because the KERP is not applicable to any "insider" (as that term is defined by section 101(31) of the Bankruptcy Code). Sections 503(c)(1)

and 503(c)(2) of the Bankruptcy Code restrict retention and severance plans that are implemented for the benefit of "insiders." Section 101(31) of the Bankruptcy Code defines "insider" in this context to include, a "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; . . . ([iv]) general partner of the debtor; or ([v]) relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B).

95.     Courts have found that while retention of lower level "discretionary employees" during the pendency of a chapter 11 case may be vital, such employees are not "insiders" in this context where they do not have decision-making authority akin to an executive, could not implement company policies, and do not report to the board of directors. *See, e.g., In re Borders Grp., Inc.*, 453 B.R. 459, 469–70 (Bankr. S.D.N.Y. 2011) (employees in KERP plan were not insiders because none of them had authority to implement company policy, did not report to board of directors, were subordinate to actual officers, and were instead responsible for the day-to-day operations of the debtor).

96.     Indeed, this analysis is in line with the Congressional intent of this provision:

> The legislative history of § 101(31)(B) makes it clear that Congress was concerned with situations where "[a]n insider ... has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms' length with the debtor." *9281 Shore Road Owners Corp.*, 187 B.R. at 853 (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 311–314 (1977)). In the context of enacting the limitations set forth in § 503(c), Congress was responding to an "inherently unseemly" public perception that chapter 11 bonus programs "ha[d] been used to lavishly reward-at the expense of the creditor body-the very executives whose bad decisions or lack of foresight were responsible for the debtor's financial plight."

*In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 149–50 (Bankr. E.D.N.Y. 2012) (internal citation omitted).

97.    As described in the Shared Services Motion, the Debtor agreed to reimburse Thermal for payments only to Thermal employees that operate the Power Plant and are "non-insiders."[11]  As a result, the individuals to be included in the KERP (the "KERP Participants") have limited scopes of authority based on their respective roles, and do not have the power to make company-wide decisions for the Debtor or for his or her employer, non-debtor affiliate, Thermal. As described in the Shared Services Motion, the KERP Participants include eight employees working exclusively or nearly exclusively at the Power Plant, with roles related to the day-to-day operation of the Power Plant, subject to managerial and supervisory authority of non-KERP Participants.

98.    Specifically, the KERP Participants include individuals holding the following roles:

(i)    Operations and Maintenance Manager (the "O&M Manager"), whose job responsibilities include:

   a.  Overseeing and managing the day-to-day operations and maintenance of the Power Plant;

   b.  Managing direct reports from the O&M Technicians (defined below);

   c.  Reporting to Vice President, Thermal Operations;

   d.  Exercising limited purchasing rights (subject to a $25,000 cap on a single purchase order);[12] and

(ii)   Operations and Maintenance Technicians (the "O&M Technicians"): There are six individuals occupying this role with the same title but have different, complementary strengths in Mechanical, Electrical, and Control Systems maintenance as well as shared qualifications as Operators of the Power Plant. The O&M Technicians' job responsibilities include:

   a.  Performing operations, maintenance and technical support to achieve safe, cost effective operation and maintenance of the Power Plant;

---

[11] The Debtor is not requesting authority to reimburse Thermal for any severance payments that may become due to any of the KERP Participants at this time.
[12] For the avoidance of doubt, the O&M Manager does not have the ability or authority to execute agreements on behalf of the Debtor.

    b.   Operating the Power Plant during start-up, shutdown, normal and emergency conditions in accordance with operating procedures and instructions to maintain a safe and efficient operation;

    c.   Maintaining and trouble-shooting mechanical, electrical and or control systems in the Power Plant; and

    d.   Performing/directing housekeeping tasks to maintain a clean safe work environment and professional appearance.

99.    None of the KERP Participants have authority over the decisions or policies of the Debtor, but are rank and file employees of Thermal responsible for the day to day operations of the Power Plant on behalf of the Debtor. *See Supplemental Declaration at Pars. 9-13*. As such, the KERP Participants are not "insiders," and, accordingly, sections 503(c)(1) and 503(c)(2) do not apply to the KERP. *See In re Borders Grp., Inc.*, 453 B.R. at 469–70.

**B.    Even If The KERP Participants Were the Debtor's Employees, the KERP is Justified by the Facts and Circumstances of the Chapter 11 Case and is Therefore Appropriate under Section 503(c)(3) of the Bankruptcy Code.**

100.    Because the KERP Participants are not the Debtor's employees and the payments are solely a reimbursement obligation arising under an unassumed executory contract, the Debtor's business judgment should dictate. That same standard and factors of this case support approval of the amount and payment of the proposed Retention Payments even if under Section 503(c)(3).

