# EXHIBIT C

**Amended and Restated Credit and Guaranty Agreement**

**EXECUTION VERSION**

AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT
dated as of

August 22, 2019

among

INVENERGY THERMAL OPERATING I LLC,
as the Borrower,

CERTAIN SUBSIDIARIES OF THE BORROWER,
as the Subsidiary Guarantors,

THE FINANCIAL INSTITUTIONS AND
OTHER PERSONS FROM TIME TO TIME PARTIES HERETO,
as the Lenders and Revolving LC Issuers,

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent,

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Collateral Agent

---

CREDIT SUISSE LOAN FUNDING LLC

and

GOLDMAN SACHS BANK USA,
as Joint Lead Arrangers and Joint Bookrunners of the Closing Date Credit Facilities,

and

CREDIT SUISSE LOAN FUNDING LLC,
as Sole Lead Arranger and Sole Bookrunner of the Incremental Term Facility

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ............................................2
    Section 1.01   Defined Terms ...............................................................2
    Section 1.02   Certain Principles of Interpretation..................................52
    Section 1.03   Accounting Terms.........................................................52
    Section 1.04   Times of Day................................................................52
    Section 1.05   Timing of Payment or Performance..............................52
    Section 1.06   Payments; Exchange Rates; Currency Equivalents .......53

ARTICLE II COMMITMENTS AND CREDIT EXTENSIONS ...............................53
    Section 2.01   Commitments................................................................53
    Section 2.02   Reduction of Commitment Amounts. ...........................55
    Section 2.03   Borrowing Procedures. .................................................56
    Section 2.04   Continuation and Conversion Elections........................56
    Section 2.05   Funding ........................................................................57
    Section 2.06   Notes ............................................................................57
    Section 2.07   Revolving Letters of Credit ..........................................58
    Section 2.08   Payments by Borrower; Presumptions by Administrative Agent.............63
    Section 2.09   Extension of Term Loans...............................................63

ARTICLE III REPAYMENTS, PREPAYMENTS, INTEREST AND FEES .............67
    Section 3.01   Repayment of Loans .....................................................67
    Section 3.02   Prepayment of Loans.....................................................67
    Section 3.03   Application of Prepayments and Repayments. ..............70
    Section 3.04   Interest Provisions........................................................71
    Section 3.05   Fees ..............................................................................72

ARTICLE IV CERTAIN LIBO RATE AND OTHER PROVISIONS........................73
    Section 4.01   LIBO Rate Lending Unlawful ......................................73
    Section 4.02   Inability to Determine Rates .........................................73
    Section 4.03   Increased Costs .............................................................74
    Section 4.04   Funding Losses .............................................................75
    Section 4.05   Increased Capital Costs.................................................76
    Section 4.06   Taxes ............................................................................77
    Section 4.07   Payments, Computations, etc. .......................................80
    Section 4.08   Sharing of Payments .....................................................81
    Section 4.09   Setoff............................................................................82
    Section 4.10   Change in Lending Office..............................................82
    Section 4.11   Replacement of Lenders ...............................................82
    Section 4.12   Defaulting Lenders........................................................84

ARTICLE V CONDITIONS TO CREDIT EXTENSIONS .....................................87
    Section 5.01   [Intentionally Omitted] .................................................87
    Section 5.02   All Credit Extensions....................................................87

i

Section 5.03    Determinations under Article V ..................................................88

ARTICLE VI REPRESENTATIONS AND WARRANTIES .......................................88
Section 6.01    Due Organization; Subsidiaries; Capitalization; etc. ...................88
Section 6.02    Operation of the Projects ............................................................89
Section 6.03    Taxes; Other Laws ......................................................................89
Section 6.04    Compliance with ERISA..............................................................90
Section 6.05    Environmental Laws ....................................................................90
Section 6.06    Title to Property ..........................................................................91
Section 6.07    Regulations T, U and X; Investment Company Act .....................91
Section 6.08    Insurance .....................................................................................92
Section 6.09    Labor Matters..............................................................................92
Section 6.10    Intellectual Property....................................................................93
Section 6.11    Indebtedness; Other Liabilities; Future Liens; Separateness .....93
Section 6.12    Material Project Documents ........................................................94
Section 6.13    Business Activities.......................................................................94
Section 6.14    Due Authorization; Enforceability of Loan Documents ............94
Section 6.15    Property Rights ............................................................................94
Section 6.16    Defaults under Material Project Documents................................95
Section 6.17    Defaults under Other Agreements ...............................................95
Section 6.18    Non-Contravention; etc................................................................95
Section 6.19    Approvals.....................................................................................95
Section 6.20    Legal and other Proceedings .......................................................96
Section 6.21    Disclosure ....................................................................................96
Section 6.22    Certain Documents.......................................................................96
Section 6.23    Solvency.......................................................................................96
Section 6.24    Security Documents......................................................................96
Section 6.25    Material Adverse Effect...............................................................97
Section 6.26    Anti-Corruption Compliance .......................................................97
Section 6.27    Terrorism Laws; PATRIOT Act ..................................................98
Section 6.28    Office of Foreign Assets Control.................................................98
Section 6.29    Regulatory Status; Regulation of Lenders. ..................................98
Section 6.30    Certain Fees .................................................................................99
Section 6.31    Deposit Accounts and Security Accounts.....................................99
Section 6.32    Senior Ranking.............................................................................99
Section 6.33    Use of Proceeds............................................................................99
Section 6.34    Operating and Capital Budget......................................................99

ARTICLE VII REPORTING REQUIREMENTS......................................................100
Section 7.01    Financial Statements; Compliance Certificate..........................100
Section 7.02    Notices Generally.......................................................................101
Section 7.03    Violations of Terrorism Laws; PATRIOT Act ..........................102
Section 7.04    Materials and Documents ..........................................................102
Section 7.05    Operating and Capital Budget; Reports. ....................................102
Section 7.06    Other Information .......................................................................103

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

ARTICLE VIII AFFIRMATIVE COVENANTS ........................................................103
    Section 8.01    Payment of Obligations ................................................................103
    Section 8.02    Maintenance of Regulatory Status ..............................................103
    Section 8.03    Maintenance of Property; Required Insurance .........................104
    Section 8.04    Maintenance of Existence ............................................................104
    Section 8.05    Compliance with Laws; Environmental Laws............................104
    Section 8.06    Fiscal Year .................................................................................105
    Section 8.07    Inspection of Property, Books and Records.................................105
    Section 8.08    Government Approvals; Title .......................................................106
    Section 8.09    First Priority Ranking .................................................................106
    Section 8.10    Cash Management .......................................................................106
    Section 8.11    Performance of Project Documents .............................................106
    Section 8.12    Maintenance of Commodity Hedge Agreements.........................106
    Section 8.13    Non-Wholly-Owned Subsidiaries ..............................................106
    Section 8.14    Security; Further Assurances, etc. .............................................107
    Section 8.15    Collateral Accounts ....................................................................108
    Section 8.16    St. Clair Consent ........................................................................108
    Section 8.17    Organic Documents; Separateness.............................................108
    Section 8.18    Interest Rate Hedge Agreements ................................................108
    Section 8.19    Taxes ...........................................................................................109
    Section 8.20    Use of Proceeds..........................................................................109
    Section 8.21    Maintenance of Rating of the Loans ..........................................109
    Section 8.22    Compliance with Project Document Covenants ........................110
    Section 8.23    Consents to Collateral Assignment ...........................................110

ARTICLE IX NEGATIVE COVENANTS ..............................................................110
    Section 9.01    Limitation on Indebtedness .........................................................110
    Section 9.02    Liens............................................................................................111
    Section 9.03    Restricted Payments....................................................................111
    Section 9.04    Consolidations and Mergers ......................................................112
    Section 9.05    Sales and Issuances of Capital Stock .........................................113
    Section 9.06    Asset Sales ..................................................................................113
    Section 9.07    Transaction with Affiliates ........................................................114
    Section 9.08    Investments in Other Persons......................................................115
    Section 9.09    Guarantees..................................................................................115
    Section 9.10    Change in Nature of Business......................................................116
    Section 9.11    Material Project Documents; Organic Documents .....................116
    Section 9.12    Project Level Indebtedness Documents; Refinancings............117
    Section 9.13    Bank Accounts ............................................................................118
    Section 9.14    Capital Expenditures..................................................................118
    Section 9.15    Speculative Transactions ............................................................118
    Section 9.16    Sales and Lease-Backs................................................................119
    Section 9.17    Restrictions on Subsidiary Distributions ...................................119
    Section 9.18    Accounting Changes ...................................................................119
    Section 9.19    Debt Service Coverage Ratio......................................................119
    Section 9.20    Negative Pledges........................................................................121

ARTICLE X EVENTS OF DEFAULT ..................................................................121
    Section 10.01  Events of Default .................................................................121
    Section 10.02  Action if Bankruptcy...........................................................124
    Section 10.03  Action if Other Event of Default ..........................................124

ARTICLE XI GUARANTY ...............................................................................124
    Section 11.01  Guaranty of the Obligations..................................................124
    Section 11.02  Contribution by Subsidiary Guarantors .................................125
    Section 11.03  Payment by Subsidiary Guarantors.......................................125
    Section 11.04  Liability of Subsidiary Guarantors Absolute .........................125
    Section 11.05  Waivers by Subsidiary Guarantors .......................................127
    Section 11.06  Subsidiary Guarantors' Rights of Subrogation, Contribution, etc...........128
    Section 11.07  Subordination of Other Obligations......................................129
    Section 11.08  Continuing Guaranty ...........................................................129
    Section 11.09  Authority of the Subsidiary Guarantors or the Borrower ........129
    Section 11.10  Financial Condition of the Borrower .....................................129
    Section 11.11  Bankruptcy, etc. ..................................................................129
    Section 11.12  Keepwell. ...........................................................................130
    Section 11.13  Non-Guarantor Borrower Parties...........................................130

ARTICLE XII AGENCY ...................................................................................131
    Section 12.01  Appointment and Authority .................................................131
    Section 12.02  Rights as a Lender ...............................................................131
    Section 12.03  Exculpatory Provisions ........................................................131
    Section 12.04  Reliance by Agent ...............................................................133
    Section 12.05  Delegation of Duties ............................................................133
    Section 12.06  Resignation of Agent ...........................................................133
    Section 12.07  Non-Reliance on Administrative Agent and Other Lenders....................134
    Section 12.08  No Other Duties, etc. ...........................................................134
    Section 12.09  Administrative Agent May File Proofs of Claim.....................134
    Section 12.10  Withholding Taxes ..............................................................135
    Section 12.11  Collateral and Guaranty Matters ..........................................135

ARTICLE XIII MISCELLANEOUS PROVISIONS .............................................136
    Section 13.01  Waivers, Amendments, etc...................................................136
    Section 13.02  Notices; Effectiveness; Electronic Communication; Time.......138
    Section 13.03  Expenses; Indemnity; Damage Waiver...................................141
    Section 13.04  Survival...............................................................................143
    Section 13.05  Severability .........................................................................143
    Section 13.06  Headings ............................................................................143
    Section 13.07  Counterparts; Integration; Effectiveness; Electronic Execution..............143
    Section 13.08  Successors and Assigns........................................................144
    Section 13.09  Other Transactions ..............................................................150
    Section 13.10  Independence of Covenants and Default Provisions ...............150
    Section 13.11  Confidentiality ....................................................................150
    Section 13.12  Governing Law; Jurisdiction; etc...........................................151
    Section 13.13  Waiver of Jury Trial.............................................................152

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

Section 13.14  PATRIOT Act.................................................................................152
Section 13.15  No Advisory or Fiduciary Responsibility.................................153
Section 13.16  Judgment Currency ....................................................................153
Section 13.17  Scope of Liability........................................................................154
Section 13.18  Obligations Several; Independent Nature of Lenders' Rights .................155
Section 13.19  Collateral Agency and Intercreditor Agreement....................155
Section 13.20  Collateral Agent and Depositary Bank ...................................155
Section 13.21  Acknowledgment and Consent to Bail-In of EEA Financial
                      Institutions...........................................................................156
Section 13.22  Certain ERISA Matters...............................................................156
Section 13.23  Acknowledgement Regarding Any Supported QFCs............................158

v

SCHEDULE I            –    Lenders; Commitments; Applicable Lending Office
SCHEDULE II           –    Subsidiary Guarantors
SCHEDULE III          –    Required Insurance
SCHEDULE 2.01(c)      –    Closing Date Revolving Letters of Credit
SCHEDULE 6.01(a)      –    Obligor Jurisdictions of Organization
SCHEDULE 6.01(b)      –    Subsidiaries of the Borrower
SCHEDULE 6.01(c)      –    Subsidiaries of the Other Obligors
SCHEDULE 6.02(a)      –    Certain Project Operation Matters
SCHEDULE 6.05         –    Environmental Laws; Compliance with Laws
SCHEDULE 6.06(b)      –    IT Real Property Interests
SCHEDULE 6.09         –    Labor Matters
SCHEDULE 6.11(a)      –    Indebtedness
SCHEDULE 6.12         –    Material Project Documents
SCHEDULE 6.13         –    Permitted Businesses
SCHEDULE 6.15         –    Property Rights
SCHEDULE 6.19         –    Certain Permits
SCHEDULE 6.24         –    Security Filings
SCHEDULE 6.31         –    Existing Accounts
SCHEDULE 7.05         –    Project Operating Report
SCHEDULE 8.17(b)      –    Separateness Covenants
SCHEDULE 8.23         –    Consents to Collateral Assignment
SCHEDULE 9.07         –    Affiliate Transactions
SCHEDULE 13.08(b)     –    Ineligible Assignees
SCHEDULE 13.08(g)     –    Dutch Auction Procedures


EXHIBIT A   –   Form of Assignment and Assumption
EXHIBIT A-1 –   Form of Affiliated Lender Assignment and Assumption
EXHIBIT B-1 –   Form of Borrowing Request
EXHIBIT B-2 –   Form of Issuance Request
EXHIBIT C-1 –   Form of Revolving Note
EXHIBIT C-2 –   Form of Term Note
EXHIBIT D-1 –   Form of Compliance Certificate
EXHIBIT D-2 –   Form of Leverage Ratio Certificate
EXHIBIT E-1 –   Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not
                Partnerships For U.S. Federal Income Tax Purposes)
EXHIBIT E-2 –   Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are
                Not Partnerships For U.S. Federal Income Tax Purposes)
EXHIBIT E-3 –   Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are
                Partnerships For U.S. Federal Income Tax Purposes)
EXHIBIT E-4 –   Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are
                Partnerships For U.S. Federal Income Tax Purposes)
EXHIBIT F   –   Form of Continuation/Conversion Notice
EXHIBIT G   –   Form of Solvency Certificate
EXHIBIT H   –   Form of Closing Date Certificate
EXHIBIT I   –   Form of Consent to Collateral Assignment
EXHIBIT J   –   Nelson Risk Management Policy

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

EXHIBIT K    –    Ector Risk Management Policy
EXHIBIT L    –    Grays Harbor Risk Management Policy

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT

THIS AMENDED AND RESTATED CREDIT AND GUARANTY AGREEMENT (this "Agreement"), dated as of August 22, 2019, is made by and among INVENERGY THERMAL OPERATING I LLC, a Delaware limited liability company (the "Borrower"); the Subsidiary Guarantors (as defined below) from time to time party hereto; the various financial institutions and other Persons from time to time parties hereto (the "Lenders"); the Revolving LC Issuers (as defined below) party hereto from time to time; CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH as the administrative agent (in such capacity, the "Administrative Agent"); and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH as the collateral agent (in such capacity, the "Collateral Agent"). Capitalized terms used herein shall have the meanings ascribed to such terms in Article I.

W I T N E S S E T H:

WHEREAS, Invenergy AMPCI Thermal Power LLC, a Delaware limited liability company (the "Sponsor"), is the direct owner of 100% of the Capital Stock of Invenergy Thermal Operating I Holdings LLC, a Delaware limited liability company ("HoldCo");

WHEREAS, HoldCo is the direct owner of 100% of the Capital Stock of the Borrower;

WHEREAS, the Borrower is the direct owner of 100% of the Capital Stock of Invenergy Thermal LLC, a Delaware limited liability company ("IT"), which indirectly owns: (a) 100% of each of the Project Companies that, in turn, own the Nelson Project, the Ector Project and the Grays Harbor Project; and (b) 51% of the Project Companies that, in turn, own the Spindle Hill Project, the Cannon Falls Project, and the Hardee Project, each of which is located in the United States;

WHEREAS, the Borrower, the Subsidiary Guarantors, certain of the Lenders party thereto, the Administrative Agent and the Collateral Agent entered into that certain Credit and Guaranty Agreement, dated as of the Closing Date, as amended by that certain letter agreement dated December 7, 2018 (as in effect immediately prior to the Amendment Effective Date, "Original Credit Agreement");

WHEREAS, pursuant to the Omnibus Amendment Agreement, the Borrower has requested, and the Lenders party thereto, the Administrative Agent and the Collateral Agent have agreed, upon the terms and subject to the conditions set forth therein, that the Original Credit Agreement be amended and restated in its entirety as provided herein, effective upon satisfaction of the conditions set forth in the Omnibus Amendment Agreement; and

WHEREAS, the Subsidiary Guarantors, by executing this Agreement and the Security Documents, have agreed to guarantee the Obligations and to secure their respective obligations hereunder by granting to the Collateral Agent, for the benefit of the Secured Parties, a first priority Lien on substantially all of their respective assets, including a pledge of all of the Capital Stock in certain of their respective Subsidiaries.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.01    Defined Terms.    The following terms when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, is bearing interest at a rate determined by reference to the Alternate Base Rate.

"Additional Project Document" means any Contractual Obligations entered into by any Obligor or any of their Subsidiaries after the Closing Date in respect of the ownership, construction, operation, maintenance or modification of a Project (including any Power Purchase Agreement, Operation and Maintenance Agreement or Interconnection Agreement, but excluding any Loan Document) that has revenues (net of any related expenses) or expenditures originating from and attributable to such Contractual Obligations in excess of $5,000,000 in any single year or $10,000,000 during any period of five years or less.

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the greater of (a) the LIBO Rate in effect for such Interest Period divided by one (1) minus the Statutory Reserve Rate and (b) 0.00% per annum.

"Adjusted Operating Cash Available for Debt Service" means, during any period: (a) the sum of Operating Cash Available for Debt Service for such period plus, without duplication, (b) the amount of any Capital Expenditures actually paid by any of the Obligors during such period.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 12.06.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Administrative Services Agreement" means the Administrative Services Agreement, dated as of January 1, 2015, among Invenergy LLC, an Illinois limited liability company, and the Affiliates of Invenergy LLC party thereto.

"Affected Lender" has the meaning set forth in Section 4.11(a).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Affiliate Transaction" is defined in Section 9.07.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

"<u>Affiliated Debt Fund</u>" means any Affiliate of the Borrower (other than its Subsidiaries and any other Person in which the Borrower, directly or indirectly, owns any Capital Stock) that is a bona fide diversified debt fund either (a) with information barriers in place restricting the sharing of investment-related and other information between it and the Borrower and its Subsidiaries or (b) whose managers have fiduciary duties to the investors of such fund independent of their fiduciary duties to the investors in the Borrower or any of its Subsidiaries; <u>provided</u> that the Borrower does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of any such fund.

"<u>Affiliated Lender</u>" is defined in <u>Section 13.08(g)</u>.

"<u>Affiliated Lender Cap</u>" is defined in <u>Section 13.08(g)(iii)</u>.

"<u>Agent Parties</u>" is defined in <u>Section 13.02(d)(ii)</u>.

"<u>Agents</u>" means: (a) the Administrative Agent; (b) the Collateral Agent; and (c) the Depositary Bank.

"<u>Aggregate Payments</u>" means, with respect to a Contributing Subsidiary Guarantor as of any date of determination, an amount equal to: (a) the aggregate amount of all payments and distributions made on or before such date by such Contributing Subsidiary Guarantor in respect of the Guaranty (including in respect of <u>Section 11.02</u>); <u>minus</u> (b) the aggregate amount of all payments received on or before such date by such Contributing Subsidiary Guarantor from the other Contributing Subsidiary Guarantors as contributions under <u>Section 11.02</u>.

"<u>Agreement</u>" means this Amended and Restated Credit and Guaranty Agreement, as further amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Alternate Base Rate</u>" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect for such day *plus* 0.50%, (b) the Prime Rate in effect on such day and (c) the Adjusted LIBO Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) *plus* 1.00%; <u>provided</u>, that for the avoidance of doubt, the LIBO Rate for any day shall be based on the rate determined on such day at approximately 11:00 a.m. (London time) by reference to the ICE Benchmark Administration Interest Settlement Rates (or the successor thereto if the ICE Benchmark Administration is no longer making a LIBO Rate available) for deposits in Dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the ICE Benchmark Administration (or the successor thereto if the ICE Benchmark Administration is no longer making a LIBO Rate available) as an authorized vendor for the purpose of displaying such rates). Any change in such rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"<u>Amendment Effective Date</u>" means the date (which shall be a Business Day) on which the conditions set forth in Section 5 of the Omnibus Amendment Agreement shall have been satisfied.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

"Amendment Effective Date Distribution" means the Restricted Payment made to the Sponsor on the Amendment Effective Date with a portion of the proceeds of the Incremental Term Loans in the amount set forth in the Funds Flow Memorandum, which shall be no greater than $72,348,875.51.

"Amendment Transactions" means (a) the execution, delivery and performance by the Obligors of the Omnibus Amendment Agreement and the other Loan Documents, as amended by the Omnibus Amendment Agreement, (b) the borrowing of Incremental Term Loans and the use of proceeds thereof as further described in Section 8.20(a), and (c) the other transactions contemplated by the Omnibus Amendment Agreement.

"Applicable Law" means any constitution, statute, law, rule, regulation, ordinance, judgment, order, decree or Permit, or any published directive or requirement which has the force of law, or other governmental restriction which has the force of law, or any determination by, or interpretation of any of the foregoing by, any judicial authority, applicable to and/or binding on a given Person or any Project, as the context may require.

"Applicable Lending Office" means the office of a Lender designated as its "Applicable Lending Office" on Schedule I or in an Assignment and Assumption, or such other office of such Lender (or of an Affiliate of such Lender) as may be designated from time to time by written notice from such Lender to the Administrative Agent and the Borrower.

"Applicable Margin" means, (a) in respect of any Term Loans, the applicable rate per annum set forth below under the caption "ABR Spread" or "Eurodollar Spread" as the case may be, based upon the Leverage Ratio as of the end of the most recent Quarterly Payment Date;

| Category | Leverage Ratio | ABR Spread | Eurodollar Spread |
|---|---|---|---|
| Category 1 | > 4.00 to 1.00 | 2.50% | 3.50% |
| Category 2 | ≤ 4.00 to 1.00 | 2.25% | 3.25% |

and (b) in respect of any Revolving Loan, the applicable rate per annum set forth below under the caption "ABR Spread" or "Eurodollar Spread" as the case may be, based upon the Leverage Ratio as of the end of the most recent Quarterly Payment Date; provided that until the Quarterly Payment Date occurring at the end of the first full Fiscal Quarter occurring after the Closing Date the Applicable Margin shall be the applicable rate per annum set forth below in Category 1.

| Category | Leverage Ratio | ABR Spread | Eurodollar Spread |
|---|---|---|---|
| Category 1 | > 4.00 to 1.00 | 2.25% | 3.25% |
| Category 2 | ≤ 4.00 to 1.00 | 2.00% | 3.00% |

The Applicable Margin for each Loan bearing interest by reference to the Alternate Base Rate or the LIBO Rate shall be determined by reference to the Leverage Ratio in effect from time to time; provided, however, that (i) no reduction in the Applicable Margin shall be effective until three Business Days after the date on which the Administrative Agent receives the Leverage Ratio Certificate required to be delivered pursuant to Section 7.01(d) and (ii) the Applicable Margin shall

*ITOI Amended and Restated Credit and Guaranty Agreement*

be at Category 1 for so long as the Borrower has not submitted to the Administrative Agent the information described in clause (i) of this proviso as and when required under Section 7.01.

"Applicable Permit" means, at any time, any Permit with respect to the development, construction or operation of a Project, including any zoning environmental, sanitation, energy regulatory, NERC, import, export, safety, siting or building Permit that is: (a) necessary at such given time in light of the stage of development, construction or operation of such Project (to the extent required by Legal Requirements, the Loan Documents or the Project Documents) to site, construct, test, operate, maintain, repair, own or use such Project as contemplated by the Loan Documents and Material Project Documents and its Project Schedule (if applicable), to sell and transmit electricity therefrom, and to enter into any Project Document with respect to such Project or to consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements; or (b) necessary so that: (i) none of the Secured Parties may be deemed by any Governmental Authority to be subject to regulation under PUHCA (except as provided in Section 6.29(e)) or under any state laws or regulations respecting the rates or the financial or organizational regulation of electric utilities solely as a result of the construction, ownership or operation of such Project by its Project Company or the sale or transmission of electricity therefrom by such Project Company; or (ii) none of the Project Companies, the Borrower or any of its Subsidiaries (other than the Project Companies) that directly or indirectly owns, controls or holds with power to vote ten (10) percent or more of the outstanding voting securities of a Project Company may be deemed by any Governmental Authority to be subject to regulation under PUHCA (except as set forth in Section 6.29(a)).

"Approved Fund" means any Fund that is administered or managed by: (a) a Lender; (b) an Affiliate of a Lender; or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" is defined in Section 9.06.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 13.08(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Auction Manager" means (a) the Administrative Agent or (b) any other financial institution or advisor engaged by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Dutch Auction; provided that the Borrower shall not designate the Administrative Agent as the Auction Manager without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as and the Borrower shall be under no obligation to engage the Administrative Agent to act as the Auction Manager); provided, further, that none of Borrower, Sponsor, any Subsidiary Guarantor nor any of their respective Affiliates may act as the Auction Manager.

"Authorized Financial Officer" means, relative to any Obligor or any of its Subsidiaries, an Authorized Officer that is the principal financial officer of such Obligor or such Subsidiary.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

"Authorized Officer" of any Person means the individual or individuals authorized to act on behalf of such Person by the managing member, Board of Directors, board of managers or similar governing body of such Person as designated from time to time in a certificate of such Person with specimen signatures of the principal executive officer, president, principal financial officer, or any vice president of such Person or, in the case of actions taken by any other officer of such Person in respect of a Default, such other officer who in the normal performance of his or her operational duties would have knowledge of the subject matter relating to such Default.

"Available Cash" means all cash, Permitted Investments, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of each Obligor and each of its Subsidiaries other than: (a) Non-Distributable Assets; and (b) only with respect to ITF and each of its Subsidiaries, appropriate reserves maintained by such applicable Person for operation, maintenance and similar expenses (including Capital Expenditures permitted under Section 9.14) relating to the ITF Projects that are reasonably necessary under Prudent Industry Practice.

"Bail-in Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Base Case Projections" means the base case financial model for the Borrower and each of its Subsidiaries for a period commencing on June 1, 2019 and ending on or after December 31, 2025, and the pro forma consolidated balance sheet for the Borrower and its Subsidiaries (including Grays Harbor) as of March 31, 2019 (after giving effect to the transactions contemplated by the Omnibus Amendment Agreement and this Agreement in the form delivered to the Administrative Agent on or prior to the Amendment Effective Date and certified by an Authorized Officer of the Borrower.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means:

(a)      with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(b)      with respect to a partnership, the board of directors of the general partner of such partnership or any committee duly authorized and empowered to take action on behalf of such partnership by the partnership agreement of such partnership;

(c)      with respect to a limited liability company, the board of managers, the managing member or members or any controlling committee of managing members thereof; and

(d)      with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower" is defined in the preamble.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a Loan request and certificate duly executed by an Authorized Officer of the Borrower substantially in the form of Exhibit B-1 hereto.

"Business Day" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law, regulation or executive order to close; provided, however, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar deposits in the London interbank market.

"CAD" means lawful money of Canada.

"Call Premium" is defined in Section 3.02(c).

"Cannon Falls" means Invenergy Cannon Falls LLC, a Delaware limited liability company, and the sole owner of the Cannon Falls Project.

"Cannon Falls Project" means that approximately 357 MW natural gas-fired generating facility located in Cannon Falls, Minnesota, including all related real and personal property interests, equipment, and related assets.

"CapEx Cap" is defined in Section 9.14.

"Capital Expenditures" means any expenses that are required to be capitalized on the balance sheet of the Borrower or a Subsidiary of the Borrower in accordance with GAAP or IFRS, as applicable, including the principal amount of any Capitalized Lease Obligations.

 "Capital Stock" means: (a) in the case of a corporation, corporate stock; (b) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (c) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

(d) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person including, all warrants, options or other rights to acquire any of the foregoing, whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are authorized or otherwise existing on any date of determination.

"Capitalized Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP or IFRS, as applicable, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP or IFRS, as applicable.

"Cash Collateralize" means, with respect to any Revolving Letter of Credit or any other Obligation, the deposit of immediately available funds into a cash collateral account maintained with (or on behalf of) the applicable Revolving LC Issuer or holder of such Obligation on terms reasonably satisfactory to such Revolving LC Issuer or holder in an amount equal to 102.5% of the Stated Amount of such Revolving Letter of Credit or such other Obligation. "Cash Collateral" and "Cash Collateralization" shall have a correlative meaning.

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of any property of any Obligor or any of its Subsidiaries, but in any event shall exclude any losses due to business interruption.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response Compensation Liability Information System List.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means, at any date, the consummation of any transaction or series of transactions the result of which is (a) the Designated Holders collectively cease to own and control, legally and beneficially, directly or indirectly, at least 50% of the Capital Stock representing the Borrower's voting power and economic interests, (b) the Designated Holders cease to have the

right to direct the day to day management of the Borrower or (c) HoldCo shall cease, directly or indirectly, to own and control legally and beneficially all of the Capital Stock representing voting power and economic interests of the Borrower; provided, however, that no disposition or transaction described in clauses (a) or (b) that would otherwise give rise to a Change of Control shall constitute a Change of Control hereunder so long as: (x) the Person (other than the Designated Holders) maintaining ownership of Capital Stock or having the right to direct the day to day management and operation of the Borrower is a Qualified Owner; (y) each of S&P and Moody's shall have provided a Ratings Reaffirmation after giving effect to such disposition or transaction; and (z) the Leverage Ratio (determined for any period by reference to the most recent Compliance Certificate delivered pursuant to Section 7.01(c) that calculates the Leverage Ratio) is less than 6.00 to 1.00; provided that, for purposes of this clause (z), prior to (or simultaneously with) making such determination, the Borrower shall have the right to: (A) voluntarily prepay Term Loans (subject to compliance with Section 3.02(a)(i)(C) or Section 4.04) from cash contributions received for such purpose from any Affiliate of the Borrower other than a Subsidiary of the Borrower (which, if not contributed by HoldCo, shall be contributed to HoldCo and then contributed by HoldCo to the Borrower) in an aggregate amount equal to the amount that, if subtracted from Total Net Debt on the last day of the most recently ending applicable Measurement Period (and taking into account any other prepayments of Term Loans since such date), would have been sufficient to cause compliance with this clause (z) on such date; and (B) recalculate the Leverage Ratio as of the last day of such Measurement Period after giving effect to the reduction in Total Net Debt resulting from such prepayment of Term Loans from the proceeds of such equity contribution to the Borrower solely for purposes of determining compliance with this clause (z).

"Closing Date" means August 28, 2018.

"Closing Date Credit Facilities" means, collectively, the Closing Date Term Facility and the Revolving Credit Facility.

"Closing Date Credit Facilities Lead Arrangers" means each of Credit Suisse Loan Funding LLC and Goldman Sachs Bank USA in their capacities as joint lead arranger and joint bookrunner of the Closing Date Credit Facilities.

"Closing Date Term Facility" means the aggregate amount of the Closing Date Term Loan Commitment on the Closing Date, which was equal to $350,000,000.

"Closing Date Term Loan" means a term loan made by any Closing Date Term Loan Lender under the Closing Date Term Facility.

"Closing Date Term Loan Lender" means, at any time, a Lender that, at such time, has Term Loan Exposure with respect to any Closing Date Term Loans.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all collateral pledged, or in respect of which a Lien is granted, pursuant to the Security Documents.

"Collateral Accounts" is defined in in the Depositary Agreement.

"Collateral Agency and Intercreditor Agreement" means that certain Collateral Agency and Intercreditor Agreement, dated as of the Closing Date, as amended by the Omnibus Amendment Agreement, by and among HoldCo, the Obligors, the Administrative Agent, the Collateral Agent and the other Persons party thereto from time to time.

"Collateral Agent" is defined in the preamble.

"Commitment" means, as the context may require, an Incremental Term Loan Commitment, a Revolving Loan Commitment, or a Revolving Letter of Credit Commitment.

"Commitment Amount" means, as the context may require, the Incremental Term Loan Commitment Amount, the Revolving Loan Commitment Amount, or the Revolving Letter of Credit Commitment Amount.

"Commitment Termination Date" means, as the context may require, the Incremental Term Loan Commitment Termination Date, or the Revolving Loan Commitment Termination Date.

"Commitment Termination Event" means: (a) the occurrence of any Event of Default described in Section 10.01(i) with respect to any Obligor or any of its Subsidiaries; or (b) the occurrence and continuance of any other Event of Default and either: (i) the declaration of all or any portion of the Loans to be due and payable pursuant to Section 10.03; or (ii) the giving of notice by the Administrative Agent, acting at the direction of the Required Lenders, to the Borrower that the Commitments have been terminated.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commodity Hedge Agreement" means any agreement (including each confirmation entered into pursuant to any Master Agreement) providing for swaps, caps, collars, puts, calls, floors, futures, options, spots, forwards, energy, capacity and/or ancillary services purchase, tolling or sale agreements (including Power Purchase Agreements), Fuel purchase or sale agreements, emissions credit purchase or sales agreements, power transmission agreements, Fuel transportation agreements, Fuel storage agreements, netting agreements, commercial or trading agreements, each with respect to, or involving the purchase, transmission, distribution, sale, lease or hedge of, any energy, generation capacity or Fuel, or any other energy related commodity or service, price or price indices for any such commodities or services or any other similar derivative agreements, and any other similar agreements (including with respect to weather), consistent with Prudent Industry Practices and entered into in the ordinary course of business (and not for speculative purposes) in order to manage fluctuations in the price or availability of any commodity, but excluding all such agreements or transactions (including any confirmation entered into pursuant to any Master Agreement) that are daily sales, spot market, or other short term (not to exceed three months) arrangements.

"Commodity Hedge Cap Amount" means, with respect to all Permitted Obligor Commodity Hedge Agreements entered into with any Person, Termination Payments (as defined in the Collateral Agency and Intercreditor Agreement) under such Permitted Obligor Commodity Hedge Agreements in an aggregate amount equal to $75,000,000; provided that such cap amount shall not apply to (x) any Secured Hedge Provider or (y) any Permitted Obligor Commodity Hedge

10

Agreement only to the extent that the Secured Obligations with respect to such Permitted Obligor Commodity Hedge Agreement are secured solely by a First Lien on the assets of Grays Harbor.

"Commodity Institution" means any Person that is a commercial bank, investment bank, insurance company, energy trading company, brokerage or other similar financial institution, or any Affiliate thereof, or any regulated utility, in each case which is engaged in the business of entering into Commodity Hedge Agreements; provided that at the time of entering into any Commodity Hedge Agreement, no Commodity Institution shall be a Defaulting Lender.

"Communications" is defined in Section 13.02(d)(ii).

"Compliance Certificate" means a compliance certificate duly executed by an Authorized Financial Officer of the Borrower substantially in the form of Exhibit D-1 hereto.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate in the form of Exhibit F duly executed by an Authorized Officer of the Borrower, which notice shall specify the Type of Loans to be continued or converted, the amount thereof and, if such Loan is to be continued as or converted to a Eurodollar Loan, the applicable Interest Period therefor, and shall otherwise be in form and substance satisfactory to the Administrative Agent.

"Contractual Obligation" means, as applied to any Person, any provision of any indenture, mortgage, deed of trust, credit agreement, contract, undertaking or other agreement or instrument to which such Person is a party or to which such Person or any of its assets is subject.

"Contributing Subsidiary Guarantors" is defined in Section 11.02.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Corporate Trust Office" means, the office of the Collateral Agent at which at any particular time its corporate trust business shall be principally administered, which office on the date of the execution of this Agreement is specified in Section 13.02(a), or such other address as the Collateral Agent may designate from time to time by prior written notice to the Obligors and the Administrative Agent, or the principal corporate trust office of any successor Collateral Agent (or such other address as such successor Collateral Agent may designate from time to time by notice to the Obligors and the Administrative Agent).

"Corrupt Practices Laws" means: (a) the U.S. Foreign Corrupt Practices Act of 1977, as amended (15 U.S.C. §§ 78dd-1, et seq.); (b) U.S. laws prohibiting bribery of U.S. Public Officials, including 18 U.S.C. § 201 and relevant state and local laws; (c) the U.S. Travel Act, 18 U.S.C. § 1952; (d) U.S. mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343; (e) U.S. federal securities laws, including the Sarbanes-Oxley Act of 2002 (Pub.L. 107–204, 116 Stat. 745); and (f) any

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

equivalent U.S. or foreign Legal Requirement governing bribery, corruption, conflicts of interest, lobbying, or public procurement.

"<u>Covered Entity</u>" means any of the following:

(a)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Covered Party</u>" has the meaning assigned to it in <u>Section 13.23</u>.

"<u>Credit Extension</u>" means, as the context may require: (a) the making of a Loan by a Lender or (b) the issuance of any Revolving Letter of Credit, the increase of the Stated Amount of any existing Revolving Letter of Credit or the extension of any Stated Expiry Date of any existing Revolving Letter of Credit, by any Revolving LC Issuer (whether automatically by its terms or upon request of the Borrower).

"<u>Credit Party</u>" means any of the following Persons: (a) each Lender; (b) each Revolving LC Issuer; (c) the Collateral Agent; (d) the Depositary Bank; (e) the Administrative Agent; and (f) each of their respective successors, transferees and assigns.

"<u>Cure Amount</u>" is defined in <u>Section 9.19(b)(i)</u>.

"<u>Cure Notice</u>" is defined in <u>Section 9.19(b)(i)</u>.

"<u>Debt Issuance Proceeds</u>" means any Net Cash Proceeds with respect to the incurrence, sale or issuance by any Obligor or any of its Subsidiaries of any Indebtedness.

"<u>Debt Service</u>" means, for any period, the sum of: (a) all scheduled interest, commitment fees, letter of credit fees, fronting fees and scheduled principal payable during such period in respect of the Obligations; and (b) any net payments paid by the Borrower during such period pursuant to any Transaction Interest Rate Hedge Agreements <u>less</u> any net payments received by the Borrower during such period pursuant to any Transaction Interest Rate Hedge Agreements; <u>provided</u> that in the case of any Transaction Interest Rate Hedge Agreement that constitutes a prepaid cap, the quotient of: (x) the aggregate upfront payment made by the Borrower pursuant to such Transaction Interest Rate Hedge Agreement, <u>divided by</u>: (y) the number of periods that equals the length of the term of such Transaction Interest Rate Hedge Agreement shall be included in <u>clause (b)</u> of this definition for each period over the term of such Transaction Interest Rate Hedge Agreement (in lieu of including the aggregate amount of such prepaid cap for the period when actually paid); <u>provided</u> that, notwithstanding anything to the contrary herein, (i) Debt Service for the Measurement Period ending on the first Quarterly Payment Date to occur after the Closing Date, shall be (A) actual Debt Service for the Measurement Period ending on such date <u>multiplied by</u> (B) four, (ii) Debt Service for the Measurement Period ending on the second Quarterly Payment

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

Date to occur after the Closing Date, shall be (A) actual Debt Service for the Measurement Period ending on such date underlined multiplied by (B) two, (iii) Debt Service for the Measurement Period ending on the third Quarterly Payment Date to occur after the Closing Date shall be (A) actual Debt Service for the Measurement Period ending on such date multiplied by (B) four-thirds and (iv) Debt Service for the Measurement Period ending on the fourth Quarterly Payment Date to occur after the Closing Date shall be actual Debt Service for such Measurement Period.

"Debt Service Coverage Ratio" means, as of any date of determination, the ratio of: (a) the sum of all Operating Cash Available for Debt Service for the Measurement Period corresponding to such date of determination to (b) the aggregate amount of all Debt Service during such Measurement Period.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means an Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means subject to Section 4.12(b), any Lender that: (a) has failed to: (i) fund all or any portion of its Loans within one (1) Business Day of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable default, if any, shall be specifically identified in such writing) has not been satisfied or waived in accordance with the terms and conditions hereof; or (ii) pay to the Administrative Agent, a Revolving LC Issuer or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Revolving Letters of Credit) within one (1) Business Day of the date when due; (b) has notified the Borrower, the Administrative Agent or a Revolving LC Issuer in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied and has not been waived in accordance with the terms and conditions hereof); (c) has failed, within one (1) Business Day after written request by the Administrative Agent, the applicable Revolving LC Issuer or the Borrower, to confirm in writing to the Administrative Agent, such Revolving LC Issuer and the Borrower that it will comply with its prospective funding obligations hereunder; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent, the applicable Revolving LC Issuer and the Borrower; or (d) the Administrative Agent has received notification that such Lender has, or has a direct or indirect parent company that is: (i) insolvent, or is generally unable to pay its debts as they become due, or

13

admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors; or (ii) the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Deposit Account" has the meaning set forth in the UCC.

"Depositary Agreement" means that certain Depositary Agreement, dated as of the Closing Date, among the Obligors, HoldCo, the Administrative Agent, the Collateral Agent, and the Depositary Bank.

"Depositary Bank" means The Bank of New York Mellon, in its capacity as the Depositary Bank under the Depositary Agreement.

"Designated Holders" means (a) AMP Capital Holdings Limited or any entity directly or indirectly managed and/or Controlled by AMP Capital Holdings Limited and (b) Invenergy Clean Power LLC.

"Designation Date" is defined in Section 2.09(f).

"Disbursement" has the meaning set forth in Section 2.07(c)(i).

"Disbursement Date" has the meaning set forth in Section 2.07(c)(i).

"Distributions" means, with respect to any period, each of the following to the extent received or available to be received by any Obligor (whether in the form of a dividend, a repayment of intercompany indebtedness or otherwise): (a) distributions or dividends; and (b) management and incentive fees paid in cash.

"Dollar" and the sign "$" mean lawful money of the United States.

"Dollar Equivalent" means, with respect to an amount denominated in Dollars, such amount, and with respect to an amount denominated in CAD, the equivalent in Dollars of such amount determined at the Exchange Rate on the Valuation Date.

"DSCR Covenant" is defined in Section 9.19(a).

"DSCR Covenant Failure" is defined in Section 9.19(b)(i).

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

"DSR Account" is defined in the Depositary Agreement.

"DSR Requirement" means, as of any date of determination, an amount equal to 100% of the sum of the reasonably anticipated Debt Service (but excluding any required payment of principal at the Stated Maturity Date) payable during the six (6) month period immediately following such date of determination.

"DSR Support Instrument" is defined in the Depositary Agreement.

"Dutch Auction" has the meaning set forth in Schedule 13.08(g) hereof.

"Ector" means Ector County Energy Center LLC, a Delaware limited liability company.

"Ector Disposition" is defined in Section 9.06(f).

"Ector Disposition Proceeds" means any Net Cash Proceeds with respect to an Ector Disposition.

"Ector Energy Management Plan" means: (a) that Energy Management Agreement, dated November 2, 2017, between Invenergy Services LLC and Ector; and (b) any replacement of any of the foregoing that is reasonably acceptable to the Administrative Agent (in consultation with the Market Consultant for the Ector Project).

"Ector Holdings" means Ector County Energy Center Holding LLC, a Delaware limited liability company.

"Ector Mortgage" means that certain Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of the Closing Date, by and among Ector, Rebecca Conrad c/o Chicago Title Insurance Company and the Collateral Agent, as amended by the Ector Mortgage Amendment.

"Ector Mortgage Amendment" means the First Amendment to Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of August 22, 2019, by and between Ector, Rebecca Conrad c/o Chicago Title Insurance Company, and the Collateral Agent.

"Ector Project" means that approximately 330 MW natural gas-fired generating facility located in Ector County, Texas, including all related real and personal property interests, equipment, and related assets.

"Ector Project Site" means the Project Site for the Ector Project.

"Ector Risk Management Policy" means the Risk Management Policy for Ector, attached hereto as Exhibit K, as such Risk Management Policy may be amended in accordance with Section 9.11.

"Ector Target Sale Amount" means, as of any date, $75,000,000.

"Ector Title Insurer" means Chicago Title Insurance Company.

"Ector Title Policy" means the mortgagee extended coverage title insurance policy with respect to the Ector Project Site delivered to the Administrative Agent under the Omnibus Amendment Agreement as a condition to the Amendment Effective Date.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" is defined in Section 13.08(b).

"Energy Management Plan" means any of the Ector Energy Management Plan, the Nelson Energy Management Plan, the Grays Harbor Energy Management Plan or the St. Clair Energy Management Plan, as the context requires.

"Environmental Claims" shall mean all written notices of violation, Liens, claims, demands, suits, or causes of action for any liability, loss, damage, or expense including, without limitation, natural resources damages, personal injury or property damage, arising out of or related to environmental, health or safety conditions or pursuant to applicable Environmental Laws.

"Environmental Laws" means all applicable and legally binding Federal, state, local or foreign laws, statutes, laws (including common law), ordinances, codes, rules, regulations and guidelines (including consent decrees and administrative orders) relating to public and worker health and safety (to the extent related to exposure to Hazardous Materials) and the preservation or protection of the environment, including those relating to the generation, use, storage, handling, transportation, or Release of, or exposure to, Hazardous Materials.

"Environmental Liabilities" means all liabilities, obligations and responsibilities (including any obligations to conduct cleanups, and all pending or threatened Environmental Claims against any Obligor or its Subsidiaries or against any Person whose liability for any Environmental Claim any Obligor or its Subsidiaries may have retained or assumed, either contractually or by operation of law) arising from: (a) environmental, health or safety conditions; (b) compliance or any actual or alleged non-compliance with applicable Environmental Laws and any Permits issued pursuant thereto; (c) the presence, Release or threatened Release of, or exposure to, Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or its Subsidiaries; or

16

(d) circumstances forming the basis of any violation, or alleged violation of, or alleged noncompliance with, any Environmental Law.

"Equity Cure" is defined in Section 9.19(b)(i).

"Equity Cure Contributions" is defined in Section 9.19(b)(i).

"Equity Cure Deadline" is defined in Section 9.19(b)(i).

 "Equity Issuance Proceeds" means any Net Cash Proceeds with respect to the sale or issuance by any Obligor or any of its Subsidiaries of any Capital Stock.

 "ERCOT" means the Electric Reliability Council of Texas, Inc. and its successors.

 "ERCOT Protocols" means the document adopted by ERCOT, including any attachments or exhibits referenced therein, as amended from time to time, that contains the scheduling, operating, planning, reliability, and settlement (including registration) policies, rules, guidelines, procedures, standards, and criteria of ERCOT.  The version of the ERCOT Protocols in effect at the time of the performance or non-performance of an action shall govern with respect to that action.

 "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the rules and regulations promulgated thereunder.

 "ERISA Event" means: (a) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Sections 412 or 430 of the Code or Sections 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Code or Section 302(c) of ERISA) or the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contributions to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (d) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (e) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Code or Section 305 of ERISA; (f) the withdrawal by the Borrower or any of its Subsidiaries or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' respective ERISA Groups from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to the Borrower or any of its Subsidiaries or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' ERISA Group pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which would constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the imposition of liability on the Borrower or any of its Subsidiaries or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' respective ERISA Groups pursuant to Section 4062(e)

17

or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of the Borrower or any of its Subsidiaries or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' respective ERISA Groups in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by the Borrower or any of its Subsidiaries or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' respective ERISA Groups of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the imposition on the Borrower or any of its Subsidiaries or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' respective ERISA Groups of fines, penalties, Taxes or related charges under Chapter 43 of the Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Plan; (k) the assertion of a material claim (other than routine claims for benefits) against any Plan or the assets thereof other than a Multiemployer Plan or the assets thereof, or against the Borrower or any of the Borrower's Subsidiaries in connection with any Plan; (l) receipt from the IRS of notice of the failure of any Pension Plan (or any other Plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Code; (m) the imposition of a Lien pursuant to Section 430(k) of the Code or pursuant to Section 303(k) of ERISA or a violation of Section 436 of the Code with respect to any Pension Plan; (n) the occurrence of a non-exempt "prohibited transaction" with respect to which the Borrower or any of the Borrower's Subsidiaries is a "disqualified person" or a "party of interest" (within the meaning of Section 4975 of the Code or Section 406 of ERISA, respectively) and which could reasonably be expected to result in material liability to the Borrower or any of the Borrower's Subsidiaries; or (o) any other event or condition with respect to a Plan with respect to which the Borrower or any of the Borrower's Subsidiaries is likely to incur material liability other than in the ordinary course.

"ERISA Group" means the Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar" means, when used in reference to any Loan or Borrowing, that a Loan is, or the Loans comprising such Borrowing are, bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Abandonment" means, with respect to a Project: (a) the occurrence of an event of abandonment however defined in the Project Level Indebtedness Documents for such Project; or (b) the suspension or cessation for a period of at least 120 consecutive days of all or substantially all the operational and maintenance activities at such Project; provided, however, that any such suspension or cessation that arises from an Event of Loss, a requirement of law or an event of force majeure shall not constitute an Event of Abandonment, in each case, so long as an Obligor or its Subsidiary, as applicable, is taking commercially reasonable actions to overcome or mitigate the effects of the cause of suspension or cessation so that maintenance and/or operations of the

18

applicable Project, as the case may be, can be resumed within a period of 210 consecutive days. Any period of cessation or suspension shall end on the date that operation and maintenance activities of a substantial nature are resumed.  The termination of a lease or the requirement to cease operation under any contract shall not constitute an Event of Abandonment so long as, in the case of any such cessation of operations due to the termination or expiration of a contract or lease, an Obligor or its applicable Subsidiary, as applicable, are taking commercially reasonable actions to overcome or mitigate the effects of the cause of such termination, cessation so that maintenance and/or operations, as the case may be, can be resumed.

"Event of Default" is defined in Section 10.01.

"Event of Loss" has the meaning set forth in Section 10.01(k).

"EWG" means an "exempt wholesale generator," as defined in PUHCA.

"Excess Cash Flow" means, as of any date of determination, the amount remaining on deposit in the Master Revenue Account as of such date following the application of funds therefrom in accordance with clauses *first* through *eight* of Section 3.1(d)(iii) of the Depositary Agreement.

"Excess Sale Proceeds" means, (a) with respect to an Ector Disposition, the total Net Cash Proceeds received by the Borrower and its Subsidiaries from such Ector Disposition in excess of the Ector Target Sale Amount and (b) with respect to a Grays Harbor Disposition, the total Net Cash Proceeds received by the Borrower and its Subsidiaries from such Grays Harbor Disposition in excess of the Grays Harbor Target Sale Amount.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended from time to time.

"Exchange Rate" means the rate at which any currency (the "Original Currency") may be exchanged into any other currency (the "Exchanged Currency") as set forth on such date of exchange on the relevant Bloomberg Key Cross Currency Rates Page at or about 11:00 a.m. (London, England time) on such date or, if the Depositary Bank exchanges such Original Currency, then the spot rate of exchange in the interbank market for such Original Currency where the Depositary Bank's foreign currency exchange operations in respect of such Original Currency are being conducted.  In the event that such rate does not appear on the Bloomberg Key Cross Currency Rates Page as described above, the "Exchange Rate" with respect to such Original Currency into such Exchanged Currency shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower or, in the absence of such agreement, such "Exchange Rate" shall instead be the Administrative Agent's spot rate of exchange in the interbank market where its foreign currency exchange operations in respect of such Original Currency are then being conducted, at or about 11:00 a.m., local time, on such date for the purchase of the Exchanged Currency, with such Original Currency for delivery two Business Days later; provided that if at the time of any such determination, no such spot rate can reasonably be quoted, the Administrative Agent may use any reasonable method as it deems applicable to determine such rate, and such determination shall be conclusive absent manifest error.

"Excluded Swap Obligation" means, with respect to any Subsidiary Guarantor: (a) as it relates to all or a portion of the Guaranty of such Subsidiary Guarantor, any Swap Obligation if, and to the extent that, such Swap Obligation (or any Guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Subsidiary Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guaranty of such Subsidiary Guarantor becomes effective with respect to such Swap Obligation; or (b) as it relates to all or a portion of the grant by such Subsidiary Guarantor of a security interest, any Swap Obligation if, and to the extent that, such Swap Obligation (or such security interest in respect thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Subsidiary Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the security interest of such Subsidiary Guarantor becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a Master Agreement or any other master agreement in each case governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guaranty or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case: (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof); or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which: (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 4.11(a)); or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 4.06(a), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office; (c) Taxes attributable to such Recipient's failure to comply with Section 4.06(f); and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exemption Certificate" has the meaning set forth in Section 4.06(e)(iii).

 "Existing Loans" is defined in Section 2.09(a).

"Existing Project Level Indebtedness" means Indebtedness incurred by any Subsidiaries of the Borrower that: (a) exists on, and remains outstanding after giving effect to the transactions contemplated by the Original Credit Agreement and occurring on or about, the Closing Date; (b) arises under the Existing Project Level Indebtedness Documents; and (c) is identified on Schedule 6.11(a).

"Existing Project Level Indebtedness Documents" means each of the agreements, instruments, undertakings and other documents listed on Schedule 6.11(a) that evidence Existing Project Level Indebtedness, in each case, as such agreements instruments, undertakings and other documents are in effect on the Closing Date (after giving effect to the transactions contemplated by the Original Credit Agreement and occurring on or about the Closing Date), and without giving effect to any amendments, supplements, waivers or other modifications thereto.

"Extended Loan" is defined in Section 2.09(a).

"Extending Lender" is defined in Section 2.09(b).

"Extension" is defined in Section 2.09(b).

"Extension Amendment" is defined in Section 2.09(c).

"Extension Date" is defined in Section 2.09(d).

"Extension Election" is defined in Section 2.09(b).

"Extension Request" is defined in Section 2.09(a).

"Extension Request Deadline" is defined in Section 2.09(b).

"Fair Share" means, with respect to a Contributing Subsidiary Guarantor as of any date of determination, an amount equal to: (a) the ratio of: (i) the Fair Share Contribution Amount with respect to such Contributing Subsidiary Guarantor; to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Subsidiary Guarantors; *multiplied* by (b) the aggregate amount paid or distributed on or before such date by all Funding Subsidiary Guarantors under the Guaranty in respect of the Guaranteed Obligations.

"Fair Share Contribution Amount" means, with respect to a Contributing Subsidiary Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Subsidiary Guarantor under the Guaranty that would not render its obligations under Article XI subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Contributing Subsidiary Guarantor for purposes of Section 11.02, any assets or liabilities of such Contributing Subsidiary Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Subsidiary Guarantor.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary to the next 1/100th of 1%) of the rates on overnight federal funds transactions

with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary to the next 1/100th of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"<u>Fee Letter</u>" means the Amended and Restated Fee Letter, dated as of June 7, 2018, between the Borrower, the Administrative Agent and the other parties thereto, as amended by that certain Amendment No. 1, dated as of June 27, 2018.

"<u>FERC</u>" means the Federal Energy Regulatory Commission.

"<u>Filing Statements</u>" means UCC financing statements (Form UCC-1), including "transmitting utility" financing statements, naming each such Obligor executing the Pledge and Security Agreement as a debtor and the Collateral Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable, to perfect the security interests of the Collateral Agent pursuant to the Pledge and Security Agreement.

"<u>Fiscal Quarter</u>" means a quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means a fiscal year of the Borrower and each other Obligor ending on December 31 of each calendar year.

"<u>Forced Outage</u>" means any condition at a Project that requires immediate removal of such Project from service.

"<u>Foreign Lender</u>" means any Lender that is not a U.S. Person.

"<u>FPA</u>" means the Federal Power Act, as amended, and the regulations publicly promulgated thereunder.

"<u>Fronting Exposure</u>" means, at any time there is a Defaulting Lender, with respect to a Revolving LC Issuer, such Defaulting Lender's Revolving Loan Percentage of the outstanding Obligations with respect to Revolving Letters of Credit issued by such Revolving LC Issuer other than such Obligations as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms hereof.

"<u>Fuel</u>" means any fuel oil and/or gas purchased or to be purchased by the Borrower or any of its Subsidiaries from any supplier in order to meet the operating requirements of the Projects.

"<u>Fuel Marketer</u>" means any Person whose business includes the sale, marketing or distribution of Fuel.

"<u>Fund</u>" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Funding Subsidiary Guarantor" is defined in Section 11.02.

"Funds Flow Memorandum" means the memorandum, dated the Amendment Effective Date, delivered by the Borrower to the Administrative Agent (with a copy to the Depositary Bank) with respect to the disbursement of funds on the Amendment Effective Date.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect as of the relevant date of determination.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency (including FERC, NERC and any applicable regional reliability entity, National Energy Board of Canada, PUCT, Minnesota Public Utilities Commission, Florida Public Service Commission, Colorado Public Utilities Commission, Washington Utilities and Transportation Commission, Illinois Commerce Commission, Ontario Energy Board, PJM Interconnection, L.L.C., ERCOT, Midcontinent Independent System Operator, Inc., and Ontario Independent Electricity System Operator), authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Grays Harbor" means Grays Harbor Energy LLC.

"Grays Harbor Disposition" is defined in Section 9.06(f).

"Grays Harbor Disposition Proceeds" means any Net Cash Proceeds with respect to a Grays Harbor Disposition.

"Grays Harbor Energy Management Plan" means: an energy management plan that is reasonably acceptable to the Administrative Agent (in consultation with the Market Consultant for the Grays Harbor Project).

"Grays Harbor Mortgage" means that certain Deed of Trust, Security Agreement and Fixture Filing, dated as of the Closing Date, among Grays Harbor, First American Title Insurance Company and the Collateral Agent, as amended by the Grays Harbor Mortgage Amendment.

"Grays Harbor Mortgage Amendment" means the First Amendment to Deed of Trust, Security Agreement and Fixture Filing, dated as of August 22, 2019, between Grays Harbor, First American Title Insurance Company and the Collateral Agent.

"Grays Harbor Project" means that approximately 620 MW natural gas-fired generating facility located in Grays Harbor County, Washington, including all related real and personal property interests, equipment, and related assets.

"Grays Harbor Project Site" means the Project Site for the Grays Harbor Project.

"Grays Harbor Risk Management Policy" means the Risk Management Policy for Grays Harbor, attached hereto as Exhibit L, as such Risk Management Policy may be amended in accordance with Section 9.11.

"Grays Harbor Target Sale Amount" means, as of any date, $100,000,000.

"Grays Harbor Title Insurer" means First American Title Insurance Company.

"Grays Harbor Title Policy" means the mortgagee extended coverage title insurance policy with respect to the Grays Harbor Project Site delivered to the Administrative Agent under the Original Credit Agreement as a condition to the Closing Date.

"Grays Holding" means Invenergy Grays Harbor LLC, a Delaware limited liability company.

"Guaranteed Obligations" is defined in Section 11.01(a).

"Guaranty" is defined in Section 11.01(a).

"Hardee" means Hardee Power Partners Limited, a Florida limited partnership, and the sole owner of the Hardee Project.

"Hardee Indebtedness" means the Existing Project Level Indebtedness of Hardee.

"Hardee Project" means that approximately 370 MW natural gas-fired generating facility located in Hardee County, Florida, including all related real and personal property interests, equipment, and related assets.

"Hazardous Material" means any substance, material or waste listed, defined, designated or classified under any Environmental Law as hazardous, toxic, radioactive, biohazardous, infectious or dangerous, or otherwise regulated as such or for which liability or standards of care are imposed under any Environmental Law, including petroleum, petroleum by-products and asbestos-containing materials.

"Hedge Agreements" means Commodity Hedge Agreements, Interest Rate Hedge Agreements, and all other agreements or arrangements designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices (and not for speculative purposes).

"Hedging Obligations" means, with respect to any specified Person, the obligations of such Person under Hedge Agreements.

"HoldCo" is defined in the recitals.

"HoldCo Pledge Agreement" means that certain Pledge Agreement, dated as of the Closing Date, by and among HoldCo and the Collateral Agent.

"IDC" means Invenergy Development Company, a Delaware limited liability company.

"IFRS" means International Financial Reporting Standards in effect as of the date of determination thereof, consistently applied.

"IGHH" means Invenergy Grays Harbor Holdings LLC, a Delaware limited liability company.

"Impermissible Qualification" means, relative to the opinion or certification of any independent public accountant as to any financial statement of any Obligor or any of its Subsidiaries, any qualification or exception to such opinion or certification: (a) which is of a "going concern" or similar nature (other than any such exception or explanatory paragraph that is expressly solely with respect to, or expressly resulting solely from, an upcoming maturity date under the Term Loans that is scheduled to occur within one year from the time such opinion or certification is delivered); or (b) which relates to the limited scope of examination of matters relevant to such financial statement (except, in the case of matters relating to any acquired business or assets, in respect of the period prior to the acquisition by such Obligor or such Subsidiary of such business or assets).

"Incremental Term Facility" means, at any time, the aggregate amount of the Incremental Term Loan Lenders' Incremental Term Loan Commitments at such time, which shall not exceed the Incremental Term Loan Commitment Amount.

"Incremental Term Facility Sole Lead Arranger" means Credit Suisse Loan Funding LLC, in its capacity as sole lead arranger of the Incremental Term Facility.

"Incremental Term Loan" means a term loan made by any Incremental Term Loan Lender under the Incremental Term Facility.

"Incremental Term Loan Commitment" means, with respect to any Incremental Term Loan Lender, such Lender's obligation to make Incremental Term Loans pursuant to Section 2.01(b). The amount of each Lender's Incremental Term Loan Commitment, if any, is set forth on Schedule I or in the applicable Assignment and Assumption, subject to any adjustment or reduction pursuant to the terms and conditions hereof.  The aggregate amount of the Incremental Term Loan Commitments as of the Amendment Effective Date equals the Incremental Term Loan Commitment Amount.

"Incremental Term Loan Commitment Amount" means $75,000,000.

"Incremental Term Loan Commitment Termination Date" means the Amendment Effective Date (immediately after the making of the Incremental Term Loans on such date).

"Incremental Term Loan Lender" means, at any time, a Lender that, at such time, has Term Loan Exposure with respect to any Incremental Term Loans.

"Indebtedness" of any Person means, at any date, without duplication:

(a)    all obligations of such Person for borrowed money;

(b)    all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (excluding "deposit only" endorsements on checks payable to the order of such Person);

(c)    all obligations of such Person to pay the deferred purchase price of property or services (except accounts payable and similar obligations or accrued liabilities arising in the ordinary course of business shall not be included herein);

(d)    all obligations of such Person as lessee under Capitalized Lease Obligations;

(e)    all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person;

(f)    all indebtedness of others secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed;

(g)    all net liabilities of such Person under all Hedge Agreements;

(h)    all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances;

(i)    all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person; and

(j)    all obligations of others of the type referred to in clauses (a) through (i) above guaranteed by such Person, whether or not secured by a Lien or other security interest on any asset of such Person.

"Indemnified Taxes" means: (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Obligor under any Loan Document; and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" is defined in Section 13.03(b).

"Independent Engineer" means: (a) with respect to the Ector Project, E3 Consulting Services, LLC; (b) with respect to the Nelson Project, E3 Consulting Services, LLC; (c) with respect to the Grays Harbor Project, E3 Consulting Services, LLC; (d) with respect to the St. Clair Project, Leidos Engineering, LLC.

"Ineligible Assignee" means (a) those banks, financial institutions and other institutional lenders set forth on Part I of Schedule 13.08(b) and (b) any Person that is a competitor of, a major equipment supplier to, or an entity in material litigation with, the Borrower or its Affiliates in the development of electric generating facilities (as reasonably determined by the Borrower) and such Person's Affiliates identified in writing or clearly identifiable solely on the basis of their names (with respect to (b) other than bona-fide debt funds, CLOs, long term investment strategies, portfolios and accounts) and designated as such on Part II of Schedule 13.08(b), which schedule may be updated upon at least five (5) Business Days' prior written notice at the option of the

Borrower; provided, however, that: (i) the maximum number of Persons (without taking into account any Affiliates of such Persons) that may be designated on Part II of Schedule 13.08(b) at any one time is seventy-five (75); and (ii) Schedule 13.08(b) may not be updated: (A) more frequently than quarterly; (B) less than forty-five (45) days after the previous update to Part II of Schedule 13.08(b); or (C) so long as an Event of Default has occurred and is continuing; provided, further, that any such update to such Schedule shall not apply retroactively to disqualify any Person that has been a Lender or Participant hereunder at any time prior to the effective date of such update.

"Information" is defined in Section 13.11.

"Initial Hedge Agreement" means each of (i) the ISDA Master Agreement, including the Schedule related thereto, dated as of July 23, 2018, by and between the Borrower and J. Aron & Company LLC, and (ii) the Confirmation related to the ISDA Master Agreement and Schedule referred to in clause (i), dated as of July 23, 2018, by and between the Borrower and J. Aron & Company LLC.

"Intellectual Property Rights" is defined in Section 6.10.

"Interconnection Agreements" means the interconnection agreements listed on Schedule 6.12.

"Interest Period" means, relative to any Eurodollar Loan, the period beginning on (and including) the date on which such Eurodollar Loan is made or continued as, or converted into, a Eurodollar Loan pursuant to Sections 2.03 or 2.04 and shall end on (but exclude) the day which numerically corresponds to such date one, two, three or six months thereafter (or, with the consent of each applicable Lender, twelve (12) months or a period of less than one month) (or, if such month has no numerically corresponding day, on the last Business Day of such month), as the Borrower may select in their relevant notice pursuant to Sections 2.03 or 2.04; provided that:

(a)    the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than eight (8) different dates (it being understood that there shall not be more than eight (8) contracts in respect of Eurodollar Loans in effect at any one time);

(b)    if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and

(c)    no Interest Period for any Loan may end later than the Stated Maturity Date for such Loan.

"Interest Rate Hedge Agreements" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is entered into by the Borrower or any of its Subsidiaries for the purpose of hedging the interest rate exposure associated with the Borrower's and/or such Subsidiaries' operations and not for speculative purposes.

27

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Capital Stock or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP or IFRS, as applicable.

"IRS" means the United States Internal Revenue Service.

"Issuance Request" means a Revolving Letter of Credit request and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B-2 hereto.

"IT" is defined in the recitals.

"IT Project Companies" means each of Ector, Grays Harbor and Nelson.

"IT Projects" means each of the Ector Project, the Grays Harbor Project and the Nelson Project.

"IT Real Property Interest" has the meaning set forth in Section 6.06(b).

"ITF" means Invenergy Thermal Financing LLC, a Delaware limited liability company, and the indirect owner of the ITF Project Companies.

"ITF Project Companies" means each of Cannon Falls, Hardee, and Spindle Hill.

"ITF Projects" means each of the Cannon Falls Project, the Hardee Project and the Spindle Hill Project.

"Judgment Currency" is defined in Section 13.16(a).

"Judgment Currency Conversion Date" is defined in Section 13.16(a).

"Lead Arrangers" means, collectively, the Closing Date Credit Facilities Lead Arrangers and the Incremental Term Facility Sole Lead Arranger.

"Legal Requirements" means, as to any Person, the articles of incorporation, bylaws or other organizational or governing documents of such Person, and any Applicable Law, any requirement under a Permit, and any determination of any Governmental Authority in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its property is subject.

"Lenders" means each Term Loan Lender, each Revolving Loan Lender and any Person that becomes one of them pursuant to Section 13.08.

"Leverage Ratio" means, as of any date of determination, the ratio of: (a) Total Net Debt as of the last day of the Measurement Period corresponding to such date of determination after

giving effect to any payment or prepayment of such Indebtedness to be made on the last day of such Measurement Period; to (b) the sum of all Adjusted Operating Cash Available for Debt Service for such Measurement Period (*minus* any amounts used to pay or prepay such Total Net Debt on the last day of such Measurement Period under clause (a)).

"Leverage Ratio Certificate" means a certificate with respect to the Leverage Ratio duly executed by an Authorized Financial Officer of the Borrower substantially in the form of Exhibit D-2 hereto.

"LIBO Rate" means, with respect to any Eurodollar Loans for any Interest Period, the rate of interest appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to such service as determined by the Administrative Agent) as the London interbank offered rate for deposits in Dollars for a term comparable to such Interest Period, at approximately 11:00 a.m. (London time) on the date which is two (2) Business Days prior to the commencement of such Interest Period (but if more than one rate is specified on such page, the rate will be an arithmetic average of all such rates).

"Lien" means: (a) any mortgage, pledge, hypothecation, assignment, mandatory deposit arrangement, encumbrance, security interest, charge, lien (statutory or other), preference, priority or other agreement of any kind or nature whatsoever which has the substantial effect of constituting a security interest, including any conditional sale or other title retention agreement, any financing lease having substantially the same effect as any of the foregoing and the filing of any financing statement or similar instrument under the UCC or comparable law of any jurisdiction; or (b) any right of any Person other than the Borrower or any of its Subsidiaries to control, use or occupy any real property or assets owned in whole or in part by the Borrower or any of its Subsidiaries.

"Loan Documents" means this Agreement, the Collateral Agency and Intercreditor Agreement, the Security Documents, the Funds Flow Memorandum, the Notes, the Fee Letter and the Omnibus Amendment Agreement.

"Loans" means, as the context may require, Revolving Loans and/or Term Loans.

"Local Accounts" is defined in the Depositary Agreement.

"Major Maintenance and CapEx Reserve Account" is defined in the Depositary Agreement.

"Major Maintenance Expenses" is defined in the Depositary Agreement.

"Market Consultant" means with respect to the Ector Project, the Grays Harbor Project and the Nelson Project, PA Consulting Group, Inc.

"Master Agreement" means any Master Agreement published by the International Swaps and Derivatives Association, Inc.

"Master Revenue Account" is defined in the Depositary Agreement.

"Material Adverse Effect" means any event, development or circumstance that has, or could reasonably be expected to have, a material adverse effect on: (a) the business, assets, property, condition (financial or otherwise), results of operations of the Borrower and its Subsidiaries (taken as a whole); (b) the ability of the Obligors to perform their respective obligations under any Loan Document; or (c) the validity, enforceability or priority of the security interests granted in favor of the Secured Parties pursuant to the Security Documents granting a security interest in a material portion of the Collateral.

"Material Project Documents" means: (a) those agreements set forth on Schedule 6.12; and (b) each Additional Project Document.

"MBR Authority" means authorization from FERC: (a) authorizing a Project Company to sell at wholesale at market-based rates electric energy and capacity and the ancillary services, if any, contained in its market-based rate tariff; and (b) granting a Project Company waivers of regulations and blanket authorizations customarily granted by FERC to an entity that sells electric energy, capacity or ancillary services at wholesale at market-based rates, including blanket authorization for the issuance of securities and assumption of liabilities under Section 204 of the FPA.

"Measurement Period" means as of any date of determination, the then-ending (or, if applicable, most recently ended) period of four consecutive Fiscal Quarters, taken as one accounting period.

"Minimum Extension Condition" is defined in Section 2.09(g).

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means each mortgage, deed of trust or other agreement, in any case in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered by any Obligor in favor of, or collaterally assigned by any Obligor to, the Collateral Agent, for the benefit of the Secured Parties, pursuant to the requirements of this Agreement, under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time. The Mortgages shall include the Ector Mortgage, the Grays Harbor Mortgage and the Nelson Mortgage.

"Mortgage Amendments" means each of the Ector Mortgage Amendment, the Grays Harbor Mortgage Amendment and the Nelson Mortgage Amendment.

"Multiemployer Plan" means an employee pension benefit plan within the meaning of Section 4001(a)(3) of ERISA to which any member of the ERISA Group is then making or accruing an obligation to make contributions or has any liability.

"MW" means one million watts.

"Necessary Capital Expenditures" means any Capital Expenditures required by Applicable Law or any Material Project Document; provided that for any such Capital Expenditures in excess of $1,000,000 in the aggregate for any Project in any Fiscal Year: (a) such Applicable Law requires such Capital Expenditure by a specified date before the Stated Maturity Date; and (b) any such

Material Project Document: (i) was in effect as of the Closing Date and has not been amended thereafter to provide for additional Capital Expenditures; or (ii) replaces a Material Project Document that was in existence as of the Closing Date and which, during what would have been the remaining term of the Material Project Document that it replaces, does not require Capital Expenditures during such remaining term in excess of the Capital Expenditures required and not yet made under such existing Material Project Document.  Necessary Capital Expenditures shall not include any Capital Expenditure undertaken primarily to increase the electric generating capacity of, or to expand or re-power, any Project, or Capital Expenditures for environmental purposes that are not required by Applicable Law or any Material Project Document in existence on the Closing Date.

"Nelson" means Invenergy Nelson LLC, a Delaware limited liability company.

"Nelson Energy Management Plan" means: (a) that Energy Management Agreement, dated November 2, 2017, between Invenergy Services LLC and Nelson; and (b) any replacement of any of the foregoing that is reasonably acceptable to the Administrative Agent (in consultation with the Market Consultant for the Nelson Project).

"Nelson Holding" means Invenergy Nelson Holdings LLC, a Delaware limited liability company and the sole owner of Nelson.

"Nelson Mortgage" means that certain Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of the Closing Date, among Nelson and the Collateral Agent, as amended by the Nelson Mortgage Amendment.

"Nelson Mortgage Amendment" means the First Amendment to Mortgage, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of August 22, 2019, by and between Nelson and the Collateral Agent.

"Nelson Project" means that approximately 615 MW natural gas-fired generating facility located in Rock Falls, Illinois, including all related real and personal property interests, equipment, and related assets.

"Nelson Project Site" means the Project Site for the Nelson Project.

"Nelson Risk Management Policy" means the Risk Management Policy for the Nelson Project, attached hereto as Exhibit J, as such Risk Management Policy may be amended in accordance with Section 9.11.

 "Nelson Title Insurer" means First American Title Insurance Company.

"Nelson Title Policy" means the mortgagee extended coverage title insurance policy with respect to the Nelson Project Site delivered to the Administrative Agent under the Original Credit Agreement as a condition to the Closing Date.

"NERC" means the North American Electric Reliability Corporation or any successor certified by FERC as the electric reliability organization for the United States.

"<u>Net Asset Sale Proceeds</u>" means any Net Cash Proceeds received by an Obligor or any of its Subsidiaries from an Asset Sale (other than an Ector Disposition or a Grays Harbor Disposition) that are not: (a) required to be applied: (i) to the payment or reduction of Project Level Indebtedness; or (ii) to another purpose under any applicable Project Level Indebtedness Document; (b) otherwise prohibited at the time of receipt from being distributed to an Obligor or any of its Subsidiaries under the applicable Project Level Indebtedness Document; or (c) Non-Distributable Assets under the Organic Documents of any Non-Wholly-Owned Subsidiary.

"<u>Net Cash Proceeds</u>" means in connection with any issuance or sale of equity securities or debt securities or instruments or the incurrence of loans or the sale of any assets, the cash proceeds received from such issuance or incurrence or sale, net of Taxes, attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses, in each case actually incurred in connection therewith, and any minority interests in respect of such amounts and proceeds attributable to a Person other than an Obligor or any of its Subsidiaries.

"<u>Net Casualty Proceeds</u>" means, with respect to any Casualty Event, the cash amount of any insurance proceeds under any casualty insurance policy (other than any insurance proceeds in respect of or arising under any casualty insurance policy relating to liability, business interruption or Forced Outage) or condemnation awards received by any Obligor or any of its Subsidiaries in connection therewith, <u>*less*</u>: (a) amounts expended by such Obligor or such Subsidiary on legal, accounting and other professional fees, expenses and charges incurred in connection with collecting such insurance proceeds or condemnation awards; (b) all amounts required to be applied: (i) to the payment or reduction of Project Level Indebtedness; or (ii) to another purpose under any applicable Project Level Indebtedness Document; and (c) any Non-Distributable Assets under the Organic Documents of any Non-Wholly-Owned Subsidiary.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Non-Distributable Assets</u>" means any and all cash and Permitted Investments of a Subsidiary of the Borrower, the distribution of which to the Borrower (either directly or indirectly through one or more intermediate Subsidiaries) is: (a) contrary to the Organic Documents of such Subsidiary; or (b) prohibited by any applicable Project Level Indebtedness Documents.

"<u>Non-Domestic Credit Party</u>" means any Credit Party that is not a "United States person," as defined under Section 7701(a)(30) of the Code.

"<u>Non-Extending Lender</u>" is defined in <u>Section 2.09(e)</u>.

"<u>Non-Guarantor Borrower Party</u>" is defined in <u>Section 11.13</u>.

"<u>Non-Recourse Party</u>" is defined in <u>Section 13.17</u>.

"<u>Non-Wholly-Owned Subsidiary</u>" means a Subsidiary of the Borrower other than a Wholly-Owned Subsidiary, and "<u>Non-Wholly-Owned Subsidiaries</u>" means all Subsidiaries of the Borrower other than Wholly-Owned Subsidiaries, collectively.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

"Note" means, as the context may require, Revolving Note and/or Term Note.

"Obligation Currency" is defined in Section 13.16(a).

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of each Obligor arising under or in connection with a Loan Document, including the principal of and premium, if any, and interest (including interest accruing during the pendency of any proceeding of the type described in Section 10.01(i), whether or not allowed in such proceeding) on the Loans and all Reimbursement Obligations.

"Obligee Subsidiary Guarantor" is defined in Section 11.07.

"Obligor" means, collectively, the Borrower and the Subsidiary Guarantors.

"OFAC" is defined in Section 6.28.

"Omnibus Amendment Agreement" means that certain Omnibus Amendment Agreement dated as of August 22, 2019, among the Borrower, the Subsidiary Guarantors, the Lenders party thereto, the Revolving LC Issuers party thereto, J. Aron & Company LLC, the Collateral Agent and the Administrative Agent.

"Operating Accounts" is defined in the Depositary Agreement.

"Operating and Capital Budget" is defined in Section 7.05(a).

"Operating Cash Available for Debt Service" means during any period: (a) the sum of (without duplication): (i) all cash amounts received by the Borrower from Distributions from its Subsidiaries; (ii) all cash proceeds received by the Borrower from business interruption insurance; (iii) all cash interest income received by the Borrower in respect of Permitted Investments; and (iv) all other cash amounts received by the Borrower in respect of any Subsidiary (excluding amounts comprised of: (x) proceeds of casualty insurance; (y) any receipts derived from the sale of any property pertaining to the such Subsidiaries; and (z) the proceeds of any condemnation awards relating to such Subsidiaries; *minus* (b) the sum of (without duplication): (i) all amounts paid by or on behalf of the Borrower in respect of Operation and Maintenance Expenses during such period other than Major Maintenance Expenses and Capital Expenditures paid with funds from the Major Maintenance and CapEx Reserve Account; (ii) all cash amounts contributed by or on behalf of the Borrower to the Major Maintenance and CapEx Reserve Account; and (iii) all Taxes paid by the Borrower; provided that any amounts contributed to the Borrower or any of its Subsidiaries as cash contributions by an Affiliate of the Borrower (other than any of the Borrower's Subsidiaries) for purposes of making Capital Expenditures or otherwise (other than amounts contributed to the Borrower for purposes of determining compliance with the DSCR Covenant, but only as and to the extent permitted under Section 9.19(b)) shall be disregarded for purposes of determining Operating Cash Available for Debt Service; provided that, notwithstanding anything to the contrary herein, Operating Cash Available for Debt Service for the Fiscal Quarters ending on March 31, 2018, June 30, 2018 and September 30, 2018, shall be deemed to be $10,973,253, $19,738,455 and $18,514,098, respectively.

*ITOI Amended and Restated Credit and Guaranty Agreement*

"Operation and Maintenance Agreements" means the operation and maintenance agreements listed on Schedule 6.12.

"Operation and Maintenance Expenses" means, for any period, the sum without duplication of: (a) all costs and expenses of administering and operating the IT Projects and all other equipment and facilities ancillary to the IT Projects and maintaining them in good repair and operating condition, including Major Maintenance Expenses, Capital Expenditures, costs and expenses under long-term service agreements or spare parts agreements, Fuel costs, transmission costs, costs, fees and expenses under any Project Document (including payments under any Commodity Hedge Agreement other than any termination, liquidation or unwind payments under such Commodity Hedge Agreement to the extent such termination, liquidation or unwind payments are not compensation for deliveries made, or obligations performed, prior to such termination, liquidation or unwind) to which any Obligor is a party, costs and payments under the Energy Management Plans and any other energy management agreements relating to the IT Projects, costs and payments under the Operation and Maintenance Agreements relating to the IT Projects, and costs and payments under leases; (b) general and administrative expenses of the Obligors and their Subsidiaries and permitted intercompany servicing and costs; (c) insurance costs and expenses, including outage insurance; (d) all sales, use, property, excise, franchise, licensing and other Taxes (excluding Taxes imposed on or measured by income or receipt) to which the IT Projects, the Obligors or their Subsidiaries may be subject; (e) employee salaries, wages and other employment-related costs associated with the IT Projects; (f) costs, fees and expenses incurred in connection with obtaining and maintaining in effect the Permits required to maintain and operate the IT Projects; (g) the reasonable costs and expenses of administration and enforcement of the Loan Documents; (h) all costs and expenses associated with commodity or Fuel transactions and Fuel transportation relating to the IT Projects, in each case to the extent incurred pursuant to arrangements permitted under this Agreement; (i) to the extent permitted under this Agreement, all costs and expenses associated with the transfer of collateral or margin to secure commodity, emissions allowances or Fuel transactions relating to the IT Projects; and (j) reasonable and necessary legal, accounting and other professional fees and expenses incurred in connection with any of the foregoing items; provided, however that, Operation and Maintenance Expenses shall be exclusive in all cases of: (x) non-cash charges, including depreciation or obsolescence charges or reserves therefor; (y) amortization of intangibles or other bookkeeping entries of a similar nature; and (z) all interest charges and charges for the payment or amortization of the principal of the Indebtedness of the Borrower.

"Organic Document" means, relative to any Person, as applicable, its certificate of incorporation, by laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, articles of association or any other similar document and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Person's partnership interests, limited liability company interests or authorized shares of Capital Stock.

"Original Credit Agreement" is defined in the recitals.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security

interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 4.11</u>).

"<u>Participant</u>" is defined in <u>Section 13.08(d)</u>.

"<u>Participant Register</u>" is defined in <u>Section 13.08(d)</u>.

"<u>PATRIOT Act</u>" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"<u>Pension Plan</u>" means any single-employer defined benefit "<u>employee pension benefit plan</u>" (within the meaning of Section 3(2) of ERISA) which is subject to Title IV of ERISA or Section 412 of the Code and which is maintained in whole or in part by the Borrower, its Subsidiaries, or any member of the Borrower's ERISA Group or of the Borrower's Subsidiaries' respective ERISA Groups for current or former employees (or any beneficiary thereof) of the Borrower or any Subsidiary of the Borrower, as the case may be.

"<u>Permit</u>" means any action, approval, consent, waiver, exemption, variance, franchise, order, permit, authorization, filing, notice, grant, easement, registration, right or license of, with or from a Governmental Authority.

"<u>Permitted Business</u>" means: (a) in respect of HoldCo, each Obligor and each Subsidiary of an Obligor (other than any Project Company): (i) entering into the transactions and assuming the obligations as contemplated in the Loan Documents; (ii) owning the Capital Stock of its existing Subsidiaries as of the Closing Date; and (iii) to the extent applicable, performing its obligations under any applicable Project Level Indebtedness Document as of the Closing Date; and (b) in respect of each Project Company: (i) owning the Project it owns on the Closing Date; (ii) operating and maintaining such Project in accordance with Prudent Industry Practices and such Project's Risk Management Policy to produce and sell electric energy and derivative products; and (iii) to the extent applicable, performing its obligations under any applicable Project Level Indebtedness Document as of the Closing Date.

"<u>Permitted Commodity Hedge Agreement</u>" means any Commodity Hedge Agreement: (a) entered into by Ector in connection with the Ector Project that is consistent with the Ector Energy Management Plan or the Ector Risk Management Policy; (b) entered into by Nelson in connection with the Nelson Project that is consistent with the Nelson Energy Management Plan or the Nelson Risk Management Policy; or (c) entered into by Grays Harbor in connection with the Grays Harbor

Project that is consistent with the Grays Harbor Energy Management Plan or the Grays Harbor Risk Management Policy.

"Permitted Encumbrances" means, with respect to any Title Policy, those certain encumbrances appearing as exceptions to title in Schedule B of such Title Policy, but only to the extent such exceptions to title have been approved by the Administrative Agent prior to the issuance of such Title Policy; provided, however, that notwithstanding the foregoing, the term "Permitted Encumbrances" shall not include: (a) any such exceptions to title which are general exceptions (unless such general exceptions to title would constitute Permitted Liens without giving effect to clause (n) of the definition of "Permitted Liens"); or (b) exceptions to coverage relating to the failure of a Project or the insured under such Title Policy to comply with the terms and provisions of any document described in Schedule A of such Title Policy.

"Permitted Indebtedness" is defined in Section 9.01.

"Permitted Investments" means an investment in any of the following:

(a)    direct obligations of the United States of America or any of its agencies with a maturity of not more than one year after the issuance of such obligations;

(b)    obligations guaranteed by the United States of America or any of its agencies with a maturity of not more than one year after the issuance of such obligations;

(c)    interest-bearing demand or time deposit accounts (which may be represented by money market, time or certificates of deposit) of any lender or any U.S. domestic bank, Canadian bank or European Union bank whose outstanding short-term debt is rated at least "A-1" or the equivalent thereof by S&P or "Prime 1" or the equivalent thereof by Moody's with capital and surplus of at least $1,000,000, which, in the case of a time deposit, has a maturity of 180 days or less;

(d)    money market mutual funds which are registered under the Investment Company Act of 1940 and rated "AAA" by S&P and "Aaa" by Moody's.  Such fund must have assets in excess of $500,000,000 and at no point in time will this investment constitute more than 5% of fund assets;

(e)    direct obligations of, obligations guaranteed by, and any other obligations issued by, any state of the United States, the District of Columbia or any political subdivision, agency, authority or instrumentality of any of the foregoing, which are rated at "A" or higher by S&P or "A2" or higher by Moody's with a maturity at the time of acquisition thereof of 270 days or less; and

(f)    commercial paper, not including liquidity notes or other extendable securities, issued by any Person which is rated at least "A 1" or the equivalent thereof by S&P or at least "Prime 1" or the equivalent thereof by Moody's with a maturity at the time of acquisition thereof of 185 days or less.

"Permitted Liens" means:

36

(a)     the rights and interests of the Collateral Agent and any other Secured Party as provided for in the Loan Documents;

(b)     Liens for any Tax, either not yet due or being contested in good faith and by appropriate proceedings, so long as adequate reserves have been provided therefor on the books of the taxpayer to the extent required by and in accordance with GAAP or IFRS, as applicable;

(c)     materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, arising in the ordinary course of business, either for amounts that are not yet delinquent or for amounts being contested in good faith and by appropriate proceedings, so long as adequate reserves have been provided therefor on the books of the relevant Person to the extent required by and in accordance with GAAP or IFRS, as applicable;

(d)     Liens arising out of judgments or awards so long as enforcement of such Liens has been stayed and an appeal or proceeding for review is being prosecuted in good faith and for the payment of which adequate reserves, bonds or other reasonable security (as determined by the Administrative Agent) have been provided or are fully covered by insurance;

(e)     Liens, deposits or pledges to secure statutory obligations incurred in the ordinary course of business;

(f)     Liens, deposits or pledges to secure performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or for purposes of like general nature in the ordinary course of its business;

(g)     other Liens incidental to the ordinary course of business of a Project that are not incurred in connection with the obtaining of any loan, advance or credit and that do not in the aggregate materially impair the use of an Obligor's or any of its Subsidiaries' property or assets or the value of such property or assets for the purpose of such business and that could not otherwise reasonably be expected to have a Material Adverse Effect;

(h)     involuntary Liens as contemplated by the Loan Documents and the Project Documents (including a Lien of an attachment or execution) securing a charge or obligation on any of an Obligor's or any of its respective Subsidiaries' property, either real or personal, whether now or hereafter owned, in the aggregate sum of less than $1,000,000;

(i)     servitudes, easements, rights-of-way, restrictions, minor defects or irregularities in title and such other encumbrances or charges against real property or interests therein as of a nature generally existing with respect to properties of similar character and which in the aggregate do not in a material way interfere with the value or use of Obligor's or any of its respective Subsidiaries' assets or property, either real or personal, whether now or hereafter owned;

(j)     Liens securing: (i) Existing Project Level Indebtedness that are in existence as of the Closing Date or (ii) any Permitted Refinancing Indebtedness;

(k)     Liens as contemplated under the Power Purchase Agreements that are: (i) in existence as of the Closing Date; (ii) that arise after the Closing Date with respect to power purchase agreements that replace such existing Power Purchase Agreements that expire in

37

accordance with their terms or are terminated by the counterparty thereunder; or (iii) that arise under the Permitted St. Clair Marketing Agreements; provided that such Liens may not, after the Closing Date, extend to: (x) any assets of any Project Company not party to such existing Power Purchase Agreement; or (y) any additional property of: (i) the Project Company party to such existing Power Purchase Agreement or Permitted St. Clair Marketing Agreements; or (ii) any other Obligor or Subsidiary thereof;

    (l)      Liens securing Indebtedness incurred pursuant to Section 9.01(c);

    (m)     Liens securing Hedging Obligations arising under:

        (i)      Transaction Interest Rate Hedge Agreements entered into by the Borrower pursuant to Section 8.18 that are Secured Interest Rate Hedge Agreements;

        (ii)     subject to the Commodity Hedge Cap Amount (to the extent applicable), any Permitted Obligor Commodity Hedge Agreements; and

        (iii)    the Permitted St. Clair Marketing Agreements;

    (n)      Permitted Encumbrances.

For the avoidance of doubt, "Permitted Liens" does not include any such Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA.

"Permitted Obligor Commodity Hedge Agreements" means any Permitted Commodity Hedge Agreement that is entered into by Ector, Nelson or Grays Harbor with any Commodity Institution, Power Distributor or Fuel Marketer (a) with a Required Rating or (b) that has provided a letter of credit from a financial institution with a Required Rating in sufficient amount (as reasonably determined by the Borrower) with respect to such Permitted Commodity Hedge Agreement; provided, that the Administrative Agent shall have the right to disapprove such letter of credit if the Administrative Agent reasonably determines that the amount of such letter of credit is insufficient; provided, further, that, in the case of clause (b), the Borrower shall have provided the Administrative Agent written notice of the amount of such letter of credit at least ten (10) days prior to entry into such Permitted Commodity Hedge Agreement by the applicable IT Project Company; provided, further to the extent the Hedging Obligations arising thereunder are secured by a Lien on the Collateral, the Secured Commodity Hedge Counterparty (as defined in the Collateral Agency and Intercreditor Agreement) party thereto shall be or shall become a party to the Collateral Agency and Intercreditor Agreement in accordance with the terms thereof and shall have the obligations of a "Secured Party" thereunder.

"Permitted Refinancing Indebtedness" mean Indebtedness incurred to refinance, renew, replace, defease, refund or extend, in whole or in part the St. Clair Indebtedness or the Hardee Indebtedness, as applicable, and satisfying the conditions with respect to such incurrence set forth in Section 9.12(b).

"Permitted Restriction" means, with respect to any Non-Guarantor Borrower Party, a restriction in any applicable Project Level Indebtedness Document to which such Non-Guarantor

Borrower Party is a party on the ability of such Non-Guarantor Borrower Party to provide the Guaranty or otherwise create a Lien on any of its Property.

"Permitted St. Clair Marketing Agreements" means those Commodity Hedge Agreements that are permitted under the St. Clair Energy Management Plan.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA (other than a Multiemployer Plan): (a) which is maintained in whole or in part for current or former employees (or any beneficiary thereof) of the Borrower or its Subsidiaries; or (b) with respect to which the Borrower or its Subsidiaries, as the case may be, has a direct or indirect, actual or contingent liability.

"Platform" is defined in Section 13.02(d)(i).

"Pledge and Security Agreement" means that certain Pledge and Security Agreement, dated as of the Closing Date, by and among the Obligors and the Collateral Agent.

"Power Distributor" means, with respect to any Power Purchase Agreement, any Person that is a public utility or one of whose primary businesses includes the sale or distribution of electric energy.

"Power Purchase Agreements" means power purchase and/or tolling agreements pursuant to which any Subsidiary of the Borrower sells power and energy to third parties in transactions permitted under the terms of this Agreement, excluding all such agreements which are daily sales, spot market or other short-term (not to exceed three months) arrangements. Schedule 6.12 lists all of the Power Purchase Agreements to which any Subsidiary of the Borrower is a party as of the Closing Date.

"Prime Rate" means the per annum rate of interest established from time to time and announced by the Administrative Agent as its base rate in effect at the Administrative Agent's offices in New York, New York. Any change in the interest rate resulting from a change in the Prime Rate shall become effective as of 12:01 a.m. New York time of the Business Day on which each change in the Prime Rate is announced by the Administrative Agent.

"Project Company" means any of the IT Project Companies, the ITF Project Companies, or St. Clair.

"Project Documents" means the Material Project Documents and any other agreement relating to the operation of a Project.

"Project Level Indebtedness" means the Existing Project Level Indebtedness and any Permitted Refinancing Indebtedness, as applicable.

"Project Level Indebtedness Documents" means the Existing Project Level Indebtedness Documents or the Refinancing Project Level Indebtedness Documents, as applicable.

*ITOI Amended and Restated Credit and Guaranty Agreement*

"Project Site" means, with respect to each Project, all Real Property Interests owned or controlled by the Project Company owning such Project.

"Projects" means each of the IT Projects, the ITF Projects and the St. Clair Project.

"Property" means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent consolidated balance sheet of such Person under GAAP or IFRS, as applicable.

"Prudent Industry Practice" means the practices, methods and acts engaged in or approved by a significant portion of the independent power project industry in Canada, in the case of the facilities located in Canada, or the United States, in the case of the facilities located in the United States, for power plants similar to the Projects during the relevant time period, which practices, methods and acts, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.  Prudent Industry Practice is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather is intended to include prudent practices, methods, and acts generally accepted in Canada or the United States, as applicable.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Official" means: (a) any Person holding a legislative, administrative or judicial position of any kind; (b) any officer, employee or any other Person acting in an official capacity for any Governmental Authority; and (c) any political party or official thereof or any candidate for political office.

"PUCT" means the Public Utilities Commission of Texas.

"PUHCA" means the Public Utility Holding Company Act of 2005, as amended from time to time hereafter, and all rules and regulations adopted thereunder as found in 18 C.F.R. Part 366.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 13.23.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Subsidiary Guarantor that, at the time the relevant Guaranty or grant of the relevant security interest becomes effective with respect to such Swap Obligation, has total assets exceeding $10,000,000, or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Energy Manager" means any Person having demonstrated experience providing energy management services to thermal generating facilities in North America with an aggregate capacity of at least 1000 MW.

"Qualified Operator" means any Person that has been a majority owner and operator during the preceding five (5) year period of thermal generating facilities in North America with an aggregate capacity of at least 1000 MW.

"Qualified Owner" means any Person that (a) either (i) is a Qualified Operator or (ii) has caused the Borrower to contract for the operation of the Projects with one or more Qualified Operators and (b) either (i) is a Qualified Energy Manager or (ii) has caused the Borrower to contract for energy management services for the Projects with one or more Qualified Energy Managers (which may include a Qualified Operator for the Projects to the extent such Qualified Operator is a Qualified Energy Manager); provided, that prior to any such Person becoming an owner, directly or indirectly, of any of the equity interests in the Borrower, such person shall have satisfied the "know your customer" and anti-money laundering rules and regulations of the Administrative Agent and the Lenders.

"Quarterly Payment Date" means the last Business Day of each March, June, September and December; provided, that the first Quarterly Payment Date shall occur on the last business day of December 2018.

"Rating Agencies" means S&P and Moody's.

"Ratings Reaffirmation" means, with respect to any applicable transaction, that each Rating Agency shall have delivered a written confirmation that the credit ratings assigned by such entities to the Term Loans or Revolving Loans, as applicable, made or committed hereunder shall be no lower than such ratings assigned by such Rating Agency, as the case may be, to such Term Loans or Revolving Loans immediately prior to the time that such Rating Agency, as the case may be, became aware of the proposed occurrence of such event and all transactions related thereto, in each case after giving effect to the occurrence of such proposed transaction, and all transactions related thereto.

"Real Property" means the real property to which the Real Property Interests pertain.

"Real Property Interests" has the meaning set forth in Section 6.15(a).

"Recipient" means the Administrative Agent or any Lender, as applicable.

"Reconstruction Period" is defined in the Depositary Agreement.

"Reduction Amount" has the meaning set forth in Section 3.03(c).

"Refinancing Project Level Indebtedness Documents" means each of the agreements, instruments, undertakings and other documents that evidence Permitted Refinancing Indebtedness to the extent that the terms thereof are otherwise consistent with the requirements of Section 9.12(b).

41

"Register" is defined in Section 13.08(c).

"Regulation T" means Regulation T of the Board, as in effect from time to time.

"Regulation U" means Regulation U of the Board, as in effect from time to time.

"Regulation X" means Regulation X of the Board, as in effect from time to time.

"Reimbursement Obligation" has the meaning set forth in Section 2.07(d).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, emptying, escaping, dumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of any Hazardous Material, into the indoor or outdoor environment including the movement of Hazardous Materials through or in the air, soil, surface water, ground water or property.

"Release Event" means, with respect to any Non-Guarantor Borrower Party, that such Non-Guarantor Borrower Party ceases to be subject to any Permitted Restriction.

"Remedial Action" means all actions required under applicable Environmental Law to: (a) clean up, remove, remedy, treat or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent any threatened Release or minimize the further Release of Hazardous Materials so that Hazardous Materials do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"Replacement Lender" has the meaning set forth in Section 4.11(a).

"Replacement Notice" has the meaning set forth in Section 4.11(a).

"Replacement Project Document" means any Additional Project Document entered into in replacement of an existing Material Project Document, as certified to the Administrative Agent by an Authorized Officer of the Borrower: (a) which has economic terms substantially similar to or more favorable to the Borrower or the Subsidiary of the Borrower party thereto, as applicable, and substantially similar or more favorable non-economic terms (taken as a whole) as the Material Project Document being replaced; and (b) with a counterparty (or a guarantor of such counterparty's obligations) having substantially similar or better creditworthiness and experience as the counterparty to the Material Project Document being replaced.

"Required Insurance" means insurance in the forms, types, amounts and with the deductibles specified by Schedule III.

"Required Lenders" means, at any time, Lenders holding more than 50% of the Total Exposure Amount; provided that the Total Exposure Amount held by a Defaulting Lender or an Affiliated Lender (other than an Affiliated Debt Fund) shall be disregarded when determining the

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

Required Lenders; provided, further, that the Total Exposure Amount held by Affiliated Lenders that are Affiliated Debt Funds shall be disregarded when determining Required Lenders to the extent of the Total Exposure Amount held by Affiliated Lenders that are Affiliated Debt Funds in excess of 49.9% of the Total Exposure Amount.

"Required Rating" means, with respect to any Commodity Institution, Power Distributor or Fuel Marketer, that either: (a) the unsecured senior debt obligations of such Person are rated at least Baa3 by Moody's and at least BBB- by S&P; or (b) such Person's obligations under any applicable Permitted Commodity Hedge Agreement are guaranteed by a Person whose unsecured senior debt obligations are rated at least Baa3 by Moody's and at least BBB- by S&P; provided that if as of any date of determination such Person does not have any rating for its unsecured senior debt obligations, then such Person's corporate issuer rating shall be at least Baa3 by Moody's and at least BBB- by S&P; provided further that if as of any date of determination such Person's unsecured senior debt obligations are rated by only one of S&P and Moody's (or only one of S&P and Moody's has assigned a corporate issuer rating to such Person if neither S&P nor Moody's has rated such Person's unsecured senior debt obligations), then such Person's unsecured senior debt obligations are rated at, or its corporate issuer rating is (if neither S&P nor Moody's has rated such Person's unsecured senior debt obligations), at least the rating identified for such applicable rating agency in clause (a) or (b) above.

"Required Revolving Lenders" means, at any time, Revolving Loan Lenders holding, in the aggregate, more than 50% of the total Revolving Loan Exposure of all Revolving Loan Lenders; provided that any Revolving Loan Exposure held by a Defaulting Lender shall be disregarded when determining the Required Revolving Lenders.

"Resignation Effective Date" is defined in Section 12.06(a).

"Restricted Payment" means, with respect to any Person: (a) the declaration and payment of distributions, dividends or any other payment made in cash, property, obligations or other notes in respect of its Capital Stock; (b) the making of any loans or advances to any Affiliate; (c) any prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement or similar payment with respect to any Indebtedness other than the Loans; or (d) any purchase, redemption, acquisition or retirement for value (including in connection with any merger or consolidation) of the an Obligor's Capital Stock; provided that the term "Restricted Payments" shall not include: (i) any payments made to the Secured Parties in connection with the transactions contemplated hereby and by the other Loan Documents; and (ii) payments made to any Affiliate of such Person for goods and services purchased or procured in accordance with transactions permitted under the terms of the Loan Documents.

"Revenue Accounts" is defined in the Depositary Agreement.

"Revolving Credit Facility" means Commitments provided by the Revolving Loan Lenders and Revolving LC Issuers pursuant to which Revolving Loans may be made and Revolving Letters of Credit may be issued from time to time, not to exceed the Revolving Loan Commitment Amount in the aggregate.

"Revolving LC Issuer" means any of: (a) Credit Suisse AG, Cayman Islands Branch and Goldman Sachs Bank USA in its capacity as an issuer of the Revolving Letters of Credit; (b) any other Lender acting in such capacity; or (c) any other Person appointed pursuant to Section 2.07(g). A Revolving LC Issuer may, in its discretion, arrange for one or more Revolving Letters of Credit to be issued by Affiliates of such Revolving LC Issuer in which case the term "Revolving LC Issuer" shall include any such Affiliate with respect to any Revolving Letter of Credit issued by such Affiliate.

"Revolving Letter of Credit" is defined in Section 2.01(c)(i)(A).

"Revolving Letter of Credit Application" means an application and agreement for the issuance or amendment of a Revolving Letter of Credit in the form from time to time in use by a Revolving LC Issuer.

"Revolving Letter of Credit Commitment" means a Revolving LC Issuer's obligation to issue Revolving Letters of Credit pursuant to Section 2.01(c)(i). The amount of each Revolving LC Issuer's Revolving Letter of Credit Commitment Amount, if any, is set forth on Schedule I or in the assignment documentation delivered pursuant to Section 2.07(g), subject to any assignment, adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Letter of Credit Commitments as of the Amendment Effective Date equals the Revolving Letter of Credit Commitment Amount.

"Revolving Letter of Credit Commitment Amount" means, on any date, a maximum amount of $70,000,000, as such amount may be permanently reduced from time to time pursuant to Section 2.02 or Section 3.03; provided that any reduction of the Revolving Loan Commitment Amount below the Revolving Letter of Credit Commitment Amount shall result in an automatic and corresponding reduction of the Revolving Letter of Credit Commitment Amount to an aggregate amount not in excess of the Revolving Loan Commitment Amount, as so reduced.

"Revolving Letter of Credit Outstandings" means, at any time of determination, the sum of: (a) the aggregate Stated Amount of all issued and outstanding Revolving Letters of Credit; plus (b) all outstanding and unreimbursed Reimbursement Obligations.

"Revolving Loan Commitment" means, as the context may require, relative to any Lender, such Lender's obligation (if any) to make Revolving Loans pursuant to Section 2.01(a)(i) and the obligation of such Revolving Loan Lender to acquire participations in Revolving Letters of Credit hereunder, as applicable, and "Revolving Loan Commitments" means such commitments of all Lenders. The amount of each Lender's Revolving Loan Commitment, if any, is set forth on Schedule I or in the applicable Assignment and Assumption, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Revolving Loan Commitments as of the Amendment Effective Date equals the Revolving Loan Commitment Amount.

"Revolving Loan Commitment Amount" means, on any date, $70,000,000 as such amount may be reduced from time to time pursuant to Section 2.02 or Section 3.03.

"Revolving Loan Commitment Reduction Amount" means (a) $10,000,000 with respect to an Ector Disposition and (b) $10,000,000 with respect to a Grays Harbor Disposition.

*ITOI Amended and Restated Credit and Guaranty Agreement*

"Revolving Loan Commitment Termination Date" means the earliest of: (a) the Revolving Loan Maturity Date; (b) the date on which the Revolving Loan Commitment Amount is terminated in full or permanently reduced to zero pursuant to the terms of this Agreement; and (c) the date on which any Commitment Termination Event occurs.  Upon the occurrence of any event described above, the Revolving Loan Commitments shall terminate automatically and without any further action.

"Revolving Loan Exposure" means, as of any date of determination with respect to a Revolving Loan Lender: (a) prior to the termination of the Revolving Loan Commitments, the aggregate amount of all Revolving Loan Commitments, all Revolving Loans and all Revolving Letter of Credit Outstandings of such Revolving Loan Lender; and (b) after the termination of the Revolving Loan Commitments, the sum of: (i) the aggregate outstanding principal amount of all Revolving Loans of such Revolving Loan Lender; and (ii) all Revolving Letter of Credit Outstandings of such Revolving Loan Lender.

"Revolving Loan Lender" is defined in Section 2.01(a)(i).

"Revolving Loan Maturity Date" means August 28, 2023.

"Revolving Loan Percentage" means with respect to all payments, computations and other matters relating to the Revolving Loan Commitment or Revolving Loans of any Revolving Loan Lender or any Revolving Letters of Credit issued or participations acquired therein by any Revolving Loan Lender at any time, the percentage obtained by dividing: (a) the Revolving Loan Exposure of that Revolving Loan Lender; by (b) the aggregate Revolving Loan Exposure of all Revolving Loan Lenders at such time.

"Revolving Loans" is defined in Section 2.01(a)(i).

"Revolving Note" means a promissory note of the Borrower payable to any Lender, in the form of Exhibit C-1 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from outstanding Revolving Loans and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Risk Management Policy" means any of the Ector Risk Management Policy, Grays Harbor Risk Management Policy or the Nelson Risk Management Policy.

"S&P" means Standard & Poor's Rating Services, a Standard & Poor's Financial Services LLC business, a division of The McGraw-Hill Companies, Inc.

"Section 2.09 Additional Amendment" is defined in Section 2.09(c).

"Secured Hedge Provider" means, with respect to any Transaction Interest Rate Hedge Agreement or Permitted Commodity Hedge Agreement, (a) each counterparty (other than any Obligor) to an Initial Hedge Agreement and (b) any Person who is (or, at the time such Transaction Interest Rate Hedge Agreement or Permitted Commodity Hedge Agreement, as applicable, was entered into, was) the  Administrative Agent, a Lender, a Lead Arranger, an Affiliate of the Administrative Agent or an Affiliate of a Lead Arranger; provided that such Person shall be or

shall become a party to the Collateral Agency and Intercreditor Agreement in accordance with the terms thereof and shall have the obligations of a "Secured Party" thereunder.

"Secured Interest Rate Hedge Agreement" means each Interest Rate Hedge Agreement entered into with a Secured Hedge Provider.

"Secured Obligation" is defined in the Collateral Agency and Intercreditor Agreement.

"Secured Parties" is defined in the Collateral Agency and Intercreditor Agreement.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Account" has the meaning of "security account" set forth in the UCC.

"Security Documents" means, collectively, the Depositary Agreement, the Pledge and Security Agreement, the HoldCo Pledge Agreement, the Mortgages, the consents and any other document providing for any Lien, pledge, encumbrance, mortgage or security interest in favor of the Secured Parties on any or all of assets or the ownership interests thereof of the Obligors and HoldCo.

"Solvent" means, with respect to any Person, that, as of any date of determination: (a) the amount of the "fair saleable value" of the assets of such Person will, as of such date, exceed: (i) the value of all "liabilities of such Person, including contingent and other liabilities" as of such date, as such quoted terms are generally determined in accordance with applicable federal laws governing determinations of the insolvency of debtors; and (ii) the amount that will be required to pay the probable liabilities of such Person on its existing debts (including contingent liabilities) as such debts become absolute and matured; (b) such Person will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date; and (c) such Person will be able to pay its liabilities, including contingent and other liabilities, as they mature.  For purposes of this definition: (x) "able to pay its liabilities, including contingent and other liabilities, as they mature" means that such Person will be able to generate enough cash from operations, asset dispositions or refinancings, or a combination thereof, to meet its obligations as they become due; (y) the contingent and other liabilities of such Person are assumed to be enforceable in accordance with their terms including any limitations set forth therein; and (z) the assets of such Person are assumed to be valued on a going concern basis.

"Spare Parts" means any part, appliance, instrument, appurtenance, accessory or other personal property of any nature necessary or useful to the operation, maintenance, service or repair of a Project: (a) that is not, as of the Closing Date, currently being used in, at or by such Project; and (b) whose book value does not exceed $1,000,000.  The term "Spare Parts" shall include, without limitation: (x) combustion systems hardware; (y) turbine and compressor buckets, blades, vanes, nozzles and shrouds; and (z) any part that could lead to a single-point failure of a single turbine, boiler, steam turbine train (i.e., any part that, if were to fail, could reasonably be expected to lead to the immediate shutdown of the equipment of which it is a part).

"Specified Existing Loan" is defined in Section 2.09(a).

46

"Spindle Hill" means Spindle Hill Energy LLC, a Delaware limited liability company, and the sole owner of the Spindle Hill Project.

"Spindle Hill Project" means that approximately 314 MW natural gas-fired generating facility located in the Town of Frederick, Colorado, including all related real and personal property interests, equipment, and related assets.

"Sponsor" is defined in the recitals.

"Stated Amount" means, on any date and with respect to any Revolving Letter of Credit, the total amount then-available to be drawn under such Revolving Letter of Credit; provided, however, that with respect to any Revolving Letter of Credit that, by its terms or the terms of any other document, agreement or instrument entered into by the Borrower and the applicable Revolving LC Issuer, or in favor of such Revolving LC Issuer and relating to such Revolving Letter of Credit, provides for one or more automatic increases in the total amount available to be drawn under such Revolving Letter of Credit, the "Stated Amount" of such Revolving Letter of Credit shall be deemed to be the maximum amount available to be drawn under such Revolving Letter of Credit after giving effect to all such increases, whether or not such maximum amount is in effect at such time.

"Stated Expiry Date" means, with respect to any Revolving Letter of Credit, its date of expiration.

"Stated Maturity Date" means: (a) with respect to all Term Loans, the Term Loan Maturity Date; and (b) with respect to all Revolving Loans, the Revolving Loan Maturity Date.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one *minus* the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Without limiting the effect of the foregoing, the Statutory Reserve Rate shall reflect any other reserves required to be maintained by such member banks with respect to: (a) any category of liabilities which includes deposits by reference to which the applicable Adjusted LIBO Rate or any other interest rate of a Loan is to be determined; or (b) any category of extensions of credit or other assets which include Eurodollar Loans. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"St. Clair" means St. Clair Power, L.P., an Ontario limited partnership, and the sole owner of the St. Clair Project.

"St. Clair Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of August 30, 2013, among St. Clair; St. Clair Management Corporation; Royal Bank of

*ITOI Amended and Restated Credit and Guaranty Agreement*

Canada; Union Bank, Canada Branch; the institutions party thereto from time to time; RBC Capital Markets; Bayerische Landesbank, New York Branch; Natixis, New York Branch; and Sumitomo Mitsui Banking Corporation of Canada, as amended by that First Amendment to Amended and Restated Credit Agreement, dated as of July 30, 2015, and as further amended by that Second Amendment to Amended and Restated Credit Agreement, dated as of October 19, 2015, and as further amended by that Third Amendment to Amended and Restated Credit Agreement, dated as of June 20, 2018, as in effect on the Closing Date and without giving effect to any further amendments, supplements, waivers or other modifications thereto.

"St. Clair Credit Documents" means: (a) the St. Clair Credit Agreement; and (b) the agreements instruments, undertakings and other documents delivered in connection with the St. Clair Credit Agreement, in each case as such agreements, instruments, undertakings and other documents are in effect as of the Closing Date, and without giving effect to any amendments, supplements, waivers or other modifications thereto occurring on or after the Closing Date.

"St. Clair Energy Management Plan" means: (a) the Energy Management Plan for St. Clair Energy Centre, dated April 14, 2014; and (b) any replacement thereof: (i) permitted by the Project Level Indebtedness Documents applicable to St. Clair; or (ii) if the Project Level Indebtedness Documents of St. Clair have been terminated, that is reasonably acceptable to the Administrative Agent (in consultation with the Independent Engineer for the St. Clair Project).

"St. Clair Indebtedness" means the Existing Project Level Indebtedness of St. Clair.

"St. Clair PPA" means that certain Amended and Restated St. Clair Energy Centre Clean Energy Supply Contract, dated August 15, 2006, between St. Clair and the Ontario Power Authority, as amended from time to time.

"St. Clair Project" means that approximately 584 MW natural gas-fired generating facility located near Sarnia, Ontario, Canada, including all related real and personal property interests, equipment, and related assets.

"Subsidiary" means, with respect to any specified Person:

(a)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(b)    any partnership: (i) the sole general partner of which is such Person or a Subsidiary of such Person; or (ii) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof);

provided, however, that notwithstanding the foregoing, except as otherwise noted herein, for all purposes hereof each Project Company shall be a Subsidiary of an Obligor as long as such Obligor owns, directly or indirectly, any Capital Stock of such Project Company.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

"<u>Subsidiary Guarantors</u>" means, collectively, (a) the parties listed on <u>Schedule II</u> hereto from time to time, which, as of the Amendment Effective Date, shall include IT, IDC, Nelson Holding, Ector Holding, IGHH, Grays Holding, Nelson, Ector and Grays Harbor and (b) each other Subsidiary of the Borrower that shall be required to become a Subsidiary Guarantor and otherwise be bound by this Agreement pursuant to <u>Section 11.13</u> from time to time.

"<u>Supported QFC</u>" has the meaning assigned to it in <u>Section 13.23</u>.

"<u>Swap Obligation</u>" means, with respect to any Obligor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, as amended.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Facility</u>" means, collectively, the Closing Date Term Facility and the Incremental Term Facility.

"<u>Term Loan</u>" means each Closing Date Term Loan and Incremental Term Loan.

"<u>Term Loan Exposure</u>" means, with respect to any Lender, as of any date of determination, (a) with respect to the Closing Date Term Loans, the outstanding principal amount of the Closing Date Term Loans of such Lender and (b) with respect to the Incremental Term Loans, the outstanding principal amount of the Incremental Term Loans of such Lender; <u>provided</u> that at any time prior to the making of the Incremental Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Incremental Term Loan Commitment.

"<u>Term Loan Lender</u> means each Closing Date Term Loan Lender and Incremental Term Loan Lender.

"<u>Term Loan Maturity Date</u>" means August 28, 2025.

"<u>Term Note</u>" means a promissory note of the Borrower payable to any Lender, in the form of <u>Exhibit C-2</u> hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the Indebtedness of the Borrower to such Lender resulting from outstanding Term Loans and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"<u>Termination Date</u>" means the date on which all Obligations have been paid in full (other than unasserted contingent indemnity obligations not yet due and payable) in cash, all Revolving Letters of Credit have been terminated, expired or Cash Collateralized and all Commitments shall have terminated.

"<u>Terrorism Laws</u>" means any of the following: (a) Executive Order 13224 issued by the President of the United States; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist

49

Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the Bank Secrecy Act, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (as it may be subsequently codified); (f) all applicable anti-money laundering statutes of the jurisdictions where such Obligor or such Subsidiary conducts business, the rules and regulations thereunder, and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency; and (g) any regulations promulgated pursuant thereto or pursuant to any Legal Requirements of any Governmental Authority governing terrorist acts.

"Title Insurer" means the Ector Title Insurer, the Grays Harbor Title Insurer and/or the Nelson Title Insurer, as the context requires.

"Title Policy" means the Ector Title Policy, the Grays Harbor Title Policy and/or the Nelson Title Policy, as the context requires.

"Total Exposure Amount" means, on any date of determination, the sum of: (a) the outstanding principal amount of all Term Loans; _plus_ (b) the total Revolving Loan Exposure of all Revolving Loan Lenders.

"Total Net Debt" means, as at any date of determination: (a) the aggregate principal amount of Indebtedness outstanding of the Borrower (excluding Capitalized Lease Obligations, obligations of Borrower as an account party in respect of letters of credit and bankers' acceptances to the extent such letters of credit and bankers' acceptances have not been drawn upon by the beneficiaries thereof and purchase money indebtedness) as of such date of determination; _minus_ (b) without duplication, the aggregate amount of cash and Permitted Investments held by (or deposited in or credited to any account of) the Borrower as of such date of determination (other than cash deposited in or credited to the Operating Accounts, and the Local Accounts).

"Trade Date" means the date on which an assigning Lender entered into a binding agreement to sell or assign all or a portion of its rights or obligations under this Agreement.

"Transaction Interest Rate Hedge Agreement" means any Interest Rate Hedge Agreement to which the Borrower is a party.

"Transformative Acquisition" means any acquisition or investment by the Borrower or any of its Subsidiaries that is either (a) not permitted under the Loan Documents immediately prior to the consummation of such acquisition or investment or (b) if permitted by the terms of the Loan Documents immediately prior to the consummation of such acquisition or investment, the Loan Documents do not provide the Borrower and its Subsidiaries with adequate flexibility for the continuation and/or expansion of their combined operations following such consummation, as determined by the Borrower acting in good faith.

"Type" means, relative to any Loan, the portion thereof, if any, being maintained as an ABR Loan or a Eurodollar Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to

_ITOI Amended and Restated Credit and Guaranty Agreement_

the Collateral Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes" has the meaning assigned to it in Section 13.23.

"Valuation Date" means with respect to the calculation of an Exchange Rate or Dollar Equivalent, the date specified herein for such calculation or, if no date is specified, the date designated by the Administrative Agent for such calculation, except to the extent that such calculation is specified herein as being determined by the Borrower, in which case the date for such calculation shall be determined by the Borrower. The date of the incurrence by any Obligor or any Project Company of any Indebtedness or Lien or the sale by any such Person of any asset (including all or a portion of any Capital Stock) shall be a Valuation Date with respect to such Indebtedness, Lien or proceeds.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness multiplied by the amount of such payment, by (2) the sum of all such payments.

"Weighted Average Yield" means with respect to any Loan, on any date of determination, the weighted average yield to maturity, in each case, based on the interest rate applicable to such Loan on such date and giving effect to any applicable interest rate floor as well as original issue discount and all upfront or similar fees (which shall be deemed to constitute like amounts of original issue discount) payable by the Borrower to all of the Lenders generally with respect to such Loan in the initial primary syndication thereof (with original issue discount being equated to interest based on assumed four-year life to maturity), but excluding customary arrangement, structuring, underwriting, amendment, commitment fees or other fees not paid generally to all Lenders or payable to the Lead Arranger (or its Affiliates) or the Administrative Agent (or its Affiliates) in connection with such Loans.

"Wholly-Owned Subsidiary" of any specified Person means a Subsidiary of such Person all of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares) will at the time be owned by: (a) such Person; (b) one or more Wholly-Owned Subsidiaries of such Person; or (c) such Person and one or more Wholly-Owned Subsidiaries of such Person.

"Withdrawal Certificate" is defined in the Depositary Agreement.

"Withholding Agent" means any Obligor and the Administrative Agent.

51

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Certain Principles of Interpretation. The definition of any terms herein shall apply equally to the singular and plural forms of such term. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise: (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; (b) any reference herein to any Person shall be construed to include such person's permitted successors and assigns and, in the case of Governmental Authorities, persons succeeding to such Governmental Authorities' respective functions and capacities; (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement; (d) all references herein to Articles, Sections, and Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement; (e) any reference to a "month" shall, unless otherwise specified, refer to a calendar month; (f) any reference to any law or regulation herein, including Applicable Laws, shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time; and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. References in this Agreement to the "knowledge" of or facts and circumstances "known to" the Borrower, and all similar references, mean facts or circumstances of which an Authorized Officer of the Borrower has, or in the exercise of reasonable care should have, knowledge.

Section 1.03    Accounting Terms. Except as otherwise expressly provided herein, all accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP or IFRS, as applicable, as in effect at the time of such preparation and applied in a manner consistent with that used in preparing the audited financial statements of the relevant Project Company delivered to the Administrative Agent as a condition precedent to the Closing Date.

Section 1.04    Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time in the United States (daylight or standard, as applicable).

Section 1.05    Timing of Payment or Performance. Except as otherwise provided herein, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and in the case of payments, such extension of time shall be included in the computation of interest or fees, as the case may be, without duplication of any interest or fees so paid in the next subsequent calculation of interest or fees payable.

*ITOI Amended and Restated Credit and Guaranty Agreement*

Section 1.06    <u>Payments; Exchange Rates; Currency Equivalents</u>.  Except as otherwise explicitly set forth herein or in the applicable Loan Document, all payments made by the Borrower or any Obligor pursuant to this Agreement or any other Loan Document shall be made in Dollars. If payment in a currency other than Dollars is permitted, then the Administrative Agent shall determine the Exchange Rates as of each Valuation Date to be used for calculating Dollar Equivalent amounts for the purposes set forth herein. Except for purposes of financial statements delivered by the Borrower hereunder or except as otherwise provided herein, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be the Dollar Equivalent of such currency as so determined by the Administrative Agent (or the Borrower (as applicable) as of the relevant Valuation Date).

## ARTICLE II
## COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    <u>Commitments</u>.  Subject to the terms and the conditions of this Agreement, the Lenders and the Revolving LC Issuers severally agree to make the Credit Extensions as set forth below:

(a)    <u>Revolving Loan Commitment</u>.  From time to time on any Business Day occurring on or after the Closing Date, but prior to the Revolving Loan Commitment Termination Date:

(i)    each Lender that has a Revolving Loan Commitment (referred to as a "<u>Revolving Loan Lender</u>") agrees that it will make loans (relative to such Lender, its "<u>Revolving Loans</u>"), in Dollars, to the Borrower, equal to such Revolving Loan Lender's Revolving Loan Percentage of the aggregate amount of each Borrowing of the Revolving Loans requested by the Borrower to be made on such day; and

(ii)    on the terms and subject to conditions hereof, the Borrower may from time to time borrow, repay, and reborrow Revolving Loans;

provided, however, that no Revolving Loan Lender (or the Administrative Agent on its behalf) shall be permitted or required to make any Revolving Loan if, after giving effect thereto, the aggregate outstanding principal amount of all Revolving Loans of such Revolving Loan Lender, together with such Revolving Loan Lender's Revolving Loan Percentage of the aggregate amount of all Revolving Letter of Credit Outstandings, would exceed such Revolving Loan Lender's Revolving Loan Percentage of the then-existing Revolving Loan Commitment Amount. Revolving Loans may be ABR Loans or Eurodollar Loans, as provided herein.

(b)    <u>Term Loan Commitments</u>.  The Closing Date Term Loans were made as a single Borrowing on the Closing Date. The Incremental Term Loans shall be made as a single Borrowing on the Amendment Effective Date. Each Incremental Term Loan Lender agrees that it will make Incremental Term Loans, in Dollars, to the Borrower equal to such Lender's Incremental Term Loan Commitment.  Amounts repaid or prepaid with respect to Term Loans may not be reborrowed.  Term Loans may be ABR Loans or Eurodollar Loans, as provided herein.

(c)    <u>Revolving Letters of Credit</u>.

(i)    Subject to Section 2.01(c)(iv), from time to time on any Business Day occurring from the Closing Date until the date that is five (5) Business Days prior to the Revolving Loan Commitment Termination Date, each Revolving LC Issuer agrees that it will, to the extent requested by the Borrower and subject to the requirements of Sections 2.01(c)(ii) and 2.07(a):

(A)    issue one or more standby letters of credit (a "Revolving Letter of Credit"), in Dollars, for the account of the Borrower in the Stated Amount requested by the Borrower on such day; or

(B)    extend the Stated Expiry Date of an existing Revolving Letter of Credit previously issued hereunder;

provided, however, that such Revolving LC Issuer shall not issue or extend any such Revolving Letter of Credit if it has received written notice that an Event of Default has occurred and is continuing at the time such Revolving LC Issuer must elect to allow such issuance or extension; provided further that if any Revolving Loan Lender (other than such Revolving LC Issuer or its Affiliate) is a Defaulting Lender, such Revolving LC Issuer shall not be required to issue or extend any Revolving Letter of Credit unless: (x) the Defaulting Lender's participation in the Revolving Letters of Credit requested to be issued or extended (and the related Revolving Loans) have been reallocated among the Non-Defaulting Lenders in accordance with Section 4.12(a)(iii); (y) the Borrower has Cash Collateralized such Revolving Loan Lender's Revolving Loan Percentage of the Revolving Letter of Credit requested to be issued or extended (including by transfer of funds available in the Master Revenue Account, but excluding by funding of a Revolving Loan); or (z) such Revolving LC Issuer has entered into arrangements satisfactory to it and the Borrower to reduce such Revolving LC Issuer's risk with respect to the participation in the Revolving Letters of Credit by the Defaulting Lender to the same extent as would have existed were such Revolving Loan Lender not a Defaulting Lender; provided further that after giving effect to any such issuance or extension, in no event shall (I) the Revolving Letter of Credit Outstandings relating to Revolving Letters of Credit issued by such Revolving LC Issuer exceed the Revolving Letter of Credit Commitment of such Revolving LC Issuer or (II) the aggregate Revolving Letter of Credit Outstandings exceed the Revolving Letter of Credit Commitment Amount.

(ii)    No Revolving LC Issuer shall be under any obligation to issue any Revolving Letter of Credit if any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such Revolving LC Issuer from issuing the Revolving Letter of Credit, or any law applicable to such Revolving LC Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such Revolving LC Issuer shall prohibit, or request that such Revolving LC Issuer refrain from, the issuance of letters of credit generally or the Revolving Letter of Credit in particular or shall impose upon such Revolving LC Issuer with respect to the Revolving Letter of Credit any restriction, reserve or capital requirement (for which such Revolving LC Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such Revolving LC Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date and which such Revolving LC Issuer in good faith deems material to it (for which such Revolving LC Issuer is not otherwise reimbursed hereunder).

(iii)    The Stated Expiry Date of each Revolving Letter of Credit shall be no later than the earlier of: (A) the date which is one (1) year from the date of issuance of such Revolving Letter of Credit; or (B) date that is five (5) Business Days prior to the Revolving Loan Maturity Date; provided, however, that, subject to the limitation of Section 2.01(c)(iii)(B) and to each Revolving LC Issuer's obligation to extend the Stated Expiry Date of a Revolving Letter of Credit pursuant to Section 2.01(c)(i)(B), a Revolving LC Issuer may agree in its sole discretion and on terms acceptable to such Revolving LC Issuer that a Revolving Letter of Credit will automatically be extended for one or more successive periods not to exceed one (1) year each, unless such Revolving LC Issuer elects not to extend, or is obligated not to extend pursuant to Section 2.01(c)(i), for any such additional period. No Revolving LC Issuer shall be permitted or required to issue any Revolving Letter of Credit or extend the Stated Expiry Date of any Revolving Letter of Credit if, after giving effect thereto: (A) the aggregate amount of all Revolving Letter of Credit Outstandings plus all outstanding Revolving Loans would exceed the Revolving Loan Commitment Amount; or (y) the aggregate amount of all Revolving Letter of Credit Outstandings would exceed the Revolving Letter of Credit Commitment Amount.

(iv)    The Borrower may not request the issuance of, and the Revolving LC Issuers will not be required to issue, any Revolving Letters of Credit on the Closing Date other than those set forth on Schedule 2.01(c). Revolving Letters of Credit shall constitute utilization of each of the Revolving Loan Commitments and the Revolving Letter of Credit Commitments.

Section 2.02    Reduction of Commitment Amounts.

(a)    Voluntary Reductions. The Borrower may, from time to time on any Business Day occurring on and after the Amendment Effective Date, voluntarily reduce the amount of any Commitment Amount on the Business Day so specified by the Borrower; provided, however, that all such reductions shall require at least three (3) Business Days' prior written notice to the Administrative Agent and be permanent, and any partial reduction of any Commitment Amount shall be in a minimum amount of $1,000,000 and in an integral multiple of $100,000; provided further that if such notice is conditioned upon the effectiveness of other credit facilities or any incurrence or issuance of debt or equity, such notice may be revoked by the Borrower (by notice to the Administrative Agent) if such credit facilities do not become effective or such other transaction does not close. Any reduction of any Commitment Amount shall be applied ratably to reduce the related Commitments of the applicable Lenders in respect of the applicable Commitment Amount.

(b)    Mandatory Reductions after Project Dispositions. Upon the consummation of an Ector Disposition or a Grays Harbor Disposition, the Revolving Loan Commitment Amount shall be reduced by an amount equal to the applicable Revolving Loan Commitment Reduction Amount.

(c)    Revolving Letter of Credit Commitments. Any optional or mandatory reduction of the Revolving Loan Commitment Amount pursuant to the terms of this Agreement which reduces the Revolving Loan Commitment Amount below the Revolving Letter of Credit Commitment Amount shall result in an automatic and corresponding reduction of the Revolving Letter of Credit Commitment Amount to an aggregate amount not in excess of the Revolving Loan Commitment Amount, as so reduced; provided, however, that in no event shall the Borrower be permitted to reduce the Revolving Loan Commitments below the sum of: (i) the aggregate outstanding principal

55

amount of all Revolving Loans of all Revolving Loan Lenders; and (ii) the aggregate Revolving Letter of Credit Outstandings of all Revolving Loan Lenders; provided, further, that any such reduction shall be applied ratably to reduce the Revolving Letter of Credit Commitment of each Revolving LC Issuer.

(d)    Mandatory Prepayment Reductions.    The Revolving Loan Commitments and Revolving Letter of Credit Commitments shall be permanently reduced as contemplated under Section 3.03.

Section 2.03    Borrowing Procedures.

(a)    General.    Subject to Section 2.07(c)(ii), the Borrower, by delivering a Borrowing Request to the Administrative Agent (which Borrowing Request must be received by the Administrative Agent no later than 12:00 p.m. three (3) Business Days before (in the case of Eurodollar Loans), or no later than 12:00 p.m. on the Business Day before (in the case of ABR Loans), the proposed date of Borrowing), may irrevocably request that a Borrowing be made.  Any Borrowing requested by the Borrower shall be in a minimum amount of $1,000,000 and in an integral multiple of $100,000, or in the unused amount of the applicable Commitment.  Each Borrowing shall be made on the Business Days specified in such Borrowing Request.

(b)    Funding of Incremental Term Loans.    In the case of Incremental Term Loans, as soon as reasonably practicable on such Business Day, each Lender that has an Incremental Term Loan Commitment shall deposit with the Administrative Agent same-day funds in an amount equal to such Lender's Incremental Term Loan Commitment.  Such deposit will be made to an account which the Administrative Agent shall specify from time to time by notice to the Lenders.  To the extent funds are received from the Lenders, the Administrative Agent shall, upon satisfaction or waiver of the conditions precedent specified herein and in Section 5 of the Omnibus Amendment Agreement, as soon as reasonably practicable thereafter on such Business Day, make such funds available to, or at the direction of, the Borrower by wire transfer to the account that the Borrower shall have specified in the Borrowing Request.  No Lender's obligation to make any Loan shall be affected by any other Lender's failure to make any Loan.

(c)    Funding of Revolving Loans.    In the case of Revolving Loans, on or before 1:00 p.m. on such Business Day, each Revolving Loan Lender that has a Revolving Loan Commitment shall deposit with the Administrative Agent same-day funds in an amount equal to such Lender's Revolving Loan Percentage multiplied by the requested Borrowing.  Such deposit will be made to an account which the Administrative Agent shall specify from time to time by notice to the Lenders.  To the extent funds are received from the Lenders, the Administrative Agent shall, except as expressly provided herein, upon satisfaction or waiver of the conditions specified herein, as soon as reasonably practicable thereafter on such Business Day make such funds available to, or at the direction of, the Borrower by wire transfer to the account that the Borrower shall have specified in their Borrowing Request.  No Lender's obligation to make any Loan shall be affected by any other Lender's failure to make any Loan.

Section 2.04    Continuation and Conversion Elections.

(a)    The Borrower may irrevocably elect from time to time to convert Eurodollar Loans in an aggregate minimum amount of $1,000,000 and an integral amount of $100,000 to ABR Loans by delivering a Continuation/Conversion Notice to the Administrative Agent no later than 12:00 p.m. on the third (3rd) Business Day preceding, the proposed conversion date; provided that any such conversion may only be made on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert ABR Loans in an aggregate minimum amount of $1,000,000 and an integral amount of $100,000 to Eurodollar Loans by delivering a Continuation/Conversion Notice to the Administrative Agent no later than 12:00 p.m. on the third (3rd) Business Day preceding, the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); provided that no ABR Loan may be converted into a Eurodollar Loan if a Default has occurred and is continuing.  Upon receipt of any such notice, the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any Eurodollar Loan may be continued as such upon the expiration of the then-current Interest Period with respect thereto by the Borrower delivering a Continuation/Conversion Notice to the Administrative Agent no later than 12:00 p.m. three (3) Business Days before such expiration, provided that no Eurodollar Loan may be continued as such if a Default has occurred and is continuing; provided further that if the Borrower shall fail to give any Continuation/Conversion Notice as described above in this clause (b) or if such continuation is not permitted pursuant to the preceding proviso, such Eurodollar Loans shall be automatically converted to ABR Loans on the last day of such then-expiring Interest Period.  Upon receipt of any Continuation/Conversion Notice the Administrative Agent shall promptly notify each relevant Lender thereof.

Section 2.05    Funding.  Each Lender may, if it so elects, fulfill its obligation to make, continue or convert Eurodollar Loans hereunder by causing one of its foreign branches or Affiliates (or an international banking facility created by such Lender) to make or maintain such Eurodollar Loans; provided, however, that such Eurodollar Loans shall nonetheless be deemed to have been made by, and to be held by, such Lender, and the obligation of the Borrower to repay such Eurodollar Loans shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility.  In addition, the Borrower hereby consents and agrees that, for purposes of any determination to be made for purposes of Sections 4.01, 4.02, 4.03 or 4.04, it shall be conclusively assumed that each Lender elected to fund all Eurodollar Loans by purchasing Dollar deposits in its LIBOR Office's interbank eurodollar market.

Section 2.06    Notes.

(a)    Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal, interest and fees payable and paid to such Lender from time to time hereunder.  In the case of a Lender that does not request, pursuant to clause (b) below, the execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; provided, however, that the failure of any Lender to maintain such account or accounts or any error in any such account shall not limit or otherwise affect any Obligations of any Obligor.

57

(b)     The Borrower agrees that, upon the request to the Administrative Agent by any Lender, it will execute and deliver to such Lender, as applicable, a Term Note evidencing the Term Loans made by such Lender and/or a Revolving Note evidencing the Revolving Loans made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid), which notations, if made, shall evidence, *inter alia*, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; provided, however, that the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any Obligations of the Borrower.  A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 13.08.

Section 2.07   Revolving Letters of Credit.

(a)     Issuance/Extension Procedures.

(i)     Provided that the Revolving Loan Commitments have not been reduced to zero, prior to the date that is five (5) Business Days prior to the Revolving Loan Maturity Date, and subject to the terms and conditions hereof, including Section 2.01(c), the Borrower, subject to Section 2.01(c)(ii), may, by delivering on or before 1:00 p.m. on a Business Day: (A) an Issuance Request to the Administrative Agent in the form of Exhibit B-2; and (B) a completed Revolving Letter of Credit Application to each Revolving LC Issuer, from time to time irrevocably request on not less than three (3), but no more than ten (10), Business Days' notice in the case of an initial issuance of a Revolving Letter of Credit, and not less than three (3) Business Days' prior notice in the case of a request for the extension of the Stated Expiry Date of a Revolving Letter of Credit (in each case, unless a shorter notice period is agreed to by the applicable Revolving LC Issuer, in its sole discretion), that such Revolving LC Issuers issue, or extend the Stated Expiry Date of, Revolving Letters of Credit in form and substance satisfactory to each such Revolving LC Issuer in its sole discretion, solely for the purposes described in Section 8.20.

(ii)     Each Revolving LC Issuer will use reasonable efforts to issue Revolving Letters of Credit in substantially the form provided by the beneficiary of such Revolving Letter of Credit to the extent such form is consistent with such Revolving LC Issuer's customary practices and internal policies and procedures, consistently applied.  Each Revolving LC Issuer will make available to the beneficiary thereof the original of the Revolving Letter of Credit which it issues.

(iii)     Notwithstanding anything in Section 2.01 or this Section 2.07(a) to the contrary, each Revolving LC Issuer: (A) shall not be obligated to issue any commercial trade or direct pay (as opposed to standby) Revolving Letter of Credit; (B) shall only be required to issue Revolving Letters of Credit in Dollars; (C) shall not be required to issue a Revolving Letter of Credit if more than ten (10) Revolving Letters of Credit would be outstanding from such Revolving LC Issuer after taking into account such issuance; (D) shall not be required to issue a Revolving Letter of Credit without a final expiry date, which final expiry date shall not be later than the date that is five (5) Business Days prior to the Revolving Loan Maturity Date; or (E) shall not be

58

required to issue a Revolving Letter of Credit unless such Revolving Letter of Credit is to be used in the ordinary course of business of the Obligors or their respective Wholly-Owned Subsidiaries.

(b)     _Other Lenders' Participations._  Immediately upon the issuance of each Revolving Letter of Credit or an increase in the Stated Amount thereof, and without further action, each Revolving Loan Lender (other than the applicable Revolving LC Issuer) shall be deemed to have irrevocably purchased, and hereby agrees to irrevocably purchase, to the extent of its Revolving Loan Percentage, a participation interest in such Revolving Letter of Credit, and such Revolving Loan Lender shall be responsible, to the extent of its Revolving Loan Percentage and regardless of whether the conditions set forth in Section 2.07(a) or Section 5.02 have been satisfied, for reimbursing the applicable Revolving LC Issuer, within one (1) Business Day of receiving notice from such Revolving LC Issuer, for Reimbursement Obligations which have not been reimbursed by the Borrower in accordance with Section 2.07(c) (with the terms of this Section 2.07(b) surviving the termination of this Agreement).  In the event that such Revolving Loan Lender fails to make available to any Revolving LC Issuer on such Business Day the amount of such Revolving Loan Lender's participation in such Revolving Letter of Credit as provided in this Section 2.07(b), such Revolving LC Issuer shall be entitled to recover such amount on demand from such Revolving Loan Lender together with interest thereon for three (3) Business Days at the rate customarily used by such Revolving LC Issuer for the correction of errors among banks, and thereafter at the interest rate otherwise payable hereunder with respect to Revolving Loans that are ABR Loans.  In addition, such Revolving Loan Lender that is a Revolving LC Issuer shall, to the extent of its Revolving Loan Percentage, be entitled to receive a ratable portion of the letter of credit fees payable pursuant to Section 3.05(c) with respect to each Revolving Letter of Credit and of interest payable pursuant to Section 3.04(a) with respect to any Reimbursement Obligation.  To the extent that any Revolving Loan Lender has reimbursed the applicable Revolving LC Issuer for a Disbursement, such Revolving Loan Lender shall be entitled to receive its ratable portion of any amounts subsequently received (from the Borrower or otherwise) in respect of such Disbursement. Each Revolving Loan Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.07(b) in respect of Revolving Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Revolving Letter of Credit or the occurrence or continuation of a Default or Event of Default, or reduction or termination of the Revolving Letter of Credit Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(c)     _Disbursements._

(i)     The applicable Revolving LC Issuer will notify the Borrower and the Administrative Agent promptly of the presentment for payment of any Revolving Letter of Credit issued by such Revolving LC Issuer, together with notice of the date (the "Disbursement Date") such payment shall be made (each such payment, a "Disbursement").  Subject to the terms and provisions of such Revolving Letter of Credit, the applicable Revolving LC Issuer shall make such payment to the beneficiary of such Revolving Letter of Credit and shall notify the Borrower of the making of such payment.  Prior to 1:00 p.m. on the first Business Day following the Disbursement Date, the Borrower will reimburse such Revolving LC Issuer for all amounts which such Revolving LC Issuer has disbursed under such Revolving Letter of Credit.  Without limiting in any way the foregoing or the provisions of Section 2.07(c)(ii) below, and notwithstanding anything

59

to the contrary contained herein or in any separate application for any Revolving Letter of Credit, the Borrower hereby acknowledges and agrees that it shall be obligated to reimburse each Revolving LC Issuer upon each Disbursement of a Revolving Letter of Credit, and it shall be deemed to be the obligor for purposes of each such Revolving Letter of Credit issued hereunder, regardless of whether or not the notice of payment by the applicable Revolving LC Issuer is delivered as described above, or at all.

(ii)    Subject to Section 2.07(b), in the event a Disbursement with respect to a Revolving Letter of Credit is not reimbursed by the Borrower in accordance with the terms of Section 2.07(c)(i) above: (A) unless the Borrower has notified the Administrative Agent and the applicable Revolving LC Issuer prior to 10:00 a.m. on the first Business Day following the date of such Disbursement that the Borrower intends to reimburse such Revolving LC Issuer for such Disbursement with funds other than the proceeds of Revolving Loans, the Borrower shall be deemed to have given a timely Borrowing Request to the Administrative Agent requesting Revolving Loan Lenders with Revolving Loan Commitments to make Revolving Loans that are ABR Loans on the first Business Day following the date of such Disbursement in an amount in Dollars equal to the amount of such Disbursement (subject to the Borrower's right under Section 2.04 to convert ABR Loans to Eurodollar Loans); and (B) regardless of whether a Default or an Event of Default has occurred and is continuing and notwithstanding anything to the contrary contained in Section 2.01(a) or Section 2.03, each Revolving Loan Lender with a Revolving Loan Commitment shall, on the first Business Day following the date of such Disbursement, make a Revolving Loan that is an ABR Loan in an amount equal to the product of: (I) the Disbursement; and (II) such Revolving Loan Lender's Revolving Loan Percentage, the proceeds of which shall be paid directly to such Revolving LC Issuer to reimburse the amount of the Disbursement; provided further that if for any reason proceeds of Revolving Loans are not received by such Revolving LC Issuer on the first Business Day following the date of such the Disbursement in an amount equal to the amount of Disbursement, the Borrower shall reimburse such Revolving LC Issuer, on demand, in an amount in same-day funds equal to the excess of the amount of such Disbursement over the aggregate amount of such Revolving Loans, if any, which are so received.

(d)    Reimbursement.    Each obligation of the Borrower under Section 2.07(c) to reimburse a Revolving LC Issuer with respect to each Disbursement (including interest thereon) (each such obligation a "Reimbursement Obligation"), and each obligation of a Revolving Loan Lender under Section 2.07(b) to pay to a Revolving LC Issuer such Revolving Loan Lender's applicable Revolving Loan Percentage of any drawing under a Revolving Letter of Credit in accordance with the terms hereof, shall be absolute, irrevocable and unconditional under any and all circumstances, including any of the following circumstances: (i) any lack of validity or enforceability of any Revolving Letter of Credit; (ii) the existence of any claim of setoff, counterclaim or defense to payment which the Borrower or such Revolving Loan Lender may have or have had against such Revolving LC Issuer or any Lender or any beneficiary, including any defense based upon the failure of any Disbursement to conform to the terms of the applicable Revolving Letter of Credit or any non-application or misapplication by the beneficiary of the proceeds of such Revolving Letter of Credit or any discharge of the Borrower or any other Obligor; provided, however, that after paying in full its Reimbursement Obligation hereunder, or paying its Revolving Loan Percentage of any drawing under a Revolving Letter of Credit, as the case may be, nothing herein shall adversely affect the right of the Borrower or such Revolving Loan Lender, as the case may be, to commence any proceeding against such Revolving LC Issuer for any

60

wrongful Disbursement made by such Revolving LC Issuer under a Revolving Letter of Credit as a result of acts or omissions constituting gross negligence or willful misconduct on the part of such Revolving LC Issuer (as determined by a final and nonappealable decision of a court of competent jurisdiction).

(e)    Deemed Disbursements.

(i)    Upon the occurrence and during the continuation of any Event of Default under Section 10.01(i) applicable to an Obligor, or upon notification by the Administrative Agent (acting at the direction of the Revolving LC Issuers) to the Borrower of the Borrower's obligations under this Section 2.07(e) following the occurrence and during the continuation of any other Event of Default:

(A)    the aggregate Stated Amount of all Revolving Letters of Credit shall, without demand upon or notice to the Borrower or any other Person, be deemed to have been paid or disbursed by the Revolving LC Issuers of such Revolving Letters of Credit (notwithstanding that such amount may not in fact have been paid or disbursed);

(B)    the Borrower shall be immediately obligated to reimburse the Revolving LC Issuers for: (I) the amount deemed to have been so paid or disbursed by the Revolving LC Issuers; and (II) any outstanding and unreimbursed Reimbursement Obligations; and

(C)    the Borrower shall be immediately obligated to deposit with (or for the benefit of) each Revolving LC Issuer an amount equal to 2.5% of the sum of: (I) the amount deemed to have been paid or disbursed by such Revolving LC Issuer pursuant to the preceding clause (A); and (II) the amount of all outstanding and unreimbursed Reimbursement Obligations.

(ii)    Amounts payable by the Borrower pursuant to this Section 2.07(e) shall be deposited in immediately available funds with the Administrative Agent and held as collateral security for the Reimbursement Obligations.  When all Defaults giving rise to the deemed disbursements under this Section 2.07(e) have been cured or waived, the Administrative Agent shall promptly return to the Borrower all amounts then on deposit with the Administrative Agent pursuant to this Section 2.07(e) (together with any interest accrued thereon), which have not been applied to the satisfaction of the Reimbursement Obligations.

(f)    Nature of Reimbursement Obligations.  The Borrower, each other Obligor, and, to the extent set forth in Section 2.07(a), each Revolving Loan Lender, shall assume all risks of the acts, omissions or misuse of any Revolving Letter of Credit by the beneficiary thereof.  No Revolving LC Issuer shall be responsible for, and the Reimbursement Obligations of the Borrower, each other Obligor and the Revolving Loan Lenders shall not be affected by:

(i)    the form, validity, sufficiency, accuracy, genuineness or legal effect of any Revolving Letter of Credit or any document submitted by any party in connection with the application for and issuance of a Revolving Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged;

(ii)    the form, validity, sufficiency, accuracy, genuineness or legal effect of any instrument transferring or assigning or purporting to transfer or assign a Revolving Letter of Credit or the rights or benefits thereunder or the proceeds thereof in whole or in part, which may prove to be invalid or ineffective for any reason;

(iii)    failure of the beneficiary to comply fully with conditions required in order to demand payment under a Revolving Letter of Credit;

(iv)    errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise;

(v)    any loss or delay in the transmission or otherwise of any document or draft required in order to make a Disbursement under a Revolving Letter of Credit;

(vi)    any adverse change in the business, operations, properties, assets, conditions (financial or otherwise) or prospects of any of the Borrower or any other Obligor;

(vii)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any circumstance that might otherwise constitute a defense available to, or a discharge of the Borrower or any other Obligor; or

(viii)    the fact that an Event of Default or Default shall have occurred and be continuing.

None of the foregoing shall affect, impair or prevent the vesting of any of the rights or powers granted to any Revolving LC Issuer or any Revolving Loan Lender hereunder.  In furtherance and not in limitation or derogation of any of the foregoing, any action taken or omitted to be taken by any Revolving LC Issuer in good faith (and not constituting gross negligence or willful misconduct (as determined by a final and nonappealable decision of a court of competent jurisdiction)) shall be binding upon each Obligor and each such Credit Party, and shall not put any Revolving LC Issuer under any resulting liability to any Obligor or any Credit Party, as the case may be.

(g)    Resignation or Removal of Revolving LC Issuer.

(i)    Except as provided in Section 12.06, at any time a Revolving LC Issuer is not obligated to issue any Revolving Letter of Credit due to the circumstances described in (and in accordance with) Section 2.01(c)(i) or Section 2.01(c)(ii), such Revolving LC Issuer may resign as a Revolving LC Issuer upon forty-five (45) days' prior written notice to the Administrative Agent, the Revolving Loan Lenders and the Borrower.

(ii)    At any time the unsecured senior debt obligations of a Revolving LC Issuer cease to be rated at least A3 by Moody's and at least A- by S&P or, if the unsecured senior debt obligations of a Revolving LC Issuer are rated exactly A3 by Moody's or A- by S&P and such Revolving LC Issuer is placed on negative credit watch by S&P or Moody's, such Revolving LC Issuer may be replaced at any time by written request of the Borrower; provided that the consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed) shall be required if an Event of Default has occurred and is continuing at the time such request is made.

(iii)    The Administrative Agent shall notify the Lenders of any such replacement or resignation of such Revolving LC Issuer.  At the time any such replacement shall become effective, the Borrower shall return or Cash Collateralize all issued and outstanding Revolving Letters of Credit issued by the replaced Revolving LC Issuer and, at the time any such replacement or resignation shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Revolving LC Issuer.

(iv)    From and after the effective date of any such replacement: (A) any successor Revolving LC Issuer shall have all the rights and obligations of a Revolving LC Issuer under this Agreement with respect to Revolving Letters of Credit to be issued thereafter and, unless otherwise agreed to in writing by the Revolving Loan Lenders, the Revolving Letter of Credit Commitment of such successor Revolving LC Issuer shall be equal to the Revolving Letter of Credit Commitment of the replaced Revolving LC Issuer; and (B) references herein to the term "Revolving LC Issuer" shall be deemed to refer to such successor or to any previous Revolving LC Issuer, or to such successor and all previous Revolving LC Issuers, as the context shall require. After the replacement or resignation of a Revolving LC Issuer hereunder, the replaced or resigning Revolving LC Issuer, as the case may be, shall remain a party hereto to the extent that Revolving Letters of Credit issued by it remain outstanding and shall continue to have all the rights and obligations of a Revolving LC Issuer under this Agreement with respect to Revolving Letters of Credit issued by it prior to such replacement or resignation, but shall not be required to issue additional Revolving Letters of Credit.

(v)    If a Revolving LC Issuer resigns as a Revolving LC Issuer, it shall retain all the rights and obligations of a Revolving LC Issuer hereunder with respect to all Revolving Letters of Credit issued by it prior to the effective date of its resignation as a Revolving LC Issuer and all Reimbursement Obligations with respect thereto (including the right to require the Revolving Loan Lenders to pay to such Revolving LC Issuer its applicable Revolving Loan Percentage of any drawing under a Revolving Letter of Credit).

Section 2.08    Payments by Borrower; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it, but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.09    Extension of Term Loans.

(a)    The Borrower may, by written notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the Existing Loans) (an "Extension Request") not earlier than 60 days and not later than 30 days prior to the Term Loan Maturity Date

*ITOI Amended and Restated Credit and Guaranty Agreement*

then in effect hereunder, request that the Term Loans outstanding at the time of such request (the "Existing Loans") be converted to extend the scheduled maturity date(s) of any payment of principal with respect to the principal amount of such Existing Loans (the "Extended Loans") and to provide for other terms consistent with this Section 2.09; provided that (i) no Default or Event of Default shall have occurred and be continuing at the time of such extension or would exist after giving effect to such extension, (ii) any such request shall apply to all Term Loan Lenders on a *pro rata* basis (based on the aggregate outstanding principal amount of the applicable Term Loans), (iii) the representations and warranties contained in this Agreement are true and correct in all material respects (except to the extent any such representation and warranty itself is qualified by "materiality," "Material Adverse Effect" or similar qualifier, in which case, it shall be true and correct in all respects) on and as of the date of such extension and after giving effect thereto, as though made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date),  (iv) the Borrower shall have paid in full any fees and expenses in respect of any such extension that are then due and payable, (v) the DSCR Covenant would be satisfied on a *pro forma* basis on the date of such extension and for the most recent Measurement Period after giving effect to such extension and as if such extension had occurred as of the first day of such Measurement Period and (vi) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower in its sole discretion.  In order to establish any Extended Loans, Borrower shall provide an Extension Request setting forth the proposed terms of the Extended Loans to be established, which terms shall be substantially similar to those applicable to the Existing Loans from which they are to be extended (the "Specified Existing Loans"), except (x) all or any of the final maturity dates of such Extended Loans may be delayed to later dates than the final maturity dates of the Specified Existing Loans, (y) (A) the interest margins with respect to the Extended Loans may be higher or lower than the interest margins for the Specified Existing Loans and/or (B) additional fees may be payable to the Lenders providing such Extended Loans in addition to or in lieu of any increased margins contemplated by the preceding clause (A) and (z) so long as the Weighted Average Life to Maturity of such Extended Loans would be no shorter than the remaining Weighted Average Life to Maturity of the Specified Existing Loans, amortization rates with respect to the Extended Loans may be higher or lower than the amortization rates for the Specified Existing Loans, in each case to the extent provided in the applicable Extension Amendment; provided that, notwithstanding anything to the contrary in this Section 2.09 or otherwise, assignments and participations of Extended Loans shall be governed by the same or, at the Borrower's discretion, more restrictive assignment and participation provisions applicable to the Term Loans set forth in Section 13.08. No Lender shall have any obligation to agree to have any of its Existing Loans converted into an Extended Loan pursuant to any Extension Request.

(b)    Borrower shall provide the applicable Extension Request at least ten (10) Business Days (or such shorter period as the Administrative Agent may agree in its reasonable discretion) prior to the date on which Lenders under the applicable Existing Loans are requested to respond. Any Lender (an "Extending Lender") wishing to have all or a portion of its Specified Existing Loan converted into an Extended Loan shall notify the Administrative Agent (each, an "Extension Election") on or prior to the date specified in such Extension Request of the amount of its Specified Existing Loan that it has elected to convert into an Extended Loan. In the event that the aggregate amount of the Specified Existing Loan subject to Extension Elections exceeds the amount of Extended Loans requested pursuant to the Extension Request, the Specified Existing Loans subject to Extension Elections shall be converted to Extended Loans on a *pro rata* basis based on the

64

amount of Specified Existing Loans included in each such Extension Election. In connection with any extension of Loans pursuant to this <u>Section 2.09</u> (each, an "<u>Extension</u>"), the Borrower shall agree to such procedures regarding timing, rounding and other administrative adjustments to ensure reasonable administrative management of the credit facilities hereunder after such Extension, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this <u>Section 2.09</u>. The Borrower may amend, revoke or replace an Extension Request pursuant to procedures reasonably acceptable to the Administrative Agent at any time prior to the date (the "<u>Extension Request Deadline</u>") on which Lenders under the applicable Existing Loans are requested to respond to the Extension Request. Any Lender may revoke an Extension Election at any time prior to 5:00 p.m. on the date that is two (2) Business Days prior to the Extension Request Deadline, at which point (unless so revoked by such time) the Extension Election becomes irrevocable (unless otherwise agreed by the Borrower). The revocation of an Extension Election prior to the Extension Request Deadline shall not prejudice any Lender's right to submit a new Extension Election prior to the Extension Request Deadline.

(c)     Extended Loans shall be established pursuant to an amendment (an "<u>Extension Amendment</u>") to this Agreement (which may include amendments to provisions related to maturity, interest margins or fees referenced in <u>clauses (x)</u> and <u>(y)</u> of <u>Section 2.09(a)</u>, or amortization rates referenced in <u>clause (z)</u> of <u>Section 2.09(a)</u>, and which, in each case, except to the extent expressly contemplated by the last sentence of this <u>Section 2.09(c)</u> and notwithstanding anything to the contrary set forth in <u>Section 13.01</u>, shall not require the consent of any Lender other than the Extending Lenders with respect to the Extended Loans established thereby) executed by the Obligors, the Administrative Agent, and the Extending Lenders. Subject to the requirements of this <u>Section 2.09</u> and without limiting the generality or applicability of <u>Section 13.01</u> to any Section 2.09 Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "<u>Section 2.09 Additional Amendment</u>") to this Agreement and the other Loan Documents; <u>provided</u> that such Section 2.09 Additional Amendments do not become effective prior to the time that such Section 2.09 Additional Amendments have been consented to (including, without limitation, pursuant to consents applicable to holders of any Extended Loans provided for in any Extension Amendment) by such of the Lenders, Credit Parties and other parties (if any) as may be required in order for such Section 2.09 Additional Amendments to become effective in accordance with <u>Section 13.01</u>; <u>provided</u>, <u>further</u>, that no Extension Amendment may provide for (i) any Extended Loan to be secured by any Collateral or other assets of any Obligor that does not also secure the Existing Loans or be guaranteed by any Person other than the Subsidiary Guarantors and (ii) so long as any Existing Loans are outstanding, any mandatory or voluntary prepayment provisions that do not also apply to the Existing Loans on a *pro rata* basis. Notwithstanding anything to the contrary in <u>Section 13.01</u>, any such Extension Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary or appropriate, in the reasonable judgment of the Borrower and the Administrative Agent, to effect the provisions of this <u>Section 2.09</u>; <u>provided</u> that the foregoing shall not constitute a consent on behalf of any Lender to the terms of any Section 2.09 Additional Amendment.

(d)     Notwithstanding anything to the contrary contained in this Agreement, on any date on which any Existing Loan is converted to extend the related scheduled maturity date(s) in accordance with <u>Section 2.09(a)</u> above (an "<u>Extension Date</u>"), in the case of the Specified Existing

Loan of each Extending Lender, the aggregate principal amount of such Specified Existing Loan shall be deemed reduced by an amount equal to the aggregate principal amount of Extended Loan so converted by such Lender on such date, and such Extended Loans shall be established as a separate Loan from the Specified Existing Loan and from any other Existing Loans (together with any other Extended Loans so established on such date).

(e)        If, in connection with any proposed Extension Amendment, any Lender declines to consent to the applicable extension on the terms and by the deadline set forth in the applicable Extension Request (each such other Lender, a "Non-Extending Lender") then Borrower may, on notice to the Administrative Agent and the Non-Extending Lender, replace such Non-Extending Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 13.08 (with the assignment fee and any other costs and expenses to be paid by Borrower in such instance) all of its rights and obligations under this Agreement to one or more assignees; provided that neither the Administrative Agent nor any Lender shall have any obligation to Borrower to find a replacement Lender; provided, further, that the applicable assignee shall have agreed to provide Extended Loans on the terms set forth in such Extension Amendment; provided, further, that all obligations of Borrower owing to the Non-Extending Lender relating to the Existing Loans so assigned shall be paid in full by the assignee Lender to such Non-Extending Lender concurrently with such Assignment and Assumption.  In connection with any such replacement under this Section 2.09, if the Non-Extending Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption by the later of (A) the date on which the replacement Lender executes and delivers such Assignment and Assumption and (B) the date as of which all obligations of Borrower owing to the Non-Extending Lender relating to the Existing Loans so assigned shall be paid in full by the assignee Lender to such Non-Extending Lender, then such Non-Extending Lender shall be deemed to have executed and delivered such Assignment and Assumption as of such date and Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption on behalf of such Non-Extending Lender.

(f)        Following any Extension Date, with the written consent of the Borrower, any Non-Extending Lender may elect to have all or a portion of its Existing Loans deemed to be an Extended Loan on any date (each date, a "Designation Date") prior to the maturity date of such Extended Loans; provided that such Lender shall have provided written notice to the Borrower and the Administrative Agent at least ten (10) Business Days prior to such Designation Date (or such shorter period as the Administrative Agent may agree in its reasonable discretion); provided, further, that no greater amount shall be paid by or on behalf of the Borrower or any of its Affiliates to any such Non-Extending Lender as consideration for its Extension than was paid to any Extending Lender as consideration for its Extension.  Following a Designation Date, the Existing Loans held by such Lender so elected to be extended will be deemed to be Extended Loans, and any Existing Loans held by such Lender not elected to be extended, if any, shall continue to be "Existing Loans".

(g)        With respect to all Extensions consummated by the Borrower pursuant to this Section 2.09, (i) such Extensions shall not constitute optional or mandatory payments or prepayments for purposes of Sections 3.02(a) and (b) and (ii) no Extension Request is required to be in any minimum amount or any minimum increment, provided that the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such

66

Extension that a minimum amount (to be determined and specified in the relevant Extension Request in the Borrower's sole discretion and may be waived by the Borrower) of Existing Loans be extended. The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this <u>Section 2.09</u> (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Request) and hereby waive the requirements of any provision of this Agreement (including, without limitation, <u>Sections 3.02(a)</u> and <u>(b)</u> and <u>3.03</u>) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this <u>Section 2.09</u>.

## ARTICLE III
## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

Section 3.01    <u>Repayment of Loans</u>.

(a)    The Borrower shall repay in full the unpaid principal amount of each Loan upon the applicable Stated Maturity Date therefor.

(b)    On each Quarterly Payment Date, the Borrower shall make a scheduled repayment of the aggregate outstanding principal amount, if any, of all Term Loans in an amount equal to $1,074,732.22, with the remaining amount of Term Loans due and payable in full on the Stated Maturity Date for Term Loans.

(c)    Immediately upon any Commitment Termination Event, the Borrower shall repay all Loans and Cash Collateralize all Revolving Letters of Credit.

Section 3.02    <u>Prepayment of Loans</u>.

(a)    <u>Voluntary Prepayments</u>.

(i)    From time to time on any Business Day, the Borrower may, by delivering a written notice to the Administrative Agent, make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans; <u>provided</u> that:

(A)    any prepayment of Term Loans is to be applied *pro rata* among the Term Loans so prepaid of the same Type and, if applicable, having the same Interest Period of all Lenders that have made such prepaid Term Loans (to be applied as set forth in <u>Section 3.03</u>); and any prepayment of Revolving Loans is to be applied *pro rata* among the Revolving Loans so prepaid of the same Type and, if applicable, having the same Interest Period of all Revolving Loan Lenders that have made such prepaid Revolving Loans (to be applied as set forth in <u>Section 3.03</u>);

(B)    all such voluntary prepayments shall require at least one (1) Business Day's (and at least three (3) Business Days' in the case of Eurodollar Loans) but no more than ten (10) Business Days' irrevocable prior written notice to the Administrative Agent; <u>provided</u> that if a notice is conditioned upon the effectiveness of other credit facilities or any incurrence or issuance of debt or equity, such notice may be revoked by the Borrower (by notice to the Administrative Agent) if such credit facilities do not become effective or such other transaction does not close, subject to the obligations of the Borrower under <u>Section 4.04</u>);

67

*ITOI Amended and Restated Credit and Guaranty Agreement*

(C)    all such voluntary partial prepayments of any Loans shall be in an aggregate minimum amount of $1,000,000 and, in each case, an integral multiple of $100,000; and

(D)    such voluntary prepayment shall be made with any Call Premium to the extent contemplated by <u>Section 3.02(c)</u> below and any amounts payable pursuant to <u>Section 4.04</u>.

(b)    <u>Mandatory Prepayments</u>.

(i)    <u>Exceedance of Revolving Loan Commitment</u>.  On each date when the sum of: (i) the aggregate outstanding principal amount of all Revolving Loans; and (ii) the aggregate amount of all Revolving Letter of Credit Outstandings, exceeds the Revolving Loan Commitment Amount, the Borrower shall make a mandatory prepayment of Revolving Loans and, if necessary, Cash Collateralize all Revolving Letter of Credit Outstandings, in an amount equal to such excess.

(ii)    <u>Excess Cash Flow</u>.  Within ten (10) Business Days after each Quarterly Payment Date commencing with the first such Quarterly Payment Date occurring at the end of the first full Fiscal Quarter occurring after the Closing Date, the Borrower shall make a mandatory prepayment of the Loans (to be applied as set forth in <u>Section 3.03</u>) with an amount equal to: (A) if the Leverage Ratio (determined as of such Quarterly Payment Date) is greater than 4.00 to 1.00, 75% of Excess Cash Flow (if any); (B) if the Leverage Ratio (determined as of such Quarterly Payment Date) is equal to or less than 4.00 to 1.00 but greater than 2.00 to 1.00, 50% of Excess Cash Flow (if any); (C) if the Leverage Ratio (determined as of such Quarterly Payment Date) is equal to or less than 2:00 to 1.00 but greater than 1.00 to 1.00, 25% of Excess Cash Flow (if any); and (D) if the Leverage Ratio (determined as of such Quarterly Payment Date) is equal to or less than 1.00 to 1.00, 0% of Excess Cash Flow.

(iii)    <u>Asset Sales</u>.  No later than five (5) Business Days following the receipt by any Obligor or any of its Subsidiaries of any Net Asset Sale Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of the amount of such proceeds, and, in the event the aggregate amount of such proceeds received by the Obligors and their Subsidiaries in any Fiscal Year exceeds $2,500,000, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of all such Net Asset Sale Proceeds in excess of such $2,500,000 amount, to be applied as set forth in <u>Section 3.03</u>.

(iv)    <u>Net Casualty Proceeds</u>.  No later than five (5) Business Days following the receipt by any Obligor or any of its Subsidiaries of any Net Casualty Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of the amount of such proceeds, and, in the event the aggregate amount of such proceeds received by the Obligors and their Subsidiaries in any Fiscal Year exceeds $2,500,000, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of all such Net Casualty Proceeds in excess of such $2,500,000 amount, to be applied as set forth in <u>Section 3.03</u>; <u>provided</u>, <u>however</u>, that upon written notice by the Borrower to the Administrative Agent not more than five (5) Business Days following receipt of any Net Casualty Proceeds to which this <u>Section 3.02(b)(iv)</u> would otherwise apply, such proceeds shall be excluded from the prepayment requirements of this <u>clause (b)(iv)</u> if: (A) the Borrower informs the Administrative Agent in such notice of its good-faith intention to apply such Net Casualty Proceeds to the rebuilding, replacement or restoration of the assets subject to the

Casualty Event which resulted in such Net Casualty Proceeds; and (B) during the Reconstruction Period, such proceeds are applied or committed in accordance with the Depositary Agreement. The amount of such Net Casualty Proceeds unused or uncommitted after the expiration of the Reconstruction Period (or unreinvested in the case of Net Casualty Proceeds committed to reinvestment prior to one hundred eighty (180) days from the date of receipt) shall be applied to prepay the Loans as set forth in this clause (b)(iv) and in Section 3.03.

(v)     Debt Issuances.  No later than one (1) Business Day following the receipt by any Obligor or any of its Subsidiaries of any Debt Issuance Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of the amount of such Debt Issuance Proceeds and make a mandatory prepayment of the Loans in an amount equal to 100% of such Debt Issuance Proceeds, to be applied as set forth in Section 3.03; provided, however, that for the avoidance of doubt, this clause (b)(v) does not constitute and shall not be interpreted as constituting a consent to the incurrence or issuance of any Indebtedness by any Obligor or any Subsidiary of an Obligor, or a waiver of any Default or Event of Default arising from such issuance or incurrence.

(vi)    Equity Issuances.  No later than one (1) Business Day following the receipt by any Obligor or any of its Subsidiaries of any Equity Issuance Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of the amount of such Equity Issuance Proceeds and make a mandatory prepayment of the Loans in an amount equal to 100% of such Equity Issuance Proceeds, to be applied as set forth in Section 3.03; provided, however, that for the avoidance of doubt, this clause (b)(vi) does not constitute and shall not be interpreted as constituting a consent to the issuance of any Capital Stock by any Obligor or any Subsidiary of an Obligor, or a waiver of any Default or Event of Default arising from such issuance.

(vii)   Ector Disposition.  No later than three (3) Business Days following the receipt by the Borrower or any of its Subsidiaries of any Ector Disposition Proceeds: (A) the Borrower shall make a mandatory prepayment of the Loans in an amount equal to the Ector Target Sale Amount, to be applied as set forth in Section 3.03; and (B) the Revolving Loan Commitment Amount shall be reduced in accordance with Section 2.02(b); provided that unless an Event of Default has occurred and is continuing, the Borrower may make Restricted Payments of any Excess Sale Proceeds from an Ector Disposition.

(viii)  Grays Harbor Disposition.  No later than three (3) Business Days following the receipt by the Borrower or any of its Subsidiaries of any Grays Harbor Disposition Proceeds: (A) the Borrower shall make a mandatory prepayment of the Loans in an amount equal to the Grays Harbor Target Sale Amount, to be applied as set forth in Section 3.03; and (B) the Revolving Loan Commitment Amount shall be reduced in accordance with Section 2.02(b); provided that unless an Event of Default has occurred and is continuing, the Borrower may make Restricted Payments of any Excess Sale Proceeds from a Grays Harbor Disposition.

(c)     Call Premium.  In the event that, prior to the date that is the six (6)-month anniversary of the Amendment Effective Date (i) all or any portion of the Term Facility is (A) refinanced or replaced or (B) repriced or effectively refinanced through any waiver, consent or amendment (in each case, in connection with (I) any waiver, consent or amendment to the Term Facility directed at, or the result of which would be, the lowering of the effective interest cost or the Weighted Average Yield of the Term Facility or (II) the incurrence of any debt financing

having an effective interest cost or Weighted Average Yield that is less than the effective interest cost or Weighted Average Yield of the Term Facility (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced, (ii) all or any portion of the Term Facility is repaid pursuant to Section 3.02(b)(v) (if any) and the debt incurred to make such prepayment has an effective interest cost or Weighted Average Yield that is less than the effective interest cost or Weighted Average Yield of the Term Facility (or portion thereof) so repaid, prepaid, refinanced, replaced or repriced) or (iii) a Term Loan Lender must assign its Term Loans as a result of its failure to consent to an amendment, amendment and restatement or other modification of the Term Facility that would have the effect of reducing the total yield then in effect for the Term Loans then in each case, such repayment, prepayment, refinancing, replacement or repricing will be made at 101% (*i.e.*, a 1% premium) (the "Call Premium") of the principal amount so repaid, prepaid, refinanced, replaced or repriced; provided, that the Call Premium shall not be applicable to any prepayment of Term Loans or Revolving Loans pursuant to Section 3.02(b)(vii) or Section 3.02(b)(viii); provided further that the Call Premium shall not be applicable in the event of a Change of Control, a Transformative Acquisition, or an initial public offering by the Borrower.

(d)     No Premium or Penalty; Notice. Each prepayment of any Loans made pursuant to this Section 3.02 shall be without premium or penalty, except as may be required by Section 3.02(c) or Section 4.04. The Borrower shall give prior written notice of any mandatory prepayment required under Sections 3.02(b)(ii) through (b)(iv) (including the date and an estimate of the aggregate amount of such mandatory prepayment at least three (3) Business Days prior thereto or, in the case of notice with respect to a mandatory prepayment described in Sections 3.02(b)(v) or (b)(vi), at least one (1) Business Day prior thereto); provided that the failure to give such notice shall not relieve the Borrower of its obligation to make such mandatory prepayments on or prior to the dates set forth in Section 3.02 and the Borrower shall be permitted to make such mandatory prepayments on or prior to such dates.

Section 3.03     Application of Prepayments and Repayments.

(a)     Order of Priority by Type. Subject to clauses (b) and (c) below, each prepayment or repayment of the principal of the Loans pursuant to Section 3.02 shall be applied, to the extent of such prepayment or repayment: *first*, to the principal amount thereof being maintained as ABR Loans; and *second*, subject to the terms of Section 4.04, to the principal amount thereof being maintained as Eurodollar Loans.

(b)     Voluntary Prepayment of Term Loans. Each prepayment of Term Loans made pursuant to Section 3.02(a) shall be applied equally and ratably: (i) *pro rata* across the remaining amortization payments of the Term Loans (including the final payment due on the Term Loan Maturity Date); and (ii) to any breakage costs or termination amounts payable in respect of any Secured Interest Rate Hedge Agreements that are incurred as a result of such prepayment.

(c)     Mandatory Prepayments. Each prepayment of the Loans made pursuant to Section 3.02(b) shall be applied: (i) *first*, equally and ratably to: (A) the prepayment of the outstanding principal amount of all Term Loans on a *pro rata* basis regardless of what Type (with the amount of such prepayment of Term Loans being applied to the remaining amortization payments of the Term Loans in inverse order of maturity (including the final payment due on the Term Loan Maturity Date)) and (B) any breakage costs or termination amounts payable in respect of any

70

Secured Interest Rate Hedge Agreements that are incurred as a result of such prepayment; (ii) *second*, equally and ratably to the Cash Collateralization of all Revolving Letters of Credit (and in connection therewith the Revolving Loan Commitments and Revolving Letter of Credit Commitments shall not be permanently equally and ratably reduced in an amount equal to the Stated Amount of the Revolving Letters of Credit that are so Cash Collateralized); (iii) *third* to the prepayment of the outstanding principal amount of all Revolving Loans on a pro rata basis regardless of what Type (and the Revolving Loan Commitments and Revolving Letter of Credit commitments shall be permanently equally and ratably reduced in an amount equal to such prepayment) and (iv) *fourth*, any amount remaining (the "Reduction Amount") may be retained by the Borrower and the Revolving Loan Commitments shall be permanently reduced *pro rata* on each date on which prepayment thereof is required to be made pursuant to Section 3.02(b) in an amount equal to the applicable Reduction Amount.

Section 3.04    Interest Provisions.    Interest on the outstanding principal amount of the Loans and Reimbursement Obligations shall accrue and be payable in accordance with the terms set forth below.

(a)    Rates.

(i)    Pursuant to an appropriately delivered Borrowing Request or Continuation/Conversion Notice, the Borrower may elect that the Loans accrue interest at a rate per annum:

(A)    on that portion of the Loans maintained from time to time as ABR Loans, equal to the sum of the Alternate Base Rate from time to time in effect *plus* the Applicable Margin for ABR Loans; and

(B)    on that portion of the Loans maintained as a Eurodollar Loans, during each Interest Period applicable thereto, equal to the sum of the Adjusted LIBO Rate for such Interest Period *plus* the Applicable Margin for Eurodollar Loans.

(ii)    All Eurodollar Loans shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period.

(iii)    The Borrower agrees to pay to the applicable Revolving LC Issuers, with respect to any Reimbursement Obligations, interest on such Reimbursement Obligations in respect of each honored drawing under a Revolving Letter of Credit from the date such drawing is honored to but excluding the date such Reimbursement Obligation is reimbursed by or on behalf of the Borrower at a rate equal to, for the period from the date such drawing is honored to but excluding the applicable date of reimbursement of such Reimbursement Obligation, the rate of interest otherwise payable hereunder with respect to Revolving Loans that are ABR Loans.

(iv)    If on any day a Loan is outstanding with respect to which a Borrowing Request or Continuation/Conversion Notice has not been delivered to the Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a ABR Loan.

(b)    _Post-Default Rates_.    After the date any principal amount of any Loan is due and payable (whether on any Stated Maturity Date, upon acceleration or otherwise), or after any other monetary Obligation of the Borrower shall have become due and payable, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on such amounts at a rate per annum equal to: (i) in the case of overdue principal of any Loan, the rate of interest that otherwise would be applicable to such Loan _plus_ 2.00% per annum; (ii) in the case of overdue Reimbursement Obligations, the rate of interest that otherwise would be applicable to such Reimbursement Obligation _plus_ 2.00% per annum; and (iii) in the case of overdue interest, fees, and other monetary Obligations, the Alternate Base Rate; _plus_ the Applicable Margin for Term Loans accruing interest at the Alternate Base Rate; _plus_ 2.00% per annum.

(c)    _Payment Dates_.    Interest accrued on each Loan shall be payable, without duplication:

(i)    on the Stated Maturity Date therefor;

(ii)    on the date of any payment or prepayment, in whole or in part, of principal outstanding on any Loan, on the principal amount so paid or prepaid;

(iii)    with respect to ABR Loans, on each Quarterly Payment Date;

(iv)    with respect to Eurodollar Loans, on the last day of each applicable Interest Period (and, if such Interest Period shall exceed three (3) months, on the date occurring on each three-month interval occurring after the first day of such Interest Period);

(v)    with respect to any ABR Loans converted into Eurodollar Loans on a day when interest would not otherwise have been payable pursuant to clause (iii) above, on the date of such conversion; and

(vi)    immediately upon a Commitment Termination Event.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

Section 3.05    _Fees_.    The Borrower agrees to pay the fees set forth below.    All such fees shall be non-refundable.

(a)    _Commitment Fee_.    The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Loan Lender, a commitment fee in a _per annum_ amount equal to: (i) 0.50%; _multiplied by_ (ii)(A) the average daily Revolving Loan Commitments; _minus_ (B) outstanding Revolving Letter of Credit Outstandings; _minus_ (iii) outstanding Revolving Loans. Such fees shall be calculated on a year comprised of 360 days and payable quarterly in arrears on each Quarterly Payment Date and on the Revolving Loan Commitment Termination Date.

(b)    _Administrative Agent's Fees_.    The Borrower agrees to pay to the Administrative Agent, for its own account, the respective fees payable in the amounts and on the dates set forth in the Fee Letter.

_ITOI Amended and Restated Credit and Guaranty Agreement_

(c)    <u>Revolving Letter of Credit Fees</u>.

(i)    The Borrower agrees to pay to the Administrative Agent for the account of: (A) each Revolving Loan Lender, a Revolving Letter of Credit fee in a *per annum* amount equal to: (x) the Applicable Margin for Revolving Loans maintained as Eurodollar Loans; *multiplied by* (y) the daily Stated Amount of each Revolving Letter of Credit; and (B) the fronting Revolving LC Issuer, 0.125% of the aggregate face amount of outstanding Revolving Letter of Credit Outstandings, in each case, such fees being calculated on a year comprised of 360 days and payable quarterly in arrears on each Quarterly Payment Date following the date of issuance of each Revolving Letter of Credit and on the Revolving Loan Commitment Termination Date.

(ii)    In addition, the Borrower agrees to pay to each Revolving LC Issuer the customary issuance, drawing, presentation and amendment fees, and other standard costs and charges, of such Revolving LC Issuer relating to Revolving Letters of Credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are non-refundable.

## ARTICLE IV
## CERTAIN LIBO RATE AND OTHER PROVISIONS

Section 4.01    <u>LIBO Rate Lending Unlawful</u>.  If any Lender shall determine in good faith (which determination shall, upon notice thereof to the Borrower and the Administrative Agent, be conclusive and binding on the Borrower) that any Change in Law makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a Eurodollar Loan, the obligations of such Lender to make, continue or convert any such Eurodollar Loan shall, after the determination thereof, forthwith be suspended until such Lender shall notify the Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding Eurodollar Loans payable to such Lender shall automatically convert into ABR Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

Section 4.02    <u>Inability to Determine Rates</u>.

(a)    If prior to the commencement of any Interest Period for a Eurodollar Borrowing the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that:

(i)    Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or

(ii)    by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to Eurodollar Loans for such Interest Period;

then, subject to <u>Section 4.02(b)</u>, upon written notice from the Administrative Agent to the Borrower and the Lenders, the obligations of the affected Lenders to make or continue any Loans under <u>Section 2.03</u> and <u>Section 2.04</u> on the last day of the Interest Period applicable thereto as, or to convert any Loans into, Eurodollar Loans shall forthwith be suspended until the Administrative

73

Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

(b)    If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in Section 4.02(a) have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in Section 4.02(a) have not arisen but (w) the supervisor for the administrator of the LIBO Rate has made a public statement that the administrator of the LIBO Rate is insolvent (and there is no successor administrator that will continue publication of the LIBO Rate), (x) the administrator of the LIBO Rate has made a public statement identifying a specific date after which the LIBO Rate will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the LIBO Rate), (y) the supervisor for the administrator of the LIBO Rate has made a public statement identifying a specific date after which the LIBO Rate will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Eurodollar Rate may no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable (but for the avoidance of doubt, such related changes shall not include a reduction of the Applicable Margin).    Notwithstanding anything to the contrary in Section 13.01, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Required Lenders stating that such Lenders object to such amendment.    Until an alternate rate of interest shall be determined in accordance with this Section 2.04(b) (but, in the case of the circumstances described in clause (ii)(w), clause (ii)(x) or clause (ii)(y) of the first sentence of this Section 2.04(b), only to the extent the LIBO Rate for Dollars for such Interest Period is not available or published at such time on a current basis), (x) any Continuation/Conversion Notice that requests the conversion of any Loan to, or continuation of any Loan as, a Eurodollar Loan shall be ineffective and (y) if any Borrowing Request requests a Eurodollar Loan, such Loan shall be made as an ABR Loan.

Section 4.03    Increased Costs.

(a)    The Borrower agrees to reimburse each Lender and each Revolving LC Issuer for any increase in the cost to such Lender or such Revolving LC Issuer of, or any reduction in the amount of any sum receivable by such Credit Party (whether of principal, interest or any other amount) in respect of, such Credit Party's Commitments and the making of Credit Extensions hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, Eurodollar Loans), on account of any Change in Law that: (i) imposes, modifies or deems applicable any reserves, special deposit, compulsory loan, insurance change or similar requirement against assets of, deposits with or for the account of, or credit extended by any Lender; or (ii) imposes on any Lender or any Revolving LC Issuer or the London interbank market any other condition, cost or

74

expense affecting this Agreement or Eurodollar Loans made by such Lender or any Revolving Letter of Credit or participation therein, except for: (x) such changes with respect to increased capital costs governed by Section 4.05, Taxes subject to indemnification under Section 4.06, Taxes described under clauses (b) through (d) of the definition of "Excluded Taxes," and Connection Income Taxes; and (y) increased costs which are already included in the determination of the Statutory Reserve Rate.  Each affected Credit Party shall promptly notify the Administrative Agent and the Borrower in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Credit Party for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrower directly to such Credit Party within ten (10) days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower

(b)    A certificate of an officer of a Lender or a Revolving LC Issuer setting forth the amount or amounts necessary to compensate such Lender or such Revolving LC Issuer as specified in this Section 4.03 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender or such Revolving LC Issuer, as applicable, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(c)    Promptly after any Lender or any Revolving LC Issuer has determined that it will make a request for increased compensation pursuant to this Section 4.03, such Lender or such Revolving LC Issuer shall notify the Borrower thereof.  Failure or delay on the part of any Lender or any Revolving LC Issuer to demand compensation pursuant to this Section 4.03 shall not constitute a waiver of such Lender's or such Revolving LC Issuer's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or any Revolving LC Issuer pursuant to this Section 4.03 for any increased costs or reductions incurred more than nine (9) months prior to the date that such Lender or Revolving LC Issuer, as applicable, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Revolving LC Issuer's intention to claim compensation therefor; provided further that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 4.04    Funding Losses.  In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or redeployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a Eurodollar Loan) as a result of:

(a)    any conversion or repayment or prepayment of the principal amount of any Eurodollar Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article III or otherwise;

(b)    any Loans not being made as Eurodollar Loans in accordance with the Borrowing Request therefor;

(c)    any Loans not being continued as, or converted into, Eurodollar Loans in accordance with the Continuation/Conversion Notice therefor; or

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

(d)      any Eurodollar Loans not being prepaid in accordance with any notice delivered pursuant to Section 3.02(a) (as a result of a revocation of such notice or as a result of such payment not being made);

provided that in each case other than due to such Lender's failure to fulfill its obligations hereunder, then, upon the written notice of such Lender to the Borrower, the Borrower shall, within ten (10) days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense.  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrower. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender to be the excess, if any, of: (x) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, such amount represented as the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a Eurodollar Loan, for the period that would have been the Interest Period for such Loan); over (y) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in dollars of a comparable amount and period from other banks in the Eurodollar market.  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.

Section 4.05    Increased Capital Costs.

(a)      If, after the Closing Date, any Change in Law affects or would affect the amount of capital required or expected to be maintained by any Credit Party or any Person Controlling such Credit Party, and such Credit Party determines that the rate of return on its or such Controlling Person's capital as a consequence of the Commitments or the Credit Extensions made, or the Revolving Letters of Credit participated in, by such Credit Party is reduced to a level below that which such Credit Party or such Controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Credit Party to the Borrower, the Borrower shall within twenty (20) days following receipt of such notice pay directly to such Credit Party additional amounts sufficient to compensate such Credit Party or such Controlling Person for such reduction in rate of return.  A statement of such Credit Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower.  In determining such amount, such Credit Party may use any reasonable method of averaging and attribution that it shall deem applicable.

(b)      A certificate of an officer of a Lender setting forth the amount or amounts necessary to compensate such Lender as specified in this Section 4.05 shall be delivered to the Borrower and shall be conclusive absent manifest error.

(c)      Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 4.05, such Lender shall notify the Borrower thereof. Failure or delay on the part of any Lender or any Revolving LC Issuer to demand compensation pursuant to this Section 4.05 shall not constitute a waiver of such Lender's or such Revolving LC Issuer's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 4.05 for any increased costs or reductions incurred

more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; _provided_ _further_ that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9)-month period referred to above shall be extended to include the period of retroactive effect thereof.

Section 4.06    Taxes.    The Borrower covenants and agrees as follows with respect to Taxes.  For purposes of this Section 4.06, the term "Lender" includes any Revolving LC Issuer.

(a)    Any and all payments by or on account of any obligation of any Obligor or the Administrative Agent under any Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes, except to the extent such deduction or withholding is required by law.  In the event that any Taxes are required by law (as determined in the good faith discretion of an applicable Withholding Agent) to be deducted or withheld from any payment required to be made by a Withholding Agent to or on behalf of any Credit Party under any Loan Document, then:

(i)    subject to clause (f) of this Section 4.06, if such Taxes are Indemnified Taxes, the amount of such payment shall be increased as may be necessary so that the amount of such payment, after withholding or deduction for or on account of such Indemnified Taxes (including such withholdings or deductions applicable to additional sums payable under this Section 4.06), is equal to the amount provided for in such Loan Document (and for the avoidance of doubt, it shall be the responsibility of the Borrower (or other relevant Obligor) to pay such increased amounts without regard to whether such Taxes are imposed on the Borrower (or such Obligor) or another party); and

(ii)    the applicable Withholding Agent shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i), if applicable) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with Applicable Law.

(b)    Without duplication, the Obligors shall pay, or at the option of the Administrative Agent timely reimburse it for the payment of, any and all Other Taxes to the relevant Governmental Authority imposing such Other Taxes in accordance with Applicable Law.

(c)    As promptly as practicable, the relevant Obligor shall furnish to the Administrative Agent a copy of an official receipt (or a certified copy thereof) or other documentation reasonably satisfactory to the Administrative Agent evidencing the payment of any Taxes payable under this Section 4.06 to any Governmental Authority.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)    Subject to clause (f) of this Section 4.06, and without duplication of Indemnified Taxes or additional amounts paid under Section 4.06(a) and Other Taxes paid under Section 4.06(b), the Obligors shall jointly and severally indemnify each Credit Party, within thirty (30) days after demand therefor, for any Indemnified Taxes (including Indemnified Taxes imposed, asserted, or attributable to amounts payable under this Section 4.06) levied, imposed, assessed on or actually paid by or on behalf of such Credit Party arising from the execution, delivery or performance of its obligations or from receiving a payment hereunder, or enforcing this Agreement

77

or any Loan Document, or any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The Borrower acknowledges that any payment made to any Credit Party or to any Governmental Authority in respect of the indemnification obligations of the Borrower provided in this <u>clause (d)</u> shall constitute a payment in respect of which the provisions of <u>clause (a)</u> and this <u>clause (d)</u> shall apply. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the basis and calculation thereof delivered to the Borrower by a Credit Party, or by the Administrative Agent on behalf of the applicable Credit Party, shall be conclusive absent manifest error.

(e)    Each Credit Party shall deliver documentation prescribed by Applicable Law and reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not and to what extent such Credit Party is subject to withholding, backup withholding or information reporting requirements. Notwithstanding anything to the contrary, the completion, execution, and submission of such documentation (other than such documentation set forth in this <u>Section 4.06(e)(i)</u> through <u>Section 4.06(e)(iv)</u>) shall not be required if in the Credit Party's reasonable judgment such completion, execution, or submission would subject such Credit Party to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Credit Party. Without limiting the generality of the foregoing, each Non-Domestic Credit Party that is entitled to an exemption from U.S. withholding Tax, or is subject to such Tax at a reduced rate under an applicable Tax treaty, on or prior to the date on which such Non-Domestic Credit Party becomes a Credit Party hereunder, and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but, in each case, only if and for so long as such Non-Domestic Credit Party is legally entitled to do so, shall deliver to the Borrower and the Administrative Agent whichever of the following is applicable:

(i)    if it is claiming the benefits of an income Tax treaty to which the United States is a party: (A) with respect to payments of interest under any Loan Document, two (2) properly completed and duly executed copies (or such other reasonable number of copies as shall be requested by the recipient) of IRS Form W-8BEN or W-8BEN-E (establishing an exemption from, or a reduction of U.S. federal withholding Tax pursuant to the "interest" article of such Tax treaty); and (B) with respect to any other applicable payments under any Loan Document, two (2) properly completed and duly executed copies (or such other reasonable number of copies as shall be requested by the recipient) of IRS Form W-8BEN or W-8BEN-E (establishing an exemption from, or a reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such Tax treaty);

(ii)    two (2) properly completed and duly executed copies (or such other reasonable number of copies as shall be requested by the recipient) of IRS Form W-8ECI;

(iii)    in the case of a Non-Domestic Credit Party claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code: (A) a certificate substantially in the form of <u>Exhibit E-1</u> to the effect that such Non-Domestic Credit Party is not: (I) a "bank" within the meaning of Section 881(c)(3)(A) of the Code; (II) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code; or (III) a Controlled foreign corporation receiving interest from a related Person within the meaning of

Section 881(c)(3)(C) of the Code (such certificate, an "Exemption Certificate"); and (B) two (2) properly completed and duly executed copies (or such other reasonable number of copies as shall be requested by the recipient) of IRS Form W-8BEN or W-8BEN-E (or applicable successor form) certifying that the Non-Domestic Credit Party is not a U.S. person; or

(iv)    if it is not the beneficial owner, two (2) properly completed and duly executed copies (or such other reasonable number of copies as shall be requested by the recipient) of IRS Form W-8IMY, accompanied by two (2) properly completed and duly executed copies (or such other reasonable number of copies as shall be requested by the recipient) of IRS Forms W-8ECI or W-8BEN or W-8BEN-E, an Exemption Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as well as any state form reasonably required by the Borrower; provided that if the Non-Domestic Credit Party is a partnership and one or more direct or indirect partners of such Non-Domestic Credit Party are claiming the portfolio interest exemption, such party may provide an Exemption Certificate substantially in the form of Exhibit E-4 on behalf of each such direct or indirect partner.

Each Credit Party that is not a Non-Domestic Credit Party shall deliver to the Borrower and the Administrative Agent two (2) copies (or such other reasonable number of copies as shall be requested by the recipient) on or prior to the date on which such Credit Party becomes a Credit Party hereunder (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), properly completed and duly executed, of IRS Form W-9 (or any applicable successor form) establishing that such Credit Party is not subject to backup withholding tax.  In addition, each Credit Party shall promptly deliver such forms promptly upon the obsolescence, inaccuracy or invalidity of any form previously delivered by such Credit Party. Each Credit Party shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer legally able to provide any previously delivered form or certificate to the Borrower or the Administrative Agent.

(f)    The Borrower shall not be obligated to gross up any payments to any Credit Party pursuant to clause (a)(i) of this Section 4.06, or to indemnify any Credit Party pursuant to clause (d) of this Section 4.06, in respect of any Excluded Taxes.

(g)    If any Credit Party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by the Borrower or any other Obligor or with respect to which the Borrower or any other Obligor has paid additional amounts pursuant to this Section 4.06, it shall pay to the Borrower or such other Obligor as soon as practical thereafter an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower or any other Obligor under this Section 4.06 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Credit Party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrower or other Obligor, upon the request of such Credit Party, agrees to repay to such Credit Party the amount paid over to the Borrower or other Obligor pursuant to this clause (g) (plus any interest, penalties or other charges imposed by the relevant Governmental Authority) in the event and to the extent such Credit Party is required to repay such refund to such Governmental Authority; provided further that a Credit Party shall not be obligated to pay any amount of such refund to the Borrower or any other Obligor pursuant to this clause (g) to the extent such payment would place the Credit Party

*ITOI Amended and Restated Credit and Guaranty Agreement*

in a less favorable net after-Tax position than the Credit Party would have been in if the Tax subject to indemnification or with respect to which additional amounts were paid and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  In addition, if any Credit Party is entitled to claim any refund of or with respect to Taxes as to which it has been indemnified by the Borrower (or any other Obligor) or with respect to which the Borrower (or any other Obligor) has paid additional amounts pursuant to this Section 4.06, at the reasonable request of the Borrower or other Obligor, such Credit Party shall reasonably cooperate with the Borrower or other Obligor to make a claim for such refund at the Borrower or other Obligor's expense.  This clause (g) shall not be construed to require any Credit Party to make available its tax returns (or any other information relating to its Taxes which it deems confidential) to the Borrower or other Obligor or any other Person.

(h)    If a payment made to a Credit Party under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Credit Party were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Credit Party shall deliver to the Borrower (or any other Obligor) and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower (or any other Obligor) or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower (or any other Obligor) or the Administrative Agent as may be necessary for the Borrower (or any other Obligor) and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Credit Party has complied with such Credit Party's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Section 4.07    Payments, Computations, etc.  Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the *pro rata* account of the Credit Parties entitled to receive such payment. All payments shall be made without setoff, deduction or counterclaim not later than 12:00 p.m. on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower. Funds received after that time shall be deemed, in the Administrative Agent's sole discretion, to have been received by the Administrative Agent on the next succeeding Business Day. The Administrative Agent shall promptly remit in same day funds to each Credit Party its share, if any, of such payments received by the Administrative Agent for the account of such Credit Party. All interest (including interest on Eurodollar Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days (or, in the case of interest on a ABR Loan, 365 days or, if appropriate, 366 days). Except as otherwise set forth herein, payments due on a day other than a Business Day shall be made on the preceding Business Day. Except as otherwise set forth in any Loan Document, following an Event of Default, all payments made under any Loan Document (and allocable to the Credit Parties in accordance with the terms of the Depositary Agreement and the Collateral Agency and Intercreditor Agreement) shall be applied upon receipt: (a) *first*, to the payment of all Obligations owing to the

80

Administrative Agent and the Collateral Agent, in their respective capacity as the Administrative Agent or the Collateral Agent, as applicable, but not as a Lender (including the reasonable fees and expenses of counsel to the Administrative Agent and the Collateral Agent); (b) *second*, after payment in full in cash of the amounts specified in <u>clause (a)</u>, to the payment of interest and fees on any portion (without duplication) of: (i) Revolving Loans that the Administrative Agent may have advanced on behalf of any Revolving Loan Lender for which the Administrative Agent has not then been reimbursed by such Revolving Loan Lender or the Borrower; and (ii) payments that the Administrative Agent may have advanced to the Credit Parties in accordance with this <u>Section 4.07</u> for which the Administrative Agent has not been reimbursed by the Borrower, any other Obligor or the Credit Parties; (c) *third*, after payment in full in cash of the amounts specified in <u>clauses (a)</u> and <u>(b)</u>, to the ratable payment of interest and fees on any portion (without duplication) of Revolving Loans and Revolving Letters of Credit then outstanding and Reimbursement Obligations then owing; (d) *fourth*, after payment in full in cash of the amounts specified in <u>clauses (a)</u> through <u>(c)</u>, to the ratable payment of the principal amount of each of the Revolving Loans then-outstanding and Reimbursement Obligations then-owing and amounts required for purposes of Cash Collateral for contingent liabilities under Revolving Letter of Credit Outstandings and all other costs and expenses owing to the Revolving Loan Lenders pursuant to the terms of this Agreement; (e) *fifth*, after payment in full in cash of the amounts specified in <u>clauses (a)</u> through <u>(d)</u>, to the ratable payment of all interest and fees owing with respect to the then outstanding Term Loans; (f) *sixth*, after payment in full in cash of the amounts specified in <u>clauses (a)</u> through <u>(e)</u>, to the ratable payment of the principal amount of the Term Loans then outstanding and all costs and expenses owing to the Term Loan Lenders pursuant to the terms of this Agreement; (g) *seventh*, after payment in full in cash of the amounts specified in <u>clauses (a)</u> through <u>(f)</u>, to the ratable payment of all other Obligations owing to the Credit Parties; and (h) *eighth*, after payment in full in cash of the amounts specified in <u>clauses (a)</u> through <u>(f)</u>, to each other Person lawfully entitled to receive such surplus.

Section 4.08    <u>Sharing of Payments</u>. If any Credit Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Credit Extension or Reimbursement Obligation (other than pursuant to the terms of <u>Section 4.03</u>, <u>4.04</u>, <u>4.05</u> or <u>4.06</u>) in excess of its *pro rata* share of payments obtained by all Credit Parties, such Credit Party shall promptly notify the Administrative Agent of such payment or recovery and shall thereafter as soon as practicable purchase from the other Credit Parties such participations in Credit Extensions made by them as shall be necessary to cause such purchasing Credit Party to share the excess payment or other recovery ratably (to the extent such other Credit Parties were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u>, <u>however</u>, that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Credit Party, the purchase shall be rescinded and each Credit Party which has sold a participation to the purchasing Credit Party shall repay to the purchasing Credit Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Credit Party's ratable share (according to the proportion of: (a) the amount of such selling Credit Party's required repayment to the purchasing Credit Party; to (b) total amount so recovered from the purchasing Credit Party) of any interest or other amount paid or payable by the purchasing Credit Party in respect of the total amount so recovered. The Borrower agrees that any Credit Party purchasing a participation from another Credit Party pursuant to this <u>Section 4.08</u> may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to <u>Section 4.09</u>) with respect to such participation as fully as if such Credit Party were the direct creditor of

81

the Borrower in the amount of such participation; provided that the Borrower shall have no liability to the Lenders hereunder to the extent that they have made all payments to the Lenders and the Administrative Agent required to be made by the Borrower hereunder.  If under any applicable bankruptcy, insolvency or other similar law any Credit Party receives a secured claim in lieu of a setoff to which this Section 4.08 applies, such Credit Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Credit Parties entitled under this Section 4.08 to share in the benefits of any recovery on such secured claim.  The provisions of this Section 4.08 shall not be construed to apply to: (x) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender); or (y) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

Section 4.09    Setoff.   Each Credit Party shall, upon the occurrence and during the continuance of any Default described in Section 10.01(i) or, with the consent of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to each Credit Party a continuing security interest in, any and all balances, credits, deposits, accounts (other than any trust accounts comprised entirely of moneys held in trust for the benefit of Persons other than the Borrower or its Affiliates) or moneys of the Borrower then or thereafter maintained with such Credit Party (other than any Deposit Accounts or Securities Accounts subject to a Control Agreement); provided, however, that any such appropriation and application shall be subject to the provisions of Section 4.08.   Each Credit Party agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Credit Party; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Credit Party under this Section 4.09 are in addition to other rights and remedies (including other rights of setoff under Applicable Law or otherwise) which such Credit Party may have.

Section 4.10    Change in Lending Office.   Each Credit Party agrees that if it makes any demand for payment under Section 4.03, 4.05 or 4.06, or if any adoption or change of the type described in Section 4.01 shall occur with respect to it, it will, if requested by the Borrower, file a certificate or document reasonably requested by the Borrower and/or use reasonable efforts (in either case, consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, as determined in its sole discretion) to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if the filing of such certificate or document or the making of such a designation would reduce or obviate the need for the Borrower to make payments under Section 4.03, 4.05 or 4.06, or would eliminate or materially reduce the effect of any adoption or change described in Section 4.01; provided, however, that nothing in this Section 4.10 shall affect or postpone any of the Obligations of the Borrower or the right of any Credit Party provided in Section 4.01, 4.03, 4.05 or 4.06.

Section 4.11    Replacement of Lenders.

(a)     If any Lender (an "Affected Lender"): (i) fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of a greater percentage of the Lenders than the Required Lenders and such election, consent, amendment, waiver or other modification is otherwise consented to by the Required Lenders; (ii) makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to Section 4.03, 4.05 or 4.06 (and the payment of such amounts are, and are likely to continue to be, more onerous in the reasonable judgment of the Borrower than with respect to the other Lenders), or gives notice pursuant to Section 4.01 requiring a conversion of such Affected Lender's Eurodollar Loans to ABR Loans or suspending such Lender's obligation to make Loans as, or to convert Loans into, Eurodollar Loans; (iii) shall become and continues to be a Defaulting Lender and shall have failed to cease being a Defaulting Lender pursuant to Section 4.12(b) within five (5) Business Days after Borrower's request therefor; or (iv) is a Revolving Loan Lender: (A) whose unsecured senior debt obligations cease to be rated at least A3 by Moody's and at least A- by S&P; or (B) whose unsecured senior debt obligations are rated exactly A3 by Moody's or A- by S&P and such Revolving Loan Lender is placed on negative credit watch by S&P or Moody's; the Borrower may (in the case of clause (i) only, within thirty (30) days of such consent of Required Lenders, or in the case of clauses (ii), (iii) or (iv), at any time) give notice (a "Replacement Notice") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans, and/or Commitments to another financial institution or other Person in accordance with Section 13.08 (a "Replacement Lender") designated in such Replacement Notice; provided, however, that no Replacement Notice may be given by the Borrower if: (w) such replacement conflicts with any Applicable Law or regulation; (x) any Event of Default shall have occurred and be continuing at the time of such replacement; (y) prior to any such replacement in connection with clause (ii) above, such Lender shall have taken any necessary action under Section 4.05 or 4.06 (if applicable) so as to eliminate the continued need for payment of amounts owing pursuant to Section 4.05 or 4.06, or (z) prior to any such replacement in connection with clause (c) above, such Lender shall have taken any necessary action under Section 4.12(b) to cease being a Defaulting Lender.

(b)     If the Administrative Agent shall, in the exercise of its reasonable discretion and within ten (10) days of its receipt of such Replacement Notice, notify the Borrower and such Affected Lender in writing that the Replacement Lender is reasonably satisfactory to the Administrative Agent (such consent not being required where the Replacement Lender is already a Lender), then such Affected Lender shall, subject to the payment of any amounts due pursuant to Section 4.04, assign, in accordance with Section 13.08, the portion of its Commitments and/or Loans, and other rights (other than its existing rights to payments pursuant to Section 4.05 or Section 4.06) and obligations under this Agreement and all other Loan Documents (including Reimbursement Obligations, if applicable) designated in the Replacement Notice to such Replacement Lender; provided, however, that: (i) such assignment shall be without recourse, representation or warranty (in accordance with and subject to the restrictions contained in Section 13.08) and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender; (ii) the purchase price paid by such Replacement Lender shall be an amount equal to the sum of: (A) the amount (at par) of such Affected Lender's Loans designated in the Replacement Notice; plus (B) such Affected Lender's Revolving Loan Percentage of all unreimbursed Reimbursement Obligations (at par); plus (C) all accrued and unpaid interest and fees in respect thereof; plus (D) all other amounts (including the amounts demanded and unreimbursed under Sections 4.03, 4.05 and 4.06), owing to such Affected Lender hereunder; (iii)

83

in the case of an assignment from an event as described in clause (a)(i) of this Section 4.11, the Replacement Lender shall consent, at the time of such assignment, to such event; and (iv) the Borrower shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment (including the processing fees described in Section 13.08).

(c)    Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents.  Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any assignment agreement necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section 4.11.

Section 4.12    Defaulting Lenders.

(a)    Defaulting Lender Adjustments.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory) shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to any Revolving LC Issuer hereunder; third, to Cash Collateralize each Revolving LC Issuer's Fronting Exposure with respect to such Defaulting Lender in accordance with Section 4.12(c); fourth as the Borrower may request (so long as no Default or Event of Default shall have occurred and be continuing), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and the Borrower, to be held in a Deposit Account and released pro rata in order to: (x) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; and (y) Cash Collateralize any Revolving LC Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future Revolving Letters of Credit issued under this Agreement, in accordance with Section 4.12(c); sixth, to the payment of any amounts owing to the Lenders, any Revolving LC Issuer or the Revolving Loan Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender, any Revolving LC Issuer or the Revolving Loan Lenders against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Event of Default shall have occurred and be continuing, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if: (x) such payment is a payment of the principal amount of any Loans, or Reimbursement Obligations with respect to Revolving Letters of Credit, in respect of which such Defaulting Lender has not fully funded its appropriate share; and (y) such Loans were made, or the related Revolving Letters of Credit were issued, at a

84

time when the conditions set forth in <u>Section 5.02</u> were satisfied and waived, such payment shall be applied solely to pay the Loans of, and Reimbursement Obligations with respect to Revolving Letters of Credit owed to, all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of, or Reimbursement Obligations with respect to Revolving Letters of Credit owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in Revolving Letters of Credit and Revolving Loans are held by the Lenders *pro rata* in accordance with the applicable Commitments without giving effect to <u>Section 4.12(a)(iii)</u>. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this <u>Section 4.12(a)(i)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(ii)    <u>Certain Fees</u>.

(A)    No Defaulting Lender shall be entitled to receive any fee pursuant to <u>Section 3.05(a)</u> for any period during which that Lender is a Defaulting Lender; <u>provided</u> that such Defaulting Lender shall be entitled to receive fees pursuant to <u>Section 3.05(a)</u> for any period during which that Lender is a Defaulting Lender only to extent allocable to its Revolving Loan Percentage of the stated amount of Revolving Letters of Credit for which it has provided Cash Collateral pursuant to <u>Section 4.12(c)</u>.

(B)    With respect to any fees not required to be paid to any Defaulting Lender pursuant to <u>clause (A)</u> above, the Borrower shall: (I) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in Revolving Letters of Credit or Revolving Loans that has been reallocated to such Non-Defaulting Lender pursuant to <u>clause (iii)</u> below; (II) pay to the applicable Revolving LC Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to such Revolving LC Issuer's Fronting Exposure to such Defaulting Lender; and (III) not be required to pay the remaining amount of any such fee.

(iii)    <u>Reallocation of Participations to Reduce Fronting Exposure</u>.  All or any part of any Defaulting Lender's participation in Revolving Letters of Credit and Revolving Loans shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Revolving Loan Percentage (calculated without regard to such Defaulting Lender's Revolving Loan Commitment) but only to the extent that: (A) the conditions set forth in <u>Section 5.02</u> are satisfied at the time of such reallocation (and, unless the Borrower shall have otherwise notified the Administrative Agent at such time, the Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time); and (B) such reallocation does not cause the aggregate outstanding principal amount of all Revolving Loans of such Non-Defaulting Lender, together with such Revolving Loan Lender's Revolving Loan Percentage of the aggregate amount of all Revolving Letter of Credit Outstandings, to exceed such Non-Defaulting Lender's Revolving Loan Commitment.  No reallocation hereunder shall constitute a waiver or release of any claim of any party hereunder against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(iv)    Cash Collateral.  If the reallocation described in clause (iii) above cannot, or can only partially, be effected, then the Borrower shall, without prejudice to any right or remedy available to it hereunder or under Applicable Law, Cash Collateralize each Revolving LC Issuer's Fronting Exposure (other than the Fronting Exposure of any Revolving LC Issuer that is a Defaulting Lender or its Affiliate) in accordance with the procedures set forth in Section 4.12(c).

(b)    Defaulting Lender Cure.  If the Borrower, the Administrative Agent and each Revolving Loan Lender and each Revolving LC Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in the Revolving Letters of Credit and Revolving Loans to be held *pro rata* by the Lenders in accordance with the applicable Commitments (without giving effect to Section 4.12(a)(iii)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

(c)    Cash Collateral.  At any time that there shall exist a Defaulting Lender, within one (1) Business Day following the written request of the Administrative Agent or a Revolving LC Issuer (with a copy to the Administrative Agent), the Borrower shall Cash Collateralize each Revolving LC Issuer's Fronting Exposure (other than the Fronting Exposure of any Revolving LC Issuer that is the Defaulting Lender) with respect to such Defaulting Lender (determined after giving effect to Section 4.12(a)(iii) and any Cash Collateral provided by such Defaulting Lender).

(i)    Grant of Security Interest.  The Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent for the benefit of the applicable Revolving LC Issuers, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for such Defaulting Lender's obligation to fund participations in respect of Revolving Letters of Credit, to be applied pursuant to clause (ii) below. If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and a Revolving LC Issuer as herein provided, or that the total amount of such cash collateral is less than 102.5% of the Stated Amount of such Revolving Letter of Credit, then the Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(ii)    Application.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section 4.12 in respect of Revolving Letters of Credit shall be applied to the satisfaction of the Defaulting Lender's obligation to fund participations in respect of Revolving Letters of Credit (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) for which the Cash Collateral was

*ITOI Amended and Restated Credit and Guaranty Agreement*

so provided, prior to any other application of such property as may otherwise be provided for herein.

(iii)    Termination of Requirement.  Cash Collateral (or the appropriate portion thereof) provided to reduce the applicable Revolving LC Issuer's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section 4.12 following: (A) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender); or (B) the determination by the Administrative Agent and the applicable Revolving LC Issuer that there exists excess Cash Collateral; provided that subject to the other provisions of this Section 4.12, the Person providing Cash Collateral and the applicable Revolving LC Issuer may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations; provided further that to the extent that such Cash Collateral was provided by the Borrower, such Cash Collateral shall remain subject to the security interest granted pursuant to the Loan Documents.

(d)    Lender Counterparties.  During the period that any Lender is a Defaulting Lender, such Lender shall not be permitted to be a Secured Hedge Provider with respect to any Transaction Interest Rate Hedge Agreement entered into by it during such period; provided that such restriction shall cease upon such Lender ceasing to be a Defaulting Lender.

## ARTICLE V
## CONDITIONS TO CREDIT EXTENSIONS

Section 5.01    [Intentionally Omitted].

Section 5.02    All Credit Extensions.  Subject to Section 2.07(c)(ii), the obligation of each Lender (or the Administrative Agent on its behalf) and each Revolving LC Issuer to make any Credit Extension shall be subject to the satisfaction of each of the conditions precedent set forth below.

(a)    Compliance with Representations and Warranties; No Defaults, etc.  Subject to Section 2.07(c)(ii), both immediately before and immediately after giving effect to any Credit Extension (but, if any Default of the nature referred to in Section 10.01(e) shall have occurred with respect to any other Indebtedness, without giving effect to the application, directly or indirectly, of the proceeds thereof) the following statements shall be true and correct:

(i)    the representations and warranties set forth in each Loan Document are, in each case, true and correct (and in the case of each date after the Amendment Effective Date, in all material respects (except to the extent any such representation and warranty itself is qualified by "materiality," "Material Adverse Effect" or similar qualifier, in which case, it shall be true and correct in all respects)) with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties were true and correct as of such earlier date); and

(ii)    no Default or Event of Default shall exist and be continuing or will result as a result of the making of the requested Credit Extension (except for the making of any Revolving Loan pursuant to Section 2.07(c)(ii), in which case no Event of Default shall exist and be continuing or will result as a result of the making of the requested Credit Extension).

87

(b)    Borrowing Request; Issuance Request.    Subject to Section 2.07(c)(ii), the Administrative Agent shall have received: (i) a Borrowing Request if Loans are being requested; or (ii) an Issuance Request if a Revolving Letter of Credit is being requested or extended, or if the Stated Amount thereof is being increased.  Each of the delivery of a Borrowing Request or Issuance Request, and the acceptance by the Borrower of the proceeds or benefits of such Credit Extension, shall constitute a representation and warranty by the Borrower that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the statements required to be true and correct under Section 5.02(a) as a condition to such Credit Extension are true and correct in all material respects.

Section 5.03    Determinations under Article V.  For purposes of determining compliance with a condition specified in Section 5.02, each Lender shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to such Lender unless an officer of the Administrative Agent responsible for the transactions contemplated by the Loan Documents shall have received notice from such Lender prior to the applicable Borrowing date specifying its objection thereto and, to the extent applicable, such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of such Borrowing; provided that with respect to the making of any Revolving Loan, all Lenders shall be bound by any amendment, modification or waiver of Section 5.02 consented to by the Required Revolving Lenders with respect to any such Credit Extension after the Closing Date.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

In order to induce the Credit Parties to enter into this Agreement and to make the Credit Extensions hereunder, each Obligor makes the following representations and warranties in this Article VI, as of the Amendment Effective Date and on the other dates set forth in Article V.

Section 6.01    Due Organization; Subsidiaries; Capitalization; etc.

(a)    Due Organization.  Each Obligor and each of its Subsidiaries: (i) has been duly formed, is validly existing and is in good standing under the laws of its jurisdiction of organization identified on Schedule 6.01(a); (ii) is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (iii) has the requisite power and authority to enter into and perform its Obligations under each Loan Document to which it is a party, and to own, lease and/or operate and maintain its properties and conduct its business as currently conducted.

(b)    Subsidiaries.  Part I of Schedule 6.01(b) is a complete and accurate list of all of the direct and indirect Wholly-Owned Subsidiaries of the Borrower; and Part II of Schedule 6.01(b) is a complete and accurate list of all of the direct and indirect Non-Wholly-Owned Subsidiaries of the Borrower.

(c)     Capitalization; Ownership of Other Entities.  HoldCo, each Obligor and each of its Subsidiaries has an authorized capitalization as of the Amendment Effective Date as set forth on Schedule 6.01(c); the issued and outstanding shares or membership interests of Capital Stock of HoldCo, each Obligor and each of its respective Subsidiaries have been duly and validly authorized and issued, are fully paid and nonassessable, are free from all Liens other than Permitted Liens, and are owned of record as set forth in Schedule 6.01(c); and there are no outstanding rights, warrants or options to acquire, or instruments convertible into or exchangeable for, any Capital Stock in HoldCo, any Obligor or any of its respective Subsidiaries, except as described in Schedule 6.01(c).  None of HoldCo, the Obligors nor any of their respective Subsidiaries has any direct or indirect equity ownership interest in any corporation, partnership, joint venture or other entity other than those Subsidiaries listed on Schedule 6.01(c).

Section 6.02    Operation of the Projects.

(a)     Each Project Company owns or holds all material Real Property Interests (including but not limited to fee simple, easement and leasehold estates), tangible personal property, intangible personal property, fixtures, water rights, contracts, and agreements necessary for the operation and maintenance of its Project.  Except as set forth on Schedule 6.02(a), the material mechanical, electrical and other operating systems on and in the Projects are in all material respects in good working order (ordinary wear and tear excepted) and repair and are adequate in all material respects for the operation of the Projects as currently being and expected to be operated.

(b)     Except as could not reasonably be expected to result in a Material Adverse Effect: (i) all Applicable Permits required in connection with the ownership, leasing, use, operation and maintenance of each Project, including the sale of electricity from such Project: (A) have been issued and are held in the name of the Project Company that owns such Project; (B) are in full force and effect; and (C) are not subject to legal proceedings or to any unsatisfied conditions that could reasonably be expected to result in a material modification or revocation of such Permits, and all applicable appeal periods with respect thereto have expired; and (ii) each Project Company is in compliance with all such Permits related to its Project.

Section 6.03    Taxes; Other Laws.

(a)     Each Obligor and each of its respective Subsidiaries has filed all federal, state and material local, foreign and other Tax returns that are required to be filed and have paid all Taxes required to be paid and any related assessments, fines or penalties (except for any such Tax, assessment, fine or penalty that is being contested in good faith and by appropriate proceedings, as to which such Obligor or such Subsidiary has established adequate reserves in accordance with GAAP or IFRS, as applicable, and as to which there are no Liens other than Permitted Liens identified in clause (b) of the definition thereof).  Each Obligor is a partnership or a disregarded entity for U.S. federal and relevant state and local income tax purposes.

(b)     Each Obligor and each of its Subsidiaries has complied with all Applicable Laws, rules, regulations and orders (other than any relating to the payment of Taxes which is covered in clause (a) above, and other than any relating to Environmental Laws, which is covered in Section 6.05), except to the extent such non-compliance could not reasonably be expected to cause a Material Adverse Effect.

*ITOI Amended and Restated Credit and Guaranty Agreement*

Section 6.04    Compliance with ERISA.  Each Obligor and each of its Subsidiaries and any member of its ERISA Groups or each such Subsidiary's ERISA Groups and each Plan is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder to the extent that they relate to any Plan.  No ERISA Event has occurred or is reasonably expected to occur with respect to any Pension Plan for which any Obligor or any of its Subsidiaries would have any material liability.  None of the Obligors nor any of their respective Subsidiaries, nor any member of their ERISA Groups or their Subsidiaries' respective ERISA Groups, has incurred or expects to incur any material liabilities (including any contingent, potential or secondary liabilities) under Title IV of ERISA or Section 412 or 4971 of the Code or Section 302 of ERISA other than those arising from plan contributions or PBGC premium payments made in the ordinary course.  Except to the extent required under Section 4980B of the Code or similar state laws, no Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of an Obligor or any of its Subsidiaries, or any member of its ERISA Groups or each such Subsidiary's respective ERISA Groups.  No Plan is a Pension Plan, and no Obligor has, at any point within the last six (6) years contributed, been obligated to contribute to or had any liability to any Pension Plan or any Multiemployer Plan.  Each Obligor and each of its Subsidiaries and any member of its ERISA Groups or each such Subsidiary's ERISA Groups have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.

Section 6.05    Environmental Laws.  Except as set forth on Schedule 6.05 hereto or as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect:

(a)    all facilities and property (including underlying groundwater) owned, leased or operated by each Obligor and each of its Subsidiaries have been, and continue to be, owned, leased or operated, as applicable, by such Obligor and its Subsidiaries) in compliance with all Environmental Laws, including all Permits required thereunder;

(b)    there are no pending, or to the knowledge of the Obligors or their Subsidiaries threatened, claims, complaints, notices, inquiries or requests for information received by the Obligors or any of their respective Subsidiaries with respect to any actual or alleged Environmental Liabilities, and no Obligor, Subsidiary of an Obligor, or Project is subject to any outstanding written order, consent decree or settlement agreement with any Person relating to any Environmental Liability;

(c)    there have been no Releases of Hazardous Materials at, on or under any property now or previously owned, leased or operated by the Obligors or any of their Subsidiaries;

(d)    no property now or previously owned or leased by the Obligors or their Subsidiaries is listed or, to the knowledge of the Obligors, proposed for listing, on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state list of sites requiring investigation or clean-up;

*ITOI Amended and Restated Credit and Guaranty Agreement*

(e)    there are no underground storage tanks, active or abandoned, including petroleum storage tanks, on or under any property now or previously owned, leased or operated by the Obligors or their Subsidiaries;

(f)    none of the Obligors nor any of their respective Subsidiaries has transported or arranged for the transportation of any Hazardous Material to any location which is listed or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state list or which is the subject of Federal, state or local enforcement actions or other investigations;

(g)    there are no polychlorinated biphenyls or friable asbestos present at any property now or previously owned, leased or operated by the Obligors or any of their Subsidiaries; and

(h)    no conditions exist at, on or under any property now or previously owned, leased or operated by the Obligors or any of their respective Subsidiaries which, with the passage of time, or the giving of notice or both, would give rise to any Environmental Liability.

Section 6.06    Title to Property.

(a)    Title. Each Obligor and each of its Subsidiaries owns: (i) in the case of owned Real Property, good and marketable fee title to; and (ii) in the case of owned personal property, good and valid title to; or (iii) in the case of leased Real Property or leased personal property, valid and enforceable leasehold or easement interests (as the case may be) in, all of its material properties and assets, real and personal, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims except for Permitted Liens.

(b)    Real Estate. As of the Amendment Effective Date, Schedule 6.06(b) sets forth true, accurate and complete descriptions (in all material respects) of all interests in, and all rights to use or occupy, all Real Property owned or held by Ector, Grays Harbor or Nelson (collectively, the "IT Real Property Interests") and the Real Property to which such interests pertain. Schedule 6.06(b) contains a true, accurate and complete list in all material respects of all deeds, leases, subleases, assignments of leases, easements, licenses and rights of way (together with all amendments, modifications, supplements, renewals or extensions of any thereof) pursuant to which Ector, Grays Harbor or Nelson was granted such respective IT Real Property Interests. Each deed, lease, sublease, assignment of lease, easement, license or right of way listed in Schedule 6.06(b) is in full force and effect and the Borrower does not have knowledge of any material default that has occurred and is continuing thereunder, and each such instrument constitutes the legally valid and binding obligation of Ector, Grays Harbor or Nelson (and, to the Borrower's knowledge, all counterparties) signatory thereto, as applicable, enforceable against each such Person in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles.

Section 6.07    Regulations T, U and X; Investment Company Act. No Obligor nor any of its Subsidiaries: (a) is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Credit Extensions will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, Board

*ITOI Amended and Restated Credit and Guaranty Agreement*

Regulation T, U or X; and (b) is an "investment company" within the meaning of the Investment Company Act of 1940, as amended. Terms for which meanings are provided in Board Regulation T, U or X, or any regulations substituted therefor, as from time to time in effect, are used in this Section 6.07 with such meanings.

Section 6.08    Insurance.  The Required Insurance has been obtained and is in full force and effect; and none of the Project Companies: (a) has received notice from any insurer or agent of such insurer that substantial Capital Expenditures or other material expenditures will have to be made in order to continue any insurance maintained in connection with its Project; or (b) has any reason to believe that it will not be able to renew any existing insurance coverage for its Project as and when such coverage expires, or to obtain similar coverage from similar insurers at a cost that would not have a Material Adverse Effect.

Section 6.09    Labor Matters.  Except as set forth on Schedule 6.09:

(a)    Each Obligor and each of its respective Subsidiaries has available to it all the personnel (including pursuant to subcontracts to which any of the Obligors and/or their respective Subsidiaries are a party) appropriate for conducting its business and for the operation of each Project, and for the management and administration of each Project, in each case in all material respects and in accordance with Applicable Law, the applicable Material Project Documents and Prudent Industry Practices.

(b)    (i) No Obligor nor any of its Subsidiaries is a party to any material labor dispute and there are no strikes or walkouts relating to any labor contracts to which such Person is a party or is otherwise subject; (ii) there is no unfair labor practice complaint pending against an Obligor or any of its Subsidiaries or, to the knowledge of the Obligors and their Subsidiaries, threatened against any of them, before the National Labor Relations Board that could reasonably be expected to have a Material Adverse Effect; (iii) there is no grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement pending against an Obligor or any of its Subsidiaries or, to the knowledge of the Obligors and their Subsidiaries, threatened against any of them that could reasonably be expected to have a Material Adverse Effect; (iv) no slowdown or stoppage is pending against an Obligor or any of its Subsidiaries, or to the knowledge of the Obligors and their Subsidiaries, threatened against such Obligor and its Subsidiaries, that could reasonably be expected to have a Material Adverse Effect; (v) no Obligor nor any of its Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect; and (vi) there are no pending or, to the knowledge of the Obligors and their Subsidiaries, threatened claims, complaints, notices, inquiries or requests for information received by the Obligors or their Subsidiaries with respect to any alleged violation of, or potential liability under, any law relating to employee health and safety (including the Occupational Safety and Health Act, 29 U.S.C.A. §651 et seq.) which could reasonably be expected to result in liability for the Obligors or their Subsidiaries in an aggregate amount exceeding $2,500,000 (exclusive of amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover) or which could reasonably be expected to result in result in a Material Adverse Effect.

(c)    As of the Amendment Effective Date, no Obligor nor any of its Subsidiaries is a party to or bound by any collective bargaining agreement, and at any time this representation is

92

made after the Amendment Effective Date, no Obligor nor its Subsidiaries is a party to or bound by any collective bargaining agreement which could reasonably be expected to cause a Material Adverse Effect.

Section 6.10    Intellectual Property.  Each Obligor and each of its Subsidiaries owns, possesses, has the right to use or can acquire on reasonable terms, adequate trademarks, trade names and other rights to inventions, know-how, patents, copyrights, confidential information and other intellectual property (collectively, "Intellectual Property Rights") necessary to operate the Projects, except where the failure to own, possess or have the right to use such Intellectual Property Rights, singularly or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Obligors and their Subsidiaries, no material product, process, method, substance, part or other material presently contemplated to be sold or employed by an Obligor or any of its Subsidiaries in connection with its business will infringe any patent, trademark, service mark, trade name, domain name, copyright, license or other right owned by any other Person in a manner that could reasonably be expected to have a Material Adverse Effect.

Section 6.11    Indebtedness; Other Liabilities; Future Liens; Separateness.

(a)    After giving effect to the transactions contemplated hereby and by the other Loan Documents to occur on the Amendment Effective Date, no Obligor nor any of its Subsidiaries will have at any time thereafter any outstanding Indebtedness other than: (i) the Indebtedness under or permitted by the Loan Documents; (ii) the Existing Project Level Indebtedness; (iii) any other Indebtedness set forth on Schedule 6.11(a); and (iv) any other Permitted Indebtedness.

(b)    Schedule 6.11(a) sets forth a complete and correct list of all outstanding Indebtedness of each Obligor and each of its Subsidiaries as of the Amendment Effective Date (including a description of the obligors and obligees, principal amount outstanding and collateral therefor, if any, and guaranty thereof, if any).  None of the Obligors nor any of their respective Subsidiaries is in default, and no waiver of default is currently in effect, in the payment of any principal or interest on any material Indebtedness of any Obligor or any of its Subsidiaries.  Except as set forth on Schedule 6.11(a) or the Organic Documents of a Non-Wholly-Owned Subsidiary, and except for mandatory prepayments with cash available for debt service and limitations on restricted payments, in each case, under any applicable Project Level Indebtedness Document that has not been triggered by a default or failure to satisfy a minimum financial covenant under such Project Level Indebtedness Document, no event or condition exists as of the Amendment Effective Date that currently prohibits or limits in any way a Subsidiary of an Obligor from making cash Distributions to any Obligor or any of its Subsidiaries.

(c)    Except as provided in any applicable Project Level Indebtedness Documents, the Material Project Documents and the Organic Documents of any Non-Wholly-Owned Subsidiary, no Subsidiary of an Obligor has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to any Lien (other than Permitted Liens).

(d)    Except as provided in the Loan Documents and the Project Level Indebtedness Documents, none of the Obligors nor any of their respective Subsidiaries is a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of an Obligor or

*ITOI Amended and Restated Credit and Guaranty Agreement*

any of its Subsidiaries, any agreement relating thereto, or any other agreement (including its charter or other organizational document) which limits the amount of, or otherwise imposes restrictions on the incurring of, Indebtedness by any Obligor of any of its Subsidiaries.

(e)     Except to the extent provided in the Loan Documents, the separate liabilities of each Obligor and each of its Subsidiaries are readily distinguishable from the liabilities of all other Persons.  Each Obligor and each of its Subsidiaries conducts its business solely in its own name in a manner not misleading to other Persons as to its identity.

Section 6.12    <u>Material Project Documents</u>.  The documents listed on <u>Schedule 6.12</u>: (a) are all of the contracts and agreements related to the maintenance, operation, repair and use of the Projects which are: (i) in existence on the Amendment Effective Date; and (ii) material to the respective Project or Project Company party thereto; and (b) are valid and binding agreements enforceable by each Project Company party thereto in accordance with their terms except as such enforceability: (i) may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium or other similar laws affecting the enforcement of creditors' rights and remedies generally; and (ii) is subject to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

Section 6.13    <u>Business Activities</u>.  Except as set forth on <u>Schedule 6.13</u> hereto, none of the Obligors nor any of their respective Subsidiaries has engaged in any business or activity other than its Permitted Business.

Section 6.14    <u>Due Authorization; Enforceability of Loan Documents</u>.

(a)     Each Obligor and HoldCo has all requisite corporate or other power and authority to enter into this Agreement and the other Loan Documents to which it is a party.  This Agreement and the other Loan Documents to which any Obligor or HoldCo is a party have been duly and validly authorized, executed and delivered by such Obligor or HoldCo, as applicable.

(b)     Each of the Loan Documents to which any Obligor or HoldCo is a party constitutes the legal, valid and binding obligation of such Obligor or HoldCo, as applicable, enforceable against such Obligor or HoldCo, as applicable, in accordance with its terms, except as such enforceability may be limited by: (i) bankruptcy; fraudulent conveyance, insolvency, reorganization, moratorium and other laws relating to or affecting creditors' rights generally; and (ii) the availability of equitable remedies.

Section 6.15    <u>Property Rights</u>.

(a)     The rights and real property interests (including, as applicable, the IT Real Property Interests) possessed by each Project Company (collectively, the "<u>Real Property Interests</u>"), and all other rights and personal property interests possessed by such Project Company, provide each such Project Company with all rights and property interests required for such Project Company to construct, operate, and maintain its Project, and to obtain, in all material respects, all services, materials or rights required for the operation and maintenance of its Project.

(b)     All utility and other services, means of transportation, facilities, other materials and other rights that are necessary for the operation and maintenance of the Projects in accordance with

Applicable Law and the Loan Documents (including, to the extent applicable, gas, electrical, water and sewage services and facilities) are available to the Project Companies in all material respects.

Section 6.16    <u>Defaults under Material Project Documents</u>.  (a) None of the Obligors nor any of their respective Subsidiaries that are party to a Material Project Document is in default (and no event has occurred which with lapse of time or notice or action by a third party could result in a default) in any material respect in the performance of or compliance with any Material Project Document (both before and after giving effect to this Agreement and the other Loan Documents); (b) each Material Project Document in existence as of the Amendment Effective Date is in full force and effect; and (c) no force majeure event has occurred and is continuing under any Material Project Document.

Section 6.17    <u>Defaults under Other Agreements</u>.  None of the Obligors nor any of their respective Subsidiaries: (a) is in violation of its respective Organic Documents; or (b) is in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, agreement, covenant, condition or other obligation contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it is bound or to which any of its properties or assets is subject, which defaults and violations, in the case of <u>clauses (a)</u> and <u>(b)</u> above, singularly or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 6.18    <u>Non-Contravention; etc.</u>   None of the execution or delivery of this Agreement, any other Loan Document, the performance of or compliance with the terms and conditions hereof or thereof, or the consummation of the transactions contemplated hereby or thereby: (a) contravenes any Applicable Law other than violations that individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect; (b) constitutes a default under or results in the violation of the provisions of the Organic Documents of HoldCo, any Obligor or any of its Subsidiaries; (c) results in the creation or imposition of any Liens (other than Liens created under the Security Documents) on any assets or properties of HoldCo, any Obligor or any of its Subsidiaries; or (d) constitutes a default under or results in the violation of any indenture, mortgage, deed of trust, loan agreement, license, lease or other agreement, contract or instrument to which HoldCo, any Obligor or any of its Subsidiaries is a party, or by which HoldCo, any Obligor, any of its Subsidiaries, or any of their respective properties or assets are bound except where any such default or violation under this clause (d) could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.19    <u>Approvals</u>.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those which have been duly obtained or made and which are in full force and effect) is required by any Obligor, any of its Subsidiaries, or any holder of Capital Stock of such Obligor or Subsidiary for the due execution, delivery or performance (including the valid granting of any security interest or the enforcement thereof) by any Obligor or any of its Subsidiaries of any Loan Document to which it is a party, except for: (a) authorizations, approvals, actions notices, and filings in connection the exercise of certain remedies under the Loan Documents; and (b) the authorizations, approvals, actions, notices and filings disclosed on <u>Schedule 6.19</u>.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

Section 6.20  <u>Legal and other Proceedings</u>.  There is no: (a) legal or governmental proceeding pending to which any Obligor or any of its Subsidiaries is a party or to which any property or assets of any Obligor or any of its Subsidiaries is subject that, if determined adversely to such Obligor or such Subsidiary, could reasonably be expected to have a Material Adverse Effect, and to the knowledge of the Obligors and their Subsidiaries, no such proceedings are threatened or contemplated by Governmental Authorities or by any other Person; (b) proceeding pending other than rulemaking proceedings of general applicability; (c) proceeding related to the renewal of Permits with respect to any Obligor or any of its Subsidiaries that could reasonably be expected to result in a rescission, termination, material modification, or suspension of any material Permit held by any Obligor or any of its respective Subsidiaries; or (d) action, suit or proceeding by or before any court, Governmental Authority, or any arbitrator involving any Obligor or any of its Subsidiaries with respect to any Terrorism Law that is pending or, to the best knowledge of the each Obligor, threatened.

Section 6.21  <u>Disclosure</u>.

(a)    The Obligors have disclosed all material agreements, instruments and corporate or other restrictions to the Credit Parties which each Obligor and each of its respective Subsidiaries is subject and all other matters known to the Obligors, other than such agreements, instruments and corporate or other restrictions in respect of which, individually or in the aggregate, a breach, default, event of default or violation thereof could not reasonably be expected to result in a Material Adverse Effect.  Subject to the next sentence, no report, financial statement, certificate or other written information furnished by or on behalf of any Obligor to a Credit Party in connection with this Agreement and the transactions contemplated hereby (including such as were delivered prior to the date hereof, but excluding any forecasts or financial projections) or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any untrue statement of material fact or omits to state any material fact necessary to make the statements therein (taken as a whole), in the light of the circumstances under which they were made, not materially misleading.  Each of the forecasts and financial projections furnished by or on behalf of Obligor or any of its Subsidiaries to a Credit Party in connection with the transactions contemplated hereby have been prepared in good faith upon the basis of assumptions that were reasonable at the time of such preparation and at the time furnished to the Lead Arranger, the Administrative Agent or the Lenders.

(b)    As of the Amendment Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 6.22  <u>Certain Documents</u>.  All of the Organic Documents in respect of each Obligor and each of its respective Subsidiaries, the Project Documents and the Project Level Indebtedness Documents provided to the Administrative Agent on or prior to the date hereof are true, complete and correct copies in all material respects.

Section 6.23  <u>Solvency</u>.  Each Obligor, on a consolidated basis with its Subsidiaries, both before and after giving effect to any Credit Extension, is Solvent.

Section 6.24  <u>Security Documents</u>.  The Security Documents create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security

interest in the Collateral and the proceeds thereof to the extent provided in the Security Documents. In the case of the pledged Capital Stock described in the Security Documents, when certificates representing such pledged Capital Stock are delivered to the Collateral Agent, and in the case of the other Collateral described in the Security Documents, when financing statements and other filings specified on <u>Schedule 6.24</u> in appropriate form are filed in the offices specified on <u>Schedule 6.24</u>, the Security Documents shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of HoldCo, each Obligor in such Collateral and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person (except: (a) in the case of Collateral other than pledged Capital Stock, Permitted Liens existing as of the Closing Date; and (b) in the case of pledged Capital Stock, Liens: (i) arising pursuant to the Organic Documents of HoldCo and each Obligor or applicable securities laws; or (ii) for Taxes not yet due or delinquent).

Section 6.25    <u>Material Adverse Effect</u>.  As of the Amendment Effective Date and the date of each Credit Extension, since December 31, 2017, no event, circumstance or change has occurred and is continuing that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 6.26    <u>Anti-Corruption Compliance</u>.

(a)    Each Obligor, each of its Subsidiaries, and each of their respective directors, officers, general partners, managing members, agents and employees: (i) have complied with all applicable Corrupt Practices Laws in obtaining any consents, licenses, approvals, authorizations, rights or privileges with respect to the Projects, the Obligors and each of their Subsidiaries, and their respective businesses; (ii) are otherwise conducting and will continue to conduct the Projects, the Obligors and each of their Subsidiaries, and their respective businesses, in compliance with all applicable Corrupt Practices Laws; and (iii) have not corruptly offered, paid, promised to pay, or, and will not corruptly offer, pay, promise to pay, or authorize the payment of anything of value, directly or indirectly to any person, including any Public Official, to improperly influence any act or decision of a Public Official, improperly induce a Public Official to do or omit to do an act in relation to his or her lawful duty, induce a Public Official to improperly influence any act or decision of any Governmental Authority, or induce or reward any Person for improper performance of any activity in connection with the person's employment, in order to assist any party related to the Projects, the Obligors and each of their Subsidiaries, and their respective businesses, or in obtaining or retaining business or securing an improper business advantage, if doing so would violate the Corrupt Practices Laws or the anti-corruption law of any other relevant jurisdiction.  No Obligor nor any of its Subsidiaries are currently under investigation or engaged in litigation with respect to any alleged violation of the Corrupt Practices Law.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b)    The internal management and accounting practices and controls of each Obligor and each of its Subsidiaries are adequate to ensure compliance with all Corrupt Practices Laws.

Section 6.27    Terrorism Laws; PATRIOT Act.  Each Obligor and each of its Subsidiaries is in compliance with: (a) each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto; (b) the Bank Secrecy Act, as amended by the PATRIOT Act; and (c) all other Terrorism Laws.

Section 6.28    Office of Foreign Assets Control.  None of the Obligors nor any of their respective Subsidiaries, nor any of their respective directors, officers or employees is: (a) a Person listed on the Specially Designated Nationals and Blocked Persons List, as published from time to time by the Office of Foreign Assets Control of the United States Treasury Department ("OFAC"); or (b) currently targeted by any United States economic sanction administered by OFAC; and none of the Obligors nor any of their respective Subsidiaries, nor any of their respective directors, officers or employees, will directly or indirectly use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any Affiliate, joint venture partner or other Person or entity, in violation of any of the United States economic sanctions administered by OFAC.

Section 6.29    Regulatory Status; Regulation of Lenders.

(a)    Each Project Company is an EWG.  Each Obligor and each of its Subsidiaries (other than the Project Companies) that directly or indirectly owns, Controls or holds with power to vote ten (10) percent or more of the outstanding voting securities of a Project Company is a "holding company" within the meaning of PUHCA solely with respect to its ownership interest in one or more EWGs and is thus exempt from regulation under PUHCA, including the regulation of federal access to books and records and recordkeeping requirements, except for regulation under Section 1265 of PUHCA and any compliance requirements applicable under PUHCA to a "holding company" of one or more EWGs.

(b)    Each of Cannon Falls, Spindle Hill, Hardee, Grays Harbor and Nelson has MBR Authority and such authority is not subject to any pending challenge, investigation, complaint, or other proceeding imposing a rate cap, mitigation measure, or other limitation on any of the Project Companies' authority to engage in sales of electric energy, capacity or ancillary services at wholesale at market-based rates, other than rate caps, mitigation measures and other limitations generally applicable to wholesale suppliers participating in the applicable market.  Neither St. Clair nor Ector is subject to regulation as a "public utility," as that term is defined in the FPA.

(c)    Each Obligor and each of its Subsidiaries is not, as the result of the ownership, repair, maintenance, use and/or operation of any Project or the sale of electricity and other services related to the sale of electricity from the Projects, or the entering into of, or the performance of, any obligations under any of the agreements to which any of them are a party, or the consummation of any transaction contemplated thereby, subject to regulation under the state laws governing the rates charged by, or the financial or organizational regulation of, entities defined as "electric utilities", "public utilities", "public service companies", or other similar terms, under the laws or regulations of any state.

(d)    Except for FERC approvals required in connection with the exercise of remedies by the Secured Parties under the Loan Documents, no prior approvals or authorizations from FERC with respect to the Amendment Transactions and the other transactions contemplated by the Loan

98

Documents are required to be obtained by any Obligor, any Project Company or any Secured Party (assuming, with respect to any Secured Party that is otherwise a "holding company" for purposes of Section 203(a)(2) of the FPA, that such Secured Party meets the conditions set forth in 18 C.F.R. §§ 33.1(c)(2)(i) and (3)).

(e)    Assuming that: (x) no Secured Party is otherwise a "public utility" as defined in the FPA; and (y) any Secured Party that is otherwise a "holding company" for purposes of Section 203(a)(2) of the FPA meets the conditions set forth in 18 C.F.R. §§ 33.1(c)(2)(i) and (3) of FERC's regulations, none of the Secured Parties, solely by virtue of the execution, delivery and performance of or its consummation of the transactions contemplated by Loan Documents shall be or become: (i) a "public-utility company", a "holding company" or a "subsidiary company", an "associate company" or an "affiliate" of a "holding company", as such terms are defined in PUHCA, or subject to regulation under PUHCA; (ii) an "electric utility" or a "public utility," as such terms are defined in the FPA, or subject to regulation pursuant to the FPA; or (iii) a "public utility", "public service corporation" or similar term, or subject to regulation under the laws of any state with respect to regulation thereof; <u>provided</u> that any exercise of remedies under the Loan Documents that results in the direct or indirect ownership or Control of an Obligor, any of its Subsidiaries, or any of the Projects may require the authorization of FERC under Sections 203 and 205 of the FPA and may require the filing of a notice of change in status pursuant to 18 C.F.R. § 35.42 with respect to any Project Companies that have obtained market-based rate authority from FERC, and may expose such direct or indirect owners to regulation under PUHCA, the FPA, or state laws with respect to the regulation of "public utilities", "public service corporations" or similar terms.

Section 6.30    <u>Certain Fees</u>.  No broker's or finder's fee or commission will be payable with respect to the Amendment Transactions, except as payable to the Credit Parties.

Section 6.31    <u>Deposit Accounts and Security Accounts</u>.  No Obligor nor any of its Subsidiaries has any Deposit Accounts or Securities Accounts, except those accounts: (a) identified in the Depositary Agreement; (b) permitted by the Project Level Indebtedness Documents or (c) on <u>Schedule 6.31</u>.

Section 6.32    <u>Senior Ranking</u>.  The Loan Documents and the Obligations evidenced thereby constitute senior secured obligations of each Obligor ranking first in right and priority of payment over all other Indebtedness of each Obligor whether now existing or hereafter outstanding, except for: (a) other Secured Obligations ranking *pari passu* with the Obligations; and (b) Permitted Liens which by operation of law would rank senior in right of priority.

Section 6.33    <u>Use of Proceeds</u>.  The Borrower has used the proceeds of all Credit Extensions in accordance with <u>Section 8.20</u>.

Section 6.34    <u>Operating and Capital Budget</u>.  The Operating and Capital Budget has been prepared in good faith and in a reasonable manner based upon assumptions that were believed by the preparer thereof to be reasonable at the time such Operating and Capital Budget was prepared.

## ARTICLE VII
## REPORTING REQUIREMENTS

Each Obligor covenants and agrees that, until the Termination Date has occurred, it shall furnish, or cause to be furnished, to the Administrative Agent and each Lender copies of the following financial statements, reports, notices and information in accordance with this Article VII:

Section 7.01    Financial Statements; Compliance Certificate.

(a)    Quarterly Financial Statements.  As soon as available and in any event within sixty (60) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, an unaudited consolidated balance sheet of the Borrower as of the end of such Fiscal Quarter, and consolidated statements of income and cash flow of the Borrower for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, certified as complete and correct by an Authorized Financial Officer of the Borrower and as presenting fairly in all material respects the financial condition and results of operation of the Borrower on a consolidated basis in accordance with GAAP consistently applied (subject to normal year end audit adjustments and the absence of footnotes).

(b)    Annual Financial Statements.  As soon as available and in any event within one-hundred twenty (120) days after the end of each Fiscal Year, a copy of the consolidated balance sheet of the Borrower and the related consolidated statements of income and cash flow of the Borrower for such Fiscal Year audited (without any Impermissible Qualification) by independent public accountants reasonably acceptable to the Administrative Agent, all such financial statements to be certified as complete and correct by an Authorized Financial Officer of the Borrower and as presenting fairly in all material respects the financial condition and results of operation of the Borrower on a consolidated basis in accordance with GAAP consistently applied.

(c)    Compliance Certificates.  Concurrently with delivery of the financial information pursuant to clauses (a) and (b) above, a Compliance Certificate containing the following: (i) a statement that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that an Obligor or any of its Subsidiaries has taken or proposes to take with respect thereto); (ii) a statement that no direct or indirect Subsidiary of the Borrower has been formed or acquired since the delivery of the last Compliance Certificate; and (iii) the Debt Service Coverage Ratio for the Measurement Period corresponding to the last day of such Fiscal Quarter or Fiscal Year, as applicable.

(d)    Leverage Ratio Certificates.  Concurrently with, or prior to, delivery of the financial information pursuant to clauses (a) and (b) above, a Leverage Ratio Certificate containing the Leverage Ratio for the Measurement Period corresponding to the last day of the relevant Fiscal Quarter or Fiscal Year, as applicable. For the avoidance of doubt, each Leverage Ratio Certificate shall cover the full four-quarter Measurement Period to which it relates and no Leverage Ratio Certificate shall be delivered prior to the end of such Measurement Period.

(e)    Telephonic Discussion.  The Borrower shall make an Authorized Officer of the Borrower available for a telephonic meeting (at such time as may be reasonably agreed between

the Borrower and the Administrative Agent) with the Administrative Agent and the Lenders within ten (10) Business Days following delivery of the financial information delivered pursuant to clauses (a) and (b) to discuss such financial information.

Section 7.02    Notices Generally.  As soon as reasonably practicable and in any event, in the case of clauses (a), (h) and (i) within five (5) Business Days, and in the case of clauses (b) through (g) within ten (10) Business Days, after an Obligor or any of its Subsidiaries obtains knowledge of the occurrence of:

(a)    a Default or an Event of Default, a written statement of an Authorized Officer of the Borrower setting forth details of such Default or Event of Default and the action which such Obligor or such Subsidiary thereof has taken and proposes to take with respect thereto;

(b)    any Casualty Event or Asset Sale giving rise to proceeds in excess of $2,500,000, written notice thereof and in each case a certificate of an Authorized Officer of the Borrower setting forth the details thereof and the action which such Obligor or such Subsidiary has taken and proposes to take with respect thereto;

(c)    any material litigation involving an Obligor or any of its Subsidiaries, written notice thereof;

(d)    any event or condition that constitutes a default or event of default under any Project Level Indebtedness Document or any Material Project Document, written notice thereof and in each case a certificate of an Authorized Officer of the Borrower setting forth the details thereof and the action which the applicable Obligor or its relevant Subsidiary has taken and proposes to take with respect thereto;

(e)    any event of force majeure under a Project Document that could reasonably be expected to have a Material Adverse Effect, written notice thereof and in each case a certificate of an Authorized Officer of the Borrower setting forth the details thereof and the action which the applicable Obligor or its relevant Subsidiary has taken and proposes to take with respect thereto;

(f)    any event or condition that has had or could reasonably be expected to have a Material Adverse Effect, notice thereof and, to the extent the Administrative Agent requests, copies of documentation relating thereto, if any, and the action which the applicable Obligor or its relevant Subsidiary has taken and proposes to take with respect thereto;

(g)    (i) any ERISA Event; (ii) the adoption of any new Pension Plan subject to Title IV of ERISA or Section 412 of the Code by an Obligor, any of its Subsidiaries or any member of such Obligor's ERISA Group or the respective ERISA Groups of such Obligor's Subsidiaries; (iii) the adoption of any Pension Plan amendment if such amendment results in a material increase in benefits or unfunded liabilities; or (iv) the commencement of contributions by an Obligor, any of the Obligor's Subsidiaries, or any member of the Obligor's ERISA Group or of the respective ERISA Groups of the Obligor's Subsidiaries to a new Multiemployer Plan or Pension Plan, written notice thereof and copies of all documentation relating thereto;

(h)    promptly after the occurrence thereof, notice of any Forced Outage in respect of any Project for a consecutive period of more than 240 hours;

*ITOI Amended and Restated Credit and Guaranty Agreement*

(i)      any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification.

Section 7.03    Violations of Terrorism Laws; PATRIOT Act.  If an Obligor or any of its Subsidiaries obtains knowledge that any Person which owns, directly or indirectly, any Capital Stock of an Obligor or any of its Subsidiaries, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is in violation of any of the Terrorism Laws: (a) the Borrower shall promptly notify the Administrative Agent in writing as soon as reasonably practicable and in any event within two (2) Business Days of obtaining such knowledge; and (b) upon the request of the Administrative Agent or any Lender, the Borrower will provide, or will cause its Subsidiaries to provide, any information that the Administrative Agent or such Lender believes is reasonably necessary to be delivered to comply with the PATRIOT Act or any other Terrorism Law or other law applicable to the Administrative Agent or such Lender.

Section 7.04    Materials and Documents.  Promptly provide to the Administrative Agent and each Lender copies of:

(a)      all notices of any material breach, event of default, force majeure event, termination, material amendment or material dispute received by an Obligor or any of its Subsidiaries with respect to any Material Project Document;

(b)      all written claims, complaints, notices or other non-privileged materials (or summaries thereof to the extent necessary to comply with any confidentiality agreement or non-disclosure order) in connection with, any proceedings that relate to the Obligors, their Subsidiaries, their respective properties or any Project, except as could not reasonably be expected to result in a Material Adverse Effect;

(c)      all written claims, complaints, notices or inquiries which: (i) relate to the condition of the Projects or the other properties and facilities of the Obligors and their Subsidiaries in respect of, or as to compliance with, Environmental Laws or Permits; and (ii) that could reasonably be expected to result in the Obligors incurring more than $500,000 in liabilities in the aggregate with respect to the same occurrence or set of facts and circumstances; and

(d)      all reports, notices, prospectuses and registration statements which any Obligor or any of its Subsidiaries files with the SEC or any national securities exchange.

Section 7.05    Operating and Capital Budget; Reports.

(a)      Operating and Capital Budget.  As soon as available and in any event no later than sixty (60) days after the first day of the Fiscal Year of the Borrower, the Borrower shall furnish each Lender and the Administrative Agent copies of an annual operating and capital budget setting forth in reasonable detail for such Fiscal Year the projected operating, maintenance and capital requirements and expected revenues for each Project prepared in a manner consistent with the Base Case Projections (with respect to each such Fiscal Year, the "Operating and Capital Budget"), which Operating and Capital Budget shall be certified by an Authorized Financial Officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made and at the time so furnished.  If any Operating and Capital Budget

*ITOI Amended and Restated Credit and Guaranty Agreement*

is materially amended or modified, the Borrower shall promptly furnish to each Lender and the Administrative Agent such amended or modified Operating and Capital Budget, which Operating and Capital Budget shall be certified by an Authorized Financial Officer of the Borrower as having been prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made and at the time so furnished.

(b)    _Existing Project Level Indebtedness Reports_.  As soon as practicable and in any event within thirty (30) days after the end of each month, any operating reports in respect of each Project provided to any lender pursuant to the applicable Project Level Indebtedness Documents.

(c)    _Combined Project Reports_.  As soon as practicable and in any event within forty-five (45) days after the end of each quarter: (i) a combined summary operating report covering all of the Projects, which shall include the information set forth on Schedule 7.05 for each Project; and (ii) a management discussion and analysis on the results presented in such summary operating report and any material developments or events during such quarter.

Section 7.06    _Other Information_.  (a) As soon as reasonably practicable any such other information as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request and (b) promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent or any Lender (including, for the avoidance of doubt, requests made by the Administrative Agent or any Lender on behalf of any prospective Lender) for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the PATRIOT Act and the Beneficial Ownership Regulation; provided, that such information and documentation requested on behalf of any prospective Lender shall be provided directly to such prospective Lender by the Borrower at the option of the requesting Lender or Administrative Agent, as applicable.

## ARTICLE VIII
## AFFIRMATIVE COVENANTS

Each Obligor, as applicable, covenants and agrees with each Lender, each Revolving LC Issuer and the Administrative Agent that until the Termination Date has occurred, such Person will perform or cause to be performed the obligations set forth below.

Section 8.01    _Payment of Obligations_.  Each Obligor shall, and shall cause each of its Subsidiaries to, pay and discharge all of its material Contractual Obligations and payment liabilities, except material Contractual Obligations or liabilities: (a) as may be subject to good faith disputes or contested in good faith by appropriate proceedings or actions; and (b) for which appropriate reserves are maintained for the accrual of any such contested amounts in accordance with GAAP.

Section 8.02    _Maintenance of Regulatory Status_.  Each Obligor shall take, and shall cause each Project Company to take, any and all actions necessary to obtain, maintain and preserve (in each case, except to the extent failure to do so could not reasonably be expected to have a Material Adverse Effect): (a) each Project Company's EWG status; (b) each Project Company's MBR Authority, except in the case of a Project Company that does not have MBR Authority because it

is not subject to, or is exempt from, Sections 205 and 206 of the FPA, or that only makes sales pursuant to Power Purchase Agreements that have been filed with and accepted by FERC; (c) the exemption of each Obligor (and each of its Subsidiaries that is a "holding company" (within the meaning of PUHCA) of a Project Company) from FERC's access to books and records and recordkeeping requirements under PUHCA; and (d) each Obligor's (and each of its Subsidiaries') exemption from regulation as an "electric utility," "electric corporation," "electrical company," "public utility," "public utility holding company," or similar term, under the laws or regulations of any state.

Section 8.03    Maintenance of Property; Required Insurance.

(a)    Each Obligor shall maintain, and shall cause each of its Subsidiaries to maintain, the Required Insurance.

(b)    Each Obligor shall, and shall cause each of its Subsidiaries to: (i) keep all property useful and necessary in its business in good repair, working order and condition, except: (A) to the extent failure to so keep such property could not reasonably be expected to have a Material Adverse Effect; and (B) for ordinary wear and tear; and (ii) operate and maintain each of the Projects owned by it in accordance with Prudent Industry Practice.

(c)    Each Obligor shall own at all times, directly or indirectly: (i) 100% of the issued and outstanding Capital Stock of each of its respective Subsidiaries that are Wholly-Owned Subsidiaries on the Closing Date (excluding any IT Project Company that is sold pursuant to Section 9.06(f)); and (ii) not less than the amount of issued and outstanding Capital Stock of its Non-Wholly-Owned Subsidiaries as the Obligors own directly or indirectly as of the Closing Date.

Section 8.04    Maintenance of Existence.  Except as otherwise expressly permitted under this Agreement, each Obligor shall, and shall cause each of its Subsidiaries to: (a) at all times preserve and keep in full force and effect its corporate or limited liability company (or equivalent in any applicable non-U.S. jurisdiction) existence, as applicable; and (b) preserve and keep in full force and effect all rights and franchises of each Obligor and each of its Subsidiaries, including any qualification as a foreign entity in each jurisdiction where the nature of its business or the location of its assets requires it to be so qualified, except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.

Section 8.05    Compliance with Laws; Environmental Laws.

(a)    Each Obligor shall, and shall cause each of its Subsidiaries to, comply in all material respects with all Applicable Laws (including all ERISA and the rules and regulations thereunder, but excluding Environmental Laws, which are covered by clause (b) below) and pay (before any Lien except a Permitted Lien arises with respect thereto) all Taxes imposed upon such Obligor, its respective Subsidiaries, or upon their property (except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP or IFRS, as applicable, have been established on the books of such Obligor or such Subsidiary, as applicable), except for noncompliance, the result of which could not reasonably be expected to have a Material Adverse Effect.  Notwithstanding the foregoing, the Borrower shall, and shall cause each of its Subsidiaries to: (i) ensure that no portion of the Loans will be used,

disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of Terrorism Laws and shall comply with all Terrorism Laws with respect thereto; and (ii) that the internal management and accounting practices and controls of each Obligor and each of its Subsidiaries are adequate to ensure compliance with all Corrupt Practices Laws.

(b)    Each Obligor will, and shall cause its Subsidiaries to: (i) comply, and use commercially reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws, including all Permits issued pursuant thereto, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect; (ii) obtain, maintain and renew all Permits issued pursuant to applicable Environmental Laws necessary for its operations and properties, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect; (iii) conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, Remedial Action, or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all applicable Environmental Laws, except where failure to do so could not reasonably be expected to have a Material Adverse Effect; provided, however, that such Obligor (or such Subsidiary) shall not be required to undertake any such cleanup, removal, Remedial Action or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances; (iv) promptly notify the Administrative Agent and provide copies upon receipt of any Environmental Claims or information requests related to any actual, alleged or potential material non-compliance with or material liability under applicable Environmental Laws and provide the Administrative Agent with periodic updates (at least quarterly) on the status of such matters; (v) promptly notify the Administrative Agent of any Release or discovery of Hazardous Materials at any of its properties that could reasonably be expected to cause a Material Adverse Effect and provide the Administrative Agent with periodic updates (at least quarterly) on the status of such matters; (vi) keep its property free of any Lien imposed by any Environmental Law other than Permitted Liens and provide prompt notice to the Administrative Agent in the event any such Lien is imposed; and (vii) provide reasonable access to the Administrative Agent and its representatives, consultants and engineers to each Obligor's (or its Subsidiary's) property, personnel and records, at the cost of expense of each Obligor, to allow the Administrative Agent to evaluate whether said Obligor (or its Subsidiary) is in compliance with the covenants set forth in this Section 8.05(b).

Section 8.06    Fiscal Year.  The Borrower shall maintain as its Fiscal Year the twelve-month period ending on December 31 of each year.

Section 8.07    Inspection of Property, Books and Records.  Each Obligor shall, and shall cause each of its Subsidiaries to, keep proper books of record and account in accordance with GAAP or IFRS, as applicable, which accurately reflect all of its business affairs and transactions, and will permit, and will cause each of its Subsidiaries to permit, representatives of the Credit Parties, together with representatives of any widely-recognized independent engineering firm reasonably satisfactory to the Administrative Agent retained as an independent engineer by the Borrower for the benefit of the Credit Parties, to visit and inspect any of their respective properties (including the Projects), to examine and make abstracts from any of their respective books and records and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants, all at such reasonable times during normal

business hours and as often as may reasonably be desired, upon reasonable advance notice to each Obligor or its respective Subsidiaries, as the case may be.

Section 8.08    Government Approvals; Title.  Each Obligor shall, and shall cause its Subsidiaries to, at all times: (a) obtain and maintain in full force and effect all Permits and other consents and approvals required at any time in connection with its business as currently conducted and as proposed to be conducted, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) preserve and maintain good and valid title to its properties and assets (subject to no Liens other than Permitted Liens), except for any Asset Sales explicitly permitted pursuant to Section 9.06.

Section 8.09    First Priority Ranking.  Each Obligor shall ensure that the Obligations constitute secured obligations of each Obligor ranking first in right and priority of payment over all other Indebtedness of such Obligor (other than any Existing Project Level Indebtedness of such Obligor and any Permitted Indebtedness of an Obligor ranking *pari passu* or higher in priority under Applicable Law regardless of when the priority of the Obligations was established) whether now existing or hereafter outstanding.  For the avoidance of doubt, this Section 8.09 does not constitute and shall not be interpreted as constituting a consent to the incurrence or issuance of any Indebtedness by an Obligor or any of its Subsidiaries, or a waiver of any Default or Event of Default arising from such issuance or incurrence.

Section 8.10    Cash Management.  Each Obligor shall, and shall cause each of its Subsidiaries to, deposit, or cause to be deposited, as soon as practicable following the receipt thereof, all Available Cash of such Obligor or its Subsidiaries into the Master Revenue Account (except as otherwise set forth in the Depositary Agreement).

Section 8.11    Performance of Project Documents.  Subject to Section 8.12, each Obligor shall, and shall cause each of its Subsidiaries to, perform and observe all of the terms and provisions of each Project Document to be performed or observed by it, maintain each such Project Document to which it is a party in full force and effect, and enforce such Project Document in accordance with its material terms, except to the extent: (a) such failure could not reasonably be expected, together with all such failures then occurring, to cause a Material Adverse Effect; or (b) with respect to any Material Project Document, a Replacement Project Document is entered into by any Obligor (or any of its respective Subsidiaries) in accordance with Section 10.01(j) following such party's failure to perform or observe any such material term, covenant or agreement.

Section 8.12    Maintenance of Commodity Hedge Agreements.  Notwithstanding anything to the contrary in Section 8.11, each Obligor shall cause each of the Project Companies to at all times keep in full force and effect any Commodity Hedge Agreement to which such Project Company is a party, except to the extent: (a) any such Commodity Hedge Agreement: (i) is not a Material Project Document; (ii) is being, and is, replaced by one or more Replacement Project Documents in accordance with Section 10.01(j); or (iii) expires at the regularly scheduled end of its term and is not extended by the parties thereto; or (b) not keeping any such Commodity Hedge Agreement in effect is consistent with such Project Company's Energy Management Plan.

Section 8.13    Non-Wholly-Owned Subsidiaries.  Each Obligor shall, and shall cause each of its Subsidiaries to: (a) vote all of the Capital Stock of any Non-Wholly-Owned Subsidiary

106

owned by such Obligor or by any of its Subsidiaries in such a manner so as to cause such Non-Wholly-Owned Subsidiary to comply with each of the covenants set forth in <u>Article VIII</u> and <u>Article IX</u> to the same extent as if such Non-Wholly-Owned Subsidiary were a Wholly-Owned Subsidiary of the Subsidiary Guarantor; (b) vote against any proposed decreases in Distributions (after setting aside, or causing its Subsidiary to set aside, any amounts that such Obligor reasonably believes, in accordance with prudent business practice and consistent with its fiduciary duties to the extent applicable, should be maintained by such Non-Wholly-Owned Subsidiary); (c) vote against any increases in capital account contributions, other than: (i) capital contributions to make expenditures required by the Project Level Indebtedness Documents; or (ii) capital contributions necessary to cure any actual payment defaults or potential payment defaults with respect to debt service under the Project Level Indebtedness Documents so long as, in the case of <u>clause (i)</u> or <u>(ii)</u>, the Person that owns the Capital Stock of such Non-Wholly-Owned Subsidiary and is not an Affiliate of Obligor contributes its *pro rata* portion of such capital contributions; and (d) vote against any proposal that could reasonably be expected to result in a Material Adverse Effect; <u>provided</u> that the obligation on the part of such Obligor under this <u>Section 8.13</u> to cause or not permit any Non-Wholly-Owned Subsidiary to take certain actions shall be deemed fully performed or complied with if: (x) in each case where such Obligor has the direct or indirect right to vote on such matter, such Obligor votes its direct and indirect interests in such Non-Wholly-Owned Subsidiary to cause or not permit such Non-Wholly-Owned Subsidiary to take such action and takes all other necessary action within its control, and consistent with any fiduciary duties that such Obligor has to the other owners of such Non-Wholly-Owned Subsidiary, to cause such Non-Wholly-Owned Subsidiary to put such matters to a vote by the holders of such Capital Stock; or (y) in each case where such Obligor does not have a direct or indirect right to vote on such matters, such Obligor provides (consistent with any fiduciary duties, if any, that such Obligor has, or such Obligor's Subsidiary has, to the other owners of such Non-Wholly-Owned Subsidiary) written notice to such Non-Wholly-Owned Subsidiary of such Obligor's obligation to cause or not permit such Non-Wholly-Owned Subsidiary to take such action, along with a request that such Person take or not take such action.

Section 8.14    <u>Security; Further Assurances, etc.</u>

(a)    Each Obligor will execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages and the Mortgage Amendments on the Real Property Interests as set forth in <u>clause (b)</u> below and on any other real property acquired thereafter) that may be required under Applicable Law, or that the Administrative Agent or the Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Permitted Liens) of the Liens created or intended to be created by the Loan Documents.

(b)    From time to time and to the extent permitted under Applicable Law, the Obligors shall, at their cost and expense, promptly secure the Secured Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to such of their assets and properties as the Administrative Agent and the Collateral Agent or the Required Lenders shall designate (it being agreed that it is the intent of the parties that the Secured Obligations shall be secured by, among other things, substantially all the assets of the Obligors and each of their Subsidiaries, including any real property acquired after the Closing Date, but not by any assets on

107

which a Lien may not be granted pursuant to any applicable Project Level Indebtedness Document). Such Liens will be created under the Loan Documents in form and substance reasonably satisfactory to the Administrative Agent, and the Obligors, as applicable, shall deliver, or cause to be delivered, to the Administrative Agent and the Collateral Agent all such instruments and documents (including legal opinions, title insurance policies and Lien searches) as the Administrative Agent and the Collateral Agent shall reasonably request to evidence compliance with this Section 8.14.

Section 8.15    Collateral Accounts.  To the extent required by the Depositary Agreement, the Borrower will maintain the Major Maintenance and CapEx Reserve Account, the DSR Account, the Revenue Accounts and the other accounts described in the Depositary Agreement with the Depositary Bank for the benefit of the Credit Parties pursuant to the Pledge and Security Agreement and the Depositary Agreement and will fund the Major Maintenance and CapEx Reserve Account, the DSR Account, and such other applicable accounts to the extent required by the terms of the Loan Documents.

Section 8.16    St. Clair Consent.  If an Event of Default has occurred and is continuing and: (a) has continued for more than ten (10) Business Days without cure; or (b) the Credit Parties are affirmatively exercising their remedies in connection therewith, then, at the request of the Collateral Agent (at the direction of the Administrative Agent), the Borrower shall, and shall cause St. Clair to, cooperate with and use commercially reasonable efforts to assist the Collateral Agent in obtaining the consent of the Ontario Power Authority to the transfer of the Capital Stock of the Borrower to the Collateral Agent or its designee (by foreclosure or otherwise) without adversely affecting the St. Clair PPA.  Such cooperation and assistance may include, without limitation, scheduling and actively participating in meetings between the Collateral Agent and the Ontario Power Authority on the Collateral Agent's behalf, executing any and all documents or instruments reasonably necessary to obtain or effect such consent, and paying any reasonable consent and/or work fees required by the Ontario Power Authority in connection therewith.

Section 8.17    Organic Documents; Separateness.

(a)    Each Obligor shall, and shall cause each of its Subsidiaries to, satisfy customary corporate formalities, including the holding of regular Board of Directors' and shareholders' or members', managers' or partners' meetings and the maintenance of corporate or company offices and records.  None of the Obligors or their Subsidiaries shall take any action, or conduct its affairs in a manner, which is likely to result in the separate existence of an Obligor from any non-Obligor being ignored by any court of competent jurisdiction.

(b)    (i) The Borrower shall comply in all material respects with the covenants set forth in its Organic Documents to maintain its separate and distinct existence from any other Person; and (ii) the Obligors (other than the Borrower) shall comply in all material respects with the covenants set forth in Schedule 8.17(b) (as if set forth in the Organic Documents of such Obligor, *mutatis mutandis*).

Section 8.18    Interest Rate Hedge Agreements.  On or before the date that is sixty (60) days following the Closing Date the Borrower shall have in effect and thereafter maintain at all times until the third (3rd) anniversary of the Closing Date, one or more Interest Rate Hedge

Agreements which shall be documented under customary ISDA agreements containing customary terms for non-recourse power generation portfolio project financings syndicated in the "Term Loan B" market or, if not so documented or without such customary terms, in form and substance reasonably satisfactory to the Administrative Agent, with an aggregate notional amount equal to at least 50% but not more than 100% of the outstanding principal amount of Term Loans anticipated by the Base Case Projections on each Quarterly Payment Date; provided that in the event that: (x) the Net Asset Sale Proceeds of any Asset Sale permitted under Section 9.06 are applied in accordance with Sections 3.02 and 3.03; or (y) the Ector Disposition Proceeds of an Ector Disposition or the Grays Harbor Disposition Proceeds of a Grays Harbor Disposition are applied in accordance with Sections 3.02 and 3.03, then, in each case, the outstanding principal amount of Term Loans anticipated by the Base Case Projections on each Quarterly Payment Date shall be reduced *pro rata* in accordance with the actual amount of reduction in the outstanding principal amount of the Term Loans; provided further that if any other prepayment is made in accordance with Section 3.02, then the Borrower shall terminate (in whole or in part) one or more Secured Interest Rate Hedge Agreements to the extent that the aggregate notional amount of all Secured Interest Rate Hedge Agreements is in excess of 100% of the outstanding principal amount of the Term Loans after giving effect to any such prepayment so that the Borrower is in compliance with the requirements of this Section 8.18 after such termination.  Any termination of Secured Interest Rate Hedge Agreements shall be on a *pro rata* basis across all outstanding Secured Interest Rate Hedge Agreements.

Section 8.19    Taxes.  Each Obligor shall, and shall cause its Subsidiaries to, timely file all federal, state and material other Tax returns required to be filed in any jurisdiction and to pay and discharge all federal, state and material other Taxes imposed on or payable by them to the extent the same have become due and payable and before they have become delinquent; provided that none of the Obligors nor any of their Subsidiaries shall be required to pay any such Tax to the extent the amount, applicability or validity thereof is contested by such Obligor or such Subsidiary in good faith and in or by appropriate proceedings, and such Obligor or such Subsidiary have established adequate reserves therefor in accordance with GAAP or IFRS, as applicable, on the books of such Obligor or such Subsidiary.  Each Obligor will continue to be treated as a partnership or a disregarded entity for U.S. federal and relevant state and local income tax purposes.

Section 8.20    Use of Proceeds.    The Borrower shall use: (a) the proceeds of the Incremental Term Loans solely: (i) to make the Amendment Effective Date Distribution, (ii) to fund the DSR Account to an amount at least equal to the DSR Requirement (taking into account the Debt Service with respect to the Incremental Term Loans),  and (iii) to pay a portion of the costs, fees and expenses related to the Amendment Transactions; and (b) the proceeds of the Revolving Loans solely: (i) to fund the working capital requirements of the Ector Project, the Grays Harbor Project and the Nelson Project; (ii) to fund the Major Maintenance and CapEx Reserve Account; (iii) to issue Revolving Letters of Credit to fund the DSR Requirement in accordance with this Agreement; (iv) for reimbursement of draws on Revolving Letters of Credit; and (v) for general corporate purposes of the Borrower and its Wholly-Owned Subsidiaries (including to issue Revolving Letters of Credit to provide credit support for the contractual obligations of the Borrower and its Wholly-Owned Subsidiaries).

Section 8.21    Maintenance of Rating of the Loans.  Each Obligor will use commercially reasonable efforts to cause a senior secured credit rating with respect to the Term Loans from each

Rating Agency (each for so long as such Rating Agency is in the business of rating loans and securities of a type similar to the Term Loans, it being understood that if either Rating Agency shall discontinue such business, such Rating Agency shall be replaced with an alternative service reasonably satisfactory to the Administrative Agent and the Borrower) to be available at all times until the Term Loan Maturity Date (it being acknowledged that there shall be no requirement to maintain a minimum rating).

Section 8.22    Compliance with Project Document Covenants.  The Borrower shall, and shall cause each applicable Subsidiary to:

(a)    perform and observe all covenants and obligations contained in the Project Documents except where failure to perform could not reasonably be expected to result in a Material Adverse Effect;

(b)    take all reasonable and necessary action to prevent the termination or cancellation of any Material Project Document in accordance with the terms of such Material Project Document or otherwise (except for the expiration of a Material Project Document in accordance with its terms and not as a result of a breach or default thereunder); and

(c)    take all reasonable and necessary action to enforce against the relevant counterparty each covenant or obligation of each Project Document in accordance with its terms, including enforcing rights and remedies under the Project Documents, as applicable, to maximize the amount of liquidated damages available to the Borrower and its Subsidiaries under the Project Documents, except where failure to enforce such covenant or obligation could not reasonably be expected to result in a Material Adverse Effect.

Section 8.23    Consents to Collateral Assignment.  With respect to each Project Document listed on Schedule 8.23, the Borrower shall cause its Subsidiary party thereto, and shall use commercially reasonable efforts to cause the counterparty party thereto, to execute and deliver to the Administrative Agent a consent to collateral assignment: (a) in substantially the form of Exhibit I; or (b) in form and substance reasonably satisfactory to the Administrative Agent.

## ARTICLE IX
## NEGATIVE COVENANTS

Each Obligor covenants and agrees with each Lender, each Revolving LC Issuer and the Administrative Agent that until the Termination Date has occurred, such Person will perform or cause to be performed its respective obligations set forth below.

Section 9.01    Limitation on Indebtedness.  Each Obligor shall not, and shall not permit any of its Subsidiaries to, incur, assume, create or suffer to exist any Indebtedness, except for the following Indebtedness (collectively, "Permitted Indebtedness"):

(a)    Indebtedness in respect of the Obligations;

(b)    the Existing Project Level Indebtedness and any Permitted Refinancing Indebtedness;

(c)    Indebtedness of any Obligor or any of its Subsidiaries under purchase money mortgages that is: (i) incurred to finance the acquisition of equipment for, or the improvement of the existing equipment of, any Project Company that is used in the ordinary course of business of such Project Company and necessary for the operation and/or maintenance of its Project in accordance with Prudent Industry Practices; <u>provided</u> that such Indebtedness is incurred within thirty (30) days following the acquisition of such equipment or property; and (ii) in respect of Capitalized Lease Obligations; <u>provided</u> that the aggregate amount of all Indebtedness outstanding pursuant to this <u>clause (c)</u> shall not at any time exceed $10,000,000.

(d)    (i) Hedging Obligations of any Obligor or any of its Subsidiaries permitted pursuant to <u>Section 9.15</u>; and (ii) Interest Rate Hedge Agreements permitted pursuant to <u>Section 8.18</u>;

(e)    trade or other similar indebtedness incurred in the ordinary course of business (but not for borrowed money) and: (i) not more than sixty (60) days past due; or (ii) being contested in good faith and by appropriate proceedings, so long as adequate reserves have been provided therefor on the books of the relevant Person to the extent required by and in accordance with GAAP or IFRS, as applicable;

(f)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business;

(g)    Indebtedness in respect of acquisitions under Fuel purchase contracts;

(h)    Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations in each case provided in the ordinary course of business, including those incurred to secure health, safety, and environmental obligations in the ordinary course of business; and

(i)    any other Indebtedness set forth on <u>Schedule 6.11(a)</u> in effect as of the Closing Date, and without giving effect to any amendments, supplements, waivers or other modifications thereto occurring on or after the Closing Date;

<u>provided</u>, <u>however</u>, that no Indebtedness otherwise permitted under <u>clause (c)</u> shall be created, incurred, or assumed if an Event of Default has occurred and is continuing or would result therefrom.

Section 9.02    <u>Liens</u>.  Each Obligor shall not, and shall not permit any of its Subsidiaries to, create, assume or suffer to exist any Lien on any property (including the Capital Stock of any Person), assets or revenues now owned or hereafter acquired by it, except for Permitted Liens.

Section 9.03    <u>Restricted Payments</u>.

(a)    Each Obligor shall not, and shall not permit or cause any of its Subsidiaries to, make any Restricted Payments, except:

(i)    Restricted Payments made by any Subsidiary of an Obligor for the purpose of making a Restricted Payment to such Obligor or to the Borrower;

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

(ii)    Restricted Payments that any Subsidiary of an Obligor is obligated to make under any applicable Project Level Indebtedness Documents;

(iii)    in the case of any dividend or distribution payable on or in respect of any class or series of Capital Stock issued by any Non-Wholly-Owned Subsidiary of an Obligor, *pro rata* dividends or distributions to minority stockholders of such Non-Wholly-Owned Subsidiary (or owners of an equivalent interest in the case of an entity other than a corporation);

(iv)    Restricted Payments permitted by: (A) Sections 3.02(b)(vii) or 3.02(b)(viii); and (B) Section 3.1(d) of the Depositary Agreement;

(v)    Distributions from the Borrower to any direct or indirect holder of the Capital Stock of the Borrower; provided that:

(A)    no Default or Event of Default has occurred and is continuing and such Restricted Payment will not result in a Default or Event of Default;

(B)    the Debt Service Coverage Ratio for the most recent Measurement Period prior to the day on which such Distribution is to be made is equal to or greater than 1.20:1.00;

(C)    the DSR Requirement has been fully funded (or one or more DSR Support Instruments have been put in place in lieu of funding in accordance with the Depositary Agreement) up to the balance then required pursuant to the Depositary Agreement;

(D)    no Reimbursement Obligations are outstanding;

(E)    such Restricted Payment is made from funds distributed or transferred pursuant to clause *tenth* of Section 3.1(d) of the Depositary Agreement; and

(F)    in connection with any Restricted Payment pursuant to clause *tenth* of Section 3.1(d) of the Depositary Agreement, the Borrower shall have delivered to Administrative Agent a Withdrawal Certificate certifying that each of the foregoing conditions has been satisfied;

provided further that if such Restricted Payment is from the DSR Account for which one or more DSR Support Instruments have been provided in accordance with Section 3.3 of the Depositary Agreement, then the requirements of clauses (B) through (F) (other than clause (C) after giving effect to such Restricted Payment) shall not apply; and

(vi)    the Amendment Effective Date Distribution.

(b)    No Obligor will (and no Obligor will permit any of its Subsidiaries to) make any payment or prepayment of principal of, or premium or interest on, any Indebtedness for borrowed money other than the Obligations and Permitted Indebtedness.

Section 9.04    Consolidations and Mergers.

*ITOI Amended and Restated Credit and Guaranty Agreement*

(a)    Each Obligor shall not, and shall not permit any of its Subsidiaries to: (i) enter into any transaction of merger or consolidation, or sell all or substantially all of its or its Subsidiaries' respective assets to, any other Person other than: (A) pursuant to a transaction permitted under Section 9.06(f); or (B) a merger, consolidation or sale of any Obligor (other than the Borrower) to or into any other Obligor (other than the Borrower) that directly owns or is directly owned by such first Obligor; (ii) change its respective form of organization (except a corporation may be converted to a limited liability company subject to the review and approval of relevant documentation by the Administrative Agent and the Collateral Agent prior to such conversion and provided that all actions reasonably necessary to maintain Liens on the Collateral, as reasonably requested by the Administrative Agent and/or Collateral Agent, have been taken) or its respective businesses; or (iii) liquidate or dissolve itself (or suffer any liquidation or dissolution), or discontinue its respective businesses.

(b)    Each Obligor shall not, and shall not permit its Subsidiaries to, purchase or otherwise acquire any Capital Stock of, or all or substantially all of the assets of, any other Person.

Section 9.05    Sales and Issuances of Capital Stock.  Each Obligor shall not, and shall not permit any of its Subsidiaries to:

(a)    directly or indirectly, issue, sell, assign, pledge or otherwise encumber or dispose of any shares of the Capital Stock of any of its Subsidiaries, except (i) pledges of the Capital Stock of the Subsidiaries of the Borrower as contemplated by the Loan Documents and the Project Level Indebtedness Documents or (ii) as permitted under Section 9.06(f); or

(b)    sell or otherwise issue its Capital Stock to any Person; provided that the restriction in this clause (b) shall not prohibit the Borrower from making capital contributions to the direct Subsidiaries of the Borrower, which may be further contributed to indirect Subsidiaries of the Borrower.

Section 9.06    Asset Sales.  Each Obligor shall not, and shall not permit any of its Subsidiaries to, sell, lease (as lessor), transfer (as transferor) or otherwise dispose of any property or assets not otherwise prohibited by Section 9.05 (an "Asset Sale"), except:

(a)    sales in the ordinary course of business (for the avoidance of doubt, no Asset Sale of all or a material portion of a Project shall be deemed to be in the ordinary course of business);

(b)    property which is worn out, obsolete or no longer useful or necessary in connection with the operation of a Project;

(c)    sales of Spare Parts from one Project Company to another Project Company; provided that: (i) any such sale is conducted on an arm's length basis; and (ii) each Project Company shall not maintain less Spare Parts at its respective Project than it otherwise would have if no such sales were permitted;

(d)    in the case of a Project Company, Asset Sales permitted by its respective Project Level Indebtedness Documents;

(e)    to the extent constituting an Asset Sale, the termination (in whole or in part) of any Hedge Agreement; provided that the Borrower is in compliance with Section 8.18 after giving effect to such termination;

(f)    sales, transfers, or other dispositions of all of the direct or indirect equity interests in, or all or substantially all of the property and assets of (x) Ector (an "Ector Disposition") or (y) Grays Harbor (a "Grays Harbor Disposition") to one or more Persons that are not the Borrower or any Subsidiaries of the Borrower; provided that:

(i)    such Obligor or Subsidiary receives Ector Disposition Proceeds or Grays Harbor Disposition Proceeds, as applicable, in cash or Permitted Investments (except to the extent that any such Ector Disposition Proceeds or Grays Harbor Disposition Proceeds, as applicable, exceed the amount required to be applied to the mandatory prepayment of Loans in accordance with Sections 3.02(b)(vii) or 3.02(b)(viii) (as applicable) and Section 3.03);

(ii)    the Ector Disposition Proceeds or Grays Harbor Disposition Proceeds, as applicable, received by such Obligor or Subsidiary in respect of such Ector Disposition or Grays Harbor Disposition, as applicable: (A) equal or exceed the Ector Target Sale Amount or the Grays Harbor Target Sale Amount, as applicable; and (B) except for Excess Sale Proceeds with respect to such Ector Disposition Proceeds or Grays Harbor Disposition Proceeds, as applicable, are applied to the mandatory prepayment of Loans in accordance with Sections 3.02(b)(vii) or 3.02(b)(viii) (as applicable) and Section 3.03;

(iii)    each of S&P and Moody's shall have provided a Ratings Reaffirmation after giving effect to such Ector Disposition or Grays Harbor Disposition, as applicable;

(iv)    any Revolving Letter of Credit issued, and any Indebtedness of an Obligor incurred, to support the obligations of, or for the benefit of, the Ector Project or the Grays Harbor Project, as applicable, shall have been terminated or returned for cancellation in a manner satisfactory to the Administrative Agent and/or applicable Revolving LC Issuer prior to, or substantially simultaneously with, the consummation of such Ector Disposition or Grays Harbor Disposition, as applicable; and

(v)    no Default or Event of Default shall have occurred or be continuing (or would exist after giving effect to such Ector Disposition or Grays Harbor Disposition, as applicable);

(g)    Asset Sales not covered above; provided that such Asset Sales are less than $1,000,000 in the aggregate.

Section 9.07    Transaction with Affiliates. Each Obligor shall not, and shall not permit any of its Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its respective properties or assets to, or purchase any property or assets from, or enter into, make, suffer to exist or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any of the Affiliates of the Obligors (each, an "Affiliate Transaction"), unless such arrangement, transaction or contract is:

(a)    described in Schedule 9.07 (as in effect on the Closing Date) and transactions contemplated thereby;

(b)    (i) on fair and reasonable terms no less favorable to such Obligor (or its Subsidiary) than it could obtain in an arm's-length transaction with a Person that is not an Affiliate; and (ii) of the kind which would be entered into by a reasonably prudent Person in the position of such Obligor (or its Subsidiary) with a Person that is not one of its Affiliates;

(c)    any employment agreement, employee benefit plan, cost-based administration agreement or officer and director indemnification agreement entered into by the Borrower or any of its Subsidiaries in the ordinary course of business;

(d)    transactions between such Obligor and its Wholly-Owned Subsidiaries;

(e)    a Loan Document;

(f)    a transaction permitted under Sections 9.03, 9.06(c), or 9.08(a);

(g)    the Administrative Services Agreement and the transactions contemplated thereby; provided, however, that the aggregate amount of payments made by the Borrower and its Subsidiaries in any Fiscal Year pursuant to the Administrative Services Agreement shall not exceed $100,000; or

(h)    an energy management agreement entered into between Grays Harbor and Invenergy Services LLC (or an Affiliate thereof with substantially equivalent energy management experience) that is (i) substantially similar in form and substance to that certain Energy Management Agreement, dated November 2, 2017, between Invenergy Services LLC and Ector and (ii) substantially consistent in all material respects with the Grays Harbor Energy Management Plan.

Section 9.08    Investments in Other Persons.

(a)    Each Obligor will not, and will not permit any of its Subsidiaries to: (i) make any loans or advances other than trade credit in the ordinary course of business; or (ii) contribute equity or any assets or property to any Subsidiary of Obligor or any other Person; provided, however, that an Obligor or any of its Subsidiaries will be permitted to make Investments: (x) for purposes of making Capital Expenditures in accordance with Section 9.14; and (y) as otherwise expressly permitted under this Agreement and the Depositary Agreement.

(b)    Each Obligor will not, and will not permit any of its Subsidiaries to, enter into any partnership or joint venture or acquire or create any additional Subsidiaries (including for the avoidance of doubt, the creation of Subsidiaries as intermediate holding companies).

Section 9.09    Guarantees.    Each Obligor will not, and will not permit any of its Subsidiaries to, contingently or otherwise, be or become liable in connection with any guarantee or other contingent obligation, except for: (a) guarantees of the Secured Obligations; and (b) with respect solely to the Project Companies: (i) endorsements and similar obligations in the ordinary course of business; and (ii) guarantees in existence on the Closing Date as required by the Existing

115

Project Level Indebtedness Documents or otherwise listed on <u>Schedule 6.11(a)</u>; <u>provided</u> that if any Wholly-Owned Subsidiary of an Obligor is not already an Obligor, such Wholly-Owned Subsidiary will become Obligor to the extent permitted by its Existing Project Level Indebtedness Documents and Organic Documents.

Section 9.10    <u>Change in Nature of Business</u>.  Each Obligor shall not, and shall not permit any of its Subsidiaries to, engage in any business other than a Permitted Business except as set forth on <u>Schedule 6.13</u>.

Section 9.11    <u>Material Project Documents; Organic Documents</u>.  Each Obligor shall not, and shall not permit any of its Subsidiaries to:

(a)    cancel or terminate (prior to its stated termination) any Material Project Document or consent to or accept any cancellation or termination thereof, materially amend or otherwise modify any Material Project Document or give any consent, waiver or approval thereunder, waive any default under or breach of any Material Project Document, or agree in any manner to any other amendment, modification or change of any material term or condition of any Material Project Document, except for, in each case, a modification, amendment or consent that: (i) is required by Applicable Law; or (ii) could not reasonably be expected to have a Material Adverse Effect; <u>provided</u> that: (x) any extension of the term of a Material Project Document on substantially the same terms and conditions then in effect shall be permitted hereunder; and (y) no termination or material relinquishment of rights under any Power Purchase Agreement shall be permitted hereunder;

(b)    except as permitted under <u>Section 9.04</u>, amend, supplement, waive or otherwise modify its Organic Documents in any material respect; <u>provided</u> that no amendment, supplement, waiver or modification shall be made with respect to any "separateness" provision; or

(c)    enter into or assume by assignment any obligations under any Additional Project Document without the prior written consent of the Administrative Agent, unless: (i)(A) such Additional Project Document could not reasonably be expected to materially and adversely affect the Credit Parties or any of the Projects; and (B) the Administrative Agent has received an execution version of such Additional Project Document at least five (5) Business Days prior to execution of such Additional Project Document; or (ii) such Additional Project Document is: (A) a Replacement Project Document as set forth in <u>Sections 8.12</u> and <u>10.01(j)</u>; or (B) a Permitted Commodity Hedge Agreement;

(d)    materially amend or replace any Risk Management Policy, unless: (i) such material amendment or replacement could not reasonably be expected to have a Material Adverse Effect on the applicable Project; (ii) such material amendment or replacement does not alter or modify the Permitted Business of the applicable Project; (iii) the Administrative Agent and the applicable Independent Engineer has received an execution version of such material amendment or replacement at least five (5) Business Days prior to its implementation; and (iv) such Obligor and its applicable Subsidiary have considered the comments of the Administrative Agent and/or applicable Independent Engineer on such material amendment or replacement, if any, in good faith before approving, executing, and implementing such material amendment or replacement;

provided, however, that so long as the St. Clair Credit Documents are in full force and effect, neither Section 9.11(a) nor Section 9.11(c) shall apply to, prohibit, or restrict any action in respect of the Permitted St. Clair Marketing Agreements, which shall be governed by the limitations set forth under the St. Clair Credit Documents.

Section 9.12    Project Level Indebtedness Documents; Refinancings.

(a)    Each Obligor shall not, and shall not permit any of its Subsidiaries to: (i) cancel or terminate (prior to its stated termination) any Project Level Indebtedness Document or consent to or accept any cancellation or termination thereof (except as could not reasonably be expected to have a Material Adverse Effect); (ii) amend or otherwise modify any Project Level Indebtedness Document or give any consent, waiver or approval thereunder, or agree in any manner to any other amendment, modification or change of any term or condition of any Project Level Indebtedness Document, except to the extent such amendment, modification, change, consent, waiver or approval: (A) could not reasonably be expected to materially and adversely affect the Credit Parties or any of the Projects; and/or (B) is permitted under clause (b) below; or (iii) waive any default under or breach of any Project Level Indebtedness Document (except as could not reasonably be expected to have a Material Adverse Effect).

(b)    Notwithstanding anything to the contrary in clause (a) above, the Borrower may refinance, or cause one or more of its Subsidiaries to refinance, the St. Clair Indebtedness or the Hardee Indebtedness; provided that:

(i)    the Weighted Average Life to Maturity of the refinanced St. Clair Indebtedness or Hardee Indebtedness, as applicable, shall be greater than or equal to the Weighted Average Life to Maturity of the existing St. Clair Indebtedness or existing Hardee Indebtedness, as applicable;

(ii)    the principal amount of the refinanced St. Clair Indebtedness or Hardee Indebtedness, as applicable (or unutilized commitments thereof, as applicable), shall be less than or equal to the principal amount (including any accreted or capitalized amount) then outstanding of the existing St. Clair Indebtedness or the existing Hardee Indebtedness, as applicable (or unutilized commitments thereof, as applicable), *plus* the amount of any accrued and unpaid interest, fees and expenses in respect of the outstanding principal amount then outstanding of the existing St. Clair Indebtedness or the existing Hardee Indebtedness, as applicable, immediately prior to such refinancing, *plus* the amount of any settlement costs in connection with Commodity Hedge Agreements and Interest Rate Hedge Agreements entered into by St. Clair or Hardee, as applicable, resulting from such refinancing, *plus* other reasonable amounts paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension;

(iii)    the security, if any, for the refinanced St. Clair Indebtedness or Hardee Indebtedness, as applicable, shall be substantially the same as that for the existing St. Clair Indebtedness or the existing Hardee Indebtedness, as applicable (except to the extent that less security is granted to holders of refinancing Indebtedness);

(iv)    no material terms (other than fees or interest rate) applicable to such refinanced St. Clair Indebtedness or refinanced Hardee Indebtedness, as applicable, or, if applicable, the related security or guarantees of such refinanced St. Clair Indebtedness or refinanced Hardee Indebtedness, as applicable (including covenants, events of default, remedies, acceleration rights), shall be, taken as a whole, materially more favorable to the refinancing lenders than the terms that are applicable under the instruments and documents governing the existing St. Clair Indebtedness or the existing Hardee Indebtedness, as applicable; and

(v)    the Borrower can demonstrate to the Administrative Agent's reasonable satisfaction that the refinanced St. Clair Indebtedness or the refinanced Hardee Indebtedness, as applicable, will not have a Material Adverse Effect on the projected Available Cash available for distribution to the Borrower from St. Clair or Hardee, as applicable.

For the avoidance of doubt, any refinancing of the St. Clair Indebtedness or the Hardee Indebtedness, as applicable, that does not satisfy all of the conditions of this Section 9.12(b) shall materially and adversely affect the Credit Parties and is therefore prohibited.

(c)    The Borrower shall not prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Indebtedness that is expressly subordinated to the Obligations hereunder.

Section 9.13    Bank Accounts.  Each Obligor shall not maintain any bank account or similar account with any financial institution other than the Collateral Accounts and the Local Accounts.

Section 9.14    Capital Expenditures.  Subject to Section 9.01(c) in the case of Capitalized Lease Obligations, no Obligor nor any of its Subsidiaries shall make or commit to make Capital Expenditures with respect to any Project during any Fiscal Year that would exceed 110% of the Capital Expenditures set forth in the Operating and Capital Budget for such Fiscal Year with respect to such Project (the "CapEx Cap"), except to the extent such amounts in excess of the CapEx Cap for such Project are: (a) made in connection with Necessary Capital Expenditures; (b) other Capital Expenditures that are paid for solely from amounts that are contributed to such Obligor or its Subsidiary as cash contributions by an Affiliate of the Borrower (other than an Obligor or any of its Subsidiaries); or (c) consented to by the Administrative Agent.

Section 9.15    Speculative Transactions.  No Obligor will (and each Obligor shall cause its Subsidiaries not to) engage in any transaction involving commodity options or futures contracts or any similar transactions, other than Commodity Hedge Agreements (which may include Permitted Commodity Hedge Agreements), transactions entered into in the ordinary course of business, including the Power Purchase Agreements, energy services agreements, Fuel supply agreements, Fuel transportation agreements, Fuel storage agreements, gas Hedge Agreements and other Commodity Hedge Agreements to hedge against fluctuations in electricity, Fuel, emissions allowances or other commodity exposure prices, and other similar undertakings so long as such Obligor (or its Subsidiary) has not entered into any Hedge Agreement or agreement for the purchase and sale of electricity, Fuel or other commodities in respect of the electric generation capacity of any Project which would result in the aggregate amount of contracted capacity of, or

Fuel for, or other commodity exposure of, such Project subject to all such Hedge Agreements and purchase and sale agreements to exceed, for any calendar year, the reasonably projected available capacity, generation or other commodity exposure (plus the Borrower's estimate of scheduled or forced outages) for such year.

Section 9.16    <u>Sales and Lease-Backs</u>.  The Borrower will not, and will cause each of its Subsidiaries not to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease, whether an operating lease or Capitalized Lease Obligation, of any property (whether real, personal or mixed), whether now owned or hereafter acquired: (a) which the Borrower or any of its Subsidiaries has sold or transferred or is to sell or transfer to any other Person (other than the Borrower or another Subsidiary of the Borrower); or (b) which the Borrower or any of its Subsidiaries intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by the Borrower or any of its Subsidiaries to any Person (other than the Borrower or another Subsidiary of the Borrower).

Section 9.17    <u>Restrictions on Subsidiary Distributions</u>.  Except as provided herein, the Borrower shall not, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any such Person to: (a) pay dividends or make any other distributions on any of such Person's Capital Stock owned by the Borrower or any Subsidiary of the Borrower; (b) repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any Subsidiary of the Borrower; (c) make loans or advances to the Borrower or any other Obligor; or (d) transfer any of its property or assets to the Borrower or any other Obligor, in each case, other than restrictions in agreements evidencing Indebtedness permitted by <u>Section 9.01(b)</u> or Indebtedness permitted by <u>Section 9.01(c)</u> that impose restrictions on the property so acquired.

Section 9.18    <u>Accounting Changes</u>.  From and after the Closing Date, no Obligor will (and each Obligor shall cause its Subsidiaries not to) make any change in accounting policies or reporting policies, except as required by GAAP or IFRS, as applicable, or change its Fiscal Year.

Section 9.19    <u>Debt Service Coverage Ratio</u>.

(a)    <u>Requirement</u>.  Subject to <u>Section 9.19(b)</u>, the Borrower shall not permit the Debt Service Coverage Ratio as of any Quarterly Payment Date, commencing with the first Quarterly Payment Date, to be less than 1.10:1.00 (the "<u>DSCR Covenant</u>").

(b)    <u>Equity Cure</u>.

(i)    <u>General</u>.  Notwithstanding anything to the contrary contained in <u>Section 9.19(a)</u>, if the Borrower fails to comply with the DSCR Covenant for any Quarterly Payment Date (any such failure, a "<u>DSCR Covenant Failure</u>"), then until the fifteenth (15th) calendar day after delivery of the related Compliance Certificate for the corresponding Fiscal Quarter or Fiscal Year pursuant to <u>Section 7.01(c)</u> (with respect to such DSCR Covenant Failure, the "<u>Equity Cure Deadline</u>"), the Borrower shall have the right to cure such failure (such cure, an "<u>Equity Cure</u>") by receiving cash contributions from any Affiliate of the Borrower other than a Subsidiary of the Borrower (such cash contributions, "<u>Equity Cure Contributions</u>") (which, if not contributed by

119

HoldCo, shall be contributed to HoldCo and then contributed by HoldCo to the Borrower) in an aggregate amount equal to the amount that, if added to Operating Cash Available for Debt Service during the applicable Measurement Period, would have been sufficient to cause compliance with the DSCR Covenant for such Quarterly Payment Date (such amount with respect to such DSCR Covenant Failure, the "Cure Amount"). The Borrower shall give the Administrative Agent written notice of its intention to undertake an Equity Cure with respect to a DSCR Covenant Failure (each such notice, a "Cure Notice") on or before the day that the Borrower completes such Equity Cure. The Borrower may not, and shall not be entitled to, effect an Equity Cure more than two (2) times within any rolling twelve (12) month period, or more than four (4) times in total.

(ii)    Equity Cure Requirements. With respect to any Equity Cure, the applicable DSCR Covenant Failure shall only be deemed cured (with the same effect as though there had been no failure to comply with the DSCR Covenant on the applicable Quarterly Payment Date) if, on or prior to the Equity Cure Deadline for such DSCR Covenant Failure: (A) Equity Cure Contributions in an amount equal to the required Cure Amount for such DSCR Covenant Failure have actually been deposited into the Master Revenue Account; and (B) the Borrower has notified the Administrative Agent in writing confirming such deposit(s). With respect to any DSCR Covenant Failure, so long as the Borrower has complied with this clause (ii) with respect to such DSCR Covenant Failure, any Default or Event of Default arising from such DSCR Covenant Failure shall be deemed to not have occurred for purposes of the Loan Documents.

(iii)    Suspension of Remedies Pending Equity Cure. Notwithstanding anything herein to the contrary, after the Borrower has delivered a Cure Notice with respect to a DSCR Covenant Failure, neither the Administrative Agent nor any Lender may exercise any rights or remedies under Article X or under any other Loan Document on the basis of such DSCR Covenant Failure unless: (A) the Equity Cure Deadline for such DSCR Covenant Failure has passed; and (B) such DSCR Covenant Failure has not been deemed cured in accordance with Section 9.19(b)(ii); provided, however, that that no Credit Extension may occur after the occurrence of such DSCR Covenant Failure unless and until such DSCR Covenant Failure has been deemed cured in accordance with Section 9.19(b)(ii), or has been waived in accordance with the terms of this Agreement.

(iv)    Effect of Equity Cure Limited. Equity Cure Contributions received by the Borrower in accordance with clause (ii) above shall be added to Operating Cash Available for Debt Service for the last Fiscal Quarter of the Measurement Period immediately preceding the date on which such Equity Cure Contributions are deposited into the Master Revenue Account, and such Equity Cure Contributions shall be used solely for the purpose of recalculating compliance with the DSCR Covenant for the applicable Quarterly Payment Date and for the following three (3) Quarterly Payment Dates. Such Equity Cure Contributions shall not be taken into account for purposes of determining compliance with any other covenant or financial test hereunder or under any other Loan Document, including determination of the Leverage Ratio for purposes of Section 3.02(b)(ii) or Section 7.01(c), or compliance with the financial test for Restricted Payments set forth in Section 9.03(a)(v)(B), or for any other purpose. There shall be no pro forma reduction in Debt Service (directly or by way of netting) with any Equity Cure Contributions for determining compliance with the DSCR Covenant for any applicable Quarterly Payment Date with respect to which such Equity Cure Contributions were made. For the avoidance of doubt, an Equity Cure

shall be deemed to be made on the last Business Day of the relevant Measurement Period even if such Equity Cure is made after such date.

Section 9.20  <u>Negative Pledges</u>.  No Obligor shall (and each Obligor shall cause its Subsidiaries not to) enter into or permit to exist any agreement prohibiting the creation or assumption of any Lien in favor of the Secured Parties upon the properties, revenues or assets of such Obligor or any of its Subsidiaries, whether now owned or hereafter acquired, except for: (a) restrictions imposed by Applicable Law; (b) restrictions under the Loan Documents; (c) contractual encumbrances or restrictions in effect on the Closing Date, including the Existing Project Level Indebtedness Documents; (d) any encumbrance or restriction contained in any agreement entered into with respect to any Permitted Refinancing Indebtedness, but only so long as such encumbrance or restriction has not been expanded from the encumbrance or restriction contained in the Existing Project Level Indebtedness Documents relating to the Indebtedness being refinanced; (e) restrictions imposed by any Hedge Agreement so long as such restrictions: (i) do not restrict the creation of Liens in favor of the Secured Parties under the Loan Documents; and (ii) permit the Liens set forth in the definition of "Permitted Lien"; or (f) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in agreements, leases, licenses and similar agreements entered into in the ordinary course of business; <u>provided</u> that in each case such restrictions or encumbrances are limited to the property or assets subject to such agreements, leases, or licenses.

## ARTICLE X
## EVENTS OF DEFAULT

Section 10.01  <u>Events of Default</u>.  Each of the following events or occurrences described in this <u>Article X</u> shall constitute an "<u>Event of Default</u>":

(a)      <u>Non-Payment of Obligations</u>.  Any Obligor shall fail to pay when due: (i) any principal of any Loan or premium thereon, or any Reimbursement Obligation; (ii) interest on any Loan, or any fee described in <u>Article III</u>, and such Default remains unremedied for a period of three (3) Business Days after such amount becomes due; or (iii) any other amount, cost, charge or other sum due under this Agreement or any other Loan Document within ten (10) days after the date that such sum is due.

(b)      <u>Breach of Representation or Warranty</u>.  Any representation or warranty of any Obligor made or deemed to be made in any Loan Document is or shall be incorrect when made or deemed to have been made in any material respect (except to the extent any such representation and warranty itself is qualified by "materiality," "Material Adverse Effect" or similar qualifier, in which case, it shall be true and correct in all respects); <u>provided</u>, <u>however</u>, that if: (i) the fact, event or circumstance resulting in such false or incorrect representation or warranty is capable of being cured, corrected or otherwise remedied; and (ii) such fact, event or circumstance resulting in such false or incorrect representation or warranty shall have been cured, corrected or otherwise remedied within thirty (30) days from the date an Authorized Financial Officer of any Obligor obtains knowledge thereof such that such representation or warranty (as cured, corrected or remedied) could not reasonably be expected to result in a Material Adverse Effect, then such false or incorrect representation or warranty shall not constitute a Default or an Event of Default for purposes of the Loan Documents.

(c)    <u>Non-Performance of Certain Covenants and Obligations</u>.  The failure by an Obligor to perform or observe any of its covenants or obligations under <u>Sections 7.02(a)-(g)</u> *(Notices Generally)*, <u>7.03</u> *(Violations of Terrorism Laws; PATRIOT Act)*, <u>8.03(a)</u> *(Maintenance of Property; Required Insurance)*, <u>8.03(c)</u> *(Maintenance of Property; Required Insurance)*, <u>8.04(a)</u> *(Maintenance of Existence)*, <u>8.10</u> *(Cash Management)*, <u>8.15</u> *(Collateral Accounts)*, <u>8.20</u> *(Use of Proceeds)*, or <u>Article IX</u> *(Negative Covenants)*.

(d)    <u>Non-Performance of Other Covenants and Obligations</u>.  The failure by any Obligor to perform or observe any of its other covenants or obligations in the Loan Documents to which it is a party (other than such failures described in <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> above) and such failure shall continue uncured for thirty (30) or more days after an Authorized Officer of the Borrower obtains knowledge thereof; <u>provided</u> that if such Obligor believes in good faith such failure is capable of cure within a period not to exceed sixty (60) days in the aggregate and such Obligor commences efforts to cure such Default within such sixty (60) day period, such Obligor may continue to effect such cure and such Default will not be deemed an Event of Default for an additional thirty (30) days so long as such Obligor is diligently pursuing such cure.

(e)    <u>Default on Other Indebtedness</u>.  Any Obligor: (i) shall fail to make when due any payment of principal of or interest on, or any other amount payable in respect of, any Indebtedness with an individual or aggregate principal amount in excess of $10,000,000, in each case beyond the grace period, if any, provided therefor; or (ii) is in default or breach in the performance of or compliance with any other term of any such Indebtedness (or any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness) and as a consequence of such default such Indebtedness has become, or has been declared, due and payable or such Obligor is required to prepay, redeem, repurchase or defease, or to make an offer to prepay, redeem, repurchase or defease, such Indebtedness (or any underlying obligation) prior to its stated maturity.

(f)    <u>Judgments</u>.  The entry of one or more final and non-appealable judgment or judgments for the payment of money in excess of $5,000,000 (exclusive of judgment amounts covered by insurance) shall be rendered against any Obligor or any of its Subsidiaries, which remain unpaid or unstayed for a period of sixty (60) or more consecutive days.

(g)    <u>Permits</u>.  Any Permit required for the operation of, or sale from, any Project or any material portion thereof owned by Obligor or any of its Subsidiaries is revoked, terminated, withdrawn or ceases to be in full force and effect if such revocation, termination, withdrawal or cessation has had or could reasonably be expected to have a Material Adverse Effect and such revocation, termination, withdrawal or cessation is not cured within forty-five (45) days following the occurrence thereof.

(h)    <u>Impairment of Security, Loan Documents etc</u>.  Any of the Security Documents or any other Loan Document (other than in accordance with the provisions thereof) ceases to be in full force and effect or any security interest in the Collateral purported to be created by any Security Document shall cease to be a valid and perfected first priority Lien on and security interest in the Collateral covered thereby to the extent provided therein or any Obligor shall assert in writing such invalidity or lack of perfection or priority or repudiate, disavow or take legal action to challenge the effectiveness or enforceability of any Loan Document or any such Loan Document shall be declared void by a Governmental Authority.

(i)    <u>Bankruptcy, Insolvency, etc</u>.  Any Obligor or any of its Subsidiaries shall:

(i)    generally fail to pay, or admit in writing its inability or unwillingness generally to pay, debts as they become due;

(ii)    apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(iii)    in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, sequestrator or other custodian shall not be discharged within sixty (60) days; <u>provided</u> that each Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any relevant proceeding during such sixty (60) day period to preserve, protect and defend their rights under the Loan Documents; or

(iv)    permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by Obligor, such case or proceeding shall be consented to or acquiesced in by such Person or shall result in the entry of an order for relief or shall remain for sixty (60) days undismissed; <u>provided</u> that each Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such sixty (60) day period to preserve, protect and defend their rights under the Loan Documents.

(j)    <u>Material Project Documents</u>.  Any Material Project Document: (i) ceases to be valid and binding and in full force and effect prior to its stated termination date other than as a result of an amendment or termination permitted hereunder; or (ii) a party thereto fails to perform or observe any of its covenants or obligations thereunder, and such event as set forth in either clauses (i) or (ii) above has had or could reasonably be expected to have a Material Adverse Effect; <u>provided</u> that no such event shall be an Event of Default if within ninety (90) days from the occurrence thereof: (A) any breaching party resumes performance and otherwise cures such failure to perform or observe its covenants or obligations under such Material Project Document; or (B) the applicable Subsidiary of the applicable Obligor enters into a Replacement Project Document in replacement of such Material Project Document.

(k)    <u>Event of Loss; Event of Abandonment</u>.  (a) A destruction of, or loss with respect to, all or a substantial part of any Project; or (b) any condemnation, seizure or appropriation of all or a substantial part of any Project (each of the events described in the preceding <u>clauses (a)</u> and <u>(b)</u>, an "<u>Event of Loss</u>"); or (c) an Event of Abandonment with respect to any Project, in each case, to the extent such Event of Loss or Event of Abandonment, taken together with all other Events of Loss and Events of Abandonment then-existing, could reasonably be expected to cause a Material Adverse Effect.

(l)    <u>Pension Plans</u>.  Any of the following events shall occur with respect to any Pension Plan that could reasonably be expected to result in a liability in excess of $10,000,000: (i) the

termination of a Pension Plan or the institution of any proceedings to terminate a Pension Plan by the PBGC if, as a result of such termination, any Obligor or any of its Subsidiaries could reasonably be expected to be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan; or (ii) one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of Obligor or any of its Subsidiaries.

(m)    <u>Change of Control</u>.  A Change of Control shall occur.

(n)    <u>Abandonment</u>.  A Project Company shall have voluntarily abandoned operation of any Project with no intent to resume such operation, such abandonment to be evidenced by such Project Company's cessation of such operation for a period of thirty (30) consecutive days for reasons not associated with the occurrence of any of the events set forth in <u>Section 10.01(k)</u> or a Forced Outage or a force majeure event, to the extent all such abandonments pursuant to this <u>Section 10.01(n)</u>, taken together with all Events of Loss then existing pursuant to <u>Section 10.01(k)</u>, could reasonably be expected to cause a Material Adverse Effect.

Section 10.02  <u>Action if Bankruptcy</u>.  If any Event of Default described in <u>Section 10.01(i)</u> with respect to Obligor shall occur, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents shall immediately become due and payable, without notice or demand to any Person.

Section 10.03  <u>Action if Other Event of Default</u>.  If any Event of Default (other than any Event of Default described in <u>Section 10.01(i)</u>) shall occur and be continuing for any reason, whether voluntary or involuntary, any or all of the following actions may be taken, in addition to the exercise of all other rights and remedies available to the Administrative Agent, the Collateral Agent and the other Secured Parties under the Loan Documents or under Applicable Law or in equity: (a) the Administrative Agent, upon the request of the Required Lenders, shall, by notice to the Obligors declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (b) the Administrative Agent, upon the request of the Required Lenders, shall, by notice to the Obligors, declare the Loans (with accrued interest thereon) and all other Obligations owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this <u>Section 10.03</u>, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Obligors.

**ARTICLE XI**
**GUARANTY**

Section 11.01  <u>Guaranty of the Obligations</u>

(a)    Subject to <u>clause (b)</u> below, Subsidiary Guarantors jointly and severally hereby irrevocably and unconditionally guaranty (the "<u>Guaranty</u>") to the Administrative Agent for the ratable benefit of the Secured Parties the due and punctual payment in full of all Secured Obligations (other than, for the avoidance of doubt, Excluded Swap Obligations) when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration,

demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)) (collectively, the "Guaranteed Obligations").

(b)    Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (i) in no event shall the Guaranteed Obligations include any amounts owed by any Obligor under any Permitted Obligor Commodity Hedge Agreement entered into with any Person that is not a Secured Hedge Provider in an aggregate amount for all such Permitted Obligor Commodity Hedge Agreements that exceeds the Commodity Hedge Cap Amount and (ii) Grays Harbor and Grays Holding shall be the sole Subsidiary Guarantors with respect to Secured Obligations under any Permitted Obligor Commodity Hedge Agreement to the extent that such Secured Obligations are secured solely by a First Lien on the assets of Grays Harbor.

Section 11.02  Contribution by Subsidiary Guarantors.  All Subsidiary Guarantors desire to allocate among themselves (collectively, the "Contributing Subsidiary Guarantors"), in a fair and equitable manner, their obligations arising under the Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Subsidiary Guarantor (a "Funding Subsidiary Guarantor") under the Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Subsidiary Guarantor shall be entitled to a contribution from each of the other Contributing Subsidiary Guarantors in an amount sufficient to cause each Contributing Subsidiary Guarantor's Aggregate Payments to equal its Fair Share as of such date.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Subsidiary Guarantor.  The allocation among Contributing Subsidiary Guarantors of their obligations as set forth in this Section 11.02 shall not be construed in any way to limit the liability of any Contributing Subsidiary Guarantor hereunder. Each Subsidiary Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 11.02.

Section 11.03  Payment by Subsidiary Guarantors.  The Subsidiary Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Subsidiary Guarantor by virtue hereof, that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Subsidiary Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to beneficiaries as aforesaid.

Section 11.04  Liability of Subsidiary Guarantors Absolute.  Each Subsidiary Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of

the foregoing and without limiting the generality thereof, each Subsidiary Guarantor agrees as follows:

(a)    the Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Subsidiary Guarantor and not merely a contract of surety;

(b)    Administrative Agent may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Borrower and any Secured Party with respect to the existence of such Event of Default;

(c)    the obligations of each Subsidiary Guarantor hereunder are independent of the obligations of the Borrower and the obligations of any other guarantor (including any other Subsidiary Guarantor) of the obligations of the Borrower, and a separate action or actions may be brought and prosecuted against such Subsidiary Guarantor whether or not any action is brought against the Borrower or any of such other guarantors and whether or not the Borrower is joined in any such action or actions;

(d)    payment by any Subsidiary Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Subsidiary Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Subsidiary Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Subsidiary Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Subsidiary Guarantor, limit, affect, modify or abridge any other Subsidiary Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)    any Secured Party, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Subsidiary Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Subsidiary Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Secured Party in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Secured Party may have against any such security, in each case as such Secured Party in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right

126

of reimbursement or subrogation or other right or remedy of any Subsidiary Guarantor against any other Secured Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f)     this Guaranty and the obligations of the Subsidiary Guarantors under this <u>Article XI</u> shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Subsidiary Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce, or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to Events of Default) hereof, any of the other Loan Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Secured Party might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Secured Party's consent to the change, reorganization or termination of the corporate structure or existence of the Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any Collateral; (vii) any defenses, set-offs or counterclaims which the Borrower may allege or assert against any Secured Party in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Subsidiary Guarantor as an obligor in respect of the Guaranteed Obligations.

Section 11.05 <u>Waivers by Subsidiary Guarantors</u>.  Each Subsidiary Guarantor hereby waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by such Subsidiary Guarantor, to: (i) proceed against the Borrower, any other guarantor (including any other Subsidiary Guarantor) of the Guaranteed Obligations or any other Person; (ii) proceed against or exhaust any security held from the Borrower, any such other guarantor or any other Person; (iii) proceed against or have resort to any balance of any account or credit on the books of any Secured Party in favor of any Person; or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of the Borrower or any other Subsidiary Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating

127

thereto or by reason of the cessation of the liability of the Borrower or any other Subsidiary Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e)(i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Subsidiary Guarantor's obligations hereunder; (ii) the benefit of any statute of limitations affecting such Subsidiary Guarantor's liability hereunder or the enforcement hereof; (iii) any rights to set-offs, recoupments and counterclaims; and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of Default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in <u>Section 11.04</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

Section 11.06  <u>Subsidiary Guarantors' Rights of Subrogation, Contribution, etc.</u>  Until the Termination Date, each Subsidiary Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Subsidiary Guarantor now has or may hereafter have against the Borrower or any other Subsidiary Guarantor or any of its assets in connection with the Guaranty or the performance by such Subsidiary Guarantor of its obligations under this <u>Article XI</u>, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including: (a) any right of subrogation, reimbursement or indemnification that such Subsidiary Guarantor now has or may hereafter have against the Borrower with respect to the Guaranteed Obligations; (b) any right to enforce, or to participate in, any claim, right or remedy that any Secured Party now has or may hereafter have against the Borrower; and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Secured Party.  Each Subsidiary Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Subsidiary Guarantor may have against the Borrower or against any collateral or security, and any rights of contribution such Subsidiary Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Secured Party may have against the Borrower, to all right, title and interest any Secured Party may have in any such collateral or security, and to any right any Secured Party may have against such other guarantor.  If any amount shall be paid to any Subsidiary Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time prior to the Termination Date, such amount shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

Section 11.07  <u>Subordination of Other Obligations</u>.  Any Indebtedness of any Obligor now or hereafter held by any Subsidiary Guarantor (the "<u>Obligee Subsidiary Guarantor</u>") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Subsidiary Guarantor after an Event of Default has occurred and is continuing shall be held in trust for the Administrative Agent on behalf of the Secured Parties and shall forthwith be paid over to the Administrative Agent for the benefit of the Secured Parties to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Subsidiary Guarantor under any other provision hereof.

Section 11.08  <u>Continuing Guaranty</u>.  The Guaranty is a continuing guaranty and shall remain in effect until the Termination Date.  Each Subsidiary Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

Section 11.09  <u>Authority of the Subsidiary Guarantors or the Borrower</u>.  It is not necessary for any Secured Party to inquire into the capacity or powers of any Subsidiary Guarantor or the Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

Section 11.10  <u>Financial Condition of the Borrower</u>.  Any extension of credit may be made to the Borrower or continued from time to time without notice to or authorization from any Subsidiary Guarantor regardless of the financial or other condition of the Borrower at the time of any such grant or continuation.  No Secured Party shall have any obligation to disclose or discuss with any Subsidiary Guarantor its assessment, or any Subsidiary Guarantor's assessment, of the financial condition of the Borrower.  Each Subsidiary Guarantor has adequate means to obtain information from the Borrower on a continuing basis concerning the financial condition of the Borrower and its ability to perform its obligations under the Loan Documents, and each Subsidiary Guarantor assumes the responsibility for being and keeping informed of the financial condition of the Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Subsidiary Guarantor hereby waives and relinquishes any duty on the part of any Secured Party to disclose any matter, fact or thing relating to the business, operations or conditions of the Borrower now known or hereafter known by any Secured Party.

Section 11.11  <u>Bankruptcy, etc.</u>

(a)  So long as any Guaranteed Obligations remain outstanding, no Subsidiary Guarantor shall, without the prior written consent of the Administrative Agent acting pursuant to the instructions of the Required Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against the Borrower or any other Subsidiary Guarantor.  The obligations of Subsidiary Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of the Borrower or any other Subsidiary Guarantor or by any defense which the Borrower or any other Subsidiary Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding;

129

(b)    Each Subsidiary Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Subsidiary Guarantors and the Secured Parties that the Guaranteed Obligations which are guaranteed by Subsidiary Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve the Borrower of any portion of such Guaranteed Obligations.  The Subsidiary Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay the Administrative Agent, or allow the claim of the Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced; and

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by the Borrower, the obligations of the Subsidiary Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Secured Party as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

Section 11.12 Keepwell.   Each Qualified ECP Guarantor hereby jointly, severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Subsidiary Guarantor to honor all of its obligations to the Secured Parties under the Guaranty and the Security Documents in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 11.12 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 11.12, or otherwise under the Guaranty or the Security Documents, voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  Each Qualified ECP Guarantor intends that this Section 11.12 constitute, and this Section 11.12 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Subsidiary Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Section 11.13 Non-Guarantor Borrower Parties. Upon the occurrence of a Release Event, the Borrower shall cause any of its Wholly-Owned Subsidiaries that is not a Subsidiary Guarantor due to such Wholly-Owned Subsidiary being subject to a Permitted Restriction (each such Wholly-Owned Subsidiary, a "Non-Guarantor Borrower Party") (a) to provide a guaranty to the Administrative Agent for the ratable benefit of the Secured Parties of the due and punctual payment in full of the Guaranteed Obligations on terms substantially identical to the terms of this Article XI, or otherwise become obligated under this Agreement to the same extent as the Subsidiary Guarantors, at such time as such Non-Guarantor Borrower Party ceases to be subject to any Permitted Restriction in any Project Level Indebtedness Document and (b) to comply with the provisions of Section 8.14(b) in order for such Non-Guarantor Borrower Party to grant a security interest in substantially all of its assets including any real property owned by such Non-Guarantor Borrower Party and any Capital Stock of such Non-Guarantor Borrower Party owned by any other Obligor, in each case, within 45 days of the occurrence of such Release Event.

# ARTICLE XII
# AGENCY

Section 12.01  <u>Appointment and Authority</u>.  Each Lender and each Revolving LC Issuer hereby irrevocably appoints Credit Suisse AG, Cayman Islands Branch to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent, in the absence of written instructions from the Required Lenders, to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this <u>Article XII</u> are solely for the benefit of the Administrative Agent, the Lenders and the Revolving LC Issuers, and no Obligor shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to, and shall not, connote any fiduciary duty or other implied (or express) obligations arising under agency doctrine of any Applicable Law.  Instead such term is used as a matter of market custom, and is intended to, and shall, create or reflect only an administrative relationship between contracting parties.  Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to: (a) execute any and all documents (including releases) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents; and (b) at the direction of the Required Lenders and the Revolving LC Issuer, negotiate, enforce or the settle any claim, action or proceeding affecting the Lenders in their capacity as such, which negotiation, enforcement or settlement will be binding upon each Lender; <u>provided</u>, <u>however</u>, that Administrative Agent shall not be required to take any action under any Loan Document, or to prosecute or defend any suit in respect of any Loan Document, unless it is indemnified hereunder to its satisfaction, and if any indemnity in favor of the Administrative Agent shall be or become, in the Administrative Agent's determination, inadequate, the Administrative Agent may call for additional indemnification from the Lenders and Revolving LC Issuers and cease to do the acts indemnified against hereunder until such additional indemnity is given.

Section 12.02  <u>Rights as a Lender</u>.  In the event the Person serving as the Administrative Agent hereunder is or becomes a Lender or Revolving LC Issuer hereunder, such Person shall have the same rights and powers in its capacity as a Lender or Revolving LC Issuer as any other Lender or Revolving LC Issuer and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Revolving LC Issuer" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, an Obligor, any Subsidiary, or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or the Revolving LC Issuers.

Section 12.03  <u>Exculpatory Provisions</u>.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

(a)    The Administrative Agent shall have no duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder and thereunder shall be administrative in nature.  Without limiting the generality of the foregoing:

(i)    the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) and the Revolving LC Issuers; provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

(iii)    the Administrative Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and nor shall it be liable for the failure to disclose, any information relating to an Obligor or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    Neither the Administrative Agent nor any Revolving LC Issuer nor any of their respective directors, officers, employees, or agents shall be liable for any action taken or not taken by it: (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 4.08, 10.02, 10.03 and 13.01); or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Administrative Agent shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by an Obligor or a Lender.

(c)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into: (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document; (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith; (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the conditions set forth in any Loan Document or the occurrence of any Default; (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document; or (v) the satisfaction of any condition set forth in Article V or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d)    The Administrative Agent shall have no liability or obligation to monitor or control any assignments to Ineligible Assignees.

Section 12.04  Reliance by Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan or the issuance of a Revolving Letter of Credit that by its terms must be fulfilled to the satisfaction of a Lender or a Revolving LC Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or Revolving LC Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or Revolving LC Issuer prior to the making of such Loan or the issuing of such Revolving Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 12.05  Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article XII shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities as the Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 12.06  Resignation of Agent.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders, the Revolving LC Issuers and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above.  Whether or not a successor has been appointed, such Administrative Agent's resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    With effect from the Resignation Effective Date: (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; and (ii) except for any indemnity payments owed to the retiring or

133

removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender or Revolving LC issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article XII and Section 13.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 12.07  Non-Reliance on Administrative Agent and Other Lenders.  Each Lender and each Revolving LC Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender, Revolving LC Issuer or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and each Revolving LC Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender, Revolving LC Issuer or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 12.08  No Other Duties, etc.  Anything herein to the contrary notwithstanding, the Lead Arranger listed on the cover page hereof shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity the Administrative Agent or a Lender.

Section 12.09  Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to an Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 3.03 and 13.03) allowed in such judicial proceeding; and

134

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 3.03 and 13.03.

Section 12.10  Withholding Taxes.  To the extent required by any Applicable Law, the Administrative Agent may withhold or deduct from any payment to any Credit Party an amount equivalent to any withholding or deduction of any Tax applicable to such payment.  Each Credit Party shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for: (a) any Indemnified Taxes attributable to such Credit Party (but only to the extent that any Obligor has not already indemnified the Administrative Agent for such Indemnified Taxes without limiting the obligation of the Obligors to do so); (b) any Taxes attributable to such Credit Party's failure to comply with the provisions of Section 13.08(d) relating to the maintenance of a Participant Register; and (c) any Excluded Taxes attributable to such Credit Party, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Credit Party by the Administrative Agent shall be conclusive absent manifest error.  Each Credit Party hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Credit Party under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 12.10.  The agreements in this Section 12.10 shall survive the resignation or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, any other Credit Party and Termination Date.

Section 12.11  Collateral and Guaranty Matters.

(a)      The Credit Parties irrevocably authorize the Administrative Agent, at its option and in its discretion:

(i)      to direct the Collateral Agent to release any Lien on any property granted to or held by the Collateral Agent under any Loan Document for the benefit of the Credit Parties: (x) upon termination of all Commitments and payment in full of all Obligations (other than contingent indemnification obligations); (y) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted under the Loan Documents; or (z) subject to Section 13.01, if approved, authorized or ratified in writing by the Required Lenders; and

(ii)      to release any Subsidiary Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary of the Borrower as a result of a transaction permitted under the Loan Documents.

*ITOI Amended and Restated Credit and Guaranty Agreement*

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to direct the Collateral Agent to release its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Guaranty pursuant to this <u>Section 12.11</u>.

(b)    The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Obligor in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders or the Revolving LC Issuers for any failure to monitor or maintain any portion of the Collateral.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

Section 13.01  <u>Waivers, Amendments, etc.</u>  The provisions of each Loan Document may from time to time be amended, modified or waived: (x) in the case of this Agreement, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; and (y) in the case of any other Loan Document (other than the Fee Letter or any Revolving Letter of Credit, the provisions of which may be amended, modified or waived by the parties thereto in accordance with their respective terms), pursuant to an agreement in writing entered into by each party thereto and Administrative Agent and consented to by the Required Lenders; <u>provided</u>, <u>however</u>, that no such amendment, modification or waiver shall:

(a)    modify this <u>Section 13.01</u> without the consent of all Term Loan Lenders (with respect to provisions relating to Term Loans), all Revolving Loan Lenders (with respect to provisions relating to Revolving Loans), and all Revolving LC Issuers (with respect to provisions relating to Revolving Letters of Credit);

(b)    increase the aggregate amount of any Credit Extensions required to be made by any Lender or Revolving LC Issuer pursuant to its Commitments, extend the Commitment Termination Date of Credit Extensions made (or participated in) by a Lender, extend any Stated Maturity Date for any Loan or Revolving Letter of Credit of a Lender or Revolving LC Issuer, respectively, or reduce any fees described in <u>Article III</u> payable to any Lender or Revolving LC Issuer, in each case without the consent of such Lender or Revolving LC Issuer, it being agreed, however, that: (i) any vote to rescind any acceleration made pursuant to <u>Section 10.02</u> and <u>Section 10.03</u> of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders; and (ii) waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the aggregate Commitments shall not constitute an increase of the Commitments of any Lender;

(c)    extend any scheduled date of payment of principal for any Lender's Loan, or reduce or forgive the principal amount of, rate of interest, premium or fees on any Loan or extend the scheduled date on which interest, premium or fees are payable in respect of such Loan, without the consent of the Lender which has made such Loan; <u>provided</u> that the vote of the Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under <u>Section 3.04(b)</u>;

*ITOI Amended and Restated Credit and Guaranty Agreement*

(d)    change the currency of payment of any principal, interest, premium or fees, in respect of the Loans, without the consent of all Lenders;

(e)    reduce the percentage set forth in the definitions of "Required Lenders", "Percentage" or "Revolving Loan Percentage", or modify any requirement hereunder that any particular action may not be taken without the consent of all Lenders;

(f)    except as otherwise expressly provided in a Loan Document, release: (i) an Obligor from its Obligations under the Loan Documents or any Subsidiary Guarantor from its obligations under the Guaranty; or (ii) all or substantially all of the Collateral, in each case without the consent of all Lenders;

(g)    affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as such) unless consented to by the Administrative Agent;

(h)    affect adversely the interests, rights or obligations of the Collateral Agent (in its capacity as such) unless consented to by the Collateral Agent (at the direction of the Administrative Agent);

(i)    modify the *pro rata* or ratable distribution or sharing requirements of <u>Section 3.02(a)</u>, <u>Section 3.03(b)</u>, <u>Section 3.03(c)</u>, <u>Section 4.07</u>, or <u>Section 4.08</u>, in each case, without the consent of each Lender adversely affected thereby;

(j)    increase any Revolving Loan Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; <u>provided</u> that no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Revolving Loan Commitment of any Lender;

(k)    change any provision of this Agreement or any other Loan Document in a manner that by its terms adversely affects the rights or priority in respect of payments due to either Revolving Loan Lenders or Term Loan Lenders, differently from the other Lenders, without the consent of either the Revolving Loan Lenders or Term Loan Lenders, as applicable, holding a majority in interest of the applicable portion of the Total Exposure Amount of such adversely affected Lenders;

(l)    affect adversely the ability of any Lender to assign any of its rights and obligations under this Agreement without the consent of such Lender; or

(m)    modify the definition of "<u>Interest Period</u>" to permit Interest Periods in excess of six (6) months without the consent of each Lender directly affected thereby;

<u>provided</u>, <u>however</u>, that notwithstanding the foregoing provisions of this <u>Section 13.01</u>, the Administrative Agent and the Borrower may, without the consent of any Lender or Revolving LC Issuer, enter into any amendment, supplement or other modification to any Loan Document, in form and substance reasonably satisfactory to the Administrative Agent (w) to amend the definition of LIBO Rate to reflect a successor index rate as contemplated by the definition thereof, (x) to cure any ambiguity or to correct or supplement any provision in such agreement that may be inconsistent with any other provision of the Loan Documents or to further the intended purposes

137

thereof, (y) to make any change that would provide any additional rights or benefits to the Lenders or (z) to make, complete or confirm any grant of collateral permitted or required by this Agreement or any of the Security Documents or any release of any Collateral that becomes effective as set forth in this Agreement or any of the Security Documents; provided further that a copy of any such amendment, supplement or other modification shall be furnished to the Lenders, the Revolving LC Issuers, the Collateral Agent and the Depositary Bank in accordance with the notice provisions hereof or another applicable Loan Document, as applicable, no later than three (3) Business Days prior to the execution thereof by the Administrative Agent.

No failure or delay on the part of any Credit Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on an Obligor in any case shall entitle it to any notice or demand in similar or other circumstances. No waiver or approval by any Credit Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions. No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

Section 13.02  Notices; Effectiveness; Electronic Communication; Time.

(a)    Notices Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

| | |
|---|---|
| If to the Administrative Agent: | Credit Suisse AG<br>Eleven Madison Avenue<br>New York, NY 10010<br>Attn:  Loan Operations – Agency Manager<br>Tel:  (919) 994-6369<br>Email:  agency.loanops@credit-suisse.com |
| If to the Borrower: | Invenergy Thermal Operating I LLC<br>One South Wacker Drive, Suite 1800<br>Chicago, Illinois 60606<br>Tel:    (312) 224-1400<br>Fax:    (312) 224-1444<br>Email: mschultz@invenergyllc.com<br>Attn:   Meghan Schultz<br><br>*with a copy to:*<br><br>Invenergy Thermal Operating I LLC<br>One South Wacker Drive, Suite 1800<br>Chicago, Illinois 60606<br>Tel:    (312) 224-1400 |

138

Fax:    (312) 224-1444
Email: bbradley@invenergyllc.com
Attn:   General Counsel

| | |
|---|---|
| If to the Collateral Agent: | Credit Suisse AG<br>Eleven Madison Avenue<br>New York, NY 10010<br>Attn:  Loan Operations – Agency Manager<br>Tel:  (919) 994-6369<br>Email:  agency.loanops@credit-suisse.com |
| If to a Lender or Revolving<br>LC Issuer: | To the address set forth next to its name on<br><u>Schedule I</u> |
| If to a Subsidiary Guarantor: | To the address set forth next to its name on<br><u>Schedule II</u> |

Other than with respect to the Collateral Agent, notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  With respect to the Collateral Agent, if a notice or communication is mailed or delivered in the manner provided above within the time prescribed, it shall be deemed to have been given upon actual receipt by the Collateral Agent at its Corporate Trust Office.  Notices delivered through electronic communications, to the extent provided in <u>clause (b)</u> below, shall be effective as provided in said <u>clause (b)</u>.

(b)      <u>Electronic Communications</u>.  Notices and other communications to the Lenders and Revolving LC Issuers hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under <u>Article II</u> by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u> that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes: (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing <u>clause (i)</u>, of notification that such notice or communication is available and identifying the website address therefor; <u>provided</u> that for both <u>clauses (i)</u> and <u>(ii)</u> above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or

139

communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)    <u>Change of Address, etc</u>.  Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(d)    <u>Platform</u>.

(i)    Each Obligor agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders and Revolving LC Issuers by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "<u>Platform</u>").

(ii)    The Platform is provided "as is" and "as available<u>.</u>"  The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to an Obligor, any Lender, any Revolving LC Issuer or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of an Obligor's or the Administrative Agent's transmission of Communications through the Platform.  "<u>Communications</u>" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of an Obligor pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender or Revolving LC Issuer by means of electronic communications pursuant to this <u>Section 13.02</u>, including through the Platform.

(e)    <u>Public Information</u>.  The Borrower hereby acknowledges that certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the materials and information provided by or on behalf of the Borrower hereunder and under the other Loan Documents (collectively, "<u>Borrower Materials</u>") that may be distributed to the Public Lenders and that (i) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC," which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Agents, the Revolving LC Issuers and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrower or its securities for purposes of U.S. federal and state securities laws (provided, however, that to the extent that such Borrower Materials constitute Information, they shall be subject to <u>Section 13.11</u>); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public

140

Side Information;" and (iv) the Agents shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information".    Each Public Lender will designate one or more representatives that shall be permitted to receive information that is not designated as being available for Public Lenders

(f)    Time.  Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York, New York time.

Section 13.03  Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.  The Borrower shall pay: (i) all reasonable, documented out-of-pocket expenses incurred by the Lead Arrangers, the Administrative Agent and their Affiliates (including the reasonable documented fees, charges and disbursements of Shearman & Sterling LLP as counsel for the Administrative Agent and Credit Suisse Loan Funding LLC in its capacities as Closing Date Credit Facilities Lead Arranger and Incremental Term Facility Sole Lead Arranger, or such other counsel to the Administrative Agent and any special or local counsel who may be retained on behalf of the Administrative Agent), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including the reasonable documented fees and out-of-pocket expenses of any independent engineers, market consultants, insurance consultants, or environmental consultants engaged in connection with the Amendment Transactions; and (ii)  all reasonable documented out-of-pocket expenses incurred by the Administrative Agent or any Lender or Revolving LC Issuer (including the reasonable documented fees, charges and disbursements of any counsel for the Administrative Agent, such Lender, or such Revolving LC Issuer), in connection with the enforcement or protection of its rights: (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 13.03; or (B) in connection with the Loans made, or Revolving Letters of Credit issued, hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and Revolving Letters of Credit.

(b)    Indemnification by the Borrower.    The Borrower shall indemnify the Administrative Agent, each Lender, each Revolving LC Issuer, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee" and collectively "Indemnitees") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related legal expenses (including the reasonable fees, disbursements and other legal charges, provided that the Borrower shall not be required to reimburse the expenses of more than one firm of primary counsel (and one firm of specialty counsel) and one firm of local counsel in each applicable jurisdiction for the Indemnitees and, if any Indemnitee shall have advised the Borrower that there is an actual or perceived conflict of interest, one additional firm of primary counsel (and one firm of specialty counsel) and one firm of local counsel in each applicable jurisdiction for each group of affected Indemnitees that are similarly situated), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Obligor), arising out of, in connection with, or as a result of: (i) the execution or delivery of this Agreement,

*ITOI Amended and Restated Credit and Guaranty Agreement*

any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (ii) any Loan or Revolving Letter of Credit or the use or proposed use of the proceeds therefrom; (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by an Obligor or any of its Subsidiaries, or any Environmental Liabilities related in any way to an Obligor or any of its Subsidiaries; or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by an Obligor, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses: (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; or (y) result from a claim brought by an Obligor against an Indemnitee that has resulted from such Indemnitee acting in bad faith hereunder or under any other Loan Document, if the Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. This Section 13.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

Except with respect to such gross negligence or willful misconduct (as determined by a final and nonappealable decision of a court of competent jurisdiction), each Obligor and its successors and assigns hereby waive, release and agree not to make any claim or bring any cost recovery action against, any Indemnitee under CERCLA or any state equivalent, or any similar law now existing or hereafter enacted. It is expressly understood and agreed that to the extent that any Indemnitee is strictly liable under any Environmental Laws, each Obligor's obligation to such Indemnitee under this indemnity shall likewise be without regard to fault on the part of any Obligor with respect to the violation or condition which results in liability of an Indemnitee. If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities which is permissible under Applicable Law.

(c)    Reimbursement by Lenders. To the extent that the Borrower for any reason fails to indefeasibly pay any amount required to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of the Administrative Agent under any Loan Document, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Exposure Amount at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent).

(d)    Waiver of Consequential Damages, Etc. To the fullest extent permitted by Applicable Law, each Obligor shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the

142

transactions contemplated hereby or thereby, any Loan, any Revolving Letter of Credit, or the use of the proceeds thereof. No Indemnitee referred to in this Section 13.03 shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    Payments.  All amounts due under this Section 13.03 shall be payable not later than thirty (30) days after demand therefor.

(f)    Survival.  Each party's obligations under this Section 13.03 shall survive the termination of the Loan Documents and payment of the obligations hereunder.

Section 13.04  Survival.  The obligations of the Borrower under Sections 4.03, 4.04, 4.05, 4.06 and 13.03, the obligations of the Lenders under Sections 12.01, 13.03, 13.12 and 13.13, and the obligations of the Subsidiary Guarantors under Article XI, shall in each case survive any assignment from one Lender to another, the occurrence of the Termination Date, and the resignation or removal of the Administrative Agent.  The representations and warranties made by each Obligor in each Loan Document to which it is a party shall survive the execution and delivery of such Loan Document; provided that the foregoing shall not be construed to mean any representation or warranty set forth herein shall be deemed made as of any date later than the date of this Agreement (or such other date as to which any such representation explicitly relates).

Section 13.05  Severability.  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 13.06  Headings.  The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

Section 13.07  Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent or other agents, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective on the Amendment Effective Date. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)    The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of

143

records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 13.08  <u>Successors and Assigns</u>.

(a)  <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that an Obligor may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except: (i) to an assignee in accordance with the provisions of <u>clause (b)</u> and <u>clause (g)</u> of this <u>Section 13.08</u>; (ii) by way of participation in accordance with the provisions of <u>clause (d)</u> of this <u>Section 13.08</u>; or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>clause (f)</u> of this <u>Section 13.08</u> (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>clause (d)</u> of this <u>Section 13.08</u> and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions (any such Person for which all of the following conditions have been satisfied, an "<u>Eligible Assignee</u>"):

(i)  <u>Minimum Amounts</u>.  The aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender, subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than, and shall be in an integral multiple of, in the case of Revolving Loans and Revolving Loan Commitments, $2,500,000, and in the case of Term Loans, $1,000,000, unless: (A) the aggregate amount of such Commitment or Loans is less than $1,000,000, in which case the assignment may be for the entire remaining amount of such Commitment or Loans; or (B) each of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)  <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

(iii)    <u>Required Consents</u>.  No Lender or Revolving LC Issuer shall assign any or all of its Commitment or its outstanding Loans, as applicable, without the prior written consent of: (A) the Administrative Agent, such consent not to be unreasonably withheld, conditioned, or delayed; <u>provided</u> that such consent shall not be required (x) for an assignment to an existing Lender, an Affiliate of an existing Lender, an Approved Fund or an Affiliated Lender and (y) the assignment occurs prior to the completion of primary syndication of the Term Loans; (B) the Borrower, such consent not to be unreasonably withheld, conditioned, or delayed; <u>provided</u> that such consent shall not be required if: (x) the assignment occurs prior to the completion of primary syndication of the Term Loans; (y) an Event of Default under <u>Section 10.01(a)</u>, <u>Section 10.01(d)</u> (with respect to a Default under <u>Section 7.01</u> or <u>Section 9.19</u> only) or <u>Section 10.01(i)</u> has occurred and is continuing at the time of such assignment; or (z) such assignment is to an existing Lender or an Affiliate of an existing Lender, an Approved Fund or an Affiliated Lender; <u>provided</u> <u>further</u> that the Borrower shall be deemed to have consented to any such assignment (except to an Ineligible Assignee) unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof; or (C) in the case of assignments with respect to Revolving Loans or Revolving Loan Commitments, each Revolving LC Issuer, such consent not to be unreasonably withheld, conditioned, or delayed; <u>provided</u>, that such consent shall not be required for an assignment to an existing Lender, an Affiliate of an existing Lender, an Approved Fund or an Affiliated Lender.

(iv)    <u>Notice to Borrower</u>.  Any Lender or Revolving LC Issuer shall provide notice to the Borrower of its intent to assign all or a portion of its Commitment or outstanding Loans concurrently with its request to the Administrative Agent for the Administrative Agent's consent to such assignment.

(v)    <u>Assignment and Assumption</u>.  The parties to each assignment shall: (A) execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent; or (B) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, together in each case with a processing and recordation fee of $3,500; <u>provided</u> that the Administrative Agent may, in its sole discretion, elect to waive or reduce such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(vi)    <u>No Assignment to Certain Persons</u>.  No such assignment shall be made: (A) to an Ineligible Assignee unless: (I) an Event of Default under <u>Section 10.01(i)</u> with respect to any Obligor has occurred and is continuing; (II) an Event of Default under <u>Section 10.01(a)</u> has occurred and is continuing and the Borrower has not caused such Event of Default to be cured within five (5) Business Days after notice thereof to the Borrower; or (III) an Event of Default (other than under <u>Section 10.01(a)</u> or <u>Section 10.01(i)</u> with respect to any Obligor) has occurred and is continuing and the Borrower has not caused such Event of Default to be cured within thirty (30) days after notice thereof to the Borrower; or (B) to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(vii)    <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

145

(viii)    _Defaulting Lenders._  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Administrative Agent, the applicable Revolving Loan Percentage of Revolving Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to: (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the Revolving LC Issuers, the Revolving Loan Lenders and each other Lender hereunder (and interest accrued thereon); and (y) acquire (and fund as appropriate) its full Revolving Loan Percentage of Revolving Loans and participations in Revolving Letters of Credit and Revolving Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under Applicable Law without compliance with the provisions of this clause (viii), then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 13.08, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 4.03, 4.05, 4.06 and 13.03 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) of this Section 13.08.

(c)    _Register._  The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause (c), to maintain a register (the "Register") on which the Administrative Agent will record each Lender's Commitments, the Loans made by each Lender and each repayment in respect of the principal amount of the Loans of each Lender and annexed to which the Administrative Agent shall retain a copy of each Assignment and Assumption delivered to the Administrative Agent pursuant to Section 13.08(b).  Failure to make any recordation, or any error in such recordation, shall not affect the Borrower's obligation in respect of such Loans.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person in whose name a Loan is registered as the owner thereof for all purposes of this Agreement, notwithstanding notice or any provision herein to the contrary.  A Lender's Commitment and the Loans made pursuant thereto may be assigned or otherwise transferred in whole or in part only by registration of such assignment or transfer in the Register.  Any assignment or transfer of a Lender's Commitment or the Loans made pursuant thereto shall be registered in the Register only upon delivery to the Administrative Agent of an Assignment and Assumption duly executed by the

146

assignor thereof and the compliance by the parties thereto with the other requirements of <u>Section 13.08(b)</u>.

(d)     <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Borrower, any Revolving LC Issuer or the Administrative Agent, sell participations to any Person (other than a natural Person; or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person; or the Borrower or any of the Borrower's Affiliates or Subsidiaries; or an Ineligible Assignee) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); <u>provided</u> that: (i) such Lender's obligations under this Agreement shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations; and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the reimbursement obligations under <u>Section 13.03(c)</u> with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver requiring the consent of all Lenders, as set forth in <u>Sections 13.01(b)</u>, <u>(c)</u> and <u>(f)</u>, that affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 4.03</u>, <u>4.04</u>, <u>4.05</u>, <u>4.06</u> and <u>4.09</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (b)</u> of this <u>Section 13.08</u>; <u>provided</u> that such Participant agrees to be subject to the provisions of <u>Section 4.09</u> as if it were an assignee under <u>clause (b)</u> of this <u>Section 13.08</u>.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 4.08</u> as though it were a Lender; <u>provided</u> that such Participant agrees to be subject to <u>Section 4.07</u> as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans, Commitments or other rights or obligations under the Loan Documents (each such register, a "<u>Participant Register</u>"); <u>provided</u>, that no Lender shall have any obligation to disclose all or any portion of any Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or other rights or obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other right or obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in a Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Sections 4.03</u>, <u>4.05</u> and <u>4.06</u> than the applicable Lender would have

been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(f)    <u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    <u>Assignments to Borrower and Affiliated Lenders</u>.  Notwithstanding anything to the contrary contained herein but subject to recording thereof by the Administrative Agent pursuant to <u>Section 13.08(c)</u>, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans (<u>provided</u>, <u>however</u>, that each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Term Loan) to one or more Affiliates of the Borrower (other than Subsidiaries of the Borrower or Affiliates of the Borrower that are natural persons) (such Affiliates of the Borrower, "<u>Affiliated Lenders</u>") or the Borrower on a non-*pro rata* basis among the Lenders pursuant to (x) open market purchases or (y) one or more Dutch Auctions open to all Lenders holding the relevant Term Loans on a *pro rata* basis (provided that (A) notice of the Dutch Auction shall be made to all Term Loan Lenders and (B) the Dutch Auction shall be conducted pursuant to such procedures as the Auction Manager may establish which are consistent with the Dutch Auction procedures set forth on <u>Schedule 13.08(g)</u> and are otherwise reasonably acceptable to the Borrower and the Auction Manager) , in each case, without the consent of the Administrative Agent; <u>provided</u> that:

(i)    any Term Loans acquired by the Borrower shall be retired and cancelled immediately upon the acquisition thereof; <u>provided</u> that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans so retired and cancelled, and each principal repayment installment with respect to the Term Loans pursuant to <u>Section 3.01(b)</u> shall be reduced on a pro rata basis by the full par value of the aggregate principal amount of Term Loans so cancelled;

(ii)    the relevant Affiliated Lender or the Borrower (as applicable) and assigning Lender shall have executed and delivered an Affiliated Lender Assignment and Assumption;

(iii)    after giving effect to the relevant assignment and to all other assignments to all Affiliated Lenders, the aggregate principal amount of all Term Loans then held by all Affiliated Lenders shall not exceed twenty percent (20%) of the aggregate principal amount of the Term Loans then outstanding (after giving effect to any substantially simultaneous cancellations thereof) (the "<u>Affiliated Lender Cap</u>"); <u>provided</u> that each party hereto acknowledges and agrees that the Administrative Agent shall not be liable for any losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever incurred or suffered by any Person in connection with any compliance or non-compliance with this clause (g)(iii) or any purported assignment exceeding the Affiliated Lender Cap; <u>provided</u>, <u>further</u>, that to the extent that any assignment to any Affiliated Lender would result in the aggregate

148

principal amount of Term Loans held by Affiliated Lenders exceeding the Affiliated Lender Cap (after giving effect to any substantially simultaneous cancellations thereof), the assignment of the relevant excess amount shall be null and void;

(iv)    in connection with any assignment effected by the Borrower pursuant to this Section 13.08(g), (A) no Event of Default shall exist at the time of acceptance of bids for the assignment and (B) the Borrower shall not use the proceeds of any Revolving Loans for any such assignment;

(v)    by its acquisition of Term Loans, each relevant Affiliated Lender shall be deemed to have acknowledged and agreed that:

(A)    the Term Loans held by such Affiliated Lender shall be disregarded in both the numerator and denominator in the calculation of any Required Lender or other Lender vote (and the Term Loans held by such Affiliated Lender shall be deemed to be voted *pro rata* along with the other Lenders that are not Affiliated Lenders); provided that (x) such Affiliated Lender shall have the right to vote (and the Term Loans held by such Affiliated Lender shall not be so disregarded) with respect to any amendment, modification, waiver, consent or other action that (1) increases the commitment of such Affiliated Lender, (2) reduces the principal, interest, fees or premium of or due to such Affiliated Lender, (3) extends the final maturity or other due date of any amortization, interest, fee or premium due to such Affiliated Lender and (4) requires the vote of all Lenders or all Lenders directly and adversely affected thereby, as the case may be, and (y) no amendment, modification, waiver, consent or other action shall (1) disproportionately affect such Affiliated Lender in its capacity as a Term Loan Lender as compared to other Term Loan Lenders that are not Affiliated Lenders or (2) deprive any Affiliated Lender of its share of any payments which the Lenders are entitled to share on a *pro rata* basis hereunder, in each case without the consent of such Affiliated Lender;

(vi)    such Affiliated Lender, solely in its capacity as an Affiliated Lender, will not be entitled to (i) attend (including by telephone) or participate in any meeting or discussion (or portion thereof) among the Administrative Agent or any Lender or among Lenders to which the Obligors or their representatives are not invited or (ii) receive any information or material prepared by the Administrative Agent or any Lender or any communication by or among the Administrative Agent and one or more Lenders, except to the extent such information or materials have been made available by the Administrative Agent or any Lender to any Obligor or its representatives (and in any case, other than the right to receive notices of prepayments and other administrative notices in respect of its Term Loans required to be delivered to Lenders pursuant to Article II);

(vii)    such Affiliated Lender shall either (A) represent and warrant as of the date of any such assignment or purchase, that it does not have any material non-public information with respect to the Borrower and its Subsidiaries that has not been disclosed to the assigning Term Loan Lender (unless such assigning Lender does not wish to receive material non-public information with respect to the Borrower or the Subsidiaries) prior to such date or (B) disclose that it cannot make the representation and warranty described in clause (A); and

(viii)    in case of the pendency of any proceeding under any Debtor Relief Law, each Affiliated Lender (x) authorizes the Administrative Agent to take all action on such Affiliated

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

Lender's behalf as directed by the Required Lenders and (y) hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) in furtherance thereof and (z) agrees to not object to any action taken by the Administrative Agent in connection with the pendency of such proceeding;

provided, that clauses (iii) and (v) – (viii) of this Section 13.08(g) shall not apply to Affiliated Lenders that are Affiliated Debt Funds.

Section 13.09  Other Transactions.    Nothing contained herein shall preclude the Administrative Agent, the Lead Arranger, any Lender or any Revolving LC Issuer from engaging in any transaction, in addition to those contemplated by the Loan Documents, with an Obligor or any of its Affiliates in which the Obligor or such Affiliate is not restricted hereby from engaging with any other Person.

Section 13.10  Independence of Covenants and Default Provisions.    All covenants and default provisions contained in this Agreement or any other Loan Document shall be given independent effect such that, in the event a particular action or condition is not permitted by any of such covenants or default provisions, the fact that it would be permitted by an exception to, or be otherwise within the limitations of, another covenant or default provision shall not, unless expressly so provided in such first covenant or default provision, avoid the occurrence of a Default if such action is taken or such condition exists.

Section 13.11  Confidentiality.  Each Credit Party that is a party hereto agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed: (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process; (d) to the Administrative Agent; (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section 13.11, to: (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement; or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) on a confidential basis to: (i) any rating agency in connection with rating the Loans; or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; (h) with the consent of the Borrower; or (i) to the extent such Information: (x) becomes publicly available other than as a result of a breach of this Section 13.11; (y) becomes available to any Credit Party or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower which is not actually known by the applicable Credit Party to be bound by a confidential relationship with or obligation of confidentiality to the Borrower or by a confidentiality or other similar agreement; or (z) is independently developed by a Credit Party or any of their respective Affiliates.

For purposes of this Section 13.11, "Information" means all information received from an Obligor or any of its Subsidiaries relating to an Obligor or any of its Subsidiaries, or any of their respective businesses, other than any such information that is available to a Credit Party on a nonconfidential basis prior to disclosure by an Obligor or any of its Subsidiaries; provided that, in the case of information received from an Obligor or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 13.11 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person accords to its own confidential information concerning its portfolio of privately placed notes and loans.

Section 13.12  Governing Law; Jurisdiction; etc.

(a)    Governing Law.  EACH LOAN DOCUMENT (EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN A LOAN DOCUMENT) WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK) WITHOUT GIVING EFFECT TO ITS PRINCIPLES OR RULES OF CONFLICT OF LAWS TO THE EXTENT SUCH PRINCIPLES OR RULES ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

(b)    Jurisdiction.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS, ANY REVOLVING LC ISSUER, OR THE OBLIGORS IN CONNECTION HEREWITH OR THEREWITH SHALL BE BROUGHT AND MAINTAINED IN THE COURTS OF THE BOROUGH OF MANHATTAN OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN (INCLUDING ANY APPELLATE COURT THEREOF); PROVIDED THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.

(c)    Waiver of Venue.  EACH OBLIGOR HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY OBLIGOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH OBLIGOR HEREBY IRREVOCABLY

151

WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

(d)    <u>Service of Process</u>.  EACH OBLIGOR IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN <u>SECTION 13.02</u> OR TO ITS AGENT DESIGNATED FOR SUCH PURPOSE.

Section 13.13 <u>Waiver of Jury Trial</u>.  THE ADMINISTRATIVE AGENT, EACH LENDER, EACH REVOLVING LC ISSUER, AND EACH OBLIGOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER, SUCH REVOLVING LC ISSUER, OR SUCH OBLIGOR IN CONNECTION THEREWITH.      EACH OBLIGOR ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT, EACH LENDER AND EACH REVOLVING LC ISSUER ENTERING INTO THE LOAN DOCUMENTS.

Section 13.14 <u>PATRIOT Act</u>.

(a)    Each Lender that is subject to the PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Obligor that pursuant to the requirements of the PATRIOT Act it is required to obtain, verify and record information that identifies each Obligor, which information includes the name, address and tax identification number of each Obligor and other information regarding each Obligor that will allow such Lender or the Administrative Agent, as applicable, to identify each Obligor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

(b)    Each Lender or assignee or Participant of a Lender that is not incorporated under the laws of the United States or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the PATRIOT Act and the applicable regulations because it is both: (x) an Affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country; and (y) subject to supervision by a banking regulatory authority regulating such affiliated depository institution or foreign bank) shall deliver to the Administrative Agent the certification or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the PATRIOT Act and the applicable regulations thereunder: (i) within ten (10) days after the Closing Date or, if later, the date such Lender, assignee or Participant of a Lender becomes a Lender, assignee or Participant of a Lender hereunder; and (ii) at such other times as are required under the PATRIOT Act.

Section 13.15 <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby, each Obligor acknowledges and agrees, and acknowledges their applicable Affiliates' understanding, that: (a) the credit facilities provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Affiliates, on the one hand, and the Credit Parties and the Lead Arranger, on the other hand, and each Obligor is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (b) in connection with the process leading to such transaction, the Credit Parties and the Lead Arranger are and have been acting solely as a principal and are not the agent or fiduciary for the Obligors or any of their Affiliates, stockholders, creditors or employees or any other Person; (c) neither the Credit Parties nor the Lead Arranger has assumed or will assume an advisory, agency or fiduciary responsibility in favor of any Obligor with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether a Credit Party or any Lead Arranger has advised or is currently advising any Obligor or any of its Affiliates on other matters) and neither the Credit Parties nor the Lead Arranger has any obligation to the Obligors or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (d) the Credit Parties and the Lead Arranger and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Obligors and their Affiliates, and neither the Credit Parties nor the Lead Arranger has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (e) the Credit Parties and the Lead Arranger have not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and each Obligor has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  Each Obligor hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against any Credit Party or the Lead Arranger with respect to any breach or alleged breach of agency or fiduciary duty.

Section 13.16 <u>Judgment Currency</u>.

(a)    The obligations of the Obligors hereunder and under the other Loan Documents to make payments in a specified currency (the "<u>Obligation Currency</u>") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by a Lender of the full amount of the Obligation Currency expressed to be payable to it under this Agreement or another Loan Document.  If, for the purpose of obtaining or enforcing judgment against an Obligor in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "<u>Judgment Currency</u>") an amount due in the Obligation Currency, the conversion shall be made, at the rate of exchange (as quoted by the Administrative Agent or, if the Administrative Agent does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Administrative Agent) determined, in each case, as of the Business Day immediately preceding the date on which the judgment is

*ITOI Amended and Restated Credit and Guaranty Agreement*
NYDOCS02/1191319

given (such Business Day being hereinafter referred to as the "<u>Judgment Currency Conversion Date</u>").

(b)    If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, each Obligor covenants and agrees to pay, or cause to be paid, or remit, or cause to be remitted, such additional amounts, if any (but in any event not a lesser amount), as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate of exchange prevailing on the Judgment Currency Conversion Date.

(c)    For purposes of determining any rate of exchange or currency equivalent for this <u>Section 13.16</u>, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

Section 13.17  <u>Scope of Liability</u>.  Notwithstanding any other provision of the Loan Documents (but subject to the last sentence of this <u>Section 13.17</u>), there shall be no recourse against Sponsor, any of Sponsor's Affiliates (except for the Obligors), or the members or other owners, officers, directors or employees of any of them (each, a "<u>Non-Recourse Party</u>"), for any liability to the Credit Parties arising in connection with any breach or Default under this Agreement except to the extent the same is enforced against the Obligors and the Collateral and the rents, issues, profits, proceeds and products of the Collateral, and the Credit Parties shall look solely to the Obligors (but not to any Non-Recourse Party or to any distributions received by any Non-Recourse Party pursuant to the terms of this Agreement except as provided herein and in the other Loan Documents) and the Collateral and the rents, issues, profits, proceeds and products of the Collateral in enforcing rights and obligations under and in connection with the Loan Documents; <u>provided</u> that: (a) the foregoing provisions of this <u>Section 13.17</u> shall not constitute a waiver, release or discharge of any of the indebtedness, or of any of the terms, covenants, conditions, or provisions of this Agreement or any other Loan Document (but without personal liability to the Non-Recourse Parties except as provided herein and therein), and the same shall continue until the Commitments have been terminated and all Obligations have been fully paid, discharged, observed, or performed; (b) the foregoing provisions of this <u>Section 13.17</u> shall not limit or restrict the right of any Credit Party to name any Obligor or any other Person as a defendant in any action or suit for a judicial foreclosure or for the exercise of any other remedy under or with respect to this Agreement or any other Loan Document, or otherwise, or for injunction or specific performance, so long as no judgment in the nature of a deficiency judgment shall be enforced against any Non-Recourse Party out of any property, assets or funds other than the Collateral and the rents, issues, profits, proceeds or products of the Collateral, and any other property of any Obligor; and (c) the foregoing provisions of this <u>Section 13.17</u> shall not affect or diminish or constitute a waiver, release or discharge of any specific written obligation, covenant, or agreement made by any of the Non-Recourse Parties or any security granted by the Non-Recourse Parties in support of the obligations of such Persons under any guarantee or as security for the obligations of the Borrower. Notwithstanding the foregoing, it is expressly understood and agreed that nothing contained in this <u>Section 13.17</u> shall be deemed to: (x) limit or restrict any right or remedy of a Credit Party (or any assignee or beneficiary thereof or successor thereto) with respect to, and the Obligors and all of the other Persons described above shall remain fully liable to the extent that such Person would

154

otherwise be liable for its own actions with respect to any fraud, willful misconduct or gross negligence; or (y) limit in any respect the enforceability against the Obligors of the Loan Documents in accordance with their respective terms.

Section 13.18 <u>Obligations Several; Independent Nature of Lenders' Rights</u>.    The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lenders shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof, subject to the Collateral Agency and Intercreditor Agreement, and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 13.19 <u>Collateral Agency and Intercreditor Agreement</u>.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document:

(a)    the Liens granted to the Collateral Agent in favor of the Secured Parties pursuant to the Pledge and Security Agreement and the other Loan Documents and the exercise of any right related to any Collateral by the Collateral Agent shall be subject to the terms of the Collateral Agency and Intercreditor Agreement;

(b)    in the event of any conflict between the express terms and provisions of this Agreement or any other Loan Document, on the one hand, and the Collateral Agency and Intercreditor Agreement, on the other hand, the terms and provisions of the Collateral Agency and Intercreditor Agreement shall control; and

(c)    each Lender authorizes the Administrative Agent and the Collateral Agent to execute the Collateral Agency and Intercreditor Agreement on behalf of such Lender, and such Lender agrees to be bound by the terms thereof.

Section 13.20 <u>Collateral Agent and Depositary Bank</u>.  Each of the Collateral Agent and the Depositary Bank is entitled to all rights, privileges, protections, benefits, immunities and indemnities provided to such Person under the Collateral Agency and Intercreditor Agreement, Depositary Agreement and the other Loan Documents.  Each of the Collateral Agent and the Depositary Bank is an intended third-party beneficiary of this Agreement.  Each Lender and each Revolving LC Issuer (and each Person that becomes a Lender or Revolving LC Issuer pursuant to <u>Section 13.08(b)</u>) hereby: (a) authorizes and directs each of the Collateral Agent and the Depositary Bank to enter into the Loan Documents to which it is a party on behalf of such Lender and Revolving LC Issuer, as applicable; (b) consents to and ratifies the terms of the Loan Documents to which the Collateral Agent and Depositary Bank parties; and (c) agrees that the Collateral Agent and Depositary Bank may take such actions on behalf of such Lender or Revolving LC Issuer as are contemplated by the terms of the Loan Documents.  Neither the Collateral Agent nor any of its officers, directors, employees or agents shall have any responsibility for taking any necessary steps to establish or maintain perfection of the Lien (including the filing of any financing statements) granted in its favor hereunder or preserve rights against any parties or any other rights pertaining to any Collateral.

155

Section 13.21 <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(a)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority

Section 13.22 <u>Certain ERISA Matters</u>.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and each Lead Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any Subsidiary Guarantor, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the letters of credit or the Commitments;

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the letters of credit, the Commitments and this Agreement;

*ITOI Amended and Restated Credit and Guaranty Agreement*

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the letters of credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the letters of credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the letters of credit, the Commitments and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Agents and each Lead Arranger and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any Subsidiary Guarantor, that:

(i)    none of the Agents or any Lead Arranger or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, the Loan Documents or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the letters of credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21, as amended from time to time) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50,000,000, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the letters of credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the letters of credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the letters of credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

*ITOI Amended and Restated Credit and Guaranty Agreement*

(v)    no fee or other compensation is being paid directly to the Agents or the Lead Arrangers or any of their respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the letters of credit, the Commitments or this Agreement.

(c)    The Agents and each Lead Arranger hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the letters of credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the letters of credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the letters of credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 13.23  Acknowledgement Regarding Any Supported QFCs.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with

respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

*[Signature pages to follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

INVENERGY THERMAL OPERATING I LLC, as Borrower

By: _____
Name:
Title:

[Signature Page to ITOI Amended and Restated Credit and Guaranty Agreement]

INVENERGY THERMAL LLC,
as Subsidiary Guarantor


By: _____
     Name:
     Title:

INVENERGY DEVELOPMENT COMPANY
LLC,
as Subsidiary Guarantor

By: _____
Name:
Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

INVENERGY NELSON HOLDINGS LLC,
as Subsidiary Guarantor

By: _____
     Name:
     Title:

ECTOR COUNTY ENERGY CENTER HOLDING
LLC,
as Subsidiary Guarantor


By: _____
     Name:
     Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

INVENERGY GRAYS HARBOR HOLDINGS LLC,
as Subsidiary Guarantor


By: _____
     Name:
     Title:

INVENERGY GRAYS HARBOR LLC,
as Subsidiary Guarantor

By: _____
      Name:
      Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

INVENERGY NELSON LLC,
as Subsidiary Guarantor


By: _____
       Name:
       Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

ECTOR COUNTY ENERGY CENTER LLC,
as Subsidiary Guarantor

By: _____
Name:
Title:

GRAYS HARBOR ENERGY LLC,
as Subsidiary Guarantor


By: _____
       Name:
       Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH,
as Collateral Agent

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Lender and Revolving LC Issuer


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]

GOLDMAN SACHS BANK USA,
as Lender and Revolving LC Issuer


By: _____
      Name:
      Title:

[_____],
as Lender

By: _____
     Name:
     Title:

[Signature Page to ITOI Amended & Restated Credit and Guaranty Agreement]