## EXHIBIT 1

**Revised Proposed Complaint**

29439286.1

**Exhibit B**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ECTOR COUNTY ENERGY CENTER LLC,[1]<br><br>     Debtor. | Chapter 11<br><br>Case No. 22-10320 (JTD) |
| DIRECT ENERGY BUSINESS MARKETING, LLC, on behalf of the estate of Ector County Energy Center LLC<br><br>     Plaintiff,<br><br>   -against-<br><br>INVENERGY THERMAL OPERATING I LLC, INVENERGY AMPCI THERMAL POWER LLC, INVENERGY THERMAL LLC, INVENERGY DEVELOPMENT COMPANY LLC, INVENERGY NELSON HOLDINGS LLC, ECTOR COUNTY ENERGY CENTER HOLDINGS LLC, INVENERGY GRAYS HARBOR HOLDINGS LLC, INVENERGY GRAYS HARBOR LLC, INVENERGY NELSON LLC, ECTOR COUNTY ENERGY CENTER LLC, GRAYS HARBOR ENERGY LLC, INVENERGY SERVICES THERMAL US LLC, INVENERGY SERVICES LLC, CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH<br><br>     Defendants. | Adv. Pro. No. _____ |

## [PROPOSED] COMPLAINT

---

[1]  The last four digits of the Debtor's federal tax identification are 6852.  The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.

Direct Energy Business Marketing LLC ("Direct Energy" or "Plaintiff"), the largest unsecured creditor of the above-captioned debtor in possession (the "Debtor"), having been granted authority to commence and prosecute certain claims on behalf of the Debtor's estate, for its complaint against Invenergy Thermal Operating I LLC ("ITOI"), Invenergy AMPCI Thermal Power LLC ("IAMPCI"), Invenergy Thermal LLC, Invenergy Development Company LLC, Invenergy Nelson Holdings LLC, Ector County Energy Center Holdings LLC, Invenergy Grays Harbor Holdings LLC, Invenergy Grays Harbor LLC, Invenergy Nelson LLC, Grays Harbor Energy LLC,[2] Invenergy Services Thermal US LLC ("Thermal"), Invenergy Services LLC ("Services"), and Credit Suisse AG, Cayman Islands Branch ("Credit Suisse"), in its capacity as the administrative and collateral agent for the Invenergy Secured Lenders (defined below), hereby alleges as follows:

### NATURE OF THE ACTION[3]

1.     The Debtor's Chapter 11 Case is nothing more than an attempt by its parent entities ("Invenergy"), who indisputably control the Debtor's governing board, to retain value on account of equity in the Debtor by sidestepping the Debtor's liabilities to Direct Energy, who holds an approximately $400 million contingent liability claim against the Debtor, and other general unsecured creditors.

2.     With these goals in mind, Invenergy caused the Debtor to take a number of inappropriate actions to the detriment of itself and its creditors, for the benefit of only Invenergy

---

[2]    Invenergy Thermal LLC, Invenergy Development Company LLC, Invenergy Nelson Holdings LLC, Ector County Energy Center Holdings LLC, Invenergy Grays Harbor Holdings LLC, Invenergy Grays Harbor LLC, Invenergy Nelson LLC, and Grays Harbor Energy LLC are each a Subsidiary Guarantor under the Credit Agreement (defined below) and are referred to collectively here as the "Subsidiary Guarantors."

[3]    Capitalized terms not otherwise defined have the meanings given to them below.

and its secured lenders (the "Invenergy Secured Lenders"), while rendering the Debtor an empty box from which the Debtor's unsecured creditors, including Direct Energy, would have no hope of any meaningful recovery on their claims.

3.     Invenergy's scheme has been effectuated in several steps:   *First*, Invenergy orchestrated the sale of virtually all of the Debtor's assets for roughly $91 million (the "Sale") pursuant to a stalking horse asset purchase agreement (the "APA"), initially dated March 3, 2022 and amended on March 31, 2022 solely to add a provision whereby the purchaser agreed that it would not pursue any avoidance actions against the Invenergy Secured Lenders acquired from the Debtor in connection with the Sale.

4.     *Second*, less than one week later, and within days of the commencement of the chapter 11 case (the "Chapter 11 Case"), on April 4, 2022, Invenergy caused the Debtor to execute Amendment No. 4 to the Credit Agreement, pursuant to which the Debtor incurred a $75 million direct obligation to the Invenergy Secured Lenders (the "Direct Obligation"), relieving ITOI of its obligation to make the $75 million payment upon the disposition of the Debtor's assets.

5.     *Third*, also on April 4, 2022, Invenergy caused the Debtor to enter into a plan support agreement (the "PSA"), which, among other things, provides for the Sale, the proceeds of which are to be used to make $75 million in prepayments to the Invenergy Secured Lenders and more than $10 million to fund chapter 11 administrative expenses and a wind-down budget, leaving only $5 million available for all general unsecured creditors (the "Proposed Waterfall"). *See* PSA at Ex. B (Term Sheet).  In addition, the PSA obligates the Debtor to abandon avoidance actions (inclusive of claims against the Invenergy Secured Lenders) and to release the party who has controlled and obligated the Debtor to this process—Invenergy.

6.     *Fourth*, only seven days later, on April 11, 2022 (the "Petition Date"), Invenergy caused the Debtor to file this Chapter 11 Case with the intent of consummating the Sale pursuant to section 363 of the Bankruptcy Code so that the assets could be sold free and clear of any claims, liens, and encumbrances.

