*SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION*

*CREDIT AND SECURITY AGREEMENT*

Dated as of June [⬚], 2022

among

Ector County Energy Center LLC,
as Borrower,

and

Invenergy Thermal Operating I LLC,

as Lender,

## TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ...........................................................................1

| | | |
|---|---|---|
| Section 1.01 | Defined Terms .....................................................1 |
| Section 1.02 | Terms Generally ...................................................15 |
| Section 1.03 | Accounting Terms; GAAP ....................................16 |
| Section 1.04 | Rounding .............................................................16 |
| Section 1.05 | Times of Day .......................................................16 |
| Section 1.06 | Currencies ...........................................................16 |

ARTICLE II THE CREDITS AND SECURITY INTEREST .................................16

| | | |
|---|---|---|
| Section 2.01 | Commitments. ......................................................17 |
| Section 2.02 | Procedure for Borrowing .....................................17 |
| Section 2.03 | Termination and Reduction of Commitments ..........17 |
| Section 2.04 | Repayment of Loans; Evidence of Debt. ................17 |
| Section 2.05 | Prepayments ........................................................18 |
| Section 2.06 | Interest. ..............................................................18 |
| Section 2.07 | Taxes. .................................................................18 |
| Section 2.08 | Order of Distribution ...........................................18 |
| Section 2.09 | Security Interest. .................................................20 |
| Section 2.10 | Lien on Deposit Accounts ....................................21 |
| Section 2.11 | Other Collateral. .................................................21 |
| Section 2.12 | Limitations. .........................................................22 |
| Section 2.13 | Further Assurances; Extent of Liens ......................22 |
| Section 2.14 | Subordination of Security Interest to Certain Claims....22 |
| Section 2.15 | No Modification without Consent ..........................22 |

ARTICLE III REPRESENTATIONS AND WARRANTIES....................................23

| | | |
|---|---|---|
| Section 3.01 | Organization; Powers ...........................................23 |
| Section 3.02 | Authorization; Enforceability ...............................23 |
| Section 3.03 | Governmental Approvals; No Conflicts ..................23 |
| Section 3.04 | Title to Assets. ....................................................23 |
| Section 3.05 | Litigation and Environmental Matters.....................24 |
| Section 3.06 | Compliance with Laws and Agreements ..................24 |
| Section 3.07 | Investment Company Status; Regulations T, U and X ...24 |
| Section 3.08 | Taxes. .................................................................24 |
| Section 3.09 | Disclosure ...........................................................25 |
| Section 3.10 | Liens; Security Interests in the Collateral. ..............25 |
| Section 3.11 | No Change ...........................................................25 |
| Section 3.12 | No Default ...........................................................25 |
| Section 3.13 | Anti-Corruption Laws ..........................................25 |
| Section 3.14 | Use of Proceeds ...................................................25 |
| Section 3.15 | Insurance. ............................................................26 |
| Section 3.16 | Beneficial Ownership Certificate ...........................26 |
| Section 3.17 | Bankruptcy Matters. ............................................26 |

ARTICLE IV CONDITIONS ...............................................................................26

    Section 4.01    Closing Date ................................................................26
    Section 4.02    Each Credit Event ........................................................28

ARTICLE V AFFIRMATIVE COVENANTS..............................................................29

    Section 5.01    Postpetition Obligations ...............................................29
    Section 5.02    Payment of Obligations ................................................29
    Section 5.03    Compliance with Laws .................................................29
    Section 5.04    Use of Proceeds and Extensions of Credit ........................29
    Section 5.05    Plan and Sale Milestones ..............................................30

ARTICLE VI NEGATIVE COVENANTS ..................................................................31

    Section 6.01    Indebtedness ...............................................................31
    Section 6.02    Liens ........................................................................31
    Section 6.03    Investments ................................................................32
    Section 6.04    Consolidations and Mergers; Asset Sales...........................32
    Section 6.05    Transactions with Affiliates and Shareholders....................32
    Section 6.06    Bankruptcy Matters .....................................................32

ARTICLE VII EVENTS OF DEFAULT .....................................................................33

    Section 7.01    Events of Default..........................................................33
    Section 7.02    Obligations Under Cash Management Agreements .......................35

ARTICLE VIII MISCELLANEOUS ..........................................................................35

    Section 8.01    Notices.......................................................................35
    Section 8.02    Waivers; Amendments. .................................................36
    Section 8.03    No Waiver; Cumulative Remedies; Enforcement ................37
    Section 8.04    Expenses; Indemnity; Damage Waiver. .............................37
    Section 8.05    Successors and Assigns. ................................................39
    Section 8.06    Survival.....................................................................39
    Section 8.07    Counterparts; Integration; Conflicts with Final DIP Order; Effectiveness ....39
    Section 8.08    Severability................................................................40
    Section 8.09    Governing Law; Jurisdiction; Consent to Service of Process. ......40
    Section 8.10    WAIVER OF JURY TRIAL ..........................................41
    Section 8.11    Headings ...................................................................41
    Section 8.12    Confidentiality............................................................41
    Section 8.13    Collateral ..................................................................42
    Section 8.14    Third Party Beneficiaries...............................................42

## LIST OF SCHEDULES

Schedule 2.09(a)(iii)        Commercial Tort Claims
Schedule 3.15        Material Insurance
Schedule 6.02(b)        Prepetition Liens
Schedule 8.01(a)        Notice Addresses

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT
ECTOR COUNTY ENERGY CENTER LLC

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of June [__], 2022 (this "Agreement"), between Ector County Energy Center LLC, a Delaware limited liability company (the "Borrower") and Invenergy Thermal Operating I LLC, a Delaware limited liability company ("ITOI" or the "Lender").

PRELIMINARY STATEMENTS:

On April 11, 2022 (the "Petition Date"), the Borrower filed a voluntary petition for relief under Title 11 of the United States Code (as now or hereafter in effect, or any successor thereto, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such case is being administered under Case No. 22-10320-JTD and is referred to herein as the "Chapter 11 Case"), and such debtor-Borrower continues to operate its businesses and manage its property as a debtor and debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Borrower has requested that the Lender provide a secured superpriority debtor-in-possession credit facility to the Borrower in an aggregate principal amount not to exceed $5,000,000 (the "DIP Facility") for the purposes set forth herein, and the Lender is willing to do so on the terms and conditions set forth herein.

The Borrower acknowledges that it will receive substantial direct and indirect benefits by reason of the making of the loans and other financial accommodations to it as provided in this Agreement.

To provide for the security and repayment of all obligations of any kind of the Borrower under this Agreement and other Loan Documents, Borrower will provide to the Lender the Liens, status, and protection set forth in the Final DIP Order.

In consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE I

Definitions

Section 1.01    Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"Adequate Protection Claims" means a lien on the Borrower's postpetition assets and superpriority claims in favor of the Prepetition Agent for the benefit of the Prepetition Lenders to the same extent and with the same priority as was held by the Prepetition Lenders in the Borrower's prepetition assets as of the Petition Date for any diminution in the value of the Prepetition Lenders' interest in the Cash Collateral granted pursuant to orders of the Bankruptcy Court.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning assigned to such term in the preamble to this Credit Agreement.

"Allowed Professional Fees" has the meaning assigned to such term in Section 2.08.

"Applicable Rate" means a rate per annum corresponding to the Secured Overnight Financing Rate ("SOFR") for a one-month interest period on such day (or if such day is not a Business Day, the immediately preceding Business Day) that a Loan is made, plus 3.50%.

"Asset Sale" means any sale, issuance, conveyance, transfer, lease, assignment, or other disposition by the Borrower to any Person (including by means of a sale and leaseback transaction or a merger or consolidation) (collectively, for purposes of this definition, a "transfer"), in one transaction or a series of related transactions, of any assets of the Borrower other than dispositions of inventory in the ordinary course of business. For purposes of this definition, the term "Asset Sale" shall not include:

> (a)     transfers of cash and dispositions of Cash Equivalents in accordance with the Cash Collateral Orders;

> (b)     Restricted Payments and Investments not prohibited hereunder;

> (c)     the creation of any Lien permitted hereunder;

> (d)     transfers of assets that are (i) damaged, worn out or obsolete or (ii) replaced by or exchanged for assets of similar suitability and value;

> (e)     Involuntary Dispositions;

> (f)     any transfer made in the ordinary course of the Borrower's businesses;

> (g)     licenses, sublicenses, leases or subleases granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Borrower; and

> (h)     any transfer or series of related transfers that, but for this clause, would be Asset Sales, if the aggregate Fair Market Value of the assets transferred in such transaction or any such series of related transactions does not exceed $1,000,000.

"Avoidance Actions" means any and all causes of action arising under Chapter 5 of the Bankruptcy Code including those actions under Section 544 of the Bankruptcy Code arising under applicable non-bankruptcy law.

