UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
|  | . | Chapter 11 |
| IN RE: | . |  |
|  | . | Case No. 22-10320(JTD) |
| ECTOR COUNTY ENERGY | . |  |
| CENTER, LLC, | . |  |
|  | . | 824 Market Street |
|  | . | Wilmington, Delaware 19801 |
| Debtor. | . |  |
| . . . . . . . . . . . . . . . . | . | Wednesday June 15, 2022 |

TRANSCRIPT OF VIDEO HEARING RE:
DISCOVERY DISPUTE
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:            Christopher A. Ward, Esq.
                            Michael V. DiPietro, Esq.
                            POLSINELLI, PC

                            John J. Monaghan, Esq.
                            David W. Wirt, Esq.
                            William Farley, Esq.
                            Martin Durkin, Esq.
                            Jacob Morton, Esq.
                            HOLLAND & KNIGHT, LLP

For the U.S. Trustee:       Juliet Sarkessian, Esq.
                            OFFICE OF THE U.S. TRUSTEE




(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Court Personnel

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:   (Continued)

For Credit Suisse:              Amanda Steele, Esq.
                                Mark Collins, Esq.
                                RICHARDS, LAYTON & FINGER, PA

                                Brian Resnick, Esq.
                                Joshua Sturm, Esq.
                                Stella Li, Esq.
                                Sophy Ma, Esq.
                                Elliot Moskowitz, Esq.
                                Sean Stefanik, Esq.
                                DAVIS, POLK & WARDWELL, LLP

For Direct Energy Business
Marketing, LLC:                 Matthew Lunn, Esq.
                                Michael Nestor, Esq.
                                Michael Neiburg, Esq.
                                YOUNG, CONAWAY, STARGATT
                                 & TAYLOR, LLP

                                Zachary Russell, Esq.
                                Benjamin Finestone, Esq.
                                Christine Botvinnik, Esq.
                                Christopher Kercher, Esq.
                                John Shaffer, Esq.
                                Jacqueline Stykes, Esq.
                                Kathryn Bonacorsi, Esq.
                                Katherine Scherling, Esq.
                                QUINN, EMANUEL, URQUHART
                                 & SULLIVAN, LLP

For Invenergy Thermal
Operating I:                    William Hazeltine, Esq.
                                William Sullivan, Esq.
                                SULLIVAN HAZELTINE ALLINSON, LLC

                                Ellen Halstead, Esq.
                                Gregory Plotko, Esq.
                                Sarah Gilbert, Esq.
                                CROWELL & MORING, LLP

For Ector County
Generation, LLC:                Mark Dendinger, Esq.
                                BRACEWELL, LLP


(Appearances Continued)

APPEARANCES VIA ZOOM:   (Continued)

Also Appearing:                John Baumgartner
                               GRANT THORNTON, LLP

                               Jason DiBattista
                               LEVFIN INSIGHTS

                               Ana Lucia Hurtado
                               REORG Research

                               Taylor Harrison
                               DEBTWIRE

                               Akiko Matsuda
                               WALL STREET JOURNAL

                               JaKayla DaBera
                               Laura Haney
                               U.S. BANKRUPTCY COURT

INDEX

Page

ARGUMENT BY MR. FINESTONE                        6

ARGUMENT BY MR. DURKIN                          13

ARGUMENT BY MS. HALSTEAD                        14

FURTHER ARGUMENT AND COLLOQUY                   18

COURT DECISION                                  28

1      (Proceedings commence at 11:02 a.m.)

2      THE COURT:  Good morning.  This is Judge Dorsey.

3  We're on the record in Ector County Energy Center, LLC, Case

4  Number 22-10320.

5      This is the time I set aside to hear a discovery

6  dispute.  I believe it was Direct Energy who requested the

7  hearing, so I'll go ahead and hear from them first.  Go

8  ahead, Mr. Finestone.

9      (No verbal response)

10     THE COURT:  Mr. Finestone, can you hear me?

11     (No verbal response)

12     THE ECRO:  Good morning, Counsel.  Can you hear us?

13     (No verbal response)

14     THE COURT:  Host not allowing to unmute?  I didn't

15  think we could even do that.

16     (Court and court personnel confer)

17     MR. FINESTONE:  Okay.  It looks like that works,

18  Your Honor.

19     THE COURT:  All right.  That's never happened

20  before.  I'm not sure what happened there.

21     (Court and court personnel confer)

22     THE COURT:  Go ahead, Mr. Finestone.

23     MR. FINESTONE:  Thank you, Your Honor.  Ben

24  Finestone with Michael Nestor on behalf of Direct Energy.

25  Mr. Neiberg is traveling this morning, so I'll be handling

1    the argument.  Thank you to the Court for putting some time

2    aside.

