## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ECTOR COUNTY ENERGY CENTER LLC,[1] | Case No. 22-10320 (JTD) |
| Debtor. | |

## DIRECT ENERGY BUSINESS MARKETING LLC'S LIMITED OBJECTION
## TO DEBTOR'S PROPOSED SALE

---

[1]   The last four digits of the Debtor's federal tax identification are 6852.  The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.

Direct Energy Business Marketing LLC ("Direct Energy") respectfully objects to entry of an order authorizing the sale of substantially all of the Debtors' assets (the "Proposed Sale") based upon the terms of the *Stalking Horse Asset Purchase Agreement* (Dkt. No. 7-3) (the "APA").[2]

## LIMITED OBJECTION

1.      As the Debtor's largest unsecured creditor, and given that Invenergy has already placed the Debtor into chapter 11 (*i.e.*, the bell has been rung), Direct Energy does not object to a fair and orderly sale process conducted under the supervision of this Court.  Therefore, with one important exception, discussed below, Direct Energy does not object to the Proposed Sale.

2.      As this Court is aware, Direct Energy's concerns regarding this chapter 11 case have focused on the scheme hatched by the Debtor's parent, Invenergy Thermal Operating I ("ITOI"), and other non-debtor affiliates (collectively, "Invenergy"), to administer the Debtor's assets to benefit Invenergy and its secured lenders and their "remaining portfolio," paired with various forms of releases, to the detriment of the (to-be-liquidated) Debtor and its unsecured creditors.[3]  In that vein, Direct Energy has reviewed the terms of the APA and the *[Proposed] Order (A) Authorizing and Approving the Sale of Acquired Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (Dkt.

---

[2]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the *Motion of the Debtor for Orders (I)(A) Authorizing Debtor's Entry Into Asset Purchase Agreement, (B) Authorizing and Approving the Bidding Procedures, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Authorizing and Approving a Break-Up Fee and Reduced Break-Up Fee, (E) Approving the Notice Procedures, and (F) Setting a Date for the Sale Hearing; and (II) Authorizing and Approving (A) the Sale of Certain Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases* (the "Sale Motion") (Dkt. No. 7) or the APA, as applicable.

[3]    *See, e.g.*, *Direct Energy's Omnibus Objection to Debtor's (I) Motion to Use Cash Collateral and Grant Adequate Protection, (II) Bid Procedures Motion, and  (III) Shared Services Motion* (Dkt. No. 118) ¶ 1.

No. 7-4) (the "Proposed Sale Order") to confirm that none of the provisions contained in either document dictates the application of or otherwise authorizes the objectionable payment waterfall (the "Waterfall") contemplated under the *Plan Support Agreement* (Dkt. No. 2-1) (the "PSA")[4] such that approval of the Proposed Sale would constitute an impermissible *sub rosa* plan of reorganization. As far as Direct Energy can discern, nothing within the Proposed Sale Order or APA even addresses the PSA's improper Waterfall, and no such provisions have been identified by the Debtors to parties or the Court.

3.      However, Direct Energy does object to the Proposed Sale to the extent it provides for the sale of Avoidance Actions to the Stalking Horse Bidder.[5] *See* APA at 2-3 (including the Avoidance Actions among the "Acquired Assets"); Proposed Sale Order ¶ 31 ("The Acquired Assets under the Asset Purchase Agreement shall include the Avoidance Actions."). Moreover, section 11.6 of the APA provides that the Stalking Horse Bidder "will not pursue, participate in the  pursuit of, sell, transfer, or enter into any agreement with a third party to facilitate the pursuit of, any Avoidance Action," thereby effectively releasing all Avoidance Actions. APA § 11.6; *see also* Proposed Sale Order ¶ 31. In other words, the Debtor is proposing to sell the estate's Avoidance Actions to a party who is contractually bound to abandon them.

