## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

ECTOR COUNTY ENERGY CENTER LLC,[1]

           Debtor.

Chapter 11

Case No. 22-10320 (JTD)

## DIRECT ENERGY MARKETING, LLC'S OMNIBUS REPLY IN SUPPORT OF MOTION TO COMMENCE AND PROSECUTE CLAIMS <u>ON BEHALF OF THE ESTATE</u>

---

[1]    The last four digits of the Debtor's federal tax identification are 6852.　The Debtor's mailing address is One South Wacker Drive, Suite 1900, Chicago, IL, 60606, and the Debtor has a principal place of business at 8200 OB Holt Road, Goldsmith, Ector County, Texas, 79761.

29479677.1

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

REPLY .........................................................................................................................................4

    A.    Delaware Law Does Not Preclude A Creditor From Asserting Claims On Behalf Of An LLC Debtor's Federal Bankruptcy Estate .........................................4

    B.    Direct Energy Has Asserted Colorable Estate Claims In The Proposed Complaint .............................................................................................................10

        1.    The Debtor Has Colorable, Valid Contribution Claims Against The Other Subsidiary Guarantors .....................................................................10

        2.    The Debtor's Subrogation Claim Is Colorable ...........................................13

        3.    Claims To Avoid The Incurrence Of The Direct Obligation Are Colorable .....................................................................................................16

        4.    No Objector Seriously Disputes That The Invenergy Fiduciary Defendants Breached Their Fiduciary Duties To The Debtor Or That Invenergy Received Insider Preferences ...........................................19

    C.    The Debtor Has Evinced Its Unjustifiable Refusal To Assert The Proposed Claims On Behalf Of The Estate, Rendering Formal Demand Futile ...................20

    D.    The Debtor's Estate Stands To Benefit Significantly From Direct Energy's Prosecution Of Estate Claims On The Estate's Behalf .........................................22

CONCLUSION ............................................................................................................................23

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Aetna Casualty and Surety Co. v. Norwalk Foods, Inc.*,
    480 N.Y.S.2d 851 (1984)......................................................................................... 14

*In re Black Elk Energy Offshore Operations, LLC*,
    No. 15-34287, 2016 WL 4055044 (Bankr. S.D. Tex. July 26, 2016)....................................... 7

*In re Caesars Entm't Operating Co., Inc.*,
    561 B.R. 457 (Bankr. N.D. Ill. 2016) ................................................................................... 21

*CML V, LLC v. Bax*,
    28 A.3d 1037 (Del. 2011) ..................................................................................................... 4

*Commodity Futures Trading Comm'n v. Weintraub*,
    471 U.S. 343 (1985)............................................................................................................. 6

*In re Educators Group Health Trust*,
    25 F.3d 1281 (5th Cir.1994) ................................................................................................ 7

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992) .............................................................................................. 12

*Garza v. Marine Transport Lines, Inc.*,
    861 F.2d 23 (2d Cir. 1988) ................................................................................................ 12

*Gavin/Somonese LLC v. Citadel Energy Partners, LLC (In re Citadel Waterford City*
    *Disposal Partners, L.P.)*, 603 B.R. 897 (Bankr. D. Del. 2019)................................................. 8

*Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*,
    965 A.2d 715 (Del. Ch. 2008) ............................................................................................ 12

*Int'l Shoe Co. v. Pinkus*,
    278 U.S. 261 (1929)............................................................................................................. 6

*Integrated Solutions, Inc. v. Service Support Specialties Inc.*,
    124 F.3d 487 (3d Cir. 1987) ................................................................................................. 5

*Louisiana World Exposition v. Federal Insurance Company*,
    858 F.2d 233 (5th Cir. 1988) ............................................................................... 5, 9, 10, 20

*Metro Storage Int'l LLC v. Harron, CV*,
    2018-0937-JTL, 2022 WL 1404359 (Del. Ch. May 4, 2022)................................................ 19

*Miller v. Fallas (In re J&M Sales Inc.),*
    Adv. Pro., No. 20-50775(JTD) (Bankr. D. Del. Aug. 20, 2021) ............................................. 9

*Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,*
    330 F.3d 548 (3d Cir. 2003) ................................................................................... *passim*

*Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.),*
    326 B.R. 532 (W.D. Pa. 2005)................................................................................... 20

*Official Committee of Unsecured Creditors of HH Liquidation, LLC v. Comvest Group
    Holdings, LLC (In re HH Liquidation, LLC),* 590 B.R. 211 (Bankr. D. Del. 2018) ............ 7, 8

*Pandora Industries, Inc. v. Paramount Communications Inc. (In re Wingspread Corp.),*
    145 B.R. 784 (S.D.N.Y. 1992)................................................................................... 13

*Port Distributing Corp. v. Pflaumer,*
    880 F. Supp. 204 (S.D.N.Y. 1995) ........................................................................... 16

*In re QC Piping Installations, Inc.,*
    225 B.R. 553 (Bankr. E.D.N.Y. 1998)....................................................................... 15

*Stream TV Networks, Inc., v. SeeCubic, Inc.,*
    Case No. 360, 2021 (Del. Jun. 15, 2022)................................................................. 10

*Wetzler v. Cantor,*
    202 B.R. 573 (D. Md. 1996) ..................................................................................... 15

## Statutes

6 Del. C. § 17-1002 ...................................................................................................... 8

6 Del. C. § 18-1001 ...................................................................................................... 5

6 Del. C. § 18-1101(e) ........................................................................................... 10, 19

6 Del. C. § 18-1002 ...................................................................................................... 4

11 U.S.C. § 307 ............................................................................................................ 6

11 U.S.C. § 323 ............................................................................................................ 8

11 U.S.C. § 323(a) ........................................................................................................ 5

11 U.S.C. § 323(b) ........................................................................................................ 5

11 U.S.C. § 362(a) ........................................................................................................ 13

11 U.S.C. § 502(a) ........................................................................................................ 6

29479677.1

11 U.S.C. § 541 ......................................................................................................... 5

11 U.S.C. § 541(a) ................................................................................................. 5, 8

