```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

                                   .  Chapter 11
IN RE:                             .
                                   .  Case No. 22-10320(JTD)
ECTOR COUNTY ENERGY                .
CENTER, LLC,                       .
                                   .  824 Market Street
                                   .  Wilmington, Delaware 19801
                        Debtor.    .
. . . . . . . . . . . . . . . . .  Wednesday August 17, 2022
```

                    TRANSCRIPT OF VIDEO HEARING RE:
      MOTION FOR ORDER AUTHORIZING DIRECT ENERGY MARKETING, LLC TO
        COMMENCE AND PROSECUTE CLAIMS ON BEHALF OF THE ESTATE
                  BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:

For the Debtors:            Christopher A. Ward, Esq.
                            POLSINELLI, PC

                            John J. Monaghan, Esq.
                            Lynne B. Xerras, Esq.
                            Kathleen M. St. John, Esq.
                            Jacob Morton, Esq.
                            David W. Wirt, Esq.
                            HOLLAND & KNIGHT, LLP

                            Gregory Plotko, Esq.
                            CROWELL & MORNING, LLP

For the U.S. Trustee:       Juliet Sarkessian, Esq.
                            OFFICE OF THE U.S. TRUSTEE



(Appearances Continued)

Audio Operator:             Electronically Recorded
                            by Nolley Rainey, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email: gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:   (Continued)

For Credit Suisse:          Amanda Steele, Esq.
                            Mark Collins, Esq.
                            RICHARDS, LAYTON & FINGER, PA

                            Brian Resnick, Esq.
                            Joshua Sturm, Esq.
                            Stella Li, Esq.
                            Sophy Ma, Esq.
                            Elliot Moskowitz, Esq.
                            Sean Stefanik, Esq.
                            Josh Pitkoff, Esq.
                            Amber Leary, Esq.
                            DAVIS, POLK & WARDWELL, LLP

For Direct Energy Business
Marketing, LLC:             Michael Nestor, Esq.
                            Matthew Lunn, Esq.
                            Michael Neiburg, Esq.
                            YOUNG, CONAWAY, STARGATT
                             & TAYLOR, LLP

                            Benjamin Finestone, Esq.
                            Christopher Kercher, Esq.
                            K. John Shaffer, Esq.
                            Jacqueline Stykes, Esq.
                            Zachary Russell, Esq.
                            Kathryn Bonacorsi, Esq.
                            Katherine Scherling, Esq.
                            QUINN, EMANUEL, URQUHART
                             & SULLIVAN, LLP

For Invenergy Thermal
Operating I:                William Hazeltine, Esq.
                            SULLIVAN HAZELTINE ALLINSON, LLC

                            Ellen Halstead, Esq.
                            CROWELL & MORING, LLP

For ERCOT:                  Deborah Perry, Esq.
                            MUNSCH, HARDT, KOPF & HARR,

Also Appearing:             Casey Moran
                            John Baumgartner
                            Ann Huynh
                            Elliot Prange
                            GRANT THORNTON, LLP

(Appearances Continued)

Also Appearing:            Johhannes Werner
                           CREDIT SUISSE

                           Jeff Kaplan
                           "BCAS"

                           Jason DiBattista
                           LEVFIN INSIGHTS

                           David Mayo
                           REORG

                           Taylor Harrison
                           DEBTWIRE

                           JaKayla DaBera
                           U.S. BANKRUPTCY COURT

INDEX

Page

ARGUMENT BY MR. FINESTONE                    6

ARGUMENT BY MR. MONAGHAN                     28

ARGUMENT BY MR. STRUM                        40

ARGUMENT BY MR. HAZELTINE                    51

FURTHER ARGUMENT BY MR. FINESTONE            54

COURT DECISION                               58

1              (Proceedings commence at 11:02 a.m.)

2              THE COURT:  Good morning, this is Judge Dorsey.

3    We're on the record in Ector County Energy Center, LLC, Case

4    Number 22-10320.

5              I'll go ahead and turn it over to debtor's counsel

6    to run the agenda.

7              MR. WARD:  Good morning, Your Honor.  For the

8    record, Chris Ward of Polsinelli on behalf of the debtors.

9              There were three matters scheduled for a hearing

10   this morning; the Court has entered orders on the first two

11   matters.  That leaves Direct Energy's standing motion as the

12   only matter going forward.  Given that that is their motion,

13   I will cede the podium to their counsel.

14             THE COURT:  Okay.

15             THE COURT:  Who's going to --

16             MR. FINESTONE:  Good morning --

17             THE COURT:  -- speak for them?

18             MR. FINESTONE:  -- Your Honor.

19             THE COURT:  Go ahead.  Go ahead, Mr. Finestone.

20             MR. FINESTONE:  Good morning, Your Honor.  Ben

21   Finestone and Mike Nestor and Kate Scherling, here today on

22   behalf of Direct Energy.

23             Your Honor, our motion is at Docket Number 163.

24             It's been a while since we've been before Your

25   Honor, so we thought that it made some sense to spend some

time on the procedural background and also give some case

background for context, for two reasons, Your Honor:

One, as I said, it's been a while since we've been

here.  The motion was actually filed on May 25th.

But also because our reading of the Cybergenics

decision, which really is a treatise on overall estate

administration, at least from my perspective, incorporates a

zoom-out perspective.  Indeed, Judge Becker spoke of the need

to view Chapter 11 as a whole.

So, with that, my plan is just to refresh all of

our recollection as to how we got here before diving into the

legal argument that's been asserted that there can be no

derivative standing because the debtor is an LLC, and then

proceed into colorability and cost/benefit analysis, Your

Honor.

THE COURT:  All right.  Well, you don't have to go

into a lot of detail because I read the papers, so I'm

familiar with --

MR. FINESTONE:  Okay.

THE COURT:  -- with the issues.

MR. FINESTONE:  Your Honor, as a -- thank you for

that.  We -- as I noted, we filed that motion on May 25th,

and Your Honor held a cash collateral trial on May 31st,

which was about a week after we filed the motion.  In the

motion, we asserted claims for marshaling, fraudulent

transfer, breach of fiduciary duty, and insider preferences.

When Your Honor ruled on June 2nd, following the cash collateral trial, I don't certainly purport to know what was going on in Your Honor's head. But I am of the view that, when Your Honor approved of the waiver of the estate's right to marshal these guaranteed secured creditors up to the primary obligor Invenergy, I'm of the view that Your Honor took some comfort in the fact that contractual claims for subrogation and contribution were being preserved.

I do remember Your Honor asking, not just me, but asking all of the participants in that cash collateral trial whether everybody agreed that the subrogation and contribution claims were being preserved at least at that point in the case, Your Honor. Your Honor asked me right when I got started at closing argument and asked if I be -- if I agreed, then why did I care about marshaling and subrogation and contribution were being preserved, and I answered Your Honor. I said there's a sequence aspect to them, but, yes, Your Honor, subrogation and contribution claims were not on the chopping block.

Your Honor asked debtor's counsel the same question, they gave the same answer. The rights to seek contribution are preserved.

And Your Honor asked the secured guaranteed lenders question -- the same question. And they said, to the extent

we're talking about contractual claims, we recognize that

we're not getting a waiver of contractual rights or claims.

The reason that it wasn't on the table that day,

either at the May 31st trial or at -- when Your Honor ruled

on June 2nd, was because the debtor had -- was not going

forward with their DIP financing motion.  And we had argued

before Your Honor that the debtor doesn't need that DIP

financing.  And we discovered in discovery, leading up to the

cash collateral trial, that they really didn't need the DIP

financing.

There was -- Your Honor may remember there was $3

million in nonrecurring operating costs in the budget that

never materialized, and there was no UCC appointed in this

case.  So that was about the amount, even just there, those

two amounts enough, was about the amount -- was almost

sufficient to moot the DIP financing.

Your Honor, after Your Honor ruled and approved the

waiver of the marshaling claim, we amended our proposed

complaint for obvious reasons.  We had a claim in there for

marshaling and we, of course, respected Your Honor's ruling.

So we took marshaling out and we replaced it with the

subrogation and contribution claims because, as I said, we

respect Your Honor's ruling.  And from our perspective, $75

million in sale proceeds is going to come into this estate,

it has now come into the estate, and will be paid out to

these secured creditors, Your Honor.

And so the resulting claims of subrogation and contribution became our focus. That amended complaint we filed on June 8th, 2022 -- proposed complaint, Your Honor. Excuse me. And that's at Docket Number 201.

At this point in the case, Your Honor, everybody -- I usually can't speak for the debtors and the secured lenders -- but everybody understood that the DIP financing was the basis for Invenergy, the controlling insider and shareholder, to get a release, Your Honor.

And I'm sorry I didn't do this before, Your Honor. But can I ask for my colleague Kate Scherling to be able to share a presentation on the screen? Maybe she can do that already. But is that okay with the Court?

THE COURT: That's fine. Have her raise her electronic hand, so we can identify her more easily and we can give her -- there we go. Good to go.

MR. FINESTONE: Okay. Ms. Scherling, can you bring up the slide presentation.

Your Honor can see that, right?

THE COURT: Yes.

MR. FINESTONE: Okay.