101.    Section 503(c)(3) specifically permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). In evaluating the appropriateness of a KERP *not* involving insiders under section 503(c)(3) of the Bankruptcy Code, the "business judgment" standard is applied.

102.    The majority of courts considering this issue have held that this Section 503(c)(3) standard is no different from the business judgment standard applied by courts in determining whether to authorize the use, sale or lease of property outside the ordinary course of business under section 363(b) of the Bankruptcy Code. *See In re Global Home Prods., LLC*, 369 B.R. 778, 783-87 (Bankr. D. Del. 2007); *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) (collecting cases);

4 COLLIER ON BANKRUPTCY ¶ 503.17[4] (Henry J. Sommer & Alan N. Resnick eds. 16th ed. rev. 2012). *See also In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006).

103.    A debtor's retention plan can be a proper exercise of business judgment simply if it allows the debtor to avoid the cost and delay associated with the loss of personnel and their institutional knowledge. *See In re Residential Capital, LLC*, 491 B.R. 73, 85-86 (Bankr. S.D.N.Y. 2013) (approving retention plan for "noninsiders" because of the "continuity promoted, and the institutional knowledge preserved, by the retention of such employees"). Courts taking a deeper dive into the business judgment standard applied under section 503(c)(3) frequently also look at six factors (the "Dana Factors"): (i) whether the plan is calculated to achieve the desired performance; (ii) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (iii) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (iv) whether the plan is consistent with industry standards; (v) whether the debtor performed due diligence in investigating the need for the plan; and (vi) whether the debtor received independent advice in performing due diligence with respect to creating and authorizing the plan. *See Glob. Home Prods.*, 369 B.R. at 786; *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006).

104.    The Dana Factors are satisfied here. For approximately $86,000 in reimbursement to Thermal, the Debtor hopes to ensure that the seven rank and file employees who operate the Power Plant will be retained, thereby maintaining operations of the Power Plant throughout the sale process and avoiding the increased contractual reimbursement obligations attendant upon Thermal locating and engaging substitute and potentially higher priced employees. All rank and file employees are included in the plan, and the plan is consistent with industry standards as evidenced by more than half a dozen similar, if not broader and more expensive plans, approved in this District. *See*, *e.g.*, *In re*

*MobiTV, Inc.*, Case No. 21-10457-LSS (Bankr. D. Del. April 7, 2021) [Docket No. 162]; *In re True*

*Religion Apparel Inc*., Case No. 20-10941 (CSS) (Bankr. D. Del. June 22, 2020) [Docket No. 364];

*In re Kona Grill, Inc*., Case No. 19-10953 (CSS) (Bankr. D. Del. May 23, 2019) [Docket No. 152];

*In re Achaogen, Inc*., Case No. 19-10844 (BLS) (Bankr. D. Del. May 8, 2019) [Docket No. 162]; *In*

*re Brookstone Holdings Corp*., Case No. 18-11780 (BLS) (Bankr. D. Del. Aug. 30, 2018) [Docket

No. 279]; *In re Pacific Sunwear of California, Inc*., Case No. 16-10882 (LSS) (Bankr. D. Del. May

12, 2016) [Docket No. 335].

**WHEREFORE**, the Debtor respectfully requests that the Court overrule the Objection and

enter orders granting the relief requested in the Cash Collateral Motion and Shared Services Motion,

and directing such other relief as is just and proper under the circumstances.

Dated:  May 24, 2022
       Wilmington, Delaware

Respectfully submitted,

*/s Christopher A. Ward*_____
**POLSINELLI PC**
Christopher A. Ward (Del. Bar No. 3877)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801
Telephone: 302-252-0920
Facsimile: 302-252-0921
cward@polsinelli.com
mdipietro@polsinelli.com

-and-

**HOLLAND & KNIGHT LLP**
John J. Monaghan (admitted *pro hac vice*)
Lynne B. Xerras (admitted *pro hac vice*)
Kathleen M. St. John (admitted *pro hac vice*)
10 St. James Avenue
Boston, MA 02116
Telephone: 617-523-2700
Facsimile: 617-523-6850
john.monaghan@hklaw.com
lynne.xerras@hklaw.com
kathleen.stjohn@hklaw.com

-and-

David W. Wirt (admitted *pro hac vice*)
Phillip W. Nelson (admitted *pro hac vice*)
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Telephone: 312-263-3600
Facsimile: 312-578-6666
david.wirt@hklaw.com
phillip.nelson@hklaw.com

*Proposed Counsel for the Debtor and*
*Debtor in Possession*