7.     *Fifth*, on May 10, 2022, the Debtor filed a motion (Docket No. 141) seeking authorization to obtain $5 million of post-petition financing (the "DIP Financing") from its insider indirect parent, ITOI, in exchange for among other things, the Debtor's broad release of ITOI and its affiliates from ***all claims*** other than pursuant to the PSA, the DIP Facility Documents, and the Final DIP Order.

8.     Based on these facts and others set forth below, Direct Energy, on behalf of the Debtor's estate, seeks to prevent Invenergy's improper attempt to subvert the Debtor's general unsecured creditors by siphoning the vast majority of the value of the Sale to prepay Invenergy's own debts by requesting an order (i) avoiding the $75 million obligation incurred by the Debtor via Amendment No. 4 to the Credit Agreement as an intentional or constructive fraudulent incurrence, and (ii) seeking subrogation against ITOI and contribution from the Subsidiary Guarantors for the amounts the Debtor will be forced to pay to the Invenergy Secured Lenders under the PSA upon the occurrence of the Sale.

9.     Direct Energy, on behalf of the Debtor, also seeks damages stemming from the IAMPCI's and ITOI's (together, the "Invenergy Fiduciary Defendants") breaches of their fiduciary duties occasioned by the effectuation of their scheme to benefit Invenergy at the Debtor's expense by authorizing and approving Amendment No. 4 and the PSA, and causing the unnecessary filing of this Chapter 11 Case, among other things.

10.     Finally, Direct Energy seeks to avoid and recover for the benefit of the Debtor's

estate amounts paid to insiders Services and Thermal (together, the "Invenergy Service Providers")

on the Petition Date.[4]

## JURISDICTION AND VENUE

11.     The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court") has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference of the United States District Court for the District of

Delaware ("District of Delaware") referring to the Bankruptcy Judges of the District of Delaware

all cases and proceedings arising under title 11 of the United States Code (the "Bankruptcy Code").

12.     This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C.

§ 157(b)(2)(A).[5]

13.     Venue in the District of Delaware is and was proper under 28 U.S.C. §§ 1408 and

1409 because this adversary proceeding arises under and is in connection with a case commenced

under the Bankruptcy Code.

## THE PARTIES

**Plaintiff**

14.     Plaintiff is Direct Energy Business Marketing LLC, a limited liability company

with its principal place of business at 194 Wood Ave. South, Iselin, New Jersey 08830.  Plaintiff

holds an unsecured, contingent claim against the Debtor totaling nearly $400,000,000.  Direct

---

[4]   Direct Energy reserves the right to amend the Complaint to assert additional preference claims against insiders of the Debtor, as such preferences become known.

[5]   Bankruptcy Rule 7008 requires Direct Energy to state whether it consents to the entry of final orders or judgments.  Direct Energy has not yet determined its position on this issue but will do so promptly upon a grant of standing and prior to the filing of any final complaint.

Energy has been authorized to prosecute the claims set forth herein on behalf of the Debtor's estate pursuant to the order of the Honorable John T. Dorsey, dated [____].

**Defendants**[6]

15.    Defendant Invenergy Thermal Operating I LLC is a Delaware limited liability company.  ITOI is the indirect parent of the Debtor.  Like the Debtor, ITOI's principal place of business is 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  ITOI has a portfolio of seven natural gas-fired power plants, located across the United States and Canada, including the Debtor.  On information and belief, ITOI is an indirect subsidiary of IAMPCI and, like the Debtor, is ultimately controlled and managed by IAMPCI.

16.    Defendant Invenergy AMPCI Thermal Power LLC is a Delaware limited liability company.  IAMPCI is the sole manager of Invenergy Thermal Operating I Holdings LLC, which is the sole manager of ITOI, which is the sole manager of Invenergy Thermal LLC, which is the sole manager of Ector County Energy Center Holding LLC, which is the sole manager of the Debtor.  The Board of Managers of the IAMPCI purportedly has the right and authority—which it calls the "Indirect Ultimate Authority"—to oversee the management of the business and affairs of the Debtor.  *See* Ector County Energy Center LLC, Unanimous Written Consent of Special Committee, dated April 8, 2022, attached to the Debtor's Voluntary Petition (Docket No. 1) (the "Unanimous Written Consent").

17.    Defendant Invenergy Thermal LLC is a Delaware limited liability company.  Invenergy Thermal LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its

---

[6]    Direct Energy reserves the right to name additional defendants, either through the amendment of this complaint if standing is granted and such defendants are related to the defendants named herein, or through a subsequent motion for standing to bring claims against additional defendants.

principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Invenergy Thermal LLC is a Subsidiary Guarantor under the Credit Agreement.

18.     Defendant Invenergy Development Company LLC is a Delaware limited liability company.  Invenergy Development Company LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Invenergy Development Company LLC is a Subsidiary Guarantor under the Credit Agreement.

19.     Defendant Invenergy Nelson Holdings LLC is a Delaware limited liability company.  Invenergy Nelson Holdings LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Invenergy Nelson Holdings LLC is a Subsidiary Guarantor under the Credit Agreement.

20.     Defendant Ector County Energy Center Holdings LLC is a Delaware limited liability company.  Ector County Energy Center Holdings LLC is a non-debtor parent of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Ector County Energy Center Holdings LLC is a Subsidiary Guarantor under the Credit Agreement.