"Bankruptcy Code" has the meaning specified in the recitals hereto.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Board of Managers" means the special committee or board of managers of the Borrower or any other committee duly authorized to act on behalf or in the stead thereof.

"Borrower" has the meaning assigned to such term in the preamble to this Agreement.

"Borrower Materials" has the meaning assigned to such term in Section 9.17.

"Borrowing" means a Loan of the same type, made, converted, or continued on the same date.

"Borrowing Date" means any Business Day specified by the Borrower as a date on which the Borrower requests the Lender make Loans hereunder.

"Budget" means the budget attached to the then in effect Cash Collateral Order or any subsequent updated budget or replacement budget.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP, in each case, as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)".

"Carve-Out" means an amount equal to the Carve-Out Amount to be funded by the Borrower into the Carve-Out Account.

"Carve-Out Account" means a segregated account of the Borrower that is not subject to the control of the Lender or the Prepetition Agent into which the Borrower shall be required pursuant to the Final DIP Order to deposit the Carve-Out Amount immediately upon delivery of a Carve-Out Trigger Notice to the Borrower by the Lender or the Prepetition Agent.

"Carve-Out Amount" has the meaning assigned to such term in Section 2.08.

"Carve-Out Trigger Notice" means a written notice delivered to the Borrower by ITOI or the Prepetition Agent (on the behalf of the Prepetition Secured Parties) describing the event of

default that has occurred and is continuing, as applicable, under the Loan Documents or Cash Collateral Orders.

"<u>Cash Collateral Orders</u>" means any interim or final order of the Bankruptcy Court authorizing the Borrower to use the cash collateral of the Prepetition Lenders.

"<u>Cash Equivalents</u>" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of one year or less from the date of acquisition issued by any commercial bank organized under the laws of the United States or any state thereof; (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's or P-1 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within one year from the date of acquisition; (d) repurchase obligations of any commercial bank satisfying the requirements of clause (b) of this definition with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by Standard & Poor's or A by Moody's; (f) securities with maturities of one year or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; and (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by Standard & Poor's or Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"<u>Cash Management Agreement</u>" means any agreement entered into from time to time by the Borrower with a Cash Management Bank in connection with cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"<u>Cash Management Bank</u>" means any Person that enters into a Cash Management Agreement or provides any cash management services to the Borrower.

"<u>Cash Management Obligations</u>" means obligations arising on or after the Petition Date owed by the Borrower to any Cash Management Bank under any Cash Management Agreement.

"<u>Cash Management Order</u>" means, collectively, the orders entered by the Bankruptcy Court with respect to the Borrower in the Chapter 11 Case authorizing and approving Borrower's cash management arrangements and procedures, and which orders shall be in form and substance reasonably satisfactory to the Lender.

"Change in Law" means (a) the adoption of any law, rule, regulation or treaty after the Closing Date, (b) any change in any law, rule, regulation or treaty or in the interpretation or application thereof by any Governmental Authority after the Closing Date.

"Change of Control" means any of the following events:

(a)     the appointment in the Chapter 11 case of a trustee or examiner with expanded powers;

(b)     the conversion of the Chapter 11 case to a case under Chapter 7; or

(c)     the appointment of any individual or entity that results in Control with respect to the Borrower being held by any individual other than the Chief Restructuring Officer.

"Chapter 11 Case" has the meaning specified in the recitals hereto.

"Chief Restructuring Officer" means John Baumgartner.

"Closing Date" means the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied (or waived).

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means, collectively, all presently owned and hereafter acquired tangible and intangible property and assets of the Borrower, wherever located, and any proceeds and products thereof, upon which a Lien exists, is created, or is purported to be created by this Agreement or any other Collateral Document or the Final DIP Order.

"Collateral Documents" means this Agreement each financing statement, security document, Mortgage, pledge agreement or collateral agreement executed, delivered, or authorized by the Borrower to be filed in connection with this Agreement and/or the other Loan Documents to grant or perfect a security interest in any property as collateral to secure the Obligations.

"Commitment" means, $5,000,000, subject to any limitations on borrowing as set forth in this Agreement.

"Commitment Period" means the period from and including the Closing Date to the Maturity Date.

"Committee" means any official committee of unsecured creditors (if any is appointed) in the Chapter 11 Case.

"Committee Professionals" has the meaning assigned to such term in Section 2.08.

"Conforming Plan" has the meaning assigned to such term in Section 5.05(a)(i).

"Consenting Prepetition Lenders" means the Prepetition Term Lenders and the Prepetition Revolving Lenders that are signatory to the PSA in each case constituting not less than two-thirds of the then outstanding principal balance of the applicable facility.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtor Professionals" has the meaning assigned to such term in Section 2.08.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"DIP Facility" has the meaning specified in the recitals hereto.

"Disposition" means, with respect to any property, any sale, lease, license, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" or "$" refers to lawful money of the United States of America.

"Ector CAD" has the meaning assigned to such term in Section 2.14.

"EMA" means the Energy Management Agreement dated November 2, 2017 by and among the Borrower and Invenergy Services LLC, as amended or modified from time to time, or any replacement agreement with respect to the services provided pursuant thereto.

"Environmental Law" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, of any Person, (a) any and all shares or other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person and (b) all rights to purchase, warrants or options (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person, but excluding any debt securities convertible into such shares or other interests.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excluded Indebtedness" means all Indebtedness permitted to be incurred under Section 6.01.

"Existing Liens" has the meaning specified in Section 6.02.

"FMA" means the Facilities Management Agreement dated November 25, 2014, by and among the Borrower and Invenergy Services Thermal US LLC, as amended or modified from time to time, or any replacement agreement with respect to the services provided pursuant thereto.

"Fair Market Value" means, with respect to any asset, the price (after taking into account any liabilities relating to such assets) that would be negotiated in an arm's-length transaction for cash between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) all Commitments have expired or been terminated; and (b) all Obligations then due and owing have been paid in full in cash or immediately available funds (other than contingent indemnification obligations for which no claim has been asserted), have otherwise been satisfied, or with respect to any Obligations constituting Cash Management Obligations, other arrangements with respect thereto reasonably satisfactory to the applicable Cash Management Bank shall have been made.

"Final DIP Order" means, collectively, the order or orders entered by the Bankruptcy Court, as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof, in form and substance satisfactory to the Lender and the Prepetition Secured Lenders, with respect to the Borrower in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other Loan Documents (including the payment of interest, fees, costs and expenses hereunder and thereunder) and granting the Liens, status and protections set forth herein or provided for in the Collateral Documents.

"Final DIP Order Entry Date" means the date on which the Final DIP Order (which, for purposes of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired) shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case.

"Final Order" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as

to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, consistently applied.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person at any date means, without duplication:

(a)    all liabilities, contingent or otherwise, of such Person for borrowed money;

(b)    all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)    all direct or contingent obligations of such Person in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions;

(d)    all obligations of such Person to pay the deferred and unpaid purchase price of property or services, except trade payables and accrued expenses incurred by such Person in the ordinary course of business;

(e)    all Capital Lease Obligations of such Person;

(f)    all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person;

(g)    all Indebtedness of others Guaranteed by such Person to the extent of such Guarantee; provided that Indebtedness of the Borrower that is Guaranteed by the Borrower shall only be counted once in the calculation of the amount of Indebtedness of the Borrower; and

(h)     all obligations of such Person under conditional sale or other title retention agreements relating to assets purchased by such Person (excluding obligations arising from inventory transactions in the ordinary course of business).

The amount of any Indebtedness which is incurred at a discount to the principal amount at maturity thereof as of any date shall be deemed to have been incurred at the accreted value thereof as of such date. The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above, the maximum liability of such Person for any such contingent obligations at such date and, in the case of clause (f), the lesser of (x) the Fair Market Value of any asset subject to a Lien securing the Indebtedness of others on the date that the Lien attaches and (y) the amount of the Indebtedness secured.

"Indemnified Party" has the meaning assigned to such term in Section 8.04(b).

"Indemnified Parties" has the meaning assigned to such term in Section 8.04(b).

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Information" has the meaning assigned to such term in Section 8.12.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, patents, trademarks, service marks, trade dress, internet domain names, software, data, databases, technology, know-how, trade secrets, processes and other confidential or proprietary information, together with all registrations and applications for registration thereof, all licenses thereof or pertaining thereto, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Investment Banker" means Perella Weinberg Partners LP/Tudor, Pickering, Holt & Co.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding commission, travel, and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests, or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of the Borrower.

"ITOI" has the meaning assigned to such term in the preamble to this Agreement.

"Lender" has the meaning assigned to such term in the preamble to this Agreement.

"Lien" means, with respect to any asset, any mortgage, deed of trust, lien (statutory or other), pledge, easement, charge, security interest or other encumbrance of any kind or nature in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Loan Documents" means the collective reference to this Agreement, the Collateral Documents, any other agreement, instrument or document entered into in connection with this Agreement and designated by its terms as a "Loan Document" and any amendments or waivers to any of the foregoing (but specifically excluding any Cash Management Agreement).