3            As Your Honor noted, we're here on a discovery

4    dispute.  Direct Energy, pursuant to the Court's instruction,

5    put in a letter brief at Docket Number 206, and the debtors

6    and Invenergy have responded at Docket Number 212 and 213.

7            Your Honor, I'll venture to say that, relative to

8    other discovery disputes that have come before Your Honor,

9    this is not a complex one.  This isn't an issue of navigating

10   through a thorny privilege issue, it's not an issue of

11   weighing burdens on the producing and the requesting side.  I

12   don't even think, Your Honor, it's going to be a relevance

13   issue.

14           The primary issue, from Direct Energy's

15   perspective, Your Honor, and why we felt the need to contact

16   chambers is that the responding parties have just failed to

17   fulfill their discovery obligations over an approximate two-

18   month period.  And let me, just very quickly to level-set, go

19   through a high-level time period, Your Honor, time line.

20           As Your Honor knows, the debtor filed its voluntary

21   petitions on April 11th.  Direct Energy, without delay, as

22   quickly as we could, assessed the issues, served disc --

23   document requests on both respondents here on April 19th;

24   that's eight days later, Your Honor.  We were -- at the time,

25   we were facing a May 9th second-day hearing, final hearing on

1    the debtor's interim relief.  We had an April 29th discovery

2    conference with Your Honor, and the debtor ultimately

3    adjourned the disputed issues from May 9th, and the Court was

4    willing to reschedule those issues for May 31st.  And May

5    31st, of course, Your Honor, is when we had the mini-trial on

6    cash collateral.

7            We're now -- today, it's June 15th.  We're now two

8    months from the service of our discovery requests,

9    approximately two months.  I think we're probably about four

10   days shy of two months, give or take a day or two, Your

11   Honor.  And we're less than one week from the next contested

12   -- for when at least the next contested matter is scheduled,

13   June 21st.  We're less than one week from there.  And neither

14   party, the debtors or Invenergy, have been able to and, by

15   negative inference are making it quite clear they're not done

16   producing documents, Your Honor.  They -- they're -- they

17   have not certified completion.

18           This isn't a technical glitch.  We peppered them

19   with emails every couple of days, can you please let us know

20   if you're complete, if your document production is

21   substantially complete.  I can tell you, with high levels of

22   certainty, that Invenergy is not complete and they don't

23   represent as much in the letter that they put into the Court,

24   Your Honor.  The debtors, there's a little bit of ambiguity,

25   but I don't think that they're complete.  I don't think

they've completed their document production, either, Your

Honor.

So it's -- we're two months -- I mean, this is two

months of -- this isn't an adversary proceeding that's going

to take three years, to state the obvious.  This is the

Chapter 11 case, it's moving quickly.  We've been very

reasonable in trying to balance our ability to represent our

client with giving these responding parties time to produce

documents and they're just not finished, Your Honor.

Starting first with Invenergy, I know I've been a

refrain on this, but I'll do it one more time.  Invener --

ITOI is the proposed DIP lender in this case.  They are the

controlling shareholder.  They -- as Your Honor heard from

the testimony at the May 31st hearing, it was ITOI that

proposed the framework for this bankruptcy case *vis-a-vis* its

secured lenders.

There are two senior Invenergy representatives that

sit on the board of managers that control this debtor.  I

don't believe the debtors have control over their mailboxes.

We've seen no emails from those two senior Invenergy

representatives.

ITOI is also the proposed defendant in several of

the causes of action that Direct Energy has requested court

approval to pursue on behalf of the estate because we know

the estate is not going to pursue those claims.  They've

agreed in the pre-petition plan support agreement to release

them all, Your Honor.  So they're also the proposed defendant

and they're the beneficiary of the release that's clear in

the plan support agreement and that Mr. Baumgartner testified

about.

ITOI has produced 231 documents.  And in the letter

that they sent to the Court and in all of the email responses

to us, they've refused to confirm substantial completion.

They just haven't completed their discovery obligations.

The debtors, Your Honor, as I said, a little more

ambiguous.  They've produced a higher number of documents,

but we're not in the position to say that's a lot of

documents, it must be complete.  We don't know what they

haven't produced.

And just to give the Court some example of Direct

Energy's reasonableness on discovery, Your Honor, when we

went forward at the May 31st hearing, the debtors' position

to us had been we've produced all documents that may be

responsive to the DIP financing we haven't produced yet, but

don't worry about it, Mr. Finestone, don't worry about it,

Mr. Nestor, DIP financing is not going forward.

Just by way of example, we received two documents

in this interim period between May 31st and today, June 15th,

from the debtors that, in our view, were very much relevant

for the May 31st hearing.