4.      As an initial matter, Direct Energy notes that the APA is not clear as to whether the transferred Avoidance Actions include Avoidance Actions against Invenergy. The APA provides that "Acquired Assets" include "all claims and counterclaims of the Seller against any other Person

---

[4]  The Waterfall provides that the sale proceeds must be applied as follows: $75 million to the Prepetition Secured Lenders, roughly $10 million to fund chapter 11 administrative expenses and a wind-down budget, and $5 million to general unsecured creditors. *See* PSA at Ex. B (Term Sheet).

[5]  "Avoidance Action" is defined in the APA to mean "any claim, right or cause of action of Seller arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common Law relating to the Acquired Assets, the Transferred Contracts or the Assumed Liabilities." APA at 4.

(*except any Affiliate of Seller*) relating to the Business, any of the Acquired Assets or any of the Assumed Liabilities."  APA § 1.1(k) (emphasis added).  Meanwhile, as noted, Acquired Assets also include "any Avoidance Actions." *Id.* § 1.1(p).  While the carve-out of claims against Invenergy is express in section 1.1(k) of the APA, its absence in section 1.1(p) creates ambiguity that must be addressed.

5.      Even if Avoidance Actions only against non-Invenergy parties (*i.e.*, the Prepetition Secured Lenders) will be sold, the critical challenge rights preserved by the Court in the Cash Collateral Order[6] will be largely nullified.  The Cash Collateral Order provides that parties in interest have until at least June 28, 2022 (the "Challenge Deadline") to assert claims against the Prepetition Secured Lenders, which claims would include Avoidance Actions relating to Amendment No. 4 to the Credit Agreement.  This deadline is automatically extended upon the "filing of a motion seeking standing to file a Challenge before the Challenge Deadline, which attaches a pleading setting forth a Challenge" until at least "two business days after the Court approves the standing motion."  *Id.*  Direct Energy has already filed its Standing Motion and Proposed Complaint[7] in accordance with the terms of the Cash Collateral Order, and such claims thus should be "expressly preserved" for the benefit of the Debtor's estate.  *Id.*  An order approving the Proposed Sale should not be used to affect an end-run around Direct Energy's properly exercised challenge rights, but this is exactly what will result should the Court approve the sale of

---

[6]   *See Final Order (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection ro Prepetition Secured Lenders, (III) Modifying Automatic Stay, And (IV) Granting Related Relief* (Dkt. No. 195) (the "Cash Collateral Order") ¶ 16.

[7]   *Motion to Authorize Direct Energy to Commence and Prosecute Claims on Behalf of the Estate* (Dkt. No. 163) ("Standing Motion"), attaching a proposed complaint.  Following this Court's June 2, 2022 ruling, Direct Energy filed a notice of revised proposed complaint (Dkt. No. 201) (the "Proposed Complaint").

the Avoidance Actions, and the limitation on the prosecution of those actions contained within section 11.6 of the APA and paragraph 31 of the Proposed Sale Order.

6.     Among the estate claims asserted in Direct Energy's Proposed Complaint are claims against Credit Suisse, as administrative and collateral agent for the Prepetition Secured Lenders, to avoid the "Direct Obligation" incurred by the Debtor in connection with Amendment No. 4 to the Credit Agreement.[8]  While the Debtor has waived its marshaling rights, a ruling which Direct Energy gives all due respect, avoidance of the Direct Obligation potentially remains relevant to the estate's valuable subrogation and contribution claims against ITOI and the Subsidiary Guarantors, respectively.[9]  Thus, Invenergy stands to benefit greatly if the Court approves the sale (and burial) of Avoidance Actions, even if only (nominally) against the Prepetition Secured Lenders.

7.     Meanwhile, if the Proposed Sale also entails a sale of Avoidance Actions against Invenergy, then the insider preference claims asserted in the Proposed Complaint will also effectively be released.[10]  Testimony elicited at the May 31, 2022 hearing already establishes that there are at least $700,000 of payments to Invenergy entities that are subject to avoidance under

---

[8]  *See* Counts I-IV of the Proposed Complaint (asserting federal and state law fraudulent transfer claims to avoid the Debtor's incurrence of the $75 million direct obligation (the "Direct Obligation") to the Prepetition Secured Lenders, relieving the Borrower, ITOI, of its obligation to make the $75 million payment upon the disposition of the Debtor's assets).  While these fraudulent transfer claims technically must be asserted against Credit Suisse, as agent for the Prepetition Secured Lenders, the Prepetition Secured Lenders will not be prejudiced if Direct Energy prevails on these claims on behalf of the estate.  Direct Energy asserts these claims on behalf of the estate in furtherance of the subrogation and contribution claims against Invenergy, in the event avoidance of the Direct Obligation is relevant to such claims.