11 U.S.C. § 541(a)(7) ............................................................................................... 5

11 U.S.C. §§ 544-552 .............................................................................................. 8

11 U.S.C. § 547(b) ................................................................................................. 19

11 U.S.C. § 704(a) ............................................................................................... 5, 8

11 U.S.C. § 704(a)(1) ............................................................................................... 2

11 U.S.C. § 1106(a)(1) ............................................................................................. 2

11 U.S.C. § 1107(a) ............................................................................................. 6, 8

11 U.S.C. § 1109(b) ............................................................................................. 6, 8

Direct Energy Business Marketing, LLC ("<u>Direct Energy</u>"), hereby replies to the objections filed by (i) the Debtor (the "<u>Debtor's Objection</u>") (Docket No. 207), (ii) Invenergy Thermal Operating I LLC ("<u>ITOI</u>") (Docket No. 204) ("<u>ITOI's Objection</u>"), and (iii) Credit Suisse AG, Cayman Island Branch and the Ad Hoc Group of Prepetition Secured Lenders (collectively, the "<u>Invenergy Secured Lenders</u>" and together with the Debtor and ITOI, the "<u>Objectors</u>") (Docket No. 208) (the "<u>Lenders' Objection</u>" and with the Debtor's Objection and ITOI's Objection, the "<u>Objections</u>") to the *Motion for Entry of Order Authorizing Direct Energy to Commence and Prosecute Claims on Behalf of the Estate* (Docket No. 163) (the "<u>Standing Motion</u>"), and respectfully states as follows:

## <u>PRELIMINARY STATEMENT</u>[2]

1.      The Objectors do not seriously dispute that the Proposed Claims contemplated by the Standing Motion and the Proposed Complaint are colorable.  Nor could they do so objectively, as the Objectors or their insiders and affiliates are the subject of the Proposed Complaint.  Their primary substantive argument is that this Court cannot grant a creditor standing to assert claims on behalf of, and for the benefit of, a Delaware LLC's *bankruptcy estate*.  This argument, however, ignores the dominance of federal bankruptcy law with respect to whether a party in interest should be granted standing to pursue claims—not on behalf of a prepetition debtor—but on behalf of a section 541 bankruptcy estate.  *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 579 (3d Cir. 2003) (en banc) (creditor standing "seems clearly to give effect to the policy of the legislature").

2.      Meanwhile, the Debtor argues that there is "no urgency to the Standing Motion." Debtor's Obj. ¶ 2.  Certainly, however, there is no cause for delay, because there can be no

---

[2]      Capitalized terms not otherwise defined herein have the meanings given to them below or in the Standing Motion.

doubt that this debtor-in-possession is not seeking to monetize or prosecute the Proposed Claims. *See* 11 U.S.C. §§ 1106(a)(1); 704(a)(1).   It is true that the Debtor withdrew from its DIP Motion its improper request to release the Debtor's controlling insiders (ITOI and all of its affiliates and related parties).   However, *the fact remains today* that the Debtor (and its sole and powerless "independent" director) agreed, by the terms of the PSA (which the Debtor has not disavowed), to provide "broad releases" to ITOI under a plan.   *See* PSA Ex. B (Term Sheet); May 31 Transcript at 73:16-24; 96:3-8 (CRO testimony concerning broad releases for ITOI).[3]   The *fact also remains today* that the Debtor has refused to agree to deposit the Proposed Claims into a litigation trust so that their value can be realized for unsecured creditors.[4]   None of this is surprising—the "framework" of the Debtor's bankruptcy case was crafted and negotiated by ITOI, and the Proposed Claims were not part of ITOI's blueprint.

3.   The Objectors further argue that the Standing Motion is improper because Direct Energy is not the proper party to assert claims on behalf of the estate, citing the totally irrelevant fact that Direct Energy was a potential bidder for the Debtor's assets, and that Direct Energy has been "litigious" in this case.   *See, e.g.*, Debtor's Obj. ¶¶ 4, 6.   These arguments hold no water whatsoever.   At the Debtor's invitation, Direct Energy looked at the Debtor's assets, but Direct Energy is in fact *not a bidder*, nor could it seriously be contended that any of Direct Energy's actions in this case were some part of a scheme to facilitate the acquisition of the Debtor's assets. More importantly, to the extent Direct Energy has been "litigious," it is because Direct Energy has had no choice.   *Some* party in interest has had to defend the estate against the Debtor's efforts to benefit ITOI and the other Invenergy entities.   Direct Energy would much prefer if

---

[3]   The PSA was admitted into evidence at the May 31, 2022 hearing as Direct Energy Exhibit Number ("DE") 28.

[4]   Any such trust must be administered by an unconflicted litigation trustee, selected by unsecured creditors.

29479677.1

there were (i) a faithful debtor-in-possession serving its duty as a trustee and/or (ii) an official committee of unsecured creditors serving as estate watchdog—but, this estate has neither.   If the Objectors prefer that an independent chapter 11 trustee be appointed, *or* if the Objectors agree that the Proposed Claims be prosecuted by a litigation trustee selected by unsecured creditors, Direct Energy would consider its Standing Motion resolved.   In the meantime, Direct Energy has been expending its *own* resources in an effort to hold the Debtor to its fiduciary responsibilities to its estate.   Through its efforts in this case, Direct Energy has already accomplished, among other things:   (i) ITOI and the Debtor agreeing to strike the broad Invenergy releases previously contemplated under the DIP Motion—*at least for now*; (ii) the unearthing of insider preference claims concerning stunning payments made by the Debtor to Invenergy entities *on the Petition Date*—payments which the CRO did not discuss with the "independent" director, despite the fact that the CRO was futilely pleading with Invenergy: "[w]e should hold the Invenergy Services and Invenergy Services Thermal payments until they come due.   Paying early like this will get a lot of unfavorable attention"[5]; and (iii) reduction of the amount the Debtor will be paying under its shared services arrangements during this case pursuant to the Court's Shared Services Order.

4.     Direct Energy believes wholeheartedly in the Proposed Claims and the value that their prosecution will bring to the estate, and its priority is to see that these claims are in fact pursued for the benefit of all unsecured creditors.   Indeed, *Direct Energy is willing to fund the costs of prosecution*, causing the cost-benefit analysis to tip decidedly in favor of granting the Standing Motion.   Given that the Debtor agreed to release, and has refused to agree to deposit in a trust, the Proposed Claims, the Standing Motion should be granted as a step short of

---

[5]     *See* March 22, 2022 email from Baumgartner to Mackenzie Evans and others at Invenergy, ECEC0028499 (produced after the May 31 hearing).

29479677.1

appointing a chapter 11 trustee.   See *Cybergenics*, 330 F.3d at 577 ("forcing [motions] to appoint trustees would amount to replacing the scalpel of derivative suit with a chainsaw") (cleaned up).