THE COURT: Well -- there we go.

(Participants confer)

MR. FINESTONE: Okay. So this is just a cover

1   page.

2              I'm going to call you by your first name for

3   brevity, Kate.  Can we go to Slide 2, please?

4              So I just said, Your Honor, everybody in the case

5   understood that the release that was on the table for the

6   insider was in exchange for the insider's agreement to

7   provide DIP financing.

8              Here, on Page 2, this is the debtor's motion, this

9   is the DIP financing motion.  It is -- that's what the motion

10  says, you're getting a release for providing DIP financing.

11             Can we move to Slide 3, Your Honor -- Ms.

12  Scherling?

13             Your Honor, it's not just a pleading that they

14  filed with the Court; it was also the sworn testimony of the

15  CRO Mr.  Baumgartner.  He testified in no uncertain terms

16  that the release that was on the table for the controlling

17  shareholder and insider who dominates the board, Your Honor,

18  in exchange for the debtor-in-possession financing:

19             "Yes, that's correct."

20             He also clarified that that release was a broad

21  release and it was going to include -- it was going to cover

22  everything.  This debtor is out here to protect its

23  shareholder, Your Honor.

24             Next page, Ms. Scherling, please.

25             It wasn't just Mr. Baumgartner's sworn testimony,

1   Your Honor.  But Mr. Adams, the sole purportedly, although

2   powerless, independent director, swore at deposition that

3   Invenergy was getting a release, why, for the contribution of

4   making the DIP loan, Your Honor.  These are statements that

5   are -- these are out-of-court statements, but they are

6   concessions of a party opponent.  And in no uncertain terms,

7   Mr. Adams agreed with Mr. Baumgartner that the reason he

8   viewed it appropriate to give a release was for the DIP

9   financing.

10          Next page, Ms. Scherling, please.

11          I also believe, Your Honor, that the Court

12  understood that those releases were going to potentially be

13  in exchange for DIP financing.

14          By the way, I was going to object if that DIP

15  financing motion was ever presented, but that hasn't

16  happened.

17          But the Court also understood that those releases

18  were going to be on the table, not today, Mr. Finestone, not

19  on May 31st, but when and if the DIP motion gets presented.

20          Thank you, Ms. Scherling.  Can you go to slide --

21  okay.

22          Your Honor, we walk away from that hearing.  The

23  debtor files an opposition to our Cybergenics motion, the

24  motion that we're all here today -- and the debtor's

25  opposition is littered with language that I fairly read to

1    suggest that maybe these subrogation and contribution claims

2    and all of these resulting claims are not going to be

3    released.  The debtor, in its opposition, suggested that

4    these litigation claims will be liquidated, wait until you

5    see a plan, these litigations will be controlled by the

6    appointment of an appropriate fiduciary under a confirmed

7    plan.  The debtor said there may come a time when it's

8    appropriate to appoint a creditor representative to pursue

9    estate causes of action.  So I read this opposition.

10   And then, Ms. Scherling, can we just pull it down

11   for now?

12   And then, Your Honor, on July 25th, 2022, at Docket

13   Number 298, the debtor withdrew the DIP financing motion.

14   After adjourning it for several hearings, the debtor

15   ultimately withdrew it.

16   So maybe I was naive, Your Honor.  But these two

17   things in combination, the withdrawal of the DIP financing

18   motion -- which everybody swore to the Court and to everybody

19   was the reason for the release -- and the fact that the

20   debtor's opposition had some bases for my cautious optimism

21   that we weren't just going to extinguish claims, I naively

22   thought, well, maybe this debtor is going to do the right

23   thing.

24   And Your Honor saw -- I hope this wasn't annoying

25   to chambers.  But Your Honor saw we were pulling -- we held

1    our motion back, we kept adjourning it and adjourning it.

2    And why did I do that, Your Honor?  Because I didn't think

3    Your Honor was going to grant my motion if the debtor was

4    going to do something appropriate with these causes of

5    action.

6         I wasn't totally naive, to be candid with the

7    Court.  What I expected to see was a renewed 9019 motion,

8    pursuant to which Invenergy would pay off for some

9    insufficient consideration for a release; or I thought maybe

10    what I would see was the debtor would deposit the claims into

11    a litigation trust, but appoint Mr. Adams, the purported

12    independent director, to be the trustee, and that I would

13    have that future settlement to deal with post-effective-date.

14    I actually think that would have been more strategic of the

15    debtor, but we didn't see either of those two things that I

16    expected.

17         Instead, Your Honor, we saw the filing of a

18    disclosure statement and a proposed plan of reorganization.

19    The plan is at Docket Number 322, the proposed plan.  It was

20    filed on August 9th, 2022.  These things don't matter, but it

21    was filed without a heads-up to Direct Energy.  It wasn't --

22    obviously not negotiated with us at all, even though we are

23    the largest unsecured creditor in the case.

24         And what does that plan have, Your Honor?  It

25    doesn't have the two things that I feared tactically:  The

debtor itself picking a litigation trustee or the debtor with

a new settlement, pursuant to which Invenergy paid something

that, in our view, would have been too cheap.  No, it just

releases the claims without any consideration whatsoever.  It

proposes to release the claims.  There's no DIP financing,

Your Honor, so they don't have that argument.  There's not

even expense savings because, as we said in our motion,

Direct Energy is willing to pay for the prosecution of these

causes of action.

All the disclosure statement and the plan says is -

- well, I'm going to paraphrase here -- that what we have

here is a conflicted board.  Four out of the five board

members are representatives of the putative defendants and

they have come to the conclusion that the causes of action

are worthless.  And so they're worth -- because they're

worthless, no harm, no foul on the release.

There is, Your Honor, some language in the plan and

the disclosure statement that I just want to make sure we

don't confuse.  Other Invenergy affiliates, the service

providers, are paying back the preferences that they paid

themselves on the petition date in full.  That's $729,000.

But those are different Invenergy entities and the debtor

does not even purport to say that $729,000 is being paid to

the estate in exchange for the release of the primary

defendant, which is the parent, the primary obligor on the

1     debt, and the entity that's receiving all the benefits of

2     this bankruptcy.  So that's a side issue.

3          And to be somewhat -- at the risk of being somewhat

4     flippant about it, that's only because they got their hand

5     caught in the cookie jar with that preference and they're

6     paying that back.  It's really not part of today's analysis.

7     We do agree that the proposed preference claims in our

8     proposed complaint should be held in abeyance because, if the

9     defendant is willing to pay that back, it's not an issue for

10    this estate, Your Honor.

11         They've created, Your Honor, in our view, out of

12    thin air, an argument that the reason Invenergy deserves a

13    release is in exchange for the lenders capping their claim at

14    $75 million.  Now this argument, I presume we will hear

15    today.  It's completely inconsistent, as I showed the Court,

16    with the prior sworn statements that the release is for the

17    DIP financing.  It is also inconsistent with the lead

18    argument that these claims have no value whatsoever.  That's

19    what the board decided, unsurprisingly.

20         And it's also inconsistent, Your Honor, with more

21    sworn testimony, which I'll bring up on the screen.  But Your

22    Honor may remember at the cash collateral hearing, when

23    Direct Energy was arguing and upset, Your Honor, about the

24    fact that this pre-petition debtor changed the credit

25    agreement on the eve of bankruptcy to assume or incur a

direct seventy-five-million-dollar claim, when the plain
language of the credit agreement had the parent nondebtor on
the hook for the 75 million.

They responded to my argument, Mr. Baumgartner did
in more sworn testimony.

And I'll ask Ms. Scherling to bring up Slide Number
7.

Mr. Baumgartner said:

"No. Actually, there's no change here. The debtor
was always on the hook for $75 million to the secured lenders
once the assets were sold."

Just to stroke -- to sort of spark Your Honor's
memory, Your Honor then asked some question along the lines
of, well, if the debtor was always on the hook for it, then
why was the amendment made, Your Honor. This is Slide 7B.

Thank you.

So this is Mr. Baumgartner in his sworn testimony,
in the first-day declaration, Your Honor. And I'm mentally
highlighting that -- the last clause that says:

"The credit agreement was amended to require the
debtor make a mandatory prepayment in that same
seventy-five-million-dollar amount."

So, back then, it was seventy-five, no matter --
back then, it was a seventy-five-million-dollar payment. But
now, suddenly, they had agreed to cap it. It's another

1    inconsistent argument, Your Honor.

2         We don't see the basis for this threat, and it's

3    basically a threat to the estate that, if the parent

4    nondebtor shareholder has to face suit for any of the

5    benefits that it's getting from this bankruptcy, the secured

6    lenders will glom on and take the entire estate.  That's --

7    Your Honor, it really is a threat.  I don't see the basis.

8    The credit agreement before the amendment had it at 75

9    million.  It changed it to clarify that the debtor owes them

10   seventy-five.

11        And I will also say it's not an issue for today.

12   But if these secured lenders do try that, I don't think the

13   credit agreement supports it and I would suggest they're

14   judicially estopped from trying to take more than $75 million

15   from this estate.