21.     Defendant Invenergy Grays Harbor Holdings LLC is a Delaware limited liability company.  Invenergy Grays Harbor Holdings LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Invenergy Grays Harbor Holdings LLC is a Subsidiary Guarantor under the Credit Agreement.

22.     Defendant Invenergy Grays Harbor LLC is a Delaware limited liability company. Invenergy Grays Harbor LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Invenergy Grays Harbor LLC is a Subsidiary Guarantor under the Credit Agreement.

23.     Defendant Invenergy Nelson LLC is a Delaware limited liability company. Invenergy Nelson LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Invenergy Nelson LLC is a Subsidiary Guarantor under the Credit Agreement.

24.      Defendant Grays Harbor Energy LLC is a Delaware limited liability company. Grays Harbor Energy LLC is a non-debtor affiliate of the Debtor and a subsidiary of ITOI, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Grays Harbor Energy LLC is a Subsidiary Guarantor under the Credit Agreement.

25.     Defendant Invenergy Services Thermal US LLC is a Delaware limited liability company.  Thermal is a non-debtor affiliate of the Debtor, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Thermal is responsible for administration of all project agreements and financing documents, and general operations and oversight of the Debtor's Power Plant, pursuant to a Facilities Management Agreement, dated November 25, 2014 (the "FMA").

26.     Defendant Invenergy Services LLC is a Delaware limited liability company is a Delaware limited liability company.  Services is a non-debtor affiliate of the Debtor, with its principal place of business also located at 1 South Wacker Drive, Suite 1800, Chicago, Illinois 60606.  Services serves as the Debtor's "energy manager" pursuant to an Energy Management

Agreement, dated November 2, 2017 (the "EMA" and with the FMA, the "Shared Services Agreements").

27.     Defendant Credit Suisse AG, Cayman Islands Branch is a Swiss corporation with an office at Eleven Madison Avenue, New York, New York.  Credit Suisse is the Administrative Agent and Collateral Agent for the Invenergy Secured Lenders under the Credit Agreement (as amended).

## BACKGROUND

### A.     The Debtor Is A Subsidiary Guarantor Under Invenergy's Credit Agreement

28.     The Debtor is the owner and operator of a 330 MW natural gas-fired electricity-generating facility ("Power Plant") located in Ector County, Texas.  Its indirect parent, ITOI, has a portfolio of seven natural gas-fired power plants, including the Debtor, located across the U.S. and Canada.  ITOI is ultimately controlled and managed by Invenergy LLC, a large private equity firm that develops, owns, and operates power generation facilities around the globe, comprising a portfolio of approximately 190 projects.

29.     ITOI is the borrower and primary obligor under a secured Credit and Guaranty Agreement, dated August 28, 2018 (as amended, the "Credit Agreement"), with Credit Suisse AG, New York Branch ("Credit Suisse" or the "Administrative Agent"), as administrative agent for the lenders party thereto (*i.e.*, the Invenergy Secured Lenders).[7]  The Debtor and the Subsidiary Guarantors are each guarantors of ITOI's debt under the Credit Agreement (the "Prepetition Secured Loans").

---

[7]  Credit Suisse is also collateral agent under the Pledge and Security Agreement, dated August 28, 2018.

30.     Section 11.01 of the Credit Agreement contemplates the guaranty (the "Guaranty")
of due and punctual payment in full of all secured obligations, but only "*when the same shall
become due*, whether at stated maturity, by required prepayment, declaration, acceleration, or
otherwise." Credit Agmt. § 11.01 (emphasis added). Section 11.03 provides that only "upon the
failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall
become due," the Subsidiary Guarantors shall pay the Guaranteed Obligations at the demand of
the Administrative Agent. *Id.* § 11.03.

31.     Section 11.02 of the Credit Agreement states that "in the event any payment or
distribution is made on any date by a Subsidiary Guarantor (a "Funding Subsidiary Guarantor")
under the Guaranty such that the Aggregate Payments exceeds its Fair Share[8] as of such date, such
Funding Subsidiary Guarantor shall be entitled to a contribution from each of the other
Contributing Subsidiary Guarantors in an amount sufficient to cause each Contributing Subsidiary
Guarantor's Aggregate Payments to equal its Fair Share as of such date." Credit Agmt. § 11.02.
The Credit Agreement also states that the "amounts payable as contributions hereunder shall be
determined as of the date on which the related payment or distribution is made by the applicable
Funding Subsidiary Guarantor." *Id.*

---

[8]     "Fair Share" is defined in the Credit Agreement to be "(a) the ratio of: (i) the Fair Share
Contribution Amount with respect to such Contributing Subsidiary Guarantor; to (ii) the aggregate of the
Fair Share Contribution Amounts with respect to all Contributing Subsidiary Guarantors; *multiplied* by (b)
the aggregate amount paid or distributed on or before such date by all Funding Subsidiary Guarantors under
the Guaranty in respect of the Guaranteed Obligations." Credit Agmt. at 26.