"Loans" has the meaning assigned to such term in Section 2.01.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, property or condition, financial or otherwise, of the Borrower that results in a material impairment of the ability of the Borrower to perform any payment obligations hereunder or (b) the validity or enforceability of this Agreement or the other Loan Documents or the rights or remedies of the Lender hereunder or thereunder; provided that changes, events, effects, or circumstances which, directly or indirectly, to the extent they relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Chapter 11 Case (and any defaults under Prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); and (i) the existence of any Prepetition claim or liability which is unsecured and junior in priority to the Obligations.

"Maturity Date" means the earliest to occur of the following:

(a)     the date that is eight (8) months following the Final DIP Order Entry Date;

(b)     the date upon which any Plan of Reorganization becomes effective; or

(c)     the date upon which the Obligations are accelerated following the occurrence of an Event of Default;

provided that notwithstanding the foregoing or anything to the contrary in this Agreement or any other Loan Document, each of the dates contemplated by the foregoing clauses (a) and (d) may be extended with the consent of the Requisite Consenting Prepetition Lenders.

"Obligations" means the unpaid principal of and interest on (including interest, fees and expenses accruing after the maturity of the Loans) the Loans, any Cash Management Obligations, and all other obligations and liabilities of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, fees, indemnities, costs, expenses or otherwise, including, in each case, (a) all fees, charges and disbursements of counsel to the Lender that are required to be paid by the

Borrower pursuant hereto and (b) interest, fees and expenses accruing after the Petition Date in the Chapter 11 Case.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing, excise or property Taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"Outstanding Credit" means, with respect to the Lender at any time, an amount equal to the sum of the aggregate then outstanding principal amount due to the Lender after giving effect to any Borrowings and prepayments or repayments occurring on the date of determination.

"Permitted Encumbrances" means:

(a)    Liens granted pursuant to the Prepetition Loan Documents or the Cash Collateral Orders.

(b)    Liens imposed by law for taxes, assessments or governmental charges that are not yet due or are being contested;

(c)    landlord's, carriers', warehousemen's, mechanics', supplier's, materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing (i) accounts payable and accrued expenses existing on the Petition Date or (ii) obligations that are not overdue by more than 30 days or are being contested in good faith;

(d)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation (or pursuant to letters of credit issued in connection with such workers' compensation compliance), unemployment insurance and other social security laws or regulations;

(e)    deposits to secure the performance of tenders, bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds, leases, subleases, government contracts and return-of-money bonds, letters of credit and other obligations of a like nature, in each case in the ordinary course of business (exclusive of the obligation for the payment of borrowed money);

(f)    judgment liens in respect of judgments that do not constitute an Event of Default;

(g)    easements, zoning restrictions, rights-of-way, survey exception, minor encumbrances, reservation of, licenses, electric lines, telegraph and telephone lines and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower;

(h)      Liens securing obligations in respect of trade-related letters of credit and covering the goods (or the documents of title in respect of such goods) financed or the purchase of which is supported by such letters of credit and the proceeds and products thereof;

(i)      Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(j)      Liens securing obligations in respect of letters of credit, bank guarantees, warehouse receipts or similar instruments issued to support performance obligations (other than obligations in respect of Indebtedness) and trade-related letters of credit, in each case, outstanding on the Closing Date or issued thereafter in and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit, banker's acceptances or bank guarantees and the proceeds and products thereof;

(k)      licenses, sublicenses, covenants not to sue, releases or other rights under Intellectual Property granted to others in the ordinary course of business or in the reasonable business judgment of the Borrower; and

(l)      title defects, encroachments or irregularities which are of a minor nature and which in the aggregate do not materially impair the value of any real property or the use of the affected property for the purpose for which it is used by the Borrower.

"Permitted Liens" means Liens permitted by Section 6.02.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, incorporated or unincorporated association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof or other entity of any kind.

"Petition Date" has the meaning specified in the recitals hereto.

"Plan of Reorganization" means any plan of reorganization or plan of liquidation filed under Section 1121 of the Bankruptcy Code.

"Postpetition" or "postpetition" means the time period beginning immediately upon the filing of the Chapter 11 Case.

"Prepetition" or "prepetition" means the time period prior to the filing of the Chapter 11 Case.

"Prepetition Agent" means Credit Suisse AG, Cayman Islands Branch, as the administrative agent and collateral agent pursuant to the Prepetition Credit Agreement.

"Prepetition Credit Agreement" means that certain Amended and Restated Credit and Guaranty Agreement, dated as of August 22, 2019, with Credit Suisse AG, Cayman Islands

Branch, as the administrative agent and collateral agent, ITOI as the borrower, certain co-guarantors thereunder including the Borrower, and the lenders party thereto from time to time, as amended from time to time by that certain Amendment No. 1 to the Amended and Restated Credit and Guaranty Agreement, dated as of March 3, 2020, by that certain Amendment No. 2 to the Amended and Restated Credit and Guaranty Agreement, dated as of February 24, 2021, by that certain Amendment No. 3 to the Amended and Restated Credit and Guaranty Agreement, dated as of April 28, 2021, and by that certain Amendment No. 4 to the Amended and Restated Credit and Guaranty Agreement, dated as of April 4, 2022.

"Prepetition Lenders" means the lenders party to the Prepetition Credit Agreement.

"Prepetition Loan Documents" means the "Loan Documents" under and as defined in the Prepetition Credit Agreement.

"Prepetition Revolving Lenders" means the revolving loan lenders party to the Prepetition Credit Agreement.

"Prepetition Revolving Loans" means those revolving loans extended, and those letters of credit issued and outstanding, pursuant to the Prepetition Credit Agreement.

"Prepetition Secured Loans" means those loans, guaranteed by the Borrower pursuant to the Prepetition Loan Documents.

"Prepetition Secured Obligations" means all of the obligations of the Borrower under the Prepetition Credit Agreement and the other Prepetition Loan Documents.

"Prepetition Secured Parties" means the "Secured Parties" under and as such term is defined in the Prepetition Credit Agreement.

"Prepetition Term Lender Prepayment Claim" means $75,000,000.00 plus any unpaid fees and expenses.

"Prepetition Term Lenders" means the term loan lenders party to the Prepetition Credit Agreement.

"Prepetition Term Loans" means the term loans extended pursuant to the Prepetition Credit Agreement.

"Professional Fees" means fees and expenses of Professional Persons.

"Professional Persons" has the meaning assigned to such term in Section 2.08.

"Property" means all real property and personalty.

"PSA" means the Plan Support Agreement among the Borrower, the Lender (but only to the limited extent specified therein), certain Prepetition Term Lenders holding no less than 66.7% in the aggregate outstanding principal amount of the Prepetition Term Loans, and certain

Prepetition Revolving Lenders holding no less than 66.7% of the aggregate outstanding principal balance of the Prepetition Revolving Loans.

"PWP Success Fee" shall mean any success fee payable to the Investment Banker, as allowed pursuant to an order of the Bankruptcy Court.

"Recovery Event" means any event that gives rise to the receipt by the Borrower of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets, business interruption or real property (including any improvements thereon).

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, or to issue other Indebtedness in exchange or replacement for, such Indebtedness.

"Related Business" means any business in which the Borrower was engaged on the Closing Date or any reasonable extension of such business and any business related, ancillary or complementary to any business of the Borrower in which the Borrower was engaged on the Closing Date or any reasonable extension of such business.

"Related Parties" means, with respect to any specified Person, such Person's affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's affiliates.

"Requirements of Law" means, as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule, regulation or official administrative pronouncement or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Requisite Consenting Prepetition Lenders" means those Consenting Prepetition Lenders holding more than 50% of the aggregate principal amount of the outstanding Prepetition Loans held by Consenting Prepetition Lenders.

"Revolving Lender Guaranty Claim" means a claim in the amount of $64,553,598.00 plus the amount of all accrued and unpaid interest on account of the Prepetition Revolving Loans and all fees, expenses, and any and all other Prepetition Secured Obligations owed to or held by the Prepetition Revolving Lenders or the Prepetition Agent on account of, or in connection with, the Prepetition Revolving Loans.

"Revolving Lender Payment Claim" means the claims of the applicable Revolving LC Issuer (as defined in the Prepetition Credit Agreement) and Prepetition Revolving Lenders' Issuer with respect to Direct Energy Business Marketing, LLC or OneOK Inc.

"Sale Transaction" has the meaning assigned to such term in Section 4.01(g).

"Sanction(s)" means any sanction, law, rule or regulation administered or enforced by the United States Government (including without limitation, OFAC).

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Lender Guaranty Claims</u>" means a claim in the amount of $337,319,920.82 plus the amount of all accrued and unpaid interest on account of the Prepetition Term Loans and all fees, expenses, and any and all other Prepetition Secured Obligations owed to or held by the Prepetition Term Lenders or the Prepetition Term Agent on account of or in connection with the Prepetition Term Loans.