1     And before I describe them to Your Honor, I just

2 want to be clear, Your Honor, I am not suggesting that we are

3 contemplating a motion for reconsideration or that these

4 documents are material, such that Your Honor would have ruled

5 differently, I'm not raising them for that point.  I'm just

6 raising them for the fact to establish that we've been

7 reasonable in taking the debtor's representations and

8 deferring to their determinations on what's relevant.

9     But by way of example, Your Honor, ECEC28499 is an

10 email from Mr. Baumgartner to Invenergy, stating:

11          "We should hold the Invenergy Services and

12          Invenergy Service Thermal payments until they come

13          due.  Paying early like this will get a lot of

14          unfavorable attention."

15     Well, Your Honor will remember from the testimony

16 the debtor did, in fact, pay early, it did, in fact, get a

17 lot of unfavorable attention.  In our view, those are blatant

18 insider preferences on the day of the voluntary petition.

19 And this was a document that was not produced to us in

20 advance of May 31st.

21     There's another document, Your Honor, ECEC29103, in

22 which a debtor representative, Tim McMillan is stating that:

23          "The cash forecasts need to be updated to reflect

24          Ector reimbursing ITOI for LC fees associated with

25          the direct LC and the 1OK LC that will remain under

1          the ITOI during the filing."

2          I don't know what that's all about, Your Honor, but

3     it sounds a lot to me that this cash -- that these cash

4     forecasts that we had testimony about either did or did not

5     include additional reimbursements to ITOI from the debtor.  I

6     don't know if they're in there or they're not.

7          Your Honor will remember there was testimony about

8     amended -- about an amended cash forecast, cash budget that

9     was never produced and still hasn't been filed on the docket

10    to today, even though they want to go forward on DIP

11    financing.  So these are documents that were produced after

12    the May 31st hearing.

13         Long story short, Your Honor.  We're facing a June

14    21st hearing on the debtor's DIP financing motion and on our

15    Cybergenics motion.  We just want them to produce the

16    document to us ASAP.  We asked in our letter for Your Honor

17    to order them to produce documents by tomorrow, so that we

18    can feel that we will have a fair day in court.  I'll just

19    put an asterisk there, Your Honor.

20         With respect to June 21st, chambers had indicated

21    that the Court only had an hour available to it.  I think,

22    Your Honor, that, irrespective of where Your Honor comes out

23    on these discovery issues, that an hour is going to be like -

24    - and I'm not suggesting -- I probably don't disagree with

25    the debtors.  I'm not suggesting an evidentiary hearing of

1    the sort that the Court oversaw on May 31st.  But I -- some

2    of the legal arg -- even just the legal arguments alone that

3    these parties have articulated and advanced in their

4    objection -- which, in my read, attempt to shut down

5    derivative standing and bankruptcy for every LLC debtor that

6    could ever file -- that alone I think takes more than an

7    hour.

8            So our request of the Court is to order these

9    parties to finish their document production, assumes they can

10   do it -- and again, they've had approximately two months.

11   And then I think all parties -- and I don't know about this,

12   but I think it does make sense for that hearing to be

13   adjourned about a week to allow them to finish their document

14   production, and just until a time in which the Court has

15   something more than an hour.

16           Thank you for the opportunity to be heard, Your

17   Honor.  Of course, if the Court has any questions.

18           THE COURT:  All right.  Let me hear from debtor's

19   counsel.

20       (No verbal response)

21           THE COURT:  Have we -- what's going on with the ...

22       (Court and court personnel confer)

23           MR. DURKIN:  Your Honor, I believe --

24           THE COURT:  There you go.

25           MR. DURKIN:  Is this working now?  Okay.  Thank

1    you.  I got the same message Mr. Finestone received.

2         Your Honor, it's debtor's position that, at this

3    point, we now have completed our production.  We sent a

4    production over last evening to Mr. Finestone's office.  I

5    believe they received that.  If there was an issue with that,

6    please let me know.

7         Throughout this process, Your Honor, we have tried

8    to be fairly open with Mr. Finestone's office.  We've sent to

9    them the search terms that we used for these searches.  We

10   exchanged information on that.  At this point, subject to

11   Direct Energy's counsel identifying something that they

12   believe is missing, we've run the searches, we've produced

13   the documents that we've found.  That's all I can do right

14   now.

15        I'm happy to run more searches if they think

16   something was missed by the searches that we ran.  Again, we

17   produced the search terms.  I recognize that we didn't meet

18   Direct Energy's time line for this.  But quite frankly, we

19   worked with all due diligence possible that this was a fairly

20   extensive discovery request.  It wasn't limited to just what

21   we had in our immediate possession and we produced the

22   documents as quickly as we could.