[9]  *See* Counts V and VI of the Proposed Complaint.

[10]  *See* Count VIII of the Proposed Complaint.

section 547 of the Bankruptcy Code.[11]  Invenergy should not receive a back-door release of those

claims—or any other Avoidance Actions—by virtue of the Proposed Sale.

8.       Notably, the Debtor provides no business justification for the sale of the Avoidance

Actions—particularly, inclusion of section 11.6 of the APA, pursuant to which the Stalking Horse

Bidder agrees that it will not pursue or facilitate the pursuit of the acquired Avoidance Actions.

*See In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) (debtor must demonstrate "reasonable business

judgment" to obtain approval of a sale outside of the ordinary course); *In re Federal Mogul Global,*

*Inc.*, 293 B.R. 124, 126 (D. Del. 2003); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147,

154 (Bankr. D. Del. 1999) (cited in Debtor's Sale Motion ¶ 85).  Nor can the Debtor argue that the

Stalking Horse Bidder insisted on this provision, as testimony indicates that it was included at the

behest of the Prepetition Secured Lenders.[12]  The only purpose for assigning the Avoidance

Actions to the Stalking Horse Bidder is to bury them.

9.       Moreover, to the extent the APA purports to release Avoidance Actions ***against***

***Invenergy***, such provision would be subject to heightened scrutiny as a result of the Debtor's

hopelessly conflicted corporate governance.  *Shubert v. Lucent Techs. Inc. (In re Winstar*

*Commc'ns Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009); *In re Zerodec Mega Corp.*, 39 B.R. 932, 935

(Bankr. E.D. Pa. 1984) (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)); *In re Bidermann Indus.*

*U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997).  Similarly, because ITOI and its other non-

debtor affiliates are liable to the Prepetition Secured Lenders, any release of Avoidance Actions

---

[11]  *See, e.g.*, May 31, 2022 Hr'g Tr. 148:2-6.

[12]  *See* 30(b)(6) Deposition Transcript of Credit Suisse 77:4-24 ("Q. So I want to direct your attention to Section 11.6 of this document. . . . Did Credit Suisse negotiate this provision? . . . A.  I believe that this provision was included as a result of feedback that was provided by counsel, counsel to the [administrative agent] . . . Q. Okay. So this was added after feedback from your counsel?  A. I believe that to be the case.").

against the Prepetition Secured Lenders would also benefit insiders, and thus likewise should be subject to heightened scrutiny.

## **RESERVATION OF RIGHTS**

10.    Direct Energy reserves all rights to object on any grounds to any alternative Proposed Sale, or to any revisions to the APA or the Proposed Sale Order.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Direct Energy respectfully requests that the Court deny the sale of the Avoidance Actions to the Stalking Horse Bidder on the terms set forth in the APA and the Proposed Sale Order.

Dated: June 17, 2022
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
**CM/ECF Noticing**: bankfilings@ycst.com
Email:    mnestor@ycst.com
             mlunn@ycst.com

– and –

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone, Esq.
Christopher D. Kercher, Esq.
Kate Scherling, Esq.
Zachary Russell, Esq.
Jacqueline M. Stykes, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
Email:        benjaminfinestone@quinnemanuel.com
                 christopherkercher@quinnemanuel.com
                 katescherling@quinnemanuel.com
                 zacharyrussell@quinnemanuel.com
                 jacquelinestykes@quinnemanuel.com

– and –

K. John Shaffer, Esq.
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Facsimile:  (213)443-3100
Email:    johnshaffer@quinnemanuel.com

*Counsel to Direct Energy Business Marketing, LLC*