## REPLY

### A.   Delaware Law Does Not Preclude A Creditor From Asserting Claims On Behalf Of An LLC Debtor's Federal Bankruptcy Estate

5.     Direct Energy's ability to assert the Proposed Claims on behalf of the Debtor's estate is governed by the Bankruptcy Code and federal common law, not Delaware state LLC law.   Therefore, the Objectors' primary argument in opposition to the Standing Motion—that the Delaware LLC Act precludes a creditor from suing derivatively on behalf of an LLC—fails.

6.     The Objectors urge this Court to deny the Standing Motion based upon the Delaware LLC Act's prohibition of anyone other than "a member or an assignee" to sue on behalf of a Delaware LLC:

> In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and:
>
> (1) At the time of the transaction of which the plaintiff complains; or
>
> (2) The plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.

6 Del. Code § 18-1002.   Applying this statute, the Delaware Supreme Court has held that "[o]nly LLC members or assignees of LLC interests have derivative standing to sue on behalf of an LLC—creditors do not."   *CML V, LLC v. Bax*, 28 A.3d 1037, 1043 (Del. 2011), as corrected (Sept. 6, 2011).

7.     By its very own terms, however, this statute has nothing to do with derivative standing in bankruptcy.   Rather, the statute concerns a "derivative action," which is an action to

be brought "*in the Court of Chancery*."   6 Del. Code § 18-1001-2 (emphasis added).   Direct

Energy, of course, is not seeking to bring a derivative action "in the Court of Chancery" on

behalf of a "limited liability company."   *Id.*   It is seeking authority under this Court's equitable

bankruptcy powers (as recognized in *Cybergenics*) to act on behalf of a bankruptcy estate—

"create[d]" pursuant to federal law—and to stand in the shoes of a "trustee" under the

Bankruptcy Code and in the Bankruptcy Court.

8.      Upon commencement of a bankruptcy case, an "estate" is created, comprising all

property listed in Bankruptcy Code section 541, wherever located and by whomever held.   *See*

11 U.S.C § 541(a).   Section 541 defines the estate broadly to include all claims and causes of

action that belong to the debtor at the commencement of the bankruptcy.   *See Integrated*

*Solutions, Inc. v. Service Support Specialties Inc.*, 124 F.3d 487, 490-91 (3d Cir. 1987) ("The

Bankruptcy Code defines a bankrupt's estate broadly to encompass all kinds of property,

including intangibles and causes of action."); *Louisiana World Exposition v. Federal Insurance*

*Company*, 858 F.2d 233, 245 (5th Cir. 1988) ("Section 541(a)(1)'s reference to 'all legal and

equitable interests of the debtor's property' includes causes of action belonging to the debtor at

the time the case is commenced.").   Property of the estate also includes "any property the estate

acquires after the commencement of the case."   11 U.S.C. § 541(a)(7).

9.      Federal bankruptcy law also determines who can act on behalf of an estate.

Under the Bankruptcy Code, the trustee generally is "the representative of the estate" and "has

capacity to sue and be sued."   11 U.S.C. § 323(a), (b).   Among its many duties, a trustee *must*

collect the property of the estate in order to maximize the value of the estate.   *See* 11 U.S.C.

§ 704(a); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (noting

that the trustee "has the duty to maximize the value of the estate").   With certain exceptions not

relevant here, a debtor-in-possession performs the same functions as a trustee in a reorganization. 11 U.S.C. § 1107(a).

10.    In turn, standing in bankruptcy is not limited to just a trustee and debtor-in-possession.    Bankruptcy Code section 1109(b) provides that:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a **creditor**, an equity security holder, or any indenture trustee, **may raise and may appear and be heard on any issue in a case under this chapter.**

11 U.S.C. § 1109(b) (emphasis added).    Moreover, various other provisions of the Code grant standing to parties in different circumstances.    *See, e.g.*, 11 U.S.C. §§ 307 (granting U.S. trustee right to be heard); 502(a) (granting creditors of a general partner standing to object to claims).

11.    Prior to its bankruptcy filing, Debtor Ector County Energy Center, LLC had breach of fiduciary duty claims against the Invenergy Fiduciary Defendants.    Those claims and causes of action became property of the estate upon the chapter 11 filing.    No Objector disputes that the Debtor, *as estate representative and debtor-in-possession*, can assert these causes of action (and any causes of action that may accrue post-petition, including subrogation, contribution, and preference claims, as well as breach of fiduciary duty claims arising from post-petition conduct).    Nor could any Objector reasonably dispute that a trustee, if one were appointed, would have standing to assert the same claims on behalf of the estate.    Any state law that purported to mandate otherwise—and the Delaware Code does not purport to do so—would conflict with the Bankruptcy Code, and thus be preempted.    It is well established that "States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations."    *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929).[6]

---

[6]    For this reason, a state could not *expand* creditor's derivative rights in bankruptcy either.    "It is fundamental that derivative claims are property of the debtor's estate."    *In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287, 2016 WL 4055044, at *2 (Bankr. S.D. Tex. July 26, 2016) (citing *In re*

12.    Unfortunately, for the reasons discussed in the Standing Motion and herein, this conflicted debtor-in-possession will not assert these estate claims, and it is hopelessly conflicted to do so.    One remedy thus would be the appointment of a chapter 11 trustee, who could pursue the claims on behalf of the estate.    But, as the Third Circuit recognized, there are other equitable remedies in bankruptcy—short of ordering the appointment of a trustee—for cases such as this where the debtor-in-possession refuses to bring an action that would benefit the estate, thereby violating its fiduciary duty to maximize the estate's value.    *See Cybergenics*, 330 F.3d at 568. "It is in precisely this situation that bankruptcy courts' equitable powers are most valuable, for the courts are able to craft flexible remedies." *Id.*    One such remedy is the bankruptcy court's grant of standing to creditors to pursue estate causes of action where the debtor-in-possession has unjustifiably refused to do so.    In light of the Debtor's conflicts and unjustifiable refusal to assert the Proposed Claims, Direct Energy has sought this Court's approval to assert the estate's claims, *on behalf of the estate, for the benefit of the estate* (not only Direct Energy) as contemplated by the Third Circuit in *Cybergenics*.