16        Your Honor, I can't say this with more passion

17   behind it.  This is not about Direct Energy, it's not about

18   Quinn Emanuel, it's not about Young Conaway.  None of those

19   three parties are here because we want to control this

20   litigation.  None of those three parties believed it would

21   ever be their job to prosecute these claims to maximize the

22   value of the estate.

23        We are an involuntary movant here, Your Honor,

24   because nobody else is doing nit.  In our motion, we said it,

25   in our reply at Paragraph 3.  If -- so it's not in our

1   motion, it's in our reply.  If the claims were preserved the

2   way, in our view, a faithful fiduciary would preserve them

3   and asserted by an independent trustee, our motion is

4   resolved.  We're not here because we want to play estate

5   fiduciary.  It's a job that has fallen to us, Your Honor.

6          We've already lost $400 million.  That was our

7   breach of contract claim.  The out -- we're paying out of

8   pocket to make sure that all of these -- to make sure that

9   whatever percentage of recovery we ultimately get is as high

10  as possible, Your Honor.

11         Pausing one more time and zooming out, I can't help

12  but observe -- and this is similar to some of the theme that

13  I argued before Your Honor at the cash collateral hearing --

14  if Invenergy does get this release, it really will complete a

15  constructive bankruptcy filing for Invenergy, the primary

16  obligor on this debt.  They've achieved no cross-default for

17  filing their subsidiary in this Court, the lenders gave them

18  that.  They've received a reduction of debt in $75 million

19  for paying down the guarantee.

20         They've improved its leverage ratio.  You remember

21  the -- in the evidence at the last hearing, Your Honor, when

22  Invenergy schemed this whole bankruptcy, it was a negotiation

23  between Invenergy and the secured lenders.  And the pot of

24  gold at the end of the rainbow was look how healthy the

25  nondebtors will be after this debtor goes into bankruptcy and

1    sells all of its assets.  It got the waiver of marshaling,

2    pursuant to Your Honor's ruling, which we 100 percent

3    respect, again.  And they want a broad release.  It will be

4    quite an achievement for these -- for this board of these

5    debtors if they achieve this out-of-court restructuring, Your

6    Honor.

7             THE COURT:  Well, what --

8             MR. FINESTONE:  So that's my --

9             THE COURT:  Let me interrupt for a second.  What

10   releases am I being asked to approve?  As far as I know,

11   there's nothing in front of me.  The only thing before me

12   today is whether or not to grant standing to Direct Energy,

13   right?

14            MR. FINESTONE:  I agree with that, Your Honor.  And

15   that is precisely why we held our motion in abeyance as long

16   as we could.  But once the motion is in on file, it, in no

17   uncertain terms, says the release is coming.  We -- and since

18   nobody else but us is concerned about this estate -- the tort

19   -- I don't expect the tort claimants to, Your Honor, I --

20   they're not deep-pocketed, Your Honor, they're not paying

21   lawyers -- we felt we had to push our motion and call this --

22   when we saw the plan, we had to bring it to Your Honor's

23   attention.  The more we wait, the more that release is at

24   risk.  But you are right, Your Honor.  The debtor does have

25   relief requested today to give its shareholder a release,

1    Your Honor.

2           And one thing Your Honor could do if Your Honor is

3    not inclined to grant derivative standing, certainly would be

4    hold this motion in abeyance for plan confirmation.  But I

5    don't want to sit and wait on rights.  When I see something

6    like this that I think is wrong -- I will just say it, I

7    think it's wrong, I think it's -- I think it's borderline

8    duplicitous, Your Honor, given the sworn testimony about why

9    this release was given before.  It was time for us to

10   prosecute our motion, Your Honor.

11          Is that responsive to the question --

12          THE COURT:  Yeah.

13          MR. FINESTONE:  -- whether or not you agree with me

14   or not?

15          THE COURT:  Yeah, that's fine.  Go ahead.

16          MR. FINESTONE:  Your Honor, the threshold argument

17   that some of these defendant -- proposed defendants make is

18   that this debtor is an LLC, a Delaware LLC; and so,

19   therefore, it's carved out from the teachings of Cybergenics

20   as a matter of law.

21          This has been sufficiently brief.  I appreciate

22   Your Honor's comment about having read the papers, I'll -- so

23   I'll be brief on it.  I'll only say, Your Honor, that we

24   don't think -- what Cybergenics says, Cybergenics says, based

25   on a textual reading of the Code, derivative standing -- and

pursuant to the Bankruptcy Court's equitable powers, this
Court can grant derivative standing.  It didn't just say for
a corporation, it said any debtor.  And it was based upon the
language of the Code.

With that foundation from the greatest court that's
relevant here today, Your Honor, the Code provides for
derivative standing, that's what Judge Becker told us.
Delaware state law, as much respect as I have for Delaware
state law, is unable to affect that, impair that, override
the Code in those respects, Your Honor.  And we cite a law
school case, International Shoe, for that proposition.

Delaware -- don't get me wrong, Your Honor, we're
completely cognizant of Butner and the fact that Delaware
law, state law, does control of claim allowance and it does
control for the determination of property interests, what's
in the estate, but it is not allowed to override the Code.
And Cybergenics, Your Honor, does say that the Code, based
upon a textual interpretation -- that's 330 F.3d at 566 --
does give Your Honor the equitable power to appoint -- to
approve derivative standing.

THE COURT:  Well, cyber --

MR. FINESTONE:  I'll also just say --

THE COURT:  Cybergenics --

MR. FINESTONE:  -- Your Honor --

THE COURT:  -- was decided before the Delaware

1    Chancery Court and Supreme Court ruled on CML, wasn't it?

2            MR. FINESTONE:  It certainly was, Your Honor, by a

3    healthy amount of years.  And let me just say C-M -- nothing

4    -- no part of our argument is contrary to CML.  CML, and more

5    importantly, frankly, the Delaware statute that CML

6    interprets, 100 percent controls outside of bankruptcy.  Look

7    at the text of the statute, Your Honor, it controls a

8    derivative action in the Court of Chancery.  The Delaware

9    Court can do all of that, and no one but the Delaware Court

10   can do that.  Your Honor couldn't alter that.  The Supreme

11   Court of the United States couldn't alter that.  Totally --

12   that's an Erie issue [sic].

13           But what it's not allowed to do -- and what I --

14   and what I don't think the Delaware statute even purports to

15   do is override the Bankruptcy Code because, with respect to

16   bankruptcy, that's federal, that's supremacy, and Cybergenics

17   did interpret the federal bankruptcy law.  So I actually

18   don't think there's a conflict.  I think CML and that

19   Delaware statute controls prior to bankruptcy, completely

20   controls prior to bankruptcy in any action in the Court of

21   Chancery.

22           It doesn't purport to say and, in bankruptcy, the

23   only party that could bring derivative standing would be a

24   member.  And if you think about it, Your Honor, if it were

25   that express, if the Delaware Congress -- or the Delaware

1    Legislature were that express, it would almost be more

2    obvious that it is overstepping because the Delaware

3    Legislature, in our view, Your Honor, cannot alter the Code,

4    it cannot alter Judge Becker's interpretation of Title 11.

5           So, again, I don't think there's a conflict because

6    it talks about actions in the Court of Chancery.  But to the

7    extent there is any conflict, I don't think it's

8    constitutionally able to override the Bankruptcy Code, which

9    provides for derivative standing.  So I -- C-M -- this -- no

10   -- nothing about the relief that we're requesting of this

11   Court undercuts CML or that statute in any regard.  It's just

12   that, for purposes of estate administration, process in

13   bankruptcy, pursuant to 1109(b), 503(b) -- 503(b)(3)(B), the

14   Bankruptcy Code provides Your Honor with the equitable power

15   to grant derivative standing, Your Honor.

16          THE COURT:  All right.

17          MR. FINESTONE:  In terms of colorability, Your

18   Honor -- and Ms. Scherling, if you would, could we bring up

19   Slide 8 again?

20          And I'm going to be brief on colorability, Your

21   Honor, and reserve for rebuttal, but I do want to at least

22   identify the issues.

23          This is contribution, Your Honor, and this is

24   Section 11.02 of the credit agreement.  I think this is at

25   least one of the contractual provisions that Your Honor was

focused on at the cash collateral hearing.  It does say, in very plain language, that contribution claims will exist in the event any payment or distribution is made.

As we've said, I think all parties understanding there is going to be a seventy-five-million-dollar payment or a distribution to these secured lenders, Your Honor.  What we saw in the papers was that that calculation of fair share is confusing and complex and expensive.

The expensive part we had no sympathy for because we're the ones that are proposing to burden the cost, Your Honor, but it also is not confusing.  It's a simple savings clause to ensure that none of the other subsidiary guarantors are rendered insolvent when they have to make their contribution payment.  Baumgartner testified, Your Honor, that the other entities are all solvent, not even going to be an issue.  But if it is, then the fair share will control.  So this, Your Honor, contribution is an easy one.  They're, at a minium, colorable under 12(b)(6).

Ms. Scherling, can you go to the next slide?

Subrogation, Your Honor.  The argue -- this is just vertical, this is the claim against the primary obligor, the parent.  And what we saw in the papers is that Your Honor already ruled that, because the debtor's obligation was primary, there can be no subrogation.  I'm confident that Your Honor didn't rule that.  Your Honor did rule that the

obligation was primary, but that's an analysis that was relevant for marshaling. It's not an analysis, Your Honor, that's relevant for subrogation. And we cite the Pandora case for that.