Each Contributing Subsidiary Guarantor's "Fair Share Contribution Amount" is equal to, with
respect to that Contributing Subsidiary Guarantor, "the maximum amount of the obligations of such
Contributing Subsidiary Guarantor under the Guaranty that would not render its obligations under Article
XI subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United
States Code or any comparable applicable provisions of state law . . . ." *Id.*

32.     The Credit Agreement contemplated certain circumstances in which ITOI would be obligated to make mandatory prepayments to the Invenergy Secured Lenders.  Relevant here, and prior to April 4, 2022, the Credit Agreement provided that upon a sale, transfer, or other disposition of the property and assets of the Debtor (an "Ector Disposition"), *ITOI* (*not the Debtor*) was required to make a prepayment on the Prepetition Secured Loans equal to $75 million.  The Debtor had no primary obligation to prepay the Prepetition Secured Loan upon an Ector Disposition—that obligation was squarely ITOI's as the primary borrower.

33.     The Credit Agreement was amended several times between August 2018 and March 2022, but none of those amendments altered ITOI's obligation to make the $75 million mandatory prepayment upon an Ector Disposition.  That is, until April 4, 2022, on the eve of this Chapter 11 Case.

**B.      Invenergy Attempts To Hinder And Delay And Defraud After The Debtor Is Sued By Direct Energy**

34.     Prior to Winter Storm Uri, the Debtor and Direct Energy were party to a financially settled heat rate call option, memorialized in a Transaction Confirmation and ISDA Master Agreement, signed October 18, 2017 (the "Agreement"), pursuant to which Direct Energy made fixed monthly cash payments and the Debtor agreed that, if Direct Energy exercised its option, the Debtor would pay Direct Energy the excess of market power price and generating costs of electricity.[9]  Given that the Agreement was financially settled, it did not contemplate or require an actual exchange of energy, and was not actually tied to whether any Power Plant could or could not operate.

---

[9]    *See* Amended Complaint, *Direct Energy Business Marketing, LLC v. Ector County Energy Center, LLC, et al.*, Index No. 653977/2021 (Docket No. 70), filed January 27, 2022, ¶ 4.

35.     Winter Storm Uri struck Texas in mid-February 2021, during which Invenergy took the Power Plant offline, despite the fact that gas was available to run the plant, albeit at a higher cost than usual.  On February 13, 2021, Invenergy sent a notice of a force majeure event to Direct Energy, asserting that the storm prevented the Power Plant from generating energy and, because of that, the Debtor could not perform under the Agreement.  Notably, neither Invenergy nor the Debtor asserted that the storm prevented the Debtor from making the contractually required payments to Direct Energy—which had exercised its option under the Agreement—because it did not.  Financial payments only required that the financial system was functioning, which it was.  Moreover, neither Invenergy nor the Debtor ever disputed that Direct Energy properly exercised its option rights.

36.     The parties thereafter entered into a standstill agreement, deferring payments and invoicing in order to engage in settlement discussions.  By April 30, 2021, the Debtor owed Direct Energy approximately $400 million.  *Id.* ¶ 7.

37.     In May 2021, the *Debtor* filed suit against *Direct Energy*, alleging that the Agreement was void.  The lawsuit was commenced in Ector County, Texas, despite the Agreement's exclusive forum selection clause designating New York State as the exclusive forum for disputes.  The Texas court promptly dismissed the Debtor's lawsuit.  *Id.* ¶ 8.

38.     Continuing its refusal to pay Direct Energy the amounts clearly owed to it under the Agreement, in June 2021, Invenergy, on behalf of the Debtor, submitted a fraudulent drawdown demand to Credit Suisse, falsely asserting that Direct Energy owed the Debtor more than $840,000 under the same agreement the Debtor had just branded null and void in Texas.  *Id.* ¶ 9.  Thereafter, Direct Energy commenced suit in New York Supreme Court against the Debtor

and Invenergy, asserting a claim for damages in an amount in excess of $400 million, none of which the Debtor or Invenergy has paid.

39.    The Debtor's and Invenergy's evasion of their obligations under the Agreement continued.  They refused to provide Direct Energy with discovery in the New York State action, and upon information and belief, even directed Credit Suisse to withhold the Credit Agreement in response to the third-party subpoena served by Direct Energy.  Meanwhile, the Debtor and Invenergy had apparently undertaken a "broad marketing outreach"[10] to sell substantially all of the Debtor's assets, and, on March 3, 2022, entered into the APA with Ector County Generation LLC, an acquisition entity affiliated with Rockland Capital, LLC.

40.    Then, on April 4, 2022, *even though it was faced with no current or impending default thereunder*, Invenergy entered into Amendment No. 4 to the Credit Agreement.  Among other things, Amendment No. 4 purported to relieve ITOI of its obligation to make a mandatory prepayment upon an Ector Disposition under section 3.02(b)(vii) *and instead made the Debtor the party responsible for that prepayment*.  *See* Amendment No. 4 at 83 (amending former section 3.02(b)(vii) (now section 3.08(b)(vii)) to provide that "following the receipt of any Ector Disposition Proceeds (a 'Disposition Proceeds Date') by Ector, *Ector* shall make a mandatory prepayment of the Prepetition Secured Loans in an amount equal to the Ector Target Sale Amount") (emphasis added).  The Debtor does not appear to have received any consideration or benefit in exchange for its new obligation.

---

[10]    *See Declaration of Alexander Svoyskiy in Support of Motion of the Debtor for Orders (I)(A) Authorizing Debtor's Entry into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving A Break-Up Fee and Reduced Break-Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of All Liens, Claims, and Encumbrances and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (Docket No. 8) ¶ 13.