"<u>Term Lender Prepayment Claim</u>" means a claim in the amount of $75,000,000.00 owed to the Prepetition Term Lenders or the Prepetition Agent on account of, or in connection with, Section 3.02(b)(vii) of the Prepetition Credit Agreement.

"<u>Term Lender Retained Senior Lien</u>" means the liens and claims of the Prepetition Term Lenders in an aggregate amount of $55,000,000.00.

"<u>Transactions</u>" means (a) the entry into the Loan Documents and the borrowings under this Agreement to occur on the Closing Date and (b) the payment of fees and expenses in connection therewith.

"<u>UCC</u>" means the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"<u>USCO</u>" means the United States Copyright Office.

"<u>USPTO</u>" means the United States Patent and Trademark Office.

Section 1.02    <u>Terms Generally</u>.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated, amended and restated, extended or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities,

accounts and contract rights. The foregoing standards shall also apply to the other Loan Documents.

(b)    Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

Section 1.03    Accounting Terms; GAAP. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that for purposes of any determinations associated with leases, including, without limitation, determinations of whether such leases are capital leases, whether obligations under such leases are Capital Lease Obligations, the amount of any Capital Lease Obligations associated with such leases, and the amount of operating expenses associated with such leases, Indebtedness shall be determined based on generally accepted accounting principles in the United States of America as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)"; provided, further, that, if the Borrower notifies the Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision is amended in accordance herewith.

Section 1.04    Rounding. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    Times of Day. Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.06    Currencies. Unless otherwise specifically set forth in this Agreement, monetary amounts are in Dollars. Notwithstanding anything to the contrary herein, no Default or Event of Default will arise as a result of any limitation or threshold set forth in Dollars being exceeded solely as a result of changes in currency exchange rates.

ARTICLE II

The Credits and Security Interest

Section 2.01   Commitments.

(a)   Subject to the terms and conditions hereof, from time to time during the Commitment Period, Lender agrees to make to the Borrower one or more credit loans denominated in Dollars ("Loans") in an aggregate principal amount that will not result in the amount exceeding the Commitment of $5,000,000.

(b)   Any such Borrowing shall be in an aggregate principal amount that is an integral multiple of $50,000 and not less than $200,000.

Section 2.02   Procedure for Borrowing. To request a Borrowing on any such Business Day such that the proceeds of such Borrowing may be received by the Borrower on such Business Day, the Borrower shall notify the Lender of such request, by telephone or Committed Loan Notice (which notice must be received by the Lender prior to 12:00 noon, New York City time on the requested date of such Borrowing). Each such telephonic and written Committed Loan Notice shall specify the amount to be borrowed.

Section 2.03   Termination and Reduction of Commitments. Notwithstanding anything to the contrary contained herein:

(a)   The Borrower shall have the right, upon not less than three Business Days' notice to the Lender, to terminate the Commitments or, from time to time, to permanently reduce the amount of the Commitments in whole or in part; provided that no such termination or reduction of Commitments shall be permitted if, after giving effect thereto, the Outstanding Credit would exceed the Commitment. Any such reduction shall be in an amount equal to an integral multiple of $50,000 and not less than $200,000 and shall reduce permanently the Commitments then in effect.

(b)   The Commitment shall terminate upon the occurrence of the Maturity Date.

Section 2.04   Repayment of Loans; Evidence of Debt.

(a)   The Loans made shall be evidenced by such records as the DIP Lender and Borrower may agree to be sufficient to record and memorialize the Loans.

(b)   The Borrower unconditionally promises to pay the then unpaid principal amount of each Loan on the Maturity Date.

(c)   Lender shall maintain an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from each Loan made by Lender, including the amounts of principal and interest payable and paid to Lender from time to time hereunder.

(d)   The Lender shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.

(e)    The entries made in the accounts maintained pursuant to paragraph (c) or (d) of this Section shall be conclusive absent manifest error of the existence and amounts of the obligations recorded therein; The failure to maintain such accounts shall not affect Borrower's obligation.

Section 2.05    <u>Prepayments</u>. The Borrower may, at any time, (i) repay or prepay the Loans and/or (ii) reduce the commitments, in each case in full or in part as set forth in <u>Section 2.03(a)</u>.

Section 2.06    <u>Interest</u>.

(a)    The Loans shall bear interest at the Applicable Rate.

(b)    Upon the election of the Lender, while any Event of Default exists, all outstanding Obligations shall bear interest, after as well as before judgment, at a rate per annum equal to the Applicable Rate, <u>plus</u> 2% per annum.

(c)    Accrued interest on each Loan shall be payable on the Maturity Date; provided that in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)    All interest hereunder shall be computed on the basis of a year of 360 days.

Section 2.07    <u>Taxes</u>.

(a)    All payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes unless required by applicable Requirements of Law; <u>provided</u> that if any applicable withholding agent shall be required by applicable Requirements of Law to deduct any Taxes in respect of any such payments, then (i) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased by the Borrower as necessary so that after all required deductions (including deductions applicable to additional sums payable under this <u>Section 2.14</u>) have been made the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)    In addition, without duplication of any obligation set forth in subsection (a), the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law. Without limiting the generality of the foregoing, Lender shall deliver to the Borrower prior to the date on which Lender actually disburses properly executed originals of IRS Form W-9 certifying that Lender is exempt from U.S. federal backup withholding Tax;

Section 2.08    <u>Order of Distribution</u>. After the exercise of remedies provided for herein and irrespective of any other provision of any Loan Document to the contrary, any amounts (including cash, equity securities, debt securities, or any other property received on account of the Collateral or in consideration of any waiver of any rights to receive any payment of the Obligations

(whether received as a consequence of the exercise of such remedies or as a distribution under the Chapter 11 Case) shall be turned over to the Lender (to the extent not received directly by the Lender) and applied by the Lender in the following order:

*First*, following receipt of the Carve-Out Trigger Notice, into the Carve-Out Account, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and United States Trustee, plus interest at the statutory rate (without regard to the notice set forth in (iii) below), (ii) all reasonable fees incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below) in an amount not to exceed $50,000, (iii) to the extent allowed at any time, whether by interim or final compensation order, procedural order or any other order of the Bankruptcy Court, all unpaid fees, costs, and expenses (the "Allowed Professional Fees") incurred or accrued by persons or firms retained by the Borrower pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any Committee in the Chapter 11 Case pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following of a delivery by the Prepetition Agent (acting at the direction of the Requisite Consenting Prepetition Lenders) of , whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (defined below), plus (iv) Allowed Professional Fees of Professional Persons incurred after the first business day following delivery by the Prepetition Agent of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim or final compensation order, procedural order, or any other order of the Bankruptcy Court, in an aggregate amount not to exceed $1.0 million plus the PWP Success Fee (if earned); *provided* that except for the PWP Success Fee, no success, completion or similar fees shall be payable from the Carve-Out (the "Carve-Out Amount"), unless and until the Carve-Out Amount is fully funded;

*Second,* to the payment and satisfaction of the Term Lender Retained Senior Lien, the Revolving Lender Payment Claim and the Adequate Protection Claims;

*Third*, to the Obligations in an amount up to $5,000,000.00;

*Fourth*, to the payment of the Term Lender Payment Claim and, the extent due and payable, the payment of the Term Lender Guaranty Claim and the Revolving Lender Guaranty Claim; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law;

provided that if any such amounts are not in the form of cash, then the amount of such securities or other property applied to each of clauses *First* through *Last* below shall be an amount with a fair market value equal to the stated amount required to be applied pursuant to each such clause).

Section 2.09    <u>Security Interest.</u>

(a)    *Grant of Security Interest*. The Liens granted to the Lender in all Collateral pursuant to the Final DIP Order shall be automatically perfected upon the entry of the Final DIP Order without reference to any filing or recording of any financial statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, filing of Uniform Commercial Code financing statements, mortgages, assignments, notices of lien and similar documents, and entering into any deposit account control agreement, customs broker agreement, or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law). For the avoidance of doubt, to secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all Property of Borrower other than and expressly excluding Avoidance Actions, but including all of the following Property, whether now owned or hereafter acquired, and wherever located, which shall constitute the Collateral (each such capitalized term below having the meaning ascribed to such term in the UCC):

(i)    all Accounts;

(ii)    all Chattel Paper, including electronic chattel paper;

(iii)    all Commercial Tort Claims, including those shown on Schedule 2.09(a)(iii);

(iv)    all Deposit Accounts, Securities Accounts, and Commodities Accounts;

(v)    all Documents;

(vi)    all General Intangibles, including Intellectual Property;

(vii)    all Goods, including Inventory, Equipment and fixtures;

(viii)    all Instruments;

(ix)    all Investment Property;

(x)    all Letter-of-Credit Rights;

(xi)    all Supporting Obligations;

(xii)    all monies, whether or not in the possession or under the control of Lender, or a bailee or Affiliate of Lender;

(xiii)    all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned

premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(xiv) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

(b) *Security Perfection*. Borrower agrees to take all action that the Lender may reasonably request as a matter of non-bankruptcy law to perfect and protect its security interest in or to any Collateral, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents necessary to perfect the Lender's security interest in or to any Collateral in recordable form as the Lender may reasonably request. Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization, and any organization identification number issued to the Borrower and (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. The Borrower agrees to use commercially reasonable efforts to furnish any such information to the Lender promptly upon request. Notwithstanding the provisions of this <u>Section 2.09(b)</u>, the Lender shall have the benefits of the Final DIP Order.