23        And as I said, I believe we're finished.  Direct

24   Energy hasn't identified categories of documents that they

25   say we haven't produced yet.  And if they do, I'm happy to

1  sit down with him, have a meet-and-confer, and go through

2  that.  We haven't had that at this point.

3          THE COURT:  All right.  Let me hear from ITIO

4  [sic].

5      (No verbal response)

6          THE COURT:  Ms. Halstead.  We've got to find out

7  what's going on with that.  This never happened before.

8          MS. HALSTEAD:  Thank you, Your Honor.  Can you hear

9  me now?

10          THE COURT:  Yes.  Thank you.

11          MS. HALSTEAD:  Yes.  Ellen Halstead from Crowell &

12  Moring on behalf of Invenergy Thermal Operating I, LLC.

13          Our client has also been producing documents on a

14  rolling basis.  At this point, we are not complete with the

15  production, although expect to be complete with it shortly.

16          THE COURT:  What does --

17          MS. HALSTEAD:  You know --

18          THE COURT:  -- "shortly" --

19          MS. HALSTEAD:  -- mister --

20          THE COURT:  -- mean?

21          MS. HALSTEAD:  We should be done by Monday, June

22  20th.

23          THE COURT:  That's only a day before the hearing.

24  Go ahead.

25          MS. HALSTEAD:  If it -- thank you, Your Honor.

1          You know, Mr. Finestein [sic] has made mention that

2     Thermal's production is small, it's only about 230 documents.

3     That's because Thermal has not produced documents that the

4     debtor has also produced, were produced -- I think, as Your

5     Honor knows and as Mr. Finestein has mentioned several times,

6     these are related entities, the debtor and Thermal are both

7     related entities.  So, as a result, there's -- there are

8     documents that are in the possession, custody, and control of

9     both.  We focused our efforts on producing documents that the

10    debtor has not produced, as opposed to, you know, re-

11    duplicating the production that debtor is making.

12         THE COURT:  Well, debtor said they produced 30,000

13    documents.  Are you going through 30,000 documents and

14    comparing them to the documents you have and then making the

15    decision about whether you're going to produce something that

16    hasn't already been produced?

17         MS. HALSTEAD:  We've coordinated -- we've

18    coordinated with the debtor on search terms, so we're -- so

19    Thermal has excluded those terms from its review.  For

20    instance, the debtor has produced documents from its

21    professionals Grant Thornton and Perella.  As a result, we

22    excluded documents from our review from those professionals,

23    from the debtor's professionals.

24         THE COURT:  All right.  But you have your own

25    professionals, right?

1          MS. HALSTEAD:  We have -- Thermal does have law

2     firms that represent it, including Crowell and Sullivan

3     Hazeltine.  I'm not sure what you mean by other

4     professionals, Your Honor.

5          THE COURT:  You don't have any financial advisors

6     or I-bankers or any of that, any of those kind of folks

7     involved in this process?

8          MS. HALSTEAD:  I -- sitting here, I'm not aware of

9     any.  You know, obviously, the debtor has those, but those

10    are the debtor's professionals, they're not Thermal's

11    professionals.

12         THE COURT:  Okay.  Well, how come you only produced

13    231 documents in -- how many months -- about two months?

14         MS. HALSTEAD:  Well --

15         THE COURT:  Two months.  It seems like a pretty

16    light production to me, even if you aren't producing

17    documents that are duplicative of what the debtor is

18    producing, or at least searching for them.

19         MS. HALSTEAD:  I think the answer lies in, Your

20    Honor, that the debtor has produced the huge majority of

21    documents.  They produced, I think, as Mr. Durkin said, I

22    think over 30,000 documents or 30,000 pages.  And as a

23    result, the additional documents are a much smaller volume.

24         THE COURT:  What about documents from the

25    independent board -- not -- well, not independent board --

1    the special committee, I guess, of the board.

2            MS. HALSTEAD:  I know we've produced emails with

3    those board members.  You know, not -- I don't think it's a

4    large volume.  We can certainly go back and confirm, you

5    know, what exactly -- what we've produced from those board

6    members.  Although I do think, I -- just to be clear, I mean,

7    to me, the board members, the debtor would produce those

8    communications, as opposed to Thermal.

9            THE COURT:  Well, at least all but one of those

10   board members is also a board member of Thermal, right?

11           MS. HALSTEAD:  I apologize, Your Honor.  I'm just

12   not sure of the exact corporate association of each board

13   member, just sitting here today.  You know, happy to

14   supplement this if -- at a certain point.