13.    The cases cited by the Objectors held that creditors in a bankruptcy cannot bring claims on behalf of, and for the benefit of, a bankruptcy estate because state law precludes creditors from bringing claims outside of bankruptcy on behalf of a (non-debtor) LLC.    *See, e.g.*, *Official Committee of Unsecured Creditors of HH Liquidation, LLC v. Comvest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 284 (Bankr. D. Del. 2018) ("[The creditors committee's] rights to assert derivative claims are limited to the derivative standing of its members, none of whom have standing as creditors of a Delaware LLC to assert derivative

---

*Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir.1994)).    Thus, derivative actions are subject to the automatic stay, and the trustee has authority to pursue or settle the claims on behalf of the estate.

claims of breach of fiduciary duty on behalf of the estate.").[7]    However, the question here is not whether creditors could have pursued these claims pre-bankruptcy (in the "Court of Chancery"), on behalf of the non-bankrupt debtor.    Rather, the question is who has authority to bring the claims post-bankruptcy, in the Bankruptcy Court, and on behalf of the bankruptcy estate.    This question is governed by federal law, which (i) creates an estate (§ 541(a)), (ii) vests the debtor-in-possession or trustee with the authority to manage the estate, including to assert any claims the debtor could have asserted prior to the bankruptcy (§§ 704(a), 323, 1107(a)), (iii) vests the debtor-in-possession or trustee with additional rights that the debtor lacked prepetition, including chapter 5 avoiding powers (§§ 544-552), and (iv) vests creditors in a chapter 11 case with the right to be heard "on any issue" (§ 1109(b)).    And, as discussed, where a debtor-in-possession unjustifiably refuses to assert these claims and/or exercise these powers, federal bankruptcy courts grant standing to do so to other parties; namely, creditors' committees or individual creditors.    *See Cybergenics*, 330 F.3d at 559 (holding that granting committee standing is consistent with the Bankruptcy Code's statutory scheme).

14.    This Court, of course, is well-versed in all of the foregoing.    As recognized in *In re J&M Sales Inc.*, state LLC law cannot be invoked to prevent a trustee from pursuing fraudulent transfer claims.[8]    This is because the trustee's standing is not based on state law, but rather the provisions of the Bankruptcy Code that vest claims in the estate, and empower the

---

[7]    *See also Gavin/Somonese LLC v. Citadel Energy Partners, LLC (In re Citadel Waterford City Disposal Partners, L.P.)*, 603 B.R. 897, 904 (Bankr. D. Del. 2019) ("Debtor Citadel Watford City Disposal Partners, LP ('Citadel LP') is a limited partnership formed under Delaware law.    At no time was the Committee a partner or an assignee of a partnership interest in Citadel LP, as required by 6 Del. C. § 17-1002. Accordingly, the Committee's derivative claims asserted against Dunaway on behalf of Citadel LP must be dismissed because the initial requirement of a partner or assignee interest set forth in 6 Del. C. § 17-1002 is not satisfied.").

[8]    *See* Opinion and Order, *Miller v. Fallas (In re J&M Sales Inc.)*, Adv. Pro. No. 20-50775 (JTD) (Bankr. D. Del. Aug. 20, 2021) (Docket No. 306); *see also* Mot. ¶¶ 69-71.

trustee to pursue those claims.    No state law could prohibit a trustee or other estate representative from pursuing claims that the Bankruptcy Code expressly recognizes to be estate property.    In short, the State of Delaware cannot pass a law abrogating a federal bankruptcy trustee's power to pursue claims on behalf of the estate, and it likewise cannot purport to curtail a creditor's right to be heard under section 1109.    And while *Cybergenics* is based on equitable powers, those powers are as much a function of federal bankruptcy law as are sections 323, 544 through 552, and 1109(b).    The Delaware Supreme Court did not and cannot purport to alter *Cybergenics*; only Congress or the U.S. Supreme Court can do so.

15.    In *Louisiana World*, the Fifth Circuit similarly rejected the defendant's argument that state law, which broadly limited creditor derivative actions outside of bankruptcy, could preclude a creditors committee from obtaining derivative standing to assert estate claims.    858 F.2d 233.    The Fifth Circuit held that "once [the debtor] filed a petition for Chapter 11 relief, its causes of action against the appellees—which were property of the estate—passed to the debtor-in-possession as representative of the estate.    Since the causes of action belonged to [the debtor], the debtor-in possession had the authority to pursue it in bankruptcy proceedings." *Id.* at 246.    This was true even though the beneficiaries of that action would be the estate's creditors who, under Louisiana law, would have lacked the ability to bring the claims against the debtor's officers and directors.    The Fifth Circuit further held that because the debtor-in-possession could bring the action on behalf of the estate, so too could the creditors' committee as representative of the bankruptcy estate. *Id.* at 247-48.    Thus, notwithstanding state law that barred individual creditors from bringing claims against the debtor's officers and directors, federal bankruptcy law permitted a creditor's committee to do so as a representative of the bankruptcy estate.

16.     To be clear, there is no question that Delaware could have enacted a law precluding LLCs from pursuing breach of duty claims against their members.    Indeed, 6 Del. C. § 18-1101(e) does permit an LLC to waive liability for such claims, but only if the LLC agreement so provides (which the Debtor's LLC agreement does not).    But what Delaware (or any of the other 49 states) cannot do is dictate who has standing in a federal bankruptcy case to pursue claims that belong to the bankruptcy estate.    Federal bankruptcy law—including decisional law under *Cybergenics*—dictates who can act for a federal bankruptcy estate and be entrusted with its powers.[9]

**B.     Direct Energy Has Asserted Colorable Estate Claims In The Proposed Complaint**

**1.     The Debtor Has Colorable, Valid Contribution Claims Against The Other Subsidiary Guarantors**

17.     As an initial matter, none of the Objectors dispute that the estate has a viable claim for contribution against the other Subsidiary Guarantors under section 11.02 of the Credit Agreement.    *See, e.g.*, Debtor's Obj. ¶ 63 (admitting that, under section 11.02 of the Credit Agreement, "each of the Subsidiary Guarantors may pursue a contribution claim to the extent its payments as of a particular date exceed its 'Fair Share.'").    Indeed, the Objectors have previously impliedly conceded the colorability of the estate's contribution claims.    At closing argument at the Cash Collateral Hearing, counsel to the Invenergy Secured Lenders stated, "to the extent we're talking about contractual claims ['such as contribution, subrogation or other items'], we recognize that we are not getting a waiver of contractual rights or claims."    June 1,

---

[9]    In the last week, the Delaware Supreme Court vacated a Chancery Court ruling that a common law "insolvency exception" to state corporation law eliminates a requirement for a stockholder vote before directors can transfer the company's asset.    *See Stream TV Networks, Inc., v. SeeCubic, Inc.*, Case No. 360, 2021 (Del. Jun. 15, 2022).    Under the reasoning of the Objectors' argument, pursuant to *Stream TV*, a trustee or debtor-in-possession could not prosecute a motion pursuant to section 363 of the Bankruptcy Code absent obtaining unanimous shareholder consent.