The obligation may be primary for the reasons that the credit agreement says it's primary. But the important thing is that this debtor will be paying the obligations of the borrower, which is the parent, and Section 11.03 is clear about that. The fourth sentence says upon the failure of the borrower to pay any of the guaranteed obligations. So subrogation claims exist, as well, Your Honor. They're certainly colorable.

Ms. Scherling, can you take that down, please?

The only other thing I want to say on colorability, Your Honor, is the fraudulent transfer claim. I want Your Honor to know that we are not asking for permission to prosecute that claim to do an end run around Your Honor's marshaling ruling. I think I've said it several times today. We understand 75 million is going out to the secured lenders. We aren't prosecuting this claim for any pecuniary relief against the secured lenders. We felt we needed to avoid this direct obligation because, if we don't, then Invenergy is going to argue that even my Pandora case doesn't say -- doesn't support subrogation because this debtor is not paying the obligations of another, but this debtor is paying its own

obligation that it incurred a few weeks before bankruptcy,

Your Honor. So the secured lenders are going -- I tried to

make that clear to the secured lenders. They're still

opposing. But there is no pecuniary relief being sought

against them.

Cost/benefit, Your Honor, and I'll wrap up here. I

said Direct Energy will pay for it. We are the unsecured

creditor here. And Your Honor, I -- if we just take a step -

- take a step back, this board if four-fifths the defendants.

They are saying the claims are completely colorless, they

have no merit whatsoever. They are conflicted in that regard

because the claims are against them.

We are saying the claims have color, Your Honor,

and we're conflicted, too. We do stand to benefit because we

are the lion's share of the estate. But we are putting our

money where our mouth is, Your Honor. We believe in these

claims. They are the natural resulting asset once you -- for

paying off the secured lenders. And we are going to take a

massive loss in this case.

We provide energy to our customers. We entered

into an insurance agreement, effectively, with this debtor.

The insurance hit, we paid premiums leading up to it, and

this debtor filed this bankruptcy so it doesn't have to pay

the benefit to us, Your Honor. We are the party that will

benefit from this. This is not what we want. We're trying

to recoup losses because our debtor breached the contract.

The last slide, Your Honor, Slide 10.

Ms. Scherling, please.

I just want to leave, Your Honor, with this quote from Cybergenics in discussing derivative standing because it really is what's relevant here, Your Honor.

Your Honor remembers the evidence, but Invenergy dominates the board. The CRO, as well intended as Ms. Baumgartner may be, has no independent power. He testified to that. Whatever the board tells him to do, he has to do. He has no special bankruptcy powers. The independent director was brought on, on the eve of bankruptcy. Your Honor may remember the emails that suggests -- you can bring this down, Ms. Scherling.

Your Honor may remember the email that reflected that Mr. Adams didn't review any of the documents before they were all signed. His vote is powerless, in any event, even if he did dissent, which he didn't. Your Honor, this is a shareholders' bankruptcy. This is a continuation of a scheme. We have the plan. This is what Cybergenics is for, when the fiduciaries that are in charge are not acting as trustee.

Thank you for the opportunity to be heard, Your Honor, and I'd like reserve -- or be able to reply to opposition.

1          THE COURT:  All right.  Thank you, Mr. Finestone.

2      Who's going to argue on behalf of the debtors?

3          MR. MONAGHAN:  I will, Your Honor.  John Monaghan,

4  Holland & Knight, counsel to the debtor.  Also with me is

5  David Wirt and Lynne Xerras, also counsel to the debtor.

6          Your Honor, I'm going to start by saying one thing

7  Mr. Finestone stated is something that I agree with

8  completely:  That this is a task that should be put off until

9  plan confirmation time and run coterminous with plan

10  confirmation time.  Most of Mr. Finestone's arguments were

11  taking to task the plan and suggesting that, if the plan is

12  confirmed, then there will be releases that will result in

13  the loss of all of these causes of action.

14          But there's a predicate that has to happen before

15  those releases vest, and that predicate is that the plan has

16  to be confirmed.  And if Mr. Finestone can prevent that from

17  happening, then everything he's seeking here will be

18  unnecessary because there will be a different path that this

19  case will take.

20          I do think it's necessary, though, Your Honor, to

21  put to rest the overhang that there was some slight of hand

22  regarding the releases.  We are now in the third hearing

23  where the first-day declaration of Mr. Baumgartner, the

24  attachments thereto were ignored or pretended not to exist

25  because, if we go to that -- and it is docket -- it is on the

docket as 2-1, at Page 70 of 290, and it is something that
was designated by Mr. Finestone as evidence for this hearing.
There, the following provision in the termsheet to the plan
support agreement.  It says:

> "The plan shall contain customary releases and
> exculpations of the lenders, IQI, and each of their
> respective subsidiaries, affiliates, members,
> officers, directors, agents, financial advisors" --

And I could go on and on, but it is the usual
panoply of released parties that the plan support agreement
that affords the debtor the ability to limit their restrict -
- limit the distribution to the creditors -- excuse me -- the
secured creditors to $75 million.  It is that document, filed
on the first day of this case, that has been before the Court
now for some 4 and a half months, that established the prob -
- the issue with the plan, that established that, conditioned
to the lenders' obligation to vote in favor of the plan and
cap the recovery at $75 million, that there will be releases
to those lenders and to those -- the other borrowers that
those lenders are counting on recovering from and as -- and
that's the rationale for their cap of their recovery here,
that there was going to be 75 million, that was going to make
X number of dollars available to go to others.  And in
consideration of the X number of dollars -- giving up that X
number of dollars, then the lenders wanted their releases and

they wanted their borrowers' releases, the other borrowers'
releases. So this was, again, not a high (indiscernible)
situation. We didn't say that there were going to be no
releases. From the first day of the case, there were
releases.

It's important to note they are not third-party
releases, they are debtor releases. They are releases of the
debtor's causes of action, the debtor's causes of actions
only. So, if I -- if there are independent causes of action
that Direct Energy purports to have against other entities
within the Invenergy enterprise, this plan doesn't impact
those one iota. This is the releases of the debtor's causes
of action.

So what -- in our initial filing in connection with
this motion, we did suggest that this was premature, that
this ought to be -- to jump onto Mr. Finestone's suggestion -
- something that doesn't get considered until things
crystalize.

One thing has crystalized: The sale has been
approved, the sale has closed. As a result of that sale
closing -- it closed on July 11th. As a result of that sale
closing, the debtor has in a bank account approximately $154
million. The lenders' cap of $75 million makes it about $75
million available for other purposes.

The liquidation analysis attached to the disclosure

statement that Mr. Finestone -- that Mr. Finestone referred
to and also put into evidence, indicates that that's going to
result in about $60 million being available for general
unsecured creditors under the plan support agreement
envisioned plan, and now under the plan that has been filed
that implements the plan support agreement, if confirmed.

Going the litigation route ends the ability to
distribute that $60 million to general unsecured creditors.
The lenders' cap of their claim is based upon confirmation of
a plan that follows the plan support agreement that affords
them the releases that I just read about from the plan
support agreement.  If the litigation route is covered, then
the lenders will establish -- will assert a position that
they are entitled to all $154 million and the estate will be
left with litigation claims.

So what we're really talking about here, Your
Honor, is a best interests of creditors test analysis.  And
that best interests of creditors test analysis is best done
at the confirmation hearing, with all of the causes of action
that Mr. Finestone has referred to preserved until there's a
decision up or down on whether this plan is going to be
confirmed.

We have to turn to the -- away from the plan for a
moment and actually turn to the elements of an action --
excused me -- a motion seeking derivative standing to pursue

the debtors' causes of action during the course of the
pendency of the case and prior to confirmation of the plan of
reorganization.

Cybergenics and its progeny sets forth a number of
factors.  One of those facts is that the debtor has abused
its discretion by not bringing the causes of action by the
time the motion was filed.  We are four and a half months
into the case, Your Honor.  There are over -- there is over
18 months left on any cause of action that Mr. Finestone has
put forth.  In fact, some of those causes of action haven't
even arisen yet, which is why this is also premature.

Mr. Finestone made a great deal of -- spoke a great
deal about his -- about the subrogation rights and the
contribution rights.  Your Honor, those don't exist yet.
Both of those causes of action are contingent upon the debtor
having actually made a payment.  In order to be subrogated to
the rights of the debtor to recover a payment, it has to have
made a payment.  And in Mr. Finestone's complaint, his
allegation actually says that, it says upon making the
payment, the debtor would be subrogated, and they want
derivative standing to do that.

Contribution, Mr. Finestone's complaint says the
same thing, upon making a payment, the debtor will be -- the
debtor will be entitled to seek contribution.  We're in the
midst of a Chapter 11 case, not a dime, not a penny, not a

farthing has been paid by the debtor to the lenders on behalf
of itself or anybody else.  There is no contribution or
subrogation claim.