41.     Second, on April 4, 2022 (the same day that Amendment No. 4 was executed), Invenergy caused the Debtor to enter into the PSA, which contemplates a Plan Waterfall pursuant to which $75 million will go to the Invenergy Secured Lenders, and only $5 million will be distributed among all of the Debtor's general unsecured creditors. the PSA obligates the Debtor to provide broad releases to Invenergy and the Invenergy Secured Lenders.

42.     Completing the Debtor's sacrifice, as it was bound to do under the PSA, the Debtor filed for chapter 11 just one week later on April 11, 2022, commencing the Chapter 11 Case. Approximately four weeks later, the Debtor filed a motion (Docket No. 141) seeking authorization to obtain $5 million DIP Financing from its insider indirect parent, ITOI, in exchange for among other things, the Debtor's broad release of ITOI and its affiliates from ***all claims*** other than pursuant to the PSA, the DIP Facility Documents, and the Final DIP Order.[11]

### C.     Invenergy Abuses The Corporate Form

43.     The Debtor has no employees, and relies on its non-debtor affiliates for its day-to-day operations.[12]  Specifically, Services serves as the Debtor's "energy manager" pursuant to the EMA and Thermal is responsible for administration of all project agreements and financing documents, and general operations and oversight of the Power Plant, pursuant to the FMA.[13]

44.     The Debtor was operated and controlled by the same individuals who operated and controlled Invenergy.  Invenergy took advantage of this and utilized employees with roles at both entities to take actions ostensibly on behalf of the Debtor, but in reality at the direction of Invenergy

---

[11]  *See* Proposed Final DIP Order (Docket No. 141-3) ¶ 22.

[12]  *See Declaration of John Baumgartner, Chief Restructuring Officer, in Support of Chapter 11 Petition, First Day Motions, and Related Relief* (Docket No. 2) ¶ 27.

[13]  *See Motion of Debtor for Entry of an Order (I) Authorizing the Debtor to Continue to Perform under Shared Services Agreements, (II) Authorizing Payment of Post-Petition Obligations Accruing under Shared Services Agreements, and (III) Granting Related Relief* (Docket No. 34) ¶ 11.

to whom they were beholden.  Upon information and belief there is significant overlap among the

Debtor's and Invenergy's management.

45.    The organizational structure as is relevant for this Complaint is reflected below.



46.    Through its ownership and shared management, Invenergy completely dominates

the Debtor.  For example, separate and apart from their actions in connection with this Chapter 11

Case, Invenergy and the Debtor acted as a single entity with respect to their dealings with Direct Energy under the Agreement. Invenergy routinely communicated with Direct Energy on the Debtor's behalf regarding the Agreement, doing so through Invenergy employees using Invenergy email addresses and through letters on Invenergy letterhead, and consistently referred to the Debtor and Invenergy as "we."

47. Critically, the Board of Managers of the Debtor's indirect parent, IAMPCI, purportedly has the right and authority—which it calls the "Indirect Ultimate Authority"—to oversee the management of the business and affairs of the Debtor. This "Indirect Ultimate Authority" was exercised by the "Special Committee" of the IAMPCI Board of Managers, comprising five members, only one of which was "independent," who authorized the Debtor to (i) obtain the DIP Financing from ITOI, (ii) sell substantially all of its assets in accordance with the APA, (iii) execute the PSA and the related Amendment No. 4, and (iv) commence this Chapter 11 Case.[14]

48. Notably, the purported "independent" member of the Special Committee, Colin Adams, was selected by the four conflicted members of the Special Committee, and does not have any veto right over any decision made pursuant to the Special Committee's "ultimate authority" over the Debtor.

49. Mr. Adams was appointed as the sole independent member of the Special Committee on March 29, 2022, and participated in his first call on March 30. He first received the relevant agreements—which were the product of months of negotiation by the Debtor's conflicted management—no earlier than April 1 (a Friday), and they were executed the following Monday, April 4.

---

[14] *See* the Unanimous Written Consent.

50.     Adding insult to injury, the Debtor made payments to the Invenergy Service Providers outside of the ordinary course of the Debtor's business on Petition Date.  Under the Shared Services Agreements, in the ordinary course, the Debtor would make payments for services provided the month *after* the provision of such services.  However, on the Petition Date, the Debtor paid the Invenergy Service Providers at least $750,000 for services provided before the Petition Date (the "Services Preferences"), presumably to enable the Invenergy Service Providers to avoid the hassle (and misfortune) of being a prepetition unsecured creditor of the Debtor.

## GROUNDS FOR RELIEF

### COUNT I

### ACTUAL FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §548(a)(1)(A)
**(Against Credit Suisse as Agent for the Invenergy Secured Lenders)**

51.     Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

52.     The Direct Obligation was incurred by the Debtor within 2 years before the Petition Date.

53.     The Direct Obligation was incurred by the Debtor with an actual intent to hinder, delay, and/or defraud the Debtor's unsecured creditors.  Such intent can be inferred from, among other things, (i) the Direct Obligation was incurred for the benefit of insiders of the Debtor (Invenergy), (ii) the Direct Obligation was incurred with little or no consideration to the Debtor, (iii) the Direct Obligation was incurred in the midst of litigation between the Debtor and Direct Energy concerning an approximately $400 million obligation the Debtor owes to Direct Energy, (iv) the Direct Obligation was incurred on the eve of the filing of the Debtor's Chapter 11 Case, (v) the Debtor was either insolvent at the time of its incurrence of the Direct Obligation, or was rendered insolvent by the incurrence, (vi) the Direct Obligation effectively places virtually all of

the Debtor's assets beyond the reach of its unsecured creditors, and (vii) the Debtor, Invenergy, and Credit Suisse repeatedly refused to provide a copy of the Credit Agreement (and Amendment No. 4 thereto) to Direct Energy, even after being served with discovery in connection with the New York State action.