Section 2.10   <u>Lien on Deposit Accounts</u>. To further secure the prompt payment and performance of its Obligations, Borrower hereby grants to Lender a continuing security interest in and Lien upon all amounts credited to any Deposit Account of Borrower, including sums in any blocked, lockbox, sweep or collection account. Borrower hereby authorizes and directs each bank or other depository to deliver to Lender, upon request, all balances in any Deposit Account maintained for Borrower, without inquiry into the authority or right of Lender to make such request.

Section 2.11   <u>Other Collateral</u>.

(a) *Commercial Tort Claims*. Borrower shall promptly notify Lender in writing if Borrower has a Commercial Tort Claim (other than, as long as no Default or Event of Default exists, a Commercial Tort Claim for less than One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00)), shall promptly amend Schedule 2.09(a)(iii) to include such claim, and shall take such actions as Lender deems appropriate to subject such claim to a duly perfected, first priority Lien in favor of Lender.

(b)    *Certain After-Acquired Collateral*. Borrower shall promptly notify Lender in writing if, after the Closing Date, Borrower obtains any interest in any Collateral consisting of Deposit Accounts (other than Deposit Accounts with Lender), Chattel Paper, Documents, Instruments, Intellectual Property, Investment Property or Letter-of-Credit Rights and, upon Lender's request, shall promptly take such actions as Lender deems appropriate to effect Lender's duly perfected, first priority Lien upon such Collateral, including obtaining any appropriate possession, control agreement or Landlord Waiver. If any Collateral is in the possession of a third party, at Lender's request, the Borrower shall obtain an acknowledgment that such third party holds the Collateral for the benefit of Lender, including, with respect to any Collateral acquired on or after the Closing Date, an Access and Acknowledgment Agreement.

Section 2.12    <u>Limitations</u>. The Lien on Collateral granted hereunder is given as security only and shall not subject Lender to, or in any way modify, any obligation or liability of Borrower relating to any Collateral

Section 2.13    <u>Further Assurances; Extent of Liens</u>. All Liens granted to Lender under the Loan Documents are for the benefit of Lender. Promptly upon request, Borrower shall deliver such instruments and agreements, and shall take such actions, as Lender deems appropriate under applicable law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement.

Section 2.14    <u>Subordination of Security Interest to Certain Claims</u>. As set forth in Paragraph 6 of the Final DIP Order, the Lien on the Collateral granted hereunder shall be junior and subordinated to only (a) the Term Lender Retained Senior Lien, (b) the Revolving Lender Payment Claim, (c) the Adequate Protection Claims, (d) any valid, perfected, unavoidable liens or security interests in existence as of the Petition Date (other than the liens of the Prepetition Term Lenders, which have priority only to the extent of the Term Lender Retained Senior Lien as referenced above), or that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b); and (e) any valid, binding, perfected, enforceable, and non-avoidable liens held by Ector County Appraisal District (the "<u>Ector CAD</u>") for local ad valorem taxes that under the applicable state statute are granted priority over a prior perfected security interest or lien, subject to the rights of parties to object to the priority, validity, amount, and extent of the claims and liens asserted by Ector CAD, as preserved by the Final DIP Order.

Section 2.15    <u>No Modification without Consent</u>. Except as otherwise agreed to by the Lender and the Requisite Consenting Prepetition Lenders, the Liens, Lien priorities, Superpriority Claims and other rights and remedies granted to them pursuant to the Final DIP Order, this Agreement or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of any Chapter 11 Case, or by any other act or omission whatsoever.

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lender that:

Section 3.01    <u>Organization; Powers</u>. The Borrower is (a) duly organized and validly existing, (b) if applicable, in good standing under the laws of the jurisdiction of its organization, (c) has all requisite power and authority to carry on its business as now conducted and (d) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except, in each case referred to in <u>clauses (b)</u>, <u>(c)</u> or <u>(d)</u>, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and except, in each case, where failure or non-compliance results from any such Person's status as a "debtor" under, or is permitted by, the Bankruptcy Code.

Section 3.02    <u>Authorization; Enforceability</u>. Subject to entry of the Final DIP Order and subject to the terms thereof, the Transactions (including the performance of the Loan Documents) are within the corporate or other organizational powers of the Borrower and have been duly authorized by all necessary corporate or other organizational action. This Agreement has been and each other Loan Document will be duly executed and delivered by each party thereto. Subject to entry of the Final DIP Order and subject to the terms thereof, this Agreement constitutes, and each other Loan Document when executed and delivered will constitute a legal, valid and binding obligation of Borrower thereto, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights or remedies generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    <u>Governmental Approvals; No Conflicts</u>. Subject to entry the Final DIP Order and subject to the terms thereof, the Transactions (including the performance of the Loan Documents) (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) the filings referred to in <u>Section 3.10(b)</u>, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or its assets except as would not reasonably expected to result in a Material Adverse Effect and except, in each case, where failure or non-compliance is permitted by the Bankruptcy Code, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Subsidiaries (other than any Permitted Lien).

Section 3.04    <u>Title to Assets</u>.

(a)    The Borrower has good title to, or, other than as a result of the Chapter 11 Case, valid leasehold interests in, all its personal property material to its business, except for minor defects in title and Permitted Liens that do not interfere with its ability to conduct its business as

currently conducted or to utilize such properties for their intended purposes or as, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)    The Borrower owns, or, other than as a result of the Chapter 11 Case, is validly licensed to use, all Intellectual Property necessary to operate their respective business as currently conducted and contemplated to be conducted, and the operation of their respective businesses by the Borrower does not infringe upon or otherwise violate the rights of any other Person, in each case, except for any such Intellectual Property or infringements or violations that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.05    Litigation and Environmental Matters.

(a)    There are no actions, suits or proceedings (other than the Chapter 11 Case) by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower, threatened in writing against or affecting the Borrower (i) that would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (ii) on the Closing Date, that involve this Agreement or the Transactions or (iii) after the Closing Date, that, individually or in the aggregate, are material, involve this Agreement or the Transactions and are reasonably likely to be adversely determined with respect to the Borrower.

(b)    Except with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, the Borrower (i) has not failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has not become subject to any Environmental Liability, (iii) has not received written notice of any claim with respect to any Environmental Liability or (iv) does not know of any basis reasonably likely to result in Environmental Liability.

Section 3.06    Compliance with Laws and Agreements. The Borrower is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where (a) the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (b) such non-compliance results from any such Person's status as a "debtor" under, or is permitted under, the Bankruptcy Code.

Section 3.07    Investment Company Status; Regulations T, U and X. The Borrower is not an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940. No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.

Section 3.08    Taxes. The Borrower has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower, as applicable, has set aside on its books adequate reserves in

accordance with GAAP or (b) to the extent that the failure to do so would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

Section 3.09    Disclosure. None of the reports, financial statements, certificates or other written information furnished by or on behalf of the Borrower to the Lender in connection with the negotiation of this Agreement or delivered hereunder (with respect to any such report, financial statement, certificate or other written information furnished after the Closing Date, as modified or supplemented by other information so furnished), taken as a whole, contained any material misstatement of fact or omitted to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of the date furnished; provided that with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 3.10    Liens; Security Interests in the Collateral.

(a)    This Agreement will (to the extent required thereby), together with the entry of the  Final DIP Order, create in favor of the Lender, a security interest in the Collateral described therein (subject to any limitations specified therein).

(b)    Subject to entry of the Final DIP Order and, if applicable, when this Agreement is properly filed and recorded in the United States Patent and Trademark Office and the United States Copyright Office, and, with respect to Collateral in which a security interest cannot be perfected by such filings, upon the proper filing of the financing statements referred to in clause (a) above, the Lender shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Borrower thereunder in the United States Intellectual Property included in the Collateral listed in such ancillary document (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on material registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the Borrower after the Closing Date) to the extent such security interest can be perfected by such filing or recordation.

Section 3.11    No Change. Since the Closing Date, there has been no event that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.12    No Default. No Default or Event of Default has occurred and is continuing.

Section 3.13    Anti-Corruption Laws. The Borrower has conducted its business in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

Section 3.14    Use of Proceeds. After giving effect to any extension of credit hereunder and the use of proceeds thereof, the Borrower shall be in compliance with Section 5.04.