15           THE COURT:  Well, from what I recall from the

16   testimony before and some of the stuff in the pleadings is

17   that -- I forgot how many members there are of this special

18   committee, but only one is an independent director, and the

19   others are either directors or officers of ITIO or some other

20   entity connected with ITIO.  And if they're having internal

21   communications in connection with their sitting on the board

22   for the debtors, that has to be produced, unless it's

23   privileged.

24           MS. HALSTEAD:  Yes, Your Honor.  Yes, Your Honor.

25   Yeah.  Yes, Your Honor.

1          THE COURT:  Well, I mean, it sounds like the

2     debtors have been diligent in producing stuff.  I'm not

3     impressed with what ITIO has done.  And there are serious

4     allegations here of insiders getting releases.  And I did

5     review the revised form of the DIP order, which says they're

6     not -- that they eliminated the releases from the revised

7     form of DIP order, but Mr. Finestone says they still are

8     being provided releases in other ways, and I want to know

9     about that.

10          I want to know what's going on.  I want to hear

11    from these directors, especially the independent director.

12    Has he been deposed yet?

13          (No verbal response)

14          THE COURT:  So I see nods.  Can someone respond

15    verbally, so we have it on the record?  We're still having

16    problems with the host thing.

17          (Court and court personnel confer)

18          THE COURT:  If you want to say something, use --

19    there's a raise your hand feature.  If you use that, we'll

20    see you and then we can make sure we unmute you.  I'm not

21    sure what's going on with the ...

22          MR. DURKIN:  Yes, Your Honor.  Martin Durkin.  Yes,

23    the independent director has been deposed.

24          THE COURT:  Okay.  And so what other depositions

25    are we waiting for, Mr. Finestone, or is this just document

1    production?

2            (No verbal response)

3                    THE COURT:  Mr. Finestone needs to be -- is he --

4                    MR. FINESTONE:  Yes.  Okay.  Thank you.  Thank you,

5    Your Honor.  Ben Finestone on behalf of Direct Energy.

6                    This is document production, in the first instance.

7    I appreciate Mr. Durkin's statement this morning that the

8    debtors have completed document production.  That was the

9    first time that we heard it.

10                   THE COURT:  Well, it was --

11                   MR. FINESTONE:  They are --

12                   THE COURT:  -- in their --

13                   MR. FINESTONE:  -- certifying --

14                   THE COURT:  They had it in their letter that they

15   filed yesterday, so ... they told me that it was -- their --

16   that they were going to be making a final production

17   yesterday evening and that would be the last one.

18                   MR. FINESTONE:  Yeah, I agree, Your Honor.  And

19   they said that the production that was coming was being to be

20   final, but we -- they just -- they didn't tell us that it --

21   now that they made it, it was, in fact, final.  So forget

22   debtor documents, Your Honor.  That's been resolved.  Thank

23   you.

24                   In terms of depositions, we don't need a

25   deposition.  And I don't think we need a deposition in

advance of the June 21st hearing on our Cybergenics motion,

Your Honor.  The -- it's the colorability standard on the

strength of the claims.

And with respect to the cost/benefit analysis, I

think the facts are stipulated as follows, which is that:

We will be -- we -- Direct Energy is proposing to

pay for the prosecution of those claims, which is a

particularly strong case on cost/benefit.  This isn't a

committee charging the debtor to bring those claims.  I don't

think that fact is going to be challenged by the objectors.

The debtors have removed the release from the DIP

financing, but they're still contractually obligated on a

pre-petition contract to give those releases.

I asked Mr. Wirt, who is Mr. Durkin's partner,

yesterday, whether Mr. Wirt -- whether the debtors would

agree to put these causes of action into a litigation trust

for the benefit of unsecured creditors and allow the

unsecured creditors to pick the litigation trustee.  He

hasn't responded yet.  I would suggest that, when we get to

that hearing, they are not going to say yes to that.  But if

they do say yes to that, Your Honor, we will pull our motion.

If these facts become undisputed, Your Honor, I think we do

not need a deposition in advance of the hearing on the

Cybergenics motion.

On the DIP financing motion, which is the debtor's

motion, I'm thrilled that they pulled the release.  But as I

said, it remains in the PSA.  I have my opinion about the

intention of the debtor in delivering the release in this

case, I don't think that's changed.

But more importantly, Your Honor -- and by the way,

I'm a little disappointed that I had to spend so much of my

client's money to beat back that release, for them to -- I

don't think it ever should have been in there.

But I have a slightly different issue before I can

say.  I'm not able to tell Your Honor that we're not

objecting to the post-petition financing today for the

following reason:

Your Honor will remember that it's a five-million-

dollar proposed DIP.  Based upon the testimony at the May

31st hearing, we identified $3.7 million of amounts in that

budget that are no longer forecast to be expenditures.  There

are shared services amounts that, pursuant to Your Honor's

ruling, which we appreciate, should be coming out of that

budget.  We haven't seen an amended budget.  But -- and I'm

not the best mathemetician.  For a lawyer, I'm a pretty good

mathematician, but I don't know why they need a five-million-

dollar DIP.