2022 Hr'g Tr. at 66:1-3.    Meanwhile Debtor's counsel, in response to the Court's specific inquiry, stated "the rights to seek contribution … are preserved", while also suggesting that such claims may merely be temporally held in abeyance.    *Id.* at 16:2-8.

18.    Nevertheless, the Debtor argues that pursuing these contribution claims would be a "futile exercise" (Debtor's Obj. ¶ 56), because (i) the Debtor may not be able to collect from the other Subsidiary Guarantors until the Credit Agreement "Termination Date," (ii) it could be expensive to determine each Subsidiary Guarantor's required contribution, and (iii) the Credit Agreement refinanced an earlier credit facility, $117 million of which was used to finance the construction of the Debtor's Power Plant.    All three arguments fail.

19.    *First*, the Debtor is wrong that the estate would have to "wait[] for the occurrence of the Credit Agreement 'Termination Date.'"    *See id.* ¶¶ 59-60 (citing Credit Agreement § 11.06).    Section 11.02, by its express terms, gives rise to a present right and entitlement as of the date "any payment or distribution is made", providing that the Debtor "***shall be entitled*** to a contribution from" the other Subsidiary Guarantors, premised on an amount to be calculated "***as of such date***".    *Id.* § 11.02.    Section 11.02's express right of entitlement trumps the general language of section 11.06, which section includes three specific examples (a)-(c), concerning claims other than contribution against Subsidiary Guarantors.    That section should not be read to read Section 11.02 out of the Credit Agreement.    "Under New York law, an interpretation of a contract that 'has the effect of rendering at least one clause superfluous or meaningless…is not preferred and will be avoided if possible."    *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988)); *see also Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715, 741 (Del. Ch. 2008) ("[A] contract should be read so as not to render any term meaningless.").

20.    *Second,* the Debtor argues that prosecution of its contribution claim would purportedly result in "extraordinary and potentially estate-draining expense" because the process of calculating the amounts owed by each Subsidiary Guarantor "would likely require valuation expert fees in excess of the amount that the Debtor's liquidity can fund."    Debtor's Obj. ¶¶ 63, 66.    First, the Debtor ignores the fact that, to the extent the Standing Motion is granted, Direct Energy will be the nominal plaintiff asserting the contribution claim on behalf of the estate and is willing to finance the costs of prosecution.    In any event, the Debtor does not provide any explanation as to why determining the amounts owed by the Subsidiary Guarantors pursuant to the formula set forth in the Credit Agreement would be such a difficult and expensive undertaking, or why such expense should be borne by the plaintiff, and not the Subsidiary Guarantors, who are contractually bound to pay their Fair Share.

21.    *Third*, the Debtor asserts that determination of the amounts owed by the Subsidiary Guarantors would need to "take into consideration that approximately $117 million of the total outstanding debt due to the Prepetition Secured Lenders represents financing used to construct the Debtor's Power Plant," (Debtor's Obj. ¶ 68), but this assertion is not only misleading, it is not supported by the Credit Agreement.    The operative terms "Fair Share" and "Fair Share Contribution Amount" provide for a simple ratable calculation—nowhere therein is there even the slightest notion that the use of a *predecessor* credit agreement proceeds is relevant.    *See* Debtor's Obj. (¶¶ 64-65) (quoting operative definitions).    The Debtor has no textual or equitable basis to argue that the uses of the proceeds of a *previous* credit facility approximately 10 years ago that was refinanced by the Credit Agreement has any impact on the calculation of each Subsidiary Guarantor's "Fair Share."

## 2.    The Debtor's Subrogation Claim Is Colorable

22.    The Debtor argues that the Court's statements at the Cash Collateral Hearing regarding the "primary" obligation of the Debtor under the Credit Agreement precludes the Debtor's subrogation claim.    The Debtor is wrong.    As the Court is aware, its statements were made in the context of considering the Debtor's waiver of "marshaling"—not subrogation.

23.    "[T]he relevant question in the subrogation context is not simply whether the party was directly liable, *but rather whether its payment was used to satisfy another's obligation.*"    *Pandora Industries, Inc. v. Paramount Communications Inc. (In re Wingspread Corp.)*, 145 B.R. 784, 790 (S.D.N.Y. 1992) (emphasis in original and added) (holding that guarantor's own primary liability to creditor did not preclude guarantor's subrogation rights).

24.    Sections 11.03 (and, prior to its amendment on the eve of bankruptcy, 3.02(b)(vii)), clearly provide and reflect that the Debtor is positioned to satisfy Borrower/ITOI's obligation.    Section 11.03 of the Credit Agreement, provides, in its entirety:

> Payment by Subsidiary Guarantors. The Subsidiary Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Secured Party may have at law or in equity against any Subsidiary Guarantor by virtue hereof, *that upon the failure of the Borrower to pay any of the Guaranteed Obligations when and as the same shall become due*, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), the Subsidiary Guarantors will upon demand pay, or cause to be paid, in cash, to the Administrative Agent for the ratable benefit of Secured Parties, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to beneficiaries as aforesaid.

Credit Agmt. § 11.03 (emphasis added).    Thus, the Debtor's obligation to pay *any* amounts under Article IX, *Guaranty*, of the Credit Agreement is triggered only upon ITOI's failure to pay its own "Secured Obligations" as Borrower.

25.    Even more specifically, with respect to a sale of the Debtor's assets, before April 4, 2022, section 3.02(b)(vii) of the Credit Agreement provided that upon a sale, transfer, or other disposition of the property and assets of the Debtor (an "Ector Disposition"), "the Borrower" (***i.e., ITOI, not the Debtor***) was required to make a prepayment on the Prepetition Secured Loans equal to $75 million (the "Ector Disposition Prepayment").    *See id.* § 3.02(b)(vii).    Thus, upon an Ector Disposition, ***ITOI*** specifically was required to make the Ector Disposition Prepayment; the Debtor (like each other Subsidiary Guarantor) merely guaranteed the "due and punctual payment" of the Ector Disposition Prepayment expressly due from ITOI to the Invenergy Secured Lenders.