It is premature, therefore, to afford derivative
standing because -- and this is related to both the abuse of
discretion part of the test and the colorability part of the
test.  That cause of action will be dismissed in the first
hearing after it's briefed, after a 12(b)(6) is dismissed
because nobody can allege the necessary element that the
debtor has paid more than it's paid -- more than it ought to
have paid, both necessary elements of those causes of action.

It's also premature because, unless the plan is
confirmed, we don't know how much the debtor is actually
going to pay and what the merits of the cause of action are.
Is it going to pay zero?  If so, no cause of action.  Is it
going to be $75 million?  If so, probably no cause of action
in the debtor's mind, but certainly, that establishes a level
of X.  Is it going to be $150 million because the plan
doesn't get confirmed and the lenders glom onto and take all
$154 million?  Well, that's a very different scenario, that's
a very different analysis and it's one that we can't make as
of today and we can't make until we get through plan
confirmation.

It's also important to reemphasize that, again
here, four and a half months into the case, there is no hurry

1    here.  There is -- the -- again, the subrogation and

2    contribution rights have a, you know, three- or four-year

3    statute of limitations, haven't begun to run; the avoidance

4    actions, two years.  We're only four and a half months into

5    the case.  Breach of fiduciary duty, four years.  We're two -

6    - we are, at best, one year past any arguable action that

7    might give rise to those claims.

8         So there is no hurry, there is no need to jump in

9    right now to a derivative cause of action that would be

10   subjected to motions to dismiss and extensive motion practice

11   and discovery when we're going to have to do the same

12   discovery and we're going to have basically the same fights

13   when we get to the confirmation hearing that will enable us,

14   if confirmed, to distribute $65 million to unsecured

15   creditors.

16        The prejudice of pursuing these actions now extends

17   both to the potential plaintiff in the litigation, which

18   could be, could be the debtor.  If the plan doesn't proceed,

19   if the lenders don't vote in favor of it, if we don't have an

20   impaired accepting class, then we're going to have to go

21   another route.  And if we go that other route, the causes of

22   action will be -- still be the debtor's to pursue.

23        And there's prejudice to the debtor's position and

24   there's uncertainty as to any defendant's position from the

25   fact that we are prematurely trying to go down this path or

1    Direct Energy is prematurely trying to down this path.  To be

2    sure, there are defenses that we know will be asserted that

3    are based upon contract, Mr. Finestone mentioned a few of

4    them.

5            We know that -- for example, that the subrogation

6    and contribution claim facing obstacle in Section 11.2 of the

7    credit agreement because, among other things, any recoveries

8    in those actions are specifically to be held in trust for the

9    benefit of the pre-petition secured lenders and are to be

10   forthwith paid to the administrative agent on behalf of the

11   secured lenders.  That's the subrogation and contribution

12   contractual problem that would be faced.

13           But more importantly, as I said, those causes of

14   action haven't arisen yet because there's been no payment.

15   But there's also uncertainty that leads to the defendants not

16   knowing what it is they're defending against.  And as I

17   mentioned, are they defending against 75 million, zero, 150

18   million?  We don't know that yet.  We won't know that until

19   we know whether or not the plan gets confirmed or what

20   contributions -- what amounts are paid to the lenders.

21           As to the fraudulent transfer claims, again, we

22   know that there are going to be defenses based upon the

23   history and the facts.  We know that credit agreement 9.06

24   and 11.01 and 11.04 combine to render the debtor primarily

25   liable for any mandatory prepayment.  We know that there is a

1    mandatory prepayment due upon a disposition.  And we know

2    that, but for a -- the waivers that allowed the debtor to pay

3    only $75 million, the amount that would go would be, if there

4    were a default, all $150 million.

5         But again, as to the fraudulent transfer claims,

6    amounts matter.  We know that one of the issues in the -- in

7    a fraudulent transfer case will be whether reasonably

8    equivalent value was received by the so -- the recipient of

9    the transfer.  So we don't know whether the lenders are going

10   to leave zero dollars on the table, we don't know whether the

11   lenders are going to leave $65 million on the table.

12        We don't know how much we're going to be able to

13   distribute to unsecured creditors and, therefore, what

14   consideration was yielded from the plan support agreement

15   until we know whether that plan is going to be confirmed,

16   until we know whether the lenders are actually going to cap

17   their claim at $75 million and afford consideration of sixty

18   to $65 million to the unsecured creditors.

19        The breach of fiduciary duty claims are similarly

20   challenged.  Mr. Finestone did reference what we know the

21   primary defense is going to be.  We know that the Bax case,

22   the CML v. Bax case, presents an issue.  We know that this

23   Court actually has issued a decision where it at least

24   indicates agreement, or the Bax case does provide potential

25   obstacles to pursuit of derivative actions

1              In the Miller v. Anderson Media Corporation case or

2    In Re Our Alchemy case, the Court said the following.  In CML

3    V, LLC v. Bax, the Delaware Supreme Court found that the

4    plain language of the Delaware Limited Liability Act

5    unambiguously limited derivative standing exclusively to

6    members or assignees of members of the LLC.

7              And then it goes on to quote the applicable

8    provisions of the Delaware Code, that the Court joined a

9    pantheon of other Delaware-based Bankruptcy Judges, including

10   the Court in HH Liquidation, which stated the Delaware

11   Limited Liability Act is clear an unambiguous about who can

12   bring derivative actions.  The plaintiff must be a member or

13   an assignee and it goes on from there.

14             But we also know that, in addition to that

15   particular defense as to the fiduciary duty claims, that the

16   other primary obligation -- the other primary defense is

17   going to be that entire fairness occurred; that, assuming

18   this is, as Mr. Finestone likes to characterize it, an

19   insider deal, that the deal was entirely fair.

20             And we know that, in the current state of affairs,

21   we believe that that defense will involve an assertion that

22   the board and that the officers put forth set in process an

23   undertaking where the highest return from a sale in the ERCOT

24   market for a peaker plant was tied, was received, and -- and

25   the "and" is important -- and half of those proceeds were

taken away from the secured creditors and provided to the

unsecured creditors. Well, that "and" is only available if

the plan gets confirmed. That "and" is only available if the

lenders abide by their PSA undertaking to vote in favor of

the plan and afford the debtor the one impaired accepting

class that it needs to proceed with confirmation.

And the final cause of action, the preferential

transfer claim, as Mr. Finestone said, the preferential

transfer claim is -- it will be undone. There is an

agreement by the recipients of that claim to put the money

in, all 728,000 I believe it is, back into the estate for the

purpose of distribution to the unsecured creditors.

So, again, going back and putting this into the

Cybergenics test, there isn't any possibility that the abuse

of discretion by the debtor standard can be met.

And the colorability standard, as uncomfortable as

it is to say from somebody who may find himself having to

litigate those very claims, depending on how the plan process

shakes out, the colorability part of the analysis is also

suspect.

So, rather than deal with all that here, today,

rather than have findings of fact or conclusions of law that

will prove problematic if people don't leave up to their PSA-

provided obligations, then we ought to do -- recognize this

motion for what it is. This motion, Your Honor, is a motion

1    that's previewing a best interests of creditors challenge to

2    the already filed plan of reorganization.

3            The bid and the ask is the debtor's plan position

4    is it has $154 million and it has the opportunity to

5    distribute 60 million of that to unsecured creditors, and the

6    debtor posits that that distribution is far better than

7    anything that would be received after years and years of

8    expensive litigation, net.

9            The ask, the spread, Mr. Finestone's position is

10   the opposite.  He doesn't like the idea that $65 million is

11   what's available and he thinks the other route is better;

12   that, in fact, well, we should give all 154 million to the

13   secured creditors and then litigate with them for years to

14   try to get some or all of it back.

15           We have a disagreement.  But that disagreement

16   doesn't have to be sorted out today.  That disagreement has

17   to get sorted out in the context of a best interests of

18   creditors test and in litigation about plan confirmation

19   under the already filed plan and disclosure statement that we

20   can have before the Court in a matter of months.

21           And with that, Your Honor, I yield the floor.

22   Thank you.

23           THE COURT:  Thank you, Mr. Monaghan,

24           Mr. Sturm, did you want to be heard on behalf of

25   the secured lenders?

1          MR. STURM:  I do.  Thank you, Your Honor.  Joshua

2    Sturm from Davis, Polk & Wardwell, joined by my colleagues

3    Brian Resnick and Elliot Moskowitz, on behalf of Credit

4    Suisse as agent and the Ad Hoc Group of Secured Lenders.

5          I'll start and try to be brief on Bax.  Your Honor,

6    I know, read the papers and we've already cited several of

7    Your Honor's decisions back to him.

8          I would just draw your attention to Judge Owens'

9    decision in Dura.  In that case, the creditors' committee, an

10   actual fiduciary, not an individual disputed creditor, made a

11   similar argument to Direct Energy's, saying that, in effect,

12   the Bankruptcy Code has federal claims.  And in fact, there,

13   they argued that the relevant claims were federal Bankruptcy

14   Code causes of action, which, you know, arguably, is a

15   stronger form of the argument Mr. Finestone was making.  And

16   Judge Owens reached the conclusion that we urge Your Honor to

17   follow, and I believe every Delaware Bankruptcy Code that has

18   considered and written on the issue has arrived at, that

19   Butner and other principles of governing law dictates states'

20   own laws to determine who has standing to bring claims.