54.    As a result of the Direct Obligation, the Debtor and its unsecured creditors have been harmed.

55.    Pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, the Direct Obligation incurred by the Debtor pursuant to Amendment No. 4 should be avoided by Order of the Court.

**COUNT II**

**CONSTRUCTIVE FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §548(a)(1)(B)**
**(Against Credit Suisse as Agent for the Invenergy Secured Lenders)**

56.    Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

57.    The Direct Obligation was incurred by the Debtor within 2 years before the Petition Date.

58.    The Debtor received no value, much less reasonably equivalent value, in exchange for such obligation.

59.    The Debtor was insolvent, or was rendered insolvent, when it incurred the Direct Obligation.  At the time of its entry into Amendment No. 4, the Debtor had accepted a stalking horse bid of approximately $91.25 million for substantially all of its assets pursuant to an APA wherein the parties contemplated that the assets would be sold in the context of the Chapter 11 Case, free and clear of all claims and liens.  Therefore, the $91.25 million bid is certainly indicative of the fair value of the Debtor's assets.

60.     Meanwhile, the Debtor's liabilities included the approximately $400 million contingent litigation liability as a result of the Direct Energy lawsuit, as well as the contingent Guaranty liability of approximately $337 million under the Credit Agreement.

61.     Upon the incurrence of the Direct Obligation, the Debtor converted its contingent, highly-unlikely-to-be-called-upon Guaranty into a $75 million Direct Obligation to the Invenergy Secured Creditors due upon the (planned) sale of its assets.

62.     The Direct Obligation was incurred with the belief that the Debtor had incurred or would incur debts that would be beyond the Debtor's ability to pay, namely the $400 million debt owed to Direct Energy under the Agreement.

63.     Pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the Direct Obligation incurred by the Debtor in Amendment No. 4 should be avoided by Order of the Court.

## COUNT III

### ACTUAL FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §544 AND APPLICABLE STATE LAW
**(Against Credit Suisse as Agent for the Invenergy Secured Lenders)**

64.     Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

65.     The Direct Obligation was incurred by the Debtor within 4 years of the Petition Date.

66.     The Direct Obligation was incurred by the Debtor with an actual intent to hinder, delay, and/or defraud the Debtor's unsecured creditors.  Such intent can be inferred from, among other things, (i) the Direct Obligation was incurred for the benefit of insiders of the Debtor (Invenergy), (ii) the Direct Obligation was incurred with little or no consideration to the Debtor, (iii) the Direct Obligation was incurred in the midst of litigation between the Debtor and Direct Energy concerning an approximately $400 million obligation the Debtor owes to Direct Energy,

(iv) the Direct Obligation was incurred on the eve of the filing of the Debtor's Chapter 11 Case, (v) the Debtor was either insolvent at the time of its incurrence of the Direct Obligation, or was rendered insolvent by the incurrence, (vi) the Direct Obligation effectively places virtually all of the Debtor's assets beyond the reach of its unsecured creditors, and (vii) the Debtor, Invenergy, and Credit Suisse repeatedly refused to provide a copy of the Credit Agreement (and Amendment No. 4 thereto) to Direct Energy, even after being served with discovery in connection with the New York State action.

67.     As a result of the Direct Obligation, the Debtor and its unsecured creditors have been harmed.

68.     Pursuant to Section 544(b) of the Bankruptcy Code, as representative of the Debtor's estate, Direct Energy may avoid an obligation incurred by the Debtor that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

69.     Creditors of the Debtor exist who could avoid the Direct Obligation found in section 3.08(b)(vii) of Amendment No. 4 under applicable non-bankruptcy law, including Direct Energy.

70.     The Direct Obligation is avoidable as an actual fraudulent transfer under Section 544 of the Bankruptcy Code and applicable state law, including NY DCL § 276 and 6 Del. C. § 1304.

**COUNT IV**

**CONSTRUCTIVE FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. §544 AND APPLICABLE STATE LAW**
**(Against Credit Suisse as Agent for the Invenergy Secured Lenders)**

71.     Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

72.     The Direct Obligation was incurred by the Debtor within 4 years of the Petition Date.

73.     Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

74.     The Direct Obligation was an obligation that Invenergy Fiduciary Defendants caused the Debtor to incur within 2 years before the Petition Date.

75.     The Debtor received no value, much less reasonably equivalent value, in exchange for such obligation.

76.     The Debtor was insolvent, or was rendered insolvent, when it incurred the Direct Obligation.  At the time of its entry into Amendment No. 4, the Debtor had accepted a stalking horse bid of approximately $91.25 million for substantially all of its assets pursuant to an APA wherein the parties contemplated that the assets would be sold in the context of the Chapter 11 Case, free and clear of all claims and liens.  Therefore, the $91.25 million bid is certainly indicative of the fair value of the Debtor's assets.

77.     Meanwhile, the Debtor's liabilities included the approximately $400 million contingent litigation liability as a result of the Direct Energy lawsuit, as well as the contingent Guaranty liability of approximately $337 million under the Credit Agreement.