Section 3.15  Insurance. Schedule 3.15 sets forth a true, complete and correct description, in all material respects, of all material insurance maintained by or on behalf of the Borrower as of the Closing Date. As of such date, such insurance is in full force and effect.

Section 3.16  Beneficial Ownership Certificate. As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

Section 3.17  Bankruptcy Matters.

(a)  The Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Lender and the Requisite Consenting Prepetition Lenders (which consent shall not be unreasonably withheld in the case of immaterial modifications).

(b)  Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender shall, subject to the provisions of the Final DIP Order, as applicable, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court, subject to the Final DIP Order.

(c)  If the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans, or the performance by the Borrower of any of its obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Borrower and Lender shall be entitled to rely in good faith upon the Final DIP Order, notwithstanding objection thereto or appeal therefrom by any interested party. The Borrower and Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(d)  The Borrower is in compliance in all material respects with all orders entered by the Bankruptcy Court from and after the Petition Date.

ARTICLE IV

Conditions

Section 4.01  Closing Date. This Agreement, and the obligations of the Lender to make the initial Loans hereunder, shall become effective on the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)  Loan Documents. The Lender (or its counsel) shall have received (including by telecopy or email transmission), a counterpart of such Loan Document signed on behalf of Borrower.

(b)  Secretary's Certificate. Lender shall have received such documents and certificates as the Lender or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of the Transactions and any other

legal matters relating to this Agreement or the Transactions, including a customary secretary's certificate of Borrower, all in form and substance reasonably satisfactory to the Lender and its counsel.

(c)     <u>Commencement of Chapter 11 Case</u>. The Borrower shall have commenced the Chapter 11 Case in the Bankruptcy Court.

(d)     <u>Interim Cash Collateral Order</u>. The Bankruptcy Court shall have entered the Interim Cash Collateral Order attaching the Budget, which Interim Cash Collateral Order and Budget shall be in full force and effect and shall not have been amended, modified, stayed, or reversed without the prior written consent of the Requisite Consenting Prepetition Lenders.

(e)     <u>Final DIP Order</u>. The Bankruptcy Court shall have entered the Final DIP Order, which Final DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender and, to the extent such vacatur, reversal, stay, modification or amendment might reasonably be expected to have an adverse effect on the Prepetition Lenders, the Requisite Consenting Prepetition Lenders (such consent not to be unreasonably withheld). If the Final DIP Order is the subject of a pending appeal in any respect, neither the Final DIP Order nor the making of the Loans nor the performance by the Borrower of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(f)     <u>Creation of Security Interests</u>. The Final DIP Order, upon entry of the Final DIP Order, shall be effective to create in favor of the Lender, a legal, valid and enforceable perfected first-priority security interest in and Lien on the Collateral, subject to the priorities set forth Section 2.14, in each case to the extent that such security interest can be perfected by order of the Bankruptcy Court.

(g)     <u>Sale Process</u>. The Borrower shall have commenced a sale process for the proposed sale of all or substantially all of its assets consistent with the terms of the PSA (the "<u>Sale Transaction</u>").

(h)     <u>Perfection Matters</u>. Each UCC financing statement or other filing required by this Agreement shall be in proper form for filing.

(i)     <u>Anti-Money Laundering; Beneficial Ownership</u>. The Borrower shall have provided to Lender the documentation and other information requested by the Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Act, and the Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered to Lender, if requested, a Beneficial Ownership Certification.

(j)     <u>Fees and Expenses</u>. The Lender shall have received all amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including fees of legal counsel to the Lender) required to be reimbursed or paid by the Borrower hereunder.

(k)    <u>Amendment of Prepetition Credit Agreement</u>. The Lender, the Borrower, the Prepetition Agent, and the required Prepetition Lenders shall have executed that certain Amendment No. 4 to the Prepetition Credit Agreement pursuant to which the Prepetition Agent shall have consented to the transactions contemplated by this Agreement and the Liens granted hereunder, subject to the intercreditor provisions and subordination provisions hereof.

Section 4.02    <u>Each Credit Event</u>. The obligation of Lender to make a Loan on the occasion of any Borrowing (other than a continuation or conversion of an existing Borrowing) is subject to the satisfaction of the following conditions:

(a)    The representations and warranties of Borrower set forth in this Agreement shall be true and correct in all material respects (except to the extent that any such representation and warranty is qualified by materiality or Material Adverse Effect, in which case such representation and warranty shall be true and correct in all respects) on and as of the date of such extension of credit, except to the extent that any such representation and warranty relates to an earlier date (in which case such representation and warranty shall have been true and correct in all material respects (except to the extent that any such representation and warranty is qualified by materiality or Material Adverse Effect, in which case such representation and warranty shall be true and correct in all respects) as of such earlier date).

(b)    At the time of and immediately after giving effect to such extension of credit, no Default or Event of Default shall have occurred and be continuing.

(c)    The Lender shall have received a Committed Loan Notice in accordance with <u>Section 3.02</u>.

(d)    The Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect without the prior written consent of the Lender and, to the extent such vacatur, reversal, stay, modification or amendment might reasonably be expected to have an adverse effect on the Prepetition Lenders, the Requisite Prepetition Consenting Lenders (such consent not to be unreasonably withheld). If the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans, the issuance of the Letters of Credit or the performance by Borrower of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal. The Borrower and the Lender shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction

Each such request for an extension of credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in <u>paragraphs (a)</u> and <u>(b)</u> of this Section.

ARTICLE V

Affirmative Covenants

Until the Facility Termination Date, the Borrower covenants and agrees with the Lender that:

Section 5.01    Postpetition Obligations. The Borrower will comply in all material respects with the Cash Collateral Orders, the Final DIP Order, and the Prepetition Loan Documents as and to the extent required by the Cash Collateral Orders and Final DIP Order, as applicable.

Section 5.02    Payment of Obligations. Except as prohibited by the Bankruptcy Code, the Borrower will pay its material obligations, including material Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect. For the avoidance of doubt, nothing herein shall permit payment of any obligation subject to the automatic stay under the Bankruptcy Code; provided that such obligations may be paid as required in or permitted by (i) the Final DIP Order or (ii) any other order of the Bankruptcy Court (to the extent such other order is reasonably acceptable to the Requisite Consenting Prepetition Lenders).

Section 5.03    Compliance with Laws. Except where failure or non-compliance is permitted by the Bankruptcy Code, the Borrower will comply with all applicable laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 5.04    Use of Proceeds and Extensions of Credit. The Borrower shall (a) use the proceeds of the Loans, subject to the Final DIP Order, only for the payment of costs, expenses, and working capital needs of the Borrower during the Chapter 11 Case in accordance with the Budget, including, but not limited to, posting cash collateral to secure letters of credit or providing cash deposits or other similar grants of security for fuel purchases to operate the Borrower's generation facility; provided that, to the extent provided in and subject to the Final DIP Order, as applicable, in no event shall the proceeds of any Loan be used (x) in contravention of any applicable law or of any Loan Documents; (y) for the payment of professional fees, costs and disbursements incurred in connection with (1) any challenge to (A) the amount, extent, priority, validity, perfection, or enforcement of the indebtedness of the Borrower owing to the Lender or Prepetition Lenders or (B) the collateral securing such indebtedness or the perfection, priority, or validity of the Liens granted in favor of the Lender or the Prepetition Agent or (2) any action to limit, impede, or restrict the Lender's enforcement of remedies with respect to the Collateral securing the Obligations following an Event of Default or to otherwise modify or limit the rights of the Lender or the Prepetition Agent, in each case under any Order.

Section 5.05   <u>Plan and Sale Milestones</u>. The Borrower will diligently pursue the following:

    (a)   <u>Plan Milestones</u>:

        (i)   within 60 days of the Petition Date, file a Plan of Reorganization and disclosure statement consistent with the PSA (respectively, the "<u>Conforming Plan</u>" and "<u>Disclosure Statement</u>");

        (ii)   within 90 days of the Petition Date, amend the Disclosure Statement if necessary;

        (iii)   within 120 days of the Petition Date, obtain approval of the Disclosure Statement from the Bankruptcy Court;

        (iv)   within 160 days of the Petition Date, commence the hearing before the Bankruptcy Court to confirm the Conforming Plan, subject to a 60-day extension in the event of a default by the winning bidder and pursuit of a closing with a back-up bidder;

        (v)   within 175 days of the Petition Date, obtain an order from the Bankruptcy Court confirming the Conforming Plan, subject to a 60-day extension in the event of a default by the winning bidder and pursuit of a closing with a back-up bidder;

        (vi)   within 190 days of the Petition Date, cause the Conforming Plan to become effective, subject to a 60-day extension in the event of a default by the winning bidder and pursuit of a closing with a back-up bidder;

<u>provided</u> that notwithstanding the foregoing or anything to the contrary in this Agreement or any other Loan Document, the Lender may in its reasonable discretion extend any deadline set forth in this clause (a); and

    (b)   <u>Sale Milestones</u>:

        (i)   within 70 days of the Petition Date, obtain qualifying bids for the Sale Transaction pursuant to bidding procedures for the Sale Transaction consistent with the PSA (the "<u>Bidding Procedures</u>");

        (ii)   within 75 days of the Petition Date, conduct an auction with respect to the Sale Transaction pursuant to the Bidding Procedures;

        (iii)   within 80 days of the Petition Date, obtain the entry of an order by the Bankruptcy Court approving the Sale Transaction; and

        (iv)   within 155 days of the Petition Date, close the Sale Transaction, subject to a 60-day extension in the event of a default by the winning bidder and pursuit of a closing with a back-up bidder;

provided that notwithstanding the foregoing or anything to the contrary in this Agreement or any other Loan Document, the Lender may in its reasonable discretion extend any deadline set forth in this clause (b).