A long way of saying, Your Honor, it's very

possible we have -- our objection to the DIP will be

satisfied.  And I agree, Your Honor, the main objection has

1    at least been deferred because the release is taken out.  But

2    I just don't -- I just don't know and I don't know what

3    budget they're going to file and I don't know what witness

4    they're going to bring.  They're saying that they're not

5    going to bring any witness for post-petition financing, which

6    I just think is a deficient post -- a deficient process for a

7    364 motion.

8              So that was a long way of saying depositions may or

9    may not be important, not important for our Cybergenics

10   motion, may be important for DIP financing, I don't know,

11   Your Honor.  We bothered the Court today because we were --

12   we just wanted the documents to be complete.

13             THE COURT:  Well, Mr. Monaghan, I did have a

14   question about -- I mean, we have -- make sure Mr. Monaghan

15   can talk when I'm done asking him a question.  I had a

16   question about the hearing on the 21st.  And you indicated

17   you're not calling any witnesses.  Is that correct?

18             MR. MONAGHAN:  That is correct, Your Honor.

19             THE COURT:  All right.

20             MR. MONAGHAN:  That is correct, Your Honor.

21             THE COURT:  All right.  And how do you intend to

22   establish your burden of proof on the DIP?

23             MR. MONAGHAN:  We had thought we had addressed the

24   one objection, but I gather that we have not.  When we pulled

25   the releases -- when ITOI agreed to remove the releases, we

1  believed that we had addressed the one objection.

2  Apparently, there's still an objection as to the budget.  We

3  thought we had addressed that at that -- at the cash

4  collateral hearing.  And we will be actually submitting the

5  new budget.  So perhaps I'll have to amend the statement and

6  say that we will submit a declaration of Mr. Baumgartner with

7  the revised budget.

8       I would like to say this, though, Your Honor.

9  Again, as it relates to the 21st, there have been a couple of

10 occurrences -- and I know this isn't the hearing on these

11 occurrences; and so, if I step over any line, I hope the

12 Court will stop me.  But there have been a couple of

13 occurrences that may shift the landscape a little bit.

14      We do believe that there's going to be at least one

15 overbidder in the sale process.

16      We have reason to believe that the closing of the

17 transaction, no matter which of the various people --

18 entities that are involved in considering the transaction or

19 have submitted a bid, may well take place earlier and perhaps

20 substantially earlier than the July 31st closing date

21 envisioned in the documents that are before Your Honor.

22      And the truth of the matter is, Your Honor, is

23 that, if that closing does take place substantially earlier,

24 if everybody in the process commits to closing substantially

25 earlier than July 31st; for example, before the end of June,

1    there will be no need for the DIP financing.  That DIP

2    financing is to bridge the debtor through the period to July

3    31st.

4              It is -- it has been a remarkably hot May and a

5    remarkably hot June in the Ector universe, and so the demand

6    for power has been higher than projected, and so the revenues

7    to date have been higher than projected.

8              So, if, Your Honor, all of the purchasers -- the

9    sale is approved and the purchasers close before the end of

10   June, it may be that the DIP financing is not necessary.  So

11   we should consider that in deciding what to do on the 21st.

12   We will have the bids in hand, coincidentally, but

13   fortuitously, at the end of this week.  The bid deadline is

14   Friday.

15             THE COURT:  Well, given that, does it make sense to

16   go ahead and postpone this hearing for a short period of

17   time, so that ITIO can finish their document production?

18             MR. MONAGHAN:  The debtor is in a position where it

19   has committed to certain timing from the -- with the lenders,

20   and so we have to hear from the pre-petition secured lenders

21   on that.

22             But as a practical matter, it makes sense to

23   postpone both.  As a practical matter, Your Honor, at least

24   one of the purchasers has indicated a desire to purchase

25   certain of the litigation assets of the debtor.  We don't

know how that's going to come out.  We're going to have two

different -- at least two different, perhaps more potential

deals here, and those deals may result in a variety of

things.

They may result in some assets coming back that

were thought to be subject to a sale.  They may result in

some litigation assets leaving that were not thought to be

part of a sale.  And so it may be that the derivative

standing motion is -- it needs to be altered, depending on

the outcome of the sale hearing.

It's also the case, Your Honor, that some of the

causes of action and the derivative standing motion relate to

contract counterparties; the shared services agreement, for

example.  Now the stalking horse bidder did not seek to have

that agreement assumed and assigned to it.  We don't know

whether others will.  If they do, that impacts the avoidance

actions as it relates to the counterparty to the shared

services agreement.