26.    In sum, there can be no dispute that the Debtor is positioned to satisfy ITOI's obligations and that subrogation applies in this context.    *See* May 31, 2022 Hr'g Tr. at 90:9-13 (CRO testimony:    ITOI "would enjoy if Ector sold its assets and paid down Credit Suisse, the remaining portfolio would enjoy a reduction of debt").[10]

27.    In any event, the right of subrogation is rooted in common law, and "does not depend upon contract, but is created simply from the equities of the situation."    *Aetna Casualty and Surety Co. v. Norwalk Foods, Inc.*, 480 N.Y.S.2d 851, 852-53 (1984); *see also In re QC Piping Installations, Inc.*, 225 B.R. 553, 562 (Bankr. E.D.N.Y. 1998) ("The right of subrogation or of equitable assignment is not founded upon contract nor upon the absence of a contract, but is

---

[10]    The CRO understood that ITOI was the primary obligor under the Credit Agreement, but never made a demand that ITOI make a payment, upon the sale of the Debtor's assets, because ITOI was not "sitting on a pile of cash" and never demanded that ITOI monetize its equity value to make a payment. May 31, 2022 Hr'g Tr. at 81:14-21; 83:4-84:10.

founded upon the facts and circumstances of a particular case and upon principles of natural justice…no contract is necessary upon which to base the right, for it is founded upon principles of equity and benevolence…") (citations and quotations omitted).    "Equitable subrogation compels the ultimate payment of a debt by one who in justice, equity, and good conscience ought to pay it."    *Wetzler v. Cantor*, 202 B.R. 573, 576-77 (D. Md. 1996) (assessing whether failure to subrogate would result in an unjustifiable windfall).

28.    Here, the equities warrant subrogation.    As admitted at the Cash Collateral Hearing, ITOI negotiated this bankruptcy case—*i.e.*, the Debtor's liquidation—with the Invenergy Secured Lenders to improve leverage ratios at the "remaining portfolio" at a time when those Invenergy Secured Lenders were not even threatening a default.[11]    Moreover, as discussed, from the inception of the Credit Agreement in August 2018 until April 2022, ITOI was expressly obligated to make the $75 million Ector Disposition Prepayment to the Invenergy Secured Lenders upon an Ector Disposition.    However, one week before the Petition Date, the Invenergy Secured Parties, Invenergy, and the Debtor (under the complete control of Invenergy and facing no real need to file for bankruptcy and sell all of its assets) executed Amendment No. 4, pursuant to which the Debtor replaced ITOI as the party responsible for the Ector Disposition Prepayment.    ITOI should not be permitted to receive a $75 million windfall, in the form of a

---

[11]    *See* May 31, 2022 Hr'g Tr. at 79:5-80:7; 84:19-85:8 (Debtor's CRO testifying that at the time ITOI proposed the "framework" for the Debtor's bankruptcy case, there was no default or threatened default under the Credit Agreement and the payment obligation upon a sale of the Debtor's assets was ITOI's obligation).

The framework for the bankruptcy was to "facilitate further credit enhancements to the remaining [non-Debtor] portfolio" which would "benefit shareholder ITOI and its shareholders." *Id.* at 89:19-90:16. ITOI needed and negotiated for a waiver of any default against ITOI in connection with the Debtor's bankruptcy filing. *Id.* at 93:4-8. The framework is a "good result for ITOI and its lenders"; meanwhile, the Debtor will be subject to "liquidation under Chapter 11", which will not save any jobs. *Id.* at 90:22-91:12-15; 92:12-15.

release of subrogation claims, as a result of the Debtor's hopelessly conflicted corporate governance.

29.    Finally, there is no good argument that subrogation has been waived.  *See Port Distributing Corp. v. Pflaumer*, 880 F. Supp. 204, 212 (S.D.N.Y. 1995) (noting that if parties intend the "impairment of the right to subrogation, they must include clear and unambiguous language to that effect").   Even to the extent the Debtor is right that the estate's subrogation claim is subject to some form of temporal limitation, that is all the more reason to begin to prosecute to liability now; the Debtor cannot contend that the claim is not colorable.

**3.    Claims To Avoid The Incurrence Of The Direct Obligation Are Colorable**

30.    As a matter of clarification, Direct Energy respects this Court's ruling concerning "marshaling."   Direct Energy is seeking to avoid the incurrence of the Direct Obligation—not to attempt to route sale proceeds away from the Invenergy Secured Lenders—but because ITOI and its affiliates may argue that avoiding the Direct Obligation is necessary for pursuing subrogation claims against ITOI.

**(a)    *Amendment No. 4 Imposed A "New" Obligation On The Debtor***

31.    The Debtor's and the Invenergy Secured Lenders' assertions that Amendment No. 4—namely, the Direct Obligation—did not impose a "new" obligation on the Debtor relies on certain provisions of the Credit Agreement, while ignoring others.   The argument is meritless. As the Court noted at the Cash Collateral Hearing, if Amendment No. 4 accomplished nothing, then why was it done?

32.    As noted above, prior to Amendment No. 4, section 3.02(b)(vii) of the Credit Agreement provided that upon an Ector Disposition, ITOI (the Borrower) was obligated to make the Ector Disposition Prepayment.  *See* Credit Agmt. § 3.02(b)(vii).   However, one week

before the Petition Date, on April 4, 2022, ITOI, the Debtor and the other Subsidiary Guarantors, and the Invenergy Secured Lenders entered into Amendment No. 4, pursuant to which *ITOI* was purportedly relieved of its obligation to make a mandatory prepayment upon an Ector Disposition under section 3.02(b)(vii) *and instead made the Debtor the party responsible for that prepayment,* as reflected below:

> (vii)   Ector Disposition.  No later than three (3) Business Days following the receipt ~~by the Borrower or any of its Subsidiaries~~ of any Ector Disposition Proceeds: ~~(A) the Borrower~~a **"Disposition Proceeds Date") by Ector, Ector** shall make a mandatory prepayment of the Loans in an amount equal to the Ector Target Sale Amount~~, to be~~ **(the "Ector Disposition Payment").  In the event that Ector Disposition Proceeds have not been received by Ector on the earlier of (i) the date on which a change of control of Ector occurs and (ii) July 31, 2022, on such date, Ector shall make a mandatory prepayment of the Loans in the amount of $75,000,000 in lieu of its obligation to make the Ector Disposition Payment.  Any mandatory prepayment of the Loans made by Ector pursuant to this section shall be** applied as set forth in Section 3.03~~; and (B) the Revolving Loan Commitment Amount shall be reduced in accordance with Section 2.02(b); provided that unless an Event of Default has occurred and is continuing, the Borrower may make Restricted Payments of any Excess Sale Proceeds from an Ector Disposition.~~.