21         From our standpoint, frankly, we think that would

22   be and could be the end of the analysis.  And Your Honor, we

23   anticipate and expect, may well rule on that alone.  But

24   given the hearing and where we've gone on colorability and

25   other issues, we do want to try to clarify a couple of points

that have been raised and perhaps will be on the papers.

First, the contribution and subrogation arguments, I think Direct Energy's counsel characterized how they arose a little bit differently than we would. But the bottom line is they were not at issue at the cash collateral hearing because they were not part of the cash collateral order. And we, you know, fully agreed at that time they were not relevant for discussion. Today, apparently, they are relevant for discussion, so it's worth describing just what those contractual provisions are.

Direct Energy's counsel pulled up on the screen one provision from the credit agreement, 11.02.

I would ask, if I could, Sophy Ma, my colleague who's on the line, if you could raise your hand. And if the Court would let me put up an exhibit, as well.

THE COURT: Good to go.

MR. STURM: Thank you.

So, Sophy, if you could pull up Section 11.06 of the credit agreement. Thank you.

So I don't want to belabor this too much, but I think it is worth explaining just what the contract says and doesn't say about the contribution subrogation claims because there is a paragraph called "Subsidiary Guarantor Rights of Subrogation and Contribution."

The first sentence there says, until the

termination date -- which is the date that all of the

outstanding obligations under the credit agreement are paid,

that's the full 340 million plus that everyone agreed has not

been paid:

> "-- each subsidiary guarantor hereby waives any
>
> claim, right, or remedy, direct or indirect, that
>
> such subsidiary guarantor now has or may hereafter
>
> have against the borrower or any other subsidiary
>
> guarantor" --

So I don't think the Court needs me to tick through

how the definitions work.  But this effectively means that

Ector is waiving these claims against the other co-obligors

and the parent obligor.

> And it continues:

> "-- or any of its assets in connection with the
>
> guarantee for the performance of such subsidiary
>
> guarantor's obligation under this Article 11."

And then it continues, it actually specifically

calls out whether such claim, right, or remedy arises in

equity -- so this picks up equitable versions of these claims

-- under contract, by statute, et cetera.

I'm not going to read through this whole thing.

You'll see that it specifically picks up contribution.  And I

think the right way to think about what these claims actually

are under the credit agreement come in twofold.  This is just

the first part of the paragraph.

What I think Your Honor saw in the papers -- and this is where I have to disentangle contribution and subrogation. For subrogation, we think it's crystal-clear. This is a clear waiver of subrogation rights, though, frankly, I don't know how a waiver of subrogation rights could be clearer.

In Direct Energy's own papers, they acknowledge or argue, citing to one case, that subrogation rights can exist under equity, but they note that they only exist under equity where they're not expressly waived. That's, you know, a direct quote, and the only way it can arise. This is an express waiver of those subrogation rights.

The contribution rights, we agree that Section 11.02 that Direct Energy put up on the screen is what it is, and we agree that there is a possibility for contribution claims to exist.

But the really important part here is the last sentence of 11.06. Those contribution rights aren't, as was suggested, some free-floating benefit that means that unsecured creditors should be able to seek contribution and would get the benefits of any contribution claim. If you look at the last sentence, starting about -- one, two, three -- six lines up in the middle, it says, in I think very clear language:

1      "If any amount shall be paid to any subsidiary

2      guarantor" --

3      That's Ector.

4      "-- on account of any such subrogation,

5      reimbursement, indemnification, or contribution

6      claim, at any time prior to the termination date,

7      such amount shall be held in trust for the

8      administrative agent on behalf of the secured

9      parties and shall forthwith be paid over to the

10     administrative agent for the benefit of secured

11     parties to be credited and applied against the

12     guaranteed obligations" --

13     And this part is important:

14     "-- whether matured or un-matured in accordance

15     with the terms hereof."

16          The credit agreement says what would happen, right?

17     This isn't an unsecured creditor claim.  This would never

18     benefit Direct Energy.  This is a secured creditor right

19     that, if the debtor, exercising its fiduciary duties in the

20     future, at sometime when claims have been paid to us as

21     secured lenders, were to then go and bring contribution

22     claims or subrogation claims -- which subrogation we think is

23     waived; contribution a story for a different day -- and then

24     come back and win and get a judgment.  That judgment just

25     gets paid right over to us as secured lenders.

1          So, again, to the extent that the debtor has a

2    fiduciary obligation to bring these claims, it's the debtor's

3    choice.  But the notion that somehow an unsecured creditor

4    should be granted standing to bring these claims just doesn't

5    make any common sense.

6          And on the numbers and facts of these cases, it's

7    even clearer, right?  We know that the estate has $144

8    million.  There's no other money coming in from operations.

9    So, even in a world where that full $144 million were to get

10   paid to the secured lenders -- which, again, I don't think

11   anyone thinks is the world we're in -- and there is a claim

12   for contribution or subrogation for that full $144 million --

13   sorry -- $144 million, you're still at $288 million.  You

14   still will not have paid the full amount of the secured

15   obligations that are 340 million, and there still wouldn't be

16   any proceeds to unsecured creditors.

17         So, again, I don't think this is a mistake in the

18   credit agreement.  This isn't some sort of gotcha.  The way

19   the credit agreement is supposed to work, from our

20   standpoint, if you think about it holistically, is that our

21   collateral is meant to secure our claims.  So, if there is a

22   payment getting made on our claim and there is a subrogation

23   or a contribution claim from another obligor for that same

24   payment, there's no notion that that money would go outside

25   our collateral loss or go to unsecured creditors before it's

applied, as the credit agreement very, very clearly and

expressly says it has to be, and paid directly to us.

I do want to go back to 11.02 for one moment, just

to explain what it is. And I don't actually think there's

any disagreement here. I think the disagreement just might

be how complicated and expensive it is to figure out, how you

figure out a fair share. Apologies.

Sophy, if you're able to go to the defined term

"fair share." And if not, I don't think we need to belabor

it.

But when Direct Energy says, you know, they'll pay

for the litigation, don't worry about it, it's not really as

simple as that because determining a fair share is actually

going to require determining a fair share contribution

amount, which -- Your Honor can read it now or after the

hearing -- you will see requires figuring out where the

solvency bounds are of not just this debtor, but all the

other co-obligors. I'm not saying it's impossible, but

saying, under the current circumstances, it's completely

futile because even a complete win, again, would lead to an

immediate payment of any amounts won to our secured lenders.

Turning to subrogation, just going back to that for

one moment, again, we think that claim is very clearly

waived, as we pointed out, under 11.06. Direct Energy cites,

I referenced earlier, it's (indiscernible) the Prommer case

1    (phonetic) from S.D.N.Y., which acknowledges that the only

2    way that a subrogation right -- an equitable subrogation

3    would be impaired is if there is clear an unambiguous

4    language to that effect.  You know, frankly, there is in this

5    agreement.

6         But going even beyond that, the basic principles of

7    subrogation cited throughout the cases, both those cited by

8    the debtor -- sorry -- by Direct Energy and elsewhere, is

9    that subrogation doesn't arise when you partially pay a

10   claim, right?  Here, the $75 million, as set up in the credit

11   agreement, is a prepayment on a portion of the three-hundred-

12   and-forty-million-dollar amount.

13        It is not the case that, once you pay a portion of

14   a total outstanding amount, that, even if we were to agree

15   that somehow it were a secondary obligor paying that 75

16   million, that you immediately get a subrogation claim while

17   the remaining, I guess, 265 million were outstanding.

18        And the last subject element here is that there's

19   only a subrogation claim where a secondary obligor makes a

20   payment and then subrogates for a claim against a primary

21   obligor.  We're not trying to go back to the cash collateral

22   hearing, but we think we've already discussed this issue and

23   we think that it is very clear, crystal-clear, that, with

24   respect to that $75 million, Ector is a primary guarantor.

25        I'm not fully litigating the subrogation claim

1    here.  I just -- I think that Direct Energy was glossing over

2    a lot of the colorability arguments, and these really are

3    claims that -- put aside Bax, put aside timing -- the plain

4    language of both the contract and the law makes clear don't

5    exist.

6         Fraudulent transfer.  Again, I don't want to go

7    back over everything the debtor said.  But you know,

8    candidly, we think the Court has already considered and ruled

9    on whether or not the amendment to the credit agreement was,

10   in fact, a transfer, given the conclusion that there was a

11   primary obligation of $75 million before the amendment and

12   after the amendment.  We don't believe there was a transfer.

13   We don't believe there can be a fraudulent transfer where

14   there is no transfer.

15        To the extent that the argument we're hearing is

16   that removal of ITOI or that change in the seventy-five-

17   million-dollar obligation from being a primary obligation

18   from all of the credit parties to it being solely an

19   obligation of Ector is a transfer, we submit, again, that's

20   simply how the contract worked.

21        As things have played out and as anticipated, if

22   Ector makes that seventy-five-million-dollar payment, we

23   don't think that removing the other co-obligors is a

24   transfer.  We think it's just a statement of the fact that

25   there is not a separate contribution or subrogation claim

that would make them co-liable.