78.     Upon the incurrence of the Direct Obligation, the Debtor converted its contingent, highly unlikely-to-be-called-upon Guaranty into a $75 million Direct Obligation to the Invenergy Secured Creditors due upon the (planned) sale of its assets.

79.     The Direct Obligation was incurred with the belief that the Debtor had incurred or would incur debts that would be beyond the Debtor's ability to pay, namely the $400 million debt owed to Direct Energy under the Agreement.

80.     Pursuant to Section 544(b) of the Bankruptcy Code, as representative of the Debtor's estate, Direct Energy may avoid an obligation incurred by the Debtor that is voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim.

81.     Creditors of the Debtor exist who could avoid the Direct Obligation found in section 3.08(b)(vii) of Amendment No. 4 under applicable non-bankruptcy law, including Direct Energy.

82.     The Direct Obligation is avoidable as a constructive fraudulent transfer under Section 544 of the Bankruptcy Code and applicable state law, including NY DCL §§ 273 through 275 and 6 Del. C. §§ 1304 and 1305.

**COUNT V**

**SUBROGATION**
**(Against ITOI)**

83.     Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

84.     Section 13.12 of the Credit Agreement states that it is "A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF NEW YORK."  Credit Agmt. § 13.12.

85.     Under New York law, "[t]he right of subrogation or of equitable assignment is not founded upon contract nor upon the absence of contract, but is founded upon the facts and circumstances of a particular case and upon principles of natural justice, and generally where it is equitable that a person furnishing money to pay a debt should be substituted for the creditor or in place of a creditor such person will be so substituted."  *In re QC Piping Installations, Inc.*, 225 B.R. 553, 562 (Bankr. E.D.N.Y. 1998).

86.     Under New York law, guarantors may be entitled to subrogation against the primary borrower on a debt.

87.     Under the terms of the PSA, and upon the Sale of the Debtor's assets as contemplated in the APA, the Debtor will be obligated to pay $75 million to the Invenergy Secured Lenders in satisfaction of the debts owed by ITOI.

88.     Thus, upon the payment by the Debtor of the $75 million to the Invenergy Secured Lenders, the Debtor will subrogate to the rights of the Invenergy Secured Lenders and ITOI will become liable to the Debtor for reimbursement of the $75 million dollar payment.

## COUNT VI
### CONTRIBUTION
**(Against the Subsidiary Guarantors)**

89.     Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

90.     Under the terms of the PSA, and upon the Sale of the Debtor's assets as contemplated in the APA, the Debtor will be obligated to pay $75 million to the Invenergy Secured Lenders in satisfaction of the debts owed by ITOI and guaranteed by each of the Subsidiary Guarantors.

91.     The $75 million payment by the Debtor is far in excess of the Debtor's Fair Share, as that term is defined in the Credit Agreement.

92.     Upon the payment by the Debtor to the Invenergy Secured Lenders of the $75 million contemplated in the PSA, the Debtor will be entitled to contribution from each of the Subsidiary Guarantors in an amount equal to each Subsidiary Guarantor's Fair Share including pursuant to section 11.02 of the Credit Agreement.

## COUNT VII

## BREACH OF FIDUCIARY DUTY
### (Against The Invenergy Fiduciary Defendants)

93.    Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

94.    Managers of a Delaware LLC owe the traditional fiduciary duties of care and loyalty to the LLC.

95.    ITOI is the sole manager of Ector County Energy Center Holding LLC, which in turn is the sole manager of the Debtor.  IAMPCI exercises "Indirect Ultimate Authority" over the business and affairs of the Debtor.  This "Indirect Ultimate Authority" is exercised through a "Special Committee" of the IAMPCI Board of Managers.

96.    The Invenergy Fiduciary Defendants owe fiduciary duties of care and loyalty to the Debtor.

97.    The Invenergy Fiduciary Defendants' duty of care to the Debtor requires that they use that amount of care which ordinarily careful and prudent persons would use in similar circumstances.

98.    The Invenergy Fiduciary Defendants' duty of loyalty to the Debtor obligates them, when acting on the Debtor's behalf, to put the interests of the Debtor ahead of their own self-interest, to disclose material facts, and to refrain from exploiting the relationship for the benefit of themselves and other related entities.

99.    The Invenergy Fiduciary Defendants established the Special Committee and delegated to it "full power and authority to make all decisions affecting the business and operations of, and to take all actions deemed necessary, appropriate or advisable on behalf of" the Debtor.

100.    Until on or around March 29, 2022, the Special Committee did not have any independent manager representing the interests of the Debtor.  Colin Adams was selected by the existing members of the Special Committee and was appointed on or around March 29, 2022. Upon information and belief, Mr. Adams does not have veto power with respect to any decision made by the Special Committee on behalf of the Debtor.