ARTICLE VI

Negative Covenants

Until the Facility Termination Date, the Borrower covenants and agrees with the Lenders that:

Section 6.01    Indebtedness. The Borrower will not create, incur, assume, or permit to exist any Indebtedness, except Indebtedness incurred under the Loan Documents and as otherwise permitted under clauses (c) through (i) of Section 9.01 of the Prepetition Credit Agreement (other than with respect to the protections granted to a stalking-horse bidder in connection with the Sale Transaction, the Cash Collateral Order, or as otherwise agreed to by the DIP Lender and the Requisite Consenting Prepetition Lenders, in writing, which writing may be delivered via email by counsel).

Section 6.02    Liens. The Borrower will not create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)    Permitted Encumbrances;

(b)    any Lien on any property or asset of the Borrower (or any improvements or accession thereto or proceeds therefrom) existing on the Petition Date and set forth in Schedule 6.02(b); provided that such Lien shall secure only those obligations which it secures on the Closing Date;

(c)    Liens securing Indebtedness of the Borrower incurred pursuant to Section 6.01(c) of the Prepetition Credit Agreement; provided that (i) such Liens are incurred prior to or within 180 days after such acquisition or the completion of such construction and improvement with the acquisition of such fixed or capital assets, and (ii) such Liens do not at any time encumber any of its existing property other than the property financed by such Indebtedness;

(d)    Liens created by the Collateral Documents securing the Obligations;

(e)    [reserved];

(f)    licenses, sublicenses, leases or subleases granted to others in the ordinary course of business that do not interfere in any material respect with the business of the Borrower;

(g)    any interest or title of a lessor or sublessor under, and Liens arising from UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases and subleases permitted hereunder;

(h)    any extension, renewal or replacement (or successive renewals or replacements) in whole or in part of any Lien referred to in clause (b) and (c) above; provided that with respect to clause (b) and (c) above, (x) the obligations secured thereby shall be limited to the obligations secured by the Lien so extended, renewed or replaced (and, to the extent provided in such clauses, extensions, renewals and replacements thereof) and (y) such Lien shall be limited to all or a part of the assets that secured the Lien so extended, renewed or replaced;

(i)    materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, arising in the ordinary course of business, either for amounts that are not yet delinquent or for amounts being contested in good faith and by appropriate proceedings, so long as adequate reserves have been provided therefor on the books of the relevant Person to the extent required by and in accordance with GAAP;

(j)    involuntary Liens securing a charge or obligation on any of the Borrower's property, either real or personal, whether now or hereafter owned, in the aggregate sum of less than $1,000,000;

(k)    Liens on deposits made with utilities pursuant to any order of the Bankruptcy Court;

(l)    Liens junior to the Liens created pursuant to the Loan Documents to secure the Obligations that are granted by the Final DIP Order pursuant to Section 364(d)(1) of the Bankruptcy Code as adequate protection; and

(m)    Liens in favor of the Prepetition Agent under the Prepetition Loan Documents and having the priority set forth herein and in the Final DIP Order.

Section 6.03    Investments. The Borrower will not make or permit any Investments, except Investments made in accordance with the Budget (subject to permitted variances).

Section 6.04    Consolidations and Mergers; Asset Sales. The Borrower will not (a) enter into any transaction of merger or consolidation, or sell all or substantially all of its respective assets to, (b) change its respective form of organization or its respective business, (c) liquidate or dissolve itself (or suffer any liquidation or dissolution) or discontinue its respective business or (d) make or enter into any Asset Sale, in each case except in connection with the Sale Transaction consistent with the PSA and provided that the proceeds of any of the foregoing are applied in accordance with the PSA.

Section 6.05    Transactions with Affiliates and Shareholders. The Borrower will not, sell, lease, or otherwise transfer any property or assets to, or purchase, lease, or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its affiliates or shareholders except as permitted pursuant to the Prepetition Loan Documents, as modified by the Cash Collateral Orders, including without limitation the EMA and FMA.

Section 6.06    Bankruptcy Matters. The Borrower will not:

(a)      at any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) any "first day order" entered by the Bankruptcy Court in the Chapter 11 Case, if such reversal, modification, amendment, stay, or vacation would reasonably be expected to have an adverse effect on the rights of the Lender under this Agreement or the Prepetition Lenders, or (ii) the Final DIP Order, in each case, absent the written consent of the Lender and, to the extent such vacatur, reversal, stay, modification or amendment might reasonably be expected to have an adverse effect on the Prepetition Lenders, the Requisite Prepetition Consenting Lenders (which consent shall not be unreasonably withheld in the case of immaterial modifications to the Final DIP Order);

(b)      at any time, seek or consent to a priority for any administrative expense or unsecured claim against the Borrower of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the Obligations, other than for the Carve-Out, the Term Lender Retained Senior Lien, the Revolving Lender Payment Claim, the Adequate Protection Claims, and as otherwise expressly permitted by this Agreement or the Final DIP Order;

(c)      permit to be filed with the Bankruptcy Court any of the following unless such motion, pleading, proposed order or other document is in form and substance reasonably satisfactory to Lender and the Requisite Prepetition Consenting Lenders: (i) any motion seeking approval of the DIP Facility, any other financing arrangement under Section 364 of the Bankruptcy Code or any cash management arrangements and procedures; (ii) the Final DIP Order; or (iii) any pleading or proposed order relating to the Loan Documents not addressed in the preceding clauses (i) and (ii); or

(d)      prior to the Facility Termination Date, pay any administrative expense claims except (i) the Obligations then due and payable hereunder, (ii) Professional Fees, the professional fees and expenses of  any Committee, including its advisors, and reasonable out-of-pocket expenses of its members or (iii) other administrative expense and professional claims in accordance with the Budget.

## ARTICLE VII

## Events of Default

Section 7.01    Events of Default. If any of the following events ("Events of Default") shall occur:

(a)      the Prepetition Term Lenders' claims under the Prepetition Term Loans are allowed in the Chapter 11 Case in an amount less than the amount of the Prepetition Term Lender Prepayment Claim;

(b)     the Borrower proposes or supports a plan of liquidation or reorganization under which Prepetition Term Lenders would receive less than the value of the Term Lender Retained Senior Lien in cash on the effective date of such plan;

(c)     a chapter 11 trustee is appointed in the Chapter 11 Case;

(d)     the Chapter 11 Case is converted to a case pursuant to chapter 7 of the Bankruptcy Code;

(e)     the Chapter 11 Case is dismissed;

(f)     an examiner is appointed in the Chapter 11 Case;

(g)     the Borrower shall incur debt that is senior to or *pari passu* with the Obligations, as to either or both payment or lien priority (other than with respect to the protections granted to a stalking-horse bidder in connection with the Sale Transaction, the Cash Collateral Order, as provided in the Final DIP Order, or as otherwise agreed to by the DIP Lender and the Requisite Consenting Prepetition Lenders, in writing, which writing may be delivered via email by counsel);

(h)     the Borrower shall fail to pay any principal or interest of the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(i)     the Borrower shall fail to pay other amount payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days following written notice therefor;

(j)     failure to observe, perform or comply with any covenant, condition, or agreement contained in this Agreement, any other Loan Document to which it is a party, the Final DIP Order, or the Cash Collateral Orders, and such failure shall continue unremedied for a period of thirty (30) days after the date on which written notice thereof is delivered by the Lender to the Borrower;

(k)     at any time, the Collateral Documents shall cease, for any reason, to be in full force and effect, or the Borrower shall so assert in writing, or any material Lien created by the Collateral Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby (except, in each case, as permitted under the Loan Documents);

(l)     a Change of Control shall occur; or

(m)     either of the following shall occur:

(i)     the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Lender of any amounts received in respect of the Obligations;

(ii)      entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) of the Bankruptcy Code against any holder of the Obligations;

then, and in every such event, (x) pursuant to the terms of the Final DIP Order, upon occurrence of an Event of Default, all of the Lender's rights under the Loan Documents will be automatically assigned to the Prepetition Term Lenders (or, with the consent of the Requisite Consenting Prepetition Lenders, to the Prepetition Agent for the benefit of the Prepetition Term Lenders), without requiring any further actions by the Prepetition Agent, the Prepetition Term Lenders, or the Bankruptcy Court, and (y) the Prepetition Term Lenders or the Prepetition Agent, as applicable, may, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitment, and thereupon the Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable during the continuation of such event) by the Borrower, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest, or other notice of any kind, all of which are hereby waived by the Borrower. The Final DIP Order shall provide for customary relief from automatic stay to permit the Prepetition Agent and Prepetition Term Lenders to enforce the Loan Documents upon such Event of Default without need for further order of the Bankruptcy Court.