So, Your Honor, from the debtor's standpoint, the

landscape can change dramatically between today and Monday

and we won't know until Friday.  So I can only report the

facts to the Court and the Court can make its decision.  What

I can also report is I am certainly -- I am pretty certain

that the lenders would hope that we would go forward with

both motions on Monday.  But it may be that I show up on

1    Monday saying much of what I just said today.

2              THE COURT:  Well, let's -- you mean Monday, the --

3              MR. MONAGHAN:  Excuse me.  Tuesday.  I'm sorry.

4              THE COURT:  Tuesday.

5              MR. MONAGHAN:  Tuesday, Your Honor.

6              THE COURT:  Yeah.

7              MR. MONAGHAN:  Yeah.

8              THE COURT:  There's another hearing on Monday, the

9    27th; you have a sale hearing scheduled for then.

10             MR. MONAGHAN:  Yes, Your Honor.

11             THE COURT:  Is that -- do you anticipate -- is all

12   this tied to that?  If the sale hearing goes forward on the

13   27th, you're not going to need the DIP financing.  Is that

14   what I'm hearing?

15             MR. MONAGHAN:  If the sale goes forth on the 27th

16   and the winning bidder at that sale hearing commits to

17   closing on or before, for example, June 30th, invoking 363(m)

18   and closing on the 30th, then there will be no need for the

19   DIP financing.

20             THE COURT:  Then it seems to me it makes sense to

21   wait and see what happens; and, if the 27th doesn't go

22   forward as the sale hearing, we use it as the DIP hearing

23   and, I think, on the motion for standing, as well.

24             Mr. Sturm, I saw you had raised your hand for a

25   second.  Can we get Mr. Sturm?  Make sure he's -- and I

1    apologize because there's some kind of glitch with Zoom

2    today.

3         (Court and court personnel confer)

4         MR. STURM:  Good morning, Your Honor.  Joshua Sturm

5    from Davis, Polk & Wardwell.  For the record, I'm here with

6    my colleagues Elliot Moskowitz and Brian Resnick on behalf of

7    Credit Suisse, as agent and the secured lender.

8         Just want to note for the Court that we do, as

9    debtor's counsel said, have the deadline currently said as

10   June 24th for entry of a final DIP order.  As I sit here

11   today, I do not have authority to waive or extend that

12   deadline.  But I will note that we would work constructively

13   with the Court -- the debtor, subject to your guidance, to

14   try to get the brief extension that I think Your Honor noted.

15        I would also just note for the record we're

16   learning about all of this for the first time in realtime,

17   together with Your Honor.  So apologies for coming less

18   prepared on that point, but these are really all developments

19   we're discovering in real time, as well.

20        So, in summary, if Your Honor were to say that we

21   would be going forward with the DIP order on the currently

22   scheduled, I believe it's June 27th sale hearing date, I

23   can't commit, as I sit here today, to extending the

24   milestone.  But we would quickly try to seek guidance from

25   our client and get an appropriate extension.

1    THE COURT: All right. Why don't we do that?

2  Because I'm going to move it to the 27th. And they can try

3  and default them, I guess, but we'll see how that plays out.

4  All right. So we'll move the hearing -- both hearings to the

5  27th.

6    THE COURT: Ms. Halstead, your client needs to step

7  it up and get this document discovery to Mr. Finestone, so

8  that we can make sure he has what he's looking for before

9  those hearings go forward. And hopefully, at the end of the

10 day, it all becomes unnecessary, as we've heard today.

11    So let me see. I have Mr. Sullivan and Mr.

12 Finestone. I haven't heard from Mr. Sullivan yet, so we'll -

13 - let's unmute Mr. Sullivan, so he can say something.

14    MR. SULLIVAN: Your Honor, I believe I'm unmuted.

15 Your Honor, Bill Sullivan of Sullivan Hazeltine on behalf of

16 ITOI.

17    Your Honor, I raised my hand simply to speak with

18 respect to the deposition. There's been a 30(b)(6)

19 deposition notice of ITOI. We raised an issue with it in

20 connection with the letter, in the fourth paragraph -- or

21 fourth point of our letter. And Your Honor, it does come

22 before you sort of in a backhand way because it wasn't part

23 of Direct Energy's letter to you because we hadn't had a

24 chance to raise issues with them. But once the discovery

25 dispute was on, we put it in there because we were going to

1     be before Your Honor.

2              So there is an issue with respect to the scope and

3     timing of a 30(b)(6) deposition which goes well beyond issues

4     for the DIP or the standing order, and we agree with Mr.