Amendment No. 4 at 83 (amending former § 3.02(b)(vii) (now § 3.08(b)(vii)).

33.   As a result of Amendment No. 4, the Credit Agreement now purports to require the Debtor to make the Ector Disposition Prepayment upon an Ector Disposition, whereas the Debtor (and the other Subsidiary Guarantors) previously were only required to make the Ector Disposition Prepayment if *the Borrower* failed to make the prepayment.   Thus, contrary to the Objectors' assertions, the Debtor clearly incurred a "new" obligation as a result of the parties' entry into Amendment No. 4.

34.   Section 9.06(f) of the Credit Agreement does not alter the analysis.   That is because, before the parties executed Amendment No. 4 on the eve of bankruptcy, section 9.06 provided that Ector Disposition Proceeds are to be applied to the "mandatory prepayment of Loans *in accordance with Sections 3.02(b)(vii)*…"   § 9.06(f)(ii) (emphasis added).   Notably, the Debtor omits from its citation to § 9.06(f) the critical last phrase.   As discussed above,

Section 3.02(b)(vii) expressly provided that, upon an Ector Disposition, *the Borrower (ITOI)* was required to make the Ector Disposition Prepayment and nothing about § 9.06 modifies that.[12]

      **(b)**      ***The Debtor Did Not Receive Reasonably Equivalent Value In Exchange For Its Incurrence Of The Direct Obligation***

35.      The Objectors' arguments that any "new" obligation resulting from Amendment No. 4 was incurred for "reasonably equivalent value" are based on the incorrect assertion that Amendment No. 4 avoided the Invenergy Secured Lenders' enforcement of their "post-default rights." Debtor's Obj. ¶ 50. In fact, there was no existing event of default under the Credit Agreement, which the CRO repeatedly conceded.[13] Moreover, value that *ITOI* may have realized for avoiding a cross-default with respect to the "remaining portfolio" is irrelevant to the analysis concerning the Debtor's estate's chapter 5 claim.[14]

      **(c)**      ***No Objector Seriously Disputes That The Direct Obligation Was Incurred To Hinder, Delay, Or Defraud The Debtor's Creditors***

36.      None of the Objectors seriously dispute the allegations in the Standing Motion and Proposed Complaint that the Direct Obligation was incurred with the intent to hinder, delay, or defraud the Debtor's unsecured creditors. While the Invenergy Secured Lenders make a passing argument that the PSA Transactions were the product of an "arm's-length agreement" that did not reflect the necessary actual intent to hinder, delay, or defraud creditors, they

---

[12]    Not only does the Debtor omit this critical language, but it also fails to note that the provision to which it cites *was amended pursuant to Amended No. 4*. Amendment No. 4 deleted all references to Ector Disposition and Ector Disposition Proceeds in section 9.06(f), and added a new subsection (h), which simply permits the "Ector 363 Sale." *See* Amendment No. 4 at 137.

[13]    *See* May 31, 2022 Hr'g Tr. at 79:5-80:7; 84:19-85:8 (Debtor's CRO testifying that at the time ITOI proposed the "framework" for the Debtor's bankruptcy case, there was no default or threatened default under the Credit Agreement and the payment obligation upon a sale of the Debtor's assets was ITOI's obligation).

[14]    *Id*. at 93:4-8 (CRO agreeing that "ITOI needed the lenders agreement to waive a default in connection with your bankruptcy filing; otherwise, they would be facing a default on the remaining portfolio").

acknowledge the Debtor's potential insolvency and the pending Direct Energy litigation (Lenders' Obj. ¶ 7), and do not dispute that the Direct Obligation effectively places virtually all of the Debtor's assets beyond the reach of its unsecured creditors and was incurred for the direct benefit of insiders, who controlled the Debtor's decision to do so.    In fact, the evidence already before the Court supports the existence of these "badges of fraud."    *See, e.g.*, ¶ 42, *infra*; notes 11, 13 and 14, *supra*.

> **4.    No Objector Seriously Disputes That The Invenergy Fiduciary Defendants Breached Their Fiduciary Duties To The Debtor Or That Invenergy Received Insider Preferences**

37.    Objections to the breach of fiduciary duty claim (Count VII) and preference claim (Count VIII) rely exclusively on the Objectors' argument that Direct Energy does not have standing to assert those claims.    No Objector disputes (because they cannot) that the Invenergy Fiduciary Defendants breached their duties to the Debtor or that Invenergy entities received insider preferences that are subject to avoidance under section 547(b).[15]

38.    Delaware law is clear that, absent an express limitation or waiver of liability in the LLC's governing agreement, members, managers, and officers of an LLC owe the LLC fiduciary duties.    *See Metro Storage Int'l LLC v. Harron*, CV 2018-0937-JTL, 2022 WL 1404359, at *23 (Del. Ch. May 4, 2022) (citing 6 Del. C. § 18-1101(e)).[16]    The Debtor's LLC

---

[15]    *See* May 31, 2022 Hr'g Tr. at 121:23-123:24; 155:9-11 (Debtor's CRO testifying that on the day the Debtor filed its petition for bankruptcy, the CRO authorized the transfer of $729,000 to Invenergy and its affiliates, outside the ordinary course of business, for amounts that would not have been invoiced until weeks later).

[16]    Section 1101(e) provides:

> A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

29479677.1

agreement does not contain such a waiver or limitation, and thus the Debtor held and could have prosecuted such claims as of immediately prior to the Petition Date.

39.     Thus, because the Objectors' arguments relating to standing fail (*see* Section A, *supra*), so too do their Objections with respect to these Proposed Claims.