Again, even if there were to be deemed a transfer, again, we go back down the rabbit hole that has been discussed previously that we, frankly, don't think is for today and that is well briefed in the papers and the debtor's argument.

Briefly, on the breach of fiduciary duties. Again, I'm not sure which fiduciary duty claim exactly we're talking about litigating today. To the extent that it's the preference payment, I think it would be very premature, given that the plan on file contemplates those preference funds being repaid.

To the extent that there is a breach of fiduciary duty for Ector to file for bankruptcy, you know, we certainly don't think that passes Iqbal/Twombly on the current facts.

So the extent that there is a breach of fiduciary duty to enter into a plan support agreement, likewise, there have been a lot of allegations and swirling suggestions that this case somehow benefits the parent. And that, frankly, may well be true. But it doesn't mean that, from the standpoint of the debtor, there wasn't a very clear and obvious business judgment reason to do the things that the debtor did.

So, you know, in conclusion, I want to just again reiterate something that the debtor said, where I think there

is disagreement between us and Direct Energy.  Direct Energy

seems to have the view that, under any version of the world,

if they mount a successful objection to the plan and get

standing to bring whatever direct or indirect claims they can

or want to bring against other credit parties, it doesn't

matter.  The direct lenders -- sorry.  The secured lenders

would recover only $75 million.  That is just not the case

for the way the credit agreement works.

I think Direct Energy recognizes that there is an

event of default under the credit agreement if there is any

judgment greater than $5 million against ITOI or other

creditor.  I don't think that's in dispute.

If it were to win such a judgment against other

credit parties, the secured lenders would have the right to

declare an event of default, accelerate the full amount of

outstanding loans, $340 million plus whatever else is

outstanding, and those would become due and owing as full

secured claims against, not just the other parties and the

parent, but Ector, as well.

And again, we're just sort of talking about two

alternative universes.  There's the universe of the current

proposed plan, where it is true that the amount paid to the

secured lenders would be 75 million.  But in the alternative

universe that's being proposed, where that plan is off the

table and there is, you know, litigation against anyone and

1    everyone, there is no reason to assume that the secured

2    lenders' claim is capped at $75 million.

3             If Your Honor doesn't have any questions for me,

4    that is the end of what I wanted to say.

5             THE COURT:  Okay.  Thank you, Mr. Sturm.

6             Mr. Hazeltine.

7             MR. HAZELTINE:  Yes, Your Honor.  William Hazeltine

8    on behalf of IOTI [sic].

9             And I'm going to address only the breach of

10   fiduciary duty claim and the subrogation claim because those

11   are the only two where my client is named as a defendant and

12   I'm going to limit the discussion to the standing issue.

13            And I'm not going to repeat what has already been

14   said.  Your Honor is well aware that there are -- four

15   different judges in this court have held they could not grant

16   derivative standing because of the Delaware LLC Act.

17            I do want to point out a fifth decision, which,

18   although not directly on point, I think is relevant.  And

19   that's the Optimum Energy case -- decision by Judge Shannon

20   in 2014, where he found that a creditor's request for

21   derivative standing to pursue claims was futile because the

22   limited liability agreement eliminated all fiduciary duties,

23   as permitted by the Delaware Limited Liability Act.  So then,

24   again, we have another decision that is basing a lack of

25   standing on the Delaware Limited Liability Company Act.

1    What I do want to address is Cybergenics because

2 that's where Direct Energy appears to have placed most of its

3 eggs.  This case is not Cybergenics.  Cybergenics involved

4 the Third Circuit construing the right to derivative standing

5 in comparison to the Supreme Court's decision under Hartford

6 Underwriters, where the substantial contribution found that

7 nobody else, other than the trustee, can bring a surcharge

8 claim under 506(c).

9    The Cybergenics Court did a thorough review of all

10 the textual elements in the Bankruptcy Code and found that

11 this case -- that the Cybergenics case was not governed by

12 Hartford Underwriters because of the textual support given

13 for committees to bring derivative actions.  What the Court

14 did not find is that a committee or a creditor could bring a

15 derivative action where state law prohibits that action.

16    Cybergenics involved fraudulent transfer claims.

17 Fraudulent transfer claims are claims of creditors that a

18 trustee is permitted to pursue derivatively on behalf of

19 creditors.  So, clearly, in that case, under state law,

20 creditors had a right to bring fraud -- those claims.

21    The Court does not find that the Bankruptcy Code

22 preempts Delaware law or state law on standing, Your Honor.

23 And Direct Energy does raise a preemption issue.  And just to

24 -- I just wanted to point out a few standards for preemption.

25    And the Third Circuit has found that federal

1    preemption applies where Congress, through statutes,

2    expresses language, declare its interest to displace state

3    law.  That's the first standard.

4            The second standard is where federal law preempts a

5    field.

6            And the third standard where -- is where the --

7    there is a conflict, such that both laws -- both statutes

8    could not be obeyed.

9            And this is clearly not the first because there is

10   no express statute that preempts the -- that preempts state

11   law on standing.  And it's not the third standard because it

12   -- there is no conflict that would not permit parties to

13   enforce the standing laws under state law.

14           It appears what first energy -- Direct Energy is

15   arguing is that the Bankruptcy Code preempts the field with

16   respect to standing in the context of a bankruptcy case.

17   That is not the place -- case.  I mean, preemption is

18   generally based -- preemption of the field is generally based

19   on statutory language and regulatory language that so

20   occupies the field that there's no room for state law.

21           Direct Energy, again, relies on Cybergenics and

22   sections -- well, give me a minute -- Sections 1009(b) and

23   1003(c)(5) of the Bankruptcy Code to find that the Bankruptcy

24   Code preempts the field with respect to derivative standing.

25   That's just not the case.

Again, as I noted, Cybergenics did not involve a case where standing was not permitted under state law. Here, the case -- here, standing definitely is not permitted, standing to creditors is definitely not permitted under state law. And so there's no preemption. The two sections that Cybergenics relies on are too vague to extend that to preemption of the field for standing.

So these actions, both the breach of fiduciary action and the subrogation action, are debtor's causes of action and creditors and direct entity -- Direct Energy does not have standing to pursue those actions under Delaware law.

THE COURT: Okay. Is that everything, Mr. Hazeltine?

MR. HAZELTINE: Yes. Yes, Your Honor.

THE COURT: Okay. Thank you.

Does anyone else wish to be heard before I go back to Mr. Finestone?

(No verbal response)

THE COURT: All right. Mr. Finestone, go ahead.

MR. FINESTONE: Thank you, Your Honor.

In reply, Your Honor, first, there is no basis for these secured lenders to threaten this estate to take all of the proceeds. I don't think our debtor-in-possession should be countenancing that.

The credit agreement, even before the amendment on

the eve of bankruptcy, had a seventy-five-million-dollar claim. The credit agreement after the amendment has a seventy-five-million-dollar claim.

Your Honor, the event of default that Davis Polk is talking about is -- doesn't exist today. And I am very comfortable that, in that hypothetical world, that event of default is the one that all of these parties, but me, agreed would never accrue. That is an event of default triggered by a claim against the parent that they're doing everything to keep out of that bankruptcy.

And if that triggering event of default does come to be, there's a whole -- that's all we've been asking for is to have some of the parent's assets help to be medicine to the pain of bankruptcy. So I didn't hear anything that causes me -- I don't feel like I'm gambling this estate's value. I'm trying to unlock additional value for this estate because there is damage down here and there's benefit and solvency up there, Your Honor. We've been plain about that from the beginning.

With respect to the LLC argument, the Bankruptcy Code does occupy this case, Section 1109, Section 503. That's what the entire Third Circuit determined, Your Honor. So I do think the Bankruptcy Code occupies this case.

It's not a matter of property interests. Delaware law can and often does waive fiduciary duty claims. Delaware

1    law can decide if this estate has a breach of fiduciary

2    claim.  But it can't decide, Your Honor, who gets to

3    prosecute that under Title 11.  And again, the Delaware

4    Legislature doesn't even say that it's trying to decide that.

5              I do understand, Your Honor, that I am up -- this

6    argument is up against a Mount Rushmore of Delaware

7    Bankruptcy Judges who have contributed a mountain of great

8    jurisprudence.  I think the Third Circuit is right in

9    Cybergenics, Your Honor.

10             And I -- my last argument on that is:  Imagine if

11   this Delaware legislator put forth -- legislature branch put

12   forward a statute that said, in bankruptcy, only a

13   shareholder can object to a claim, notwithstanding 502.

14   Imagine if the statute said, in bankruptcy, only a member of

15   an LLC can be heard, notwithstanding 1109; in bankruptcy,

16   only unsecured creditors could file a plan, notwithstanding

17   1121, once exclusivity is breached.  It's not just Delaware,

18   none of the 50 states are allowed to do that.  And

19   Cybergenics has told us that the Code provides for derivative

20   standing, Your Honor.

21             Why don't we wait, Your Honor?  I'll go back to

22   Cybergenics.  Cybergenics talks about one of the reasons why

23   derivative standing is a good tool for the -- for an estate

24   is because the other solutions that are available to us

25   threaten to throw out the baby with the bath water.  They

1    threaten to use a chainsaw instead of a scalpel.