101.    The Invenergy Fiduciary Defendants breached their fiduciary duties to the Debtor in connection with, among other things, (i) the decision to sell virtually all of the Debtor's assets in order to prepay debt for which ITOI was the primary obligor, (ii) causing the Debtor to incur the Direct Obligation, (iii) causing the Debtor to enter into the PSA, (iv) the filing of this Chapter 11 Case, (v) causing the Debtor to seek the relief it has requested thus far in the Chapter 11 Case, including manufacturing the need for a DIP Loan and agreeing to the use of Cash Collateral, in return for which the Debtor is waiving critical estate claims and rights and granting broad releases to Invenergy and the Invenergy Secured Creditors, and (vi) causing the Debtor to make nearly $200,000 in prepayments to the Invenergy Service Providers prepetition so that the Invenergy Service Providers would not have any prepetition claims against the Debtor  (collectively, the "Conflicted Transactions")

102.    The Invenergy Fiduciary Defendants are insiders of the Debtor, and each stand to benefit from the Conflicted Transactions.  Specifically, ITOI's debt will be reduced and the Invenergy Fiduciary Defendants (and their related officers, managers, etc.) will receive broad releases.  As such, these transactions are inherently suspect and must be "rigorously scrutinized." The Invenergy Fiduciary Defendants bear the burden of demonstrating the "entire fairness" of the Conflicted Transactions, which requires a showing of "fair dealing" and economic fairness of the transactions.

103.    The Conflicted Transactions were not entirely fair to the Debtor as they provided no benefit to the Debtor.

104.    As a direct and proximate result of the conduct of the Invenergy Fiduciary Defendants, the Debtor has been harmed through, among other things, (i) the incurrence of the Direct Obligation, for no consideration, which requires the Debtor to pay $75 million to ITOI's Invenergy Secured Lenders upon an Ector Disposition, (ii) the prepayment of amounts for services rendered by the Invenergy Service Providers prepetition, resulting in a greater recover for these insiders than they were otherwise entitle, and (iii) the obligation to pay professional and other fees occasioned by the filing of this Chapter 11 Case.

105.    As a direct and proximate result of the conduct the Invenergy Fiduciary Defendants, the Debtor has suffered damages in an amount to be proven at trial.

**COUNT VII**

**AVOIDANCE AND RECOVERY OF PREFERENCES PURSUANT TO 11 U.S.C. §§
547(b) AND 550**
**(Against the Invenergy Service Providers)**

106.    Direct Energy repeats and re-alleges each and every allegation contained in the preceding paragraphs.

107.    The Invenergy Service Providers are insiders of the Debtor.

108.    On the Petition Date, the Debtor made the following payments to the Invenergy Service Providers:

| Recipient | Payment Date | Payment Amount | Purported Reason For Payment |
|---|---|---|---|
| Thermal | 4/11/2022 | $492,353.81 | FMA Charges |
| Thermal | 4/11/2022 | $196,417.00 | FMA Charges |
| Services | 4/11/2022 | $20,420.54 | EMA Charges |
| Services | 4/11/2022 | $20,420.54 | EMA Charges |

*See* Debtor's Statement of Financial Affairs (Docket No. 146) at 16.[15]

109.    The Services Preferences enabled the Invenergy Service Providers to receive more than they would have if (i) the Services Preferences had not been made and (ii) the Invenergy Service Providers received payment on account of the debt paid by the Services Preferences to the extent provided under the Bankruptcy Code.

110.    Each of the Services Preferences constitutes an avoidable preference pursuant to section 547(b) of the Bankruptcy Code.

111.    Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the Services Preferences is avoided and recoverable.[16]

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Debtor's chapter 11 estate, prays for relief and judgment, as follows:

   a.    setting aside and avoiding the Direct Obligation;

   b.    declaring that upon the Sale and $75 million payment by the Debtor to the Invenergy Secured Lenders, the Debtor will be subrogated to the rights of the Invenergy Secured Lenders against ITOI and ITOI will be liable to the Debtor for reimbursement of the $75 million payment, and awarding to the Debtor such amount;

   c.    declaring that upon the Sale and $75 million payment by the Debtor to the Invenergy Secured Lenders, the Debtor shall be entitled to contribution from each of the Subsidiary Guarantors in an amount equal to each Subsidiary Guarantor's Fair Share, and awarding to the Debtor such amounts;

---

[15]    Direct Energy is continuing to review the Debtor's disclosures regarding other payments made by the Debtor to the Invenergy Service Providers and other insiders within one year of the Petition Date, and reserves the right to amend the Complaint to assert any and all additional claims the Debtor may have concerning those transfers.

[16]    Direct Energy presumes the Service Preferences were paid immediately prior to the filing of the petition.  In the event that the Service Preferences were paid after this case was commenced, Direct Energy reserves its right to seek appropriate relief pursuant to 11 U.S.C. § 549.

d.      awarding Plaintiff damages, disgorgement and restitution against and from the Invenergy Fiduciary Defendants caused by the breaches of the fiduciary duties to the Debtor in an amount to be determined at trial;

e.      setting aside, avoiding, and recovering the Services Preferences;

f.      awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

g.      awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action; and

h.      awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: June 8, 2022
    Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
**CM/ECF Noticing**: bankfilings@ycst.com
Email:    mnestor@ycst.com
          mlunn@ycst.com

– and –

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone, Esq.
Christopher D. Kercher, Esq.
Kate Scherling, Esq.
Zachary Russell, Esq.
Jacqueline M. Stykes, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
Email:     benjaminfinestone@quinnemanuel.com
          christopherkercher@quinnemanuel.com
          katescherling@quinnemanuel.com
          zacharyrussell@quinnemanuel.com
          jacquelinestykes@quinnemanuel.com

    – and –

K. John Shaffer, Esq.
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213)443-3100
Email:    johnshaffer@quinnemanuel.com

*Counsel to Direct Energy Business Marketing, LLC*