Section 7.02   Obligations Under Cash Management Agreements. No Cash Management Bank that obtains the benefits of any Loan Document by virtue of the provisions hereof or of any other Loan Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article VII to the contrary, Lender shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Cash Management Obligations unless the Lender has received written notice of such Obligations, together with such supporting documentation as the Lender may request, from the applicable Cash Management Bank.

ARTICLE VIII

Miscellaneous

Section 8.01   Notices.

(a)      Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in clause (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the address, facsimile number, electronic mail address or telephone

number specified for such Person on Schedule 8.01(a). Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in clause (b) below shall be effective as provided in such clause (b).

(b)     Notices and other communications to the Lender may be delivered or furnished by electronic communication (including e-mail and Internet or intranet web-sites) pursuant to procedures approved by the Lender. Unless the Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)     Each of Lender and Borrower may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.

(d)     The Lender shall be entitled to rely and act upon any notices (including telephonic notices, Committed Loan Notices and Notices of Loan Prepayment) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Lender from all losses, costs, expenses, and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices to and other telephonic communications with the Lender may be recorded by the Lender, and each of the parties hereto hereby consents to such recording.

Section 8.02  Waivers; Amendments.

(a)     No failure or delay by the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by Lender therefrom shall in any event be effective unless the same

shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, amended and restated, or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender and consented to by the Requisite Consenting Prepetition Lenders.

Section 8.03    No Waiver; Cumulative Remedies; Enforcement. No failure by to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Section 8.04    Expenses; Indemnity; Damage Waiver.

(a)     The Borrower shall pay on the Maturity Date (i) all reasonable, documented, out-of-pocket expenses incurred by the Lender for the reasonable and documented out-of-pocket fees, charges and disbursements of legal counsel in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, the Final DIP Order, any Plan, any amendments, restatements, modifications or waivers (or any proposed amendments, restatements, modifications or waivers) of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or such other orders of the Bankruptcy Court for which the Lender's consent or approval is required under the terms of this Agreement or the Final DIP Order, and (ii) all other reasonable, documented, out-of-pocket expenses incurred by the Lender (but limited in the case of legal expenses to the reasonable and documented out-of-pocket fees, charges, and disbursements of one primary counsel and one local counsel in each applicable jurisdiction), in each case, subject to receipt by the Borrower of an invoice.

(b)     The Borrower shall indemnify the Lender, the Prepetition Secured Parties and their respective Related Parties against, and hold the Lender, the Prepetition Secured Parties and their respective Related Parties (each, an "Indemnified Party" and, collectively, the "Indemnified Parties") harmless from, any and all losses, claims, damages, liabilities and reasonable, documented, out-of-pocket related expenses (including those reasonable and documented fees, charges and disbursements of any counsel to the extent provided in the immediately preceding section) that may be incurred by any Indemnified Party or asserted against an Indemnified Party by any third party or by the Borrower arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, the administration of this Agreement and the other Loan

Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower, or any action or proceeding relating to Environmental Laws related in any way to a Borrower, or (iv) any actual or prospective claim, litigation, investigation, or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower's directors, shareholders or creditors, and regardless of whether any Indemnified Party is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnified Party; provided that such indemnity shall not, as to any Indemnified Party, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Party or (y) result from a claim brought by the Borrower against an Indemnified Party for breach in bad faith or a material breach of such Indemnified Party's obligations hereunder or under any other Loan Document, if such Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     To the fullest extent permitted by applicable law, the parties shall not assert, and each hereby waives, any claim against an Indemnified Party on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof; provided that the foregoing shall not in any way limit the indemnification obligations of the Borrower pursuant to clause (b) above to the extent that such special, indirect, consequential or punitive damages are included in any claim by a third party unaffiliated with the Indemnified Third Party with respect to which the Lender is entitled to indemnification pursuant to clause (b) above. Each Indemnified Party shall not be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnified Party through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(d)     All amounts due under this Section shall be payable on the later of the Maturity Date or the tenth (10th) day following the issuance by the applicable Indemnified Party of a demand for indemnification accompanied by reasonable documentation as supports the amount claimed.

(e)     The agreements in this Section shall survive the replacement of Lender, the termination of the Commitments, and the repayment, satisfaction, or discharge of all the other Obligations.

Section 8.05 <u>Successors and Assigns</u>.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Lender and the Requisite Prepetition Consenting Lenders (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).

(b)     Lender may not assign or otherwise transfer its rights or obligations hereunder except in accordance with the Final DIP Order and Section 7.01; <u>provided</u> that notwithstanding anything contrary herein, the Final DIP Order or in any other Loan Document, the Lender and its successors and permitted assigns shall have the right to collaterally assign its rights and obligations under the Loan Documents to the Prepetition Agent for the benefit of Prepetition Secured Parties as security for the Prepetition Secured Obligations and nothing herein or in any other Loan Document shall prohibit the Lender from pledging its rights and the obligations of the Borrower hereunder or under any other Loan Document to the Prepetition Agent for the benefit of Prepetition Secured Parties as security for the Prepetition Secured Obligations or the right of the Prepetition Agent to exercise remedies in respect of such collateral security.

(c)     Lender may not sell participations to any entities in all or a portion of the Lender's rights and obligations under this Agreement.

(d)     Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby) any legal or equitable right, remedy, or claim under or by reason of this Agreement.

Section 8.06 <u>Survival</u>. All covenants, agreements, representations and warranties made by the Borrower herein, in the other Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or the other Loan Documents shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the other Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or the Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of this Agreement requiring indemnity or confidentiality shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, any assignment of rights by or replacement of a Lender or the termination of this Agreement or any provision hereof.

Section 8.07 <u>Counterparts; Integration; Conflicts with Final DIP Order; Effectiveness</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall

constitute a single contract. This Agreement, the other Loan Documents, the Final DIP Order and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. In the event of any conflict between any Order and the provisions of any other Loan Document, the provisions of the applicable Order shall control. This Agreement shall become effective as provided in Section 4.01, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by email or telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 8.08    Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 8.09    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    Subject to any applicable Debtor Relief Law, this Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby (including any power of attorney set forth in the Loan Documents) and thereby shall be governed by and construed in accordance with the law of the State of Delaware (and, to the extent applicable, the Bankruptcy Code).

(b)    The Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Lender of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court and if the Bankruptcy Court does not have or abstains from exercising jurisdiction, the courts of the State of Delaware, and of the United States District Court of the District of Delaware, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action or proceeding may be heard and determined in such courts. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower.

(c)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any court referred to in paragraph (b) of this Section. Each of the

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT
ECTOR COUNTY ENERGY CENTER LLC

40

parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 8.01</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 8.10   <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED TO IT, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 8.11   <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 8.12   <u>Confidentiality</u>. The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory or self-regulatory authority, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or an agreement described in clause (f) hereof or (ii) becomes available to the Lender on a non-confidential basis from a source other than the Borrower. For the purposes of this Section, "<u>Information</u>" means all information received from the Borrower relating to the Borrower, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that

serve the lending industry. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would reasonably accord to its own confidential information.

The Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

Section 8.13   Collateral. Lender irrevocably agrees that it shall, upon the request of the Borrower, release any Lien on any property granted to or held by it under any Loan Document (a) upon the occurrence of the Facility Termination Date, (b) subject to Section 8.02, upon any sale, transfer, or other disposition not prohibited hereunder or under any other Loan Document to any Person.

Section 8.14   Third Party Beneficiaries.   The parties hereto agree that the Prepetition Agent is an intended and express third party beneficiary of all of the provisions of this Agreement and the other Loan Documents and shall have the right, exercisable in its discretion, to enforce the terms and conditions of this Agreement and the other Loan Documents against the parties, as applicable, or prevent the breach thereof, or to exercise any other right, or seek any other remedy, which may be available to it as a third party beneficiary of this Agreement and the other Loan Documents.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers as of the date first above written.

<u>BORROWER</u>:

ECTOR COUNTY ENERGY CENTER LLC,
a Delaware limited liability company

By: _____
Name: John Baumgartner
Title:   Chief Restructuring Officer
_____

LENDER:                          INVENERGY THERMAL OPERATING I LLC,
                                 as the Lender


                                 By: _____
                                 Name: _____
                                 Title:_____