5     Finestone's -- or standing motion, I should say -- and we

6     agree with his assessment that that's not a fact-based

7     inquiry, anyway, on the standing motion.  But we haven't had

8     a chance to review those issues with Mr. Finestone, as to the

9     scope and timing of the ITOI deposition.

10             And I just -- given that there are some things

11    shifting, I guess my suggestion would be to let us have those

12    discussions and see if we can work it out.  But again, we

13    also believe that, with the removal of the releases, that,

14    you know, the primary issue for ITOI with respect to the DIP

15    motion has also been resolved.

16             So, that being said, if Your Honor wants to hear

17    further argument about whether -- you know, the ITOI 30(b)(6)

18    deposition is scheduled for tomorrow on six days' notice, and

19    we're not able to fully comply with that on six days' notice.

20    And Your Honor, we'll -- we're -- we'd like to address it to

21    see if we can work it out with Mr. Finestone, but I didn't

22    want to be silent as to that issue, Your Honor.

23             THE COURT:  Well, I think Mr. Finestone said he

24    didn't think he was going to even need a deposition.  So why

25    don't we reserve that?  I expect the parties to meet and

confer and talk about those issues before coming back to me,
and we'll see where we are.  I mean, we've now got an extra
four or five days in there for a deposition if it needs to go
forward.  But you know, Mr. Finestone is not going to want to
do that until the document discovery is completed, so that's
why we need to step up the document production.

Mr. Finestone?

MR. FINESTONE:  Thank you.  Thank you, Your Honor.
Ben Finestone on behalf of Direct Energy.

The Court didn't leave me with a whole lot to say,
in order to earn my fees for my client.  So I think this is
the right thing to do for now.  I would be remiss -- and I
appreciate that, Your Honor.

We will confer with Mr. Wirt about a new reply
deadline, both for our Cybergenics motion and for their DIP
financing motion.  I don't think we need to file those Friday
any longer, Mr. Wirt.

And finally, Your Honor, perhaps gratuitous, but I
would be very remiss if I didn't raise a red flag to hear the
news that, suddenly, there is a buyer that wants to buy the
litigation claims against the controlling parent here.  That
sounds like a business proposition that is, not only new, but
a bit bizarre to me, so we may have to come back to Your
Honor.  I don't know anything about that.

Thank you for addressing the short-term interests.

1   And we will meet and confer on any additional discovery

2   issues before we bother the Court again.  But that's a really

3   concerning statement that was made by debtor's counsel.

4               THE COURT:  All right.  Well, I don't know anything

5   about it, either.

6               Mr. Monaghan, do you want to respond to that

7   quickly?

8               MR. MONAGHAN:  I do, Your Honor.

9               The existing stalking horse bid and deposition

10  testimony that Mr. Finestone has taken reveals a provision of

11  the existing stalking horse bid that originated with the

12  stalking horse provides for the stalking horse to acquire,

13  capital A, "Avoidance Actions."

14              The reference to the buyer coming along was

15  actually a reference to the possibility that perhaps the

16  buyer wouldn't do -- excuse me -- the overbidder wouldn't do

17  that.  So whatever concern Mr. Finestone may have, the estate

18  was meant to signal that things may go in the other

19  direction.  It may not, but that things may, in fact, go in

20  the other direction.

21              We'll find out where the competing bidders come out

22  and whether or not they're going to acquire avoidance actions

23  and the scope.  But there's already a provision in the

24  stalking horse bid that says avoidance actions, capital A

25  "Avoidance Actions," defined to be all Chapter 5 actions, are

1    to be acquired.

2              We don't know what the overbidders are going to do

3    there.  But it may be that the derivative standing that Mr.

4    Finestone is seeking might expand, rather than contract.  We

5    don't know.

6              THE COURT:  Okay.  Well, we'll just have to wait

7    and see.

8              MR. MONAGHAN:  Right.  Exactly.

9              THE COURT:  All right.  All right.  Anything else

10   then before we adjourn?

11             MR. FINESTONE:  Just to thank Your Honor for the

12   time.

13             THE COURT:  All right.  So we are off --

14             MR. MONAGHAN:  Thank you --

15             THE COURT:  -- for the 21st.

16             MR. MONAGHAN:  -- Your Honor.

17             THE COURT:  And I will see everybody on the 27th.

18             MR. MONAGHAN:  Thank you, Your Honor.

19             THE COURT:  Thank you.  We're adjourned.

20             COUNSEL:  Thank you.  Thank you, Your Honor.

21         (Proceedings concluded at 11:40 a.m.)

22                              *****

1 <u>CERTIFICATION</u>

2      I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of my

5 knowledge and ability.

6

7

8

9

10

11 _____     June 16, 2022

12 Coleen Rand, AAERT Cert. No. 341

13 Certified Court Transcriptionist

14 For Reliable