### C.     The Debtor Has Evinced Its Unjustifiable Refusal To Assert The Proposed Claims On Behalf Of The Estate, Rendering Formal Demand Futile

40.     The Debtor does not dispute that (i) the PSA provides that the plan must include releases and exculpation of Invenergy, the Prepetition Secured Lenders, and their successors, members, officers and directors, among others, from any and all claims, obligations, causes of action, whether such claims could be asserted directly or derivatively, for any act, omission, transfer or occurrence that the Debtor had, has, or may have as of the effective date, and (ii) the APA provides for the sale of avoidance actions to a purchaser who agrees that it will not pursue such claims.   Moreover, the Debtor has refused to agree to deposit the Proposed Claims into a trust for unsecured creditors, administered by a trustee selected by unsecured creditors.   Any demand on the Debtor to bring the Proposed Claims against Invenergy or the Invenergy Secured Lenders would therefore be futile.   *See Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 544 (W.D. Pa. 2005) (finding formal request of debtor to bring action waived under DIP financing orders would have been futile as debtor could not have "seriously entertained the idea"); *Louisiana World*, 832 F.2d at 1397-98 (court would not remand so that committee could make formal demand upon debtor where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers).

41.     To the extent the Debtor's position is that it is settling these estate causes of action pursuant to a plan, it should not be entitled to do so and certainly is not entitled to this Court's deference to its "business judgment."   *See* Debtor's Obj. ¶ 8 ("As to method, the Debtor

'favor[s] resolving the claims through a comprehensive plan of reorganization that will provide distributions to creditors,' a means of dealing with claims that at least one court has held 'is a reasonable exercise of the debtor['s] judgment." (quoting *In re Caesars Entm't Operating Co., Inc.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016)).

42.     The evidence in this case, including testimony elicited at the May 31, 2022 hearing regarding the Cash Collateral Motion, reflects that the Debtor's governing "Special Committee" is in fact hopelessly conflicted.   For example:

- The Debtors' governing "Special Committee" is comprised of four out of five representatives of shareholder, borrower under the Credit Agreement, and proposed releasee—ITOI.   May 31, 2022 Hr'g Tr. at 65:3-5; 64:7-10.   Indeed, right up until the eve of bankruptcy, there was not even one "independent" member, at which point a sole "independent", Mr. Adams, was a selected by the conflicted members.   *Id.* at 62:11-63:6; 64:11-21.

- To be certain, the sole "independent" was not given any special authority nor could his sole vote ever defeat the four conflicted votes.   *Id.*at 65:5-23.   Mr. Adams was sent the PSA and Credit Agreement amendment documents, if at all, no sooner than the evening of April 1, which documents were signed on April 4; moreover, it appears Mr. Adams, who suggested no changes to the documents, did not even review or receive the documents over the weekend.   *Id.*   at 68:15-69:17; 70:5-7.

- Mr. Baumgartner, the Debtor's CRO, reports to the conflicted Special Committee without any special or independent powers of his own.   *Id.* at 70:24-70:1; 71:24-72:2.   Prior to being selected by Invenergy representatives, there was a pre-existing business relationship between Grant Thornton and Invenergy.   *Id.* at 72:3-14.

- The conflicted Special Committee approved broad releases of ITOI and its affiliates, in "the broad context of the Debtor in Possession financing" without any independent review granted or proposed to be granted to the sole independent, Mr. Adams.   *Id.* at 73:16-24; 74:1-19.   These releases, which are set forth in the Debtor's "plan support agreement", include subrogation, contribution, and other claims, including insider preferences paid on the day the bankruptcy petition was filed.   *Id.* at 96:3-8; 135:11-137:5.

D.     **The Debtor's Estate Stands To Benefit Significantly From Direct Energy's Prosecution Of Estate Claims On The Estate's Behalf**

43.     As an initial matter, the cost-benefit analysis here is particularly easy and straightforward given that Direct Energy is willing to fund the cost of prosecution of the Proposed Claims and there is no reason the Debtor should pay for the defense of ITOI and its affiliates.

44.     None of the Objectors argue that the subordination and contribution claims would not return significant value to the estate (indeed, the CRO testified to as much[17]); instead, their arguments focus on timing.   As discussed in Sections B.1 and B.2, *supra*, even if correct, these considerations do not render the subrogation or contribution claims invalid or without significant value.   Nor do any of the Objectors contend that the Debtor's estate would not benefit significantly from the breach of fiduciary duty and preference claims asserted in the Proposed Complaint, which claims the Objectors effectively concede are colorable.   Indeed, the damages resulting from the Invenergy Fiduciary Defendants' breach of their duties to the Debtor, including by causing the Debtor to incur the Direct Obligation, enter into the PSA, and file the Chapter 11 Case to liquidate itself for the benefit of its parent, ITOI, among other things, could be substantial, depending on the outcome of the case.

45.     Again, and most importantly, the Debtor's estate is not required to fund the prosecution of the Proposed Claims—it is Direct Energy who will be left to fund the costs of litigation should the Standing Motion be granted.   In the event Direct Energy seeks reimbursement of its fees and expenses under section 503(b) of the Bankruptcy Code, this Court will be the ultimate arbiter of their reasonableness and value to the estate.

---

[17]     *See also id.* at 98:19-24, 99:1-5 (CRO testimony conceding that subrogation and contribution claims "may very well have value" but never quantified them).

46.     Thus, the cost-benefit analysis weighs decidedly in favor of granting Direct

Energy standing to pursue the Proposed Claims on behalf of the estate.

## **CONCLUSION**

WHEREFORE, Direct Energy respectfully requests that the Court enter an order granting

the relief requested in the Standing Motion, and granting Direct Energy such other relief as this

Court deems just and proper.


Dated: June 22, 2022          **YOUNG CONAWAY STARGATT & TAYLOR, LLP**
      Wilmington, Delaware

/s/ Michael R. Nestor
Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 571-6600
Facsimile:    (302) 571-1253
**CM/ECF Noticing:** bankfilings@ycst.com
Email:        mnestor@ycst.com
             mlunn@ycst.com

– and –


**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Benjamin I. Finestone, Esq.
Christopher D. Kercher, Esq.
Kate Scherling, Esq.
Zachary Russell, Esq.
Jacqueline M. Stykes, Esq.
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100
Email: benjaminfinestone@quinnemanuel.com
      christopherkercher@quinnemanuel.com
      katescherling@quinnemanuel.com
      zacharyrussell@quinnemanuel.com
      jacquelinestykes@quinnemanuel.com

– and –

K. John Shaffer, Esq.
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213)443-3100
Email: johnshaffer@quinnemanuel.com

*Counsel to Direct Energy Business Marketing, LLC*