2           That's not what we want, Your Honor.  We don't want

3    -- we're spending our own money.  We don't want to object to

4    exclusivity now that we see this plan has a gratuitous

5    insider release and proposed a competing plan that is the

6    same, but doesn't have that release.  That's the chainsaw,

7    Your Honor.  We don't want to file a motion for a Chapter 11

8    Trustee, even though Direct Energy is completely confident

9    that this debtor-in-possession, dominated by this insider

10   board, is going to do everything they can to protect

11   Invenergy.  That's the chainsaw, Your Honor.  So this is why

12   we didn't wait and why we think, pursuant to Cybergenics,

13   this is the right fix, Your Honor.

14          With respect to colorability, Section 1106 does not

15   and cannot read Section 1102 out of the credit agreement,

16   which, on its own, provides for contribution claims.  But

17   even if that contractual interpretation is right -- and I

18   don't think that it is -- it's just a matter of timing, Your

19   Honor.  And timing is not our friend when this debtor-in-

20   possession wants to stifle and extinguish the claims.  We

21   don't get to wait for the subrogation and contribution claims

22   to be ready to go because they're going to be buried six feet

23   deep, Your Honor.

24          Lastly, on breach of fiduciary duty.  The more we

25   hear these arguments how this bankruptcy is appropriate to

1  pay all the value to the secured lenders and it is

2  appropriate for the parent to lived an improved, restructured

3  life while this debtor is disposed of, that -- I think it's a

4  scale, Your Honor.  To the extent these subrogation and

5  contribution claims have merit, then the decision to file

6  this bankruptcy case gets worse and worse and worse by this

7  conflicted board, Your Honor.

8       So, as I've said from the beginning, first of all,

9  thank you for the opportunity to be heard.  As we said from

10 the beginning, this is broad -- we view this motion as

11 broader.  We see in our -- we see the plan down the road, it

12 provides for an insider release.  We see what's been argued

13 throughout the case.

14      We see that Mr. Adams is no one that we can count

15 on to do anything.  At a discovery conference Your Honor said

16 you wanted to hear from Mr. Adams.  I asked him to testify

17 today, he's nowhere to be found.  We're headed towards a

18 confirmation in which this debtor-in-possession will seek to

19 protect its parent.

20      I think we're on the wrong track, Your Honor, so

21 we're trying to move expeditiously.  Thank you for

22 considering the requested relief.

23      THE COURT:  All right.  Thank you, Mr. Finestone.

24      All right.  Well, here's what -- the only issue

25 before today is whether -- is the motion to grant standing

filed by Direct Energy.  And I don't think there's any

question that the issue of derivative standing to pursue

claims on behalf of a debtor is a creature of state law, and

I don't believe there's anything in Cybergenics that counsels

otherwise.

Cybergenics, there was no question about whether or

not a -- in that case, a committee could pursue a claim on

behalf of a Delaware corporation.  It wasn't an LLC.  There

were no issues involving Delaware LLCs in that case.  I don't

even think the LLC statute existed at the time Cybergenics

was decided.

And the Courts here -- and I'll go back to the CML

V, LLC v. Bax case, which is 6 A.3d 238, and affirmed by the

Delaware Supreme Court at 28 A.3d 1037 in 2011.  And the

Court there said there's no inequity or prejudice to

creditors because they are presumed to be capable of

protecting themselves through the contractual relationship.

And I believe there was a contractual relationship here

between Direct Energy and the debtors; and, therefore,

there's -- there was a basis or a way for Direct Energy to

protect itself in that situation.

But that's not the only thing.  They went on.  Vice

Chancellor Laster went to great lengths to list out a number

of ways in which individual creditors of an estate could be

protected, even though they were barred from bringing a

1    derivative claim on behalf of the estate.  One of those is --

2    I believe he said, quote:

3            "-- a creditor of an LLC can protect itself by

4            seeking the appointment of a receiver."

5            Under state law.

6            The same thing applies in bankruptcy.  A creditor

7    could pursue the appointment of a Chapter 11 Trustee or

8    convert the case to Chapter 7, in which case there's no

9    question that that trustee, either a Chapter 11 or a Chapter

10   7, would have standing to pursue derivative claims on behalf

11   of the estate.  But that issue is not before me today.

12           Other things he determined was that:

13           "Despite the lack of derivative standing, a

14           creditor possesses a statutory right to enforce a

15           member's obligation to make a contribution to the

16           LLC.  Subject to statutory limitations, if a

17           creditor extends credit to an LLC in reliance on a

18           number of" -- "in reliance on a member's obligation

19           to make a contribution to the LLC or to return a

20           distribution in violation of the LLC Act, then the

21           creditor may enforce the obligation to the extent

22           the creditor's reason" -- "to the extent of the

23           creditor's reasonable."

24           And that was -- he cited to 6 Delaware Code,

25   Section 18-502(b), which is a direct claim.

1    And the issue has been decided by a number of my

2    colleagues here on the bench.  I think Judge Gross has two of

3    the opinions that I think are most persuasive on the issue.

4    He recognized that -- in HH Liquidation, LLC, 590 B.R. 211,

5    at 284 (Bankr. D. Del. 2018), that the committee did not have

6    standing to pursue a breach of fiduciary duty claim on behalf

7    of a Delaware LLC.  He determined that such claims are

8    derivative in nature, and the committee, being made up of

9    individual creditors, must look to state law to determine

10   standing to sue since Delaware law states that only a member

11   or a former member of an LLC may sue on behalf of the LLC,

12   the committee lacks standing.

13       He did also determine in In Re Golden Guernsey

14   Dairy, LLC, 548 B.R. 410, at 413 (Bankr. D. Del 2015), that a

15   Chapter 7 Trustee does have standing to pursue derivative

16   claims on behalf of a Delaware LLC.

17       So I think, at this -- there -- given that the only

18   issue before me is whether or not Direct Energy, as an

19   individual creditor of the estate, can pursue derivative

20   claims on behalf of the estate, I think that decision has

21   been decided and I'll deny that motion.

22       It remains to be seen what happens at plan

23   confirmation.  As Mr. Monaghan pointed out, it's going to be

24   a question of whether or not the plan meets the best

25   interests of creditors test.  And I expect that, given the

1    level of litigation we've seen so far, that that's going to

2    be an issue at the time of confirmation of the plan.  And I

3    expect that we'll have witnesses and testimony and exhibits

4    all introduced that will address that issue and I can address

5    it at that time.

6           And the question is going to be:  Do I approve the

7    plan or do I deny approval of the plan?  I could also say I'm

8    going to deny approval of the plan, but subject to

9    appointment of a liquidating trustee or something to that

10   nature.  I don't know at this point.  It's just -- it's

11   something that's completely up in the air at this point,

12   until I see what the plan says and whether or not the best

13   interests of creditors test is met.  So those are issues for

14   another day.

15          But for today, as I said, I'm going to deny the

16   motion for standing filed by Direct Energy.  The parties

17   should confer and submit an appropriate form of order under

18   certification of counsel and we'll proceed through the plan

19   confirmation process.

20          Where are we in that process, Mr. Monaghan?

21          MR. MONAGHAN:  Sorry, Your Honor.  I was having a

22   hard time finding my unmute button.

23          The plan and disclosure statement have been filed,

24   Your Honor.  The motion to approve the disclosure statement,

25   establish the solicitation process, I believe will be filed

1    later today.

2              THE COURT:  Okay.  So we're probably looking at

3    least a couple of months down the road here before we get to

4    plan confirmation.  Is that right?

5              MR. MONAGHAN:  It seems to be the case, yes, Your

6    Honor --

7              THE COURT:  Okay.

8              MR. MONAGHAN:  -- a couple of months.

9              THE COURT:  All right.  So, Mr. Finestone, you'll

10   have plenty of time to conduct whatever discovery you think

11   you need ahead of plan confirmation to challenge the best

12   interests of creditors test or any other provisions of the

13   plan that you think are inappropriate.

14             MR. FINESTONE:  Okay.  Thank you, Your Honor.

15             I also anticipate we'll ask the Court's permission

16   to file a mirror plan that doesn't include the releases for

17   the insider.  I'm not looking for any comments from the Court

18   on that.  But we're -- as we're looking ahead into the

19   process, I do want to be open as to how I think these debtors

20   are running this case.

21             THE COURT:  All right.  We'll deal with that when

22   it comes up.

23             All right.  Anything else?

24             MR. FINESTONE:  Thank you, Your Honor.

25             THE COURT:  Anything else for today?

1          MR. MONAGHAN:  Thank you, Your Honor.

2          THE COURT:  Nope?  Okay.  Thank you all very much.

3    We are adjourned.

4          MR. MONAGHAN:  Thank you, Your Honor.

5          MR. FINESTONE:  Thank you.

6        (Proceedings concluded at 11:29 a.m.)

7                          *****

8                       CERTIFICATION

9          I certify that the foregoing is a correct

10   transcript from the electronic sound recording of the

11   proceedings in the above-entitled matter to the best of my

12   knowledge and ability.

13

14

15

16

17

18   _____    August 24, 2022

19   Coleen Rand, AAERT Cert. No. 341

20   Certified Court Transcriptionist

21   For Reliable